EXHIBIT "A"

SP-338

Page 1 of 2

# New Jersey State Police Motor Vehicle Stop Report

A100-2020-00847728

09/09/2022

## General Information

| | | | | |
|---|---|---|---|---|
| CAD Incident No: | A100-2020-00847728 | Time Stopped: | 2135 | Pursuit: No |
| Unit: | A100 | Time Cleared: | 2158 | Entered Vehicle: Yes |
| Squad: | 2 | Duration: | 23 minutes | MVR Used: Yes |
| Date: | 08/10/2020 | MDC Data Lead to PC: No | | Supr. On Scene: No |
| County/Muni: | 0610 | Location: | STATE HIGHWAY 55 NORTH MP 24 | |
| SP Veh #: | 3513 | | | |

Reason For Initial MV Stop/Contact: MOVING VIOLATION

Basis For Entering Vehicle
Basis 1 For Entering Vehicle: DUI SEARCH (PC)                    Evidence Seized for Basis 1: No

| | | | | |
|---|---|---|---|---|
| Request for Consent Search: No | Supv. Badge: | Supv. Appr.: No | Time Supv. Contact: | Time Appr/Deny: |
| Request for K-9 Deployment: No | Supv. Badge: | Supv. Appr.: No | Time Supv. Contact: | Time Appr/Deny: |
| K-9 Deployed: No | Time K-9 Arrived: | | K-9 Alert: No | Consent Search: |
| Search Warrant: | Search Warrant County: | | Search Warrant Judge: | |

## Vehicle Information

| | | | | |
|---|---|---|---|---|
| Vehicle Year: | 2013 | Reg: ▮▮▮▮ (PA) | | MV Lookup: Yes |
| Make/Model: | Ford F-150 | Veh. Color: | BLACK | NCIC Hit: No |

## Driver Information

| | | | | |
|---|---|---|---|---|
| Driver Name: Bohdan J Zelechiwsky | Asked to Exit: Yes | | Sobriety Test: Yes | |
| OP License: ▮▮▮▮ (PA) | Frisked: No | Duty to Transport Frisk Only: No | Evid Seized (Frisk): No |
| DOB: 07/06/1951 | Searched: Yes | Was Search Incident to Arrest: No | Evid Seized (Search): No |
| Sex: M | CCH: No | Consent Request of Veh: No | |
| Race: WHITE | NCIC: Yes | Consent Request of Item: No | |
| Addr: 3108 LIMEPORT PI | SUMM: Yes | | WARM: No |
| COOPERSBURG PA 18036 | SUMN: No | | WARN: No |
| Use of Force: | Arrest: Yes | Warrant Check: Yes | Charges: 39:4-50 |

## Other Law Personnel and Case Numbers

| | |
|---|---|
| Invest Case #: | MVA Case #: |
| DD Case #: | OPR Case #: |

## Narrative/Comments

-MV Stop, moving violation, 39:4-88h
-Upon approach, made contact with driver, Bohdan Zelechiwsky and passenger Lisa Zelechiwsky
-Driver's eyes were observed to be watery, and glassy
-The driver was instructed out of the vehicle
-Driver failed SFST's and was arrested (DWI), handcuffed (double locked), searched (negative), advised of constitutional rights as per Miranda, and secured in rear of Troop car
-PC search as per motor vehicle exception of vehicle conducted with negative results
-As Per John's Law, the vehicle was released to Lisa Zelechiwsky
-Lisa Zelechiwsky showed no signs of impairment and had a valid drivers license
-Bohdan Zelechiwsky provided a BAC % of .00 - test only
-Bohdan Zelechiwsky released to Lisa Zelechiwsky at Port Norris Station

Page 2 of 2

## Persons Interacted With

| | |
|---|---|
| Name: Lisa A Zelechiwsky | |
| DOB: 10/20/1966 | |
| Sex: F | |
| Race: WHITE | |
| Addr: 3108 Limeport Pi | |
|     Coopersburg PA 18036 | |
| Use of Force: | |

| Asked to Exit: No | | Sobriety Test: No |
|---|---|---|
| Frisked: No | Duty to Transport Frisk Only: No | Evid Seized (Frisk): No |
| Searched: No | Was Search Incident to Arrest: No | Evid Seized (Search): No |
| CCH: No | Consent Request (Veh): No | |
| NCIC: No | Consent Request (Item): No | |
| SUMM: No | WARM: No | |
| SUMN: No | WARN: No | |
| Arrest: No | Warrant Check: No | Charges: |

| Rank: | 1st. Approval: | 2nd. Approval: | MVR Reviewer: |
|---|---|---|---|
| TPR. A DAVIS | SGT. M T LOWRY | SFC J I BLIZZARD | |
| # 8138 | # 6919 | # 6160 | |
| | Date: 08/16/2020 | Date: 08/19/2020 | Date: |
| Signature: | Signature: | Signature: | Signature: |

## 0610-E20-001331

YOU ARE HEREBY SUMMONED TO APPEAR BEFORE THIS COURT ON THE PAY BY DATE TO ANSWER THE COMPLAINT CHARGING YOU WITH THE OFFENSE LISTED. IF YOU PLEAD GUILTY AND PAY THE PENALTY AMOUNT OF $ 86 BEFORE THE SCHEDULED PAY BY DATE OF 08/24/2020. YOU DO NOT NEED TO APPEAR IN COURT
(SEE INSTRUCTIONS BELOW).

| Drivers License No: | 20040727 | D/L State: | PA |
| Date: | 07/31/2023 | | |

D/L Expiration Date: 07/31/2023       ☐ Commercial License

THE UNDERSIGNED CERTIFIES THAT

**BOHDAN J ZELECHIWSKY**         Telephone:         Weight:

3108 LIMEPORT PIKE          Birth Date: 07/06/1951    Height:

COOPERSBURG, PA 18036        Eyes: HAZEL       Restrictions: 0

                    Sex: M

AND DID UNLAWFULLY OPERATE A

| License Plate No. | Vehicle Make: FORD | Year: |
| **ZFP9856** | Color: BLK | Body Type: |
| | Plate State: PA | Exp Date: |

☐ Commercial Vehicle  ☐ Omnibus  ☐ Hazardous Material  ☐ Out of Service

AND DID COMMIT THE FOLLOWING OFFENSE

**39:4-123 - IMPROPER RIGHT AND LEFT TURNS-SEE SUBSECTIONS**

Date of Offense: 08/10/2020       Time: 21:35 PM

☐ Construction Zone   ☐ Safe Corridor   ☐ 65 MPH Zone

☐ Accident        ☐ Personal Injury   ☐ Death/Serious Bodily Injury

Location: @SH 55 NB MP 24 MILL
Municipality: MILLVILLE CITY          Mun. Code (Offense): 0610
                        County: CUMBERLAND

I certify that there are just and reasonable grounds to believe that you committed the above offense. I also certify that I will file this complaint in this court charging you with this offense.

| 08/10/2020 | *Ashly Davis* | 8138 |
| Date | TPR. A DAVIS | Officer ID |

1. GUILTY PLEA AND PAYMENT. If you wish to plead guilty and pay the penalty, you may make payment via the internet by logging onto www.njmcdirect.com or you may bring or mail this ticket and payment in the amount of the penalty to this court before the court date listed above. Payments by mail must be by check or money order made payable to this Municipal Court. Do not send cash. Please print the ticket number on the front of the check or money order. A receipt will be sent to you only if you send a self-addressed, stamped envelope along with payment.

2. PLEA OF NOT GUILTY. If you want to plead not guilty, you must notify the court at least 7 days before your scheduled pay by date or it may be necessary for you to make additional court appearances.

Amount of Penalty: $ 86       Pay By Date: 08/24/2020

TO MAKE PAYMENT VIA THE INTERNET OR FOR MORE INFORMATION, LOGON TO WWW.NJMCDIRECT.COM

### NOTICE

IF YOU FAIL TO APPEAR FOR YOUR SCHEDULED COURT DATE, THEN ADDITIONAL PENALTIES MAY RESULT. A WARRANT MAY BE ISSUED FOR YOUR ARREST, AND YOUR DRIVING PRIVILEGES IN NEW JERSEY MAY BE REVOKED. IF THIS IS A PARKING TICKET, YOUR FAILURE TO APPEAR SHALL BE CONSIDERED AN ADMISSION OF LIABILITY AND A DEFAULT JUDGEMENT MAY BE ENTERED AGAINST THE OWNER OF THE VEHICLE. EXCEPT FOR A PARKING TICKET, A RECORD OF THIS CONVICTION WILL BE SENT TO THE MOTOR VEHICLE COMMISSION (MVC) THAT ISSUED YOUR LICENSE.

IF YOU HOLD A COMMERCIAL DRIVERS LICENSE AND YOU ARE CONVICTED OF TWO OR MORE SERIOUS TRAFFIC VIOLATIONS, THE MVC MAY, DEPENDING ON YOUR RECORD, SUSPEND YOUR COMMERCIAL DRIVING PRIVILEGES EVEN IF THE VIOLATIONS WERE COMMITTED IN A NON-COMMERCIAL MOTOR VEHICLE. FOR MORE INFORMATION, VISIT THE OFFICIAL MVC WEBSITE AT WWW.NJMVC.GOV.

PLEASE NOTIFY COURT OF DISABILITY ACCOMMODATION NEEDS

**ROAD CONDITION**
☐ Wet   ☒ Dry   ☐ Ice   ☐ Snow

**AREA TYPE**
☐ Business  ☐ School  ☐ Residential  ☒ Rural

**TRAFFIC DENSITY**
☐ Light   ☒ Medium   ☐ Heavy

**VISIBILITY**
☒ Clear   ☐ Rain   ☐ Fog

**NARRATIVES:**

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION**

| | | |
|---|---|---|
| **BOHDAN J. ZELECHIWSKY** | : | |
| and | : | |
| **LISA A. ZELECHIWSKY,** | : | |
| 1940 Swamp Road | : | |
| Quakertown, PA 18953 | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs,** | : | |
| | : | **No.** |
| **vs.** | : | |
| | : | |
| **TROOPER ASHLEY DAVIS,** | : | |
| New Jersey State Police | : | |
| Troop A Woodstown | : | |
| 769 Rt. 40 | : | **Section 1983** |
| Pilesgrove, NJ 08098 | : | **Civil Rights Action** |
| | : | **NJCRA Action** |
| and | : | |
| | : | |
| **TROOPER JOHN DOE,** | : | |
| New Jersey State Police | : | |
| Troop A Woodstown | : | |
| 769 Rt. 40 | : | |
| Pilesgrove, NJ 08098 | : | **Jury Trial Demanded** |
| | : | |
| **Defendants.** | : | |

<u>**COMPLAINT**</u>

**NOW COMES**, the Plaintiffs, **BOHDAN J. ZELECHIWSKY and LISA**

**A. ZELECHIWSKY,** by and through their legal counsel, P. Joseph Nicola, Esquire,

and do hereby allege and aver the following:

1

## I.  **JURISDICTION AND VENUE**

1.  This action is instituted under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments, and under federal law, particularly the Civil Rights Act of 1871 hereinafter referred to as the "Act," as amended, 42 U.S.C. § 1983; as well as the New Jersey Civil Rights Act ("NJCRA") N.J. Stat. Ann. § 10:6-2, *et seq.*

2.  This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, § 1343(a)(3), § 1343(a)(4), and § 1367(a) regarding the principles of pendent and supplemental jurisdiction over related state law claims.

3.  Venue in the United States District Court for the District of New Jersey – Camden Division is properly laid pursuant to 28 U.S.C. § 1391, insofar as the alleged unlawful conduct asserted in this Complaint, which forms the factual and legal basis of the Plaintiffs' claims, arose within the geographical limits of this District in general and within the geographical limits of Millville City, Cumberland County, New Jersey, in particular.

## II.  **PARTIES**

4.  Plaintiffs Bohdan and Lisa Zelechiwsky (hereinafter "Bohdan" or "husband", or "Lisa" or "wife", collectively as "Plaintiffs") are adult individuals, with a home address of 1940 Swamp Road, Quakertown, PA 18953.

5.    Defendant Trooper Ashley Davis (hereinafter "Davis") is an adult individual who, at all times relevant hereto, was a New Jersey State Police Trooper assigned to Troop A Woodstown, located at 769 Route 40, Pilesgrove, NJ 08098, and was entrusted with the power, under color of law, to enforce the laws of the State of New Jersey, and to protect the Constitutional rights of those she encountered.

6.    Defendant Trooper John Doe (hereinafter "Doe") is an adult individual who, at all times relevant hereto, was a New Jersey State Police Trooper assigned to Troop A Woodstown, located at 769 Route 40, Pilesgrove, NJ 08098, and was entrusted with the power, under color of law, to enforce the laws of the State of New Jersey, and to protect the Constitutional rights of those he encountered.

## III.    **PRE-DISCOVERY FACTUAL ALLEGATIONS**

7.    On August 10, 2020, at or about 9:35 p.m., Plaintiff Bohdan J. Zelechiwsky, was operating his Ford Pickup Truck at SH 55 NB MP 24 MILL in Millville City, Cumberland County, New Jersey.

8.    Plaintiff Lisa A. Zelechiwsky was in the front passenger seat of the Ford being operated by her husband.

9.    The couple was returning home to Quakertown, Pennsylvania from a pleasant weekend trip to their beach house located in Cape May, New Jersey.

10.   Bohdan was obeying all traffic laws, and at all times operating his vehicle in a lawful manner.

11.   A marked New Jersey State Police vehicle operated by Trooper Ashley Davis, signaled with its overhead lights for the Ford to pull over, and Bohdan immediately complied.

12.   Again, at no time did Bohdan violate any traffic laws, or create any reason to be pulled over by Trooper Davis.

13.   Trooper Davis approached the passenger side of the Ford, Lisa lowered the passenger window, and Trooper Davis engaged the couple in conversation from the passenger side front window.

14.   Upon questioning, the couple advised that they were on a return trip home from their beach house and headed to Quakertown, PA.

15.   Trooper Davis advised Bohdan that he was pulled over for "weaving", an accusation both occupants instantly adamantly denied.

16.   Trooper Davis asked Bohdan to produce his driver's license, registration and insurance, which he promptly did.

4

17.   August of 2020 was in the heart of the Covid-19 pandemic in the world, and specifically in the State of New Jersey.

18.   Trooper Davis was not wearing a mask or taking any appropriate preventative precautions regarding the deadly virus, which was believed to be against the State of New Jersey and New Jersey State Police policies at that time.

19.   Trooper Davis took Bohdan's documentation back to her patrol vehicle for several minutes, and then returned to the driver's side of the vehicle and asked Bohdan to step out of the vehicle, and he complied.

20.   Without cause, Trooper Davis required Bohdan to perform Field Sobriety Tests, which he performed as well as an almost 70 year old man located on the side of a dark highway at night could perform.

21.   Trooper Davis's department issued Mobile Vehicle Recorder "MVR" was operational, as well as her "body cam" (camera), and should have capture the entire interaction between the Plaintiffs and Defendants, including husband's successful performance of the field sobriety tests.

22.   At some point Trooper Davis requested the presence of another State Trooper Unit and Trooper Doe arrived on the scene around the time the Field Sobriety Tests were being performed.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 11 of 261
PageID: 272
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 6 of 29 PageID: 6

23.    Both Troopers were advised that Bohdan had not consumed any alcohol, and that he was in no way intoxicated or impaired.

24.    Suddenly, and without probable cause, Trooper Davis physically placed Bohdan under arrest, handcuffed him, and placed him into her patrol vehicle at which point she threatened by stating "tell me how much you drank or I'll throw the book at you." Bohdan responded, "I had nothing to drink."

25.    Trooper Davis never subjected Bohdan to a portable breath test ("PBT").

26.    Trooper Davis demanded that Lisa produce her identification and she did.

27.    Lisa was directed to step out of the vehicle and to remove the family dog who was sitting in the rear. Lisa asked if he could please remain in the vehicle for his safety due to the fact that it would be unsafe to try to keep the young dog on the side of the highway at night. Davis responded, "Remove your dog." And Lisa did so.

28.    Trooper Davis then illegally searched the Plaintiffs' entire vehicle, and all Plaintiffs' possessions within the vehicle, including emptying the entire contents of their groceries as well as Lisa's purse on the car seat, and rummaged through them.

29.    Obviously, nothing of any criminal or evidentiary value was located within the vehicle or the grocery bags or the purse.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 12 of 261
PageID: 273
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 7 of 29 PageID: 7

30. Lisa protested to both Troopers, and again stated that there was no reason for her husband's arrest, as he was completely sober. Lisa told them that they had just eaten with the Heidecker family at a restaurant by their home and that they did not serve alcohol. But, the Troopers were not interested in confirming the fact that Bohdan had only drunk seltzer water and soda.

31. Trooper Davis transported Bohdan to the State Police Barracks, which was located approximately 40 minutes away, and Lisa followed in the Ford.

32. Trooper Doe left the scene as the search concluded, and despite the opportunity and duty to do so, never intervened in halting Trooper Davis's unconstitutional stop, search, seizure, arrest or transport.

33. Bohdan was taken to the Barracks and Trooper Davis handcuffed him to a bench upon arrival.

34. Lisa was told to enter through the rear of the Barracks and to wait in a designated room for the release of her husband.

35. Just as Davis and Doe, Troopers within the station were not wearing masks or taking any Covid-19 preventative measures as believed to be required by law and policy at that time, and no one replaced on Bohdan's face the mask which hung below his chin at that time.

36. Another Trooper, not Davis, approached Bohdan who remained handcuffed to the bench, and then brought him to a breathalyzer machine.

37.    Bohdan performed the requested test and on two occasions, registered each
       of which a 0.0 BAC.

38.    Despite this additional clear evidence of sobriety, Bohdan was returned to
       the bench and re-handcuffed.  No other tests were performed.

39.    Some time passed and Bohdan was again approached by Trooper Davis
       who provided him with a traffic citation "Improper Right and Left Turns
       (39:4-123)," stating "here's your citation, go."

40.    Bohdan was held in the State Police Barracks for roughly two (2) hours
       against his will and without cause.

41.    Bohdan and his wife then entered their car and returned home to
       Quakertown, in complete shock and disgust over the police abuse they had
       just encountered.

42.    The stop of the Plaintiffs' vehicle was pre-textual and unjustified, and was
       the product of un-Constitutional conduct.

43.    Plaintiff believes the arrest was a ploy, simply to permit Trooper Davis to
       investigate her incorrect "hunch" and to conduct an illegal search of the
       vehicle and its contents.

44.    Plaintiff Bohdan was never served with any paperwork regarding the
       search of his vehicle; and Plaintiff Lisa was never served with any
       paperwork regarding the search of her purse.

45.    The Plaintiffs believe and therefore aver that Defendant Trooper Davis
       would unlawfully criminally prosecute Bohdan, even though it was clear
       that he had not committed a crime. Moreover, she accomplished this by
       falsely swearing to a knowingly untrue Traffic Citation under 39:4-123
       Improper Right and Left Turns.

46.    Because of the false charge brought by Defendant Davis against Bohdan,
       he has had to make multiple efforts to defend against the citation.

47.    As a direct and proximate result of the acts, and omissions committed by
       the named Defendants herein, as detailed above, and as further articulated
       in the paragraphs which follow, Plaintiff(s) was/were caused to suffer,
       inter alia, the following past and future harms, injuries and damages, some
       or all of which may be permanent and/or continuing in nature:

       a.    loss of liberty;

       b.    invasion of privacy and freedom of association;

       c.    damage to reputation;

       d.    emotional distress and anguish;

       e.    loss of life's pleasures;

       f.    loss of consortium;

       g.    loss of income; and

       h.    attorney's fees and costs.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 15 of 261
PageID: 276
Case 1:22-cv-04994-CPO-AMD   Document 1   Filed 08/10/22   Page 10 of 29 PageID: 10

48.  The acts and/or omissions of the Defendants, or one or more of them, evidenced a deliberate indifference to the rights guaranteed to individuals such as Plaintiffs, under the Fourth and Fourteenth Amendments to the United States Constitution, and New Jersey Constitution.

49.  At all times relevant, the legal principles regarding the rights of persons, such as Plaintiffs, and the contours of those Constitutional and statutory rights, were well-established, and it was not reasonable for any Defendant to believe that his/her actions would not deprive the Plaintiffs of those rights.

50.  At all times during the events described herein, the Defendants were engaged in one or more joint ventures which combined to produce the Constitutional violations and other harms asserted herein. The Defendants assisted each other in performing the various actions described, and lent their physical presence, support and/or authority to one another.

51.  The Plaintiffs further believe and therefore aver, that without the intervention of this Honorable Court, the Plaintiffs, as well as others, may suffer from state and federal rights violations similarly and that, consequently, injunctive relief is demanded, and required.

52.  The Defendants, individually and collectively, at all times pertinent to the claims asserted herein, acted under color of law.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 16 of 261
PageID: 277
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 11 of 29 PageID: 11

53.    While acting under color of law, the Defendants deprived the Plaintiffs of various State and Federal Constitutional rights as more fully set forth herein.

54.    The State Police Defendants are sued in their individual capacities pursuant to 42 U.S.C. § 1983 ("Section 1983"), for their actions, all of which occurred under color of law and, accordingly, neither 11th Amendment immunity, nor sovereign immunity applies.

55.    Relative to the pendant state claims asserted, the State Police Defendants' acts and omissions are not subject to sovereign immunity (state legislated immunity, Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, 40:48-2.49 (the TCA)) because the TCA does not apply to either Plaintiff's § 1983 claims, nor Plaintiffs' NJCRA claims.  The injunctive relief sought against these Defendants is sought in their official capacities for which they are likewise not immunized.

### COUNT I
**42 U.S.C. § 1983**
**Unlawful Seizure / False Arrest**
*Plaintiffs Against Individual Defendants Davis and Doe*

56.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

57.    The conduct of Defendants Davis and Doe constituted an unlawful seizure of the Plaintiffs, within the meaning of the Fourth Amendment.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 17 of 261
PageID: 278
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 12 of 29 PageID: 12

58.   Said seizure was made by warrantless arrest of Bohdan and an unlawful seizure of Lisa and was unreasonable and without probable cause or reasonable suspicion, in that the facts and circumstances available to the Defendants would not warrant a prudent officer in believing that the Plaintiffs had committed or were committing a crime, which would justify their seizure and/or arrest.

59.   The Plaintiffs were subjected to this unlawful seizure and arrest in violation of the Fourth Amendment of the United States Constitution.

60.   As a result of the unlawful seizure and false arrest affected upon the Plaintiffs, the Plaintiffs suffered damages as stated herein.

61.   Defendants are personally liable for their direct involvement in the commission of the acts complained of here.

62.   The Defendants' stopping the Plaintiff's vehicle, without probable cause, without reasonable suspicion that it violated the vehicle code and then conducting a warrantless search of the vehicle and the contents of wife's purse, and then arresting, handcuffing and detaining the husband and transporting him to headquarters where he was handcuffed to a bench, without probable cause to believe that he had committed any crime, and then issuing him a pretextual 'signal-use' citation, when his breathalyzer test demonstrated that he had consumed no alcohol, demonstrates a

reckless and callous indifference to the federally protected rights of the Plaintiffs and, Defendant Davis's conduct and her communications also demonstrated that her conduct was intentional or impelled by evil motive or intent, all warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiffs respectfully requests that this Honorable Court award judgment in Plaintiffs' favor and against Defendants Davis and Doe, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the United States District Court, District of New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

<u>**COUNT II**</u>
**42 U.S.C. § 1983**
**False Imprisonment**
***Plaintiff Bohdan Against Individual Defendants Davis And Doe***

63.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

64.    Defendants Davis and Doe either individually, or acting in concert, subjected Plaintiff Bohdan to false imprisonment in violation of his Constitutionally protected Fourth Amendment rights.

65.    The Defendants deliberately arrested, and thereafter deliberately further detained, the Plaintiff in custody.

66.    Said detention was unlawful because it lacked probable cause.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 19 of 261
PageID: 280
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 14 of 29 PageID: 14

67.  The facts and circumstances, which were within the knowledge of the
Defendants at the time of Plaintiff's arrest, were not sufficient to warrant
a man of reasonable caution to believe that Plaintiff had committed or was
committing a crime for which an arrest or imprisonment was authorized
under the law.

68.  As a result of being subjected to False Imprisonment, in violation of his
Constitutionally protected rights under the Fourth Amendment, Plaintiff
Bohdan suffered the damages alleged herein.

69.  The Defendants' stopping the Plaintiff's vehicle, without probable cause,
without reasonable suspicion that it violated the vehicle code and then
conducting a warrantless search of the vehicle and the contents of wife's
purse, and then arresting, handcuffing and detaining the husband and
transporting him to headquarters where he was handcuffed to a bench,
without probable cause to believe that he had committed any crime, and
then issuing him a pretextual 'signal-use' citation, when his breathalyzer
test demonstrated that he had consumed no alcohol, demonstrates a
reckless and callous indifference to the federally protected rights of the
Plaintiffs and, Defendant Davis's conduct and her communications also
demonstrated that her conduct was intentional or impelled by evil motive
or intent, all warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff Bohdan's favor and against Defendants Davis and Doe, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the United States District Court, District of New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

<div align="center">

**COUNT III**
**42 U.S.C. § 1983**
**Unlawful Search in Violation of Fourth Amendment**
***Plaintiffs Against Individual Defendants Davis and Doe***

</div>

70. The preceding paragraphs are incorporated herein by reference as though fully set forth.

71. Freedom from intrusion into one's vehicle and belongings is an archetype of the privacy protection secured by the Fourth Amendment.

72. Warrantless searches are presumptively unreasonable under the Fourth Amendment.

73. The above named Defendants, violated Plaintiffs' Fourth Amendment rights actionable under 42 U.S.C. § 1983 by causing, assisting, facilitating, aiding and abetting, and conducting a warrantless intrusion into, and search of, Plaintiffs' motor vehicle and its contents, including wife's purse, on August 10, 2020, over Plaintiffs' express objection.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 21 of 261
PageID: 282
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 16 of 29 PageID: 16

74.    The above named Defendants physically restrained husband and arrested and removed him and directed wife to remove herself from their motor vehicle in order to facilitate Defendants' unlawful search of the vehicle and its contents.

75.    These acts constituted blatant violations of the Plaintiffs' rights under the Fourth Amendment and cognate provisions of New Jersey's Constitution, and directly and proximately caused the damages and losses stated herein.

76.    These acts also demonstrated a reckless or callous indifference to the federally protected rights of the Plaintiffs and constitute conduct which was intentional or otherwise impelled by evil motive or intent, thereby justifying the imposition of punitive damages, as well as compensatory damages.

**WHEREFORE,** Plaintiffs respectfully requests that this Honorable Court award judgment in Plaintiffs' favor and against Defendants Davis and Doe, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the United States District Court, District of New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

Case 1:22-cv-04994-ESK-AMD   Document 52-6   Filed 09/13/24   Page 22 of 261
PageID: 283
Case 1:22-cv-04994-CPO-AMD   Document 1   Filed 08/10/22   Page 17 of 29 PageID: 17

## COUNT IV
## 42 U.S.C. § 1983
## Malicious Prosecution
### *Plaintiff Bohdan Against Individual Defendant Davis*

77.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

78.   On August 10, 2020, Plaintiff Bohdan was falsely charged by Defendant Davis via Criminal Citation.

79.   The Plaintiff was charged with one count of Improper Right and Left Turns, 39:4-123.

80.   Defendant Davis, despite the passage of two (2) years, continues to delay the court proceeding in this matter, due to her knowingly unconstitutional conduct, which she would be required to testify about in order to further her unconstitutional prosecution.

81.   Defendant Davis violated the Plaintiff's Fourth Amendment rights by wrongfully initiating the prosecution of Plaintiff Bohdan for the said offense.

82.   The aforesaid criminal prosecution was designed, procured, facilitated, and promoted by Defendant Davis as a pretext, defense and unwarranted justification for the Defendants' unlawful and un-Constitutional violation of the Plaintiffs' state and federally protected Constitutional rights.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 23 of 261
PageID: 284
Case 1:22-cv-04994-CPO-AMD   Document 1   Filed 08/10/22   Page 18 of 29 PageID: 18

83.   The Defendant lacked probable cause to initiate the said criminal

proceeding against the Plaintiff.

84.   The criminal proceeding in the case will end in Plaintiff's favor.

85.   Our Supreme Court has stated that, in enacting the Civil Rights Act:

> Congress clearly conceived that it was altering the
> relationship between the States and the Nation with
> respect to the protection of federally created rights; it was
> concerned that state instrumentalities could not protect
> those rights; it realized that state officers might, in fact, be
> antipathetic to the vindication of those rights; and it
> believed that these failings extended to the state courts....
> The very purpose of § 1983 was to interpose the federal
> courts between the States and the people, as the guardians
> of the people's federal rights—to protect the people from
> unconstitutional action under color of state law...."

*Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705
(1972).

86.   The sole basis upon which to deny the Plaintiff relief for his claim for

malicious prosecution would ordinarily be the lack of a favorable outcome

to his citation, which despite his best efforts, remains pending.

87.   However, Defendant Davis has succeeded in continuing to prolong that

favorable result for over two years, in an obvious effort to preclude its

forming a basis for bringing a malicious prosecution claim within the two

year statute for the other causes of action prosecuted here.

88.   The Defendant's refusal to permit a magistrate to determine the invalidity

of the summary prosecution at issue here, as a shield to the within

malicious prosecution claim, undermines what the Third Circuit has called

"one of the Civil Rights Act's *raisons d'etre*, i.e., to interpose the federal

courts, as guardians of federal civil rights, between the authority of the

states and the people." *Montgomery v. De Simone*, 159 F.3d 120, 125 (3d

Cir. 1998) (internal citations omitted).

89.    Given the foregoing, this court should interpose itself as the guardian of

Plaintiff's federal right to be free from malicious prosecution by permitting

the prosecution of his malicious prosecution claim under the extant

circumstances.

90.    The Defendants acted maliciously, as stated, or for a purpose other than

bringing the Plaintiff to justice.

91.    As a consequence of the criminal proceeding, the Plaintiff suffered

damages for the injuries set forth herein.

92.    The Defendants' stopping the Plaintiff's vehicle, without probable cause,

without reasonable suspicion that it violated the vehicle code and then

conducting a warrantless search of the vehicle and the contents of wife's

purse, and then arresting, handcuffing and detaining the husband and

transporting him to headquarters where he was handcuffed to a bench,

without probable cause to believe that he had committed any crime, and

then issuing him a pretextual 'signal-use' citation, when his breathalyzer

test demonstrated that he had consumed no alcohol, demonstrates a reckless and callous indifference to the federally protected rights of the Plaintiffs and, Defendant Davis's conduct and her communications also demonstrated that her conduct was intentional or impelled by evil motive or intent, all warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendant Davis, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the United States District Court, District of New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

## COUNT V
### 42 U.S.C. § 1983
### Failure to Intervene
### *Plaintiffs Against Defendant Doe*

93.    The preceding paragraphs are incorporated herein by reference as though fully set forth at length herein.

94.    Defendant Doe should have intervened in the unConstitutional seizure, arrest, search and prosecution of the Plaintiff(s) initially effected and/or promoted by Defendant Davis.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 26 of 261
PageID: 287
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 21 of 29 PageID: 21

95.    Defendant Doe had a realistic and reasonable opportunity to intervene to
       prevent the Constitutional violations of Plaintiff(s) federally protected
       rights as claimed herein, but did not.

96.    Officer Doe had multiple opportunities to intervene in the multi-stage
       events which occurred – beginning from the moment he realized, or should
       have realized that there was no probable cause to arrest the husband, search
       the Plaintiffs' car or search the wife's purse, all without warrant authority
       and/or consent.

97.    Because these violations of the Plaintiffs' Constitutional rights were not
       brief, and were ongoing, and because Defendant Doe was at all pertinent
       times in the immediate vicinity of the Plaintiffs, Defendant Doe had a
       reasonable and realistic opportunity to intervene, as well as a duty to do
       so, but did not.

98.    Said intervention could reasonably have taken the form of oral
       communications and/or physical intervention.

99.    Defendant Doe's failure to intervene given the realistic and reasonable
       opportunities made available to him, substantially increased the risk of, it
       not induced and ratified, the violation of Plaintiff(s) Constitutional rights
       complained of herein.

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 27 of 261
PageID: 288
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 22 of 29 PageID: 22

100.    Defendant Doe's failure to intervene renders him jointly and severally liable with Defendant Davis for each and all of the harms and damages supported by Plaintiff as alleged herein, including Plaintiff's false arrest, unlawful search and seizure and false imprisonment and malicious prosecution.

101.    The Defendants' stopping the Plaintiff's vehicle, without probable cause, without reasonable suspicion that it violated the vehicle code and then conducting a warrantless search of the vehicle and the contents of wife's purse, and then arresting, handcuffing and detaining the husband and transporting him to headquarters where he was handcuffed to a bench, without probable cause to believe that he had committed any crime, and then issuing him a pretextual 'signal-use' citation, when his breathalyzer test demonstrated that he had consumed no alcohol, demonstrates a reckless and callous indifference to the federally protected rights of the Plaintiffs and, Defendant Davis's conduct and her communications also demonstrated that her conduct was intentional or impelled by evil motive or intent, all warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiffs respectfully requests that this Honorable Court award judgment in Plaintiffs' favor and against Defendants Davis and Doe, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar

Case 1:22-cv-04994-ESK-AMD   Document 52-6   Filed 09/13/24   Page 28 of 261
PageID: 289
Case 1:22-cv-04994-CPO-AMD   Document 1   Filed 08/10/22   Page 23 of 29 PageID: 23

($150,000.00) limit for arbitration in the United States District Court, District of New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

### COUNT VI
### State Claim
### Violation Of The NJCRA
### *Plaintiff Bohdan Against Individual Defendants Davis and Doe*

102.   The preceding paragraphs are incorporated herein by reference as though fully set forth herein.

103.   The New Jersey Civil Rights Act ("NJCRA") N.J. Stat. Ann. §10:6-2(c) provides that, "[a]ny person who has been deprived of any substantive rights, privileges, or immunities secured by the constitution or laws of this state by a person acting under the color of law, may bring a civil action for damages."

104.   When it enacted the NJCRA, the New Jersey State Legislature, intended it as an analogue to 42 U.S.C. §1983, and sought to incorporate existing §1983 jurisprudence. *Perez v. Zagami*, 218 N.J. 202, 515, 93 A.3d 869 (2014); *Ramos vs. Flowers*, 429 N.J. Super. 13, 23, 56 A.3d 869 (App. Div. 2012) (stating that the NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights") (citation omitted).

105.    The Third Circuit has, in fact, adopted its analogous application as a matter
of law. "The NJCA is interpreted as analogous to §1983" *Szemple v. Corr.
Med. Servs.*, 493 F. App'x. 238, 241 (3d Cir. 2012) aff'd. 747 F. Appx. 73
(3d Cir. 2018); same, *Ortiz v. New Jersey State Police*, No. 16-7976, 2017
WL 3671307, at *2 (D.N.J. Aug. 25, 2017); Accord, *Estate of Roman v.
City of Newark*, 914 F.3d 784, 796 n.5 (3d Cir. 2019).

106.    Accordingly, Plaintiff hereby incorporates by reference as if set forth *et
extenso* here, all the preceding paragraphs, including most particularly
those which set forth Plaintiff's causes of action under 42 U.S.C. § 1983
and all damages, injuries and losses associated therewith, with the
exception of substituting therefore the attorney's fees any costs awardable
under the NJCA and the punitive damages awardable under New Jersey's
Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9, *et. seq.*; and any loss
of consortium claims for both Plaintiff's which the court may find
actionable under the NJCRA.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court
award judgment in Plaintiff's favor and against Defendants Davis and Doe, jointly
and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar
($150,000.00) limit for arbitration in the United States District Court, District of

New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

## COUNT VII
### State Constitutional Violations
#### *Plaintiffs Against All Defendants*

107.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

108.  The conduct of the Defendants, as alleged herein, was violative of the Plaintiffs' rights under the cognate provisions of the New Jersey Constitution which have either been interpreted as being co-extensive with the rights afforded to the Plaintiffs under the United States Constitution, or more extensive than those rights as interpreted by our Supreme Court.

109.  To the extent that Plaintiffs' ability to assert a private cause of action for damages under the New Jersey Constitution has not been settled by the Supreme Court of New Jersey, Plaintiffs preserve those claims.

110.  To the extent that Plaintiffs' ability to assert a claim for injunctive / equitable relief has been confirmed by all Courts of competent jurisdiction, including the New Jersey Supreme Court, Plaintiffs herewith assert that, without the grant of appropriate injunctive equitable relief by this Court, the acts of the Defendants which gave rise to this action, will continue

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 31 of 261
PageID: 292
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 26 of 29 PageID: 26

unabated; that monetary damages alone would not act as a sufficient deterrent to future unConstitutional conduct by these Defendants and each of them; and that the likelihood of the Plaintiffs, and others similarly situated, being subjected to future Constitutional deprivations by these Defendants, or one or more of them, is real and not imagined, and even likely.

111.   Accordingly, Plaintiffs hereby claim not only the right to damages as alleged herein but also, equitable relief sufficient to prevent the Constitutional violations asserted here from recurring, and that such equitable relief be awarded in whatever form the Court deems right and just so to do.

112.   The Defendants' stopping the Plaintiff's vehicle, without probable cause, without reasonable suspicion that it violated the vehicle code and then conducting a warrantless search of the vehicle and the contents of wife's purse, and then arresting, handcuffing and detaining the husband and transporting him to headquarters where he was handcuffed to a bench, without probable cause to believe that he had committed any crime, and then issuing him a pretextual 'signal-use' citation, when his breathalyzer test demonstrated that he had consumed no alcohol, demonstrates a reckless and callous indifference to the federally protected rights of the

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 32 of 261
PageID: 293
Case 1:22-cv-04994-CPO-AMD    Document 1    Filed 08/10/22    Page 27 of 29 PageID: 27

Plaintiffs and, Defendant Davis's conduct and her communications also demonstrated that her conduct was intentional or impelled by evil motive or intent, all warranting the imposition of punitive damages.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court award judgment in Plaintiffs' favor and against Defendants Davis and Doe, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the United States District Court, District of New Jersey, together with punitive damages, awardable legal fees and costs and any such further relief as the Court shall deem appropriate.

## OTHER

113.  Plaintiff respectfully requests a jury trial.

114.  The within case is not subject to arbitration.

115.  Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages and any other damages deemed appropriate by the Court.

116.  Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their present and continued effects.

117.  The conduct of each Defendant was willful, wanton, deliberate, intentional and calculated to bring about the very Constitutional harms which were

Case 1:22-cv-04994-ESK-AMD    Document 52-6    Filed 09/13/24    Page 33 of 261
PageID: 294
Case 1:22-cv-04994-CPO-AMD   Document 1   Filed 08/10/22   Page 28 of 29 PageID: 28

visited upon Plaintiff and constitute reprehensible and outrageous acts not to be tolerated in a civilized society, warranting the imposition of punitive as well as compensatory damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court for each Count alleged:

a. Award compensatory damages to Plaintiff against the Defendants, jointly and severally, in an amount in excess of $150,000.00 per Count exclusive of interest and costs;

b. Award punitive damages to Plaintiff against the individual Defendants in their individual capacities, jointly and severally, in an amount in excess of $150,000.00 per Count exclusive of interest and costs;

c. Award reasonable attorney's fees and costs to the Plaintiff, as may be awardable pursuant to 42 U.S.C. Section 1988, the Civil Rights Attorney's Fees Award Act of 1976, or any other applicable provisions and/or the NJCRA, as applicable;

d. Enter an Order enjoining Defendants from engaging in the future in the conduct identified in the Complaint as violative of 42 U.S.C. §§ 1983, the 4th and 14th Amendments of the Constitution of the United States, the cognate provisions of the New Jersey Constitution the NJCRA; and further affirmatively requiring the Defendants to engage in appropriate

remedial efforts to adopt, and enforce, policies that are calculated and

intended to preclude the conduct alleged to have been engaged in by

the Defendants named herein; and

e.  Award such other and further relief, as this Court may deem appropriate.


Respectfully Submitted,


Dated:  August 9, 2022                    By: _____

P. Joseph Nicola, Esquire
N.J. Attorney I.D. # 02531980
1420 Locust Street, Suite 140
Philadelphia, PA 19102
(856) 229-2454
jnicola@nicolalaw.com
Attorney for Plaintiff

# EXHIBIT "C"

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL DOCKET: 1:22-cv-04994-CPO-AMD

BOHDAN J. ZELECHIWSKY
and LISA A.
ZELECHIWSKY,                    CIVIL ACTION

        Plaintiffs,             DEPOSITION
                                TESTIMONY OF:
    vs.
                                BOHDAN ZELECHIWSKY
TROOPER ASHLEY DAVIS,

        Defendant.

TAKEN VIA VIDEOCONFERENCE BEFORE:  LYNN SMITH, a

Certified Court Reporter of the State of New Jersey,

License No. XI01520, on Monday, May 6, 2024,

commencing at 10:05 a.m.

WORD FOR WORD REPORTING, LLC
CERTIFIED COURT REPORTERS & VIDEOGRAPHERS
6 NORTH BROAD STREET, SUITE 302
WOODBURY, NEW JERSEY  08096
Ph: 856) 384-2773 Fax: (856) 384-2779

---

**Page 2**

APPEARANCES:

KAROLY LAW FIRM
527 Hamilton Street
Allentown, Pennsylvania 18101
(610) 437-1252
BY: JOSHUA E. KAROLY, ESQUIRE
For the Plaintiffs

KENT/McBRIDE, P.C.
1040 Kings Highway North, Suite 600
Cherry Hill, New Jersey 08034
(856) 667-3113
BY: DIANA R. BROCCO, ESQUIRE
For the Defendant

ALSO PRESENT:

LISA ZELECHIWSKY

---

**Page 3**

I N D E X

WITNESS                              PAGE

BODHAN ZELECHIWSKY

    Examination By Ms. Brocco       4, 145
    Examination By Mr. Karoly       138

E X H I B I T S

NUMBER      DESCRIPTION              ID.

        (No exhibits were marked
        at this time.)

WORD FOR WORD REPORTING, LLC

---

**Page 4**

B O D H A N   Z E L E C H I W S K Y,
having been first duly sworn, testified as follows:
EXAMINATION BY MS. BROCCO:
    Q.   Hi, Mr. Zelechiwsky.  Is that the right way
to pronounce your name?
    A.   That's fine, yes.
    Q.   Okay.  So, as you know, today we're here for
your deposition, which is simply a question and
answer session, wherein I will be asking you
questions, and you will be providing me answers to
those questions.
         Do you understand?
    A.   Understood.
    Q.   I understand that you are an attorney, so
you're extremely familiar with the process, more so
than most witnesses that I depose.  But
nonetheless, I'm still going to go through my spiel
and instructions to make the process go a little more
smoothly.  Okay?
    A.   Understood.
    Q.   First, keep all of your responses spoken or
verbal.  That means yes or no, when my question calls
for such a response.  If you do um-hum or uht-uht,
shake your head, I will remind you, is that a yes, is
that a no.  I am not being rude, I am just trying to

WORD FOR WORD REPORTING, LLC

5

1  keep a clear record because, as you know, the court
2  reporter on the screen can only take down the spoken
3  word. Okay?
4      A.  Understood.
5      Q.  Additionally, please allow me to finish my
6  question in its entirety before you provide an
7  answer. As you know, the court reporter can only
8  take down one person at a time. And also, your
9  attorney only wants you to answer questions that are
10 actually being asked. So, therefore, if you do
11 interrupt me, I will say to you, please allow me to
12 finish my question. Again, I am not being rude, I am
13 just trying to keep a clear record.
14          Do you understand?
15     A.  Yes, I do.
16     Q.  Okay. Additionally, if you do not hear a
17 question, if you do not understand a question, if for
18 some reason we have a technical difficulty, please
19 tell me to rephrase my question or repeat it until
20 you do understand it, and I will be happy to do so.
21 Obviously, you know how important a deposition
22 transcript is. It is what I like to refer to as the
23 lawyer's Bible. That means that, of course, every
24 question that's on there, and all of your responses,
25 otherwise known as your testimony, are supposed to be

6

1  true and accurate. So again, if you do not
2  understand something, please tell us. Because when
3  we do refer to the transcript, we will assume that
4  you did answer truthfully and accurately. Okay?
5      A.  Yes.
6      Q.  Obviously, you've been sworn in, and you know
7  that you are under penalty of perjury. And although
8  you are in the informal setting of your attorney's
9  office, as you know, your testimony here today takes
10 the same force and effect as if you were before a
11 judge and/or a jury. Okay?
12     A.  Um-hum.
13     Q.  If for any reason you should need a break
14 during the course of this proceeding, then please
15 tell us, and we will be happy to accommodate you. I
16 may take a five-minute break, just a comfort break,
17 but I usually do not take very long breaks, and I
18 certainly will not be breaking for lunch, so. And
19 then once we're completed with your deposition, we
20 will start your wife's. Okay?
21     A.  Sounds fine.
22     Q.  Okay. Have you ever had your deposition
23 taken before for any reason?
24     A.  Not that I can -- no.
25     Q.  Okay.

7

1      A.  Not that I recall.
2      Q.  Okay.
3          MR. KAROLY: And, counsel, I assume
4  standard stipulations?
5          MS. BROCCO: Standard stipulations.
6          MR. KAROLY: For objections?
7          MS. BROCCO: Sure. Standard
8  stipulations. But we really don't have that in New
9  Jersey. But okay.
10         MR. KAROLY: All right. We have it in
11 federal depositions, period. But I guess, then, just
12 for the record, my client waives the reading and
13 signing, waives the presence of a court reporter, and
14 all objections as to form are reserved to the time of
15 trial.
16         MS. BROCCO: No objection.
17         MR. KAROLY: Thank you.
18     Q.  So may I have your full -- oh, are you on any
19 medications today, sir?
20     A.  All -- the only medication that I am on today
21 is I take a half a baby aspirin, and for my -- I take
22 Synthroid --
23     Q.  Okay.
24     A.  -- for my thyroid.
25     Q.  And were you on those medications at the time

8

1  of the incident of August 10th, 2020?
2      A.  Yes, I was.
3      Q.  Okay. May I have your full name for the
4  record.
5      A.  Bodhan John Zelechiwsky.
6      Q.  And what's your date of birth?
7      A.  July 6, 1951.
8      Q.  How old are you now?
9      A.  72.
10     Q.  At the time of the incident, how old were
11 you?
12     A.  70 or 71. 70, I believe.
13     Q.  The incident occurred, it's almost four years
14 ago, so --
15     A.  So I was 68, 69.
16     Q.  Okay.
17     A.  Happened in August, I believe.
18     Q.  Yeah, August 10th, yes.
19     A.  So I was 69.
20     Q.  And what is your current address?
21     A.  1940 Swamp Road, Quakertown, Pennsylvania.
22 ZIP is 18951.
23     Q.  How long have you lived there?
24     A.  Four years -- approximately four or five
25 years.

9

1    Q.   And who do you live there with?

2    A.   My beautiful wife.

3    Q.   And that's Lisa?

4    A.   Yes.

5    Q.   Do you have any children?

6    A.   Yes.  Not living with me.  All my children

7  are grown and -- between the two of us, we have six

8  adult children.

9    Q.   And what are their names and ages?

10   A.   My children are Sophia, she's 42.  Adrian, my

11  son, he's 39, 40.  Zenia, she's like 32 or so.  And

12  then Roman, he's 30.  And then there's Krista, and I

13  think Krista's almost.

14            LISA ZELECHIWSKY:  She's 35.

15   A.   I'm sorry.  My wife corrected me.

16   Q.   Yeah, she's not supposed to correct you.

17   A.   I know that.  But --

18   Q.   I can always ask her to clarify later on.

19   A.   They're between 35 and 40.  And then Dana's

20  like 31 or so, the youngest.

21   Q.   Okay.  So who are the children born of your

22  marriage, if any?

23   A.   Sophia, Adrian, Cynthia, Roman.  When you say

24  of my marriage, not to my wife, Lisa.  These are --

25   Q.   That's what I'm trying to clarify.  Is this

WORD FOR WORD REPORTING, LLC

10

1  --

2    A.   None.  There's no children born of this

3  marriage.

4    Q.   Okay.  And what's your date of marriage to

5  Lisa, please?

6    A.   You know, it's October -- no, it's May 20th,

7  and I can't think of the year.

8    Q.   How long have you been married?  You can

9  estimate.

10   A.   Approximately 10 years.  I'm horrible with

11  dates.

12   Q.   Okay.

13            MR. KAROLY:  That's all right.  Doesn't

14  matter.

15   Q.   And before Lisa, were you married?

16   A.   Yes.

17   Q.   And who were you married to?

18   A.   Anita.

19   Q.   And how long were you married to Anita?

20   A.   Approximately 10 years.  A little bit less

21  than 10, nine.

22   Q.   Okay.  If you can't remember the date of your

23  marriage, since this is -- I mean, this is a per

24  quod.  Lisa has a per quod.  So I would need to know

25  that for sure.

WORD FOR WORD REPORTING, LLC

11

1            So I'll ask Lisa.  I'm sure she'll know

2  her exact date of marriage.

3    A.   She's good on dates.  I'm quite the opposite.

4    Q.   So can you please tell me whether or not you

5  are currently employed?

6    A.   I hope I am, yes.

7    Q.   Okay.  And where do you work?

8    A.   I work in Allentown, Pennsylvania.

9    Q.   And what do you do?

10   A.   I practice law.

11   Q.   How long have you been practicing law?

12   A.   Since '78, '79.

13   Q.   Where did you go to school?

14   A.   Undergraduate or law school?

15   A.   Both.  High school first.

16   A.   I went to Franklin High School.

17   Q.   And where is that?

18   A.   In Somerset County, New Jersey.

19   Q.   What year did you graduate?

20   A.   1969.

21   Q.   And then where did you go to college?

22   A.   I went to Moravian University in Bethlehem,

23  Pennsylvania.

24   Q.   What year did you graduate?

25   A.   '73.

WORD FOR WORD REPORTING, LLC

12

1    Q.   And where did you go to law school?

2    A.   Vermont Law School.  And I graduated in 1976.

3    Q.   You went straight through?

4    A.   Pardon?

5    Q.   You went straight through?

6    A.   Correct.

7    Q.   And once you graduated law school, I assume

8  that you took the bar exam, true?

9    A.   I took the Pennsylvania bar exam, correct.

10   Q.   And is that the only state you're licensed in

11  currently?

12   A.   Correct.  I'm only licensed in Pennsylvania.

13   Q.   And that was always the case?

14   A.   That was always the case.

15   Q.   And tell me a little bit about your practice

16  of law.  What is your specialty areas?

17   A.   I'm a jack of all trades, and a master of

18  none.  I have a general practice, but I do a lot of

19  criminal, family, and civil.  I am also a part-time

20  solicitor, doing dependency work for the County of

21  Northampton.  And prior to that, I was a part-time

22  solicitor in the public defender's office for

23  approximately 18 years.

24   Q.   Part-time solicitor in whose office, please?

25   A.   Public defender's, of Northampton County.

WORD FOR WORD REPORTING, LLC

13

1    Q.    And what is the name of your law firm,
2    currently?
3    A.    **Zelechiwsky Law Office.**
4    Q.    Zelechiwsky & Zelechiwsky?
5    A.    **No. Just Zelechiwsky.**
6    Q.    Oh. And how long have you -- you're a solo
7    practitioner?
8    A.    **Correct.**
9    Q.    Do you have anybody who works for you?
10   A.    **Yes.**
11   Q.    How many people work for you?
12   A.    **I have one full-time, and one part-time.**
13   Q.    One full-time attorney or --
14   A.    **No. Paralegal.**
15   Q.    So, one full-time paralegal, and one
16   part-time secretary, lawyer?
17   A.    **Paralegal. Robin -- I think it's Rivera now.**
18   **She's married.**
19   Q.    So, it's the three of you that run the firm,
20   true?
21   A.    **Correct.**
22   Q.    And was that the same situation back in
23   August 10th, 2020?
24   A.    **No. I only had one person working for me --**
25   **well, no. I had David Halwick helping out, doing**

WORD FOR WORD REPORTING, LLC

14

1    some part-time work. And I had -- I can't think of
2    who I had back then. I can't recall the name of the
3    girl I had working back then.
4    Q.    Okay. You mentioned a David -- I did not get
5    that.
6    A.    **Halwick, H-A-L-W-I-C-K. I was helping him**
7    **out.**
8    Q.    You were helping him out?
9    A.    **Well, he was doing some part-time work. He**
10   **was -- he's a recovering alcoholic.**
11   Q.    And he was an attorney?
12   A.    **Former attorney.**
13   Q.    So what was he doing, just helping you out,
14   doing --
15   A.    **Some research, maybe some letters once in**
16   **awhile, maybe, you know, draft some pleadings. But**
17   **he was very part-time.**
18   Q.    Were you paying him by the hour?
19   A.    **Yes.**
20   Q.    So you explained the type of law that you
21   practice as a mixed bag, like a general practice,
22   correct?
23   A.    **That is correct.**
24   Q.    Can you give me a percentage of the type of
25   law that you practiced back in 2020, meaning, what

WORD FOR WORD REPORTING, LLC

15

1    percentage of it was criminal, what percentage of it
2    was family, what percentage of it was business?
3    Do you understand my question, sir?
4    A.    **I think I do. I would say 30 to 40 would be**
5    **criminal. 30 to 35 would be family. And the rest**
6    **would be estates, contracts, civil litigation.**
7    Q.    And before that, were you a public defender?
8    A.    **In -- I was not a public defender at the time**
9    **of the incident.**
10   Q.    Right. I understand that. But prior thereto
11   -- why don't you do this. You went pretty fast
12   before.
13   So before you went out on your own, can
14   you please tell me how long you've been out on your
15   own?
16   A.    **Since '78, '79.**
17   Q.    And it was you as a solo practitioner?
18   A.    **Initially, it was me. And then my wife was**
19   **also an attorney back then, so it was with Christina.**
20   **And then when we got divorced, and so I was back to**
21   **being by myself.**
22   Q.    Okay. Christina, I thought you said your
23   wife was Anita.
24   Did I hear that wrong?
25   A.    **No. You heard it correct.**

WORD FOR WORD REPORTING, LLC

16

1    Q.    Okay. So how many wives have you had?
2    A.    **Three.**
3    Q.    Okay. So your wife at the time was an
4    attorney, and her name was Christina?
5    A.    **Correct.**
6    Q.    And how long were you married to Christina?
7    A.    **As I stated before, nine years,**
8    **approximately.**
9    MR. KAROLY:  Oh, that was Anita.
10   A.    **Or 10. They both were like nine or 10.**
11   **Anita was nine, Christina was, also, I think, around**
12   **nine, nine and a half.**
13   Q.    And your first wife was Christina, true?
14   A.    **Correct, correct.**
15   Q.    And Christina worked with you as an attorney?
16   A.    **Correct. For a few years. And we -- we**
17   **separated in '87. So she worked for maybe -- she**
18   **worked for five or six years with me.**
19   Q.    And were any children born of that marriage
20   with Christina?
21   A.    **Correct. Two. Sophia and Adrian. The two**
22   **oldest.**
23   Q.    And then with Anita, you indicated you were
24   married to her for 10 years, true?
25   A.    **A little bit less than 10. And the children**

WORD FOR WORD REPORTING, LLC

17

1  were Cynthia and Roman.
2     Q.   Okay. And before you had your own practice,
3  this is what I was getting at, what type of work did
4  you do?
5     A.   I think I was up -- Christina was finishing
6  law school, and I think I was working for -- it was a
7  project to advance veterans -- this is in '79, '78,
8  in Vermont, veterans from the Vietnam War that had
9  less than honorable discharges.
10     Q.   And then what about after that?
11     A.   I started my own practice in Bethlehem. I
12  started with Richard working -- Richard Gasdaska gave
13  me an office space on the south side of Bethlehem,
14  and that's where I began. And then Christina came in
15  for a few years. And then in '82, I bought a
16  building at 451 Main Street in Bethlehem, and I was
17  there for 30 some odd years, 35. And I had other --
18  I rented space to other attorneys. Tom Houser and I,
19  Tom Houser and I bought the building together. We
20  both practiced law. We had separate practices. But
21  we owned the building together, and we rented to
22  other attorneys.
23     Q.   Do you still have that building?
24     A.   No. I sold it -- I bought Tom out. And then
25  when I went through my second divorce, after it was

WORD FOR WORD REPORTING, LLC

18

1  concluded, I sold it. That's maybe now 10 years ago.
2     Q.   That would be about 2014 or so?
3     A.   Like I said, I'm very bad at dates. So, you
4  know.
5     Q.   Well, we're in 2024. You said you sold the
6  building about 10 years ago, right?
7     A.   Approximately 10, 12.
8     Q.   And how long have you been married to Lisa?
9  You couldn't tell me the exact dates. Remind me, was
10  it --
11     A.   I think we've been -- we've been together now
12  for -- it's going to be our anniversary this May from
13  our first meeting. So we've been together 20 years,
14  and we've been married 10, a little bit less than 10.
15  But you have to ask her. Like I said, I'm horrible
16  with dates.
17     Q.   That's all right. So now, you are still
18  practicing law. Are you still practicing law
19  full-time?
20     A.   Yes.
21     Q.   So you're in the office pretty much every
22  day, or work from home?
23     A.   Yes.
24     Q.   And where is your office located now?
25     A.   It's at 527 Hamilton Street in Allentown.

WORD FOR WORD REPORTING, LLC

19

1     Q.   Do you rent that space?
2     A.   Yes, I do.
3     Q.   So you're kind of, like, you go in the office
4  pretty much every day, correct?
5     A.   I try to.
6     Q.   Rather than working from home?
7     A.   Yes. I do not work usually from home. Very
8  rarely do I work from home.
9     Q.   And has that been the case from the date of
10  this incident to the present day?
11     A.   Yes, I would say so.
12     Q.   Have any of the claimed injuries to your
13  knowledge that you're claiming in this lawsuit, have
14  they had any effect on your ability to work in your
15  office?
16     A.   Well, not in my ability to work in my office.
17  But, you know, there are times when, you know, I get
18  very -- I think back about the incident, about the
19  incompetency of the arresting officer, I get very
20  angry. I feel that, you know, I was very much
21  embarrassed in front of my wife. I -- when I see
22  a -- you know, sometimes when I'm in court or dealing
23  with police officers, you know, I have anxiety.
24  Which, you know, before that, I didn't experience.
25     Q.   Okay. And I'll get into that in a little

WORD FOR WORD REPORTING, LLC

20

1  bit. I'm still interested in the types of -- in the
2  type of work that you do, especially being the type
3  of case that this -- that we're here for today.
4        Do you do any civil rights litigation?
5     A.   None.
6     Q.   Okay. So you're 30 to 40 percent right now,
7  you're practicing criminal law, correct?
8     A.   Yes.
9     Q.   Tell me what types of cases you are involved
10  with in the criminal practice of your business.
11     A.   I've been involved with -- are you finished
12  with your question?
13     Q.   I am. Go ahead.
14     A.   I didn't mean to interrupt.
15     Q.   Well, try not to. You're doing okay.
16     A.   I've been involved with anything from
17  murderer to harassment, or to a traffic citation,
18  speeding.
19     Q.   You're in Municipal Court, you're in Superior
20  Court, Common Pleas Court; is that correct?
21     A.   Correct.
22     Q.   Anything from soup to nuts in the criminal
23  realm, true?
24     A.   Correct.
25     Q.   So you're pretty familiar with what

WORD FOR WORD REPORTING, LLC

21

1  constitutes a legal traffic stop on the roadway,
2  true, whether it be --
3      A.    Very much so.
4      Q.    Okay. Tell me what your understanding as a
5  criminal attorney -- tell me what your understanding
6  is with regard to a legal traffic stop.
7              MR. KAROLY: Objection. You can
8  answer.
9      A.    Well, there should be some sort of probable
10  cause. That could be anything from speeding to
11  driving erratically, to having your windows tinted
12  more than they should be. There's all different
13  types of, you know, probable causes.
14      Q.    Is it your belief that that is what the
15  standard is in New Jersey?
16              MR. KAROLY: Objection.
17      A.    I don't know what the standard in New Jersey
18  is. I'm talking about Pennsylvania.
19      Q.    Okay. Would you agree, or can we agree that
20  --
21      A.    The police officer needs a reasonable
22  suspicion to pull you over. Something, you know, I
23  would think the standard would be the same in New
24  Jersey, but.
25      Q.    Well, can we agree that it's not necessary
WORD FOR WORD REPORTING, LLC

22

1  for an officer to have probable cause to pull a motor
2  vehicle over in New Jersey? I mean, if you don't
3  know the answer to my question, that's okay.
4      A.    I think the officer, to pull you over, needs
5  to have at least some sort of reasonable suspicion
6  that there's something that's afoot.
7      Q.    Okay. And we'll get more into the incident
8  later. I don't want to go off script, although in
9  this type of case, I kind of am tempted to.
10              What, currently, what county do you
11  practice law in in PA?
12      A.    Northampton, Lehigh, Monroe sometimes,
13  Montgomery sometimes, Bucks sometimes. But primarily
14  in Northampton, Lehigh.
15      Q.    And you pretty much work on retainer fee,
16  true?
17      A.    Correct.
18      Q.    Do you do drug cases?
19      A.    Yes.
20      Q.    You said murder, harassment, traffic. Do you
21  do sex abuse, anything like that?
22      A.    Yes.
23      Q.    Anything like sexual assault?
24      A.    Yes.
25      Q.    About how often are you in court, whether
WORD FOR WORD REPORTING, LLC

23

1  it's live or in person?
2      A.    Weekly.
3      Q.    How many times a week?
4      A.    Sometimes every day, sometimes twice a week.
5  It depends.
6      Q.    And was that the case back in 2020, August?
7      A.    Well --
8          I know things were different then because of
9  the pandemic.
10      A.    Well, with the pandemic, I mean, court was
11  canceled. So there was no court.
12      Q.    Even -- there was no Zoom court?
13      A.    Very -- very limited.
14      Q.    Did that affect your practice in any way? I
15  mean, financially?
16      A.    Of course. I think it affected everybody
17  financially.
18      Q.    Were all of your appearances back in August
19  2020, were they canceled back then?
20      A.    I don't recall. I don't believe so.
21      Q.    You don't believe that all of your
22  appearances were canceled; is that what you're
23  saying?
24      A.    Yeah. I'm sure there were some court
25  appearances. I mean --
WORD FOR WORD REPORTING, LLC

24

1      Q.    And were you still going into the office at
2  that time?
3      A.    Depends on what -- I can't remember back to
4  August of whether I was -- I think we did some work,
5  but not much.
6      Q.    And at that point in time, how were you, if
7  at all, how were you communicating with your clients?
8      A.    Either by e-mail or, you know -- I'm thinking
9  back in August, was the COVID -- it was still during
10  COVID, but I think a lot of the sanctions were taken
11  off. So as I'm -- you know, as I'm thinking back, I
12  think that court was pretty well back in session back
13  then. So if it was, then I was going to court.
14  You're talking, you know, four years ago. I have
15  sometimes trouble remembering what I did yesterday,
16  so.
17      Q.    I understand. I'm just trying to get a
18  general picture for what your business was like at
19  the time in August 2020. I know that, you know, we
20  were -- we did a hard open in June of that year. I
21  don't know if you remember if that was the case with
22  your practice, but.
23      A.    Yeah, I think -- again, I think if your
24  office opened back in June of that year, I'm sure
25  that we did, also. I mean, when the courts, you
WORD FOR WORD REPORTING, LLC

25

1   know, lessened the -- you know, opened up, then we
2   became more busy, and, you know, we were due in
3   court. I mean, some of the hearings in Northampton,
4   very few were done via Zoom. And then we started
5   going back in, you have to wear masks, they took your
6   temperature. You know, it was a whole rigamarole.
7       Q.   Yes, I remember well.
8       A.   Social distances with your clients. Just --
9   it was difficult. Sometimes you'd be in a courtroom,
10  but the judge would be in his office, doing Zoom that
11  way. So it depended on the judge, depended on the
12  court.
13      Q.   Did you apply back then for assistance as a
14  result of the loss of business which you may or may
15  not have sustained as a result of COVID?
16      A.   I don't believe I did.
17      Q.   You did not, or you did?
18      A.   I don't believe I did.
19      Q.   PPP money, you didn't apply for any of that?
20      A.   I don't believe I did. I think my wife
21  applied for herself. But I don't believe I did.
22  But, you know, my wife does my books, so she can --
23  you can ask her that. She'd be more --
24      Q.   I was going to ask you, what does your wife
25  do for her job?

WORD FOR WORD REPORTING, LLC

26

1       A.   My wife was the director, owner and operator
2   of a day care center.
3       Q.   Is she still?
4       A.   No. She's retired from that. Just very
5   recently. I think she closed back in the beginning
6   of May.
7            LISA ZELECHIWSKY: March.
8       A.   Ask her.
9       Q.   I'm sorry.
10      A.   You have to ask her for the exact date, when
11  she closed.
12      Q.   That's okay.
13      A.   I was --
14      Q.   Back in August --
15      A.   Go ahead. I'm sorry.
16      Q.   That's all right. Back in August 2020, was
17  she working in day care?
18      A.   She was always -- the day care was open -- in
19  other words, she was the owner. I don't know what
20  the facility was doing, you know, whether -- you have
21  to ask her those questions, whether, you know, she
22  had the employees there, whether the children were
23  there. I have no idea.
24      Q.   That's okay. I only want you to answer you,
25  know, what you remember. I don't want you to guess

WORD FOR WORD REPORTING, LLC

27

1   at all. And I will ask your wife about what she was
2   doing back in August 2020.
3            What about, you mentioned that she
4   keeps your books. Was she doing that back in August
5   2020?
6       A.   She would review them periodically, correct.
7       Q.   Okay. So she would know whether or not you
8   applied for any type of assistance during the
9   COVID-19 pandemic?
10      A.   She would know that.
11      Q.   Okay. So as a result of the August 10th,
12  2020 incident, I'm interested in whether, to your
13  knowledge, have you sustained any type of physical
14  injuries as a result of this incident?
15      A.   I sustained no physical injuries. I mean, I
16  -- no. No physical injuries.
17      Q.   Okay. What about any physical limitations
18  versus injuries?
19      A.   No physical limitations.
20           MR. KAROLY: You mean as a result of
21  this arrest?
22           MS. BROCCO: As a result of the August
23  10th, 2020 incident.
24      A.   As a result of that incident, I did not
25  sustain any physical injuries or anything physical.

WORD FOR WORD REPORTING, LLC

28

1       Q.   And have you undergone any type of medical
2   treatment, whatsoever, for any -- strike that.
3            Are you claiming any psychological
4   injuries as a result of the August 10th, 2020
5   incident?
6       A.   I am.
7       Q.   Okay. Can you explain to me what those
8   psychological injuries are?
9       A.   On occasion --
10           MR. KAROLY: Objection. You can
11  answer.
12      A.   On occasion, I have nightmares about the
13  incident. I carry anger about the incident. I --
14  about the -- how I was illegally arrested. I get
15  very sometimes anxious, anxiety, I get depressed over
16  it. I get anxiety sometimes dealing with police
17  officers. Especially when I am dealing with them,
18  seeing how they did certain things. I -- you know,
19  on occasion, I get so upset that I might take off
20  from work. And, you know, I just, you know,
21  sometimes I'll take off, you know, half a day or
22  something, just to -- just to get away from it.
23           I also -- we had -- I was driving from
24  our -- our beach house, and I was really looking
25  forward -- I loved to go down to the shore, to Cape

WORD FOR WORD REPORTING, LLC

29

1  May.  And now, every time I drive -- well, I've
2  stopped driving down there so often, because there's
3  -- I just get angry about going down there, because I
4  think I'll run into this officer again.
5          So I -- you know, I have -- it kind of
6  depresses me to drive down there.  And I was -- I
7  really enjoyed that home.  That was, like, my happy
8  place.  I don't have that anymore.  I'm angry about
9  that.  I'm also angry because I think it bothers my
10  wife driving down there, and I think she also --
11  well, she can speak for herself.
12      Q.   So those are the psychological injuries which
13  you're claiming.  Is there anything else?
14      A.   That's what I can think of now.
15      Q.   Okay.  So have you had any -- do you have any
16  maybe psychological limitations?  I think you kind of
17  -- like, the injuries and limitations kind of bled
18  into each other in your testimony.  But do you have
19  any psychological injuries that you could discuss
20  with me?  You mentioned depression.
21          Do you treat for any of these injuries
22  that you described; nightmares, anger, anxiety,
23  depression?  Have you ever seen a therapist, a social
24  worker, a psychiatrist, a psychologist for any of the
25  conditions that you discussed with us?

WORD FOR WORD REPORTING, LLC

30

1      A.   Well, no.  I'm Ukrainian.  We don't do that.
2  I'm old school.  We just don't -- it's not part of --
3  it's not part of my DNA.
4      Q.   What is not part of your DNA?
5      A.   To seek that kind of help.  You just -- you
6  deal with it.
7      Q.   So it's not in your DNA to seek mental health
8  treatment?
9      A.   I haven't done that, no.
10          There's a certain -- you know, in my
11  mind, there's a certain stigma to that, also, so.
12      Q.   There's a stigma to getting mental health
13  treatment?
14      A.   I think -- I just don't -- I haven't done
15  that, no.
16      Q.   I would imagine that in your practice, you
17  are -- are you trying criminal cases?
18      A.   On occasion.
19      Q.   Do you do jury trials, bench trials, a little
20  bit of both?
21      A.   Little bit of both.
22      Q.   Okay.  I also would imagine that you have to
23  -- you come into contact with a lot of police
24  officers, state troopers, in your profession as a
25  criminal attorney, true?

WORD FOR WORD REPORTING, LLC

31

1      A.   Correct.
2      Q.   Has your ability to practice law and interact
3  with certain police officers, state troopers, law
4  enforcement, has your ability to practice law been
5  affected by your -- the requirement that, you know,
6  you have to deal with law enforcement?
7      A.   I would say yes.
8      Q.   Can you explain how so?
9      A.   I think my -- I get more anxious.  I think I
10  get angrier quicker.  I think I'm much more
11  distrustful.  It's important to have a good
12  relationship with various, you know, when you're
13  dealing with police officers.  I think that I'm more
14  -- I don't know.  I'm just -- I have less patience.
15  I have flashbacks sometimes when I think, you know,
16  people are getting stopped, I think about them
17  telling me how they feel, and just, you know, I'll
18  get a flashback as to how I felt.  When I got stopped
19  that night, I was livid.  And I was more than livid.
20  And it took every ounce of my self-control and
21  composure just to remain calm.
22      Q.   Okay.  But in terms of your ability to do
23  your job, you can still do your job as it relates to
24  dealing with law enforcement as a criminal defense
25  attorney?

WORD FOR WORD REPORTING, LLC

32

1      A.   I have a client to represent, and I will do
2  it to the best of my ability, of course.  But, you
3  know, it just takes a little bit -- takes more out of
4  me.
5          You know, I think if the police
6  officer, after everything was said and done, had come
7  up to me, and said, Hey, Bodhan, look, I'm sorry, you
8  know, I screwed up, you know, I really messed up, you
9  know, and apologized to me, that would have made a
10  world of difference.  But she didn't -- not only did
11  she not apologize, she gives me a ticket.  And, you
12  know, and just doesn't tell me anything about the
13  results of the -- of the breath test, but gives me a
14  ticket and sends me on my way.  After humiliating me,
15  and treating me like some sort of -- some sort of a
16  criminal, searching my vehicle, having my wife have
17  to step outside the vehicle.
18          And I, basically -- I think I said two
19  words to her.  She asked me whether I drank anything,
20  I said no, you know.  And she asked my wife the same
21  question.  And I think you can ask her what her
22  response was.  But it was just the way everything was
23  handled.  I think that if she had known how to do a
24  proper nystagmus test, that right then and there
25  would have told her that there was no alcohol.  But

WORD FOR WORD REPORTING, LLC

33

1  no, she did that, and then she persisted on doing
2  other tests. But I'm -- I'm getting far afield here.
3      Q.   What's your understanding of doing a proper
4  nystagmus test?
5      A.   That -- my understanding is is that when she
6  takes the pen, if you move the pen, if the person is
7  under the influence, the eye -- when it moves all the
8  way to the edge, it doesn't stand still, it bounces.
9  When you're -- and when you're under -- you're not
10 under the influence, it doesn't do that.
11     Q.   And how do you have this knowledge?
12     A.   Over 35 years of doing criminal work and
13 dealing with DUI cases, and police officers, and --
14 it's kind of basic, you know 101 DUI stop.
15     Q.   And what percentage of your practice is doing
16 the DUIs?
17          MR. KAROLY: Objection. You can
18 answer, if you can.
19     A.   You know, I --
20     Q.   I mean, you can estimate.
21     A.   Well --
22          MR. KAROLY: Well, I mean, as far as a
23 percentage of what your practice is on DUIs, I mean,
24 he can estimate maybe how many DUIs he has
25 represented, but.

WORD FOR WORD REPORTING, LLC

34

1          MS. BROCCO: I can rephrase the
2  question.
3      Q.   So in your practice as a criminal lawyer,
4  what percentage of your practice consists of driving
5  while under the influence?
6      A.   I mean, I know over the years I've probably
7  done thousands. What the percentage is, you know,
8  depends time of year, depends on the month. I don't
9  know. I'm guessing, 10 percent, 15.
10     Q.   Okay. I don't want you to guess. Just
11 whatever your best estimate would be would be fine.
12     A.   15 is kind of high, because there's other --
13 at least up to 10 percent. Not over, but around
14 there, I would think. I mean, there's all kinds of
15 -- you have DUI, but you might have looting in there,
16 you might have, you know, somebody burglarizing, it
17 might be DUI with drugs, I mean, after they've done
18 something else. So, you know, it's not just DUI. I
19 mean, there's all kinds of different variations.
20     Q.   Okay. And when you've represented those DUI
21 cases, have you -- what percentage of those have you
22 actually tried?
23     A.   Well, depending -- a small percentage. I
24 don't know. 2, 3 percent. Usually, you try to work
25 out a good deal for the client.

WORD FOR WORD REPORTING, LLC

35

1      Q.   All right. So we went through some of your
2  limitations. You indicated that you do not -- what
3  about, have you sought any treatment from your family
4  doctor as a result of the August 10th, 2020 incident?
5      A.   No.
6      Q.   Have you ever talked to your family doctor
7  about it?
8      A.   No.
9      Q.   Is there any reason why not?
10     A.   I don't see him that often. I see him once a
11 year for my physical. That's about it. So I -- and
12 I just -- it hasn't come up. I don't talk to him
13 about it.
14     Q.   Have you ever personally had any issues with
15 drug or alcohol addiction?
16     A.   No.
17     Q.   Have you ever been treated for drug or
18 alcohol addiction?
19     A.   No.
20     Q.   And in terms of your physical health, have
21 you or do you treat for any sort of -- you mentioned
22 that you're on thyroid medication.
23          Do you treat for any chronic health
24 conditions; heart disease, diabetes?
25     A.   No.

WORD FOR WORD REPORTING, LLC

36

1      Q.   Anything like that?
2      A.   No. The only thing that I treat for is for
3  the carotid artery blockage surgery that I had, where
4  I take the aspirin. I get that checked periodically.
5  And that's -- and for the thyroid. That's it.
6          Oh, and just very recently, the last
7  checkup, I had a very low B12 deficit. So I got
8  shots for three weeks, and I'm on B12 -- B12 vitamin
9  medication.
10     Q.   Okay. And was your health in the same state
11 back in August 2020?
12     A.   No. Because now, I have -- I didn't have the
13 B12 issue back in August of 2020.
14     Q.   Other than that, back in 2020, did you have
15 any issues different than they are today?
16     A.   No.
17     Q.   You know what, give me one minute. I have to
18 charge my computer. I'll be one second.
19          So do you have any future appointments
20 with any type of therapist, doctor, anyone that you
21 would consider seeing as a result of the limitations
22 and/or psychological injuries you just discussed?
23     A.   No appointments.
24     Q.   Okay. And your answers to interrogatories --
25 I'm just going to pull them up. Bear with me for a

WORD FOR WORD REPORTING, LLC

37

1  second.
2  Okay. Mr. Zelechiwsky, I am sharing my
3  screen with you. Can you see what is on the screen?
4  A.  Yes.
5  Q.  Okay. And I'm also going to pull up your
6  certification, just bear with me one second.
7  Anyway, getting back to your answers to
8  interrogatories. You indicate that -- I'll pull them
9  back up.
10  By the way, drawing your attention to
11  what's on the screen, which is your answer to
12  interrogatory No. 5, is James -- do you see that,
13  where it says --
14  A.  Attorney James Heidecker, yes, I do.
15  Q.  Is that the individual that you spoke to me
16  about earlier who was helping you out back in August
17  --
18  A.  No.
19  Q.  Who is that?
20  A.  That was --
21  Q.  And I don't want to know if there's an
22  attorney/client privilege. I just want to know who
23  he is.
24  A.  This individual here on the answer?
25  Q.  Yeah, Attorney James Heidecker?

WORD FOR WORD REPORTING, LLC

38

1  A.  Attorney James Heidecker is an acquaintance
2  that I was with the day of the -- earlier that day on
3  August 20th.
4  Q.  August 10th?
5  A.  August 10th.
6  Q.  That's okay. And in terms of your answers to
7  interrogatories also indicate that you have wage
8  loss. Okay? And I just need to know what exactly it
9  is that you're claiming if you are maintaining a wage
10  loss.
11  A.  Well, I mean, when you -- you know, I work on
12  an hourly basis, and I work for myself. So that if I
13  take off a half day, or a day, as you're familiar,
14  you know, you do your billing, you don't -- you're
15  not there, you're not producing, you're suffering a
16  wage loss.
17  Q.  Okay. Would that loss of wages be documented
18  anywhere in terms of, you know, with your accountant
19  on your tax returns, your W-2, your 1099, whatever it
20  is that you file?
21  A.  Well, it would just show -- no. I mean,
22  again, you know, it depends on the month, depends on
23  -- you know, there's a lot of variables.
24  Q.  Okay. But my question was, would it be
25  documented anywhere? Did you keep a running tab of

WORD FOR WORD REPORTING, LLC

39

1  your financial, alleged financial losses in
2  connection with -- wait. Let me finish my question,
3  please.
4  In connection with the August 10th,
5  2020 incident?
6  MR. KAROLY: Objection. You can
7  answer.
8  A.  No.
9  Q.  There's also an indication in your answers to
10  interrogatories that you did not return to work for
11  two weeks.
12  Do you remember providing that
13  information?
14  A.  Yes.
15  Q.  Can you explain to me why you did not return
16  to work for two weeks?
17  A.  I think I was just overly upset, anxious,
18  depressed, angry.
19  Q.  So what did you do during that time? Did you
20  just shut down your office?
21  A.  No, I didn't shut down the office. I just
22  wasn't -- you know, wasn't responding. Wasn't doing,
23  you know -- doing a minimal amount of anything. I
24  just needed to kind of get over everything with this
25  incident.

WORD FOR WORD REPORTING, LLC

40

1  Q.  Okay. So during that two-week period, what
2  did you do? Did you go back to the shore, did you
3  stay at your house?
4  A.  Oh, no, no, I didn't go back to the shore.
5  That, I didn't do.
6  Q.  Did you take another vacation somewhere?
7  A.  No.
8  Q.  Okay. So what did you do?
9  A.  I think I stayed home.
10  Q.  And did you take any client calls, did you
11  cancel your appearances? Explain to me, you know,
12  was it just like a two-week hiatus?
13  A.  I think I got some continuances. You know, I
14  scaled back as much as I could. If I didn't get a
15  continuance, then I, you know -- you know, did a
16  minimal, minimal amount of work, so.
17  Q.  At that point in time, was your practice back
18  in full swing --
19  A.  Back then, it was. August of -- it was after
20  the pandemic, yeah, I was in full swing. Everything
21  was opening up.
22  Q.  Okay.
23  A.  You know, I tried to push appearances off as
24  much as possible.
25  Q.  Okay. And then it says --

WORD FOR WORD REPORTING, LLC

41

1    A.   I didn't -- if you're a solo man
2    practitioner, you can't just close down your office.
3    Clients call, you know, they want to speak to you.
4    But I tried to keep it at a -- a minimum.
5        Q.   Okay.  Well, I'm just going by your answer,
6    which is up there, it's 7D.
7        A.   Yeah.
8        Q.   Where it says, "I did not return to work for
9    approximately two weeks after the incident.  Periodic
10   times, I would need personal days to deal with
11   psychological impact and the anxiety of my wrongful
12   arrest."
13            Do you see that?
14       A.   Um-hum.
15       Q.   So I'm just trying to understand, you know,
16   you told me why you didn't return to work, and I kind
17   of just want to know, like, what it was, how you
18   dealt with your psychological impact and the anxiety.
19       A.   I kept it all inside, and once in awhile, I
20   would probably take it out on my wife.  But
21   otherwise, you know, you just keep it inside.  That's
22   what I was always taught to do.
23       Q.   At that time, it also indicates that you --
24   your weekly wages earned were approximately 3,000 per
25   week.  Do you see that, in 7C?

WORD FOR WORD REPORTING, LLC

42

1        A.   Yes.  I'm sorry.  7C?
2        Q.   By the way, I do not have your signed
3    certification -- I do have your signed certification
4    page.  It just wasn't placed in this folder for me.
5    But do you remember signing a certification
6    certifying that these answers to interrogatories --
7    because if you don't, I can run and get it loaded on.
8        A.   I -- I'm sure I signed it.
9        Q.   Before you signed the certification, did you
10   read these interrogatories, your responses?
11       A.   Of course.
12       Q.   Okay.  So where it says $3,000 a week, is
13   that your take-home, or is that -- that would be --
14       A.   Gross.
15       Q.   A gross?  Okay.  And so can you estimate for
16   me what your net would be per week?
17       A.   I can't do that.  I'd be guessing.  I don't
18   want to guess.
19       Q.   Okay.  And is that -- why is that?  Is that
20   because it varies, or --
21       A.   Well, yes, it varies, you know, one week, it
22   varies.  Plus, there's overhead, there's secretarial,
23   there's office expenses.  So it varies.
24       Q.   And I assume that you take any forms of
25   payment at your law firm.  Do you take credit cards?

WORD FOR WORD REPORTING, LLC

43

1        A.   Yes.
2        Q.   Do you take checks?
3        A.   Yes.
4        Q.   Cash?
5        A.   Yes.
6        Q.   Nowadays, you know, cash app, Zelle.  Is that
7    all fair game, as well?
8        A.   I don't use much of that.  Very infrequently.
9    But on occasion.  I don't think I've -- I think Zelle
10   -- I think I do take Zelle, but not cash app.
11       Q.   Okay.  So as of now, I do not have a
12   quantifiable wage loss in the discovery that's been
13   conducted thus far.  So if there is a quantifiable
14   wage loss, I would ask that you provide that
15   information to your attorney.
16            MR. KAROLY:  Objection.  As the answer
17   states, it will be calculated by an expert.  And if
18   we choose to do so, you'll be provided with that.  He
19   gave you his answers as to what the wage loss would
20   be based upon.  You can do your own calculations.
21   But if we have an expert present that, we'll do so.
22            MS. BROCCO:  Will I be getting any,
23   like, tax returns, counsel?
24            MR. KAROLY:  He provided those already.
25            MS. BROCCO:  Okay.  My apologies.

WORD FOR WORD REPORTING, LLC

44

1            MR. KAROLY:  That's all right.
2        Q.   So, again, you are claiming an intermittent
3    wage loss for the days that you missed.  This is
4    according to answer to interrogatory No. 9C.  Is that
5    what you're claiming?
6            MR. KAROLY:  Objection.
7        Q.   Mr. Zelechiwsky?
8            MR. KAROLY:  Object to the form.  In
9    addition to what he's already testified to.
10            MS. BROCCO:  Okay.
11       Q.   So you're claiming intermittent wage loss for
12   your days missed?
13       A.   Correct.  That's what the answer says.
14       Q.   And intermittent wage loss means what?  What
15   does that mean?
16       A.   Well, I'm out of the office, and I'm not
17   working.  So that -- that -- those hours are missed.
18       Q.   So that's, like, for half days that you miss,
19   sometimes you take whole days.  And that's for the
20   two weeks that you missed after the incident; is that
21   what intermittent wage loss means?
22            MR. KAROLY:  Objection.  I think he
23   just said, obviously, there's the two weeks
24   initially, and then he testified to he has to take
25   off half days or full days periodically because of

WORD FOR WORD REPORTING, LLC

45

1   the impact of this incident, and he says he is a solo
2   practitioner, and --
3        MS. BROCCO: You know, I already know
4   what he testified to.
5        MR. KAROLY: I mean --
6        MS. BROCCO: I would appreciate it if
7   he could just let me explore my questioning.
8        MR. KAROLY: But then what you don't do
9   then is to try and whip it back around and say --
10       MS. BROCCO: No, I'm not trying to whip
11  it back.
12            Counsel, counsel, are you making a
13  speaking objection, counsel?
14       MR. KAROLY: It's intermittent --
15       MS. BROCCO: Just let me explore my
16  question. He's got a wage loss. I need to know why
17  he's claiming it. And my next line of questioning --
18       MR. KAROLY: And he said six different
19  times, he says six different ways how it's an
20  intermittent wage loss.
21       MS. BROCCO: No, he didn't. I didn't
22  ask him about what intermittent wage loss means. I
23  asked him about -- he explained about his half days,
24  he explained about the two weeks. I would like to
25  know what an intermittent wage loss is. He is

WORD FOR WORD REPORTING, LLC

46

1   explaining it.
2            Now I want to know, if you don't
3   mind, how many -- how often does he take half days.
4        MR. KAROLY: That's a perfectly
5   permissible question, and let's get to it, then.
6        MS. BROCCO: Thanks.
7    Q.  How often do you take half days,
8   Mr. Zelechiwsky?
9    A.  Oh, probably a half day to a day per month.
10   Q.  So you take a half day to one day per month,
11  and this has been going on since 2020?
12   A.  Approximately.
13   Q.  And are you still taking a half day to one
14  day per month as a result of the psychological impact
15  which you are alleging as a result of this incident?
16   A.  Correct. I mean, when -- back in '19, when
17  the incident occurred, you know, after I went back to
18  work, I probably could have taken off -- I was
19  probably taking off a few more days earlier on than,
20  you know, I'm taking less and less now. But it, you
21  know, comes out roughly to half a day to a day per
22  month.
23   Q.  And is that in addition to whatever vacation
24  days you take?
25   A.  Yes.

WORD FOR WORD REPORTING, LLC

47

1    Q.  Okay. You also discuss in your answers to
2   interrogatories reputational injuries. And can you
3   see that up on No. 13, sir?
4    A.  Correct.
5    Q.  Can you explain to me what the reputational
6   injuries entail.
7    A.  I think just the embarrassment of it, you
8   know, with Mr. Heidecker, you know, knows about it.
9   You know, people that have found out about it. You
10  know, they were just surprised, because they know me.
11  So, you know, it's embarrassing. I mean, how would
12  you feel to be handcuffed, thrown in back of a
13  cruiser, accused of something, when you're perfectly
14  innocent? Doesn't make you feel warm and fuzzy.
15   Q.  Okay. Have you, as a result of these
16  reputational injuries, lost any of your business?
17   A.  I don't know.
18   Q.  Has any of this, to your knowledge -- has
19  this incident been leaked to any of your local press,
20  to your knowledge?
21   A.  Not to my knowledge, no. Not to my
22  knowledge.
23   Q.  Has it ever been written up in, you know,
24  Legal Intelligencer, or other legal publication, to
25  your knowledge?

WORD FOR WORD REPORTING, LLC

48

1    A.  Not to my knowledge.
2    Q.  So I'm just trying to figure out on what you
3   base the reputational injuries on.
4    A.  Again, as I stated before, people finding out
5   about it, you know, asking me about it. You know.
6    Q.  And how did the people find out about it?
7    A.  That, I don't know.
8    Q.  You indicated earlier that you also suffer
9   from nightmares. Can you tell me how often you
10  suffer from nightmares?
11   A.  It's not -- you know, it's not every night or
12  anything. It's -- you know, it comes up once a
13  month.
14   Q.  And is that for the past three and a half,
15  almost four years?
16   A.  Approximately. It's not just -- you know,
17  it's nightmares about, you know, being -- yeah.
18   Q.  So one time per month, you have nightmares?
19   A.  Approximately.
20   Q.  And are they all about the arrest?
21   A.  No. It's about the law enforcement. It's
22  about -- they're not all the same. But it's being
23  unlawfully arrested, yeah.
24   Q.  You testified earlier that had my client
25  apologized to you, that you wouldn't have been as

WORD FOR WORD REPORTING, LLC

49

1  upset. Something along those lines. You would have
2  been okay with it.
3          Can you explain that to me?
4      A.  Well, if she would have taken responsibility
5  for her lack of professionalism and treatment of me,
6  but she didn't. And that --
7      Q.  Do you think that you would have brought a
8  lawsuit had she apologized?
9          MR. KAROLY:  Objection.
10     Q.  You can answer the question.
11     A.  Probably not. If she sincerely apologized,
12  and said, you know, I knew I screwed up. But that
13  ship has sailed a long time ago.
14          And apologized to my wife. Because she
15  made her step out of the truck and took her purse and
16  emptied through all the stuff on the seat. And my
17  wife was, like me, totally innocent.
18          (Discussion off the record.)
19     Q.  Have you ever had any prior mental health
20  treatment before this incident occurred, for any
21  reason?
22     A.  No.
23     Q.  Any kind of trauma?
24     A.  No, not that I recall, no.
25     Q.  And I forgot to ask you. Other than this
                WORD FOR WORD REPORTING, LLC

50

1  lawsuit that we're here for today, have you ever
2  brought any other lawsuits for any reason?
3      A.  No. Like this, no.
4      Q.  Other than in your capacity as an attorney,
5  of course. I mean, for --
6      A.  No.
7      Q.  -- personal injuries, other than this?
8      A.  I've never brought any lawsuit in my life for
9  any personal injuries.
10     Q.  Okay.
11     A.  Ever.
12     Q.  And since this incident, have you been
13  involved in any civil litigation on a personal level?
14     A.  No.
15     Q.  Okay. And I'm saying, of course, aside from
16  this.
17     A.  No, no.
18     Q.  Same answer?
19     A.  No.
20     Q.  Okay. And in answer to interrogatory 17, it
21  asks, "List all activities that you can no longer
22  perform as a result of the injuries sustained on
23  August 10th, 2020."
24          And your response is -- can you see
25  that up there, Mr. Zelechiwsky?
                WORD FOR WORD REPORTING, LLC

51

1      A.  Yes.
2      Q.  Your response is, "There are no physical
3  injuries that restrict me. However, the
4  psychological, emotional, and reputational injuries
5  impact me often and in various ways and in diverse
6  situations, which in time have adversely affected all
7  forms of socialization, including my marital
8  relationship."
9          Can you please explain to me what you
10  mean by in diverse situations which have adversely
11  affected all forms of socialization, including my
12  marital --
13          MR. KAROLY:  Objection. You can
14  answer.
15     A.  I think that I'm much more short tempered, I
16  think, in the office, they sometimes call me Gumpy.
17  You know, my colleagues, because I -- they see a
18  change. You know, I get angry, you know, a lot more
19  -- more -- with less -- I get much quicker angrier.
20  And that -- you know, that affects my socialization.
21  I don't enjoy, you know, the practice of law like I
22  used to. I don't enjoy -- well, for example, going
23  down to Cape May. That was, like, my -- I really
24  enjoyed that. And, you know, now, I really don't --
25  don't enjoy going down. You know, it's -- takes a
                WORD FOR WORD REPORTING, LLC

52

1  lot for me to drive down there.
2      Q.  And when you say socialization, do you mean
3  like socializing?
4      A.  Yes.
5      Q.  And do you mean socializing in what type of
6  context?
7      A.  Just in general. I mean, socializing, you
8  know, being easygoing. I just, you know, you don't
9  feel happy. You know, I -- just not being -- you
10  know, just being more closed off. I don't enjoy
11  being around friends. I don't enjoy doing stuff that
12  I used to enjoy doing.
13     Q.  And did you ever --
14     A.  As --
15     Q.  I'm sorry. Go ahead.
16     A.  As much -- you know, I still enjoy, you know,
17  meeting with friends. But it's not, you know, it's
18  not as much.
19     Q.  Did you have these -- any of these feelings
20  of, I guess, ambivalence or avoidance with friends
21  prior to the August 10th, 2020 incident?
22     A.  I don't believe so.
23     Q.  Is there a number of, like -- did you used to
24  go out with friends every night, or every other
25  night, or, you know, every weekend night before this
                WORD FOR WORD REPORTING, LLC

53

1  incident happened, whereas, you don't do that as much
2  anymore?
3      A.    I don't go out as -- I never went out every
4  night.  It -- even when you go out, it's just the
5  enjoying -- you don't enjoy it as much anymore.  You
6  know, I don't have -- I can't -- you know, I don't
7  know how many times I go out.  I don't go out once a
8  week, once every other week.  But it's just --
9  something's missing.  So I don't enjoy it as much.
10     Q.    Okay.  And that's because of the incident of
11 August 10th, 2020?
12     A.    Well, I'm always afraid, if I going out, to
13 drive back is one thing.  For example, I'm always --
14 I always have that in the back of my mind, that, you
15 know, flashbacks about being handcuffed, flashbacks
16 about doing that stupid field sobriety test.  You
17 know, the anger that I felt when -- when she -- I
18 mean, she never even talked to me.  She was at the
19 passenger's side.  She takes my license, walks around
20 the other side of the -- to the driver's side, tells
21 me to step out.  You know, I don't -- I mean, I
22 didn't have bloodshot eyes.  I wasn't slurring my
23 words.  I wasn't -- I mean, it was -- it's crazy.
24     Q.    Okay.
25     A.    And, you know, and then just, you know, I'm

54

1  70 or 69 years old, and, you know, look at the video.
2  I'm standing straight.  I'm not -- I'm not, you know,
3  my feet are together.  I don't do any -- and then
4  searching -- searching my car?
5      Q.    I have the video, and we will look at it.
6      A.    You know, I think that she made some, you
7  know -- I don't want to say lie, but she probably --
8  she made some misstatements in her deposition,
9  inaccurate, you know.  So -- and that just -- just
10 added to my anger.
11     Q.    As you sit here today, do you know why it was
12 that you were pulled over originally?
13     A.    Well, from what she told me, she said that I
14 was weaving, and that I didn't use my turn signals.
15     Q.    Okay.
16     A.    And those are lies.  Because I wasn't
17 weaving.  And, you know, my wife was with me, and I
18 mean, she's, like -- she makes sure, you know, if I
19 do anything wrong, she lets me know it.  And I wasn't
20 weaving.  I wasn't -- anything like that.  I mean, we
21 were, you know, I was just kind of flabbergasted.
22             And, you know, she asked for license,
23 registration.  I didn't -- my wife handed it to her.
24 And she didn't ask -- she asked us whether we had
25 been drinking.  My wife said no.  There was no smell

55

1  of alcohol.  I mean, there was nothing.  And she
2  just, without saying anything else, she walks around,
3  and tells me to get out of the car.  And, you know,
4  she was wrong.  She was dead wrong.
5      Q.    So you just testified that your wife will
6  tell you if you do anything wrong.  What do you mean
7  by that?
8      A.    When I'm driving, she's very -- that's just
9  one of her little -- I don't want to say quirks.
10 It's just the way she is.  If I'm, you know, if I'm
11 going over the speed limit, Bodhan, you're speeding.
12 If I do anything, she right away says, Bodhan, you
13 didn't use a turn signal, or you're -- you're
14 weaving, or something like that.  You know, so she's
15 on it.
16     Q.    And do you know if she had any concerns about
17 your ability to drive that night, meaning, your wife?
18     A.    None.  That night, none.
19     Q.    Getting to the night of the incident, let me
20 just see if I have anything else here.
21             You also talk about this, in answer to
22 interrogatory 20, you talk about there appeared to be
23 some sort of police blitz, because there was a number
24 of vehicles stopped by state troopers, and state
25 police vehicles on the roadway.

56

1              What do you mean by a police blitz?
2      A.    Well, when I -- when I was driving, I mean, I
3  noticed that there was -- there were a lot of police
4  vehicles, there was people being pulled over on the
5  other side of 55.  And I think I saw one or two --
6  again, you're going back a number of years, but I
7  just noticed there was just a lot more police
8  activity.  And then, you know, out of the clear blue,
9  you know, I get pulled over.
10     Q.    And the route that you would have taken home,
11 you were taking the shortcut -- well, I consider it,
12 from there, Route 55?
13     A.    Yep.
14     Q.    And --
15     A.    And --
16     Q.    And that would have been in lieu of the
17 Parkway?
18     A.    I never take the Parkway because -- I hardly
19 ever take the Parkway.  I always take 55 to either
20 Commodore Barry, or Ben Franklin, to get to
21 Quakertown.
22     Q.    Why is that?
23     A.    It's the shorter, more efficient way to go.
24 To take the Parkway, you're cutting over to the other
25 side of the state.

Q. So this police blitz, you noticed on 55 that there were -- is that the roadway that you're saying that you noticed a number of vehicles?
A. **That's what I -- that's when I noticed a number of police vehicles, correct.**
Q. Did you have any discussions with your wife about it?
A. **No, not that I recall.**
Q. Okay. And you also indicate that Trooper Davis had no probable cause to believe that you had violated the law.
But do you know whether probable cause, I might have asked you this, is the standard for a simple traffic stop?
A. **Well, I think for a simple traffic stop, she should have at least an articulable, or some sort of reasonable suspicion for the stop that a violation of the traffic, you know, speeding, you know, doing, you know, something -- I think the speed limit there was 65 or 60. You know, doing 80, or going above the speed limit. You know, something that would do the traffic stop.**
Q. But not probable cause, can we agree on that, that she does not need probable cause?
A. **No, she needs a reasonable suspicion that**

**there was some sort of violation of the traffic law.**
Q. Okay.
A. **New Jersey traffic law.**
Q. And as you sit here today, is it your testimony that you don't think that you did anything wrong that amounted to -- that would have amounted to reasonable suspicion to pull you over?
A. **Absolutely correct. I don't -- I think I was driving -- I was driving within the speed limit, I was not swerving. I was not -- you know, I was driving lawfully, as, you know.**
Q. All right. And it's my understanding that where you were pulled over was -- was it around the area of Millville?
A. **Yes. It was just where -- I think it's 347 turns into 55. It goes from a one lane to a four-laner, or, you know, two-lane highway, from a one-lane highway.**
Q. It goes from a --
A. **One lane. If you're heading north --**
Q. Yes. And then it --
A. **You know, 347 is one way -- one lane. And then right after, right around Millville, on the outskirts of Millville, it turns into a two-lane.**
Q. Okay.

A. **And that's where we were pulled over, on the two-lane.**
Q. Your lawsuit also mentions that Trooper Davis wasn't wearing a face mask. And did you ever sustain any sort of physical injury; did you, you know, catch COVID as a result of any actions taken by this police officer after August 10th, 2020?
A. **You asked the question previously whether I sustained any physical injury, and I stated no. And --**
Q. Okay. What about a sickness, such as COVID-19?
A. **No. But I know my wife was very upset, because Trooper Davis was right in her face. And she was upset about that. And, in fact, in the video, you can see that I had my mask around my -- my neck when she told me to step out of the vehicle. And my wife was also very upset when she went into the police station, nobody was wearing masks there either. And it was -- they were not very kind to her either, at the police station.**
Q. Okay.
A. **And she can explain to you, you know, what her concerns were.**
Q. And, sir, your pharmacy is CVS Pharmacy?

A. **Correct.**
Q. Other than CVS Pharmacy, do you have any other pharmacies?
A. **There is -- I'll be perfectly -- I get mail order from -- Viagra from -- there's -- I get mail order Viagra from a pharmacy, MediSuite.**
Q. Okay. Any other mail order prescriptions?
A. **No. That's it. I forgot to put that on the -- it just came to mind.**
Q. That's all right. Okay.
Sir, I just pulled up your supplemental interrogatories. Are they up there on the screen?
A. **No.**
Q. No?
MR. KAROLY: You have to open it yet. You're still at the --
MS. BROCCO: Yeah, I know. I'll just do it over again. Sorry.
Q. Do you see anything now?
A. **No.**
Q. Okay. Do you see your supplemental rogs?
A. **Yes.**
Q. And did your blocked carotid artery give you any residual health issues, anything that would have caused any issues at the scene of this incident on

61

1  August 10th, 2020?

2      A.  No.

3      Q.  Okay.  And that was 10 years ago that you had

4  that treated?

5      A.  No, it wasn't 10 years ago.  You're going to

6  have to ask my wife for the date.  I think it was,

7  like, five or six years ago.

8      Q.  Okay.  But you had that -- you had that

9  surgery.  It was a surgery, true?

10      A.  Correct.

11      Q.  And have you had any complications since

12  then?

13      A.  No.

14      Q.  Okay.  So here in interrogatory numbers 18

15  through 19, I -- they talk about, more about your --

16  how this incident has affected your everyday life.

17  And there are some things in here that you did not

18  talk about, such as paranoia, things like that.

19          Do you understand?  You see where that

20  --

21      A.  Yeah.  Well, yeah, um-hum.

22      Q.  Okay.  And can I ask you, you said that you

23  do not enjoy going to Cape May as much.

24          Do you still own your -- a home in Cape

25  May?

WORD FOR WORD REPORTING, LLC

62

1      A.  Yes, we do.

2      Q.  Is it the same home that you owned in August

3  2010?

4      A.  No.

5          MR. KAROLY:  2020, counsel.

6          MS. BROCCO:  I'm sorry.  2010 -- '20.

7      Q.  Is it the same --

8          MR. KAROLY:  August 10th, 2020.  That's

9  the confusion, yeah.

10          MS. BROCCO:  Yeah.  Sorry.

11      Q.  Do you still own the same home now as you did

12  on August 10, 2020?

13      A.  No.

14      Q.  Okay.  Did you sell that house?

15      A.  Yes.

16      Q.  All right.  And where was that house located?

17      A.  On Fernwood Road in -- it's North Cape May.

18      Q.  That was back in 2020, correct?

19      A.  Correct.

20      Q.  Okay.  And when did you sell Fernwood Road?

21      A.  I do not know the date.  It was after August

22  of 2020.

23      Q.  Okay.  Was it in the past year or two years,

24  three years?

25      A.  In the past three years.

WORD FOR WORD REPORTING, LLC

63

1      Q.  And was that home located in Cape May, the

2  town, or --

3      A.  It was in North Cape May.  I think the

4  address was 20 Fernwood Road in North Cape May.  And

5  the municipal is Townbank.

6      Q.  The municipal is what?  I'm sorry, sir.

7      A.  Townbank.

8      Q.  Okay.  And why did you sell that house?

9      A.  We just decided to sell it.  Get a house --

10  get a better -- try to get a better investment.

11      Q.  Okay.  And where do you have a home in Cape

12  May now?

13      A.  We do not have a home in Cape May.  I

14  sometimes think that home brought me bad luck.  So we

15  bought a home in the Villas.

16      Q.  Okay.  And that's Wildwood?

17      A.  No.

18      Q.  What's the Villas?  I always thought it was

19  Wildwood.

20      A.  No.  Wildwood is -- Wildwood is Wildwood,

21  North Wildwood, and Diamond Beach are one of the

22  islands off the -- off the Jersey coast there.

23      Q.  And what about the Villas?

24      A.  The Villas are -- is in New Jersey.  It's

25  north -- it's north of Cape May.

WORD FOR WORD REPORTING, LLC

64

1      Q.  It's still Cape May County?

2      A.  No.  It's -- it's Cape May County, but it's

3  -- yes.

4      Q.  It's Cape May County, yes?

5      A.  Yes.

6      Q.  Okay.  And can you tell me, is that a larger,

7  smaller residence?

8      A.  Smaller.

9      Q.  Is it closer to the beach?

10      A.  Yes.

11      Q.  How close is it to the beach?

12      A.  It's beach front.

13      Q.  Is it a condo, a house?

14      A.  It's a house.  Well, it's part of an

15  association.

16      Q.  Okay.

17      A.  But it's a -- it's half of a double.

18      Q.  Okay.  And you think you might have moved

19  into that about three years ago?

20      A.  Correct.

21      Q.  Okay.  So now, how often do you go to your

22  place in the Villas?

23      A.  It's not that often.  My wife uses it as a

24  Vrbo rental for income.

25      Q.  Okay.  So how often does it get rented?

WORD FOR WORD REPORTING, LLC

---

**65**

1   A.   You'll have to ask her that. I mean, during
2 the summertime, we try to rent it as much as
3 possible. In the wintertime, it doesn't get rented
4 that much.
5   Q.   So for instance, will you be renting it for
6 the upcoming Memorial Day weekend, or will you be
7 going down there?
8   A.   I -- again, you have to ask Lisa, because she
9 -- she runs the rentals, and she tells me what, you
10 know, whether we're going down, or when we're going
11 down. So I -- I don't know the answer. But, you
12 know, you have to ask her.
13   Q.   So you don't know, you know, whether or not
14 your beach front home has been rented for certain
15 holidays yet?
16   A.   She -- I don't keep the calendar. She runs
17 that whole operation. I -- I don't deal with that at
18 all. She rents it.
19   Q.   Okay. And did you also rent it out last
20 year?
21   A.   Yes.
22   Q.   2023?
23   A.   Yes.
24   Q.   Do you remember how often you were at your
25 home in the Villas in summer 2023?

WORD FOR WORD REPORTING, LLC

---

**66**

1   A.   No.
2   Q.   Do you know if you were down there for
3 Memorial Day?
4   A.   I don't believe we were there -- we were down
5 there for Memorial Day.
6   Q.   What about July 4th?
7   A.   You'll -- I don't -- I don't recall. You'll
8 have to ask Lisa. She --
9   Q.   Is there any records on this, like, that
10 would be kept?
11   A.   I believe she has -- she has a calendar of
12 what dates the home was rented.
13   Q.   And the home is rented for -- for purposes of
14 income, true?
15   A.   Correct. Supplemental income.
16   Q.   So I'd like to talk to you about the
17 incident, the actual incident, finally.
18         And can you tell me -- I have that that
19 date is August 10th, 2020. And from my calendar,
20 that would have been a Monday. And I think it's
21 about 9 -- 9:35 or so p.m.
22         Does that sound about right to you?
23   A.   It was -- it wasn't a Sunday?
24   Q.   Well, I'm asking you. I have that the
25 incident occurred on August 10 at about 9:45 p.m.

WORD FOR WORD REPORTING, LLC

---

**67**

1   A.   Yeah, I think the time is fine. It occurred
2 in 1921.
3         MR. KAROLY:  2021.
4   Q.   No, 2020.
5   A.   Well, Monday -- if you say it's -- it was
6 Monday. I don't recall.
7   Q.   I don't want to tell you anything.
8   A.   Okay.
9   Q.   We can -- let's look at your answers to
10 interrogatories. Make it abundantly clear.
11         I have that it was about 9:39 p.m. on
12 August 10th, 2020.
13         Do you have any reason to disagree with
14 me that it was a Monday?
15   A.   No reason.
16   Q.   Okay.
17   A.   No.
18   Q.   Okay. And can you tell me what your normal
19 schedule would have been like back in August 2010 in
20 terms of going down to the shore from your home where
21 you live in Quakertown?
22         MR. KAROLY:  Objection. And I think
23 just for the record, again, it's 2020. I think you
24 said August 2010.
25         MS. BROCCO:  I'm sorry.

WORD FOR WORD REPORTING, LLC

---

**68**

1         MR. KAROLY:  But we understand what you
2 mean.
3   A.   And --
4   Q.   Let me rephrase it.
5         Do you remember what your schedule was
6 like back on August 10th, 2020 in terms of traveling
7 to and from the shore?
8   A.   Well, usually, we would -- if we went down,
9 if the house wouldn't be rented, we usually would go
10 down on a Friday night, and come back on a Sunday.
11   Q.   And do you know why this particular time was
12 different, wherein you were coming home --
13   A.   Yeah, because --
14   Q.   -- on a Monday night?
15   A.   Yes. Because we had friends that were coming
16 down that were going to be using our home, and we
17 spent the day with them. They were coming down that
18 Monday.
19   Q.   Okay. And were they renting it from you, or
20 were they -- you were just letting them borrow it?
21   A.   They were just -- we were letting them use
22 it. We were letting them use it.
23   Q.   And their names are?
24   A.   James Heidecker and Maureen Heidecker, and
25 their daughter Riley, and I think their

WORD FOR WORD REPORTING, LLC

---

69

1  mother-in-law.  And I don't know what her name is.
2  Maureen -- Maureen Heidecker's mother.
3      Q.   Okay.  And so do you know when you got to the
4  beach that weekend?
5      A.   I assume so.
6      Q.   And you think it was -- I don't want you to
7  assume anything.  Do you know when you got there?
8      A.   On what day?
9      Q.   Well, I'm asking you.  When did you get to
10 Cape May that weekend, if you remember, to your
11 knowledge?
12     A.   From my recollection, we probably went down
13 Friday evening, or Friday afternoon, late afternoon.
14     Q.   And who did you go with?
15     A.   With Lisa.
16     Q.   Okay.  And I understand -- did you bring your
17 dog with you, as well?
18     A.   We brought Benny, correct.
19     Q.   And what vehicle did you guys drive down?
20     A.   Our Ford pickup.
21     Q.   And what year, make, and model would that
22 have been?
23     A.   I think it's a 2013 F-150 SU -- four-by-four
24 club cab.
25     Q.   And can you tell me if that was your vehicle

WORD FOR WORD REPORTING, LLC

70

1  to drive, or did you share that vehicle, was it your
2  wife's vehicle?  Or was it, like, a pleasure vehicle?
3      A.   I don't quite understand your question.  It's
4  a family vehicle.  My wife drives it, I drive it.  We
5  use it -- we use it on the farm.
6      Q.   Back in August 10th, 2020, did you have a
7  different vehicle that you used other than the 2013
8  F-150?
9      A.   Yes.
10     Q.   And what vehicle would that have been?
11     A.   We had a Mercedes Benz 2012, 350E.  And I
12 believe we had a 2018 or 2019 GLE 350 Mercedes Benz.
13     Q.   And so you said that you used the pickup
14 truck on your farm.
15          Do you live on a farm?
16     A.   It's a farmette.  I had a farm before.  But
17 we use it hauling stuff.
18     Q.   You had a what before?
19     A.   We had a -- I had a 30-acre home.  This is
20 six acres.  But we still have a lot of land, and you
21 need a pickup.
22     Q.   Okay.  And so in 2020, was that the vehicle
23 you usually took to the beach?
24     A.   If we were -- usually.  If we're taking the
25 dog, the dog -- or dogs, we use the truck.

WORD FOR WORD REPORTING, LLC

71

1      Q.   And did you only bring one dog with you to
2  the beach?
3      A.   We only had one dog, because our Shepherd had
4  recently died, passed.
5      Q.   Okay.  And what type of dog did you bring
6  with you?
7      A.   It's called a Bouvier.  It's a Belgian
8  sheepdog.
9      Q.   And were you comfortable driving the 2013
10 pickup truck back in 2010?
11     A.   Very.
12     Q.   Very?
13     A.   Very.
14     Q.   How long did you own that vehicle before this
15 incident occurred?
16     A.   Couple years.
17     Q.   And so you believe that you got to Cape May
18 sometime on Friday, that would have brought us to 9
19 -- May 6th, or thereabouts?  I'm sorry.  August 6th,
20 or thereabouts?
21     A.   If Friday was August -- yeah, Friday, we got
22 there Friday afternoon, late, late afternoon, early
23 evening.  That would be the 7th.
24     Q.   Approximately what time?  Oh, it was May the
25 7th, sorry.

WORD FOR WORD REPORTING, LLC

72

1          MR. KAROLY:  August.
2          MS. BROCCO:  August.
3      A.   August.
4      Q.   Because it's May.
5      A.   I don't -- I don't recall the time.  I really
6  don't.
7      Q.   Okay.
8      A.   It was sometime after -- I'm sure it was
9  after 5 o'clock.
10     Q.   Okay.  And what route would you normally take
11 to get to the shore?
12     A.   The blue route, down to either the
13 Schuylkill, or -- take Benjamin Franklin,
14 depending on traffic, or the blue route down to the
15 Commodore Barry Bridge, and then eventually onto 55,
16 and then eventually onto 347.
17     Q.   And about what -- tell me what the distance
18 would be between the two homes back in 2010.
19     A.   About a hundred --
20          MR. KAROLY:  '20.
21          MS. BROCCO:  I'm sorry?
22          MR. KAROLY:  2020.
23     Q.   2020.  I can't believe I keep saying that.
24     A.   About a hundred 25, 26 miles.
25     Q.   Okay.  And can you tell me how long that

WORD FOR WORD REPORTING, LLC

73

1   drive would be?

2   A.   Depending on traffic, it could be anywhere

3   from two hours and 15 minutes, two hours and a half,

4   to four, depending on traffic. But it's usually two

5   hours, 15 minutes, to three hours and a half.

6   Depending on traffic.

7   Q.   So when you got to your home in Cape May,

8   were your friends there, or was it just yourself,

9   your wife, and your dog?

10  A.   My wife, myself, and the dog.

11  Q.   What types -- what did you do when you got

12  there Friday night?

13  A.   Probably got something to eat. Well, first

14  we got in, we would unload, unpack, feed the dog.

15  And then go out and get something to eat.

16  Q.   Where would you normally go?

17  A.   That depends. We might go to the Olive

18  Branch, that's really close.

19  Q.   Do you remember where in particular you went

20  that day or night?

21  A.   Do not.

22  Q.   And normally, what would you do after that

23  routine that you just described; get something to

24  eat?

25  A.   Then come home and watch the sunset, or spend

WORD FOR WORD REPORTING, LLC

74

1   some quality time with my better half.

2   Q.   And was that home located on the water?

3   A.   No.

4   Q.   Could you walk to the beach, bay?

5   A.   I don't recall.

6   Q.   And then what would be a typical time for you

7   to go to go to bed on a Friday night?

8   A.   10, 10:30.

9   Q.   And what would be a typical time for you to

10  wake up?

11  A.   Well, I'm an early bird. So I usually get up

12  around 6, 6:30, let the dog out. Try to be quiet as

13  a church mouse to let my wife sleep. Sometimes I'm

14  successful, sometimes I'm not. And go out -- we'll

15  make breakfast.

16  Q.   And then what would you normally do that

17  following Saturday, after breakfast?

18  A.   Probably go -- maybe do some housekeeping

19  chores, and then make -- go to the beach.

20  Q.   And would you walk to the beach, or drive to

21  the beach?

22  A.   Depends what beach we would go to.

23  Q.   And explain that.

24  A.   Well, if we wanted to go to Cape May, to the

25  ocean side, we would drive. If we wanted to go to

WORD FOR WORD REPORTING, LLC

75

1   the bay side, we would walk.

2   Q.   And is there a beach on the bay side?

3   A.   Yes.

4   Q.   Do you remember what you did, whether you

5   would have gone to the beach that Saturday?

6   A.   I couldn't --

7   Q.   Which would be August 8th?

8   A.   I do not remember what beach we went to on

9   that Saturday.

10  Q.   And would you bring alcoholic beverages with

11  you to the beach?

12  A.   On occasion, we would.

13  Q.   What types of beverages?

14  A.   I think -- well, my wife would pack the

15  cooler. So usually, I think it would just be a beer,

16  and -- and club soda, and water.

17  Q.   Beer or club soda and water?

18  A.   Correct.

19  Q.   What about food?

20  A.   Not usually.

21  Q.   Would you grab food --

22  A.   You'd have to ask her. Because she's the one

23  that packs the cooler.

24  Q.   Okay. And about how long would you spend --

25  or what time would you normally get to the beach?

WORD FOR WORD REPORTING, LLC

76

1   A.   That varies. It could be 11 o'clock, it

2   could be 2 o'clock. It varied.

3   Q.   Okay. And then would you go to the beach by

4   yourselves, or would you meet others?

5   A.   Again, it depends on the weekend, or the

6   occasion. That week, if we went to the beach on

7   Saturday, we were alone. And in the morning, I would

8   usually -- I forgot to mention, if I'm down the

9   shore, I would normally go for a nice long bike ride

10  for an hour or two every morning.

11  Q.   You'd use your own bike?

12  A.   Yes.

13  Q.   Would you go alone?

14  A.   Yes. I would try to get my wife to go, but

15  she would go on occasion.

16  Q.   Tell me how many miles you would ride.

17  A.   30.

18  Q.   And tell me where your starting point and

19  your ending point would be.

20  A.   I would start at -- or the home on Fernwood.

21  If I was going on my 30-mile ride, I would drive down

22  into Cape May, go all the way down to the end of Cape

23  May, then up to the bridge, taking me into -- into

24  Wildwood Crest, drive up all the way through Wildwood

25  to North Wildwood, then turn left and go over the

WORD FOR WORD REPORTING, LLC

77

1    bridge, under the -- under the Parkway, back to our
2    home.
3        Q.    And what time would you normally leave the
4    house to do the bike ride?
5        A.    I would try to do it early, before it got
6    really hot, 7 -- plus the traffic, so.  The earlier,
7    the better.
8        Q.    And then you would return between 8 and 9
9    a.m.?
10       A.    8, 9, 8:30.  Usually, an hour and a half to
11   two hours.
12       Q.    Did you always ride your bike every morning
13   that you were at the shore?
14       A.    I would like to ride every morning, but it,
15   you know, depended on whether we had company,
16   whether -- you know, there was a lot of variables.
17   So I would try to -- I would like to ride as often as
18   I could.
19       Q.    Okay.  Do you know if you rode this
20   particular weekend at the shore?
21       A.    I don't recall.  I don't recall.
22       Q.    And you would -- so then that would take --
23   so you don't recall if you rode your bike that
24   Saturday morning or not?
25       A.    I do not recall.

78

1        Q.    You're an early riser, you may or may not
2    have rode your bike, probably went to the beach.
3              How many hours would you spend on the
4    beach?
5        A.    Again, it depended on what time we got there.
6    But at least, you know, two, three hours, I would
7    think.  If we went down --
8        Q.    And what -- go ahead.
9        A.    If we went down to the Cape May beach, we
10   would, you know, park the vehicle, unload it.  We had
11   beach passes, so, you know, when we came and went, we
12   could have gone at 11, stayed there, maybe went out
13   and got something to eat for lunch, came back, stayed
14   there until 2 or 3, came home, showered.
15       Q.    And then what would your nights look like?
16       A.    Either go to Fish and Fancy and get some good
17   seafood, or maybe we'd go out to dinner.  It would
18   depend --
19       Q.    What's H&H?  I saw that --
20       A.    H&H is a seafood place that is on the roadway
21   between Cape May and the Wildwood bridge, the bridge
22   over -- the toll bridge over to Wildwood.  It's on
23   the right-hand side.  It's a -- it's an outdoor fresh
24   fish restaurant.  It's only seasonal.  They don't
25   serve any alcoholic beverages or anything there.

79

1    They are just good, fresh seafood.
2        Q.    Had you gone there that weekend?
3        A.    We went there that Monday before we left to
4    go home with Mr. Heidecker, his wife, his daughter,
5    and his -- I believe his mother-in-law went with us.
6        Q.    And do you know when -- I'm sorry if I asked
7    you this -- when the Heideckers came to your place?
8        A.    I think -- I believe they came Monday.
9        Q.    So that whole weekend, Sunday, I mean, I
10   don't know if you remember what you did, can you
11   remember what your activity was in the 24 hours -- 24
12   to 48 hours before this incident occurred?
13       A.    It was nothing unusual.  We would go to the
14   beach, we'd go for a walk, I'd go for a bike ride.
15   We would watch maybe a sunset.  I -- you know, I
16   don't specifically recall what exactly we did that --
17   that weekend in 2020.  It's four years ago.
18       Q.    And did you have any other visitors,
19   grandkids, kids, anybody there that weekend?
20       A.    No.  Not that I -- not to my recollection.
21       Q.    And so, normally, would you have left Sunday
22   night, but for the Heideckers coming to use your
23   house?
24       A.    Normally.  Normally, we would have done that.
25       Q.    And what was your normal time of leaving the

80

1    shore to go back home?
2        A.    It would probably be later on in the evening,
3    on a Sunday, after the weekend -- after the
4    weekenders kind of left.  We'd go, like, leave at 7,
5    8 in the evening, sometimes even 9.
6        Q.    And then that would -- if you left at that
7    hour, you would have gotten home approximately what
8    time?  Suppose you left the beach at 9 or your house
9    at 9, what time --
10       A.    9:30 -- 10:30, 11.  11:30 -- two hours.  Two
11   hours.  I mean, if I left at 9, I'd be home by 11
12   o'clock, at the latest, if there's no traffic.  But
13   we usually left, like, around 7 or 8, so not to get
14   home too late, because Monday I have to go to work.
15       Q.    Your testimony was you would leave 7, 8, or
16   9, so.
17       A.    Depending.  Again, when we got everything
18   ready, and it wasn't a -- we would wait until after
19   the traffic was over.  Because the people, when they
20   check out of their -- out of the rooms on Sunday,
21   they leave, like -- they have to check out by 11.  So
22   it gets backed up.  So after -- after 6 o'clock, we
23   would normally leave.  Plus, we would, you know, have
24   to close everything down, get the house secure, make
25   sure it's clean.

81

1    Q.   It's a lot of work, I know, yes.
2    A.   **You know, just get everything ready, make**
3    **sure the beds are made, make sure it's clean, put the**
4    **dog food away. You know, just get everything ready.**
5    Q.   Straighten up?
6    A.   **Yep.**
7    Q.   So do you know what you did on Monday, August
8    10th?
9    A.   **Well, Monday was a special occasion, because**
10   **Jim was coming down. I was excited to see him. And**
11   **we were looking forward to it. So, yeah, I remember**
12   **what we did, because it was, you know, not your**
13   **ordinary weekend.**
14          **It was, I think, the first -- the first**
15   **time he ever came down.**
16   Q.   Okay. And what did -- and other than -- I
17   know that he's an attorney. Do you consider him a
18   good friend, Mr. Heidecker?
19   A.   **I consider him a -- not a -- not a good**
20   **friend. A good colleague.**
21   Q.   How long have you known him?
22   A.   **Oh, gosh, I've known Jim for 20, 30 -- 25**
23   **years.**
24   Q.   20 to -- how many years? 20 to 25?
25   A.   **I'd say approximately 25 years. But it's not**

82

1    that I -- you know, I don't hang out with him every
2    weekend, or anything like that, you know.
3    Q.   Do you talk to him often, whether it be text,
4    e-mail, phone?
5    A.   **When I see him, yes, I talk to him**
6    **frequently.**
7    Q.   Do you go out socially with them?
8    A.   **No, not really. Maybe once -- once a year,**
9    **once every other year.**
10   Q.   And where does he live?
11   A.   **I think he lives in -- I think it's Macungie.**
12   **I've been to --**
13   Q.   When was the last time you saw him?
14   A.   **I saw him in the morning.**
15   Q.   Where did you see him?
16   A.   **In the office.**
17   Q.   Now, remind me. He -- does he -- he works in
18   your office, or no?
19   A.   **He works in my building.**
20   Q.   Oh, he works in your building.
21          MR. KAROLY:  He's an employee of mine.
22   That's how -- that's how he knows him.
23          MS. BROCCO:  Oh.
24          MR. KAROLY:  Bo rents space in one of
25   my buildings. My office is in the same building as

83

1    Bo's office is. And Jim works for me.
2    Q.   And how old is Mr. Heidecker?
3    A.   **He's 76.**
4          MR. KAROLY:  He's 77.
5    Q.   He still practices law?
6          MR. KAROLY:  He does, yes.
7          MS. BROCCO:  Poor guy. Off the record.
8          MR. KAROLY:  He does -- he does
9    part-time, you know, three days a week.
10         MS. BROCCO:  Poor guy.
11   Q.   So you were excited he was coming down, he
12   was bringing his family. So you stayed an extra
13   night into the day, true?
14   A.   **No. We just -- we left the day that he came.**
15   **So he came on Monday.**
16   Q.   But you would -- you stayed --
17   A.   **Oh, right. I'm sorry. I stand corrected.**
18   **Right, we stayed over to Monday because he was**
19   **coming, we wanted to show him the house, get him --**
20   **show him the lay of the land, you know, and spend**
21   **some time with him.**
22   Q.   Of course, okay. And so tell me, if you
23   remember, what did you do the day before the
24   incident? I mean, do you remember what you would
25   have done that Sunday, on August 9th?

84

1    A.   **I probably went on a bike ride. If it wasn't**
2    **raining, and it wasn't too, too windy, I had probably**
3    **gone on a bike ride. I would have came back, had**
4    **breakfast, did some work around the house, you know,**
5    **either pulling weeds or just, you know, straightening**
6    **up. And then we would have gone down to the beach,**
7    **spent some time at the beach, come home, have -- go**
8    **out for dinner, come back, have some -- some R and R,**
9    **you know, enjoy each other's company, maybe watch a**
10   **movie, watch the sunset, go to sleep, get up in the**
11   **morning. You know, Monday morning, get the house**
12   **ready for Jim, make sure everything is, you know, the**
13   **way it should be. You know, make sure all the beds**
14   **are made, make sure the clean sheets, you know, just**
15   **towels are washed, towels are put away, towels are**
16   **ready. Clean out the refrigerator. So that, you**
17   **know, that's clean when they come. Put all the**
18   **dishes away, straightened up, vacuum. Just --**
19   Q.   You're putting in a full day. You're biking,
20   you're cleaning, you're beaching, you're eating,
21   you're doing a lot of stuff.
22   A.   **That's what we do.**
23   Q.   I get it. And about -- and did you -- were
24   you drinking alcohol over the weekend?
25   A.   **I'm sure Saturday and Sunday, we -- we**

**85**

1  probably had some glasses of wine out to dinner. We
2  may have had a beer or two at the beach. Monday, I
3  know that Lisa brought -- Jimmy doesn't drink at all,
4  so -- and Maureen doesn't drink. They do not drink
5  at all. So we may have -- I don't know, Lisa packed
6  a cooler, she may have put a beer in there. She may
7  have given me a beer. I don't even think I even
8  finished it. I wouldn't drink alone in front of
9  Jimmy. I wouldn't do that. Mr. Heidecker.
10         And then we came home, we showered, got
11  ready, showed him around, and then we all went out to
12  dinner to H&H. We didn't drink anything at all. I
13  mean, when I say -- no alcoholic beverages. We had
14  soda, or club soda at H&H. Then we packed up the
15  truck, we spent some time, I think we watched the
16  sunset with the Heideckers, which would be -- we left
17  around 8:30, 8:45, which it takes about a half hour
18  to get to 55 from where we were. And that's when I
19  got pulled over.
20      Q.  You left the house at about 8:30 p.m.,
21  correct?
22      A.  No. Maybe a little bit later. Because if we
23  got pulled over at 9:30, it takes about a half hour
24  to get to where -- to get to Millville. Half hour to
25  45 minutes --

WORD FOR WORD REPORTING, LLC

**86**

1      Q.  Okay.
2      A.  -- to get to Millville.
3      Q.  So you were on the road for about a half hour
4  before this incident occurred?
5      A.  Approximately.
6      Q.  Okay. So you packed up your vehicle. I
7  understand that somebody went grocery shopping. I
8  know that there were groceries in the back of your
9  vehicle.
10      A.  Lisa went grocery shopping, I think, to get
11  some groceries. She had put wet wash into -- in the
12  back, too, because we had to leave, we didn't have
13  time to dry it. We had some -- we had bought some
14  wine at Joey Canal's. We put that in the back of the
15  truck, two or three bottles. And, you know, it was
16  like any other day we're leaving to go home.
17      Q.  And why did you bring groceries home with
18  you?
19      A.  You have -- well, we were probably some --
20  you have to ask my wife. I mean, that's her -- you
21  know, that's her department.
22      Q.  Okay. Did you go grocery shopping with her
23  before leaving?
24      A.  I don't recall if she had it Instacarted, or
25  if we went grocery shopping. I mean, it wasn't a lot

WORD FOR WORD REPORTING, LLC

**87**

1  of groceries, you know. Some odds and ends. But she
2  would have -- she'd be more specific with that.
3      Q.  So during the course of the weekend,
4  including on Monday, August 10th, did you -- do you
5  take naps?
6      A.  No.
7      Q.  Do you take any kind of rest at all, other
8  than that, you know, when you're sitting on the
9  beach?
10      A.  No.
11      Q.  Can I ask you, when you got into the car at
12  about 9 p.m. on that Monday night, were you, you know
13  -- were you rested?
14      A.  Yeah. I mean, I was fine.
15      Q.  Bright eyed and bushy tailed?
16      A.  That's my -- I'm that way 24/7. Like --
17  Friday, yeah, Friday I worked out in the yard, I
18  moved two and a half yards of dirt, raked it, cut
19  four acres of lawn. Moved -- we had three pine trees
20  that fell over, cut them up, moved them. Fixed the
21  fence for the dogs. So I work from -- got up early.
22  So -- well, I went to -- it was -- I went to church
23  from 8 to 9. And then from -- I work from 9 until 6
24  o'clock non-stop, got it done, because we had -- it
25  was our Easter Sunday, so I had to have everything

WORD FOR WORD REPORTING, LLC

**88**

1  ready on the outside. Lisa was cooking up a storm.
2      Q.  It was, what did you say, your Easter?
3      A.  Easter. Greek Orthodox Easter.
4      Q.  Okay. Okay. All right.
5      A.  So, you know, we had, you know, 21 people
6  over.
7      Q.  And what day was that?
8      A.  Yesterday.
9      Q.  Oh, that was yesterday. Oh, you're just
10  giving me -- because it's so funny, because I was in
11  Florida, and then -- everything was closed because of
12  that, I'm, like, this is strange. I thought that
13  that was in May. Anyway, I digress.
14      A.  So --
15      Q.  So you're the type of -- you're a doer,
16  you're a type A?
17      A.  Yes.
18      Q.  Okay. But let's get back to the -- to the
19  date.
20         So do you know how many hours you slept
21  the day before this incident occurred?
22      A.  Well, the routine is, usually, my wife wants
23  to get her -- her -- she likes to get at least eight
24  hours sleep.
25      Q.  I'm not asking about your wife. What about

WORD FOR WORD REPORTING, LLC

89

1    you?

2        A.    Well, I usually go to bed before her.  And

3    when I'm up, she usually gets up.  So, you know, we

4    don't stay up late until 1 -- I never stay up until 1

5    or 2 o'clock in the morning, unless there's some sort

6    of function or something, or I'm driving back from a

7    long trip.  But I'm usually in bed 10:30, 11 is the

8    latest.  And I'm up by 6:30, 7.  That's, like --

9        Q.    And you believe that that was the case?

10       A.    Yeah, probably --

11       Q.    August 9th through August 10th?

12       A.    Yeah.  It was -- there was nothing to keep --

13   we didn't go to any parties, we weren't out clubbing.

14   We were just enjoying each other, and enjoying being

15   at the beach house.  And looking forward to seeing

16   Mr. Heidecker and his family the next day.

17       Q.    And you believe that you went for a bike ride

18   that morning?

19       A.    I believe I did then, yes.

20       Q.    Okay.  And about what time did your friends

21   come?

22       A.    I think they came late morning, early

23   afternoon.  Had to be in the morning, because we went

24   to the beach.  But I can't --

25       Q.    And you went to the beach with your friends,

WORD FOR WORD REPORTING, LLC

91

1        Q.    And tell me about the route you would have

2    taken from your house to the area where the incident

3    occurred.

4        A.    Well, it's the typical route, I would -- I'd

5    take Bayshore Road, make a right, go to 347, make a

6    left, and take that all the way up into Millville,

7    and hit 55 at Millville.

8        Q.    Okay.  And did you make any stops along the

9    way?

10       A.    No.

11       Q.    Nothing -- okay.  Did you have --

12       A.    No.  I'm sorry.  Go ahead.

13       Q.    Did you have any coffee to drink before you

14   left?

15       A.    I may have.  With dinner.

16       Q.    And what time was dinner?

17       A.    I think it was around 5, 6 o'clock in the

18   afternoon; 6 or 7.

19       Q.    And why would you have coffee?

20       A.    So it was -- I don't know.  Because I was

21   thirsty.  Just, you know, had a cup of coffee.

22       Q.    Because you were thirsty, okay.

23       A.    We had club soda.  I'm pretty sure I had

24   coffee then, but -- maybe I didn't.  You know, I

25   don't -- I don't recall exactly.

WORD FOR WORD REPORTING, LLC

90

1    okay, that's right.

2        A.    Correct.  We drove down to Cape May beach.

3        Q.    And when you left the house to come home,

4    what were the weather conditions?

5        A.    Dry.  I don't know if there was a full moon,

6    but it wasn't raining.  Dry, warm.  You know, your

7    typical August -- your typical New Jersey August day,

8    or evening.

9        Q.    And what about traffic conditions at that

10   point?

11       A.    I don't recall them being bad, because it was

12   later -- it was a Monday.  I mean, there was traffic.

13   It wasn't -- but it wasn't anything bad.

14             The worst traffic is before you get to

15   55.  I mean, there were cars, but it wasn't -- it

16   wasn't heavy.  You know, it wasn't stop-and-go.  Just

17   it flowed.

18       Q.    And what about in the area where you were

19   pulled over, what about the lighting conditions?

20       A.    From streetlights, or from --

21       Q.    In the vicinity where the incident took

22   place, where you were pulled over, what are the

23   lighting conditions there?

24       A.    There are no lighting -- there's no

25   streetlights.  It's a two-lane highway at night.

WORD FOR WORD REPORTING, LLC

92

1        Q.    So I mean, when you left that late, did you

2    have any concerns about your ability to drive that

3    long of a distance that late at night in the dark on

4    a dark road?

5        A.    Not at all.  I mean, I used to -- I love

6    driving at night, because usually there's less

7    traffic, you can make better time.  And even to the

8    days when I went to law school, I would leave my

9    parents' home 11, 12 at night, and then drive through

10   until -- to Vermont, and get there at 4, 5 o'clock in

11   the morning and, you know, miss all the traffic.  You

12   know, just --

13       Q.    But at that point in time, you were a lot

14   younger, agree?  I mean, no offense, but you were

15   several years younger.

16       A.    Several.  You're being very kind.

17             But no, I didn't feel tired.  I've done

18   this so many -- I mean, it's -- I could almost do it

19   in my sleep, no pun intended.  I mean, the road, I

20   just -- I've done it so many times.  Because before,

21   we had a house in Wildwood Crest, on Syracuse Street,

22   four or five -- so I mean, it's --

23       Q.    And tell me if you -- do you know if your

24   wife had any concerns about you driving that late at

25   night, not only on that night, but on any other night

WORD FOR WORD REPORTING, LLC

93

1  where the conditions were similar?
2      A.   You'd have to -- not that I -- not that I
3  recall.  If she has some concerns, she would tell me,
4  pull over, I'm driving.  That would be her -- if she
5  -- or she would -- she would first voice, if I was
6  doing something wrong, she'd voice it a couple times,
7  and then she'd say, if you're tired, or something,
8  then she would drive.  I don't know -- one instance,
9  we were visiting some friends, and down in Delaware,
10 and we were leaving late, and I was -- I was beat.
11 And she said, pull over, and she drove.  Usually, I
12 -- 90 percent of the time, I drive.  But that one
13 incident, she noticed that I was really tired, she
14 drove.
15     Q.   Okay.  Did you feel like, let's say when you
16 got on the road, did you have any trouble seeing the
17 road at any point in time that night?
18     A.   No, none.
19     Q.   Do you wear glasses?
20     A.   Yes.
21     Q.   Do you wear contacts?
22     A.   No.
23     Q.   I see that you're wearing glasses today,
24 true?
25     A.   Yes.

94

1      Q.   Were you wearing glasses the night of August
2  10th, 2020, when you were driving home?
3      A.   Yes.  And you can see me wearing the glasses
4  on the video.
5      Q.   Okay.  I'm not sure if I -- well, we'll get
6  into the video.  But -- and what do you use the
7  glasses for?
8      A.   Well, initially, they were for reading.  But
9  now they're for some distance.
10     Q.   And was your prescription the same then, back
11 in 2000 --
12     A.   Yes.
13     Q.   Let me finish.
14          -- August 10th, 2020, as it is now?
15     A.   Yes.  The prescription that I had back in
16 August, I believe, is the same as it is now.  There's
17 been no change.
18     Q.   And when was the last time you had your eyes
19 checked -- strike that.
20          As of August 10th, 2020, do you know
21 when the last time it was that you had your eyes
22 checked?
23     A.   I do not know the exact date that I had my
24 eyes checked.  But I know that I have them checked
25 regularly by the optometrist that I use.

95

1      Q.   And who's your optometrist?
2      A.   It's Fox Optical in Bethlehem, Pennsylvania.
3      Q.   And how long have you been going to them?
4      A.   At least the -- you know, the past five, six
5  years, if not longer.
6      Q.   And do you believe that your prescription was
7  up-to-date as of August 10th, 2020?
8      A.   Yes.
9      Q.   And you said 90 percent of the time, you
10 drive.  Did your wife offer to drive you that night?
11     A.   No.
12     Q.   Before you were pulled over, were there any
13 obstructions to your vision?
14     A.   No.
15     Q.   Were there any obstructions on the roadway?
16     A.   No.
17     Q.   Were you distracted in any way for any
18 reason?
19     A.   No.
20     Q.   Did you have a cell phone on you at the time?
21     A.   Yes.
22     Q.   Were you talking on your cell phone?
23     A.   No.  That's -- that's a -- my wife forbids me
24 to look or talk -- well, strike that.  To look on the
25 cell phone.  You know, if I'm driving.  Plus, it's

96

1  against the law.
2      Q.   Okay.  And I know that you had your dog with
3  you.  Where does the dog usually sit?
4      A.   The dog always sits in the back of the truck.
5  Just if I can just answer, going back, I will use my
6  -- the cell phone when we travel, we use Waze, the
7  app Waze.  So I'll have that, you know.  But the
8  sound just -- just for traffic, or for -- if there's
9  any issues with the road.
10     Q.   And you used Waze as your navigation?
11     A.   Correct.
12     Q.   And that is on your phone?
13     A.   Either my phone, or on my wife's.  It's in
14 both of our phones.  But either I will use my phone,
15 or my wife will use hers.
16     Q.   And your phone, is it mounted -- back in
17 2020, was your phone mounted on any type of
18 equipment?
19     A.   Yes.  Back then, it was on a -- I think we
20 had a thing on the -- the air conditioning vent you
21 could put it on.
22     Q.   Did you have it mounted then?
23     A.   I believe so.
24     Q.   Did you have any concerns about anything that
25 the Waze app was showing at that point in time?

**97**

1    A.   None.

2    Q.   Upcoming traffic, police on the road,

3 anything like that?

4    A.   No. Not that I can recall. No, not that I

5 recall.

6    Q.   And you indicated that your dog was seated in

7 the back of the truck?

8    A.   Correct. It's a four-door truck, and where

9 the back seat passenger -- back seat is, that lifts

10 up, and there's that big floor space. So the dog was

11 back there.

12    Q.   What was the dog doing at that time?

13    A.   I have no idea. Because I was watching the

14 road.

15    Q.   Do you know whether your wife was asleep or

16 awake at this time?

17    A.   She was awake. She was awake.

18    Q.   How do you know that?

19    A.   Because I could see she was awake. I mean,

20 she was talking to me, and -- she -- she can't sleep

21 in the car, so she's usually -- she's always awake.

22    Q.   And were you interacting with each other at

23 that time?

24    A.   We may have been.

25    Q.   And how were you interacting?

WORD FOR WORD REPORTING, LLC

**98**

1    A.   I -- there was no -- if we were interacting,

2 it would just be a casual conversation. You know,

3 maybe she'd say, you know, she enjoyed dinner, or it

4 was good seeing the Heideckers. You know, that --

5 just some chitchat.

6    Q.   So it was a peaceful interaction?

7    A.   I would hope so.

8    Q.   Okay. Was the radio on?

9    A.   It may have been. May have been.

10    Q.   What about the AC?

11    A.   Well, it was August. So it was on.

12    Q.   Okay. Do you know if your windows were open

13 or shut?

14    A.   If we had the AC on, and we're on the

15 highway, the windows would be shut.

16    Q.   And before Trooper Davis pulled you over, did

17 you notice her vehicle?

18    A.   I noticed vehicles behind me. You know, but

19 it was dark. So, you know, I know there was vehicles

20 behind me. And, you know, I passed one or two

21 vehicles. But I didn't know it was Trooper Davis, or

22 I didn't know it was a police car.

23    Q.   So in this area where the incident occurred,

24 how many lanes of travel were there?

25    A.   Two.

WORD FOR WORD REPORTING, LLC

**99**

1    Q.   And are we still on 55, or are we on --

2    A.   No. We were on 55. We were -- everything

3 happened on Route 55.

4    Q.   Okay. And there were two lanes of traffic?

5    A.   Correct.

6    Q.   I'm sorry, two lanes of travel. Okay.

7    A.   Correct.

8    Q.   So you know the reason -- strike that.

9    You know -- I know you deny it, but, of

10 course, there is information indicating that you did

11 not -- that you made an improper lane change.

12    MR. KAROLY: Objection.

13    Q.   And that you didn't use a turn signal.

14    MR. KAROLY: Objection.

15    Q.   And that you were weaving in and out of

16 traffic.

17    Okay. Can we agree that that is the

18 premises under which Trooper Davis states you were

19 pulled over?

20    A.   That's what she told us when she walked up to

21 the window.

22    Q.   Okay. And at any point in time prior to you

23 being pulled over, did you feel like you were not in

24 control of your vehicle?

25    A.   Not at all.

WORD FOR WORD REPORTING, LLC

**100**

1    Q.   Okay.

2    A.   Not at all.

3    Q.   Did you at any point in time remove your

4 hands from the steering wheel for any reason?

5    A.   No, no.

6    Q.   Were you --

7    A.   Not at all.

8    Q.   I'm sorry?

9    A.   No, nothing. No.

10    Q.   Did you have two hands on the steering wheel

11 the entire time, let's say, for about a mile or two

12 prior to being pulled over?

13    A.   I -- my normal driving position is, usually,

14 I have two hands on the wheel.

15    Q.   And did you ever hear of the term highway

16 hypnosis?

17    A.   Yes. And I've experienced it.

18    Q.   Okay. Did you experience that feeling at any

19 point in time before you were pulled over that day?

20    A.   No. No. Highway hypnosis, as I understand

21 it, is you're tired, and then your eyes are open, but

22 you essentially are basically sleeping. That

23 occurred to me one or two times when I was up in

24 Vermont driving at 2, 3 o'clock in the morning. I

25 was fully alert, wide awake, enjoying the drive home,

WORD FOR WORD REPORTING, LLC

101

1   and enjoying -- you know, wasn't a lot of traffic,
2   and there was no obstructions.  Traffic was going
3   good.  Evening is -- you know, I was on -- I was on
4   point.
5       Q.   Okay.  And yet, you still had another what,
6   hour and a half drive ahead, true?
7       A.   An hour, an hour and a half, correct.
8       Q.   Had you gone through any tollbooths?
9       A.   There's no tolls there.
10      Q.   Okay.  I didn't think so, but.
11      A.   The first toll would be either the Ben
12  Franklin Bridge, once you go over it, or the
13  Commodore Barry Bridge, once you go over it.  And
14  then the northeast extension.  Those are the only two
15  tolls.
16      Q.   Now, I know that you -- you know, you deny
17  having anything alcoholic to drink.  What about any
18  other type of substance, such as marijuana?
19      A.   I have -- no.  I have no -- no.
20      Q.   Okay.  What about any form of narcotic
21  medication, pills, painkillers, anything like that?
22      A.   I don't take any, don't take any.
23      Q.   Okay.  You did testify earlier Viagra.  Had
24  you ingested any Viagra before you got on the road
25  that day?

102

1       A.   No, no.  No.  Because there would be no need.
2   It would usually make -- no.
3       Q.   Okay.  And because, again, you did not
4   mention that in your answers to interrogatories, you
5   just talked about the thyroid medication.
6            Now -- true, can we agree you did not
7   mention the Viagra?
8       A.   I did not.
9       Q.   Okay.  And how often would you take Viagra
10  back in August 2020?
11      A.   I don't know.  Once -- once a week.
12      Q.   Would that be usually on the weekend?
13      A.   Not necessarily.
14      Q.   Did that ever make you light-headed, dizzy?
15      A.   Never.
16      Q.   Never.
17           Did you ever experience any side
18  effects with that medication?
19      A.   None.  No side effects.
20      Q.   Do you know if you took it that weekend?
21      A.   I don't recall that.
22      Q.   And who prescribes -- oh, that's right.  You
23  get it on line.
24      A.   Doctor -- my family doctor, Douglas
25  Schoenberger.

103

1       Q.   Oh, okay.  And what about your thyroid
2   medicine, when would you normally take that; morning
3   or night?  I mean, I assume you take it daily, so.
4       A.   Yes.  I take it daily, first thing in the
5   morning.
6       Q.   And how long have you been on that?  Forgive
7   me if I've asked that.
8       A.   Since my surgery.
9       Q.   The carotid artery surgery?
10      A.   No.  I think before that.  Actually, I
11  started taking the baby aspirin after the carotid
12  surgery.
13      Q.   And does the thyroid medication have any side
14  effects that you know of?
15      A.   Not that I -- not that I felt or --
16      Q.   What do you mean, not that you felt?
17      A.   I've never experienced any side effects from
18  it.
19      Q.   And you took it on that morning?
20      A.   Yes.
21      Q.   Okay.
22           MS. BROCCO:  Do you mind if I take a
23  five-minute break before I get into the video?
24           MR. KAROLY:  That's fine, sure.
25           MS. BROCCO:  Thank you.

104

1            (There was a brief recess.)
2            MS. BROCCO:  Thank you for that.
3            So anyway, what was my last question,
4   Lynn?
5            (Record read.)
6   BY MS. BROCCO:
7       Q.   So as you're driving down the highway, is it
8   your testimony that you're completely alert, and
9   completely wide awake, and you're not feeling sleepy
10  at all?
11      A.   At all.
12      Q.   Did you have any problems at that point in
13  time maintaining your lane?
14      A.   No.
15      Q.   And I forget what that area of 55 is like.  I
16  do not like that road, so I do try to avoid it.  But
17  as you are driving northbound, are you -- is there a
18  shoulder to your right?
19      A.   Yes.
20      Q.   And is that shoulder wide enough to -- for a
21  vehicle to fit?
22      A.   I believe so.
23      Q.   Okay.  And in that area, agree with me, there
24  are no -- there's no artificial lighting there; you
25  agree with that?

105

1    A.    Yes.
2    Q.    And you're not sure of what the natural
3  lighting conditions would have been on that night, as
4  you sit here today?
5    A.    It was dark. It was night. 9:30 at night.
6    Q.    When did you first realize that you were
7  getting pulled over?
8    A.    The moment the lights -- she turned on her
9  lights.
10   Q.    Okay. And do you know how long -- one
11 second. I'll be right back.
12              Sorry about that.
13              So when you -- so you don't know if you
14 saw her before. Can you tell me if you -- if you
15 observed -- what you observed exactly when it was
16 that she first pulled you over?
17   A.    What I observed, as I -- what I observed was
18 she put her -- there were cars behind me, and then I
19 saw her put her lights on, and I immediately pulled
20 over.
21   Q.    And did you hear sirens?
22   A.    No.
23   Q.    And at that point -- at that moment in time,
24 when you observed her lights behind you, what exactly
25 was it that you were doing?

106

1    A.    Driving north on 55.
2    Q.    Were you eating anything?
3    A.    No.
4    Q.    Were you drinking anything?
5    A.    No.
6    Q.    And you testified that you would have had
7  your Waze on, but you were not talking on the phone?
8    A.    Correct.
9    Q.    Had you made any phone calls, whatsoever,
10 while you were -- between the time you left your
11 house to the time that the August 10th, 2020 incident
12 occurred?
13   A.    No.
14   Q.    Was that vehicle equipped with a hands-free
15 feature?
16   A.    Yes, I believe it is.
17   Q.    Okay. Do you still have that car?
18   A.    Yes.
19   Q.    Okay. And there is a Bluetooth device.
20              Do you know if your Bluetooth was
21 activated on your phone --
22   A.    It was not.
23   Q.    -- that night? Okay.
24              So explain to me what your first
25 interaction was with my client, Trooper Davis.

107

1    A.    Well, when I first saw the lights, I thought
2  she was going to some sort of call. I got into the
3  right lane, and I saw that when she pulled in after
4  me, I was shocked that she was pulling me over, and I
5  pulled over and stopped.
6    Q.    Before you got to that area, had you made any
7  lane changes?
8    A.    I don't recall.
9    Q.    When you first saw her sirens, lights, what
10 lane were you in?
11   A.    I believe I was in the left lane.
12   Q.    How long had you been in the left lane before
13 she pulled you over?
14   A.    I don't recall.
15   Q.    Do you remember what the speed limit is in
16 that area?
17   A.    It starts at 55, and then it goes up to 65.
18   Q.    And do you know, in that area, whether it had
19 changed to 65?
20   A.    I don't recall.
21   Q.    Do you know what your speed was at the time
22 that you were -- you know, at the time right before
23 you noticed that you were being pulled over?
24   A.    I was under the speed limit. I was not
25 speeding.

108

1    Q.    Why were you under the speed limit?
2    A.    We had just pulled -- as I recall, if I
3  recall correctly, we just had merged onto the two
4  lane, and I know the speed limit there is 55. I
5  wasn't in any hurry to get home. And my wife would
6  tell me if I'm speeding.
7    Q.    So you said you had just merged onto the two
8  lane. So if I understand it, it's one lane, and then
9  all of a sudden, another lane opens up, so to speak,
10 or another lane appears; is that accurate?
11   A.    Correct. Correct.
12   Q.    Okay. And so then when that other lane
13 appears, that opens up another lane of travel, and at
14 that point in time, did you opt to travel in the
15 right or the left lane?
16   A.    Don't recall.
17   Q.    Okay. And can you tell me how much time
18 elapsed from the time you -- from the time the one
19 lane turned into a two-lane highway to the time that
20 you were pulled over?
21   A.    My recollection is it was just a few minutes.
22   Q.    Okay. A few minutes?
23   A.    Correct.
24   Q.    Can you be a little more specific? Because a
25 few means different things to different people.

---

**109**

1    A.    I cannot be more specific.  I wasn't watching
2    my clock.
3        Q.    And at that point in time, when the roadway
4    opens up into two lanes, had you decelerated,
5    accelerated, do you recall?
6        A.    When it opened up to two lanes, I
7    accelerated, because the speed limit increases when
8    you get into the two lanes.
9        Q.    Okay.  And did you activate your traffic
10   signal for any reason to indicate any type of lane
11   change?  Because you testified you couldn't
12   remember whether you made any lane change, so.
13       A.    I don't think I changed any lanes.
14       Q.    Okay.  And so, therefore, you did not
15   activate any signal?
16       A.    Correct.
17       Q.    Do you know how long, then, it was that you
18   were in that left lane before you got pulled over?
19           MR. KAROLY:  Objection.  You can
20   answer.
21       A.    I wasn't on 55 that long.  A few minutes.
22       Q.    When you -- do you know if you, once you
23   noticed Trooper Davis' lights, do you know if you
24   started to reduce your speed?
25       A.    Oh, I would assume I had to, because I was

---

**110**

1    pulling over -- I pulled out of her way to let her
2    pass, but then she got behind me in the other lane,
3    so I -- I was slowing down.
4        Q.    And before the -- before she pulled you over,
5    did you have any conversations with your wife about
6    why she was pulling you over, any kind of
7    interaction?
8        A.    My wife says, Why is she pulling you over?  I
9    said, I don't know.
10       Q.    At this point in time, would you characterize
11   your demeanor as being alert?
12       A.    Wide alert.
13       Q.    Wide alert?
14       A.    Yeah.  Well, I was, like, yeah.  I mean, I
15   was -- I was on point.
16       Q.    You didn't feel tired, fatigued, anything
17   that would have impaired your ability to drive?
18       A.    Not at all.  Not at all.
19       Q.    You did testify you had some beer that day,
20   you said you're not even sure if you finished it; is
21   that your testimony?
22       A.    Correct.  When we were down at the beach.
23       Q.    And prior to this incident, had you ever been
24   pulled over for DUI?
25       A.    No.

---

**111**

1        Q.    Have you ever been convicted of any crimes?
2    And I don't want to insult you, since you're an
3    officer of the court, but I have to ask.
4        A.    No.
5        Q.    Okay.  And how about your driving record, how
6    is that?
7        A.    It's good.
8        Q.    Have you ever had any, other than this
9    incident, have you ever been, you know, pulled over
10   for speeding, or reckless driving?
11       A.    No, never for reckless driving.
12       Q.    What about speeding?
13       A.    Once or twice.
14       Q.    And when was that?
15       A.    15 years maybe.  Another one was maybe longer
16   than that.
17       Q.    Have you ever been pulled over for driver
18   inattentiveness?
19       A.    Never.
20       Q.    Have you ever been pulled over for improper
21   lane change?
22       A.    No.
23       Q.    Have you ever been pulled over for failing to
24   activate a turn signal?
25       A.    No.

---

**112**

1        Q.    So to your knowledge, you have had only two
2    speeding tickets your entire life?
3        A.    I think, from the age of 17 to now, maybe --
4    I'm trying to think back.  Two or -- two or three.
5        Q.    Two or three speeding tickets?
6        A.    Speeding tickets.
7        Q.    And has your license ever been suspended or
8    revoked for any reason?
9        A.    No.
10       Q.    Did you have valid insurance on the date of
11   this incident?
12       A.    Yes.
13       Q.    Were any of your documents expired on the
14   date of this incident; registration, license,
15   insurance card?
16       A.    No.
17       Q.    Okay.  I'm going to show you the video.
18       A.    Um-hum.
19       Q.    Okay.  So how I'm going to do this, as I'm
20   sure you know, I am going to let the video play, and
21   then I'll ask you some questions about it.  Okay?
22       A.    Yes.
23           MR. KAROLY:  And, counsel, are you
24   intending on letting it play all the way through, or
25   --

**113**

1  MS. BROCCO:  No, no, no.  I'm going to
2  play it by ear.  I have the transcript.  I'm going to
3  try to streamline it.  Okay?
4  MR. KAROLY:  Right.  And so I guess
5  then, when you do hit pause, I guess we can just
6  agree to utilize on the bottom left-hand side of the
7  screen, whatever the time is there, note for the
8  record, and then you could ask your question.
9  MS. BROCCO:  Yeah, I will do my best.
10  If I forget, you can remind me.  But, yes, that's
11  usually my practice.  Okay?
12  Q.  Okay.  So I'm going to start the video.
13  Right now we're at 0:00.
14  (Video playing.)
15  Q.  Okay.  I'm just going to stop it right there.
16  That's your vehicle pictured there?
17  A.  Yes.
18  Q.  Mr. Zelechiwsky?  Okay.  And on the back of
19  your vehicle, I notice that there are, I believe it
20  was, like, two bikes; is that true?
21  A.  Yes.
22  Q.  Who loaded the bikes onto the back of the
23  vehicle?
24  A.  I did.
25  Q.  Did the bikes in any way, shape or form

WORD FOR WORD REPORTING, LLC

**114**

1  impair your ability to see the roadway, anything like
2  that?
3  A.  No.
4  Q.  Did you always take the bikes to and from the
5  shore with you?
6  A.  Not always.
7  Q.  Why did you do it on this particular
8  occasion?
9  A.  Because I wanted to ride.
10  Q.  At home?
11  A.  At -- down the shore.
12  Q.  Okay.  But why did you -- instead of -- why
13  bring them home, you know, why not leave them?
14  A.  Because I ride at home.
15  Q.  That's what I meant.  Okay.
16  A.  I'm sorry.  I didn't --
17  Q.  That's all right.
18  So did you have any concerns about the
19  way that they were mounted onto the back of your
20  truck?
21  A.  No.
22  Q.  Can you describe for me what you did to get
23  them on the back of your truck?
24  A.  They are on a Thule, T-H-U-L-E, bike mount
25  that is put into the trailer hitch and secured by a

WORD FOR WORD REPORTING, LLC

**115**

1  big bolt, and then the bikes are mounted, and there's
2  two straps holding each bike.
3  Q.  And who put them on the back of the truck
4  before you left to go home that day?
5  A.  I did.
6  Q.  Did you do that by yourself?
7  A.  Yes.
8  Q.  Okay.  And aside from the bikes there, was
9  there anything else on that Thule hitch that you
10  described?
11  A.  No.
12  (Video playing.)
13  MS. BROCCO:  And by the way, just for
14  the record, that was about at 55 seconds, or so.  Can
15  we agree on that, Josh?
16  MR. KAROLY:  That's fine, yes.
17  MS. BROCCO:  I forgot.
18  MR. KAROLY:  That's all right.  That
19  one's not important.
20  MS. BROCCO:  Right.
21  Q.  Now, I believe that your wife said insurance
22  expired, but it's the same.
23  Do you know anything about that?
24  A.  I -- I believe that, when she did not -- we
25  did not have the current insurance card in the

WORD FOR WORD REPORTING, LLC

**116**

1  vehicle.
2  Q.  Okay.  To your knowledge, was the vehicle
3  insured?
4  A.  Yes.
5  Q.  Who's your insurance company, by the way, at
6  that time?
7  A.  I don't recall.
8  Q.  And that was at one minute 14 seconds.
9  Now, at that point in time, and that
10  was at about one minute 25, the -- does anybody ask
11  why Trooper Davis pulled you over at that point in
12  time?
13  MR. KAROLY:  Diana, we're not hearing
14  anything on our end.
15  MS. BROCCO:  Oh, you're not?  Okay.
16  That's strange.
17  MR. KAROLY:  No.
18  MS. BROCCO:  Let me go back.
19  MR. KAROLY:  You're sharing the screen,
20  so we can see the video, but we can't hear the video.
21  MS. BROCCO:  Did you hear anything yet?
22  MR. KAROLY:  No.
23  THE WITNESS:  No.
24  MS. BROCCO:  Okay.
25  Does anybody know how I can fix that?

WORD FOR WORD REPORTING, LLC

117

1      MR. KAROLY: It's just a screen share.
2  So we're only seeing it. I don't imagine you'd be
3  able to play it through our speaker, you know what I
4  mean?
5              So we can comment on what we're seeing
6  visually, but we can't comment on what's being said.
7      MS. BROCCO: Let me just see if I can
8  figure something out here.
9      MR. KAROLY: I don't know if it plays
10  loud enough through your computer that it would --
11      MS. BROCCO: It plays pretty loud.
12      MR. KAROLY: Are you hearing it?
13      MS. BROCCO: Yeah, I hear it.
14      MR. KAROLY: Oh, yeah, we're not
15  hearing anything.
16      MS. BROCCO: Does anybody know how I
17  could make it create the audio?
18      MR. KAROLY: I do not.
19      MS. BROCCO: Let me see if I can get
20  somebody to help me with this. Okay?
21      MR. KAROLY: Okay.
22      MS. BROCCO: Because I think the
23  audio's important for sure.
24      MR. KAROLY: Okay.
25      (Discussion off the record.)
                WORD FOR WORD REPORTING, LLC

118

1      MS. BROCCO: Okay. I think I fixed it.
2  Actually, I did not fix it. One of my younger,
3  esteemed associates fixed it.
4      (Discussion off the record.)
5  BY MS. BROCCO:
6      Q.  I may as well, since nobody heard anything,
7  and I was thinking that time that you guys were, I
8  may just go back.
9          Well, let me just see.
10          All right. Could you guys hear that?
11      MR. KAROLY: Yes.
12      A.  Yes.
13      Q.  Okay.
14      (Video playing.)
15      Q.  Okay. We are at 1:22. Did anybody -- and
16  did you guys hear the officer speak with you?
17      A.  Yes.
18      MR. KAROLY: Yes.
19      Q.  Okay. And can you tell me whether anyone in
20  the vehicle, whether it was you, Mr. Zelechiwsky, or
21  your wife, did anybody ask you why you were being
22  pulled over? Strike that.
23          Did you ask the trooper why you had
24  been pulled over?
25      A.  No. I mean, she told me, as you heard, and I
                WORD FOR WORD REPORTING, LLC

119

1  was in a state of shock.
2      Q.  Do you know why she said that you traveled
3  over three lanes of traffic?
4      MR. KAROLY: Objection.
5      A.  She did not say --
6      Q.  I will play it back. Okay.
7      (Video playing.)
8      Q.  She said you were passing three lanes. Can
9  you explain --
10      MR. KAROLY: Through the lanes, through
11  the lanes.
12      MS. BROCCO: I'll go back. That's not
13  what I heard.
14      (Video playing.)
15      Q.  I hear "passing three lanes." But, you know.
16  Do you have any idea why this officer told you why
17  she pulled you over and gave you these reasons?
18      A.  Not at all.
19      Q.  So you disagree with the reason why she told
20  you she pulled you over?
21      A.  100 percent.
22      Q.  Do you have any idea why it was that she
23  pulled you over, as you sit here today?
24      A.  No idea. Maybe the same reason she didn't go
25  to the hearing. I have no idea.
                WORD FOR WORD REPORTING, LLC

120

1      (Video playing.)
2      Q.  Now, we're at three minutes 18 seconds.
3          At this point in time, between the time
4  she asked you to step out of the car and the time
5  that she performs this nystagmus test, do you have
6  any problems hearing Ashley Davis?
7      A.  No.
8      Q.  Do you have any problems understanding what
9  she's asking you to do?
10      A.  No.
11      Q.  Okay. And do you have any problems with your
12  vision, anything like that?
13      A.  No.
14      Q.  Would you consider yourself at this point in
15  time to be alert?
16      A.  Totally.
17      Q.  Okay. And at this point in time in the
18  video, your wife is in the passenger's seat?
19      A.  Correct.
20      Q.  Okay.
21      (Video playing.)
22      Q.  Now, we're at 4:12. Now, is there any reason
23  why you put your hands in your pockets at that point
24  in time?
25      A.  I think I was just angry. I just -- I don't
                WORD FOR WORD REPORTING, LLC

121

1  know. Just to be comfortable. I mean, it was just,
2  you know.
3      Q.  You were angry, or you were -- just to be
4  comfortable?
5      A.  Well, I mean, I think -- well, I was very
6  angry to begin with, because I thought, well, it was
7  ridiculous. Because when she told me to get out of
8  the car, I was shocked. And just put my hands to
9  just remain calm and comfortable.
10     Q.  Okay. And this point in time, again, at
11 4:12, she -- she completed the nystagmus eye test,
12 and then she wants you to do the right heel in front
13 of the left toe test. Can we agree to that?
14     A.  Um-hum.
15          MR. KAROLY: Yes?
16     A.  Yes.
17     Q.  If you can hear her. I mean, I know it's
18 hard, and it's also not the best --
19     A.  No. I heard her loud and clear. And as you
20 can see, I'm standing perfectly straight.
21     Q.  Okay. All right. I'm going to play again.
22          (Video playing.)
23     Q.  Okay. Now just going to ask you a couple
24 questions. And right now, we're at 5:09 on the tape.
25          So did you have any issues with the

122

1  instructions given to you by Trooper Davis at this
2  point in time with regard to the right heel in front
3  of left toe test?
4          MR. KAROLY: Objection. You can
5  answer.
6      A.  No. I did what she asked me to do. And I'm
7  standing straight.
8      Q.  Did she demonstrate for you how to perform
9  the test?
10     A.  Yes. As I was standing there perfectly
11 straight.
12     Q.  But did you watch her demonstrate for you how
13 to perform the test?
14     A.  Partially. I mean, there was cars driving
15 by. You know, I'm trying to listen to her. It's
16 dark.
17     Q.  Okay. Did you ask her any questions, though,
18 you know, before you began the right heel in front of
19 left toe test?
20     A.  No questions.
21     Q.  Okay. And we're rolling at five minutes nine
22 seconds.
23          (Video playing.)
24     Q.  As you sit here and watch that video, do you
25 know if you had any problems performing that test?

123

1      A.  No, except for the noise from the cars, you
2  know, and the roadway was not the most level. But I
3  was straight.
4      Q.  Is there any reason why you did not count out
5  loud at that point in time?
6          MR. KAROLY: Objection. You can
7  answer.
8      A.  I think I just, you know, I was just so
9  angry, and embarrassed, and felt sorry for my wife.
10     Q.  Okay. At this point in time, do you believe
11 that there was anything, other than the traffic, was
12 there anything that prevented you from performing the
13 right heel in front of left toe test?
14     A.  I thought the video shows I performed it, and
15 I -- and I counted part of the time.
16     Q.  Okay. Rolling at 5:51.
17          (Video playing.)
18     Q.  At this point in time, did you, at 6:28, did
19 you understand the instructions that were given to
20 you by Officer -- Trooper Davis?
21     A.  Yes.
22     Q.  Okay. And we're talking about the one leg
23 stand test. And she asked you to count one 1,000,
24 two 1,000, three 1,000. And you understood her
25 instructions, true?

124

1      A.  True.
2      Q.  Okay. Rolling at 6:28.
3          (Video playing.)
4      Q.  Okay. Is there any reason why you were
5  unsteady on your feet?
6      A.  Yes.
7      Q.  Can you explain?
8      A.  Try. At that point, I'm 68 years old, on the
9  side of a busy road at night, very embarrassed,
10 angry, and, you know, at that age, you know, my
11 balance isn't what it would be at 25 or 20.
12     Q.  Okay. But you still ride your bike several
13 miles several times a day, so you're in pretty good
14 shape.
15          MR. KAROLY: Objection.
16     Q.  So can you explain to me why you're unable to
17 perform -- I mean --
18          MR. KAROLY: Objection. He just did.
19     A.  I did.
20     Q.  We'll continue to roll. We're at 7:01.
21          (Video playing.)
22     Q.  So do you think that you, based on -- and
23 we're at 7:31. Based upon what the video is showing,
24 do you think that you performed that test adequately?
25          MR. KAROLY: Objection. Adequately.

125

1  He's a 68-year-old guy, trying to stand on one leg.
2  Because he can't balance, we're going to arrest him
3  for DUI? I mean, come on.
4      MS. BROCCO: He's not a hundred. He's
5  68. And he's in great shape.
6      MR. KAROLY: I think most 68-year-olds
7  I know can't stand on one leg. I can promise you
8  that.
9      MS. BROCCO: Well, I disagree with
10 that, but anyway.
11     MR. KAROLY: Okay.
12     MS. BROCCO: I'm not here to argue.
13 I'm just -- I'm just asking him why it was that he
14 lost his balance. And not -- not anything else.
15  Q.   Okay. So did you, before the test was
16 administered, and during the test, did you have
17 trouble performing the one leg stand test?
18     MR. KAROLY: Objection.
19  A.   I --
20     MR. KAROLY: Go ahead.
21  Q.   You can answer.
22  A.   I think I was so livid that I -- I just --
23 the way she was talking to me, and -- and to balance
24 -- you know, like I said, I -- I thought my balance
25 for -- at the end, you could see, I was standing up,

WORD FOR WORD REPORTING, LLC

126

1  I was standing straight. And I don't think she knows
2  what the heck she's doing. But that's for another
3  day.
4  Q.   And why do you say that?
5  A.   Because there was no signs that -- that the
6  typical signs you look for intoxication, I didn't
7  have. Well, first of all, she didn't even talk to
8  me. Didn't ask me anything, except when she took me
9  out of the vehicle, number one. Number two, you
10 know, I didn't -- I wasn't -- if you look at me, I
11 wasn't sleepy. I didn't have a flushed face. I
12 wasn't -- I didn't have, you know, dishevelled
13 clothing. I didn't -- I had none of the signs that
14 you would -- that one would look for in visibly
15 intoxicated person. I'm standing straight. I'm not
16 falling over.
17  Q.   Other than being under the influence of
18 alcohol, is there anything that you can think of that
19 may have made you unsteady on your feet during that
20 last test?
21  A.   I think the road and my age.
22  Q.   And when you say the road, you mean the
23 uneven terrain of the road?
24  A.   Yes, correct. It's sloped.
25  Q.   And do you know whether your age and/or the

WORD FOR WORD REPORTING, LLC

127

1  roadway may have caused you to drive erratically
2  before you were pulled over?
3  A.   No.
4      MS. BROCCO: Okay. I think that's all
5  I have of the video that I would like to use. And I
6  do not believe that -- I don't know, you might be
7  able to tell me this, Josh. Is there video of inside
8  of the police station?
9      MR. KAROLY: There is not.
10     MS. BROCCO: I didn't think so.
11     MR. KAROLY: There wasn't any -- there
12 wasn't any turned over, I should say. I mean,
13 obviously, they would have had video inside of the
14 police station. But it was requested, and none was
15 turned over.
16     MS. BROCCO: I didn't see it. I just
17 want to make sure that I wasn't missing anything.
18  Q.   So, Mr. Zelechiwsky, once -- so then you were
19 put into the trooper vehicle, you were read your
20 rights, she Mirandized you, and then you were taken
21 down to the station, correct?
22  A.   She asked some questions.
23  Q.   And did she ask questions of you in the
24 trooper vehicle?
25  A.   She asked questions of me when she initially

WORD FOR WORD REPORTING, LLC

128

1  put me in the trooper vehicle.
2  Q.   Okay.
3      MS. BROCCO: And you know what, Josh,
4  do you know if there's any video of your client
5  inside the trooper vehicle?
6      MR. KAROLY: I think her body cam has
7  Bo sitting in the back, and there are some questions
8  asked. And I think she circles back when the other
9  officer gets there, and there's some more brief
10 questioning. And then I think she keeps it on during
11 the drive. But I don't remember anything of any
12 significance. I don't think they have any
13 conversations, from my memory.
14  A.   No, I didn't say a word.
15  Q.   Mr. Zelechiwsky, were you nervous that night
16 when you got pulled over?
17  A.   Of course. Wouldn't you be?
18  Q.   And why were you nervous?
19  A.   Because I didn't -- I thought it was
20 ridiculous.
21  Q.   You were nervous, because you thought it was
22 ridiculous?
23  A.   Any time you interact with the police in a
24 situation like that, I don't think you feel warm and
25 fuzzy.

WORD FOR WORD REPORTING, LLC

**129**

1   Q.   And before you guys got in the car, and I
2   forget if you said this, do you know if your wife had
3   anything to drink, let's say, you know, other than on
4   the beach?
5   A.   Nothing.  I don't think she even drank on the
6   beach.
7   Q.   At some point in time, there's a conversation
8   with regard to what the front seat of the -- the
9   driver's seat smelled like alcohol.  Do you remember
10  your conversation with the trooper regarding the
11  front seat smelled like alcohol?
12  A.   There is -- I don't -- I don't know what
13  she's -- I don't know what she smelled.  But no way.
14  That's a lie.  Because there was no alcohol anywhere.
15  That's untrue.  I mean, all we had was the dirty --
16  we had the laundry, the dog, and some groceries.  And
17  some unopened, I think --
18  Q.   Unopened wine?
19  A.   I think there was one or two bottles of
20  unopened wine in the back.
21  Q.   And then you are taken down to the police
22  barracks?
23  A.   Correct.
24  Q.   Can you tell me, at that point in time, what
25  happened when you were there?

WORD FOR WORD REPORTING, LLC

**130**

1   A.   I got out of the car, and I ran up the steps,
2   very quickly up, there's steps going into the room.
3   Then they handcuffed me to the chair.  I sat there
4   for -- I don't -- I have no idea for how long, half
5   hour.  There was -- I heard joking, wise cracks.  Not
6   about me.  But just in general.
7        Then some gentleman came up, gave me --
8   told me to take the breath test.  I took the breath
9   test.  And they didn't tell me what even -- I took
10  the breath test, they didn't tell me it was zero
11  zero.  And then she came up, gave me a citation, and
12  led me out the door.
13  Q.   How long were you handcuffed before you were
14  administered the breath test?
15  A.   I don't recall.
16  Q.   Were you seated on a bench of some sort --
17  A.   On a hard bench.
18  Q.   -- when they gave you the breath test?
19  A.   Hard bench.  And my left hand was handcuffed.
20  Q.   I didn't get that.
21  A.   I was seated on a hard bench, and my left
22  hand was handcuffed to the bench.
23  Q.   Okay.  So you were in that position when you
24  were given the breath test?
25  A.   No.

WORD FOR WORD REPORTING, LLC

**131**

1   Q.   Explain then to me when you were given the
2   breath test.
3   A.   The breath test was on a machine that was
4   maybe 20 yards -- strike that.  Maybe 15, 20 feet in
5   the same room from where the bench was.  The officer
6   came, unlocked the handcuffs, took me up to the
7   machine, and told me to blow in the machine.  I blew,
8   and it came back zero zero; 0.0.
9   Q.   And how long between the time that you got to
10  the station to the time that you blew the breath
11  test, how long did that time elapse, approximately?
12  A.   I -- I'd say half hour or so.
13  Q.   And how long were you seated on the bench?
14  A.   I -- I wasn't keeping track of time.  I just
15  was -- I was in a state of shock.
16  Q.   Well, can you just estimate for me how long
17  it was that you were on the bench?
18  A.   It seemed forever.  But I think, I don't
19  know, half hour, thereabouts.
20  Q.   And at that point in time, did you have any
21  interaction with Officer -- Trooper Davis?
22  A.   I -- I had no interaction with her,
23  whatsoever, after she put me in the car.  I didn't
24  say a word to her.  She didn't say anything to me.
25  And then when she escorted me out, she said -- she

WORD FOR WORD REPORTING, LLC

**132**

1   gave me the citation, and showed me where the door
2   was.
3   Q.   And was the trooper that administered the
4   breath test, he was not the other trooper that was on
5   the scene, correct?
6   A.   I believe so.
7   Q.   It was?
8   A.   It was not.
9   Q.   He was not.  Okay.
10       Did you ask what the results of the
11  breath test were?
12  A.   They just told me.
13  Q.   Oh, so they did tell you?  Because at first
14  you said that they -- that they did not.
15       They told you?
16  A.   That's my recollection.
17  Q.   Okay.  Because you just testified that he
18  didn't even tell you that it was a zero.  Now, why
19  are you changing your testimony?
20       MR. KAROLY:  Objection.  He --
21       MS. BROCCO:  I just want to know why
22  it's different now.
23       MR. KAROLY:  Well, my objection is
24  because he did say they told me it was 0.0.
25       MS. BROCCO:  Oh, I thought he testified

WORD FOR WORD REPORTING, LLC

133

1  they didn't even tell him.
2          MR. KAROLY:  That's okay.  My
3  recollection is that he said they told him it was
4  0.0.  But I guess the record can show that.  But I
5  guess you can clarify it now.  That's fine.
6      Q.  So they did tell you that --
7      A.  **Trooper Davis did not tell me anything.**
8      Q.  Okay.
9      A.  **It was the person that gave the test told me.**
10     Q.  Okay.  And then did you have any further
11 conversations with the person that gave you the test?
12     A.  **No.**
13     Q.  Did you ask to see anybody, did you complain?
14 Did you say you wanted to talk to a supervisor?
15     A.  **No.**
16     Q.  Did you say that you wanted to talk to
17 internal affairs at that point in time?
18     A.  **No.**
19     Q.  Is there any reason why not?
20     A.  **Okay.  I didn't think it would make any**
21 **difference.  Just, you know, I just wanted to -- I**
22 **wanted to be home.  And then at that point, I was at**
23 **the point where I didn't trust anybody there.**
24     Q.  And why was that?  Why is that?
25     A.  **Because I felt that I was unlawfully taken**

134

1  **into custody, treated like a criminal, and, you know,**
2  **embarrassed in front of my wife.  You know, made to**
3  **look like, you know, like a fool for the road --**
4  **those sobriety tests, which I -- the nystagmus, and**
5  **the other one, I think, I should have passed the**
6  **nystagmus.  That was it.  Plus, there's no -- I'm**
7  **repeating myself, but I was very, very angry, very**
8  **annoyed.  I was incensed, to say the least.**
9      Q.  Okay.  And so total time from the time you
10 got to the station to the time you were released, can
11 you tell me how long you were there?
12     A.  **I cannot tell you how long I was there.**
13     Q.  Was it more than an hour?
14     A.  **Like I said, I cannot tell you.  It seemed --**
15 **it seemed forever, but I don't know the time.**
16     Q.  You can't give me an estimate?
17     A.  **No.**
18     Q.  And you were not fingerprinted, correct?
19     A.  **No.**
20     Q.  And your mug shot was not taken, correct?
21     A.  **Correct.**
22     Q.  And it's your testimony that at no point in
23 time that you were there at the station after they
24 released you that you spoke to any superior or
25 commented to any other person at the barracks about

135

1  Trooper Davis, correct?
2      A.  **Correct.  I just wanted --**
3      Q.  Go ahead.
4      A.  **I just wanted to get home.**
5      Q.  Okay.  And when you left, was your wife
6  waiting for you?
7      A.  **Yes.**
8      Q.  Okay.  So she was already there, true?
9      A.  **Yes.  She was there.**
10     Q.  And did you end up driving home that night?
11     A.  **Yes.**
12     Q.  And you were given a citation for what?
13     A.  **I think not using -- I don't recall.  I don't**
14 **recall.  It's either not using a turn signal, or**
15 **improper lane change.**
16     Q.  And did you go to court with a lawyer for
17 those tickets?
18     A.  **Yes.**
19     Q.  Who did you go with?
20     A.  **Mr. Nicola.**
21     Q.  And it's my understanding that the traffic
22 citations were dismissed?
23     A.  **Citation.  Yes.**
24     Q.  Okay.  Did you have any physical signs of
25 injury to the left wrist, or the right wrist after

136

1  this incident?
2      A.  **No.**
3      Q.  Okay.  And I know that you did not have any
4  medical treatment after this incident, correct?
5      A.  **Correct.**
6      Q.  Okay.  Did Trooper Davis ever tell you that
7  you appeared to have bloodshot eyes, or any physical
8  signs of intoxication?
9      A.  **No.  Never told me anything about my eyes,**
10 **nothing.  Because my eyes weren't -- I don't think**
11 **they were bloodshot at all.**
12     Q.  Did you review any documents in preparation
13 for your deposition today?
14     A.  **The only thing I reviewed was the video.**
15     Q.  Okay.  I'm just going to go through my notes,
16 and then I think I'm done.
17          By the way, did you have any problems
18 operating that vehicle that night?
19     A.  **No.**
20     Q.  Were the brakes working?
21     A.  **Yes.**
22     Q.  Was your turn signal working?
23     A.  **Yes.**
24     Q.  Did you have any problems with your tires, or
25 anything like that?

137

1  A.  No.
2  Q.  Was the weight of the bikes affecting your
3  operation of the vehicle?
4  A.  No. No.
5  Q.  And when was the last time that the vehicle
6  had been inspected?
7  A.  Well, it's inspected once a year. Whenever
8  -- whatever time that was.
9  Q.  And was it --
10  A.  But it's routinely serviced.
11  Q.  Say that -- it's regularly serviced?
12  A.  Correct.
13  Q.  And after this incident, it was your
14  testimony that you did not go into work for two
15  weeks?
16  A.  It was very -- I was very restricted.
17  Q.  And you did not return to the shore during
18  that two weeks?
19  A.  No, that -- I didn't do that.
20  Q.  When was the first time that you went back to
21  the shore after this incident occurred?
22  A.  I don't recall.
23      MS. BROCCO: I have nothing else.
24      THE WITNESS: Okay.
25      MR. KAROLY: Thank you, counsel. I
WORD FOR WORD REPORTING, LLC

138

1  just have a few questions, Mr. Zelechiwsky. Okay?
2      THE WITNESS: Okay.
3  EXAMINATION BY MR. KAROLY:
4  Q.  So it's my understanding that on the date of
5  the incident, you had traveled with the Heldeckers
6  down to the beach, and also with your wife, Lisa,
7  correct?
8  A.  Correct.
9  Q.  And that was in the late morning, early
10  afternoon?
11  A.  Correct.
12  Q.  And your wife, Lisa, packed the cooler that
13  you took that day?
14  A.  Correct.
15  Q.  The Heldeckers don't drink, and you recall
16  being handed one alcoholic beverage; is that correct?
17  A.  Correct.
18  Q.  And you believe that you cracked open that
19  beverage and may have taken a couple sips, but you
20  don't believe you even finished that drink; is that
21  my understanding?
22  A.  Correct.
23  Q.  Is that the only alcoholic beverage that you
24  consumed on that day in total?
25  A.  Correct.
WORD FOR WORD REPORTING, LLC

139

1  Q.  And is it also my understanding, then, that
2  you went back home, showered, brushed your teeth,
3  went to dinner?
4  A.  Showered, went to dinner. Then after dinner,
5  brushed my teeth. But, yeah.
6  Q.  Okay. Meaning, that you would have,
7  obviously, even from that half a beer, whatever you
8  had, had nine hours in between, a shower, a
9  toothbrushing, and a seafood dinner; is that correct?
10  A.  Correct.
11  Q.  So is there any possible way that there was
12  any alcoholic beverage odor coming from yourself or
13  your wife?
14  A.  Impossible.
15  Q.  Okay. Now, you're an attorney for now, what,
16  over 40 years?
17  A.  Is it that long? Yeah.
18  Q.  And practicing criminal law that entire time?
19  A.  Yes.
20  Q.  And during your practice of criminal law, and
21  DUI practices, you've explained you represented
22  thousands of people charged with driving under the
23  suspicion of alcohol; is that correct?
24  A.  Correct.
25  Q.  And are officers trained to look for, and
WORD FOR WORD REPORTING, LLC

140

1  human beings, in general, can they look for signs of
2  visible intoxication?
3  A.  Of course.
4  Q.  And I'm going to go over a few. And can you
5  tell me, did you exhibit any of these at the time
6  that Trooper Davis had her interactions with you.
7  Did you --
8      MS. BROCCO: Objection to form. You
9  can answer.
10      MR. KAROLY: Okay.
11  Q.  Mr. Zelechiwsky, do you believe that you had
12  bloodshot, glassy, or watery eyes at the time that
13  you were interacting with Trooper Davis?
14  A.  No.
15      MS. BROCCO: Note my objection.
16      MR. KAROLY: I understand.
17  Q.  Did you have a flushed face?
18  A.  No.
19  Q.  Did you have droopy eyelids?
20  A.  No.
21  Q.  Did you have a blank stare, or a dazed look
22  about yourself?
23      MS. BROCCO: Objection to form.
24  Q.  Were you twitching or having any unnecessary
25  body tremors or movements?
WORD FOR WORD REPORTING, LLC

141

1    A.    No.
2    Q.    Did you have dishevelled clothing on?
3    A.    No.
4    Q.    Did you have thick or slurred speech?
5    A.    No.
6    Q.    Were you loud or noisy in any way?
7    A.    No.
8    Q.    Were you rambling with your comments in any
9    way?
10   A.    No.  I didn't say much at all.
11   Q.    Were you speaking unusually fast, or slow, to
12   Trooper Davis?
13   A.    No.
14   Q.    Were you slow to respond to any of her
15   questions?
16   A.    No.
17   Q.    Did you have any repetitive statements?
18   A.    Negative.
19   Q.    Were you making any irrational statements?
20   A.    No.
21   Q.    Were you argumentative, aggressive, or
22   belligerent, or obnoxious towards Trooper Davis?
23   A.    I think the vid -- no, the video speaks for
24   itself.
25   Q.    Were you swaying, staggering, or stumbling in

WORD FOR WORD REPORTING, LLC

142

1    any way on that video, with the exception of the
2    one-legged stand?
3    A.    No.
4    Q.    Were you able to stand up straight during the
5    instruction phase, and any time that you were outside
6    of the car?
7    A.    Yes.
8    Q.    Did you have any difficulty with any of your
9    documents or providing any of the information that
10   Trooper Davis had asked you?
11   A.    No.
12   Q.    Were you crying or moody in any way?
13   A.    No.
14   Q.    Were you overly animated in any way?
15   A.    No.
16   Q.    Did you lack any focus or eye contact with
17   the trooper?
18   A.    No.
19   Q.    Did you have any unusual walk or gait?
20   A.    No.
21   Q.    Did you have any difficulty standing up?
22   A.    No.
23   Q.    Did you have any difficulty remembering
24   anything that Trooper Davis had asked you?
25   A.    No.  I remember everything she said.

WORD FOR WORD REPORTING, LLC

143

1    Q.    Did you grind your teeth?
2    A.    No.
3    Q.    Were you vomiting?
4    A.    No.
5    Q.    Did you have any odor of alcohol, marijuana,
6    or any chemicals about your person or in your car or
7    on your wife?
8    A.    Absolutely not.
9    Q.    Were you excessively perspiring?
10   A.    No.
11   Q.    Did you show, in your training and
12   experience, as an attorney, and listening to the
13   testimony of officers over the years, did you display
14   any signs of visible intoxication, with the exception
15   of not being able to stand on one leg?
16   A.    No, not at all.
17   Q.    And the reason that you gave for that was
18   because you're a 68-year-old man, standing on the
19   side of a busy road in the middle of night, and you
20   didn't have great balance?
21   A.    Yeah.  And I was very nervous, yeah.
22   Q.    Okay.  Now, counsel asked you about whether
23   or not you had any interactions with Trooper Davis
24   while you were at the police barracks.  Do you recall
25   any conversations when you were handcuffed about her

WORD FOR WORD REPORTING, LLC

144

1    asking you again and again whether or not you were
2    drinking that night, and to be honest with her, or
3    she'd throw the book at you, or words to that effect?
4    A.    Exactly.  She told me that if I -- if I
5    didn't cooperate with her, and tell her the truth
6    about how much I drank that night, that she was going
7    to throw the book at me.  And I would not say
8    anything else to her.  I kept my mouth shut the
9    entire time.
10   Q.    And you were telling the truth when you said
11   you weren't intoxicated, and didn't have anything to
12   drink that night, correct?
13   A.    Absolutely.  Absolutely.  Absolutely.
14   Q.    And you didn't take any illegal substances or
15   anything else that would impair your ability to drive
16   safely?
17   A.    No.
18   Q.    All right.
19   A.    No.
20         MR. KAROLY:  I don't have anything
21   further.  Thank you.
22   EXAMINATION BY MS. BROCCO:
23   Q.    Mr. Zelechiwsky, you were only administered a
24   breath test, correct?
25   A.    Correct.

WORD FOR WORD REPORTING, LLC

145

1    **Q.**   And you were not given a blood test, or not
2    taken to the hospital to have your blood drawn?
3    **A.    No.**
4    **Q.**   Okay.
5           MR. KAROLY:  Is that all for Bodhan,
6    Diana?
7           MS. BROCCO:  Just give me one moment,
8    please.
9           MR. KAROLY:  Okay.
10          MS. BROCCO:  That's all I have.
11          MR. KAROLY:  Okay.  Thanks.  You want
12   to take a couple minutes break, and then we can start
13   Mrs.?
14          MS. BROCCO:  Yeah, can I have, like, 10
15   minutes, please?
16          MR. KAROLY:  Sure.
17          MS. BROCCO:  Thank you.
18          (Deposition concluded at 2:15 p.m.)
19
20
21
22
23
24
25

            WORD FOR WORD REPORTING, LLC

146

1
2           C E R T I F I C A T E
3
4    I, LYNN SMITH, a Certified Court Reporter of the
5    State of New Jersey, do hereby certify that prior to
6    the commencement of the examination, BOHDAN
7    ZELECHIWSKY was duly sworn by me to testify the
8    truth, the whole truth and nothing but the truth.
9
10   I DO FURTHER CERTIFY that I am neither a relative nor
11   employee nor attorney nor counsel of any of the
12   parties to this action, and that I am neither a
13   relative nor employee of such attorney or counsel,
14   and that I am not financially interested in the
15   action.
16
17
18
19
20   _____
     Certified Court Reporter
21   License No. XIO1520
22
23
24
25

1

**$**

$3,000 [1] - 42:12

**'**

'19 [1] - 46:16
'20 [2] - 62:6, 72:20
'73 [1] - 11:25
'78 [3] - 11:12, 15:16, 17:7
'79 [3] - 11:12, 15:16, 17:7
'82 [1] - 17:15
'87 [1] - 16:17

**0**

0.0 [3] - 131:8, 132:24, 133:4
08034 [1] - 2:8
08096 [1] - 1:24
0:00 [1] - 113:13

**1**

1 [2] - 89:4
1,000 [3] - 123:23, 123:24
10 [20] - 10:10, 10:20, 10:21, 16:10, 16:24, 16:25, 18:1, 18:6, 18:7, 18:14, 34:9, 34:13, 61:3, 61:5, 62:12, 66:25, 74:8, 145:14
100 [1] - 119:21
101 [1] - 33:14
1040 [1] - 2:8
1099 [1] - 38:19
10:05 [1] - 1:14
10:30 [3] - 74:8, 80:10, 89:7
10th [28] - 8:1, 8:18, 13:23, 27:11, 27:23, 28:4, 35:4, 38:4, 38:5, 39:4, 50:23, 52:21, 53:11, 59:7, 61:1, 62:8, 66:19, 67:12, 68:6, 70:6, 81:8, 87:4, 89:11, 94:2, 94:14, 94:20, 95:7, 106:11
11 [7] - 76:1, 78:12, 80:10, 80:11, 80:21, 89:7, 92:9
11:30 [1] - 80:10
12 [2] - 18:7, 92:9
13 [1] - 47:3
138 [1] - 3:5

**2**

14 [1] - 116:8
145 [1] - 3:4
15 [6] - 34:9, 34:12, 73:3, 73:5, 111:15, 131:4
17 [2] - 50:20, 112:3
18 [3] - 12:23, 61:14, 120:2
18101 [1] - 2:4
18951 [1] - 8:22
19 [1] - 61:15
1921 [1] - 67:2
1940 [1] - 8:21
1951 [1] - 8:7
1969 [1] - 11:20
1976 [1] - 12:2
1:22 [1] - 118:15
1:22-cv-04994-CPO-AMD [1] - 1:2

**2**

2 [5] - 34:24, 76:2, 78:14, 89:5, 100:24
20 [9] - 18:13, 55:22, 63:4, 81:22, 81:24, 124:11, 131:4
2000 [1] - 94:11
2010 [6] - 62:3, 62:6, 67:19, 67:24, 71:10, 72:18
2012 [1] - 70:11
2013 [3] - 69:23, 70:7, 71:9
2014 [1] - 18:2
2018 [1] - 70:12
2019 [1] - 70:12
202 [1] - 1:24
2020 [45] - 8:1, 13:23, 14:25, 23:6, 23:19, 24:19, 26:16, 27:2, 27:5, 27:12, 27:23, 28:4, 35:4, 36:11, 36:13, 36:14, 39:5, 46:11, 50:23, 52:21, 53:11, 59:7, 61:1, 62:5, 62:8, 62:12, 62:18, 62:22, 66:19, 67:4, 67:12, 67:23, 68:6, 70:6, 70:22, 72:22, 72:23, 79:17, 94:2, 94:14, 94:20, 95:7, 96:17, 102:10, 106:11
2021 [1] - 67:3
2023 [2] - 65:22, 65:25
2024 [2] - 1:13, 18:5
20th [2] - 10:6, 38:3
21 [1] - 88:5
24 [1] - 79:11

**3**

24/7 [1] - 87:16
25 [6] - 72:24, 81:22, 81:24, 81:25, 116:10, 124:11
26 [1] - 72:24
2:15 [1] - 145:18

**3**

3 [3] - 34:24, 78:14, 100:24
3,000 [1] - 41:24
30 [7] - 9:12, 15:4, 15:5, 17:17, 20:6, 78:17, 81:22
30-acre [1] - 70:19
30-mile [1] - 76:21
31 [1] - 9:20
32 [1] - 9:11
347 [4] - 58:15, 58:22, 72:16, 91:5
35 [6] - 9:14, 9:19, 15:5, 17:17, 33:12
350 [1] - 70:12
350E [1] - 70:11
384-2770 [1] - 1:25
384-2779 [1] - 1:25
39 [1] - 9:11

**4**

4 [2] - 3:4, 92:10
40 [6] - 9:11, 9:13, 9:19, 15:4, 20:6, 139:16
42 [1] - 9:10
437-1252 [1] - 2:4
45 [1] - 85:25
451 [1] - 17:16
48 [1] - 79:12
4:12 [2] - 120:22, 121:11
4th [1] - 66:6

**5**

5 [4] - 37:12, 72:9, 91:17, 92:10
527 [2] - 2:3, 18:25
55 [18] - 56:5, 56:12, 56:19, 57:1, 58:16, 72:15, 85:18, 90:15, 91:7, 99:1, 99:2, 99:3, 104:15, 106:1, 107:17, 108:4, 109:21, 115:14
5:09 [1] - 121:24
5:51 [1] - 123:18

**6**

6 [8] - 1:13, 1:24, 8:7, 74:12, 80:22, 87:23, 91:17, 91:18
60 [1] - 57:20
600 [1] - 2:8
610 [1] - 2:4
65 [3] - 57:20, 107:17, 107:19
667-3113 [1] - 2:9
68 [3] - 8:15, 124:8, 125:5
68-year-old [2] - 125:1, 143:18
68-year-olds [1] - 125:6
69 [3] - 8:15, 8:19, 54:1
6:28 [2] - 123:18, 124:2
6:30 [2] - 74:12, 89:8
6th [2] - 71:19

**7**

7 [6] - 77:6, 80:4, 80:13, 80:15, 89:8, 91:18
70 [3] - 8:12, 54:1
71 [1] - 8:12
72 [1] - 8:9
76 [1] - 83:3
77 [1] - 83:4
7:01 [1] - 124:20
7:31 [1] - 124:23
7C [2] - 41:25, 42:1
7D [1] - 41:6
7th [1] - 71:23, 71:25

**8**

8 [6] - 77:8, 77:10, 80:5, 80:13, 80:15, 87:23
80 [1] - 57:20
856 [3] - 1:25, 2:9
8:30 [3] - 77:10, 85:17, 85:20
8:45 [1] - 85:17
8th [1] - 75:7

**9**

9 [12] - 66:21, 71:18, 77:8, 77:10, 80:5, 80:8, 80:9, 80:11, 80:16, 87:12, 87:23
90 [2] - 93:12, 95:9
9:30 [3] - 80:10, 85:23,

105:5
9:35 [1] - 66:21
9:39 [1] - 67:11
9:45 [1] - 66:25
9C [1] - 44:4
9th [2] - 83:25, 89:11

**A**

a.m [2] - 1:14, 77:9
ability [11] - 19:14, 19:16, 31:2, 31:4, 31:22, 32:2, 55:17, 92:2, 110:17, 114:1, 144:15
able [4] - 117:3, 127:7, 142:4, 143:15
absolutely [5] - 58:8, 143:8, 144:13
abundantly [1] - 67:10
abuse [1] - 22:21
AC [2] - 98:10, 98:14
accelerated [2] - 109:5, 109:7
accommodate [1] - 6:15
according [1] - 44:4
accountant [1] - 38:18
accurate [2] - 6:1, 108:10
accurately [1] - 6:4
accused [1] - 47:13
acquaintance [1] - 38:1
acres [2] - 70:20, 87:19
action [2] - 146:12, 146:15
ACTION [1] - 1:5
actions [1] - 59:6
activate [3] - 109:9, 109:15, 111:24
activated [1] - 106:21
activities [1] - 50:21
activity [2] - 56:8, 79:11
actual [1] - 66:17
added [1] - 54:10
addiction [2] - 35:15, 35:18
addition [2] - 44:9, 46:23
additionally [2] - 5:5, 5:16
address [2] - 8:20, 63:4
adequately [2] - 124:24, 124:25
administered [4] - 125:16, 130:14,

2

132:3, 144:23
**Adrian** [3] - 9:10, 9:23,
16:21
**adult** [1] - 9:8
**advance** [1] - 17:7
**adversely** [2] - 51:6,
51:10
**affairs** [1] - 133:17
**affect** [1] - 23:14
**affected** [5] - 23:16,
31:5, 51:6, 51:11,
61:16
**affecting** [1] - 137:2
**affects** [1] - 51:20
**afield** [1] - 33:2
**afoot** [1] - 22:6
**afraid** [1] - 53:12
**afternoon** [7] - 69:13,
71:22, 89:23, 91:18,
138:10
**age** [4] - 112:3,
124:10, 126:21,
126:25
**ages** [1] - 9:9
**aggressive** [1] -
141:21
**ago** [10] - 8:14, 18:1,
18:6, 24:14, 49:13,
61:3, 61:5, 61:7,
64:19, 79:17
**agree** [12] - 21:19,
21:25, 57:23, 92:14,
99:17, 102:6,
104:23, 104:25,
113:6, 115:15,
121:13
**ahead** [8] - 20:13,
26:15, 52:15, 78:8,
91:12, 101:6,
125:20, 135:3
**air** [1] - 96:20
**alcohol** [11] - 32:25,
35:15, 35:18, 55:1,
84:24, 126:18,
129:9, 129:11,
129:14, 139:23,
143:5
**alcoholic** [8] - 4:10,
75:10, 78:25, 85:13,
101:17, 138:16,
138:23, 139:12
**alert** [1] - 100:25,
104:8, 110:11,
110:12, 110:13,
120:15
**alleged** [1] - 39:1
**alleging** [1] - 46:15
**Allentown** [3] - 2:4,
11:8, 18:25
**allow** [2] - 5:5, 5:11

**almost** [4] - 8:13,
9:13, 48:15, 92:18
**alone** [3] - 76:7, 76:13,
85:8
**ALSO** [1] - 2:12
**ambivalence** [1] -
52:20
**amount** [2] - 39:23,
40:16
**amounted** [1] - 58:6
**anger** [4] - 28:13,
29:22, 53:17, 54:10
**angrier** [2] - 31:10,
51:19
**angry** [12] - 19:20,
29:3, 29:8, 29:9,
39:18, 51:18,
120:25, 121:3,
121:6, 123:9,
124:10, 134:7
**animated** [1] - 142:14
**Anita** [6] - 10:18,
10:19, 15:23, 16:9,
16:11, 16:23
**anniversary** [1] -
18:12
**annoyed** [1] - 134:8
**answer** [28] - 4:9, 5:7,
5:9, 6:4, 21:8, 22:3,
26:24, 28:11, 33:18,
37:11, 37:24, 39:7,
41:5, 43:16, 44:4,
44:13, 49:10, 50:18,
50:20, 51:14, 55:21,
65:11, 96:5, 109:20,
122:5, 123:7,
125:21, 140:9
**answers** [10] - 4:10,
36:24, 37:7, 38:6,
39:9, 42:6, 43:19,
47:1, 67:9, 102:4
**anxiety** [6] - 19:23,
28:15, 28:16, 29:22,
41:11, 41:18
**anxious** [2] - 28:15,
31:9, 39:17
**anyway** [4] - 37:7,
88:13, 104:3, 125:10
**apologies** [1] - 43:25
**apologize** [1] - 32:11
**apologized** [5] - 32:9,
48:25, 49:8, 49:11,
49:14
**app** [4] - 43:6, 43:10,
96:7, 96:25
**appearances** [5] -
23:18, 23:22, 23:25,
40:11, 40:23
**appeared** [2] - 55:22,
136:7

**applied** [2] - 25:21,
27:8
**apply** [2] - 25:13,
25:19
**appointments** [2] -
36:19, 36:23
**appreciate** [1] - 45:6
**area** [6] - 58:14, 90:18,
91:2, 98:23, 104:15,
104:23, 107:6,
107:16, 107:18
**areas** [1] - 12:16
**argue** [1] - 125:12
**argumentative** [1] -
141:21
**arrest** [4] - 27:21,
41:12, 48:20, 125:2
**arrested** [2] - 28:14,
48:23
**arresting** [1] - 19:19
**artery** [3] - 36:3,
60:23, 103:9
**articulable** [1] - 57:16
**artificial** [1] - 104:24
**ASHLEY** [1] - 1:8
**Ashley** [1] - 120:6
**aside** [2] - 50:15,
115:8
**asleep** [1] - 97:15
**aspirin** [3] - 7:21,
36:4, 103:11
**assault** [1] - 22:23
**assistance** [2] - 25:13,
27:8
**associates** [1] - 118:3
**association** [1] -
64:15
**assume** [8] - 6:3, 7:3,
12:7, 42:24, 69:5,
69:7, 103:3, 109:25
**attention** [1] - 37:10
**attorney** [20] - 4:14,
5:9, 13:13, 14:11,
14:12, 15:19, 16:4,
16:15, 21:5, 30:25,
31:25, 37:14, 38:1,
43:15, 50:4, 81:17,
139:15, 143:12,
146:11, 146:13
**Attorney** [1] - 37:25
**attorney's** [1] - 6:8
**attorney/client** [1] -
37:22
**attorneys** [2] - 17:18,
17:22
**audio** [1] - 117:17
**audio's** [1] - 117:23
**August** [82] - 8:1,
8:17, 8:18, 13:23,
23:6, 23:18, 24:4,

24:9, 24:19, 26:14,
26:16, 27:2, 27:4,
27:11, 27:22, 28:4,
35:4, 36:11, 36:13,
37:16, 38:3, 38:4,
38:5, 39:4, 40:19,
50:23, 52:21, 53:11,
59:7, 61:1, 62:2,
62:8, 62:12, 62:21,
66:19, 66:25, 67:12,
67:19, 67:24, 68:6,
70:6, 71:19, 71:21,
72:1, 72:2, 72:3,
75:7, 81:7, 83:25,
87:4, 89:11, 90:7,
94:1, 94:14, 94:16,
94:20, 95:7, 98:11,
102:10, 106:11
**avoid** [1] - 104:16
**avoidance** [1] - 52:20
**awake** [7] - 97:16,
97:17, 97:19, 97:21,
100:25, 104:9
**awhile** [2] - 14:16,
41:19

## B

**B12** [4] - 36:7, 36:8,
36:13
**baby** [2] - 7:21, 103:11
**backed** [1] - 80:22
**bad** [4] - 18:3, 63:14,
90:11, 90:13
**bag** [1] - 14:21
**balance** [6] - 124:11,
125:2, 125:14,
125:23, 125:24,
143:20
**bar** [2] - 12:8, 12:9
**barracks** [3] - 129:22,
134:25, 143:24
**Barry** [3] - 56:20,
72:15, 101:13
**base** [1] - 48:3
**based** [3] - 43:20,
124:22, 124:23
**basic** [1] - 33:14
**basis** [1] - 38:12
**bay** [3] - 74:4, 75:1,
75:2
**Bayshore** [1] - 91:5
**beach** [38] - 28:24,
64:9, 64:11, 64:12,
65:14, 69:4, 70:23,
71:2, 74:4, 74:19,
74:20, 74:21, 74:22,
75:2, 75:5, 75:8,
75:11, 75:25, 76:3,
76:6, 78:2, 78:4,

78:9, 78:11, 79:14,
80:8, 84:6, 84:7,
85:2, 87:9, 89:15,
89:24, 89:25, 90:2,
110:22, 129:4,
129:6, 138:6
**Beach** [1] - 63:21
**beaching** [1] - 84:20
**bear** [2] - 36:25, 37:6
**beat** [1] - 93:10
**beautiful** [1] - 9:2
**became** [1] - 25:2
**bed** [3] - 74:7, 89:2,
89:7
**beds** [2] - 81:3, 84:13
**beer** [7] - 75:15,
75:17, 85:2, 85:6,
85:7, 110:19, 139:7
**BEFORE** [1] - 1:11
**began** [2] - 17:14,
122:18
**begin** [1] - 121:6
**beginning** [1] - 26:5
**behind** [5] - 98:18,
98:20, 105:18,
105:24, 110:2
**beings** [1] - 140:1
**Belgian** [1] - 71:7
**belief** [1] - 21:14
**belligerent** [1] -
141:22
**Ben** [2] - 56:20,
101:11
**bench** [9] - 30:19,
130:16, 130:17,
130:19, 130:21,
130:22, 131:5,
131:13, 131:17
**Benjamin** [1] - 72:13
**Benny** [1] - 69:18
**Benz** [2] - 70:11,
70:12
**best** [4] - 32:2, 34:11,
113:9, 121:18
**Bethlehem** [5] - 11:22,
17:11, 17:13, 17:16,
95:2
**better** [5] - 63:10,
74:1, 77:7, 92:7
**between** [9] - 9:7,
9:19, 72:18, 77:8,
78:21, 106:10,
120:3, 131:9, 139:8
**beverage** [4] - 138:16,
138:19, 138:23,
139:12
**beverages** [4] - 75:10,
75:13, 78:25, 85:13
**Bible** [1] - 5:23
**big** [2] - 97:10, 115:1

WORD FOR WORD REPORTING, LLC

bike [13] – 76:9, 76:11, 77:4, 77:12, 77:23, 78:2, 79:14, 84:1, 84:3, 89:17, 114:24, 115:2, 124:12
bikes [7] – 113:20, 113:22, 113:25, 114:4, 115:1, 115:8, 137:2
biking [1] – 84:19
billing [1] – 38:14
bird [1] – 74:11
birth [1] – 8:6
bit [9] – 10:20, 12:15, 16:25, 18:14, 20:1, 30:20, 30:21, 32:3, 85:22
blank [1] – 140:21
bled [1] – 29:17
blew [2] – 131:7, 131:10
blitz [3] – 55:23, 56:1, 57:1
blockage [1] – 36:3
blocked [1] – 60:23
blood [2] – 145:1, 145:2
bloodshot [4] – 53:22, 136:7, 136:11, 140:12
blow [1] – 131:7
blue [3] – 56:8, 72:12, 72:14
Bluetooth [2] – 106:19, 106:20
Bo [2] – 82:24, 128:7
Bo's [1] – 83:1
Bodhan [5] – 8:5, 32:7, 55:11, 55:12, 145:5
BODHAN [2] – 1:7, 3:3
body [2] – 128:6, 140:25
BOHDAN [2] – 1:4, 146:6
bolt [1] – 115:1
book [2] – 144:3, 144:7
books [2] – 25:22, 27:4
born [3] – 9:21, 10:2, 16:19
borrow [1] – 68:20
bothers [1] – 29:9
bottles [2] – 86:15, 129:19
bottom [1] – 113:6
bought [5] – 17:15, 17:19, 17:24, 63:15, 86:13
bounces [1] – 33:8

Bouvier [1] – 71:7
brakes [1] – 136:20
Branch [1] – 73:18
break [5] – 6:13, 6:16, 103:23, 145:12
breakfast [3] – 74:15, 74:17, 84:4
breaking [1] – 6:18
breaks [1] – 6:17
breath [13] – 32:13, 130:8, 130:10, 130:14, 130:18, 130:24, 131:2, 131:3, 131:10, 132:4, 132:11, 144:24
bridge [5] – 76:23, 77:1, 78:21, 78:22
Bridge [3] – 72:15, 101:12, 101:13
brief [2] – 104:1, 128:9
bright [1] – 87:15
bring [6] – 69:16, 71:1, 71:5, 75:10, 86:17, 114:13
bringing [1] – 83:12
BROAD [1] – 1:24
BROCCO [65] – 2:9, 4:3, 7:5, 7:7, 7:16, 27:22, 34:1, 43:22, 43:25, 44:10, 45:3, 45:6, 45:10, 45:15, 45:21, 46:6, 60:17, 62:6, 62:10, 67:25, 72:2, 72:21, 82:23, 83:7, 83:10, 103:22, 103:25, 104:2, 104:6, 113:1, 113:9, 115:13, 115:17, 115:20, 116:15, 116:18, 116:21, 116:24, 117:7, 117:11, 117:13, 117:16, 117:19, 117:22, 118:1, 118:5, 119:12, 125:4, 125:9, 125:12, 127:4, 127:10, 127:16, 128:3, 132:21, 132:25, 137:23, 140:8, 140:15, 140:23, 144:22, 145:7, 145:10, 145:14, 145:17
Brocco [1] – 3:4
brought [7] – 49:7, 50:2, 50:8, 63:14, 69:18, 71:18, 85:3
brushed [2] – 139:2,

139:5
Bucks [1] – 22:13
building [6] – 17:16, 17:19, 17:21, 17:23, 18:6, 82:19, 82:20, 82:25
buildings [1] – 82:25
burglarizing [1] – 34:16
bushy [1] – 87:15
business [5] – 15:2, 20:10, 24:18, 25:14, 47:16
busy [3] – 25:2, 124:9, 143:19
BY [7] – 2:5, 2:9, 4:3, 104:6, 118:5, 138:3, 144:22

**C**

cab [1] – 69:24
calculated [1] – 43:17
calculations [1] – 43:20
calendar [2] – 65:16, 66:11, 66:19
calm [3] – 31:21, 121:9
cam [1] – 128:6
CAMDEN [1] – 1:2
Canal's [1] – 86:14
cancel [1] – 40:11
canceled [3] – 23:11, 23:19, 23:22
cannot [3] – 109:1, 134:12, 134:14
capacity [1] – 50:4
Cape [23] – 28:25, 51:23, 61:23, 61:24, 62:17, 63:1, 63:3, 63:4, 63:11, 63:13, 63:25, 64:1, 64:2, 64:4, 69:10, 71:17, 73:7, 74:24, 76:22, 78:9, 78:21, 90:2
car [13] – 54:4, 55:3, 87:11, 97:21, 98:22, 106:17, 120:4, 121:8, 129:1, 130:1, 131:23, 142:6, 143:6
card [2] – 112:15, 115:25
cards [1] – 42:25
care [3] – 26:2, 26:17, 26:18
carotid [4] – 36:3, 60:23, 103:9, 103:11
carry [1] – 28:13
cars [4] – 90:15, 105:18, 122:14,

123:1
case [8] – 12:13, 12:14, 19:9, 20:3, 22:9, 23:6, 24:21, 89:9
cases [5] – 20:9, 22:18, 30:17, 33:13, 34:21
cash [3] – 43:4, 43:6, 43:10
casual [1] – 98:2
catch [1] – 59:5
caused [2] – 60:25, 127:1
causes [1] – 21:13
cell [4] – 95:20, 95:22, 95:25, 96:6
center [1] – 26:2
certain [5] – 28:18, 30:10, 30:11, 31:3, 65:14
certainly [1] – 6:18
certification [5] – 37:6, 42:3, 42:5, 42:9
Certified [1] – 1:12, 146:4
certified [1] – 146:20
CERTIFIED [1] – 1:23
certify [1] – 146:5
CERTIFY [1] – 146:10
certifying [1] – 42:6
chair [1] – 130:3
change [7] – 51:18, 94:17, 99:11, 109:11, 109:12, 111:21, 135:15
changed [2] – 107:19, 109:13
changes [1] – 107:7
changing [1] – 132:19
characterize [1] – 110:10
charge [1] – 36:18
charged [1] – 139:22
check [2] – 80:20, 80:21
checked [5] – 36:4, 94:19, 94:22, 94:24
checks [1] – 43:2
checkup [1] – 36:7
chemicals [1] – 143:6
Cherry [1] – 2:8
children [9] – 9:5, 9:6, 9:8, 9:10, 9:21, 10:2, 16:19, 16:25, 26:22
chitchat [1] – 98:5
choose [1] – 43:18
chores [1] – 74:19
Christina [10] – 15:19, 15:22, 16:4, 16:6,

16:11, 16:13, 16:15, 16:20, 17:5, 17:14
chronic [1] – 35:23
church [2] – 74:13, 87:22
circles [1] – 128:8
citation [5] – 20:17, 130:11, 132:1, 135:12, 135:23
citations [1] – 135:22
CIVIL [2] – 1:2, 1:5
civil [4] – 12:19, 15:6, 20:4, 50:13
claimed [1] – 19:12
claiming [8] – 19:13, 28:3, 29:13, 38:9, 44:2, 44:5, 44:11, 45:17
clarify [3] – 9:18, 9:25, 133:5
clean [5] – 80:25, 81:3, 84:14, 84:16, 84:17
cleaning [1] – 84:20
clear [5] – 5:1, 5:13, 56:8, 67:10, 121:19
client [7] – 7:12, 32:1, 34:25, 40:10, 48:24, 106:25, 128:4
clients [3] – 24:7, 25:8, 41:3
clock [1] – 109:2
close [4] – 41:2, 64:11, 73:18, 80:24
closed [4] – 26:5, 26:11, 52:10, 88:11
closer [1] – 64:9
clothing [1] – 126:13, 141:2
club [5] – 69:24, 75:16, 75:17, 85:14, 91:23
clubbing [1] – 89:13
coast [1] – 63:22
coffee [4] – 91:13, 91:19, 91:21, 91:24
colleague [1] – 81:20
colleagues [1] – 51:17
college [1] – 11:21
comfort [1] – 6:16
comfortable [4] – 71:9, 121:1, 121:4, 121:9
coming [6] – 68:12, 68:15, 68:17, 79:22, 81:10, 83:11, 83:19, 139:12
commencement [1] – 146:6
commencing [1] – 1:14
comment [2] – 117:5,

117:6
commented [1] -
134:25
comments [1] - 141:8
Commodore [3] -
56:20, 72:15, 101:13
Common [1] - 20:20
communicating [1] -
24:7
company [3] - 77:15,
84:9, 116:5
complain [1] - 133:13
completed [2] - 6:19,
121:11
completely [2] -
104:8, 104:9
complications [1] -
61:11
composure [1] - 31:21
computer [2] - 36:18,
117:10
concerns [7] - 55:16,
59:24, 92:2, 92:24,
93:3, 96:24, 114:18
concluded [2] - 18:1,
145:18
conditioning [1] -
96:20
conditions [6] - 29:25,
35:24, 90:4, 90:9,
90:19, 90:23, 93:1,
105:3
condo [1] - 64:13
conducted [1] - 43:13
confusion [1] - 62:9
connection [2] - 39:2,
39:4
consider [5] - 36:21,
56:11, 81:17, 81:19,
120:14
consists [1] - 34:4
constitutes [1] - 21:1
consumed [1] -
138:24
contact [2] - 30:23,
142:16
contacts [1] - 93:21
context [1] - 52:6
continuance [1] -
40:15
continuances [1] -
40:13
continue [1] - 124:20
contracts [1] - 15:6
control [2] - 31:20,
99:24
conversation [3] -
98:2, 129:7, 129:10
conversations [4] -
110:5, 128:13,

133:11, 143:25
convicted [1] - 111:1
cooking [1] - 88:1
cooler [4] - 75:15,
75:23, 85:6, 138:12
cooperate [1] - 144:5
correct [76] - 9:16,
12:6, 12:9, 12:12,
13:8, 13:21, 14:22,
14:23, 15:25, 16:5,
16:14, 16:16, 16:21,
19:4, 20:7, 20:20,
20:21, 20:24, 22:17,
27:6, 31:1, 44:13,
46:16, 47:4, 57:5,
58:8, 60:1, 61:10,
62:18, 62:19, 64:20,
66:15, 69:18, 75:18,
85:21, 90:2, 96:11,
97:8, 99:5, 99:7,
101:7, 106:8,
108:11, 108:23,
109:16, 110:22,
120:19, 126:24,
127:21, 129:23,
132:5, 134:18,
134:20, 134:21,
135:1, 135:2, 136:4,
136:5, 137:12,
138:7, 138:8,
138:11, 138:14,
138:16, 138:17,
138:22, 138:25,
139:9, 139:10,
139:23, 139:24,
144:12, 144:24,
144:25
corrected [2] - 9:15,
83:17
correctly [1] - 108:3
counsel [11] - 7:3,
43:23, 45:12, 45:13,
62:5, 112:23,
137:25, 143:22,
146:11, 146:13
count [2] - 123:4,
123:23
counted [1] - 123:15
County [6] - 11:18,
12:20, 12:25, 64:1,
64:2, 64:4
county [1] - 22:10
couple [5] - 71:16,
93:6, 121:23,
138:19, 145:12
course [12] - 5:23,
6:14, 23:16, 32:2,
42:11, 50:5, 50:15,
83:22, 87:3, 99:10,
128:17, 140:3

COURT [2] - 1:1, 1:23
court [16] - 5:1, 5:7,
7:13, 19:22, 22:25,
23:10, 23:11, 23:12,
23:24, 24:12, 24:13,
25:3, 25:12, 111:3,
135:16
Court [6] - 1:12,
20:19, 20:20, 146:4,
146:20
courtroom [1] - 25:9
courts [1] - 24:25
COVID [4] - 24:9,
24:10, 25:15, 59:6
COVID-19 [2] - 27:9,
59:12
cracked [1] - 138:18
cracks [1] - 130:5
crazy [1] - 53:23
create [1] - 117:17
credit [1] - 42:25
Crest [2] - 76:24,
92:21
crimes [1] - 111:1
criminal [16] - 12:19,
15:1, 15:5, 20:7,
20:10, 20:22, 21:5,
30:17, 30:25, 31:24,
32:16, 33:12, 34:3,
134:1, 139:18,
139:20
cruiser [1] - 47:13
crying [1] - 142:12
cup [1] - 91:21
current [2] - 8:20,
115:25
custody [1] - 134:1
cut [1] - 87:18, 87:20
cutting [1] - 56:24
CVS [2] - 59:25, 60:2
Cynthia [2] - 9:23,
17:1

## D

daily [2] - 103:3, 103:4
Dana's [1] - 9:19
dark [5] - 92:3, 92:4,
98:19, 105:5, 122:16
date [15] - 8:6, 10:4,
10:22, 11:2, 19:9,
26:10, 61:6, 62:21,
66:19, 88:19, 94:23,
95:7, 112:10,
112:14, 138:4
dates [8] - 10:11, 11:3,
18:3, 18:9, 18:16,
66:12
daughter [2] - 68:25,
79:4

David [2] - 13:25, 14:4
DAVIS [1] - 1:8
Davis [22] - 57:10,
59:3, 59:14, 98:16,
98:21, 99:18,
106:25, 116:11,
120:6, 122:1,
123:20, 131:21,
133:7, 135:1, 136:6,
140:6, 140:13,
141:12, 141:22,
142:10, 142:24,
143:23
Davis' [1] - 109:23
days [14] - 41:10,
44:3, 44:12, 44:18,
44:19, 44:25, 45:23,
46:3, 46:7, 46:19,
46:24, 83:9, 92:8
dazed [1] - 140:21
dead [1] - 55:4
deal [5] - 30:6, 31:6,
34:25, 41:10, 65:17
dealing [6] - 19:22,
28:16, 28:17, 31:13,
31:24, 33:13
dealt [1] - 41:18
decelerated [1] -
109:4
decided [1] - 63:9
Defendant [2] - 1:9,
2:10
defender [2] - 15:7,
15:8
defender's [2] - 12:22,
12:25
defense [1] - 31:24
deficit [1] - 36:7
Delaware [1] - 93:9
demeanor [1] - 110:11
demonstrate [2] -
122:8, 122:12
deny [2] - 99:9, 101:16
department [1] - 86:21
depended [4] - 25:11,
77:15, 78:5
dependency [1] -
12:20
depose [1] - 4:16
Deposition [1] -
145:18
deposition [6] - 4:8,
5:21, 6:19, 6:22,
54:8, 136:13
DEPOSITION [1] - 1:6
depositions [1] - 7:11
depressed [2] - 28:15,
39:18
depresses [1] - 29:6
depression [2] -

29:20, 29:23
describe [1] - 114:22
described [3] - 29:22,
73:23, 115:10
DESCRIPTION [1] -
3:10
device [1] - 106:19
diabetes [1] - 35:24
Diamond [1] - 63:21
DIANA [1] - 2:9
Diana [2] - 116:13,
145:6
died [1] - 71:4
difference [2] - 32:10,
133:21
different [11] - 21:12,
23:8, 34:19, 36:15,
45:18, 45:19, 68:12,
70:7, 108:25, 132:22
difficult [1] - 25:9
difficulty [4] - 5:18,
142:8, 142:21,
142:23
digress [1] - 88:13
dinner [11] - 78:17,
84:8, 85:1, 85:12,
91:15, 91:16, 98:3,
139:3, 139:4, 139:9
director [1] - 26:1
dirt [1] - 87:18
dirty [1] - 129:15
disagree [3] - 67:13,
119:19, 129:5
discharges [1] - 17:9
discovery [1] - 43:12
discuss [2] - 29:19,
47:1
discussed [2] - 29:25,
36:22
discussion [3] -
49:18, 117:25, 118:4
discussions [1] - 57:6
disease [1] - 35:24
dishes [1] - 84:18
dishevelled [2] -
126:12, 141:2
dismissed [1] -
135:22
display [1] - 143:13
distance [3] - 72:17,
92:3, 94:9
distances [1] - 25:8
distracted [1] - 95:17
DISTRICT [2] - 1:1, 1:1
distrustful [1] - 31:11
diverse [1] - 51:5,
51:10
divorce [1] - 17:25
divorced [1] - 15:20
dizzy [1] - 102:14

WORD FOR WORD REPORTING, LLC

DNA [3] - 30:3, 30:4, 30:7
DO [1] - 146:10
DOCKET [1] - 1:2
doctor [5] - 35:4, 35:6, 36:20, 102:24
documented [2] - 38:17, 38:25
documents [3] - 112:13, 136:12, 142:9
doer [1] - 88:15
dog [18] - 69:17, 70:25, 71:1, 71:3, 71:5, 73:9, 73:10, 73:14, 74:12, 81:4, 96:2, 96:3, 96:4, 97:6, 97:10, 97:12, 129:16
dogs [2] - 70:25, 87:21
done [12] - 25:4, 30:9, 30:14, 32:6, 34:7, 34:17, 79:24, 83:25, 87:24, 92:17, 92:20, 136:16
door [3] - 97:8, 130:12, 132:1
double [1] - 64:17
Douglas [1] - 102:24
down [46] - 5:2, 5:8, 28:25, 29:2, 29:3, 29:6, 29:10, 39:20, 39:21, 41:2, 51:23, 51:25, 52:1, 65:7, 65:10, 65:11, 66:2, 66:4, 67:20, 68:8, 68:10, 68:16, 68:17, 69:12, 69:19, 72:12, 72:14, 76:8, 76:21, 76:22, 78:7, 78:9, 80:24, 81:10, 81:15, 83:11, 84:6, 90:2, 93:9, 104:7, 110:3, 110:22, 114:11, 127:21, 129:21, 138:6
draft [1] - 14:16
drank [3] - 32:19, 129:5, 144:6
drawing [1] - 37:10
drawn [1] - 145:2
drink [11] - 85:3, 85:4, 85:8, 85:12, 91:13, 101:17, 129:3, 138:15, 138:20, 144:12
drinking [4] - 54:25, 84:24, 106:4, 144:2
drive [25] - 29:1, 29:6,

52:1, 53:13, 55:17, 69:19, 70:1, 70:4, 73:1, 74:20, 74:25, 76:21, 76:24, 92:2, 92:9, 93:8, 93:12, 95:10, 100:25, 101:6, 110:17, 127:1, 128:11, 144:15
driver [1] - 111:17
driver's [1] - 53:20, 129:9
drives [1] - 70:4
driving [28] - 21:11, 28:23, 29:2, 29:10, 34:4, 55:8, 56:2, 58:9, 58:11, 71:9, 89:6, 92:6, 92:24, 93:4, 94:2, 95:25, 100:13, 100:24, 104:7, 104:17, 106:1, 111:5, 111:10, 111:11, 122:14, 135:10, 139:22
droopy [1] - 140:19
drove [3] - 90:2, 93:11, 93:14
drug [3] - 22:18, 35:15, 35:17
drugs [1] - 34:17
dry [3] - 86:13, 90:5, 90:6
due [1] - 25:2
DUI [9] - 33:13, 33:14, 34:15, 34:17, 34:18, 34:20, 110:24, 125:3, 139:21
DUIs [3] - 33:16, 33:23, 33:24
duly [2] - 4:2, 146:7
during [13] - 6:14, 24:9, 27:8, 39:19, 40:1, 65:1, 87:3, 125:16, 126:19, 128:10, 137:17, 139:20, 142:4

**E**

e-mail [2] - 24:8, 82:4
ear [1] - 113:2
early [7] - 71:22, 74:11, 77:5, 78:1, 87:21, 89:22, 138:9
earned [1] - 41:24
Easter [1] - 87:25, 88:2, 88:3
easygoing [1] - 52:8
eat [4] - 73:13, 73:15,

73:24, 78:13
eating [2] - 84:20, 106:2
edge [1] - 33:8
effect [3] - 6:10, 19:14, 144:3
effects [4] - 102:18, 102:19, 103:14, 103:17
efficient [1] - 56:23
eight [1] - 88:23
either [11] - 24:8, 56:19, 59:20, 59:21, 72:12, 78:16, 84:5, 96:13, 96:14, 101:11, 135:14
elapse [1] - 131:11
elapsed [1] - 108:18
embarrassed [4] - 19:21, 123:9, 124:9, 134:2
embarrassing [1] - 47:11
embarrassment [1] - 47:7
emotional [1] - 51:4
employed [1] - 11:5
employee [3] - 82:21, 146:11, 146:13
employees [1] - 26:22
emptied [1] - 49:16
end [4] - 76:22, 116:14, 125:25, 135:10
ending [1] - 76:19
ends [1] - 87:1
enforcement [4] - 31:4, 31:6, 31:24, 48:21
enjoy [1] - 51:21, 51:22, 51:25, 52:10, 52:11, 52:12, 52:16, 53:5, 53:9, 61:23, 84:9
enjoyed [3] - 29:7, 51:24, 98:3
enjoying [5] - 53:5, 89:14, 100:25, 101:1
entail [1] - 47:6
entire [4] - 100:11, 112:2, 139:18, 144:9
entirety [1] - 5:6
equipment [1] - 96:18
equipped [1] - 106:14
erratically [2] - 21:11, 127:1
escorted [1] - 131:25
especially [2] - 20:2, 28:17
ESQUIRE [2] - 2:5, 2:9

essentially [1] - 100:22
estates [1] - 15:6
esteemed [1] - 118:3
estimate [7] - 10:9, 33:20, 33:24, 34:11, 42:15, 131:16, 134:16
evening [8] - 69:13, 71:23, 80:2, 80:5, 90:8, 101:3
eventually [2] - 72:15, 72:16
everyday [1] - 61:16
exact [4] - 11:2, 18:9, 26:10, 94:23
exactly [6] - 38:8, 79:16, 91:25, 105:15, 105:24, 144:4
exam [2] - 12:8, 12:9
examination [1] - 146:6
Examination [2] - 3:4, 3:5
EXAMINATION [3] - 4:3, 138:3, 144:22
example [2] - 51:22, 53:13
except [2] - 123:1, 126:8
exception [2] - 142:1, 143:14
excessively [1] - 143:9
excited [2] - 81:10, 83:11
exhibit [1] - 140:5
exhibits [1] - 3:11
expenses [1] - 42:23
experience [4] - 19:24, 100:18, 102:17, 143:12
experienced [2] - 100:17, 103:17
expert [2] - 43:17, 43:21
expired [2] - 112:13, 115:22
explain [14] - 28:7, 31:8, 39:15, 40:11, 47:5, 49:3, 51:9, 59:23, 74:23, 106:24, 119:9, 124:7, 124:16, 131:1
explained [4] - 14:20, 45:23, 45:24, 139:21
explaining [1] - 46:1
explore [2] - 45:7, 45:15

extension [1] - 101:14
extra [1] - 83:12
extremely [1] - 4:15
eye [3] - 33:7, 121:11, 142:16
eyed [1] - 87:15
eyelids [1] - 140:19
eyes [9] - 53:22, 94:18, 94:21, 94:24, 100:21, 136:7, 136:9, 136:10, 140:12

**F**

F-150 [2] - 69:23, 70:8
face [4] - 59:4, 59:14, 126:11, 140:17
facility [1] - 26:20
fact [1] - 59:15
failing [1] - 111:23
fair [1] - 43:7
falling [1] - 126:16
familiar [3] - 4:15, 20:25, 38:13
family [6] - 12:19, 15:2, 15:5, 35:3, 35:6, 70:4, 83:12, 89:16, 102:24
Fancy [1] - 78:16
far [3] - 33:2, 33:22, 43:13
farm [4] - 70:5, 70:14, 70:15, 70:16
farmette [1] - 70:16
fast [2] - 15:11, 141:11
fatigued [1] - 110:16
Fax [1] - 1:25
feature [1] - 106:15
federal [1] - 7:11
fee [1] - 22:15
feed [1] - 73:14
feelings [1] - 52:19
feet [4] - 54:3, 124:5, 126:19, 131:4
fell [1] - 87:20
felt [6] - 31:18, 53:17, 103:15, 103:16, 123:9, 133:25
fence [1] - 87:21
Fernwood [4] - 62:17, 62:20, 63:4, 76:20
few [10] - 16:16, 17:15, 25:4, 46:19, 108:21, 108:22, 108:25, 109:21, 138:1, 140:4
field [1] - 53:16
figure [2] - 48:2, 117:8
file [1] - 38:20
finally [1] - 66:17

**financial** [2] - 39:1
**financially** [3] - 23:15, 23:17, 146:14
**fine** [8] - 4:6, 6:21, 34:11, 67:1, 87:14, 103:24, 115:16, 133:5
**fingerprinted** [1] - 134:18
**finish** [4] - 5:5, 5:12, 39:2, 94:13
**finished** [4] - 20:11, 85:8, 110:20, 138:20
**finishing** [1] - 17:5
**firm** [3] - 13:1, 13:19, 42:25
**FIRM** [1] - 2:3
**first** [19] - 4:2, 4:21, 11:15, 16:13, 18:13, 73:13, 81:14, 93:5, 101:11, 103:4, 105:6, 105:16, 106:24, 107:1, 107:9, 126:7, 132:13, 137:20
**Fish** [1] - 78:16
**fish** [1] - 78:24
**fit** [1] - 104:21
**five** [8] - 6:16, 8:24, 16:18, 61:7, 92:22, 95:4, 103:23, 122:21
**five-minute** [2] - 6:16, 103:23
**fix** [2] - 116:25, 118:2
**fixed** [3] - 87:20, 118:1, 118:3
**flabbergasted** [1] - 54:21
**flashback** [1] - 31:18
**flashbacks** [3] - 31:15, 53:15
**floor** [1] - 97:10
**Florida** [1] - 88:11
**flowed** [1] - 90:17
**flushed** [2] - 126:11, 140:17
**focus** [1] - 142:16
**folder** [1] - 42:4
**following** [1] - 74:17
**follows** [1] - 4:2
**food** [3] - 75:19, 75:21, 81:4
**fool** [1] - 134:3
**FOR** [2] - 1:1, 1:23
**forbids** [1] - 95:23
**force** [1] - 6:10
**Ford** [1] - 69:20
**forever** [2] - 131:18, 134:15
**forget** [3] - 104:15,

113:10, 129:2
**forgive** [1] - 103:6
**forgot** [4] - 49:25, 60:8, 76:8, 115:17
**form** [6] - 7:14, 44:8, 101:20, 113:25, 140:8, 140:23
**former** [1] - 14:12
**forms** [3] - 42:24, 51:7, 51:11
**forward** [3] - 28:25, 81:11, 89:15
**four** [13] - 8:13, 8:24, 24:14, 48:15, 58:17, 69:23, 73:4, 79:17, 87:19, 92:22, 97:8
**four-by-four** [1] - 69:23
**four-door** [1] - 97:8
**four-laner** [1] - 58:17
**Fox** [1] - 95:2
**Franklin** [4] - 11:16, 56:20, 72:13, 101:12
**free** [1] - 106:14
**frequently** [1] - 82:6
**fresh** [2] - 78:23, 79:1
**Friday** [11] - 68:10, 69:13, 71:18, 71:21, 71:22, 73:12, 74:7, 87:17
**friend** [2] - 81:18, 81:20
**friends** [9] - 52:11, 52:17, 52:20, 52:24, 68:15, 73:8, 89:20, 89:25, 93:9
**front** [11] - 19:21, 64:12, 65:14, 85:8, 121:12, 122:2, 122:18, 123:13, 129:8, 129:11, 134:2
**full** [1] - 7:18, 8:3, 13:12, 13:13, 13:15, 18:19, 40:18, 40:20, 44:25, 84:19, 90:5
**full-time** [4] - 13:12, 13:13, 13:15, 18:19
**fully** [1] - 100:25
**function** [1] - 89:6
**funny** [1] - 88:10
**FURTHER** [1] - 146:10
**future** [1] - 36:19
**fuzzy** [2] - 47:14, 128:25

# G

**gait** [1] - 142:19
**game** [1] - 43:7
**Gasdaska** [1] - 17:12

**general** [6] - 12:18, 14:21, 24:18, 52:7, 130:6, 140:1
**gentleman** [1] - 130:7
**girl** [1] - 14:3
**given** [7] - 85:7, 122:1, 123:19, 130:24, 131:1, 135:12, 145:1
**glasses** [6] - 85:1, 93:19, 93:23, 94:1, 94:3, 94:7
**glassy** [1] - 140:12
**GLE** [1] - 70:12
**gosh** [1] - 81:22
**grab** [1] - 75:21
**graduate** [2] - 11:19, 11:24
**graduated** [2] - 12:2, 12:7
**grandkids** [1] - 79:19
**great** [2] - 125:5, 143:20
**Greek** [1] - 88:3
**grind** [1] - 143:1
**groceries** [5] - 86:8, 86:11, 86:17, 87:1, 129:16
**grocery** [4] - 86:7, 86:10, 86:22, 86:25
**gross** [2] - 42:14, 42:15
**grown** [1] - 9:7
**guess** [9] - 7:11, 26:25, 34:10, 42:18, 52:20, 113:4, 113:5, 133:4, 133:5
**guessing** [2] - 34:9, 42:17
**Gumpy** [1] - 51:16
**guy** [3] - 83:7, 83:10, 125:1
**guys** [5] - 69:19, 118:7, 118:10, 118:16, 129:1

# H

**H&H** [4] - 78:19, 78:20, 85:12, 85:14
**H-A-L-W-I-C-K** [1] - 14:6
**half** [30] - 7:21, 16:12, 28:21, 38:13, 44:18, 44:25, 45:23, 46:3, 46:7, 46:9, 46:10, 46:13, 46:21, 48:14, 64:17, 73:3, 73:5, 74:1, 77:10, 85:17, 85:23, 85:24, 86:3, 87:18, 101:6, 101:7,

130:4, 131:12, 131:19, 139:7
**Halwick** [2] - 13:25, 14:6
**Hamilton** [2] - 2:3, 18:25
**hand** [4] - 78:23, 113:6, 130:19, 130:22
**handcuffed** [7] - 47:12, 53:15, 130:3, 130:13, 130:19, 130:22, 143:25
**handcuffs** [1] - 131:6
**handed** [2] - 54:23, 138:16
**handled** [1] - 32:23
**hands** [6] - 100:4, 100:10, 100:14, 106:14, 120:23, 121:8
**hands-free** [1] - 106:14
**hang** [1] - 82:1
**happy** [4] - 5:20, 6:15, 29:7, 52:9
**harassment** [2] - 20:17, 22:20
**hard** [5] - 24:20, 121:18, 130:17, 130:19, 130:21
**hardly** [1] - 56:18
**hauling** [1] - 70:17
**head** [1] - 4:24
**headed** [1] - 102:14
**heading** [1] - 58:20
**health** [7] - 30:7, 30:12, 35:20, 35:23, 36:10, 49:19, 60:24
**hear** [11] - 5:16, 15:24, 100:15, 105:21, 116:20, 116:21, 117:13, 118:10, 118:16, 119:15, 121:17
**heard** [6] - 15:25, 118:6, 118:25, 119:13, 121:19, 130:5
**hearing** [5] - 116:13, 117:12, 117:15, 119:25, 120:6
**hearings** [1] - 25:3
**heart** [1] - 35:24
**heavy** [1] - 90:16
**heck** [1] - 126:2
**heel** [4] - 121:12, 122:2, 122:18, 123:13
**Heidecker** [11] -

37:14, 37:25, 38:1, 47:8, 68:24, 79:4, 81:18, 83:2, 85:9, 89:16
**Heidecker's** [1] - 69:2
**Heideckers** [6] - 79:7, 79:22, 85:16, 98:4, 138:5, 138:15
**help** [2] - 30:5, 117:20
**helping** [6] - 13:25, 14:6, 14:8, 14:13, 37:16
**hereby** [1] - 146:5
**herself** [2] - 25:21, 29:11
**hi** [1] - 4:4
**hiatus** [1] - 40:12
**high** [2] - 11:15, 34:12
**High** [1] - 11:16
**Highway** [1] - 2:8
**highway** [8] - 58:17, 58:18, 90:25, 98:15, 100:15, 100:20, 104:7, 108:19
**Hill** [1] - 2:8
**hit** [2] - 91:7, 113:5
**hitch** [2] - 114:25, 115:9
**holding** [1] - 115:2
**holidays** [1] - 65:15
**home** [52] - 18:22, 19:6, 19:7, 19:8, 29:7, 40:9, 42:13, 56:10, 61:24, 62:2, 62:11, 63:1, 63:11, 63:13, 63:14, 63:15, 65:14, 65:25, 66:12, 66:13, 67:20, 68:12, 68:16, 70:19, 73:7, 73:25, 74:2, 76:20, 77:2, 78:14, 79:4, 80:1, 80:7, 80:11, 80:14, 84:7, 85:10, 86:16, 86:17, 90:3, 92:9, 94:2, 100:25, 108:5, 114:10, 114:13, 114:14, 115:4, 133:22, 135:4, 135:10, 139:2
**homes** [1] - 72:18
**honest** [1] - 144:2
**honorable** [1] - 17:9
**hope** [2] - 11:6, 98:7
**horrible** [2] - 10:10, 18:15
**hospital** [1] - 145:2
**hot** [1] - 77:6
**hour** [5] - 14:18, 76:10, 77:10, 80:7, 85:17, 85:23, 85:24,

WORD FOR WORD REPORTING, LLC

86:3, 101:6, 101:7,
130:5, 131:12,
131:19, 134:13
**hourly** [1] - 38:12
**hours** [15] - 44:17,
73:3, 73:5, 77:11,
78:3, 78:6, 79:11,
79:12, 80:10, 80:11,
88:20, 88:24, 139:8
**house** [22] - 28:24,
40:3, 62:14, 62:16,
63:8, 63:9, 64:13,
64:14, 68:9, 77:4,
79:23, 80:8, 80:24,
83:19, 84:4, 84:11,
85:20, 89:15, 90:3,
91:2, 92:21, 106:11
**housekeeping** [1] -
74:18
**Houser** [2] - 17:18,
17:19
**hum** [6] - 4:23, 6:12,
41:14, 61:21,
112:18, 121:14
**human** [1] - 140:1
**humiliating** [1] - 32:14
**hundred** [3] - 72:19,
72:24, 125:4
**hurry** [1] - 108:5
**hypnosis** [2] - 100:16,
100:20

## I

**ID** [1] - 3:10
**idea** [7] - 26:23, 97:13,
119:16, 119:22,
119:24, 119:25,
130:4
**illegal** [1] - 144:14
**illegally** [1] - 28:14
**imagine** [3] - 30:16,
30:22, 117:2
**immediately** [1] -
105:19
**impact** [5] - 41:11,
41:18, 45:1, 46:14,
51:5
**impair** [2] - 114:1,
144:15
**impaired** [1] - 110:17
**important** [4] - 5:21,
31:11, 115:19,
117:23
**impossible** [1] -
139:14
**improper** [3] - 99:11,
111:20, 135:15
**inaccurate** [1] - 54:9
**inattentiveness** [1] -

111:18
**incensed** [1] - 134:8
**incident** [53] - 8:1,
8:10, 8:13, 15:9,
19:10, 19:18, 22:7,
27:12, 27:14, 27:23,
27:24, 28:5, 28:13,
35:4, 39:5, 39:25,
41:9, 44:20, 45:1,
46:15, 46:17, 47:19,
49:20, 50:12, 52:21,
53:1, 53:10, 55:19,
60:25, 61:16, 66:17,
66:25, 71:15, 79:12,
83:24, 86:4, 88:21,
90:21, 91:2, 93:13,
98:23, 106:11,
110:23, 111:9,
112:11, 112:14,
136:1, 136:4,
137:13, 137:21,
138:5
**including** [3] - 51:7,
51:11, 87:4
**income** [3] - 64:24,
66:14, 66:15
**incompetency** [1] -
19:19
**increases** [1] - 109:7
**indicate** [4] - 37:8,
38:7, 57:9, 109:10
**indicated** [4] - 16:23,
35:2, 48:8, 97:6
**indicates** [1] - 41:23
**indicating** [1] - 99:10
**indication** [1] - 39:9
**individual** [2] - 37:15,
37:24
**influence** [4] - 33:7,
33:10, 34:5, 126:17
**informal** [1] - 6:8
**information** [4] -
39:13, 43:15, 99:10,
142:9
**infrequently** [1] - 43:8
**ingested** [1] - 101:24
**injuries** [22] - 19:12,
27:14, 27:15, 27:16,
27:18, 27:25, 28:4,
28:8, 29:12, 29:17,
29:19, 29:21, 36:22,
47:2, 47:6, 47:16,
48:3, 50:7, 50:9,
50:22, 51:3, 51:4
**injury** [3] - 59:5, 59:9,
135:25
**innocent** [2] - 47:14,
49:17
**inside** [5] - 41:19,
41:21, 127:7,

127:13, 128:5
**inspected** [2] - 137:6,
137:7
**Instacarted** [1] - 86:24
**instance** [2] - 65:5,
93:8
**instead** [1] - 114:12
**instruction** [1] - 142:5
**instructions** [4] -
4:18, 122:1, 123:19,
123:25
**insult** [1] - 111:2
**insurance** [5] -
112:10, 112:15,
115:21, 115:25,
116:5
**insured** [1] - 116:3
**Intelligencer** [1] -
47:24
**intended** [1] - 92:19
**intending** [1] - 112:24
**interact** [2] - 31:2,
128:23
**interacting** [4] - 97:22,
97:25, 98:1, 140:13
**interaction** [5] - 98:6,
106:25, 110:7,
131:21, 131:22
**interactions** [2] -
140:6, 143:23
**interested** [3] - 20:1,
27:12, 146:14
**intermittent** [8] - 44:2,
44:11, 44:14, 44:21,
45:14, 45:20, 45:22,
45:25
**internal** [1] - 133:17
**Interrogatories** [10] -
36:24, 37:8, 38:7,
39:10, 42:6, 42:10,
47:2, 60:12, 67:10,
102:4
**interrogatory** [5] -
37:12, 44:4, 50:20,
55:22, 61:14
**interrupt** [2] - 5:11,
20:14
**intoxicated** [2] -
126:15, 144:11
**intoxication** [4] -
126:6, 136:8, 140:2,
143:14
**investment** [1] - 63:10
**involved** [4] - 20:9,
20:11, 20:16, 50:13
**Irrational** [1] - 141:19
**Islands** [1] - 63:22
**issue** [1] - 36:13
**issues** [6] - 35:14,
36:15, 60:24, 60:25,

96:9, 121:25
**itself** [1] - 141:24

## J

**jack** [1] - 12:17
**James** [5] - 37:12,
37:14, 37:25, 38:1,
68:24
**JERSEY** [2] - 1:1, 1:24
**Jersey** [13] - 1:12, 2:8,
7:9, 11:18, 21:15,
21:17, 21:24, 22:2,
58:3, 63:22, 63:24,
90:7, 146:5
**Jim** [4] - 81:10, 81:22,
83:1, 84:12
**Jimmy** [2] - 85:3, 85:9
**job** [3] - 25:25, 31:23
**Joey** [1] - 86:14
**John** [1] - 8:5
**joking** [1] - 130:5
**Josh** [3] - 115:15,
127:7, 128:3
**JOSHUA** [2] - 2:5
**judge** [3] - 6:11,
25:10, 25:11
**July** [2] - 8:7, 66:6
**June** [2] - 24:20, 24:24
**jury** [2] - 6:11, 30:19

## K

**KAROLY** [90] - 2:3,
2:5, 7:3, 7:6, 7:10,
7:17, 10:13, 16:9,
21:7, 21:16, 27:20,
28:10, 33:17, 33:22,
39:6, 43:16, 43:24,
44:1, 44:6, 44:8,
44:22, 45:5, 45:8,
45:14, 45:18, 46:4,
49:9, 51:13, 60:15,
62:5, 62:8, 67:3,
67:22, 68:1, 72:1,
72:20, 72:22, 82:21,
82:24, 83:4, 83:6,
83:8, 99:12, 99:14,
103:24, 109:19,
112:23, 113:4,
115:16, 115:18,
116:13, 116:17,
116:19, 116:22,
117:1, 117:9,
117:12, 117:14,
117:18, 117:21,
117:24, 118:11,
118:18, 119:4,
119:10, 121:15,
122:4, 123:6,

124:15, 124:18,
124:25, 125:6,
125:11, 125:18,
125:20, 127:9,
127:11, 128:6,
132:20, 132:23,
133:2, 137:25,
138:3, 140:10,
140:16, 144:20,
145:5, 145:9,
145:11, 145:16
**Karoly** [1] - 3:5
**keep** [9] - 4:21, 5:1,
5:13, 38:25, 41:4,
41:21, 65:16, 72:23,
89:12
**keeping** [1] - 131:14
**keeps** [2] - 27:4,
128:10
**KENT/McBRIDE** [1] -
2:7
**kept** [3] - 41:19, 66:10,
144:8
**kids** [1] - 79:19
**kind** [17] - 19:3, 22:9,
29:5, 29:16, 29:17,
30:5, 33:14, 34:12,
39:24, 41:16, 49:23,
54:21, 59:20, 80:4,
87:7, 92:16, 110:6
**kinds** [2] - 34:14,
34:19
**Kings** [1] - 2:8
**knowledge** [12] -
19:13, 27:13, 33:11,
47:18, 47:20, 47:21,
47:22, 47:25, 48:1,
69:11, 112:1, 116:2
**known** [4] - 5:25,
32:23, 81:21, 81:22
**knows** [3] - 47:8,
82:22, 126:1
**Krista** [1] - 9:12
**Krista's** [1] - 9:13

## L

**lack** [2] - 49:5, 142:16
**land** [2] - 70:20, 83:20
**lane** [31] - 58:16,
58:17, 58:18, 58:20,
58:22, 58:24, 59:2,
90:25, 99:11,
104:13, 107:3,
107:7, 107:10,
107:11, 107:12,
108:4, 108:8, 108:9,
108:10, 108:12,
108:13, 108:15,
108:19, 109:10,

WORD FOR WORD REPORTING, LLC

109:12, 109:18,
110:2, 111:21,
135:15
laner [1] - 58:17
lanes [12] - 98:24,
99:4, 99:6, 109:4,
109:6, 109:8,
109:13, 119:3,
119:8, 119:10,
119:11, 119:15
larger [1] - 64:6
last [8] - 36:6, 65:19,
82:13, 94:18, 94:21,
104:3, 126:20, 137:5
late [11] - 69:13,
71:22, 80:14, 89:4,
89:22, 92:1, 92:3,
92:24, 93:10, 138:9
latest [2] - 80:12, 89:8
laundry [1] - 129:16
law [33] - 11:10, 11:11,
11:14, 12:1, 12:7,
12:16, 13:1, 14:20,
14:25, 17:6, 17:20,
18:18, 20:7, 22:11,
31:2, 31:3, 31:4,
31:6, 31:24, 42:25,
48:21, 51:21, 57:11,
58:1, 58:3, 69:1,
79:5, 83:5, 92:8,
96:1, 139:18, 139:20
LAW [1] - 2:3
Law [2] - 12:2, 13:3
lawfully [1] - 58:11
lawn [1] - 87:19
lawsuit [5] - 19:13,
49:8, 50:1, 50:8,
59:3
lawsuits [1] - 50:2
lawyer [3] - 13:16,
34:3, 135:16
lawyer's [1] - 5:23
lay [1] - 83:20
leaked [1] - 47:19
least [7] - 22:5, 34:13,
57:16, 78:6, 88:23,
95:4, 134:8
leave [8] - 77:3, 80:4,
80:15, 80:21, 80:23,
86:12, 92:8, 114:13
leaving [4] - 79:25,
86:16, 86:23, 93:10
led [1] - 130:12
left [30] - 76:25, 79:3,
79:21, 80:4, 80:6,
80:8, 80:11, 80:13,
83:14, 85:16, 85:20,
90:3, 91:6, 91:14,
92:1, 106:10,
107:11, 107:12,

108:15, 109:18,
113:6, 115:4,
121:13, 122:3,
122:19, 123:13,
130:19, 130:21,
135:5, 135:25
left-hand [1] - 113:6
leg [2] - 123:22, 125:1,
125:7, 125:17,
143:15
Legal [1] - 47:24
legal [3] - 21:1, 21:6,
47:24
legged [1] - 142:2
Lehigh [2] - 22:12,
22:14
less [9] - 10:20, 16:25,
17:9, 18:14, 31:14,
46:20, 51:19, 92:6
lessened [1] - 25:1
letters [1] - 14:15
letting [4] - 68:20,
68:21, 68:22, 112:24
level [2] - 50:13, 123:2
License [2] - 1:13,
146:21
license [4] - 53:19,
54:22, 112:7, 112:14
licensed [2] - 12:10,
12:12
lie [2] - 54:7, 129:14
lies [1] - 54:16
lieu [1] - 56:16
life [3] - 50:8, 61:16,
112:2
lifts [1] - 97:9
light [1] - 102:14
light-headed [1] -
102:14
lighting [5] - 90:19,
90:23, 90:24,
104:24, 105:3
lights [7] - 105:8,
105:9, 105:19,
105:24, 107:1,
107:9, 109:23
limit [9] - 55:11, 57:19,
57:21, 58:9, 107:15,
107:24, 108:1,
108:4, 109:7
limitations [6] - 27:17,
27:19, 29:16, 29:17,
35:2, 36:21
limited [1] - 23:13
line [2] - 45:17, 102:23
lines [1] - 49:1
Lisa [16] - 9:3, 9:24,
10:5, 10:15, 10:24,
11:1, 18:8, 65:8,
66:8, 69:15, 85:3,

85:6, 86:10, 88:1,
138:6, 138:12
LISA [4] - 1:4, 2:13,
9:14, 26:7
List [1] - 50:21
listen [1] - 122:15
listening [1] - 143:12
litigation [3] - 15:6,
20:4, 50:13
live [5] - 9:1, 23:1,
67:21, 70:15, 82:10
lived [1] - 8:23
lives [1] - 82:11
livid [3] - 31:19,
125:22
living [1] - 9:6
LLC [1] - 1:23
loaded [2] - 42:7,
113:22
local [1] - 47:19
located [4] - 18:24,
62:16, 63:1, 74:2
look [14] - 32:7, 54:1,
54:5, 87:9, 78:15,
95:24, 126:6,
126:10, 126:14,
134:3, 139:25,
140:1, 140:21
looking [3] - 28:24,
81:11, 89:15
looting [1] - 34:15
loss [18] - 25:14, 38:8,
38:10, 38:16, 38:17,
43:12, 43:14, 43:19,
44:3, 44:11, 44:14,
44:21, 45:16, 45:20,
45:22, 45:25
losses [1] - 39:1
lost [2] - 47:16, 125:14
loud [5] - 117:10,
117:11, 121:19,
123:5, 141:6
love [1] - 92:5
loved [1] - 28:25
low [1] - 36:7
luck [1] - 63:14
lunch [2] - 6:18, 78:13
Lynn [1] - 104:4
LYNN [2] - 1:11, 146:4

---

## M

machine [3] - 131:3,
131:7
Macungie [1] - 82:11
mall [5] - 24:8, 60:4,
60:5, 60:7, 82:4
Main [1] - 17:16
maintaining [2] - 38:9,
104:13

man [2] - 41:1, 143:18
March [1] - 26:7
marijuana [2] -
101:18, 143:5
marital [2] - 51:7,
51:12
marked [1] - 3:11
marriage [7] - 9:22,
9:24, 10:3, 10:4,
10:23, 11:2, 16:19
married [9] - 10:8,
10:15, 10:17, 10:19,
13:18, 16:6, 16:24,
18:8, 18:14
mask [2] - 59:4, 59:16
masks [2] - 25:5,
59:19
master [1] - 12:17
matter [1] - 10:14
Maureen [4] - 68:24,
69:2, 85:4
mean [69] - 10:23,
20:14, 22:2, 23:10,
23:15, 23:25, 24:25,
25:3, 27:15, 27:20,
33:20, 33:22, 33:23,
34:6, 34:14, 34:17,
34:19, 38:11, 38:21,
44:15, 45:5, 46:16,
47:11, 50:5, 51:10,
52:2, 52:5, 52:7,
53:18, 53:21, 53:23,
54:18, 54:20, 55:1,
55:6, 56:1, 56:2,
65:1, 68:2, 79:9,
80:11, 83:24, 85:13,
86:20, 86:25, 87:14,
90:12, 90:15, 92:1,
92:5, 92:14, 92:18,
92:19, 92:22, 97:19,
103:3, 103:16,
110:14, 117:4,
118:25, 121:1,
121:5, 121:17,
122:14, 124:17,
125:3, 126:22,
127:12, 129:15
meaning [4] - 14:25,
55:17, 139:6
means [6] - 4:22, 5:23,
44:14, 44:21, 45:22,
108:25
meant [1] - 114:15
medical [2] - 28:1,
136:4
medication [7] - 7:20,
35:22, 36:9, 101:21,
102:5, 102:18,
103:13
medications [2] -

7:19, 7:25
medicine [1] - 103:2
MediSuite [1] - 60:6
meet [1] - 76:4
meeting [2] - 18:13,
52:17
Memorial [3] - 65:6,
66:3, 66:5
memory [1] - 128:13
mental [3] - 30:7,
30:12, 49:19
mention [3] - 76:8,
102:4, 102:7
mentioned [4] - 14:4,
27:3, 29:20, 35:21
mentions [1] - 59:3
Mercedes [2] - 70:11,
70:12
merged [2] - 108:3,
108:7
messed [1] - 32:8
middle [1] - 143:19
might [8] - 28:19,
34:15, 34:16, 34:17,
57:13, 64:18, 73:17,
127:6
mile [1] - 100:11
miles [3] - 72:24,
76:16, 124:13
Millville [7] - 58:14,
58:23, 58:24, 85:24,
86:2, 91:6, 91:7
mind [9] - 30:11, 46:3,
53:14, 60:9, 103:22
mine [1] - 82:21
minimal [3] - 39:23,
40:16
minimum [1] - 41:4
minute [5] - 6:16,
36:17, 103:23,
116:8, 116:10
minutes [10] - 73:3,
73:5, 85:25, 108:21,
108:22, 109:21,
120:2, 122:21,
145:12, 145:15
Mirandized [1] -
127:20
miss [1] - 92:11
missed [4] - 44:3,
44:12, 44:17, 44:20
missing [2] - 53:9,
127:17
misstatements [1] -
54:8
mixed [1] - 14:21
model [1] - 69:21
moment [3] - 105:8,
105:23, 145:7
Monday [19] - 1:13,

WORD FOR WORD REPORTING, LLC

66:20, 67:5, 67:6,
67:14, 68:14, 68:18,
79:3, 79:8, 80:14,
81:7, 81:9, 83:15,
83:18, 84:11, 85:2,
87:4, 87:12, 90:12
**money** [1] - 25:19
**Monroe** [1] - 22:12
**Montgomery** [1] -
22:13
**month** [8] - 34:8,
38:22, 46:9, 46:10,
46:14, 46:22, 48:13,
48:18
**moody** [1] - 142:12
**moon** [1] - 90:5
**Moravian** [1] - 11:22
**morning** [18] - 76:7,
76:10, 77:12, 77:14,
77:24, 82:14, 84:11,
89:5, 89:18, 89:22,
89:23, 92:11,
100:24, 103:2,
103:5, 103:19, 138:9
**most** [3] - 4:16, 123:2,
125:6
**mother** [3] - 69:1,
69:2, 79:5
**mother-in-law** [2] -
69:1, 79:5
**motor** [1] - 22:1
**mount** [1] - 114:24
**mounted** [5] - 96:16,
96:17, 96:22,
114:19, 115:1
**mouse** [1] - 74:13
**mouth** [1] - 144:8
**move** [1] - 33:6
**moved** [4] - 84:18,
87:18, 87:19, 87:20
**movements** [1] -
140:25
**moves** [1] - 33:7
**movie** [1] - 84:10
**MR** [88] - 7:3, 7:6,
7:10, 7:17, 10:13,
16:9, 21:7, 21:16,
27:20, 28:10, 33:17,
33:22, 39:6, 43:16,
43:24, 44:1, 44:6,
44:8, 44:22, 45:5,
45:8, 45:14, 45:18,
46:4, 49:9, 51:13,
60:15, 62:5, 62:8,
67:3, 67:22, 68:1,
72:1, 72:20, 72:22,
82:21, 82:24, 83:4,
83:6, 83:8, 99:12,
99:14, 103:24,
109:19, 112:23,

113:4, 115:16,
115:18, 116:13,
116:17, 116:19,
116:22, 117:1,
117:9, 117:12,
117:14, 117:18,
117:21, 117:24,
118:11, 118:18,
119:4, 119:10,
121:15, 122:4,
123:6, 124:15,
124:18, 124:25,
125:6, 125:11,
125:18, 125:20,
127:9, 127:11,
128:6, 132:20,
132:23, 133:2,
137:25, 138:3,
140:10, 140:16,
144:20, 145:5,
145:9, 145:11,
145:16
**MS** [64] - 4:3, 7:5, 7:7,
7:16, 27:22, 34:1,
43:22, 43:25, 44:10,
45:3, 45:6, 45:10,
45:15, 45:21, 46:6,
60:17, 62:6, 62:10,
67:25, 72:2, 72:21,
82:23, 83:7, 83:10,
103:22, 103:25,
104:2, 104:6, 113:1,
113:9, 115:13,
115:17, 115:20,
116:15, 116:18,
116:21, 116:24,
117:7, 117:11,
117:13, 117:16,
117:19, 117:22,
118:1, 118:5,
119:12, 125:4,
125:9, 125:12,
127:4, 127:10,
127:16, 128:3,
132:21, 132:25,
137:23, 140:8,
140:15, 140:23,
144:22, 145:7,
145:10, 145:14,
145:17
**mug** [1] - 134:20
**municipal** [2] - 63:5,
63:8
**Municipal** [1] - 20:19
**murder** [1] - 22:20
**murderer** [1] - 20:17

**N**

**name** [6] - 4:5, 8:3,
13:1, 14:2, 16:4,

69:1
**names** [2] - 9:9, 68:23
**naps** [1] - 87:5
**narcotic** [1] - 101:20
**natural** [1] - 105:2
**navigation** [1] - 96:10
**necessarily** [1] -
102:13
**necessary** [1] - 21:25
**neck** [1] - 59:16
**need** [6] - 6:13, 10:24,
38:8, 41:10, 45:16,
57:24, 70:21, 102:1
**needed** [1] - 39:24
**needs** [3] - 21:21,
22:4, 57:25
**negative** [1] - 141:18
**nervous** [4] - 128:15,
128:18, 128:21,
143:21
**net** [1] - 42:16
**never** [11] - 50:8, 53:3,
53:18, 56:18, 89:4,
102:15, 102:16,
103:17, 111:11,
111:19, 136:9
**NEW** [2] - 1:1, 1:24
**New** [12] - 1:12, 2:8,
7:8, 11:18, 21:15,
21:17, 21:23, 22:2,
58:3, 63:24, 90:7,
146:5
**next** [2] - 45:17, 89:16
**nice** [1] - 76:9
**Nicola** [1] - 135:20
**night** [40] - 31:19,
48:11, 52:24, 52:25,
53:4, 55:17, 55:18,
55:19, 68:10, 68:14,
73:12, 73:20, 74:7,
79:22, 83:13, 87:12,
90:25, 92:3, 92:6,
92:9, 92:25, 93:17,
94:1, 95:10, 103:3,
105:3, 105:5,
106:23, 124:9,
128:15, 135:10,
136:18, 143:19,
144:2, 144:6, 144:12
**nightmares** [8] -
28:12, 29:22, 48:9,
48:10, 48:17, 48:18
**nights** [1] - 78:15
**nine** [8] - 10:21, 16:7,
16:10, 16:11, 16:12,
122:21, 139:8
**nobody** [2] - 59:19,
118:6
**noise** [1] - 123:1
**noisy** [1] - 141:6

**non** [1] - 87:24
**non-stop** [1] - 87:24
**none** [10] - 10:2,
12:18, 20:5, 55:18,
93:18, 97:1, 102:19,
126:13, 127:14
**nonetheless** [1] - 4:17
**normal** [3] - 67:18,
79:25, 100:13
**normally** [12] - 72:10,
73:16, 73:22, 74:16,
75:25, 76:9, 77:3,
79:21, 79:24, 80:23,
103:2
**north** [4] - 58:20,
63:25, 106:1
**NORTH** [1] - 1:24
**North** [6] - 2:8, 62:17,
63:3, 63:4, 63:21,
76:25
**northampton** [1] -
22:12
**Northampton** [4] -
12:21, 12:25, 22:14,
25:3
**northbound** [1] -
104:17
**northeast** [1] - 101:14
**note** [2] - 113:7,
140:15
**notes** [1] - 136:15
**nothing** [8] - 55:1,
79:13, 89:12, 9:11,
100:9, 129:5,
136:10, 137:23,
148:8
**notice** [2] - 98:17,
113:19
**noticed** [8] - 56:3,
56:7, 57:1, 57:3,
57:4, 93:13, 98:18,
107:23, 109:23
**nowadays** [1] - 43:6
**NUMBER** [1] - 3:10
**number** [7] - 52:23,
55:23, 56:6, 57:3,
57:5, 126:9
**numbers** [1] - 61:14
**nuts** [1] - 20:22
**nystagmus** [6] -
32:24, 33:4, 120:5,
121:11, 134:4, 134:6

**O**

**o'clock** [10] - 72:9,
76:1, 76:2, 80:12,
80:22, 87:24, 89:5,
91:17, 92:10, 100:24
**object** [1] - 44:8

**objection** [28] - 7:16,
21:7, 21:16, 28:10,
33:17, 39:6, 43:16,
44:6, 44:22, 45:13,
49:9, 51:13, 67:22,
99:12, 99:14,
109:19, 119:4,
122:4, 123:6,
124:15, 124:18,
124:25, 125:18,
132:20, 132:23,
140:8, 140:15,
140:23
**objections** [2] - 7:6,
7:14
**obnoxious** [1] -
141:22
**observed** [5] - 105:15,
105:17, 105:24
**obstructions** [2] -
95:13, 95:15, 101:2
**obviously** [5] - 5:21,
6:6, 44:23, 127:13,
139:7
**occasion** [10] - 28:9,
28:12, 28:19, 30:18,
43:9, 75:12, 76:6,
76:15, 81:9, 114:8
**occurred** [14] - 8:13,
46:17, 49:20, 66:25,
67:1, 71:15, 79:12,
86:4, 88:21, 91:3,
98:23, 100:23,
106:12, 137:21
**ocean** [1] - 74:25
**October** [1] - 10:6
**odd** [1] - 17:17
**odds** [1] - 87:1
**odor** [2] - 139:12,
143:5
**OF** [2] - 1:1, 1:6
**offense** [1] - 92:14
**offer** [1] - 95:10
**Office** [1] - 13:3
**office** [22] - 6:9, 12:22,
12:24, 17:13, 18:21,
18:24, 19:3, 19:15,
19:16, 24:1, 24:24,
25:10, 39:20, 39:21,
41:2, 42:23, 44:16,
51:16, 82:16, 82:18,
82:25, 83:1
**Officer** [2] - 123:20,
131:21
**officer** [12] - 19:19,
21:21, 22:1, 22:4,
29:4, 32:6, 59:7,
111:3, 118:16,
119:16, 128:9, 131:5
**officers** [8] - 19:23,

28:17, 30:24, 31:3,
31:13, 33:13,
139:25, 143: :3
**often** [14] - 22:25,
29:2, 35:10, 46:3,
46:7, 48:9, 51:5,
64:21, 64:23, 64:25,
65:24, 77:17, 82:3,
102:9
**old** [6] - 8:8, 8:10,
30:2, 54:1, 83:2,
124:8
**oldest** [1] - 16:22
**Olive** [1] - 73:17
**once** [19] - 6:19, 12:7,
14:15, 35:10, 41:19,
48:12, 53:7, 53:8,
82:8, 82:9, 101:12,
101:13, 102:11,
109:22, 111:13,
127:18, 137:7
**one** [51] - 5:8, 13:12,
13:13, 13:15, 13:24,
36:17, 36:18, 37:6,
42:21, 46:10, 46:13,
48:18, 53:13, 55:9,
56:5, 58:16, 58:18,
58:20, 58:22, 63:21,
71:1, 71:3, 75:22,
82:24, 93:8, 93:12,
98:20, 100:23,
105:10, 108:8,
108:18, 111:15,
116:8, 116:10,
118:2, 123:22,
123:23, 125:1,
125:7, 125:17,
126:9, 126:14,
129:19, 134:5,
138:16, 142:2,
143:15, 145:7
**one's** [1] - 115:19
**one-lane** [1] - 58:18
**one-legged** [1] - 142:2
**open** [6] - 24:20,
26:18, 60:15, 98:12,
100:21, 138:18
**opened** [3] - 24:24,
25:1, 109:6
**opening** [1] - 40:21
**opens** [3] - 108:9,
108:13, 109:4
**operating** [1] - 136:18
**operation** [2] - 65:17,
137:3
**operator** [1] - 26:1
**opposite** [1] - 11:3
**opt** [1] - 108:14
**Optical** [1] - 95:2
**optometrist** [2] -

94:25, 95:1
**order** [3] - 60:5, 60:6,
60:7
**ordinary** [1] - 81:13
**originally** [1] - 54:12
**Orthodox** [1] - 88:3
**otherwise** [2] - 5:25,
41:21
**ounce** [1] - 31:20
**outdoor** [1] - 78:23
**outside** [3] - 32:17,
88:1, 142:5
**outskirts** [1] - 58:24
**overhead** [1] - 42:22
**overly** [2] - 39:17,
142:14
**own** [9] - 15:13, 15:15,
17:2, 17:11, 43:20,
61:24, 62:11, 71:14,
76:11
**owned** [2] - 17:21,
62:2
**owner** [2] - 26:1,
26:19

---

**P**

**P.C** [1] - 2:7
**p.m** [6] - 66:21, 66:25,
67:11, 85:20, 87:12,
145:18
**PA** [1] - 22:11
**pack** [1] - 75:14
**packed** [4] - 85:5,
85:14, 86:6, 138:12
**packs** [1] - 75:23
**PAGE** [1] - 3:2
**page** [1] - 42:4
**painkillers** [1] -
101:21
**pandemic** [4] - 23:9,
23:10, 27:9, 40:20
**paralegal** [3] - 13:14,
13:15, 13:17
**paranoia** [1] - 61:18
**pardon** [1] - 12:4
**parents'** [1] - 92:9
**park** [1] - 78:10
**Parkway** [6] - 56:17,
56:18, 56:19, 56:24,
77:1
**part** [14] - 12:19,
12:21, 12:24, 13:12,
13:16, 14:1, 14:9,
14:17, 30:2, 30:3,
30:4, 64:14, 83:9,
123:15
**part-time** [9] - 12:19,
12:21, 12:24, 13:12,
13:16, 14:1, 14:9,

14:17, 83:9
**partially** [1] - 122:14
**particular** [4] - 68:11,
73:19, 77:20, 114:7
**parties** [2] - 89:13,
146:12
**pass** [1] - 110:2
**passed** [3] - 71:4,
98:20, 134:5
**passenger** [1] - 97:9
**passenger's** [2] -
53:19, 120:18
**passes** [1] - 78:11
**passing** [2] - 119:8,
119:15
**past** [4] - 48:14, 62:23,
62:25, 95:4
**patience** [1] - 31:14
**pause** [1] - 113:5
**paying** [1] - 14:18
**payment** [1] - 42:25
**peaceful** [1] - 98:6
**pen** [2] - 33:6
**penalty** [1] - 6:7
**Pennsylvania** [8] -
2:4, 8:21, 11:8,
11:23, 12:9, 12:12,
21:18, 95:2
**people** [10] - 13:11,
31:16, 47:9, 48:4,
48:6, 56:4, 80:19,
88:5, 108:25, 139:22
**per** [9] - 10:23, 10:24,
41:24, 42:16, 46:9,
46:10, 46:14, 46:21,
48:18
**percent** [7] - 20:6,
34:9, 34:13, 34:24,
93:12, 95:9, 119:21
**percentage** [10] -
14:24, 15:1, 15:2,
33:15, 33:23, 34:4,
34:7, 34:21, 34:23
**perfectly** [5] - 46:4,
47:13, 60:4, 121:20,
122:10
**perform** [4] - 50:22,
122:8, 122:13,
124:17
**performed** [2] -
123:14, 124:24
**performing** [3] -
122:25, 123:12,
125:17
**performs** [1] - 120:5
**period** [2] - 7:11, 40:1
**periodic** [1] - 41:9
**periodically** [3] - 27:6,
36:4, 44:25
**perjury** [1] - 6:7

**permissible** [1] - 46:5
**persisted** [1] - 33:1
**person** [9] - 5:8,
13:24, 23:1, 33:6,
126:15, 133:9,
133:11, 134:25,
143:6
**personal** [4] - 41:10,
50:7, 50:9, 50:13
**personally** [1] - 35:14
**perspiring** [1] - 143:9
**Ph** [1] - 1:25
**pharmacies** [1] - 60:3
**pharmacy** [2] - 59:25,
60:6
**Pharmacy** [2] - 59:25,
60:2
**phase** [1] - 142:5
**phone** [13] - 82:4,
95:20, 95:22, 95:25,
96:6, 96:12, 96:13,
96:14, 96:16, 96:17,
106:7, 106:9, 106:21
**phones** [1] - 96:14
**physical** [14] - 27:13,
27:15, 27:16, 27:17,
27:19, 27:25, 35:11,
35:20, 51:2, 59:5,
59:9, 135:24, 136:7
**pickup** [4] - 69:20,
70:13, 70:21, 71:10
**picture** [1] - 24:18
**pictured** [1] - 113:20
**pills** [1] - 101:21
**pine** [1] - 87:19
**place** [5] - 29:8, 64:22,
78:20, 79:7, 90:22
**placed** [1] - 42:4
**Plaintiffs** [2] - 1:6, 2:5
**play** [6] - 112:20,
112:24, 113:2,
117:3, 119:6, 121:21
**playing** [12] - 113:14,
115:12, 118:14,
119:7, 119:14,
120:1, 120:21,
121:22, 122:23,
123:17, 124:3,
124:21
**plays** [2] - 117:9,
117:11
**pleadings** [1] - 14:16
**Pleas** [1] - 20:20
**pleasure** [1] - 70:2
**plus** [5] - 42:22, 77:6,
80:23, 95:25, 134:6
**pockets** [1] - 120:23
**point** [37] - 24:6,
40:17, 76:18, 76:19,
90:10, 92:13, 93:17,

96:25, 99:22, 100:3,
100:19, 101:4,
104:12, 105:23,
108:14, 109:3,
110:10, 110:15,
116:9, 116:11,
120:3, 120:14,
120:17, 120:23,
121:10, 122:2,
123:5, 123:10,
123:18, 124:8,
129:7, 129:24,
131:20, 133:17,
133:22, 133:23,
134:22
**police** [25] - 19:23,
21:21, 28:16, 30:23,
31:3, 31:13, 32:5,
33:13, 55:23, 55:25,
56:1, 56:3, 56:7,
57:1, 57:5, 59:6,
59:19, 59:21, 97:2,
98:22, 127:8,
127:14, 128:23,
129:21, 143:24
**poor** [2] - 83:7, 83:10
**position** [2] - 100:13,
130:23
**possible** [3] - 40:24,
65:3, 139:11
**PPP** [1] - 25:19
**practice** [22] - 11:10,
12:15, 12:18, 14:21,
17:2, 17:11, 20:10,
22:11, 23:14, 24:22,
30:16, 31:2, 31:4,
33:15, 33:23, 34:3,
34:4, 40:17, 51:21,
113:11, 139:20
**practiced** [2] - 14:25,
17:20
**practices** [1] - 17:20,
83:5, 139:21
**practicing** [6] - 11:11,
18:18, 20:7, 139:18
**practitioner** [4] - 13:7,
15:17, 41:2, 45:2
**premises** [1] - 99:18
**preparation** [1] -
136:12
**prescribes** [1] -
102:22
**prescription** [3] -
94:10, 94:15, 95:6
**prescriptions** [1] -
60:7
**presence** [1] - 7:13
**PRESENT** [1] - 2:12
**present** [2] - 19:10,
43:21

press [1] - 47:19
pretty [9] - 15:11, 18:21, 19:4, 20:25, 22:15, 24:12, 91:23, 117:11, 124:13
prevented [1] - 123:12
previously [1] - 59:8
primarily [1] - 22:13
privilege [1] - 37:22
probable [7] - 21:9, 21:13, 22:1, 57:10, 57:12, 57:23, 57:24
problems [7] - 104:12, 120:6, 120:8, 120:11, 122:25, 136:17, 136:24
proceeding [1] - 6:14
process [2] - 4:15, 4:18
producing [1] - 38:15
profession [1] - 30:24
professionalism [1] - 49:5
project [1] - 17:7
promise [1] - 125:7
pronounce [1] - 4:5
proper [2] - 32:24, 33:3
provide [2] - 5:6, 43:14
provided [2] - 43:18, 43:24
providing [3] - 4:10, 39:12, 142:9
psychiatrist [1] - 29:24
psychological [10] - 28:3, 28:8, 29:12, 29:16, 29:19, 36:22, 41:11, 41:18, 46:14, 51:4
psychologist [1] - 29:24
public [4] - 12:22, 12:25, 15:7, 15:8
publication [1] - 47:24
pull [9] - 21:22, 22:1, 22:4, 36:25, 37:5, 37:8, 58:7, 93:4, 93:11
pulled [41] - 54:12, 56:4, 56:9, 58:13, 59:1, 60:11, 85:19, 85:23, 90:19, 90:22, 95:12, 98:16, 99:19, 99:23, 100:12, 100:19, 105:7, 105:16, 105:19, 107:3, 107:5, 107:13, 107:23,

108:2, 108:20, 109:18, 110:1, 110:4, 110:24, 111:9, 111:17, 111:20, 111:23, 116:11, 118:22, 118:24, 119:17, 119:20, 119:23, 127:2, 128:16
pulling [5] - 84:5, 107:4, 110:1, 110:6, 110:8
pun [1] - 92:19
purposes [1] - 66:13
purse [1] - 49:15
push [1] - 40:23
put [17] - 60:8, 81:3, 84:15, 84:17, 85:6, 86:11, 86:14, 96:21, 105:18, 105:19, 114:25, 115:3, 120:23, 121:8, 127:19, 128:1, 131:23
putting [1] - 84:19

## Q

Quakertown [3] - 8:21, 56:21, 67:21
quality [1] - 74:1
quantifiable [2] - 43:12, 43:13
questioning [3] - 45:7, 45:17, 128:10
questions [14] - 4:10, 4:11, 5:9, 26:21, 112:21, 121:24, 122:17, 122:20, 127:22, 127:23, 127:25, 128:7, 138:1, 141:15
quicker [2] - 31:10, 51:19
quickly [1] - 130:2
quiet [1] - 74:12
quirks [1] - 55:9
quite [2] - 11:3, 70:3
quod [2] - 10:24

## R

radio [1] - 98:8
raining [2] - 84:2, 90:6
raked [1] - 87:18
rambling [1] - 141:8
ran [1] - 130:1
rarely [1] - 19:8
rather [1] - 19:8
read [3] - 42:10,

104:5, 127:19
reading [2] - 7:12, 94:8
ready [7] - 80:18, 81:2, 81:4, 84:12, 84:16, 85:11, 88:1
realize [1] - 105:6
really [11] - 7:8, 28:24, 29:7, 32:8, 51:23, 51:24, 72:5, 73:18, 77:6, 82:8, 93:13
realm [1] - 20:23
reason [20] - 5:18, 6:13, 6:23, 35:9, 49:21, 50:2, 67:13, 67:15, 95:18, 99:8, 100:4, 109:10, 112:8, 119:19, 119:24, 120:22, 123:4, 124:4, 133:19, 143:17
reasonable [5] - 21:21, 22:5, 57:17, 57:25, 58:7
reasons [1] - 119:17
recently [3] - 26:5, 36:6, 71:4
recess [1] - 104:1
reckless [2] - 111:10, 111:11
recollection [5] - 69:12, 79:20, 108:21, 132:16, 133:3
record [13] - 5:1, 5:13, 7:12, 8:4, 49:18, 67:23, 83:7, 111:5, 113:8, 115:14, 117:25, 118:4, 133:4
Record [1] - 104:5
records [1] - 66:9
recovering [1] - 14:10
reduce [1] - 109:24
refer [1] - 5:22, 6:3
refrigerator [1] - 84:16
regard [3] - 21:6, 122:2, 129:8
regarding [1] - 129:10
registration [2] - 54:23, 112:14
regularly [2] - 94:25, 137:11
relates [1] - 31:23
relationship [2] - 31:12, 51:8
relative [2] - 146:10, 146:13
released [2] - 134:10, 134:24
remain [2] - 31:21,

121:9
remember [23] - 10:22, 24:3, 24:21, 25:7, 26:25, 39:12, 42:5, 65:24, 68:5, 69:10, 73:19, 75:4, 75:8, 79:10, 79:11, 81:11, 83:23, 83:24, 107:15, 109:12, 128:11, 129:9, 142:25
remembering [2] - 24:15, 142:23
remind [4] - 4:24, 18:9, 82:17, 113:10
remove [1] - 100:3
rent [3] - 19:1, 65:2, 65:19
rental [1] - 64:24
rentals [1] - 65:9
rented [8] - 17:18, 17:21, 64:25, 65:3, 65:14, 66:12, 66:13, 68:9
renting [2] - 65:5, 68:19
rents [2] - 65:18, 82:24
repeat [1] - 5:19
repeating [1] - 134:7
repetitive [1] - 141:17
rephrase [3] - 5:19, 34:1, 68:4
Reporter [3] - 1:12, 146:4, 146:20
reporter [3] - 5:2, 5:7, 7:13
REPORTERS [1] - 1:23
REPORTING [1] - 1:23
represent [1] - 32:1
represented [3] - 33:25, 34:20, 139:21
reputational [5] - 47:2, 47:5, 47:16, 48:3, 51:4
requested [1] - 127:14
requirement [1] - 31:5
research [1] - 14:15
reserved [1] - 7:14
residence [1] - 64:7
residual [1] - 60:24
respond [1] - 141:14
responding [1] - 39:22
response [4] - 4:23, 32:22, 50:24, 51:2
responses [2] - 4:21, 5:24, 42:10
responsibility [1] -

49:4
rest [2] - 15:5, 87:7
restaurant [1] - 78:24
rested [1] - 87:13
restrict [1] - 51:3
restricted [1] - 137:16
result [16] - 25:14, 25:15, 27:11, 27:14, 27:20, 27:22, 27:24, 28:4, 35:4, 36:21, 46:14, 46:15, 47:15, 50:22, 59:6
results [2] - 32:13, 132:10
retainer [1] - 22:15
retired [1] - 26:4
return [6] - 39:10, 39:15, 41:8, 41:16, 77:8, 137:17
returns [2] - 38:19, 43:23
review [2] - 27:6, 136:12
reviewed [1] - 136:14
revoked [1] - 112:8
Richard [2] - 17:12
ride [14] - 76:9, 76:16, 76:21, 77:4, 77:12, 77:14, 77:17, 79:14, 84:1, 84:3, 89:17, 114:9, 114:14, 124:12
ridiculous [3] - 121:7, 128:20, 128:22
rigamarole [1] - 25:6
right-hand [1] - 78:23
rights [2] - 20:4, 127:20
Riley [1] - 68:25
riser [1] - 78:1
Rivera [1] - 13:17
Road [5] - 8:21, 62:17, 62:20, 63:4, 91:5
road [16] - 86:3, 92:4, 92:19, 93:16, 93:17, 96:9, 97:2, 97:14, 101:24, 104:16, 124:9, 126:21, 126:22, 126:23, 134:3, 143:19
roadway [9] - 21:1, 55:25, 57:2, 78:20, 95:15, 109:3, 114:1, 123:2, 127:1
Robin [1] - 13:17
rode [3] - 77:19, 77:23, 78:2
rogs [1] - 60:21
roll [1] - 124:20
rolling [3] - 122:21,

123:16, 124:2
**Roman** [3] - 9:12, 9:23, 17:1
**room** [2] - 130:2, 131:5
**rooms** [1] - 80:20
**roughly** [1] - 46:21
**route** [6] - 56:10, 72:10, 72:12, 72:14, 91:1, 91:4
**Route** [2] - 56:12, 99:3
**routine** [2] - 73:23, 88:22
**routinely** [1] - 137:10
**rude** [2] - 4:25, 5:12
**run** [3] - 13:19, 29:4, 42:7
**running** [1] - 38:25
**runs** [2] - 65:9, 65:16

**S**

**safely** [1] - 144:16
**sailed** [1] - 49:13
**sanctions** [1] - 24:10
**sat** [1] - 130:3
**Saturday** [6] - 74:17, 75:5, 75:9, 76:7, 77:24, 84:25
**saw** [6] - 56:5, 78:19, 82:13, 82:14, 105:14, 105:19, 107:1, 107:3, 107:9
**scaled** [1] - 40:14
**scene** [2] - 60:25, 132:5
**schedule** [2] - 67:19, 68:5
**Schoenberger** [1] - 102:25
**school** [8] - 11:13, 11:14, 11:15, 12:1, 12:7, 17:6, 30:2, 92:8
**School** [2] - 11:16, 12:2
**Schuylkill** [1] - 72:13
**screen** [8] - 5:2, 37:3, 37:11, 60:12, 113:7, 116:19, 117:1
**screwed** [2] - 32:8, 49:12
**script** [1] - 22:8
**seafood** [4] - 78:17, 78:20, 79:1, 139:9
**searching** [3] - 32:16, 54:4
**seasonal** [1] - 78:24
**seat** [7] - 49:16, 97:9, 120:18, 129:8,

129:9, 129:11
**seated** [4] - 97:6, 130:16, 130:21, 131:13
**second** [5] - 17:25, 36:18, 37:1, 37:6, 105:11
**seconds** [4] - 115:14, 116:8, 120:2, 122:22
**secretarial** [1] - 42:22
**secretary** [1] - 13:16
**secure** [1] - 80:24
**secured** [1] - 114:25
**see** [30] - 19:21, 35:10, 37:3, 37:12, 41:13, 41:25, 47:3, 50:24, 51:17, 55:20, 59:16, 60:19, 60:21, 61:19, 81:10, 82:5, 82:15, 93:23, 94:3, 97:19, 114:1, 116:20, 117:7, 117:19, 118:9, 121:20, 125:25, 127:16, 133:13
**seeing** [7] - 28:18, 36:21, 89:15, 93:16, 98:4, 117:2, 117:5
**seek** [2] - 30:5, 30:7
**self** [1] - 31:20
**self-control** [1] - 31:20
**sell** [4] - 62:14, 62:20, 63:8, 63:9
**sends** [1] - 32:14
**separate** [1] - 17:20
**separated** [1] - 16:17
**serve** [1] - 78:25
**serviced** [2] - 137:10, 137:11
**session** [2] - 4:9, 24:12
**setting** [1] - 6:8
**several** [4] - 92:15, 92:16, 124:12, 124:13
**sex** [1] - 22:21
**sexual** [1] - 22:23
**shake** [1] - 4:24
**shape** [3] - 113:25, 124:14, 124:5
**share** [2] - 70:1, 117:1
**sharing** [1] - 37:2, 116:19
**sheepdog** [1] - 71:8
**sheets** [1] - 84:14
**Shepherd** [1] - 71:3
**ship** [1] - 49:13
**shock** [2] - 119:1, 131:15

**shocked** [2] - 107:4, 121:8
**shopping** [4] - 86:7, 86:10, 86:22, 86:25
**shore** [14] - 28:25, 40:2, 40:4, 67:20, 68:7, 72:11, 76:9, 77:13, 77:20, 80:1, 114:5, 114:11, 137:17, 137:21
**short** [1] - 51:15
**shortcut** [1] - 56:11
**shorter** [1] - 56:23
**shot** [1] - 134:20
**shots** [1] - 36:8
**shoulder** [2] - 104:18, 104:20
**show** [6] - 38:21, 83:19, 83:20, 112:17, 133:4, 143:11
**showed** [2] - 85:11, 132:1
**shower** [1] - 139:8
**showered** [4] - 78:14, 85:10, 139:2, 139:4
**showing** [2] - 96:25, 124:23
**shows** [1] - 123:14
**shut** [5] - 39:20, 39:21, 98:13, 98:15, 144:8
**sickness** [1] - 59:11
**side** [17] - 17:13, 53:19, 53:20, 56:5, 56:25, 74:25, 75:1, 75:2, 78:23, 102:17, 102:19, 103:13, 103:17, 113:6, 124:9, 143:19
**signal** [7] - 55:13, 99:13, 109:10, 109:15, 111:24, 135:14, 136:22
**signals** [1] - 54:14
**signed** [4] - 42:2, 42:3, 42:8, 42:9
**significance** [1] - 128:12
**signing** [2] - 7:13, 42:5
**signs** [7] - 126:5, 126:6, 126:13, 135:24, 136:8, 140:1, 143:14
**similar** [1] - 93:1
**simple** [2] - 57:14, 57:15
**simply** [1] - 4:8
**sincerely** [1] - 49:11

**sips** [1] - 138:19
**sirens** [2] - 105:21, 107:9
**sit** [6] - 54:11, 58:4, 96:3, 105:4, 119:23, 122:24
**sits** [1] - 96:4
**sitting** [2] - 87:8, 128:7
**situation** [2] - 13:22, 128:24
**situations** [1] - 51:6, 51:10
**six** [7] - 9:7, 16:18, 45:18, 45:19, 61:7, 70:20, 95:4
**sleep** [5] - 74:13, 84:10, 88:24, 92:19, 97:20
**sleeping** [1] - 100:22
**sleepy** [2] - 104:9, 126:11
**slept** [1] - 88:20
**sloped** [1] - 126:24
**slow** [2] - 141:11, 141:14
**slowing** [1] - 110:3
**slurred** [1] - 141:4
**slurring** [1] - 53:22
**small** [1] - 34:23
**smaller** [2] - 64:7, 64:8
**smell** [1] - 54:25
**smelled** [3] - 129:9, 129:11, 129:13
**SMITH** [2] - 1:11, 146:4
**smoothly** [1] - 4:19
**sobriety** [2] - 53:16, 134:4
**social** [2] - 25:8, 29:23
**socialization** [4] - 51:7, 51:11, 51:20, 52:2
**socializing** [3] - 52:3, 52:5, 52:7
**socially** [1] - 82:7
**soda** [5] - 75:16, 75:17, 85:14, 91:23
**sold** [3] - 17:24, 18:1, 18:5
**solicitor** [3] - 12:20, 12:22, 12:24
**solo** [4] - 13:6, 15:17, 41:1, 45:1
**Somerset** [1] - 11:18
**something's** [1] - 53:9
**sometime** [2] - 71:18, 72:8
**sometimes** [16] -

19:22, 22:12, 22:13, 23:4, 24:15, 25:9, 28:15, 28:16, 28:21, 31:15, 44:19, 51:16, 63:14, 74:13, 74:14, 80:5
**somewhere** [1] - 40:6
**son** [1] - 9:11
**Sophia** [3] - 9:10, 9:23, 16:21
**sorry** [22] - 9:15, 26:9, 26:15, 32:7, 42:1, 52:15, 60:18, 62:6, 62:10, 63:6, 67:25, 71:19, 71:25, 72:21, 79:6, 83:17, 91:12, 99:6, 100:8, 105:12, 114:16, 123:9
**sort** [12] - 21:9, 22:5, 32:15, 35:21, 55:23, 57:16, 58:1, 59:5, 89:5, 107:2, 130:16
**sought** [1] - 35:3
**sound** [2] - 66:22, 96:8
**sounds** [1] - 6:21
**soup** [1] - 20:22
**south** [1] - 17:13
**space** [5] - 17:13, 17:18, 19:1, 82:24, 97:10
**speaker** [1] - 117:3
**speaking** [2] - 45:13, 141:11
**speaks** [1] - 141:23
**special** [1] - 81:9
**specialty** [1] - 12:16
**specific** [3] - 87:2, 108:24, 109:1
**specifically** [1] - 79:16
**speech** [1] - 141:4
**speed** [11] - 55:11, 57:19, 57:21, 58:9, 107:15, 107:21, 107:24, 108:1, 108:4, 109:7, 109:24
**speeding** [10] - 20:18, 21:10, 55:11, 57:18, 107:25, 108:6, 111:10, 111:12, 112:2, 112:5, 112:6
**spend** [4] - 73:25, 75:24, 78:3, 83:20
**spent** [3] - 68:17, 84:7, 85:15
**spiel** [1] - 4:17
**spoken** [2] - 4:21, 5:2
**staggering** [1] - 141:25
**stand** [6] - 33:8,

83:17, 123:23,
125:1, 125:7,
125:17, 142:2,
142:4, 143:15
**standard** [7] - 7:4, 7:5,
7:7, 21:15, 21:17,
21:23, 57:13
**standing** [9] - 54:2,
121:20, 122:7,
122:10, 125:25,
126:1, 126:15,
142:21, 143:18
**stare** [1] - 140:21
**start** [4] - 6:20, 76:20,
113:12, 145:12
**started** [5] - 17:11,
17:12, 25:4, 103:11,
109:24
**starting** [1] - 76:18
**staris** [1] - 107:17
**state** [9] - 12:10,
30:24, 31:3, 36:10,
55:24, 56:25, 119:1,
131:15
**State** [2] - 1:12, 146:5
**statements** [2] -
141:17, 141:19
**states** [2] - 43:17,
99:18
**STATES** [1] - 1:1
**station** [8] - 59:19,
59:21, 127:8,
127:14, 127:21,
131:10, 134:10,
134:23
**stay** [3] - 40:3, 89:4
**stayed** [6] - 40:9,
78:12, 78:13, 83:12,
83:16, 83:18
**steering** [2] - 100:4,
100:10
**step** [5] - 32:17, 49:15,
53:21, 59:17, 120:4
**steps** [2] - 130:1,
130:2
**stigma** [2] - 30:11,
30:12
**still** [22] - 4:17, 17:23,
18:17, 18:18, 20:1,
24:1, 24:9, 26:3,
31:23, 33:8, 46:13,
52:16, 60:16, 61:24,
62:11, 64:1, 70:20,
83:5, 99:1, 101:5,
106:17, 124:12
**stipulations** [3] - 7:4,
7:5, 7:8
**stop** [10] - 21:1, 21:6,
33:14, 57:14, 57:15,
57:17, 57:22, 87:24,

90:16, 113:15
**stop-and-go** [1] -
90:16
**stopped** [6] - 29:2,
31:16, 31:18, 55:24,
107:5
**stops** [1] - 91:8
**storm** [1] - 88:1
**straight** [10] - 12:3,
12:5, 54:2, 121:20,
122:7, 122:11,
123:3, 126:1,
126:15, 142:4
**straighten** [1] - 81:5
**straightened** [1] -
84:18
**straightening** [1] -
84:5
**strange** [2] - 88:12,
116:16
**straps** [1] - 115:2
**streamline** [1] - 113:3
**STREET** [1] - 1:24
**Street** [4] - 2:3, 17:16,
18:25, 92:21
**streetlights** [2] -
90:20, 90:25
**strike** [6] - 28:2,
94:19, 95:24, 99:8,
118:22, 131:4
**stuff** [4] - 49:16,
52:11, 70:17, 84:21
**stumbling** [1] - 141:25
**stupid** [1] - 53:16
**SU** [1] - 69:23
**substance** [1] -
101:18
**substances** [1] -
144:14
**successful** [1] - 74:14
**sudden** [1] - 108:9
**suffer** [2] - 48:8, 48:10
**suffering** [1] - 38:15
**Suite** [1] - 2:8
**SUITE** [1] - 1:24
**summer** [1] - 65:25
**summertime** [1] - 65:2
**Sunday** [9] - 66:23,
68:10, 79:9, 79:21,
80:3, 80:20, 83:25,
84:25, 87:25
**sunset** [4] - 73:25,
79:15, 84:10, 85:16
**Superior** [1] - 20:19
**superior** [1] - 134:24
**supervisor** [1] -
133:14
**supplemental** [3] -
60:11, 60:21, 66:15
**suppose** [1] - 80:8

**supposed** [2] - 5:25,
9:16
**surgery** [6] - 36:3,
61:9, 103:8, 103:9,
103:12
**surprised** [1] - 47:10
**suspended** [1] - 112:7
**suspicion** [6] - 21:22,
22:5, 57:17, 57:25,
58:7, 139:23
**sustain** [2] - 27:25,
59:4
**sustained** [5] - 25:15,
27:13, 27:15, 50:22,
59:9
**Swamp** [1] - 8:21
**swaying** [1] - 141:25
**swerving** [1] - 58:10
**swing** [2] - 40:18,
40:20
**sworn** [3] - 4:2, 6:6,
146:7
**Synthroid** [1] - 7:22
**Syracuse** [1] - 92:21

---

# T

**tab** [1] - 38:25
**tailed** [1] - 87:15
**take-home** [1] - 42:13
**TAKEN** [1] - 1:11
**tape** [1] - 121:24
**taught** [1] - 41:22
**tax** [2] - 38:19, 43:23
**technical** [1] - 5:18
**teeth** [3] - 139:2,
139:5, 143:1
**temperature** [1] - 25:6
**tempered** [1] - 51:15
**tempted** [1] - 22:9
**term** [1] - 100:15
**terms** [8] - 31:22,
35:20, 38:6, 38:18,
67:20, 68:6
**terrain** [1] - 126:23
**test** [34] - 32:13,
32:24, 33:4, 53:16,
120:5, 121:11,
121:13, 122:3,
122:9, 122:13,
122:19, 122:25,
123:13, 123:23,
124:24, 125:15,
125:16, 125:17,
126:20, 130:8,
130:9, 130:10,
130:14, 130:18,
130:24, 131:2,
131:3, 131:11,
132:4, 132:11,

133:9, 133:11,
144:24, 145:1
**testified** [10] - 4:2,
44:9, 44:24, 45:4,
48:24, 55:5, 106:6,
109:11, 132:17,
132:25
**testify** [3] - 101:23,
110:19, 146:7
**TESTIMONY** [1] - 1:6
**testimony** [11] - 5:25,
6:9, 29:18, 58:5,
80:15, 104:8,
110:21, 132:19,
134:22, 137:14,
143:13
**tests** [2] - 33:2, 134:4
**text** [1] - 82:3
**THE** [4] - 1:1, 116:23,
137:24, 138:2
**therapist** [2] - 29:23,
36:20
**thereabouts** [3] -
71:19, 71:20, 131:19
**therefore** [2] - 5:10,
109:14
**thereto** [1] - 15:10
**they've** [1] - 34:17
**thick** [1] - 141:4
**thinking** [3] - 24:8,
24:11, 118:7
**thirsty** [2] - 91:21,
91:22
**thousands** [2] - 34:7,
139:22
**three** [19] - 13:19,
16:2, 36:8, 48:14,
62:24, 62:25, 64:19,
73:5, 78:6, 83:9,
86:15, 87:19, 112:4,
112:5, 119:3, 119:8,
119:15, 120:2,
123:24
**throw** [2] - 144:3,
144:7
**thrown** [1] - 47:12
**Thule** [2] - 114:24,
115:9
**THULE** [1] - 114:24
**thyroid** [8] - 7:24,
35:22, 36:5, 102:5,
103:1, 103:13
**ticket** [2] - 32:11,
32:14
**tickets** [4] - 112:2,
112:5, 112:6, 135:17
**tinted** [1] - 21:11
**tired** [5] - 92:17, 93:7,
93:13, 100:21,
110:16

**tires** [1] - 136:24
**today** [13] - 4:7, 6:9,
7:19, 7:20, 20:3,
36:15, 50:1, 54:11,
58:4, 93:23, 105:4,
119:23, 136:13
**toe** [2] - 121:13, 122:3,
122:19, 123:13
**together** [5] - 17:19,
17:21, 18:11, 18:13,
54:3
**toll** [2] - 78:22, 101:11
**tollbooths** [1] - 101:8
**tolls** [2] - 101:9,
101:15
**Tom** [3] - 17:18, 17:19,
17:24
**took** [14] - 12:8, 12:9,
25:5, 31:20, 49:15,
70:23, 90:21,
102:20, 103:19,
126:8, 130:8, 130:9,
131:6, 138:13
**toothbrushing** [1] -
139:9
**total** [2] - 134:9,
138:24
**totally** [2] - 49:17,
120:16
**towards** [1] - 141:22
**towels** [3] - 84:15
**town** [1] - 63:2
**Townbank** [2] - 63:5,
63:7
**track** [1] - 131:14
**trades** [1] - 12:17
**traffic** [32] - 20:17,
21:1, 21:6, 22:20,
57:14, 57:15, 57:18,
57:22, 58:1, 58:3,
72:14, 73:2, 73:4,
73:6, 77:6, 80:12,
80:19, 90:9, 90:12,
90:14, 92:7, 92:11,
96:8, 97:2, 99:4,
99:16, 101:1, 101:2,
109:9, 119:3,
123:11, 135:21
**trailer** [1] - 114:25
**trained** [1] - 139:25
**training** [1] - 143:11
**transcript** [5] - 5:22,
6:3, 113:2
**trauma** [1] - 49:23
**travel** [5] - 96:8, 98:24,
99:6, 108:13, 108:14
**traveled** [2] - 119:2,
138:5
**traveling** [1] - 68:6
**treat** [4] - 29:21,

35:21, 35:23, 36:2
**treated** [3] - 35:17, 61:4, 134:1
**treating** [1] - 32:15
**treatment** [7] - 28:2, 30:8, 30:13, 35:3, 49:5, 49:20, 136:4
**trees** [1] - 87:19
**tremors** [1] - 140:25
**trial** [1] - 7:15
**trials** [2] - 30:19
**tried** [3] - 34:22, 40:23, 41:4
**trip** [1] - 89:7
**trooper** [9] - 118:23, 127:19, 127:24, 128:1, 128:5, 129:10, 132:3, 132:4, 142:17
**Trooper** [22] - 57:9, 59:3, 59:14, 98:16, 98:21, 99:18, 106:25, 109:23, 116:11, 122:1, 123:20, 131:21, 133:7, 135:1, 136:6, 140:6, 140:13, 141:12, 141:22, 142:10, 142:24, 143:23
**TROOPER** [1] - 1:8
**troopers** [3] - 30:24, 31:3, 55:24
**trouble** [3] - 24:15, 93:16, 125:17
**truck** [12] - 49:15, 70:14, 70:25, 71:10, 85:15, 86:15, 96:4, 97:7, 97:8, 114:20, 114:23, 115:3
**true** [19] - 6:1, 12:8, 13:20, 16:13, 16:24, 20:23, 21:2, 22:16, 30:25, 61:9, 66:14, 83:13, 93:24, 101:6, 102:6, 113:20, 123:25, 124:1, 135:8
**trust** [1] - 133:23
**truth** [3] - 144:5, 144:10, 146:8
**truthfully** [1] - 6:4
**try** [13] - 19:5, 20:15, 34:24, 45:9, 63:10, 65:2, 74:12, 76:14, 77:5, 77:17, 104:16, 113:3, 124:8
**trying** [11] - 4:25, 5:13, 9:25, 24:17, 30:17, 41:15, 45:10, 48:2, 112:4, 122:15, 125:1

**turn** [7] - 54:14, 55:13, 76:25, 99:13, 111:24, 135:14, 136:22
**turned** [4] - 105:8, 108:19, 127:12, 127:15
**turns** [2] - 58:16, 58:24
**twice** [2] - 23:4, 111:13
**twitching** [1] - 140:24
**two** [56] - 9:7, 16:21, 32:18, 39:11, 39:16, 40:1, 40:12, 41:9, 44:20, 44:23, 45:24, 56:5, 58:17, 58:24, 59:2, 62:23, 72:18, 73:3, 73:4, 76:10, 77:11, 78:6, 80:10, 85:2, 86:15, 87:18, 90:25, 98:20, 98:25, 99:4, 99:6, 100:10, 100:11, 100:14, 100:23, 101:14, 108:3, 108:7, 108:19, 109:4, 109:6, 109:8, 112:1, 112:4, 112:5, 113:20, 115:2, 123:24, 126:9, 129:19, 137:14, 137:18
**two-lane** [2] - 58:17, 58:24, 59:2, 90:25, 108:19
**two-week** [2] - 40:1, 40:12
**type** [17] - 14:20, 14:24, 17:3, 20:2, 22:9, 27:8, 27:13, 28:1, 36:20, 52:5, 71:5, 88:15, 88:16, 96:17, 101:18, 109:10
**types** [5] - 20:1, 20:9, 21:13, 73:11, 75:13
**typical** [6] - 74:6, 74:9, 90:7, 91:4, 126:6

**U**

**uht** [1] - 4:23
**uht-uht** [1] - 4:23
**Ukrainian** [1] - 30:1
**um-hum** [6] - 4:23, 6:12, 41:14, 61:21, 112:18, 121:14
**unable** [1] - 124:16
**under** [12] - 6:7, 33:7,

33:9, 33:10, 34:5, 77:1, 99:18, 107:24, 108:1, 126:17, 139:22
**undergone** [1] - 28:1
**undergraduate** [1] - 11:14
**understood** [4] - 4:13, 4:20, 5:4, 123:24
**uneven** [1] - 126:23
**UNITED** [1] - 1:1
**University** [1] - 11:22
**unlawfully** [2] - 48:23, 133:25
**unless** [1] - 89:5
**unload** [2] - 73:14, 78:10
**unlocked** [1] - 131:6
**unnecessary** [1] - 140:24
**unopened** [3] - 129:17, 129:18, 129:20
**unpack** [1] - 73:14
**unsteady** [2] - 124:5, 126:19
**untrue** [1] - 129:15
**unusual** [2] - 79:13, 142:19
**unusually** [1] - 141:11
**up** [57] - 17:5, 25:1, 32:7, 32:8, 34:13, 35:12, 36:25, 37:5, 37:9, 40:21, 41:6, 47:3, 47:23, 48:12, 49:12, 50:25, 60:11, 60:12, 74:10, 74:11, 76:23, 76:24, 80:22, 81:5, 84:6, 84:10, 84:18, 85:14, 86:6, 87:20, 87:21, 88:1, 89:3, 89:4, 89:8, 91:6, 95:7, 97:10, 99:20, 100:23, 107:17, 108:9, 108:13, 109:4, 109:6, 125:25, 130:1, 130:2, 130:7, 130:11, 131:6, 135:10, 142:4, 142:21
**up-to-date** [1] - 95:7
**upcoming** [2] - 65:6, 97:2
**upset** [6] - 28:19, 39:17, 49:1, 59:13, 59:15, 59:18
**uses** [1] - 64:23
**utilize** [1] - 113:6

**V**

**vacation** [2] - 40:6, 46:23
**vacuum** [1] - 84:18
**valid** [1] - 112:10
**variables** [2] - 38:23, 77:16
**variations** [1] - 34:19
**varied** [1] - 76:2
**varies** [5] - 42:20, 42:21, 42:22, 42:23, 76:1
**various** [2] - 31:12, 51:5
**vehicle** [35] - 22:2, 32:16, 32:17, 59:17, 69:19, 69:25, 70:1, 70:2, 70:4, 70:7, 70:10, 70:22, 71:14, 78:10, 86:6, 86:9, 98:17, 99:24, 104:21, 106:14, 113:16, 113:19, 113:23, 116:1, 116:2, 118:20, 126:9, 127:19, 127:24, 128:1, 128:5, 136:18, 137:3, 137:5
**vehicles** [8] - 55:24, 55:25, 56:4, 57:3, 57:5, 98:18, 98:19, 98:21
**vent** [1] - 96:20
**verbal** [1] - 4:22
**Vermont** [4] - 12:2, 17:8, 92:10, 100:24
**versus** [1] - 27:18
**veterans** [2] - 17:7, 17:8
**VIA** [1] - 1:11
**via** [1] - 25:4
**Viagra** [6] - 60:5, 60:6, 101:23, 101:24, 102:7, 102:9
**VICINAGE** [1] - 1:2
**vicinity** [1] - 90:21
**vid** [1] - 141:23
**video** [34] - 54:1, 54:5, 59:15, 94:4, 94:6, 103:23, 112:17, 112:20, 113:12, 113:14, 115:12, 116:20, 118:14, 119:7, 119:14, 120:1, 120:18, 120:21, 121:22, 122:23, 122:24, 123:14, 123:17,

124:3, 124:21, 124:23, 127:5, 127:7, 127:13, 128:4, 136:14, 141:23, 142:1
**VIDEOCONFERENC E** [1] - 1:11
**VIDEOGRAPHERS** [1] - 1:23
**Vietnam** [1] - 17:8
**Villas** [6] - 63:15, 63:18, 63:23, 63:24, 64:22, 65:25
**violated** [1] - 57:11
**violation** [2] - 57:17, 58:1
**visible** [2] - 140:2, 143:14
**visibly** [1] - 126:14
**vision** [2] - 95:13, 120:12
**visiting** [1] - 93:9
**visitors** [1] - 79:18
**visually** [1] - 117:6
**vitamin** [1] - 36:8
**voice** [2] - 93:5, 93:6
**vomiting** [1] - 143:3
**Vrbo** [1] - 64:24
**vs** [1] - 1:7

**W**

**W-2** [1] - 38:19
**wage** [14] - 38:7, 38:9, 38:16, 43:12, 43:14, 43:19, 44:3, 44:11, 44:14, 44:21, 45:16, 45:20, 45:22, 45:25
**wages** [2] - 38:17, 41:24
**wait** [2] - 39:2, 80:18
**waiting** [1] - 135:6
**waives** [2] - 7:12, 7:13
**wake** [1] - 74:10
**walk** [5] - 74:4, 74:20, 75:1, 79:14, 142:19
**walked** [1] - 99:20
**walks** [2] - 53:19, 55:2
**wants** [3] - 5:9, 88:22, 121:12
**War** [1] - 17:8
**warm** [3] - 47:14, 90:6, 128:24
**wash** [1] - 86:11
**washed** [1] - 84:15
**watch** [8] - 73:25, 79:15, 84:9, 84:10, 122:12, 122:24
**watched** [1] - 85:15
**watching** [2] - 97:13,

WORD FOR WORD REPORTING, LLC

109:1

water [3] - 74:2, 75:16, 75:17

watery [1] - 140:12

ways [2] - 45:19, 51:5

Waze [5] - 96:6, 96:7, 96:10, 96:25, 106:7

wear [3] - 25:5, 93:19, 93:21

wearing [5] - 59:4, 59:19, 93:23, 94:1, 94:3

weather [1] - 90:4

weaving [5] - 54:14, 54:17, 54:20, 55:14, 99:15

weeds [1] - 84:5

week [13] - 23:3, 23:4, 40:1, 40:12, 41:25, 42:12, 42:16, 42:21, 53:8, 76:6, 83:9, 102:11

weekend [17] - 52:25, 65:6, 69:4, 69:10, 76:5, 77:20, 79:2, 79:9, 79:17, 79:19, 80:3, 81:13, 82:2, 84:24, 87:3, 102:12, 102:20

weekenders [1] - 80:4

weekly [2] - 23:2, 41:24

weeks [9] - 36:8, 39:11, 39:16, 41:9, 44:20, 44:23, 45:24, 137:15, 137:18

weight [1] - 137:2

wet [1] - 86:11

whatsoever [3] - 28:2, 106:9, 131:23

wheel [3] - 100:4, 100:10, 100:14

whereas [1] - 53:1

wherein [2] - 4:9, 68:12

whip [2] - 45:9, 45:10

whole [5] - 25:6, 44:19, 65:17, 79:9, 146:8

wide [5] - 100:25, 104:9, 104:20, 110:12, 110:13

wife [58] - 9:2, 9:15, 9:24, 15:18, 15:23, 16:3, 16:13, 19:21, 25:20, 25:22, 25:24, 26:1, 27:1, 29:10, 32:16, 32:20, 41:20, 49:14, 49:17, 54:17, 54:23, 54:25, 55:5,

55:17, 57:6, 59:13, 59:18, 61:6, 64:23, 70:4, 73:9, 73:10, 74:13, 75:14, 76:14, 79:4, 86:20, 88:22, 88:25, 92:24, 95:10, 95:23, 96:15, 97:15, 108:5, 110:5, 110:8, 115:21, 118:21, 120:18, 123:9, 129:2, 134:2, 135:5, 138:6, 138:12, 139:13, 143:7

wife's [3] - 6:20, 70:2, 96:13

Wildwood [12] - 63:16, 63:19, 63:20, 63:21, 76:24, 76:25, 78:21, 78:22, 92:21

window [1] - 99:21

windows [3] - 21:11, 98:12, 98:15

windy [1] - 84:2

wine [4] - 85:1, 86:14, 129:18, 129:20

wintertime [1] - 65:3

wise [1] - 130:5

WITNESS [4] - 3:2, 116:23, 137:24, 138:2

witnesses [1] - 4:16

wives [1] - 16:1

WOODBURY [1] - 1:24

word [3] - 5:3, 128:14, 131:24

WORD [2] - 1:23

words [4] - 26:19, 32:19, 53:23, 144:3

worker [1] - 29:24

works [5] - 13:9, 82:17, 82:19, 82:20, 83:1

world [1] - 32:10

worst [1] - 90:14

wrist [2] - 135:25

written [1] - 47:23

wrongful [1] - 41:11

## X

XIO1520 [2] - 1:13, 146:21

## Y

yard [1] - 87:17

yards [2] - 87:18, 131:4

year [13] - 10:7, 11:19,

11:24, 24:20, 24:24, 34:8, 35:11, 62:23, 65:20, 69:21, 82:8, 82:9, 137:7

years [39] - 8:13, 8:24, 8:25, 10:10, 10:20, 12:23, 16:7, 16:18, 16:18, 16:24, 17:15, 17:17, 18:1, 18:6, 18:13, 24:14, 33:12, 34:6, 48:15, 54:1, 56:6, 61:3, 61:5, 61:7, 62:23, 62:24, 62:25, 64:19, 71:16, 79:17, 81:23, 81:24, 81:25, 92:15, 95:5, 111:15, 124:8, 139:16, 143:13

yesterday [3] - 24:15, 88:8, 88:9

younger [3] - 92:14, 92:15, 118:2

youngest [1] - 9:20

yourself [5] - 73:8, 115:6, 120:14, 139:12, 140:22

yourselves [1] - 76:4

## Z

Zelechiwsky [17] - 4:4, 8:5, 13:3, 13:4, 13:5, 37:2, 44:7, 46:8, 50:25, 113:18, 118:20, 127:18, 128:15, 138:1, 140:11, 144:23

ZELECHIWSKY [8] - 1:4, 1:5, 1:7, 2:13, 3:3, 9:14, 26:7, 146:7

Zelle [3] - 43:6, 43:9, 43:10

Zenia [1] - 9:11

zero [5] - 130:10, 130:11, 131:8, 132:18

ZIP [1] - 8:22

Zoom [3] - 23:12, 25:4, 25:10

# EXHIBIT "D"

SP-338

Page 1 of 2

# New Jersey State Police Motor Vehicle Stop Report

A100-2020-00847728

09/09/2022

## General Information

| | | |
|---|---|---|
| CAD Incident No: A100-2020-00847728 | Time Stopped: 2135 | Pursuit: No |
| Unit: A100 | Time Cleared: 2158 | Entered Vehicle: Yes |
| Squad: 2 | Duration: 23 minutes | MVR Used: Yes |
| Date: 08/10/2020 | MDC Data Lead to PC: No | Supr. On Scene: No |
| County/Muni: 0610 | Location: STATE HIGHWAY 55 NORTH MP 24 | |
| SP Veh #: 3513 | | |

Reason For Initial MV Stop/Contact: MOVING VIOLATION

Basis For Entering Vehicle
Basis 1 For Entering Vehicle: DUI SEARCH (PC)          Evidence Seized for Basis 1: No

| | | | |
|---|---|---|---|
| Request for Consent Search: No | Supv. Badge: | Supv. Appr.: No | Time Supv. Contact: | Time Appr/Deny: |
| Request for K-9 Deployment: No | Supv. Badge: | Supv. Appr.: No | Time Supv. Contact: | Time Appr/Deny: |
| K-9 Deployed: No | Time K-9 Arrived: | K-9 Alert: No | Consent Search: |
| Search Warrant: | Search Warrant County: | Search Warrant Judge: | |

## Vehicle Information

| | | |
|---|---|---|
| Vehicle Year: 2013 | Reg: ZFP9856 ( PA ) | MV Lookup: Yes |
| Make/Model: Ford F-150 | Veh. Color: BLACK | NCIC Hit: No |

## Driver Information

| | | | |
|---|---|---|---|
| Driver Name: Bohdan J Zelechiwsky | Asked to Exit: Yes | Sobriety Test: Yes | |
| OP License: 20040727          (PA) | Frisked: No | Duty to Transport Frisk Only: No | Evid Seized (Frisk): No |
| DOB: 07/06/1951 | Searched: Yes | Was Search Incident to Arrest: No | Evid Seized (Search): No |
| Sex: M | CCH: No | Consent Request of Veh: No | |
| Race: WHITE | NCIC: Yes | Consent Request of Item: No | |
| Addr: 3108 LIMEPORT PI | SUMM: Yes | WARM: No | |
| COOPERSBURG PA 18036 | SUMN: No | WARN: No | |
| Use of Force: | Arrest: Yes | Warrant Check: Yes | Charges: 39:4-50 |

## Other Law Personnel and Case Numbers

| | |
|---|---|
| Invest Case #: | MVA Case #: |
| DD Case #: | OPR Case #: |

## Narrative/Comments

-MV Stop, moving violation, 39:4-88b
-Upon approach, made contact with driver, Bohdan Zelechiwsky and passenger Lisa Zelechiwsky
-Driver's eyes were observed to be watery, and glassy
-The driver was instructed out of the vehicle
-Driver failed SFST's and was arrested (DWI), handcuffed (double locked), searched (negative), advised of constitutional rights as per Miranda, and secured in rear of Troop car
-PC search as per motor vehicle exception of vehicle conducted with negative results
-As Per John'S Law, the vehicle was released to Lisa Zelechiwsky
-Lisa Zelechiwsky showed no signs of impairment and had a valid drivers license
-Bohdan Zelechiwsky provided a BAC % of .00 - test only
-Bohdan Zelechiwsky released to Lisa Zelechiwsky at Port Norris Station

Page 2 of 2

## Persons Interacted With

| | | |
|---|---|---|
| **Name:** Lisa A Zelechiwsky | **Asked to Exit:** No | **Sobriety Test:** No |
| **DOB:** 10/20/1966 | **Frisked:** No    **Duty to Transport Frisk Only:** No | **Evid Seized (Frisk):** No |
| **Sex:** F | **Searched:** No    **Was Search Incident to Arrest:** No | **Evid Seized (Search):** No |
| **Race:** WHITE | **CCH:** No    **Consent Request (Veh):** No | |
| **Addr:** 3108 Limeport Pl | **NCIC:** No    **Consent Request (Item):** No | |
| Coopersburg PA 18036 | **SUMM:** No    **WARM:** No | |
| **Use of Force:** | **SUMN:** No    **WARN:** No | |
| | **Arrest:** No    **Warrant Check:** No    **Charges:** | |

| Rank: | 1st. Approval: | 2nd. Approval: | MVR Reviewer: |
|---|---|---|---|
| TPR. A DAVIS | SGT. M T LOWRY | SFC J I BLIZZARD | |
| # 8138 | # 6919 | # 6160 | |
| | Date:  08/16/2020 | Date:  08/19/2020 | Date: |
| Signature: | Signature: | Signature: | Signature: |

## 0610-E20-001331

YOU ARE HEREBY SUMMONED TO APPEAR BEFORE THIS COURT ON THE PAY BY DATE TO ANSWER THE COMPLAINT CHARGING YOU WITH THE OFFENSE LISTED. IF YOU PLEAD GUILTY AND PAY THE PENALTY AMOUNT OF $ 86 BEFORE THE SCHEDULED PAY BY DATE OF 08/24/2020, YOU DO NOT NEED TO APPEAR IN COURT (SEE INSTRUCTIONS BELOW).

Drivers License No:  **20040727**        D/L State:  **PA**

D/L Expiration Date:  **07/31/2023**        ☐ Commercial License

THE UNDERSIGNED CERTIFIES THAT

**BOHDAN J ZELECHIWSKY**        Telephone:        Weight:

**3108 LIMEPORT PIKE**        Birth Date: **07/06/1951**        Height:

**COOPERSBURG, PA 18036**        Eyes: **HAZEL**        Restrictions: 0

Sex: **M**

AND DID UNLAWFULLY OPERATE A

| License Plate No. | Vehicle Make: **FORD** | Year: |
|---|---|---|
| **ZFP9856** | Color: **BLK** | Body Type: |
| | Plate State: **PA** | Exp Date: |

☐ Commercial Vehicle    ☐ Omnibus    ☐ Hazardous Material    ☐ Out of Service

AND DID COMMIT THE FOLLOWING OFFENSE

**39:4-123 - IMPROPER RIGHT AND LEFT TURNS-SEE SUBSECTIONS**

Date of Offense:  **08/10/2020**        Time:  **21:35 PM**

☐ Construction Zone    ☐ Safe Corridor    ☐ 65 MPH Zone

☐ Accident    ☐ Personal Injury    ☐ Death/Serious Bodily Injury

Location: **@SH 55 NB MP 24 MILL**        Mun. Code (Offense): **0610**

Municipality: **MILLVILLE CITY**        County: **CUMBERLAND**

I certify that there are just and reasonable grounds to believe that you committed the above offense. I also certify that I will file this complaint in this court charging you with this offense.

| 08/10/2020 | *Ashley Davis* | 8138 |
|---|---|---|
| Date | TPR. A DAVIS | Officer ID |

1. GUILTY PLEA AND PAYMENT. If you wish to plead guilty and pay the penalty, you may make payment via the internet by logging onto www.njmcdirect.com or you may bring or mail this ticket and payment in the amount of the penalty to this court before the court date listed above. Payments by mail must be by check or money order made payable to this Municipal Court. Do not send cash. Please print the ticket number on the front of the check or money order. A receipt will be sent to you only if you send a self-addressed, stamped envelope along with payment.

2. PLEA OF NOT GUILTY. If you want to plead not guilty, you must notify the court at least 7 days before your scheduled pay by date or it may be necessary for you to make additional court appearances.

Amount of Penalty: $ 86        Pay By Date: 08/24/2020

TO MAKE PAYMENT VIA THE INTERNET OR FOR MORE INFORMATION, LOGON TO WWW.NJMCDIRECT.COM

### NOTICE

IF YOU FAIL TO APPEAR FOR YOUR SCHEDULED COURT DATE, THEN ADDITIONAL PENALTIES MAY RESULT. A WARRANT MAY BE ISSUED FOR YOUR ARREST, AND YOUR DRIVING PREVILEGES IN NEW JERSEY MAY BE REVOKED. IF THIS IS A PARKING TICKET, YOUR FAILURE TO APPEAR SHALL BE CONSIDERED AN ADMISSION OF LIABILITY AND A DEFAULT JUDGEMENT MAY BE ENTERED AGAINST THE OWNER OF THE VEHICLE. EXCEPT FOR A PARKING TICKET, A RECORD OF THIS CONVICTION WILL BE SENT TO THE MOTOR VEHICLE COMMISSION (MVC) THAT ISSUED YOUR LICENSE.

IF YOU HOLD A COMMERCIAL DRIVERS LICENSE AND YOU ARE CONVICTED OF TWO OR MORE SERIOUS TRAFFIC VIOLATIONS, THE MVC MAY, DEPENDING ON YOUR RECORD, SUSPEND YOUR COMMERCIAL DRIVING PRIVILEGES EVEN IF THE VIOLATIONS WERE COMMITTED IN A NON-COMMERCIAL MOTOR VEHICLE. FOR MORE INFORMATION, VISIT THE OFFICIAL MVC WEBSITE AT WWW.NJMVC.GOV.

PLEASE NOTIFY COURT OF DISABILITY ACCOMMODATION NEEDS

**ROAD CONDITION**

☐ Wet    ☒ Dry    ☐ Ice    ☐ Snow

**AREA TYPE**

☐ Business    ☐ School    ☐ Residential    ☒ Rural

**TRAFFIC DENSITY**

☐ Light    ☒ Medium    ☐ Heavy

**VISIBILITY**

☒ Clear    ☐ Rain    ☐ Fog

**NARRATIVES:**

# EXHIBIT "E"



**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
CIVIL DOCKET: 1:22-CV-04994-CPO-AMD

BOHDAN J. ZELECHIWSKY
and LISA A.
ZELECHIWSKY,                :  CIVIL ACTION
        Plaintiffs,         :  DEPOSITION
                            :  TESTIMONY OF:
    vs.                     :
                            :  LISA ZELECHIWSKY
TROOPER ASHLEY DAVIS,       :
        Defendant.          :

TAKEN VIA VIDEOCONFERENCE BEFORE:  LYNN SMITH, a
Certified Court Reporter of the State of New Jersey,
License No. X101520, on Monday, May 6, 2024,
commencing at 2:35 p.m.

WORD FOR WORD REPORTING, LLC
CERTIFIED COURT REPORTERS & VIDEOGRAPHERS
4 NORTH BROAD STREET, SUITE 202
WOODBURY, NEW JERSEY  08096
Ph: (856) 384-2770 Fax: (856) 384-2779

WORD FOR WORD REPORTING, LLC

**Page 2**

APPEARANCES:

KAROLY LAW FIRM
527 Hamilton Street
Allentown, Pennsylvania 18101
(610) 437-1252
BY: JOSHUA E. KAROLY, ESQUIRE
For the Plaintiffs

KENT/McMcBRIDE, P.C.
1040 Kings Highway North, Suite 600
Cherry Hill, New Jersey 08034
(856) 667-3113
BY: DIANA R. BROCCO, ESQUIRE
For the Defendant

ALSO PRESENT:

BODHAN ZELECHIWSKY

WORD FOR WORD REPORTING, LLC

**Page 3**

                 I N D E X
WITNESS                              PAGE

LISA ZELECHIWSKY

    Examination By Ms. Brocco       4,83,84
    Examination By Mr. Karoly       78, 84

                 E X H I B I T S
NUMBER        DESCRIPTION            ID.

              (No exhibits were marked
              at this time.)

WORD FOR WORD REPORTING, LLC

**Page 4**

1  LISA    ZELECHIWSKY,
2  having been first duly sworn, testified as follows:
3  EXAMINATION BY MS. BROCCO:
4      Q.   Hi, Ms. Zelechiwsky. My name is Diana
5  Brocco. And it's my understanding, at least for the
6  majority of your husband's deposition, that you were
7  in the room, correct?
8      A.   I was in and out, yes.
9      Q.   Okay.
10     A.   For the majority, I was in here, yes.
11     Q.   Okay. And as you know, today you're here for
12  your deposition.
13          Have you ever had your deposition taken
14  before?
15     A.   I -- no.
16     Q.   Okay. So this is your first time, correct?
17     A.   Correct.
18     Q.   Okay. Before we begin, I'm just going to
19  give you a few instructions, the same instructions
20  that I gave to your husband, which are as follows:
21  Keep all of your responses spoken or verbal. That
22  means yes and no, when my question calls for such a
23  response. If you should forget that response, at any
24  point in time during the course of this proceeding, I
25  will simply remind you, is that a yes, is that a no?

WORD FOR WORD REPORTING, LLC

**5**

1  I'm not being rude. I'm just trying to keep a good,
2  clear record.
3          Do you understand?
4      A.  I understand.
5      Q.  Okay. Additionally, please do not guess at
6  any of my questions. You can, however, estimate as
7  to a time period, a distance, or what have you. If
8  you're going to give us an estimation or an
9  approximation, please tell us that you're doing so.
10  Okay?
11     A.  Okay. Sounds good.
12     Q.  If you do not understand one of my questions,
13  please tell me that you don't understand it, or that
14  you don't hear it, or there's a glitch of some sort,
15  and I will rephrase it until you do understand the
16  question. Okay?
17     A.  Okay.
18     Q.  At the end of this proceeding, the court
19  reporter will assemble what is known as a deposition
20  transcript, which will contain all of my questions
21  and all of your responses, as well as any objections
22  which your attorney may have. So, therefore, if you
23  do answer a question, we will assume that not only
24  did you answer it truthfully, but you answered it
25  accurately.

WORD FOR WORD REPORTING, LLC

**6**

1          Do you understand?
2      A.  I understand.
3      Q.  Okay. If for any reason you should need a
4  break, I will not be anywhere close to as long as I
5  was with your husband, but I will -- I will be
6  thorough with you, so if you need a break,
7  five-minute break, if you need a break, of course,
8  we'll accommodate you. Okay?
9      A.  Okay.
10     Q.  Okay. Did you review any documents in
11  preparation for this deposition today?
12     A.  I did not.
13     Q.  Okay. And are you on any medications?
14     A.  I take Albuterol, montelukast, which is
15  Singulair, and Claritin this time of year, it's my
16  allergy season. So I'm on allergy medication. Those
17  three.
18     Q.  Okay. And --
19     A.  And blood pressure. I apologize. I take
20  clorestatin.
21     Q.  Will any of those medications that you're on
22  today impair or affect your ability to testify
23  truthfully and accurately?
24     A.  No.
25     Q.  May I have your full name for the record?

WORD FOR WORD REPORTING, LLC

**7**

1      A.  Lisa Ann Zelechiwsky.
2      Q.  What's your current address?
3      A.  1940 Swamp Road, Quakertown, Pennsylvania
4  18951.
5      Q.  And I understand that you and your husband
6  are currently married, correct?
7      A.  Correct.
8      Q.  Obviously. What's your date of marriage?
9      A.  May 17th, 2009.
10     Q.  And so then you would be married how many
11  years come a couple weeks?
12     A.  About 15 years.
13     Q.  And you have children together?
14     A.  We do not.
15     Q.  Is this your first and only marriage?
16     A.  It's my second marriage.
17     Q.  Okay. And who were you married to before?
18     A.  John Popichak (ph).
19     Q.  So I understand that from the complaint you
20  have a separate cause of action of your own; is that
21  correct? Is that your understanding?
22     A.  I believe so, yes.
23     Q.  Okay. Can you tell me what injuries or
24  damages that you are claiming as a result of this
25  August 10th, 2020 incident?

WORD FOR WORD REPORTING, LLC

**8**

1      A.  I will probably have to say emotional damage,
2  myself, but more so my husband. It was a very
3  traumatic evening.
4      Q.  What about you, though? What damages or
5  injuries are you claiming as a result of this
6  incident? Because your husband already had an
7  opportunity to testify. So right now, I kind of want
8  to streamline things, but I want to know what it is
9  specifically that you are claiming as a result of the
10  incident.
11     A.  You -- I don't understand the question.
12     Q.  Okay. So you filed a complaint for certain
13  civil rights violations, okay, and that arose out of
14  the incident of August 10th, 2020, when your husband
15  was pulled over. Do you understand that?
16     A.  Yes.
17     Q.  Okay. And you were a front seat passenger in
18  the vehicle he was driving, correct?
19     A.  Correct.
20     Q.  Okay. So you are claiming certain injuries
21  or damages.
22          Can you tell me what specifically you
23  are claiming as a result of the incident.
24     A.  I mean, basically, the emotional, you know,
25  damage. I had no physical damage, but I had

WORD FOR WORD REPORTING, LLC

9

1  emotional, traumatic, like, I guess I'd have to
2  explain it -- I haven't been accurately diagnosed,
3  but it was a traumatic event that has now affected
4  emotionally, for me.
5          I mean, I don't know how much you want
6  me to explain. Maybe I could explain it as you ask
7  further questions, if we could come back to it. I'm
8  not sure actually what you're looking for in this
9  question. I mean, I just mentioned, you know, I felt
10 very violated. Do I go into details of why I felt
11 like --
12     Q.  Well, usually, my style is to ask open-ended
13 questions. So I do expect you to explain
14 specifically what damages or injuries you're
15 claiming.
16          I understand --
17     A.  Well, I was searched. You know, like,
18 myself, individually. My purse. And I had nothing
19 to do with him being pulled over. And that, to me,
20 was very violating. It was very nerve-racking. You
21 know, doing her job, towards my husband, trying to
22 figure out what she was doing there. But my -- my
23 dog was removed from the car. It was just a -- there
24 was no reason for her to search the truck, remove my
25 puppy, dog, big puppy dog, who I love dearly, and was

10

1  concerned about a truck running him over. And, you
2  know, there's no reason for her to do those things to
3  me at all. I was just a passenger. And I wasn't
4  causing any harm.
5          You could see from the video, I was
6  very soft spoken, and very respectful to the officer.
7  So it was just a very traumatic evening for me. And
8  my husband, obviously. So when I think back, it
9  just, you know -- I'll stop here, I'll just let you
10 continue with your questions. I don't want to go on
11 and on and on. I'll just answer. But --
12     Q.  So what I want to know is, so emotional
13 damage. Did you undergo any type of medical
14 treatment for this incident?
15     A.  I did not.
16     Q.  Did you ever talk to a therapist, a social
17 worker, psychiatrist, or a psychologist for this
18 incident?
19     A.  I did not.
20     Q.  Okay. What about your family doctor, did you
21 ever discuss this incident with him or her?
22     A.  I told him I had some anxiety, and he
23 prescribed anti-anxiety medication that I don't need
24 all the time. It's something as-needed.
25     Q.  And did you specifically report to him that

11

1  you had anxiety as a result of the August 10th, 2020
2  incident?
3     A.  I do not recall. It's been so long ago, I
4  apologize.
5     Q.  Okay. Who's your family doctor?
6     A.  Dr. Douglas Schoenberger.
7     Q.  Can you spell his last name?
8     A.  S-C-H-O-E-N-B-E-R-G-E-R.
9     Q.  And is that your husband's doctor, as well?
10     A.  Yes.
11     Q.  Okay. How long has he been your family
12 physician?
13     A.  I would say maybe 15 years.
14     Q.  So you believe that you may have mentioned
15 this incident to him, and as a result he prescribed
16 anxiety medication; is that your testimony?
17     A.  Most likely. I mean, I think probably when I
18 was in for my -- a reason, like, if I went in for
19 something else, he always goes over your chart, and
20 asks me some questions, any medical -- do you need
21 refills or anything, how are you doing, whatever.
22 And if I tell him I had stress going on in my life,
23 and at the time I believe I did, it could be that, or
24 other things. I don't exactly recall the
25 conversation, because it's so long ago. But I do

12

1  recall, when I think back, I just don't remember what
2  visit I would have even told him. I just -- you
3  know, it's been, what, almost five years, four? It's
4  just, you know, hard to reflect back on what
5  conversation I had with the doctor. But I do not
6  recall writing anything, or filling out any type of
7  form or anything. I just went in on a general
8  appointment, and he asked how I was feeling, and then
9  he responded with prescription. So it wasn't, like,
10 made to be a big deal, you know.
11     Q.  Okay. What was the prescription?
12     A.  It was Xanax. Point five milligrams,
13 as-needed, for anxiety.
14     Q.  And do you still take it?
15     A.  I usually -- I have one script usually for
16 the whole entire year. My life now is a lot less
17 stressful. I recently retired, so.
18     Q.  Okay.
19     A.  But if things got me upset, whether it's
20 work, or if I have an issue like most people do, it
21 could help. But if you check from my prescription
22 log, it's usually only filled once -- once a year.
23 I'm not a heavy -- don't believe in all that. But
24 there's been occasional times in my life when
25 stress, you know, like the rest of us, you know, I

13

1  would -- I would take it. But I don't get a lot of
2  prescriptions filled, if you check my record, with
3  using Xanax.
4      Q.    And was that the first time you've ever been
5  prescribed Xanax would be, you believe, after August
6  10th, 2020?
7      A.    You know, again, I don't know. I'd have to
8  go back and check my records. I know I did get a
9  prescription for Xanax one other time in my life, but
10  I don't -- I don't recall the dates. I'd have to go
11  back and check my medical record.
12      Q.    Okay. So you believe that you mentioned it
13  to your family doctor, but not to any other type of
14  specialist, such as, like I said, any psychologist,
15  psychiatrist, a social worker, a therapist?
16      A.    Correct. Correct. I mean, I have somebody
17  in the family who's a counselor, who, you know, I
18  discuss some things with that happen in our life.
19  But other than that, I did not go to a professional
20  outside of family.
21      Q.    Okay. Did you go to the family member for
22  the damages which you're claiming as a result of this
23  lawsuit?
24      A.    You mean did I discuss the situation with the
25  family member, and my feelings about it, or what do

14

1  you --
2      Q.    I need to know if you treated with any
3  healthcare professional, whether it's a family
4  doctor --
5      A.    No.
6      Q.    -- or a mental health professional, as a
7  result of the injuries allegedly sustained in this
8  accident.
9          Do you understand my question?
10      A.    Yes. And no, I did not go to a professional.
11      Q.    Okay.
12      A.    Outside the family.
13      Q.    So other than emotional damages, you
14  indicated there's no physical injuries. Can you be
15  more specific and explain to me what type of
16  emotional damages that you have sustained? And I can
17  pull up your answers to interrogatories, if you need
18  me to refresh your recollection, but I really do
19  prefer just you telling me about any specific things
20  that you experience as a result of this incident.
21          For example, your husband testified
22  that he has nightmares. So something like that would
23  be something that I would be looking for. Do you
24  understand?
25      A.    So in this question, you want to know how --

15

1  explain it again to me, because I'm not really
2  understanding what you're looking for. Are you
3  looking for why I filed the claim? Do you want a
4  legal definition of unlawful search and seizure? Is
5  that what you're looking for? Or my feelings on what
6  I went through that night?
7      Q.    Well --
8      A.    -- what are you exactly looking --
9      Q.    Well, as part of a claim for any personal
10  injury case, civil rights case, you know, you also
11  have to prove that you sustained some damages. So I
12  want to know --
13      A.    Unlawful search and seizure -- you know,
14  that's -- she had no reason or right to ask me to
15  remove the vehicle, leave my phone in the vehicle,
16  and leave my purse in the vehicle, and take my dog
17  out. She had no right to do that to me. I mean, I'm
18  not a police officer or an attorney, like my husband.
19  But I certainly know that she had no right to do.
20  And to me, it was wrong. It made me feel very
21  violated. It made me feel threatened. And I was
22  trying to be as polite and kind as possible, and I
23  even asked for her kindness towards my animal. I
24  said, could we please -- you know, can we please --
25  can I leave the dog in the car? I'm nervous he'll

16

1  get hit by a truck. I mean, you saw the picture of
2  my dog. He's a big, beautiful dog. He's big, but he
3  was still a puppy, and he's young, and I was afraid,
4  but he did -- he did sit there very well. But it was
5  still inside, I was, like -- I was very taken back by
6  that -- that was happening to me, for my husband
7  being pulled over. I thought it was over the top,
8  craziness, to be pulled over for what she pulled him
9  over for, and then do those things to me. I don't --
10  I'm not a lawyer, but I don't -- I don't think it was
11  right. And it was very upsetting. And it just --
12  you know, it caused -- it was not a good -- good
13  night, so. But I'm going to stop there, I'll let you
14  continue with your questions.
15      Q.    Did you experience any long-lasting
16  limitations as a result of the emotional damages or
17  injuries that you described in your testimony?
18      A.    I don't believe I have any long-term, except,
19  you know, occasional anxiety when we're on the way to
20  -- when I'm on the way to check on my home.
21  Especially if I have to drive myself to check on
22  things, because we rent it. So I get -- I do get
23  nervous. I get nervous that, you know, that's her
24  area. And I get nervous. It just -- you know, it
25  puts that in my mind as I'm driving down to my home.

17

1   I think back to that night, because it was traumatic
2   to me, I may have appeared very calm on the video,
3   because I -- I'm respectful to, you know, authority
4   and the police, but inside, I was scared.  I was
5   scared.  So that fear never leaves you totally.  You
6   could recall an evening -- I'm sure you have evenings
7   in your life that you felt harassed, violated, and
8   you just kept that memory in your head.  And it just
9   doesn't go away.  But I -- you know, I keep living my
10  life, and working, and doing all those things.  But
11  it triggers certain things.  Like my husband
12  mentioned, you know, because he -- officer of the
13  court, he has to go into court, and maybe a certain
14  person reminds him of that day, or a certain case,
15  and, you know, it creates a little bit of anxiety.
16  Which is, you know, it's unfortunate, because I don't
17  think it was -- her conduct was necessary that
18  evening.  It didn't have to happen the way she did
19  it.  I don't think she followed protocol.
20          Again, I'm not a police officer.  I'm
21  not a lawyer.  But it seemed a little over the top.
22  I mean, look at us.  He's older, I'm older.  We don't
23  look like young kids in a car with drugs and alcohol
24  coming back from the beach and a bicycle and a dog
25  and groceries.  It was very over the top treatment

WORD FOR WORD REPORTING, LLC

18

1   for this scene.  And it was very upsetting.  Like.
2   Right now, I'm sitting here thinking back to it, my
3   heart is pounding.  So just sitting here asking the
4   question.  It wasn't a nice night, a night that I
5   really don't care to remember.  But it is what it is.
6   It happened.  I just never thought I would experience
7   those type of feelings.  It is what it is.  And her
8   conduct, it -- that's what we were forced to do, so.
9       Q.   So do these injuries prevent you from going
10  about your activities of daily living, does it -- do
11  you understand my question?  Does it affect your
12  everyday life?  And if so, can you give me --
13      A.   It doesn't affect my, you know, my routine.
14      Q.   Wait, listen.  You got to let me -- I
15  probably didn't give you the instruction.  You got to
16  let me finish my question completely, because the
17  court reporter is going to kill us, because she can
18  only take down one of us at the time.  So just let me
19  finish my question, and you can provide me with an
20  answer.  I know that it's like an everyday
21  conversation, but it is a deposition.
22          So I'm going to repeat my question.
23  Okay?  And I just want to know if there's anything
24  that you don't do anymore as a result of the injuries
25  or emotional injuries that you're claiming happened

WORD FOR WORD REPORTING, LLC

19

1   to you as a result of the incident of August 10th,
2   2020.
3       A.   Is there anything that I -- you said don't do
4   emotionally and physically; is that what you said?
5       Q.   No.  I just want to know if you have any
6   limitations, or any limitations in your activities of
7   daily living; such as, I will give you an example, do
8   you, you know, you still go to the shore?
9       A.   Correct.
10      Q.   So that would not be something that you don't
11  do anymore.  But maybe there would be something else
12  that you can tell me that, you know, you used to do,
13  but you don't do anymore as a result of the August
14  10th, 2020 incident.
15      A.   That question is just kind of vague.
16  Because, basically, what happened to us that evening
17  affected me mentally.  So it's always on my mind.
18  And certain -- certain things will trigger it, which
19  do prevent me from having a calm, sound body and
20  mind, how can I put it, during any day of my life.
21  Something -- if I'm driving to the beach, as an
22  example, you know, it makes me think of that night.
23  Because I think of her.  And it's very upsetting.  Or
24  -- there's just different times on occasion that I
25  think back to how I was treated.

WORD FOR WORD REPORTING, LLC

20

1           Like I said a couple minutes ago, when
2   you're violated in a way that makes you feel
3   inadequate as a human being, or not being treated
4   fairly, not being treated with kindness, it almost
5   makes you feel like you were bullied, and it does
6   prevent you from -- on moments in time, it could give
7   you -- it gives me sadness.  It makes me think, wow,
8   you know, that I was treated like that.  So it
9   doesn't give me the ability to be the best person
10  that I could be, because someone -- it's like you're
11  a little kid in school, and you go to school, and the
12  -- somebody's bullying a child, and then it stops.
13  You know, the teachers make it stop.  But the child
14  will always remember.  And it does carry on as your
15  days go on.  You do recall what happened, and it -- I
16  can't explain, like, exactly when it will come to me.
17  But certain things in life will trigger, from my
18  daily routine, my traveling, or whatever, it brings
19  up the negativeness.  And I'm not a hundred percent
20  myself as I was prior to that evening, because, to
21  me, it was just a -- a very traumatic evening that I
22  don't feel I should have been treated like that.
23          So, yeah, like right now, I'm sitting
24  here, my heart is racing.  You know, it's a form of
25  anxiety, because I'm thinking of a traumatic time.

WORD FOR WORD REPORTING, LLC

21

1　Just because it's over with yesterday, doesn't mean
2　that it's not going to affect me tomorrow. It's -- I
3　internalize what happened that night, and some, you
4　know, now it's years later, so it's much less. But
5　the last couple of years, you know, when --
6　especially the -- the first couple weeks after it,
7　and the couple months after it didn't make me feel
8　too good. Let's put it that way. Like my husband
9　said, warm and fuzzy. It kind of -- I guess it gives
10　you a little bit of depression.
11　　　　　But if she would have handled it
12　differently, like my husband said, and just been a
13　little bit more -- doing things she did just really
14　was not appropriate, and, to me, I believe lawful to
15　do, especially to me. And my dog, I like Benny, and
16　I love Benny, and I didn't want anything to happen to
17　him. Just putting him on a highway like that was
18　just really unnecessary.
19　　Q.　Did anything happen to Benny that night?
20　　A.　No, nothing happened to Benny. But it was
21　the anxiety that I was placed under that something
22　could have happened to him. We were literally four
23　feet -- five feet from a road of a major highway with
24　trucks. And I told her my dog was a young puppy, and
25　he was big. So I said -- I said to her, maybe -- I

WORD FOR WORD REPORTING, LLC

22

1　don't know how he was going to be, taking him out on
2　a street like that, when there was an exit not that
3　far off the road, that she could have gladly moved us
4　all up there, if she had to search the vehicle. But
5　she said right now, it has -- you, leave your phone
6　in the car. I was told I had to leave my phone in
7　the car, get out of the car, and remove the dog. And
8　I did it nicely. I did it with kindness, even though
9　I was shaking inside. And I got out. And so did the
10　dog. And I didn't -- I didn't feel that was
11　necessary to do to me.
12　　Q.　Well, you keep differentiating between
13　yourself and your husband. I understand that you
14　were not the individual driving. Do you know of --
15　does -- did you have any concerns about your husband
16　driving home that late at night in the dark? Let's
17　say, he is at that point a 68-year-old man. Any
18　concerns at all?
19　　A.　I had no concerns with my husband that night,
20　driving that late. Because we always drove home
21　between 7 and 9 o'clock. We would leave our home
22　that late. His eyes are better than my eyes. I have
23　-- I wear triple bifocals. I -- number one, I would
24　never put myself in a vehicle -- first of all -- I
25　would say I'm married -- I've been with my husband

WORD FOR WORD REPORTING, LLC

23

1　for 20 years. I think I have seen my husband
2　intoxicated, or had a little too much to drink, maybe
3　two times. We -- he does not drink. He's not an
4　alcoholic. I certainly would never let -- put myself
5　in any vehicle and drive two hours with somebody who
6　is drunk. So that's just like our norm. It's not
7　our norm. We will have an occasional glass of wine
8　with dinner. We will have a beer here and there. We
9　will go --
10　　　　　But we drink seltzer water all the
11　time. I'm all organic. That's how I eat. I -- I
12　try to stay healthy. My husband tries to stay as
13　healthy as we can. It's kind of not a -- I would
14　never put myself in a vehicle like that. And I would
15　not be concerned about my husband's driving ability.
16　He drives very well. He drives every day on his job,
17　as an attorney, going from one case to another,
18　different travels from Philly then all the way to
19　Easton, and all in the same day. He's a very good
20　driver. His ability to drive that day was perfectly
21　fine.
22　　　　　I was actually shocked when she pulled
23　us over. I was, like, why are we being pulled over?
24　I was in shock. Because I didn't see him do anything
25　wrong. I was watching the road. I'll always tell

WORD FOR WORD REPORTING, LLC

24

1　him sometimes, you know, hey, there's a red light
2　coming up, or this is the speed limit, you know,
3　because I get a little bored when we're driving back,
4　you know. I'm kind of the back seat driver. But
5　nothing out of the ordinary that night happened at
6　all, actually, until she pulled us over, so.
7　　Q.　Do you know whether at any point in time
8　before -- first of all, what time did you leave your
9　place in Cape May that night to go home to
10　Quakertown?
11　　A.　That night, we had dinner, an early dinner
12　with our friends. We went back to the home to pack
13　up our car. I don't recall the exact time, but I
14　know it was still light out. It was, like, early
15　evening. And then as we got on the road, it got
16　dark. By then -- if I recall, it would get dark
17　around 9 o'clock. So we -- based on that time of the
18　year, I'd probably say we left around 7, 8 o'clock
19　maybe, 8 o'clock. After 8, probably.
20　　　　　Then we did eat at H&H, like I told the
21　other officer, that they don't serve alcohol there.
22　We did not drink all day. I said -- I think he had a
23　beer on the beach. I think we shared a beer. And I
24　don't think neither of us finished it. I think it
25　was dumped, because we just didn't -- we were having

WORD FOR WORD REPORTING, LLC

25

1  a good time at the beach swimming. My husband swims
2  a lot, and he makes me nervous, because he goes out
3  far, when he goes swimming, in the bay. And we were
4  just chatting, having a nice weekend with our friends
5  that came down that day.
6      Q.   Before Trooper Davis pulled you over, did you
7  notice anything unusual about your husband's
8  operation of the vehicle?
9      A.   No.
10     Q.   Did you feel that he wasn't maintaining his
11 lane properly?
12     A.   No. He was fine. We were coming from the
13 road that merges onto 55. We were on a single lane,
14 if you're familiar, coming back. We were on a single
15 lane, and we merged onto the double lane highway.
16 There was only two lanes. Because you were saying in
17 the past, there was three. But there was only two.
18 And when you merge onto a road, you have to pick one
19 lane to go in. So he picked the left. There was no
20 swerving all over the road, as she stated. There was
21 none of that. He merged onto the left lane, and was
22 driving the speed limit.
23          First of all, I don't like, myself, I
24 don't like to be in a car driven very fast, because
25 that would make me nervous. So I always remind

26

1  whoever I'm with, hey, this is the speed limit going
2  through this area. And that's about it. He was not
3  driving erratically, he was not speeding. We were
4  merging from a slow -- the road was -- the speed
5  limit was slower, and then we had to increase speed
6  to go on the double lane highway, 55.
7      Q.   Right prior to being pulled over, can you
8  remember what was going on in the car?
9      A.   It's a long time ago to actually say what was
10 going on in the car during that time. I usually look
11 at my phone and read some things, or I'll look back
12 at my dog, or Bo. And we would just have a nice
13 conversation for the ride home. We always listen to
14 Delilah, that radio station, and we enjoy her songs.
15 And it's usually on whenever -- her show is usually
16 on whenever we're driving home from the beach. So we
17 listen to Delilah. We talk about what we're going to
18 do the next day. We kind of make our schedules, talk
19 about the week upcoming. We just have conversation,
20 as husband and wife, you know.
21          I -- like my husband mentioned before,
22 I never sleep in the car, because I just cannot sleep
23 in moving vehicles. So we just, I don't know, we
24 just kind of hang out and chat, listen to music,
25 different songs. Sometimes sing. Just kind of just

27

1  do nothing. We're driving, driving home.
2      Q.   Did you make any observations at any point in
3  time from when you left the house to go home to the
4  time that Mr. Zelechiwsky was pulled over of whether
5  or not he was alert?
6      A.   He was alert. He was fine.
7      Q.   Had you had any concerns about whether it was
8  too late for him to drive home, what would you have
9  done?
10     A.   If he asked me to drive, if he wasn't feeling
11 well, I would drive. He usually drives, because his
12 night vision is better than mine. I have -- my
13 eyesight isn't the greatest at night anymore. I have
14 bifocals, and things like that. So it's hard for me
15 to see at night, where he has no trouble driving at
16 night at all.
17     Q.   I didn't ask your husband this. Do you know
18 if he's ever had cataract surgery?
19     A.   No, his -- no.
20     Q.   So I understand that you had a pretty full
21 weekend. Do you know what time it was that you guys
22 had gone to bed the night before?
23     A.   Well, I have a picture I pulled up on my
24 phone. I could give you the time and everything.
25 When you were mentioning that before, I was able to

28

1  pull up on August 9th, 2020, at 8:13 p.m., we were at
2  a restaurant called the Olive Branch, you could see
3  the fish --
4      Q.   I can't really see anything. I have very bad
5  eyesight. But if your attorney --
6      A.   But to give you an idea of where we were the
7  night before, at 8:13, we were having a nice dinner
8  at the Olive Branch. It's right -- a place, a new
9  restaurant, Greek restaurant, one of our favorites.
10 And it was 8:13 p.m., and --
11         MR. KAROLY: You were just finishing.
12     A.   We were just finishing our dinner, also.
13     Q.   So that would have been on a Sunday evening;
14 does that sound right to you?
15     A.   August the 9th. And I even have a picture of
16 the day before's on the beach, as well, on the bay
17 side. And we do kayaking on the bay. And I believe
18 we had the kayak out that day. But I do have a
19 picture on my phone of us being on the beach that
20 day, on the bay.
21     Q.   So I guess my question is, I just kind of
22 wanted to know if, like, you recall what time that
23 you and your husband, or maybe you guys go to sleep
24 at separate times, got to bed the night before the
25 incident. You just testified that you guys went out

29

1   to dinner, and it was about 8 something.
2       A.    Correct.
3       Q.    And so all I really wanted to know is, what
4   time do you think that you went to bed that night?
5       A.    Well, usually, we're pretty much the same --
6   we go to bed pretty much the same time every night.
7   It's just how we are. My husband goes to bed an hour
8   before I do every night. He's in bed between 9:30
9   and 10:30. And I'm -- I go to bed between, like, 10,
10  11. And then we both get up early. He gets up
11  first, an hour before me, usually, and then I get up
12  an hour after him. We don't -- you know, it's pretty
13  much we keep to the same routine.
14      Q.    And do you know what it was that you did that
15  day, meaning, the day that the incident occurred?
16      A.    That day --
17      Q.    August 10th.
18      A.    That day, on the 10th, I could recall
19  preparing the home for the Heidecker family,
20  preparing their bedrooms, making sure they had, you
21  know, clean towels, clean sheets, linens put on for
22  them. I remember preparing hors d'oeuvres for them
23  when they arrived, that there would be some hors
24  d'oeuvres and food for them. I went to the beach a
25  little bit, went for a walk with my dog. I -- I

WORD FOR WORD REPORTING, LLC

30

1   believe Bo went on a bike ride, not very long,
2   because they were coming. And we had things to do at
3   home. And that's pretty much it. Just stuck around
4   the house, walked down to the bay a little bit. And
5   then they arrived, and then we showed them the bay,
6   and then we went out to dinner. It was a nice day.
7       Q.    And again, they were just using your house,
8   they were not paying you to stay there?
9       A.    Correct. We were just letting them use it.
10  He's a colleague, and we were just letting them use
11  the home for a few days with the family.
12      Q.    And in letting them go to the house, it was
13  your understanding that you would prepare the house,
14  correct? And Bo testified that he was doing some
15  yard work, and things of that nature, correct?
16      A.    Correct. Because when you don't live at the
17  house, you know, all the time, there's always
18  something to do when you arrive. And when you leave,
19  you know, we, you know, have to make sure it's fine
20  for the next person who stays, so.
21      Q.    Okay. Your husband did discuss with me that
22  you are in charge of renting the property that you
23  currently own down at the beach. But also, can you
24  tell me if you rented the house that you owned at the
25  time of the August 10th, 2020 incident?

WORD FOR WORD REPORTING, LLC

31

1       A.    We did rent the home, yes.
2       Q.    How often did you rent it?
3       A.    Probably, in the summer time, maybe about
4   seven, maybe six, seven weeks out of the summer.
5   Because we did use it at times.
6       Q.    Was there a particular time period that you
7   would rent it, or did you exclude certain weekends
8   back in 2020?
9       A.    There was no set exclusions or anything like
10  that, to my knowledge. You're going back four years.
11  I don't recall, to be honest. And -- if I set a
12  weekend aside for us, I would just mark it on the
13  calendar, but.
14      Q.    Okay. So did you rent, like, what was the --
15  like, you would rent the place out for a week at a
16  time?
17      A.    Whatever -- usually, it was a week, or five
18  days, or whatever would come in. Just some people
19  rent three days, some people rent a week. Just --
20      Q.    And you would do that through your own, or
21  would you go through Airbnb?
22      A.    I went through Vrbo. And those records, I
23  cannot get into on that particular house anymore,
24  because I have a new account under Vrbo under our new
25  address. So when you buy a new home, they do not

WORD FOR WORD REPORTING, LLC

32

1   give you access to your past account, they give you a
2   whole new account. So I have no access to that
3   particular address, because they don't want you to
4   have access to your -- you know, to the people on the
5   outside. They're, like, very strict with their
6   regulations. So I can't contact the past guests
7   unless, you know, obviously, I coordinate it, when
8   they were in my home or something like that. But I
9   have a separate account now, a new account number
10  with Vrbo for our new property. They don't put -- so
11  if you have several properties, they make you get a
12  different account for each property, if you're
13  familiar with Vrbo.
14      Q.    Okay.
15      A.    But I do have some leases, possibly, or
16  e-mails, possibly. But that's about it. I don't
17  have the -- I don't have access to the calendar
18  anymore on that property.
19      Q.    Okay. And do you remember whether you -- the
20  last time it was that you rented the place out back
21  in August 10th, 2020? Obviously, you didn't rent it
22  out that weekend. Do you know whether you had done
23  so the week before?
24      A.    I do not recall.
25      Q.    And are you still in charge of renting out

WORD FOR WORD REPORTING, LLC

---

33

1 your new house?
2    A.   Yes.
3    Q.   Okay.  And do you have the same rental
4 schedule now as you did then?  Do you rent it more,
5 or do you rent it less?
6    A.   It's on Vrbo.  So whatever comes in, I review
7 the booking requests, I -- I either say yes or no to
8 an individual who's inquiring, based on the amount of
9 people, the type of age group, things like that.
10    Q.   Just want to get a little bit of background
11 information.
12         Your date of birth is what?
13    A.   10/20/66.
14    Q.   And are you currently employed?
15    A.   I just retired from my day care center that I
16 owned for 37 years.  I just closed it.
17    Q.   And when was that?
18    A.   March 4th of this year.
19    Q.   Where did you own it?
20    A.   I owned it in Hellertown, Pennsylvania, 440
21 Front Street.  It was just a small day care center.
22 We were licensed for 42 students.
23    Q.   And why did you close your doors?
24    A.   Because since COVID, it hasn't been as
25 profitable.  It wasn't -- it didn't make sense to

WORD FOR WORD REPORTING, LLC

---

34

1 stay open for the amount of money that I was now
2 earning, since COVID, the expenses tripled.  So the
3 profits -- it was very -- my location, I'm in a --
4 Hellertown is a blue collar location, so I could only
5 ask so much.  And the parents in that area could not
6 afford what I would need to stay open, so it didn't
7 make sense.  It was an investment decision to close
8 it, and that's what I did.
9    Q.   And are you completely retired now, or do you
10 do anything else?
11    A.   I'm completely retired from working.  But I
12 do have, like -- I'm very busy.  I have rent -- like,
13 I'm renovating my day care right now to sell it.  I'm
14 going to probably do another house flip after that.
15 Like, little -- dabble in real estate here and there.
16 I used to also hold a real estate license for five
17 years.  I worked for Sotheby's for a little bit, for
18 about five years.  I did that as a part-time job on
19 top of the day care, when my daughters were in
20 college, to help pay for things.  I may go back into
21 real estate after -- I want to take a year just to,
22 you know, reorganize things in my life, take care of
23 the house a little bit.  Because when you work 10
24 hours a day, your house kind of gets, you know,
25 different things.

WORD FOR WORD REPORTING, LLC

---

35

1         So pretty much just retired from
2 working right now on a steady basis, but I have other
3 things going on in my life.
4    Q.   You indicated that you're renovating your day
5 care.  So you own the building?
6    A.   I own the building, yes.
7    Q.   Other than this lawsuit that we are here
8 today for, have you ever filed any other lawsuits in
9 your lifetime for any reason?
10    A.   Never.
11    Q.   And your husband testified, and it is in the
12 discovery, that he missed two weeks from work as a
13 result of the incident.
14         Do you have any knowledge about the
15 time that he missed from work, or -- after this
16 incident?
17    A.   I do recall that he was quite upset.  I
18 believe I might have been told the blonde, or the
19 other police officer, I said, he has court the next
20 day, he has to be in court, this is, like, really
21 upsetting, how long is this going to take?  I do not
22 know how much exact time, because I'm not with my
23 husband all the time, because I -- I was running my
24 day care.  So I wasn't around him during the day.  So
25 I don't know how much he did as far as his work.

WORD FOR WORD REPORTING, LLC

---

36

1 Because I would get up -- my day care was open from 7
2 to 5.  So he -- I don't know what he did during the
3 day, let's put it that way.  I'm not around him
4 during those times.  But he was --
5    Q.   Okay.  And back then --
6    A.   But he was home more, which was unusual, so.
7    Q.   Say it again.  Oh, he was home more?
8    A.   He was home more, which is unusual.  I don't
9 think he -- he -- I didn't see him laying in bed or
10 anything, saying I'm not going in because of this.
11 But I know he wasn't -- he wasn't too happy, like, a
12 couple days after the incident.  It was a little
13 stressful.  And then he -- I know he got in that --
14 that night very late, so he drove home, and it was
15 just very stressful.
16         So that affected, you know, his next
17 day in court to represent as -- you're an attorney.
18 If someone's holding you late, and you have a long
19 drive home, and you got to still be there at 8
20 o'clock in the morning, fresh and fuzzy to, you know,
21 do your job.  And I did mention that to them.  But
22 they kept us for a long time, so.  And I told them we
23 had a long ride home.
24    Q.   Do you know any specifics of any financial
25 losses sustained by either you or your husband as a

WORD FOR WORD REPORTING, LLC

---

37

1 result of this incident?

2     A.   With my husband's business, I handle the

3 books. I do recall, but it was also the year of

4 COVID, so it's really hard to determine, I did notice

5 his wages were decreased slightly. Not horribly, but

6 they were decreased for a couple months after. But

7 again, we were -- everyone was just -- you know, that

8 COVID situation. But it -- it wasn't like a -- I'd

9 have to go back and actually check the records. But

10 my recollection that year, there was a slight

11 decline, yes.

12     Q.   So you said you keep his books. What types

13 of duties do you have in keeping your husband's

14 books, and is it -- is that for his law firm?

15     A.   I handle everything in our lives as far as

16 financial. I do the banking. I do the year-end

17 statements for the accountant. Pretty much all of

18 those things. What was your question again?

19     Q.   So what types of things do you do

20 specifically for keeping the books for your husband's

21 law firm?

22     A.   Basically, itemize expenses, you know, for

23 quarterlies, and year-end returns.

24     Q.   Does anybody else, aside from you, handle

25 your husband's financials at his law firm?

38

1     A.   No. My husband, for some of his -- some of

2 his office bills, he does them himself. Or they have

3 -- they're on an automatic bill pay. And then what I

4 do every month is I total up all the expenses, total

5 up the income. And then, at the end of the year, we

6 give it to the accountant. Basically, just, you

7 know, it's recordkeeping of income, expenses, things

8 like that.

9     Q.   And other than a slight decrease in his

10 wages, as you explained it, and you also attributed

11 that to COVID?

12     A.   It's hard to say going back that far --

13     Q.   I'm not finished my question.

14     MR. KAROLY: Let her finish her

15 question.

16     A.   Okay. Sorry. Apologize.

17     Q.   Other than the decrease in wages, and the

18 possible COVID situation, do you know of any other

19 financial losses that maybe he sustained in terms of

20 him taking half days and/or whole days off?

21     Are you writing some stuff down?

22     MS. BROCCO: Is she writing some stuff

23 down?

24     MR. KAROLY: She's playing with her

25 rings.

39

1     A.   I was playing with my rings.

2     Nerves. No.

3     Q.   Don't be nervous.

4     MR. KAROLY: She's just looking down at

5 her hands.

6     Q.   Don't be nervous.

7     I don't care. You can look down at

8 your hands. Just as long as --

9     A.   I won't play with my rings again.

10     Q.   Just as long as you're not writing your

11 lawyer notes.

12     A.   No.

13     Q.   Okay. So other than those, you know, the

14 decrease in wages, your husband testified that he

15 would take, you know, half days here and there, and

16 -- and also full days off, and he did testify that to

17 an extent, it might have affected his income, do you

18 have any specific, you know, recollection or anything

19 that you can add to that alleged financial damages

20 aspect?

21     A.   Well, without having any type of records,

22 it's kind of hard to answer that question. It's like

23 I would have to review the records at the time. I'd

24 have to go back. It's kind of hard to determine, you

25 know, he wasn't -- he wasn't working to his full

40

1 capacity as -- definitely right after the incident

2 for a little bit. He was -- I'm sure -- I mean, I'm

3 not inside him. And men, my husband, anyway, holds a

4 lot of feelings inside. So he's -- I can't really

5 answer that without the records. I would need my

6 financial records to determine how much of a loss it

7 was, and recall my memory, check on calendars.

8     Q.   I just want to know if you know off the top

9 of your head anything specific. And that would also

10 include, like, loss of clientele as a result of this

11 incident, anything like that.

12     A.   Well, the loss of clientele. I mean, it's

13 hard to go back that far, and without having

14 calendars in front, his work calendar, to determine

15 and base it on a prior calendar. You know, hearsay

16 gets out. I mean, we had another attorney, and

17 family at our home that knew what happened. One

18 person mentions it to somebody.

19     It gets out. I cannot determine how

20 many people found out about it. I can't determine

21 exact number of -- how much it affected his -- his

22 work. But it's not good for any lawyer to have their

23 reputation tarnished when nothing happened. You

24 know, I -- I'm not Einstein, I can't -- I can't say

25 an exact damage amount to the extent of those

41

1    things --
2        Q.    Okay.
3        A.    -- of -- without again, financially seeing
4    the difference in his -- without having records.  I
5    don't know what other people saying, how it affected
6    a potential client from not using him because they
7    heard about the incident.  I can only imagine, or
8    assume.  But I don't have a hundred percent accurate
9    proof that someone said that they're not going to use
10   my husband over something like this.  I mean, it's
11   kind of like one of those type of scenarios that it's
12   a tough question to answer directly.  So that's the
13   best that I could give you on that one.
14       Q.    Okay.  You said that his reputation was
15   tarnished.  Do you know that for a fact?
16       A.    Well, I know some people have -- that have
17   mentioned it, you know, we run into, you know.  So I
18   mean, if somebody comes up to you and says, hey, I
19   heard about your night, obviously, it becomes a
20   reputation issue if people are hearing about
21   something you did, and you were innocent, you didn't
22   do anything wrong.  Correct?  I mean, I -- I mean, I
23   don't know.
24       Q.    When you were in the vehicle, did you happen
25   to see the field sobriety tests that were being

WORD FOR WORD REPORTING, LLC

42

1    administered by Trooper Davis?
2        A.    I did.  And I was told to put my phone down
3    by her.
4        Q.    You did, or you did not?
5        A.    I did see it.  He was right in front of me.
6    And I was told by Officer Davis to put my phone away.
7        Q.    When you said you were told by Officer Davis
8    to put your phone away, can you explain that?  I'm
9    not sure what you mean.
10       A.    She just told me to put it away, put your
11   phone down.  This was when she got my license.  Or my
12   license --
13       Q.    So --
14       A.    I wasn't able to record -- I listened to -- I
15   cooperated with the officer, while my husband was
16   giving his nystagmus test.
17       Q.    So you did not videotape anything, yourself,
18   is what you're saying?
19       A.    No.  Because I listened to the police officer
20   to put my phone down, away.
21       Q.    Did you actually look to see with your own
22   eyes, not with a phone or anything, what was going on
23   in back of your vehicle?
24       A.    This was in the front of my vehicle.  It was
25   in the front of the truck that she did the test on

WORD FOR WORD REPORTING, LLC

43

1    him.  And I was able to see him.  He was right in
2    front of me.
3        Q.    So you did, so you saw the whole transaction?
4        A.    Yes.
5        Q.    And did you have any concerns about him
6    performing any of the tests?
7        A.    No.  I was actually in shock that she turned
8    him around on the truck and handcuffed him and put
9    him away.  I was just in shock why she was doing
10   that.  Because he was standing steady for a pretty
11   long time.  I know, if I was a police officer, and
12   someone was standing straight like that on a very
13   busy road for a very long time, and not slurring
14   words or not doing anything to appear impaired, I was
15   shocked that she handcuffed him and took him away.  I
16   was in total shock.  It was very upsetting.
17       Q.    Now, there was backup at the scene of the
18   incident, correct?
19       A.    Yes.  He arrived.
20       Q.    Can you tell me about how long a period of
21   time total that you were at that scene from the time
22   your husband was pulled over to the time that you had
23   driven away and followed the trooper with your
24   husband?
25       A.    I would say maybe 30 minutes to an hour.  30

WORD FOR WORD REPORTING, LLC

44

1    minutes, definitely.  It felt like forever.  But
2    we're going back four years.  It's hard to establish
3    a time period.  But I would definitely say a good 30
4    minutes.  And I'm sure the video will show time
5    stamps.
6        Q.    Your testimony was that you -- were you awake
7    for the entire time from the time you left your house
8    to the time that you were pulled over?
9        A.    Yes.  Yes.
10       Q.    Do you know if your husband had any trouble
11   staying awake from the time that you left your house
12   to the time that you were pulled over?
13       A.    He was -- he was fine.
14       Q.    So your answer to that is?
15       A.    Yes, he was perfectly fine.  He was not tired
16   or anything.  He was fine.
17       Q.    Between the time that you left the house and
18   the time that you got to the scene, did you make any
19   stops along the way?
20       A.    No.
21       Q.    Did you at any point -- there is an
22   allegation that the trooper, Trooper Davis, did not
23   -- was not wearing a mask at the time of the
24   incident.  Did you at any time catch COVID-19 after
25   this incident, you know, that you could attribute to

WORD FOR WORD REPORTING, LLC

45

1  this incident?
2      A.    No.  What I found for me, I'm asthmatic.  So
3  that was at the very beginning of COVID.  The State
4  of New Jersey was under a Governor's order that
5  everybody had to wear masks.  And if you even recall,
6  and she came to my side, I rolled down my window, and
7  my face was here, her face was right here.  She
8  wasn't standing back.  And she had no mask on.  And
9  back then, we all, you know, everybody was crazed.
10  We didn't know -- everyone was living in a state of
11  fear about that.  And she came right up to the
12  window, I rolled it down, and she had no mask on.
13  And it was concerning to me, and upsetting, because
14  I'm asthmatic.  So I'm at a high risk of, you know,
15  if I got COVID.  So -- and everyone in the police
16  station didn't have masks on, as well.  So -- I guess
17  they don't follow the Governor's orders, but.  It was
18  just something that was mentioned.
19            You know, I was a little concerned
20  about it.  Again, that created the anxiety of -- one
21  of the reasons, if she would have had a mask on, you
22  know, that was one little thing that created anxiety,
23  she wasn't following the law at the time, herself.
24  And you don't go up to people you don't know during
25  the midst of a pandemic, go 12 inches away from their

WORD FOR WORD REPORTING, LLC

46

1  face.  It's just something -- again, she created some
2  anxiety, and that's why I mentioned it to my
3  attorney, for myself, because I'm asthmatic.
4      Q.    Okay.  Don't tell me what you told your
5  attorney.
6            Were you --
7      A.    Well, I --
8      Q.    Did you put a mask on while you were talking
9  to her?
10      A.    I believe we had the neck things on.  I don't
11  recall if I -- I was afraid to move when she made me
12  roll the window down.  I just got the licenses and
13  handed it to her.  I was not thinking about quickly
14  putting a mask on.  Because she then moved away from
15  the vehicle.  So there was no need to put a mask on.
16  She got my license, and left, and went around the
17  other side of the vehicle, and got my husband out of
18  the car.  She did not go back to her car to run
19  license checks first.  She just went around the
20  truck, and then pulled him out of the car right away,
21  as you could see in the video.
22      Q.    You were not, and I know the answer to this
23  question, but you were not arrested that night,
24  correct?
25      A.    Correct.

WORD FOR WORD REPORTING, LLC

47

1      Q.    You were not handcuffed, correct?
2      A.    Correct.
3      Q.    You were not fingerprinted?
4      A.    No.
5      Q.    There was no mug shot taken of you?
6      A.    No.
7      Q.    And you were not given any traffic citation
8  for anything that night?
9      A.    No.
10      Q.    Okay.  And you were not given a breath test,
11  correct?
12      A.    Correct.
13            And speaking of that, it's a shame that
14  they couldn't just give him one on the side of the
15  road, would have alleviated a lot of this, if she
16  felt he was impaired.  Especially with getting --
17  calling a backup driver, she could have had the
18  backup driver bring it to her, if she suspected
19  somebody impaired.  That was -- I didn't understand
20  why that didn't happen.  But -- for whatever it is,
21  they don't -- neither officer had one in the car.
22      Q.    How do you know that?
23      A.    Because they didn't use it on my husband.
24      Q.    Oh, okay.  I thought maybe a specific --
25      A.    It would have been nice if -- she could have

WORD FOR WORD REPORTING, LLC

48

1  told him to bring one, if she called for backup.  But
2  they -- neither one of them offered to give him a
3  Breathalyzer right there.  Instead, he was just
4  handcuffed and taken away, and assumed that he was
5  drunk, when he didn't -- was not exhibiting any type
6  of behavior of someone drunk.
7      Q.    Tell me about whether you -- you indicated
8  that you and your husband shared a beer on the beach.
9  Is that your testimony that --
10      A.    I do recall putting one beer in a cooler.
11      Q.    Can I just please finish my question?
12      A.    Yes, yes.  Okay.  Go ahead.
13      Q.    Do you know whether or not your husband had
14  anything alcoholic to drink other than a half a beer
15  that day?
16      A.    He did not.
17      Q.    And did you always take the same route home
18  from Cape May to get back to Pennsylvania?
19      A.    Usually, unless the Waze app tells us there's
20  an accident or re-routes us.  But that's the way Waze
21  routes us home.  He has to go.
22            (Discussion off the record.)
23      Q.    Do you know, as you sit here today, whether
24  or not, as you were driving home, but before this
25  incident occurred, whether you, to your knowledge,

WORD FOR WORD REPORTING, LLC

49

1   did your husband have any trouble seeing the road?

2      A.   No.

3      Q.   Do you know if he was talking on his cell

4   phone?

5      A.   No.

6      Q.   Were you guys talking to anybody on the cell

7   phone together, such as one of your kids, or

8   grandkids?

9      A.   **I don't recall. It's so long ago. I -- I**

10  **honestly can't say, you know. I don't know if**

11  **somebody called us or not. It's four years ago.**

12     Q.   Would that be something that would -- could

13  have happened, wherein the both of you were in the

14  car, and one of the kids or grandkids calls in? I

15  mean, I'm not exactly sure of everybody's ages. But

16  would you both speak to the caller at the same time,

17  if that were the case?

18     A.   **Usually, that late at night, my kids usually**

19  **know our routine and schedules. A lot of the kids**

20  **text. So he's driving, he usually doesn't have his**

21  **phone. It's usually in his pocket, or if he's on a**

22  **GPS, it's stuck on the thing. We usually don't get**

23  **calls that late at night, you know, driving back from**

24  **the beach. Usually, in an emergency, I don't recall**

25  **any emergencies that evening with anybody.**

WORD FOR WORD REPORTING, LLC

50

1            I did use my cell phone, I do recall,

2   **when I got to the police station. I immediately**

3   **called Jimmy Heidecker to let him know what happened.**

4   **Other than that, I don't recall being on the phone**

5   **with anybody that evening, to be honest.**

6      Q.   What type of attorney is Jimmy Heidecker?

7      A.   **He's criminal defense, I believe.**

8      Q.   So he's in the same line of work as your

9   husband?

10     A.   **Yes.**

11     Q.   And as I recall, he -- that's right. He

12  rents space from Josh?

13     A.   **Yes, in the same building.**

14           MR. KAROLY:  Jim works for me.

15           MS. BROCCO:  Right.

16           MR. KAROLY:  Bo rents space.

17           MS. BROCCO:  You look so young, though,

18  Josh.

19           MR. KAROLY:  I'm in my 40s now. I'm

20  losing my hair here.

21           MS. BROCCO:  Well, you look younger

22  than that.

23           MR. KAROLY:  Yeah, Jim works for me,

24  and then Bo rents space in my building, along with

25  other lawyers.

WORD FOR WORD REPORTING, LLC

51

1            MS. BROCCO:  Okay.

2      Q.   I'm just going to pull up your answers to

3   interrogatories, Mrs. Zelechiwsky. And just bear

4   with me for one second because, as I stated, I am not

5   the best at this.

6            Okay, Lisa, I'm sorry, Ms. Zelechiwsky,

7   do you remember answering a series of questions known

8   as answers to interrogatories in connection with the

9   lawsuit that you brought against Trooper Davis and

10  Trooper John Doe?

11     A.   **I do.**

12     Q.   Okay. And I do not have your certification.

13  I know that you did sign them.

14           Before you signed them, did you read

15  them, read your responses to them?

16     A.   **I believe I would. I believe so.**

17     Q.   And when you read them, and you signed them,

18  did you answer them truthfully and accurately?

19     A.   **To the best of my ability, yes.**

20     Q.   Okay. And by the way, and I didn't ask your

21  husband this, but Trooper Doe is now, his identity

22  obviously is known, and upon your information and

23  belief, that is Trooper Gallagher?

24     A.   **Okay. Yes.**

25     Q.   Do you know? If you don't know, then that's

WORD FOR WORD REPORTING, LLC

52

1   okay. Do you know or not?

2      A.   **Do I know that her name changed?**

3      Q.   No, no, no. Well, there was two officers.

4      A.   **Yes.**

5      Q.   There was Trooper Davis, and then Trooper

6   Gallagher?

7      A.   **Correct.**

8      Q.   Trooper Gallagher, to my knowledge, is a

9   male, the male trooper.

10     A.   **Yes.**

11     Q.   Do you have any reason to disagree with that?

12     A.   **No.**

13     Q.   All right. So you called Jim Heidecker, and

14  you told him what had happened, and you called him

15  that night; is that true?

16     A.   **That's true.**

17     Q.   Did he come down to the police station at all

18  to give you any type of assistance?

19     A.   **Well, we were kind of far away at that point,**

20  **I think we were an hour 20 minutes away from where**

21  **our home was to the barracks. He just said to keep**

22  **him posted if we needed -- if I needed him for**

23  **anything, he would be of help.**

24     Q.   Now, how long had you been on the road before

25  the incident occurred where Trooper Davis pulled you

WORD FOR WORD REPORTING, LLC

53

```
1    over?
2       A.    I believe it was a good hour.
3       Q.    Okay.
4       A.    Or 45 minutes.
5       Q.    Your husband said it was a half hour.
6       A.    Could have been. That's why I'm saying 45
7    minutes. You know, I don't know the exact time.
8    We're talking four years ago. But it was about, I
9    would say, 45 minutes.
10      Q.    So you're estimating?
11      A.    Yeah, I'm estimating. Could be 30 minutes,
12   could be 45. I know it wasn't -- we just didn't
13   leave, and 15 minutes, we were all the way on 55. I
14   mean, based on, you know, when we leave to that
15   location, it's a good half hour, 45 minutes.
16      Q.    And when you -- oh, is this your -- you were
17   employed at the Society of Little Learners at the
18   time of the incident?
19      A.    Okay.
20      Q.    Okay. And you're not claiming a wage loss as
21   a result of this incident?
22      A.    No.
23      Q.    And you missed no time from work as a result
24   of this incident, correct?
25      A.    No.
```

WORD FOR WORD REPORTING, LLC

54

```
1       Q.    Did you report to work the next day?
2       A.    Yes. I had to.
3       Q.    And did your husband report to work the next
4    day?
5       A.    I know he had court the next morning. I
6    believe that's where he went. I don't know what he
7    did after that hearing. But I know it was a very
8    important matter. And I know he did get up early.
9       Q.    I discussed with your husband some financial
10   issues, or some financial losses that he may or may
11   not have sustained as a result of this incident.
12            I also asked him whether he ever
13   applied for any PPP money during the COVID-19
14   pandemic. He referred to you, or he deferred to you.
15            Do you have any knowledge about whether
16   you ever applied on his behalf for any COVID money?
17      A.    I believe he did not qualify. I think
18   there's -- you have to make a certain -- or not make
19   a certain amount of money to qualify. So he was not
20   eligible.
21      Q.    So but did you attempt to apply for him?
22      A.    I looked at the -- you know, the directions,
23   and what do you call that.
24            MR. KAROLY: Applications.
25      A.    The applications, you know, what's
```

WORD FOR WORD REPORTING, LLC

55

```
1    acceptable, and what is not. So he -- he would not
2    qualify. So we did not apply for PPP. Because he
3    wouldn't qualify.
4       Q.    Did your business, do you know, suffer from
5    this incident?
6       A.    Well, we were closed for two months. But I
7    did --
8       Q.    Oh.
9       A.    I did receive grants through community
10   services for children. So we were closed, but then
11   because I was a licensed facility, we were given
12   compensation. So I -- I didn't -- I didn't really
13   lose any money, because the grant took care of the
14   billing that we had to -- because the business was
15   closed.
16      Q.    Yeah. So the business was closed as a result
17   of COVID. But what I want to know is, did your
18   business suffer as a result of this incident that
19   we're here for today, not COVID?
20      A.    I would say no. Because my business is run
21   different than Bo's. I own a business. I -- like my
22   husband, he's the body that has to go to court, and
23   he's the one who has to -- if he doesn't show, he
24   loses money. My business, I delegate it. So I have
25   a director that worked under me, and I have an
```

WORD FOR WORD REPORTING, LLC

56

```
1    assistant. So I would not personally lose money from
2    my business because I -- I'm delegating my business.
3    Where Bo is the actual -- he has to go in. Like,
4    you're an attorney, you have to represent your
5    client. He can't -- you know, if he refers it out,
6    he loses money. So if he cannot work, and he has to
7    refer, let's say, to somebody in the building, he
8    doesn't make the same amount of money, where that
9    doesn't happen to me.
10      Q.    Well, do you know if he ever referred any
11   business out as a result of the --
12      A.    I honestly don't know. Because I don't work
13   in my husband's office, and I don't look at his
14   calendar every day. I was so busy, consumed with my
15   job, and myself. I have to get up every morning, and
16   I have to -- I was managing 42 students, and their
17   parents and families, and responsible -- like, it was
18   a very busy job. So I didn't have time -- I don't
19   have time to see what every move he makes throughout
20   his -- his day. I just -- I have my own thing going,
21   and he has his law firm going. And the only thing I
22   do is our billing. That's it.
23      Q.    Is your billing, you said?
24      A.    Yeah. That's the only thing I handle,
25   really, for his office. I don't -- Josh could even
```

WORD FOR WORD REPORTING, LLC

57

1  vouch. Like, I'm never in the office. I never --
2  I'm not a part of his -- I mean, I just met his new
3  secretary for the first time in over a year. I don't
4  really come in here. Because I was working full-time
5  on my own day care center, which kept me very busy.
6      Q.  So you pay the bills of the law firm, is what
7  you're saying?
8      A.  I pay the bills of everything in our lives.
9  I do not write out his secretary's check. He does
10  that. He handles -- everything for his office is
11  pretty much set on an automatic billing.
12     Q.  Okay.
13     A.  I just do basically the income and expenses,
14  and keep the expenses in check, so we know for our
15  accountant. So I don't -- I don't watch over his
16  calendar or anything like that. I don't know what
17  his daily events are. Because again, I was working
18  full-time with my -- my business.
19     Q.  So I have your answers to interrogatories
20  again, and it asks to identify all medical service
21  providers, providers of mental health services,
22  including -- I'm sorry, I'm looking at the wrong one.
23          I don't see where there's any treatment
24  mentioned for emotional and psychological injuries
25  that you sustained, yet you did testify earlier that

WORD FOR WORD REPORTING, LLC

58

1  you went to your family doctor who prescribed Xanax,
2  you weren't exactly sure, or maybe -- I can't really
3  tell. But is there any reason why your family doctor
4  is not named in your answers to interrogatories; do
5  you know?
6      A.  What reason why I didn't list him?
7      Q.  Yes.
8      A.  I thought I had listed him on something to
9  get the records from him. That's what I thought I
10  filled out.
11     Q.  Okay.
12     A.  Permission to give --
13     Q.  But I'm not asking you about that. I'm
14  asking you about your interrogatories. I do not see
15  that you did list him. And I just want to know why
16  he is not listed as a treating physician for
17  emotional or psychological damages.
18     A.  I maybe just didn't even realize he had to be
19  in there. But I thought I covered it under
20  permission to gather my records. I didn't realize
21  it. I just might have overlooked it. I have no
22  idea.
23     Q.  Your answers to interrogatories indicate that
24  while you didn't sustain physical injuries, you have
25  psychological and emotional injuries. And I just

WORD FOR WORD REPORTING, LLC

59

1  want to know how often do you experience these
2  psychological and emotional injuries you're alleging?
3  Meaning, do you experience --
4      A.  It was -- it was more back when it happened,
5  more of that course of the year.
6      Q.  Let me just finish my question.
7          Do you experience these injuries, these
8  emotional injuries, daily, you know, now that we're
9  in 2024, monthly, not at all? I'm just trying to get
10  an idea of how often you do have any residual
11  injuries.
12     A.  I would have to say it was more in the year
13  after the incident. Obviously, the following 90 days
14  after that was a little -- especially the first
15  entire year, every time we'd get on the highway to
16  drive down, it was -- you know, it was very -- I
17  would say for the first year, it was difficult, a
18  little bit emotional to think that, wow, another
19  human being could treat me like this. Because I'm a
20  pretty easy-going person, and I don't usually have
21  conflicts with people. I have never been arrested.
22  I've never experienced something like that. So for
23  me, it was kind of traumatic.
24          And I tried to just, you know, really
25  be polite, be respectful. And I just -- like my

WORD FOR WORD REPORTING, LLC

60

1  husband says, I hold a lot inside, too. You know,
2  you just learn to be -- try to be professional. I
3  get up, go to work, do my thing. But it was always
4  on the back of my mind how I was treated, and I
5  internalized it, which creates anxiety. And I'm a
6  very busy person. I didn't think it was something
7  that I had to go get professional help for, because
8  you learn to handle it. What else could I really do?
9          I mean, I was given a prescription, you
10  know, to take it as-needed, if I felt anxious,
11  whether it's over that circumstance, or another. But
12  feeling the feeling that she made me feel, you know,
13  and my husband being degraded like that, it sticks
14  with you a little while. I would definitely say a
15  good year.
16          After, it was -- you know, when I would
17  think back to that night, it wasn't a good feeling.
18  Something that -- it stigmatizes you for a little
19  while. So a time period of maybe a year. I mean,
20  now, I don't have, you know, issues of it. But the
21  first year, it was kind of, like, wow, wow, this
22  happened. I almost felt like -- I don't even know if
23  I'm supposed to say this, but I felt racial
24  discrimination towards myself or my husband. That's
25  what it felt like to me by the officer's attitude.

WORD FOR WORD REPORTING, LLC

61

1   And that's what was so shocking to me, that we were
2   being treated like that, because we were, as you
3   could see from the video, we were very nice and
4   polite to her.  And --
5       Q.   What is it about what happened that night
6   made you feel that it was racial?
7       A.   Because of when she came up to the window, it
8   was her demeanor, her tone, her attitude.  Having --
9   she went, like, over and above, I think, for a ticket
10  is one thing, but to have us -- have myself be
11  removed from the car, and told I couldn't take my
12  cell phone with -- you know, put my cell phone down,
13  keep my purse in the car, I felt like she was
14  harassing us, which gave me that feeling of -- I felt
15  like I was being violated a little bit by the police
16  officer because she really had no right to do that.
17  And I felt by her going over and above what she
18  really had to do, it seemed like she was trying to
19  just find something wrong when there was nothing
20  wrong.
21          The whole event, the whole evening was
22  like that.  I mean, my husband got taken away when he
23  was perfectly fine to walk, walked a straight line on
24  a road that was bending down to the berm, and it was
25  dark, and he -- he was standing there perfectly

WORD FOR WORD REPORTING, LLC

62

1   straight.  She had no reason to, in my opinion, it
2   felt like she was harassing us, and taking him away.
3   You know, the whole evening.
4           If there would have been a Breathalyzer
5   on site, just to make it simple, then I wouldn't have
6   felt so harassed.  But I felt like having to leave my
7   phone and my purse in the vehicle, and she's
8   searching things, to me, that -- I just felt like we
9   were being picked on for absolutely no reason.
10  That's what gave me that feeling of what I'm trying
11  to describe.
12          To me, she was out of line.  To me, she
13  was out of line.  And I don't -- I don't normally get
14  pulled over or anything.  But the times in my life
15  that I have been pulled over, an officer has never
16  treated me like that ever.  I've always been treated
17  with respect from a police officer.  And their
18  attitude towards me, that I never had another police
19  officer ever give me that feeling of uneasiness, like
20  what was going to happen to me next, or what was
21  going to happen to my husband next?  Just little
22  things like that.
23      Q.   Did you feel that the Trooper Gallagher, the
24  other officer, was also treating you that way?
25      A.   He did not say much.  He was a little bit

WORD FOR WORD REPORTING, LLC

63

1   more kinder in his attitude.  He did not give me that
2   feeling at all.  I actually had a little small talk
3   with him, and was a little sarcastic with him about
4   my husband's driving, just to kind of lighten up the
5   situation.  And he was a little more friendlier, and
6   he didn't treat me like that.  But I wasn't around
7   him that long.  I just stood on the side of the road
8   with him, and had a couple words, and he told me what
9   was going to happen.  And then I was told to get in
10  the car and drive to the police station.
11      Q.   When you got to the police station, did you
12  have any -- you followed the Trooper Davis who was
13  driving your husband to the station, correct?
14      A.   Correct.
15      Q.   Did you go inside of the station?
16      A.   I did.
17      Q.   And at that point in time, do you know if you
18  were able to see your husband?
19      A.   There was a -- a window.  I was in a
20  different room, different area, but there was a
21  window.  I couldn't see his whole body, only like a
22  foot.  They had him in a chair, like, in a hallway.
23      Q.   And how long was he there for?
24      A.   It was awhile.  Because I had asked the
25  officer at the window if I could please bring my dog

WORD FOR WORD REPORTING, LLC

64

1   in.  In the room I was in, I was the only person in
2   there.  And because it was, like, 90 degrees, it was
3   very hot, and my dog was in the truck, and which I
4   was concerned that he would overheat.  So I asked if
5   I could bring him in, and they said no.  And I said,
6   well, can I go out?  And they let me out, and I
7   turned the air conditioning on for my dog.  And then
8   I went back in.
9           MR. KAROLY:  Can we take a break for
10  just one second, Diana.
11          MS. BROCCO:  Yeah, sure.
12          (There was a brief recess.)
13          MS. BROCCO:  I don't have too much
14  longer.
15          Where was I?
16          MR. KAROLY:  I think you were talking
17  about the dog, just then she went outside with the
18  dog to put the air conditioning on, because they
19  didn't allow the dog inside.
20          MS. BROCCO:  I asked her how long --
21      A.   It was about an hour.  I would say it was
22  about an hour.  Because that's when I called Jimmy.
23      Q.   And so you went there, you went inside, you
24  were able to leave, walk in and out of the police
25  station, correct, you were not held there?

WORD FOR WORD REPORTING, LLC

65

1    A.   I was not held there, no.
2    Q.   Okay.  And was there any -- once you were
3  there for an hour, to your knowledge, they performed
4  a Breathalyzer on your husband, correct?
5    A.   Correct.
6    Q.   And after, at some point in time, then what
7  happens?  When your husband was released, are you
8  still inside the police station?
9    A.   I was in the police station, yes.  They just
10  took a long time.  Because if he had a -- you know,
11  the Breathalyzer was done, why -- again, you know, we
12  were there, like, over an hour.  I don't think it
13  takes that long for a Breathalyzer test result to
14  come back.  So why hold him in a chair handcuffed for
15  that period of time?  To me, that again made me feel
16  like we were being harassed.  Because I know from
17  past experience, my ex-husband was an alcoholic, and
18  he was arrested, and when they Breathalyzed him, the
19  results came up immediately.  So I don't understand
20  why my husband was still handcuffed for that duration
21  of time.
22    Q.   Okay.
23    A.   So again, it goes to the feeling of why are
24  they doing this to us?  You know, you're sitting
25  there, even though it's an hour or an hour and a

WORD FOR WORD REPORTING, LLC

66

1  half, whatever the time frame was, it was a feeling
2  that it gave me that night.  It didn't feel so good,
3  put it that way.  It made me feel -- made me feel
4  like we were being harassed for no reason.  I don't
5  think it would take them an hour to tell him the
6  results of it.  But yet, he was there sitting in a
7  chair handcuffed, and --
8    Q.   Do you know if after they gave him a
9  Breathalyzer, whether he was released, or was he
10  held?
11    A.   He was held.  That's why I felt like we were
12  being harassed.  And I called Jimmy, I was scared.
13  That's why I had gone -- to go out and get my dog.
14  Because it was hot.  I was worried about the dog in
15  the car, because we were there so long.  I just don't
16  -- that's not, like, normal procedure, you know.
17         Like -- like I said, I never was
18  arrested, but I know from my past experience where I
19  saw my ex-husband, I was called to a scene when he
20  had my daughter when she was a little girl, they
21  picked him up for drunk driving with my child in the
22  car.  And I know the officer did a Breathalyzer, and
23  the thing was right on it.  So why would they make my
24  husband sit there handcuffed for that duration of
25  time after they gave him the Breathalyzer?  It wasn't

WORD FOR WORD REPORTING, LLC

67

1  like it was 10 minutes, 15, 20 minutes, or a half
2  hour.  It was awhile.
3    Q.   Do you know what time you left the barracks
4  that night?
5    A.   I know it was late, because we got home
6  between -- my recollection was between 1 and 2 in the
7  morning.  And I remember telling Bo, I felt bad for
8  him, because he had to go to court in the morning.
9  So I was, you know, felt bad for him.  I even told
10  the one police officer, the male police officer, that
11  my husband has to be in court early tomorrow, is this
12  going to take long, because we had to get home to
13  sleep, so.  But I don't believe that officer came to
14  the barracks with us.  I believe it was just the
15  female officer.  And there were other officers in the
16  building that I saw, two others.  And again, nobody
17  had masks on.  Governor's order with COVID.  It just
18  kind of the whole situation that night, it was just
19  kind of just -- that's why I felt we were being
20  harassed, when there was no reason to.  You know, if
21  they brought him in, and they did a Breathalyzer, he
22  should have been released, not handcuffed to a chair
23  for that time period.  It was pretty scary for me,
24  because I didn't know what they were going to do to
25  him.

WORD FOR WORD REPORTING, LLC

68

1    Q.   But eventually, they did let him go, correct?
2    A.   Of course, yes.  When they saw he was -- he
3  was point zero.
4    Q.   And he did not sustain any physical injuries,
5  correct?
6    A.   Correct.
7    Q.   And, in fact, he did not treat for any
8  injuries as a result of this incident; isn't that
9  true?
10    A.   Correct.
11    Q.   And he did receive a traffic citation,
12  correct?
13    A.   He did, yes.
14    Q.   And that was for improper lane change, to my
15  knowledge?
16    A.   Yes.  Again, it was a merging -- it was a
17  merging road.  But that's what she said in court.
18    Q.   Do you know if he had to go to court for
19  that?
20    A.   Yes.
21    Q.   Did you go to court with him?
22    A.   I was there in -- but I wasn't up with him
23  and his attorney.  I was -- I was there because we
24  were coming back from our beach house, and he had to
25  meet Joe to go in the magistrate's office.  So I was

WORD FOR WORD REPORTING, LLC

69

1  -- I was there. I just didn't -- I wasn't part of
2  their ticket -- you know, the -- I wasn't sitting up
3  with them. I was in the back with the general
4  public.
5      Q.    Okay. So you were there, because you were on
6  your way home from the shore?
7      A.    Correct.
8      Q.    Okay.
9      A.    We stayed -- we stayed -- Joe scheduled it on
10 a Monday morning, so as to when we come back, you
11 know, then -- because it's a far drive from our house
12 in Quakertown to go to court. So we were at the
13 beach house the night prior. So I was with Bo
14 adjoining him when he had to go to the hearing. But
15 I didn't go in with them. I waited with the public
16 for him. But I was there. I just wasn't part of the
17 hearing.
18     Q.    And was it Mr. Heidecker that went to court
19 with him, or somebody else?
20     A.    It was Attorney Joseph Nicola.
21     Q.    Okay. You have allegations or you have
22 claims that this incident adversely affected all
23 forms of socialization, including your marital
24 relationship. Can you tell me how this incident has
25 affected your marital relationship?

70

1      A.    Well, I would have to go back to that time
2  period. I mean, definitely that first month, Bo was
3  pretty, you know, shook up. He -- he's a man, and he
4  was taken away by a female police officer,
5  handcuffed, and accused of something that -- you
6  know, he's an honorable man. So that affected his
7  ego. And it would make him more edgy. He wasn't
8  himself for awhile. So that would impact our, you
9  know, relationship. He just was down a little bit,
10 you know. And he holds a lot in. Based on my
11 observations, I'm sure she hurt his pride, you know,
12 his ego, so. And it wasn't like it was where a woman
13 said the wrong thing to him. It wasn't like that. I
14 mean, he was handcuffed, put in a police car,
15 strapped on a chair, you know, it -- he wasn't
16 himself for a little while.
17     Q.    Okay.
18     A.    He did the best -- he does the best he can.
19 Bo always does. He always tries to pick himself up
20 and move forward with things. And that's what he
21 does. But we really feel that night was just totally
22 unnecessary. And it was unlawful of the treatment.
23 It didn't have to be like that. She didn't have to
24 choose the things that she chose, in my opinion,
25 based on what I saw, and how I was treated. There

71

1  was no --
2      Q.    So your testimony -- sorry. Go ahead.
3      A.    No, there's -- this was no reason for her
4  treatment of us, the way she handled things.
5      Q.    So your testimony is that he has an ego, and
6  he was taken away by a female police officer?
7      A.    I wouldn't say that he has an ego. He was
8  hurt. His ego was hurt.
9      Q.    Okay. So how did that affect your marital
10 relationship?
11     A.    Well, it would make him not feel so good as a
12 man. So, I mean, do you want me to get personal? I
13 mean --
14     Q.    Well, look, you're making the allegation.
15 And so --
16     A.    Okay. So he would -- he would -- I would say
17 his libido wasn't what it always was prior to that
18 incident. He was a little, you know -- he -- all
19 right. I might as well just blurt it out. He wasn't
20 sure he would be good enough.
21     Q.    And that's because of this incident?
22     A.    It was a behavior in him I noticed after the
23 incident. I never noticed him ever saying that to me
24 ever prior to that incident. We always had a good
25 sexual relationship. We get along pretty well. He

72

1  just -- I think it changed him a little bit for a
2  period of time.
3      Q.    I understand --
4      A.    I'm not a doctor, but I'm just telling you my
5  observations. You know, I'm not a clinical
6  psychologist. I'm just telling you my observations
7  of him, that I believe he was very hurt, and I think
8  the treatment that he endured that night, he was
9  humiliated, degraded, embarrassed. So I'm, like,
10 choked up even remembering, because it was a very
11 scary traumatic time that night, because I didn't
12 know what was going to happen. I don't think he knew
13 what was going to happen. I mean, maybe he did. I
14 don't know. But I know it wasn't -- he wasn't the
15 same afterwards, put it that way. Like, you know,
16 she hurt his ego, and it -- by the --
17     Q.    Is he --
18     A.    She didn't have to -- she didn't have to
19 treat him that way. Like, you're a professional.
20 You treat your clients in a professional way, and it
21 -- it wasn't like that.
22     Q.    So your husband testified that he takes
23 Viagra, or he was taking Viagra at the time. Was he
24 taking Viagra before this incident?
25     A.    He would -- he would take it. I don't recall

73

1  how much he would take of it. But that's not what
2  I'm referring to. It was his demeanor, I would have
3  to say, during sex, he felt inadequate. He would
4  kind of tell me he felt inadequate. It didn't have
5  to do that -- he never had erectile dysfunction,
6  ever, to my knowledge, since I've been with him. It
7  wasn't about that. It was about he gets like -- when
8  I think back to when we, you know, make love, he --
9  after that incident happened, he -- he had this thing
10  about not feeling good enough for me. And that went
11  on for a little while.
12    Q.   Does it go on to this present day?
13    A.   I don't know if it goes on to this present
14  day. He's much better. It's not -- sometimes he
15  does. I would have to say yes. Sometimes he'll --
16  he'll say I just want to please you. You know, I'm
17  -- he's become, what's that word? Self --
18        MR. KAROLY:  Deprecating.
19        MS. BROCCO:  Deprecating?
20    A.   I guess. He gets, like, self -- like, he's
21  not good enough. And I never had that. He was
22  always a confident man, a confident attorney. And
23  he's become very -- he gets unsure of himself now.
24  Self doubt, like -- and it's ever since that --
25  because I don't think nothing like that has ever

WORD FOR WORD REPORTING, LLC

---

74

1  happened to him. I -- like that. So I just -- it
2  was just the whole way the whole evening was, was
3  handled. The culmination of everything. Where -- I
4  don't think it should have been handled like that,
5  could have avoided all of this.
6    Q.   So getting back to the medication, he
7  testified that he took Viagra before this incident.
8  And do you know if he ever experienced any side
9  effects from it?
10    A.   I've never noticed that. Because sometimes
11  he didn't need to take it, sometimes he did. But I
12  would -- you would have to check his medical records
13  how often he filled the script. I really don't -- I
14  don't know of any side effects from any medications
15  he's on. He doesn't smoke cigarettes. He's a pretty
16  healthy guy.
17    Q.   Other than the thyroid medicine, and the
18  Viagra that he talked about with us, and baby
19  aspirin, do you know if he was on any other
20  medications at the time of the August 10th, 2020
21  incident?
22    A.   No. He doesn't take any other medications.
23    Q.   And how far did you go in school?
24    A.   I have 60 college credits. And then I opened
25  my business in early childhood education.

WORD FOR WORD REPORTING, LLC

---

75

1    Q.   Where did you go to high school?
2    A.   I went to Saucon Valley, and then I went to
3  the community college for early childhood.
4    Q.   Did you ever receive a degree from community
5  college?
6    A.   Oh, I'm one course away from a degree.
7    Q.   And would that be an associate's degree, or a
8  bachelor's?
9    A.   An associate. I just never went back,
10  because I became a mother, and then I opened up my
11  day care center. And I always intended to go back,
12  and I never did. But I -- I have my business.
13    Q.   Have you ever taken any courses in
14  institutional law, anything about civil rights? Do
15  you have any background in criminal justice?
16    A.   I do not.
17    Q.   Okay. Are there any other things with regard
18  to how this incident has affected your marital
19  relationship that you haven't already told me about?
20    A.   Can you repeat the question?
21    Q.   Are there any other details regarding how
22  this incident affected your marital relationship that
23  you haven't already told me about?
24    A.   I don't -- I don't believe so.
25    Q.   And do you know if there's anything -- strike

WORD FOR WORD REPORTING, LLC

---

76

1  that.
2        Do you both use the same pharmacy?
3    A.   Yes.
4    Q.   And that's CVS?
5    A.   Correct.
6    Q.   I know you mentioned on the tape, on the
7  video, something about your husband having carotid
8  artery surgery.
9        Do you know why you would have
10  mentioned that on the video?
11    A.   I don't know. Maybe I was asked a question,
12  or I think maybe -- they might have asked me, does my
13  husband have any health issues. That's the only
14  issue he's ever had. And that was back in 2019, I
15  believe; he had a blockage.
16    Q.   And then he --
17    A.   I believe the officer asked me if he had
18  anything to drink that day, or if there was any
19  illness, I believe, something to that nature, when we
20  were small talking. And I -- I brought that up.
21  Because that's the only thing that I knew of in his
22  health, since I've been with him. Because he's
23  always been in top -- tip-top shape. His heart rate
24  always was at a 55 standing heart rate, because he
25  was biking, skiing, things like that. So I don't --

WORD FOR WORD REPORTING, LLC

77

1   that's probably why I mentioned it. That's the only
2   health issue. But that was in 2019, and he's been
3   fine since.
4       Q.  Okay. No other issues aside from that?
5       A.  No. He goes for his yearly Doppler tests,
6   and everything -- he's always -- everything's fine.
7       Q.  Do you guys bike together when you go to the
8   shore, or you're here?
9       A.  I don't bike as far as he did. He was in a
10  biking -- like, he would -- he goes a lot longer than
11  me. I'm happy with 10 miles, or 15, and that's it
12  for me. I'm busy. I have other things to do. Plus,
13  I like walking my dogs on the beach. I prefer that
14  than going for bike rides. Just my own interest.
15      Q.  Okay. Do you still do things together, go
16  out to dinner together, go to social events together,
17  or has that changed in any way?
18      A.  Well, four years later, yes, we -- well, yes,
19  we still -- we still go out to dinner, we still go
20  around friends. We live life. Try to enjoy it, you
21  know.
22      Q.  Okay. I'm just going to check my notes. And
23  I don't think I have anything else. But just wait
24  one second, please.
25      A.  Okay, thank you.

78

1           MS. BROCCO:  I think I'm finished.
2   Thank you.
3           MR. KAROLY:  Thank you. I'll be very
4   brief. It's been a long day, so I know everybody's
5   anxious to be done.
6   EXAMINATION BY MR. KAROLY:
7       Q.  It's my understanding that you were around
8   your husband for the entire day, basically, on August
9   the 10th; is that correct?
10          MS. BROCCO:  Objection to form. You
11  can answer.
12      Q.  Were you in his physical proximity for the
13  entire day?
14          MS. BROCCO:  Objection to form.
15      A.  With -- can I answer?
16      Q.  You can answer.
17      A.  With the exception of we each took our own
18  shower time. So there was one hour where I was in
19  the bathroom showering to get ready for dinner that I
20  was not with him.
21      Q.  Did you see him consume any drugs or alcohol,
22  or any other substance that would have impaired his
23  ability to operate a vehicle, other than that partial
24  beer that you testified to hours prior?
25      A.  No.

79

1       Q.  Now, you testified that your first husband
2   was an alcoholic; is that correct?
3       A.  Yes. That's why I ended my marriage with
4   him.
5       Q.  And you've seen him presumably intoxicated on
6   several occasions?
7       A.  Many occasions.
8       Q.  And are you able to identify signs of
9   intoxication when you see it, based upon your life
10  experiences?
11      A.  I could tell if somebody has two glasses of
12  wine right away.
13      Q.  Okay.
14      A.  Right away.
15      Q.  Now, at 9:30 at night, when Trooper Davis
16  pulled you and Bo over and had her first
17  conversations with Bo, you were actually in between
18  Bo and Trooper Davis; is that correct?
19      A.  Yes, I was sitting in the passenger's seat.
20      Q.  Would you be able to make the same physical
21  observations of Bo as Trooper Davis was, based upon
22  your location?
23      A.  Yes.
24      Q.  Now, I'd like to ask you whether or not you
25  believe, in your observations, whether or not you

80

1   believe Bo exhibited any of the following signs of a
2   potentially -- lead to signs of intoxication. Okay?
3           MS. BROCCO:  Note my objection on the
4   record.
5           MR. KAROLY:  Understood.
6       Q.  Did you see Bo having bloodshot, glassy, or
7   watery eyes?
8       A.  No.
9       Q.  Did he have a flushed face?
10      A.  No.
11      Q.  Did he have droopy eyelids?
12      A.  No.
13      Q.  Did he have a blank stare or a dazed look
14  about him?
15      A.  No.
16      Q.  Did he have twitching or body tremors or
17  uncontrolled body movements?
18      A.  No.
19      Q.  Did he have dishevelled clothing or hair?
20      A.  I was going to say maybe the hair. No.
21      Q.  Did he have thick or slurred speech?
22      A.  No, he did not.
23      Q.  Was he loud or noisy?
24      A.  No.
25      Q.  Did he ramble?

### Page 81

1    A.    No.
2    Q.    Did he speak unusually fast or slow?
3    A.    No.
4    Q.    Was he slow to respond to any questions?
5    A.    No.
6    Q.    Did he repeat himself excessively?
7    A.    No.
8    Q.    Did he make irrational statements?
9    A.    No.
10   Q.    Was he argumentative, aggressive,
11   belligerent, or obnoxious?
12   A.    No.
13   Q.    Was he boisterous?
14   A.    No.
15   Q.    Did he sway, stagger, or stumble?
16   A.    No.
17   Q.    Did he have an ability to stand up straight?
18   A.    Yes.
19   Q.    Did he have any difficulty providing his
20   information or documentation?
21   A.    No.
22   Q.    Was he crying or moody?
23   A.    No.
24   Q.    Was he overly animated?
25   A.    No.

WORD FOR WORD REPORTING, LLC

### Page 82

1    Q.    Was he drowsy or falling asleep?
2    A.    No.
3    Q.    Did he lack focus or eye contact?
4    A.    No.
5    Q.    Did he have an unusual walk or gait?
6    A.    No.
7    Q.    Was he falling down at all?
8    A.    No.
9    Q.    Did he have any difficulty remembering where
10   you were coming from, or what you were doing?
11   A.    No.
12   Q.    Was he grinding his teeth or vomiting?
13   A.    No.
14   Q.    Was he excessively perspiring?
15   A.    No.
16   Q.    Now, you were sitting next to Bo in the car
17   for what you testified to, I believe, was about 45
18   minutes, correct?
19   A.    Correct.
20   Q.    Was there an odor of alcohol, marijuana, or
21   any other substance emanating from the vehicle?
22   A.    No.
23   Q.    Or your person, for that matter?
24   A.    No. Just the dog.
25   Q.    So you had a dog in the car, laundry,

WORD FOR WORD REPORTING, LLC

### Page 83

1    groceries, right?
2    A.    Correct, yes.
3    Q.    Was there any odor of an alcoholic beverage
4    emanating from your vehicle?
5    A.    No.
6    Q.    Did you see any signs in any way, shape, or
7    form of visible intoxication of your husband?
8    A.    No.
9    Q.    With the exception of him stumbling from
10   standing on one leg, did you see any other
11   coordination issues from your husband?
12   A.    No.
13   Q.    Okay.
14        MR. KAROLY: I don't have any other
15   questions. Thank you.
16   EXAMINATION BY MS. BROCCO:
17   Q.    I just have one more question. Your husband
18   did confirm it for me, but after the -- he was only
19   given a breath test, he was not given a blood test
20   after this -- at any time, either before -- strike
21   that. After this incident, correct? After his
22   arrest?
23   A.    Correct.
24        MS. BROCCO: Okay.
25        MR. KAROLY: Just one last question.

WORD FOR WORD REPORTING, LLC

### Page 84

1    EXAMINATION BY MR. KAROLY:
2    Q.    Does your husband use illegal drugs?
3    A.    Never. He doesn't even smoke a cigarette.
4    Q.    Does your husband take any medications
5    outside of what's prescribed to him that he testified
6    to?
7    A.    No.
8        MR. KAROLY: Okay. I don't have
9    anything else.
10   EXAMINATION BY MS. BROCCO:
11   Q.    Does your husband have any physical ailments,
12   any physical pain, anything for which he has to take
13   narcotic medication, like painkillers, anything like
14   that?
15   A.    He has -- he doesn't take narcotics, but he
16   does have lower back pain from when he chops wood, or
17   if he goes on a bike ride, he'll get a lower back
18   pain. So I would assume that's probably why he, with
19   his leg, he was bike riding, that weekend, so it was
20   probably a little sore. But he never takes
21   painkillers or anything like that. He'll just take,
22   like, normal, you know, Motrin, or Advil, if he pulls
23   his back, or from bike riding, if his leg hurts or
24   something like that. But he's not prescribed any
25   narcotics, no.

WORD FOR WORD REPORTING, LLC

85

1    Q.   And do you know whether he, you know, had any

2   back pain, or any leg pain, or any kind of physical

3   ailment from bike riding on that particular weekend,

4   or any weekend back in the summer of 2020?

5    A.   What year was this again, 2020?

6    Q.   2020, um-hum.

7    A.   Bo's bike riding, since he's been older, is

8   declining.  He doesn't -- he tries to do what he used

9   to do, but he doesn't do it as often, because his

10   back hurts him more that he's older.  Back in that

11   time, if he went bike riding that weekend, and I --

12   based on what I see when he does get off his bike,

13   he's usually sore for 24 hours after he rides his

14   bike, especially if he goes 30 miles.  So that --

15   that's probably why he couldn't stand on one leg too

16   long.  But he's normally in really great shape.  I

17   don't see any ailments that physically -- like I

18   said, he always had a standing 55 heart.  He doesn't

19   have anything he takes medications for physically.

20   He is usually pretty good.

21    Q.   Do you know if, on that particular day, that

22   he was suffering from any back ailments?

23    A.   I cannot recall, because it's so long.  I --

24   I think if he was suffering from a back injury, that

25   -- from anything, that I think he would have asked me

WORD FOR WORD REPORTING, LLC

86

1   to drive, and he did not.  So he was fine.

2    Q.   Does he see an orthopedic doctor for any of

3   his back ailments?

4    A.   He does not.

5    Q.   Does he see any pain management specialists?

6    A.   No.

7    Q.   Did he back in 2020?

8    A.   No, not then, not now, not ever, to my

9   knowledge.

10        MS. BROCCO:  That's all the questions I

11   have.

12        THE WITNESS:  Okay.  Thank you.

13        (Deposition concludes at 4:45 p.m.)

14

15

16

17

18

19

20

21

24

25

WORD FOR WORD REPORTING, LLC

87

1

2           C E R T I F I C A T E

3

4   I, LYNN SMITH, a Certified Court Reporter of the

5   State of New Jersey, do hereby certify that prior to

6   the commencement of the examination, LISA ZELECHIWSKY

7   was duly sworn by me to testify the truth, the whole

8   truth and nothing but the truth.

9

10   I DO FURTHER CERTIFY that I am neither a relative nor

11   employee nor attorney nor counsel of any of the

12   parties to this action, and that I am neither a

13   relative nor employee of such attorney or counsel,

14   and that I am not financially interested in the

15   action.

16

17

18

19

20   _____

      Certified Court Reporter

21   License No. XIO1520

22

23

24

25

## 0

08034 [1] - 2:8
08096 [1] - 1:24

## 1

1 [1] - 67:6
10 [4] - 29:9, 34:23, 67:1, 77:11
10/20/66 [1] - 33:13
1040 [1] - 2:8
10:30 [1] - 29:9
10th [12] - 7:25, 8:14, 11:1, 13:6, 19:1, 19:14, 29:17, 29:18, 30:25, 32:21, 74:20, 78:9
11 [1] - 29:10
12 [1] - 45:25
15 [5] - 7:12, 11:13, 53:13, 67:1, 77:11
17th [1] - 7:9
18101 [1] - 2:4
18951 [1] - 7:4
1940 [1] - 7:3
1:22-cv-04994-CPO-AMD [1] - 1:2

## 2

2 [1] - 67:6
20 [3] - 23:1, 52:20, 67:1
2009 [1] - 7:9
2019 [2] - 76:14, 77:2
202 [1] - 1:24
2020 [15] - 7:25, 8:14, 11:1, 13:6, 19:2, 19:14, 28:1, 30:25, 31:8, 32:21, 74:20, 85:4, 85:5, 85:6, 86:7
2024 [2] - 1:13, 59:9
24 [1] - 85:13
2:35 [1] - 1:14

## 3

30 [5] - 43:25, 44:3, 53:11, 85:14
37 [1] - 33:16
384-2770 [1] - 1:25
384-2779 [1] - 1:25

## 4

4,83,84 [1] - 3:4
40s [1] - 50:19
42 [2] - 33:22, 56:16

437-1252 [1] - 2:4
440 [1] - 33:20
45 [6] - 53:4, 53:6, 53:9, 53:12, 53:15, 82:17
4:45 [1] - 86:13
4th [1] - 33:18

## 5

5 [1] - 36:2
527 [1] - 2:3
55 [5] - 25:13, 26:6, 53:13, 76:24, 85:18

## 6

6 [2] - 1:13, 1:24
60 [1] - 74:24
600 [1] - 2:8
610 [1] - 2:4
667-3113 [1] - 2:9
68-year-old [1] - 22:17

## 7

7 [3] - 22:21, 24:18, 36:1
78 [1] - 3:5

## 8

8 [5] - 24:18, 24:19, 29:1, 36:19
84 [1] - 3:5
856 [3] - 1:25, 2:9
8:13 [3] - 28:1, 28:7, 28:10

## 9

9 [2] - 22:21, 24:17
90 [2] - 59:13, 64:2
9:30 [2] - 29:8, 79:15
9th [2] - 28:1, 28:15

## A

ability [7] - 6:22, 20:9, 23:15, 23:20, 51:19, 78:23, 81:17
able [7] - 27:25, 42:14, 43:1, 63:18, 64:24, 79:8, 79:20
absolutely [1] - 62:9
acceptable [1] - 55:1
access [4] - 32:1, 32:2, 32:4, 32:17
accident [2] - 14:8, 48:20

accommodate [1] - 6:8
account [6] - 31:24, 32:1, 32:2, 32:9, 32:12
accountant [3] - 37:17, 38:6, 57:15
accurate [1] - 41:8
accurately [4] - 5:25, 6:23, 9:2, 51:18
accused [1] - 70:5
action [3] - 7:20, 87:12, 87:15
ACTION [1] - 1:5
activities [2] - 18:10, 19:6
actual [1] - 56:3
add [1] - 39:19
additionally [1] - 5:5
address [3] - 7:2, 31:25, 32:3
adjoining [1] - 69:14
administered [1] - 42:1
adversely [1] - 69:22
Advil [1] - 84:22
affect [5] - 6:22, 18:11, 18:13, 21:2, 71:9
affected [11] - 9:3, 19:17, 36:16, 39:17, 40:21, 41:5, 69:22, 69:25, 70:6, 75:18, 75:22
afford [1] - 34:6
afraid [2] - 16:3, 46:11
afterwards [1] - 72:15
age [1] - 33:9
ages [1] - 49:15
aggressive [1] - 81:10
ago [7] - 11:3, 11:25, 20:1, 26:9, 49:9, 49:11, 53:8
ahead [2] - 48:12, 71:2
ailment [1] - 85:3
ailments [4] - 84:11, 85:17, 85:22, 86:3
air [2] - 64:7, 64:18
Airbnb [1] - 31:21
Albuterol [1] - 6:14
alcohol [4] - 17:23, 24:21, 78:21, 82:20
alcoholic [5] - 23:4, 48:14, 65:17, 79:2, 83:3
alert [2] - 27:5, 27:6
allegation [2] - 44:22, 71:14
allegations [1] - 69:21
alleged [1] - 39:19

allegedly [1] - 14:7
alleging [1] - 59:2
Allentown [1] - 2:4
allergy [1] - 6:16
alleviated [1] - 47:15
allow [1] - 64:19
almost [3] - 12:3, 20:4, 60:22
ALSO [1] - 2:12
amount [6] - 33:8, 34:1, 40:25, 54:19, 56:8
animal [1] - 15:23
animated [1] - 81:24
Ann [1] - 7:1
answer [13] - 5:23, 5:24, 10:11, 18:20, 39:22, 40:5, 41:12, 44:14, 46:22, 51:18, 78:11, 78:15, 78:16
answered [1] - 5:24
answering [1] - 51:7
answers [6] - 14:17, 51:2, 51:8, 57:19, 58:4, 58:23
anti [1] - 10:23
anti-anxiety [1] - 10:23
anxiety [13] - 10:22, 10:23, 11:1, 11:16, 12:13, 16:19, 17:15, 20:25, 21:21, 45:20, 45:22, 46:2, 60:5
anxious [2] - 60:10, 78:5
anyway [1] - 40:3
apologize [3] - 6:19, 11:4, 38:16
app [1] - 48:19
appear [1] - 43:14
appeared [1] - 17:2
applications [2] - 54:24, 54:25
applied [2] - 54:13, 54:16
apply [2] - 54:21, 55:2
appointment [1] - 12:8
appropriate [1] - 21:14
approximation [1] - 5:9
area [4] - 16:24, 26:2, 34:5, 63:20
argumentative [1] - 81:10
arose [1] - 8:13
arrest [1] - 83:22
arrested [4] - 46:23, 59:21, 65:18, 66:18

arrive [1] - 30:18
arrived [5] - 29:23, 30:5, 43:19
artery [1] - 76:8
as-needed [3] - 10:24, 12:13, 60:10
ASHLEY [1] - 1:8
aside [3] - 31:12, 37:24, 77:4
asleep [1] - 82:1
aspect [1] - 39:20
aspirin [1] - 74:19
assemble [1] - 5:19
assistance [1] - 52:18
assistant [1] - 56:1
associate [1] - 75:9
associate's [1] - 75:7
assume [3] - 5:23, 41:8, 84:18
assumed [1] - 48:4
asthmatic [3] - 45:2, 45:14, 46:3
attempt [1] - 54:21
attitude [4] - 60:25, 61:8, 82:18, 63:1
attorney [14] - 5:22, 15:18, 23:17, 28:5, 36:17, 40:16, 46:3, 46:5, 50:6, 56:4, 68:23, 73:22, 87:11, 87:13
Attorney [1] - 69:20
attribute [1] - 44:25
attributed [1] - 38:10
August [13] - 7:25, 8:14, 11:1, 13:5, 19:1, 19:13, 28:1, 28:15, 29:17, 30:25, 32:21, 74:20, 78:8
authority [1] - 17:3
automatic [2] - 38:3, 57:11
avoided [1] - 74:5
awake [2] - 44:6, 44:11
awhile [3] - 63:24, 67:2, 70:8

## B

baby [1] - 74:18
bachelor's [1] - 75:8
background [2] - 33:10, 75:15
backup [4] - 43:17, 47:17, 47:18, 48:1
bad [3] - 28:4, 67:7, 67:9
banking [1] - 37:16
barracks [1] - 52:21,

WORD FOR WORD REPORTING, LLC

67:3, 67:14
**base** [1] - 40:15
**based** [8] - 24:17, 33:8, 53:14, 70:10, 70:25, 79:9, 79:21, 85:12
**basis** [1] - 35:2
**bathroom** [1] - 78:19
**bay** [8] - 25:3, 28:16, 28:17, 28:20, 30:4, 30:5
**beach** [14] - 17:24, 19:21, 24:23, 25:1, 26:16, 28:16, 28:19, 29:24, 30:23, 48:8, 49:24, 68:24, 69:13, 77:13
**bear** [1] - 51:3
**beautiful** [1] - 16:2
**became** [1] - 75:10
**become** [2] - 73:17, 73:23
**becomes** [1] - 41:19
**bed** [8] - 27:22, 28:24, 29:4, 29:6, 29:7, 29:8, 29:9, 36:9
**bedrooms** [1] - 29:20
**beer** [7] - 23:8, 24:23, 48:8, 48:10, 48:14, 78:24
**BEFORE** [1] - 1:11
**before's** [1] - 28:16
**begin** [1] - 4:18
**beginning** [1] - 45:3
**behalf** [1] - 54:16
**behavior** [2] - 48:6, 71:22
**belief** [1] - 51:23
**belligerent** [1] - 81:11
**bending** [1] - 61:24
**Benny** [4] - 21:15, 21:16, 21:19, 21:20
**berm** [1] - 61:24
**best** [8] - 20:9, 41:13, 51:5, 51:19, 70:18
**better** [3] - 22:22, 27:12, 73:14
**between** [8] - 22:12, 22:21, 29:8, 29:9, 44:17, 67:6, 79:17
**beverage** [1] - 83:3
**bicycle** [1] - 17:24
**bifocals** [2] - 22:23, 27:14
**big** [5] - 9:25, 12:10, 16:2, 21:25
**bike** [12] - 30:1, 77:7, 77:9, 77:14, 84:17, 84:19, 84:23, 85:3, 85:7, 85:11, 85:12,

85:14
**biking** [2] - 76:25, 77:10
**bill** [1] - 38:3
**billing** [4] - 55:14, 56:22, 56:23, 57:11
**bills** [3] - 38:2, 57:6, 57:8
**birth** [1] - 33:12
**bit** [14] - 17:15, 21:10, 21:13, 29:25, 30:4, 33:10, 34:17, 34:23, 40:2, 59:18, 61:15, 62:25, 70:9, 72:1
**blank** [1] - 80:13
**blockage** [1] - 76:15
**blonde** [1] - 35:18
**blood** [2] - 6:19, 83:19
**bloodshot** [1] - 80:6
**blue** [1] - 34:4
**blurt** [1] - 71:19
**bo** [2] - 50:16, 70:19
**Bo** [15] - 26:12, 30:1, 30:14, 50:24, 56:3, 67:7, 69:13, 70:2, 79:16, 79:17, 79:18, 79:21, 80:1, 80:6, 82:16
**Bo's** [2] - 55:21, 85:7
**BODHAN** [1] - 2:13
**body** [5] - 19:19, 55:22, 63:21, 80:16, 80:17
**BOHDAN** [1] - 1:4
**boisterous** [1] - 81:4
**booking** [1] - 33:7
**books** [4] - 37:3, 37:12, 37:14, 37:20
**bored** [1] - 24:3
**Branch** [2] - 28:2, 28:8
**break** [5] - 6:4, 6:6, 6:7, 64:9
**breath** [2] - 47:10, 83:19
**Breathalyzed** [1] - 65:18
**Breathalyzer** [9] - 48:3, 62:4, 65:4, 65:11, 65:13, 66:9, 66:22, 66:25, 67:21
**brief** [2] - 64:12, 78:4
**bring** [4] - 47:18, 48:1, 63:25, 64:5
**brings** [1] - 20:18
**BROAD** [1] - 1:24
**BROCCO** [19] - 2:9, 4:3, 38:22, 50:15, 50:17, 50:21, 51:1, 64:11, 64:13, 64:20, 73:19, 78:1, 78:10,

78:14, 80:3, 83:16, 83:24, 84:10, 86:10
**Brocco** [2] - 3:4, 4:5
**brought** [3] - 51:9, 67:21, 76:20
**building** [8] - 35:5, 35:6, 50:13, 50:24, 56:7, 67:16
**bullied** [1] - 20:5
**bullying** [1] - 20:12
**business** [14] - 37:2, 55:4, 55:14, 55:16, 55:18, 55:20, 55:21, 55:24, 56:2, 56:11, 57:18, 74:25, 75:12
**busy** [7] - 34:12, 43:13, 56:14, 56:18, 57:5, 60:6, 77:12
**buy** [1] - 31:25
**BY** [7] - 2:5, 2:9, 4:3, 78:6, 83:16, 84:1, 84:10

## C

**calendar** [6] - 31:13, 32:17, 40:14, 40:15, 56:14, 57:16
**calendars** [2] - 40:7, 40:14
**caller** [1] - 49:16
**calm** [2] - 17:2, 19:19
**CAMDEN** [1] - 1:2
**cannot** [6] - 26:22, 31:23, 40:19, 56:6, 85:23
**capacity** [1] - 40:1
**Cape** [2] - 24:9, 46:18
**car** [24] - 9:23, 15:25, 17:23, 22:6, 22:7, 24:13, 25:24, 26:8, 26:10, 26:22, 46:18, 46:20, 47:21, 49:14, 61:11, 61:13, 63:10, 66:15, 66:22, 70:14, 82:16, 82:25
**care** [13] - 18:5, 33:15, 33:21, 34:13, 34:19, 34:22, 35:5, 35:24, 36:1, 39:7, 55:13, 57:5, 75:11
**carotid** [1] - 76:7
**carry** [1] - 20:14
**case** [5] - 15:10, 17:14, 23:17, 49:17
**cataract** [1] - 27:18
**catch** [1] - 44:24
**caused** [1] - 16:12
**causing** [1] - 10:4
**cell** [5] - 49:3, 49:6,

50:1, 61:12
**center** [4] - 33:15, 33:21, 57:5, 75:11
**certain** [11] - 8:12, 8:20, 17:11, 17:13, 17:14, 19:18, 20:17, 31:7, 54:18, 54:19
**certainly** [2] - 15:19, 23:4
**certification** [1] - 51:12
**Certified** [2] - 1:12, 87:4
**certified** [1] - 87:20
**CERTIFIED** [1] - 1:23
**certify** [1] - 87:5
**CERTIFY** [1] - 87:10
**chair** [5] - 63:22, 65:14, 66:7, 67:22, 70:15
**change** [1] - 68:14
**changed** [3] - 52:2, 72:1, 77:17
**charge** [2] - 30:22, 32:25
**chart** [1] - 11:19
**chat** [1] - 26:24
**chatting** [1] - 25:4
**check** [12] - 12:21, 13:2, 13:8, 13:11, 16:20, 16:21, 37:9, 40:7, 57:9, 57:14, 74:12, 77:22
**checks** [1] - 46:19
**Cherry** [1] - 2:8
**child** [3] - 20:12, 20:13, 66:21
**childhood** [2] - 74:25, 75:3
**children** [2] - 7:13, 55:10
**choked** [1] - 72:10
**choose** [1] - 70:24
**chops** [1] - 84:16
**chose** [1] - 70:24
**cigarette** [1] - 84:3
**cigarettes** [1] - 74:15
**circumstance** [1] - 60:11
**citation** [2] - 47:7, 68:11
**civil** [3] - 8:13, 15:10, 75:14
**CIVIL** [2] - 1:2, 1:5
**claim** [2] - 15:3, 15:9
**claiming** [9] - 7:24, 8:5, 8:9, 8:20, 8:23, 9:15, 13:22, 18:25, 53:20
**claims** [1] - 69:22

**Claritin** [1] - 6:15
**clean** [2] - 29:21
**clear** [1] - 5:2
**client** [2] - 41:6, 56:5
**clientele** [2] - 40:10, 40:12
**clients** [1] - 72:20
**clinical** [1] - 72:5
**clorestatin** [1] - 6:20
**close** [3] - 6:4, 33:23, 34:7
**closed** [8] - 33:16, 55:6, 55:10, 55:15, 55:16
**clothing** [1] - 80:19
**collar** [1] - 34:4
**colleague** [1] - 30:10
**college** [4] - 34:20, 74:24, 75:3, 75:5
**coming** [7] - 17:24, 24:2, 25:12, 25:14, 30:2, 68:24, 82:10
**commencement** [1] - 87:6
**commencing** [1] - 1:14
**community** [3] - 55:9, 75:3, 75:4
**compensation** [1] - 55:12
**complaint** [2] - 7:19, 8:12
**completely** [3] - 18:16, 34:9, 34:11
**concerned** [4] - 10:1, 23:15, 45:19, 64:4
**concerning** [1] - 45:13
**concerns** [5] - 22:15, 22:18, 22:19, 27:7, 43:5
**concludes** [1] - 86:13
**conditioning** [2] - 64:7, 64:18
**conduct** [2] - 17:17, 18:8
**confident** [2] - 73:22
**confirm** [1] - 83:18
**conflicts** [1] - 59:21
**connection** [1] - 51:8
**consume** [1] - 78:21
**consumed** [1] - 56:14
**contact** [2] - 32:6, 82:3
**contain** [1] - 5:20
**continue** [2] - 10:10, 16:14
**conversation** [5] - 11:25, 12:5, 18:21, 26:13, 26:19
**conversations** [1] -

| | | | | |
|---|---|---|---|---|
| 79:17 | current [1] - 7:2 | demeanor [2] - 61:8, 73:2 | Doe [2] - 51:10, 51:21 | during [9] - 4:24, 19:20, 26:10, 35:24, 36:2, 36:4, 45:24, 54:13, 73:3 |
| cooler [1] - 48:10 | CVS [1] - 76:4 | deposition [6] - 4:6, 4:12, 4:13, 5:19, 6:11, 18:21 | dog [24] - 9:23, 9:25, 15:16, 15:25, 16:2, 17:24, 21:15, 21:24, 22:7, 22:10, 26:12, 29:25, 63:25, 64:3, 64:7, 64:17, 64:18, 64:19, 66:13, 66:14, 82:24, 82:25 | dutles [1] - 37:13 |
| cooperated [1] - 42:15 | **D** | | | dysfunction [1] - 73:5 |
| coordinate [1] - 32:7 | | | | |
| coordination [1] - 83:11 | d'oeuvres [2] - 29:22, 29:24 | DEPOSITION [1] - 1:6 | | |
| correct [46] - 4:7, 4:16, 4:17, 7:6, 7:7, 7:21, 8:18, 8:19, 13:16, 19:9, 29:2, 30:9, 30:14, 30:15, 30:16, 41:22, 43:18, 46:24, 46:25, 47:1, 47:2, 47:11, 47:12, 52:7, 53:24, 63:13, 63:14, 64:25, 65:4, 65:5, 68:1, 68:5, 68:6, 68:10, 68:12, 69:7, 76:5, 78:9, 79:2, 79:18, 82:18, 82:19, 83:2, 83:21, 83:23 | dabble [1] - 34:15 | Deposition [1] - 86:13 | | **E** |
| | daily [5] - 18:10, 19:7, 20:18, 57:17, 59:8 | deprecating [2] - 73:18, 73:19 | dogs [1] - 77:13 | e-mails [1] - 32:16 |
| | damage [5] - 8:1, 8:25, 10:13, 40:25 | depression [1] - 21:10 | done [4] - 27:9, 32:22, 65:11, 78:5 | early [7] - 24:11, 24:14, 29:10, 54:8, 67:11, 74:25, 75:3 |
| | damages [11] - 7:24, 8:4, 8:21, 9:14, 13:22, 14:13, 14:16, 15:11, 16:16, 39:19, 58:17 | describe [1] - 62:11 | doors [1] - 33:23 | earning [1] - 34:2 |
| | | described [1] - 16:17 | Doppler [1] - 77:5 | Easton [1] - 23:19 |
| | | DESCRIPTION [1] - 3:10 | double [2] - 25:15, 26:6 | easy [1] - 59:20 |
| | dark [4] - 22:16, 24:16, 61:25 | details [2] - 9:10, 75:21 | doubt [1] - 73:24 | easy-going [1] - 59:20 |
| counsel [2] - 87:11, 87:13 | date [2] - 7:8, 33:12 | determine [6] - 37:4, 39:24, 40:6, 40:14, 40:19, 40:20 | Douglas [1] - 11:6 | eat [2] - 23:11, 24:20 |
| counselor [1] - 13:17 | dates [1] - 13:10 | diagnosed [1] - 9:2 | down [21] - 16:25, 18:18, 25:5, 30:4, 30:23, 38:21, 38:23, 39:4, 39:7, 42:2, 42:11, 42:20, 45:6, 45:12, 46:12, 52:17, 59:16, 61:12, 61:24, 70:9, 82:7 | edgy [1] - 70:7 |
| couple [8] - 7:11, 20:1, 21:5, 21:6, 21:7, 36:12, 37:6, 63:8 | daughter [1] - 66:20 | DIANA [1] - 2:9 | | education [1] - 74:25 |
| | daughters [1] - 34:19 | Diana [2] - 4:4, 64:10 | | effects [2] - 74:9, 74:14 |
| | DAVIS [1] - 1:8 | difference [1] - 41:4 | | ego [6] - 70:7, 70:12, 71:5, 71:7, 71:8, 72:16 |
| | Davis [12] - 25:6, 42:1, 42:6, 42:7, 44:22, 51:9, 52:5, 52:25, 63:12, 79:15, 79:18, 79:21 | different [8] - 19:24, 23:18, 26:25, 32:12, 34:25, 55:21, 63:20 | Dr [1] - 11:6 | Einstein [1] - 40:24 |
| course [5] - 4:24, 6:7, 59:5, 68:2, 75:6 | | differentiating [1] - 22:12 | drink [6] - 23:2, 23:3, 23:10, 24:22, 48:14, 76:18 | either [3] - 33:7, 36:25, 83:20 |
| courses [1] - 75:13 | days [10] - 20:15, 30:11, 31:18, 31:19, 36:12, 38:20, 39:15, 39:16, 59:13 | differently [1] - 21:12 | | eligible [1] - 54:20 |
| COURT [2] - 1:1, 1:23 | | difficult [1] - 59:17 | drive [11] - 16:21, 23:5, 23:20, 27:8, 27:10, 27:11, 36:19, 59:16, 63:10, 69:11, 86:1 | emanating [2] - 82:21, 83:4 |
| court [16] - 5:18, 17:13, 18:17, 35:19, 35:20, 36:17, 54:5, 55:22, 67:8, 67:11, 68:17, 68:18, 68:21, 69:12, 69:18 | dazed [1] - 80:13 | difficulty [2] - 81:19, 82:9 | | embarrassed [1] - 72:9 |
| | deal [1] - 12:10 | dinner [10] - 23:8, 24:11, 28:7, 28:12, 29:1, 30:6, 77:16, 77:19, 78:19 | | emergencies [1] - 49:25 |
| | dearly [1] - 9:25 | | driven [2] - 25:24, 43:23 | emergency [1] - 49:24 |
| | decision [1] - 34:7 | directions [1] - 54:22 | driver [4] - 23:20, 24:4, 47:17, 47:18 | emotional [14] - 8:1, 8:24, 9:1, 10:12, 14:13, 14:16, 16:16, 18:25, 57:24, 58:17, 58:25, 59:2, 59:8, 59:18 |
| Court [3] - 1:12, 87:4, 87:20 | decline [1] - 37:11 | directly [1] - 41:12 | | |
| | declining [1] - 85:8 | director [1] - 55:25 | drives [3] - 23:16, 27:11 | |
| covered [1] - 58:19 | decrease [3] - 38:9, 38:17, 39:14 | disagree [1] - 52:11 | driving [20] - 8:18, 16:25, 19:21, 22:14, 22:16, 22:20, 23:15, 24:3, 25:22, 26:3, 26:16, 27:1, 27:15, 48:24, 49:20, 49:23, 63:4, 63:13, 66:21 | emotionally [2] - 9:4, 19:4 |
| COVID [12] - 33:24, 34:2, 37:4, 37:8, 38:11, 38:18, 45:3, 45:15, 54:16, 55:17, 55:19, 67:17 | | discovery [1] - 35:12 | | employed [2] - 33:14, 53:17 |
| | decreased [2] - 37:5, 37:6 | discrimination [1] - 60:24 | | employee [2] - 87:11, 87:13 |
| | Defendant [2] - 1:9, 2:10 | discuss [4] - 10:21, 13:18, 13:24, 30:21 | | end [4] - 5:18, 37:16, 37:23, 38:5 |
| COVID-19 [2] - 44:24, 54:13 | defense [1] - 50:7 | discussed [1] - 54:9 | droopy [1] - 80:11 | ended [2] - 9:12, 79:3 |
| crazed [1] - 45:9 | deferred [1] - 54:14 | discussion [1] - 48:22 | drove [2] - 22:20, 36:14 | endured [1] - 72:8 |
| craziness [1] - 16:8 | definitely [5] - 40:1, 44:1, 44:3, 60:14, 70:2 | dishevelled [1] - 80:19 | drowsy [1] - 82:1 | enjoy [2] - 26:14, 77:20 |
| created [3] - 45:20, 45:22, 46:1 | | distance [1] - 5:7 | drugs [3] - 17:23, 78:21, 84:2 | entire [5] - 12:16, 44:7, 59:15, 78:8, 78:13 |
| creates [2] - 17:15, 60:5 | definition [1] - 15:4 | DISTRICT [2] - 1:1, 1:1 | | |
| | degraded [2] - 60:13, 72:9 | DO [1] - 87:10 | | |
| credits [1] - 74:24 | degree [3] - 75:4, 75:6, 75:7 | DOCKET [1] - 1:2 | drunk [4] - 23:6, 48:5, 48:6, 66:21 | erectile [1] - 73:5 |
| criminal [2] - 50:7, 75:15 | degrees [1] - 64:2 | doctor [10] - 10:20, 11:5, 11:9, 12:25, 13:13, 14:4, 58:1, 58:3, 72:4, 86:2 | duly [2] - 4:2, 87:7 | erratically [1] - 26:3 |
| crying [1] - 81:22 | delegate [1] - 55:24 | | dumped [1] - 24:25 | especially [6] - 16:21, |
| culmination [1] - 74:3 | delegating [1] - 56:2 | documentation [1] - 81:20 | duration [2] - 65:20, 66:24 | |
| | Delilah [2] - 26:14, 26:17 | documents [1] - 6:10 | | |

21:6, 21:15, 47:16,
59:14, 85:14
**ESQUIRE** [2] - 2:5, 2:9
**establish** [1] - 44:2
**estate** [3] - 34:15,
34:16, 34:21
**estimate** [1] - 5:6
**estimating** [2] - 53:10,
53:11
**estimation** [1] - 5:8
**evening** [14] - 8:3,
10:7, 17:6, 17:18,
19:16, 20:20, 20:21,
24:15, 28:13, 49:25,
50:5, 61:21, 62:3,
74:2
**evenings** [1] - 17:6
**event** [2] - 9:3, 61:21
**events** [2] - 57:17,
77:16
**eventually** [1] - 68:1
**everyday** [2] - 18:12,
18:20
**ex** [2] - 65:17, 66:19
**ex-husband** [2] -
65:17, 66:19
**exact** [5] - 24:13,
35:22, 40:21, 40:25,
53:7
**exactly** [5] - 11:24,
15:8, 20:16, 49:15,
58:2
**Examination** [2] - 3:4,
3:5
**examination** [1] - 87:6
**EXAMINATION** [5] -
4:3, 78:6, 83:16,
84:1, 84:10
**example** [3] - 14:21,
19:7, 19:22
**except** [1] - 16:18
**exception** [2] - 78:17,
83:9
**excessively** [2] - 81:6,
82:14
**exclude** [1] - 31:7
**exclusions** [1] - 31:9
**exhibited** [1] - 80:1
**exhibiting** [1] - 48:5
**exhibits** [1] - 3:11
**exit** [1] - 22:2
**expect** [1] - 9:13
**expenses** [6] - 34:2,
37:22, 38:4, 38:7,
57:13, 57:14
**experience** [8] -
14:20, 16:15, 18:6,
59:1, 59:3, 59:7,
65:17, 66:18
**experienced** [2] -

59:22, 74:8
**experiences** [1] -
79:10
**explain** [8] - 9:2, 9:6,
9:13, 14:15, 15:1,
20:16, 42:8
**explained** [1] - 38:10
**extent** [2] - 39:17,
40:25
**eye** [1] - 82:3
**eyelids** [1] - 80:11
**eyes** [4] - 22:22,
42:22, 80:7
**eyesight** [2] - 27:13,
28:5

## F

**face** [4] - 45:7, 46:1,
80:9
**facility** [1] - 55:11
**fact** [2] - 41:15, 68:7
**fairly** [1] - 20:4
**falling** [2] - 82:1, 82:7
**familiar** [2] - 25:14,
32:13
**families** [1] - 56:17
**family** [16] - 10:20,
11:5, 11:11, 13:13,
13:17, 13:20, 13:21,
13:25, 14:3, 14:12,
29:19, 30:11, 40:17,
58:1, 58:3
**far** [10] - 22:3, 25:3,
35:25, 37:15, 38:12,
40:13, 52:19, 69:11,
74:23, 77:9
**fast** [2] - 25:24, 81:2
**favorites** [1] - 28:9
**Fax** [1] - 1:25
**fear** [2] - 17:5, 45:11
**feelings** [4] - 13:25,
15:5, 18:7, 40:4
**feet** [2] - 21:23
**felt** [22] - 9:9, 9:10,
17:7, 44:1, 47:16,
60:10, 60:22, 60:23,
60:25, 61:13, 61:14,
61:17, 62:2, 62:6,
62:8, 66:11, 67:7,
67:9, 67:19, 73:3,
73:4
**female** [3] - 67:15,
70:4, 71:6
**few** [2] - 4:19, 30:11
**field** [1] - 41:25
**figure** [1] - 9:22
**filed** [3] - 8:12, 15:3,
35:8
**filled** [4] - 12:22, 13:2,

58:10, 74:13
**filling** [1] - 12:6
**financial** [7] - 36:24,
37:16, 38:19, 39:19,
40:6, 54:9, 54:10
**financially** [2] - 41:3,
87:14
**financials** [1] - 37:25
**fine** [11] - 23:21,
25:12, 27:6, 30:19,
44:13, 44:15, 44:16,
61:23, 77:3, 77:6,
86:1
**fingerprinted** [1] -
47:3
**finish** [5] - 18:16,
18:19, 38:14, 48:11,
59:6
**finished** [3] - 24:24,
38:13, 78:1
**finishing** [2] - 28:11,
28:12
**FIRM** [1] - 2:3
**firm** [5] - 37:14, 37:21,
37:25, 56:21, 57:6
**first** [17] - 4:2, 4:16,
7:15, 13:4, 21:6,
22:24, 24:8, 25:23,
29:11, 46:19, 57:3,
59:14, 59:17, 60:21,
70:2, 79:1, 79:16
**fish** [1] - 28:3
**five** [7] - 6:7, 12:3,
12:12, 21:23, 31:17,
34:16, 34:18
**five-minute** [1] - 6:7
**flip** [1] - 34:14
**flushed** [1] - 80:9
**focus** [1] - 82:3
**follow** [1] - 45:17
**followed** [3] - 17:19,
43:23, 63:12
**following** [3] - 45:23,
59:13, 80:1
**follows** [2] - 4:2, 4:20
**food** [1] - 29:24
**foot** [1] - 63:22
**FOR** [2] - 1:1, 1:23
**forced** [1] - 18:8
**forever** [1] - 44:1
**forget** [1] - 4:23
**form** [5] - 12:7, 20:24,
78:10, 78:14, 83:7
**forms** [1] - 69:23
**forward** [1] - 70:20
**four** [7] - 12:3, 21:22,
31:10, 44:2, 49:11,
53:8, 77:18
**frame** [1] - 66:1
**fresh** [1] - 36:20

**friendlier** [1] - 63:5
**friends** [3] - 24:12,
25:4, 77:20
**Front** [1] - 33:21
**front** [8] - 8:17, 40:14,
42:5, 42:24, 42:25,
43:2
**full** [6] - 6:25, 27:20,
39:16, 39:25, 57:4,
57:18
**full-time** [2] - 57:4,
57:18
**FURTHER** [1] - 87:10
**fuzzy** [2] - 21:9, 36:20

## G

**gait** [1] - 82:5
**Gallagher** [4] - 51:23,
52:6, 52:8, 62:23
**gather** [1] - 58:20
**general** [2] - 12:7,
69:3
**girl** [1] - 66:20
**given** [8] - 47:7, 47:10,
55:11, 60:9, 83:19
**gladly** [1] - 22:3
**glass** [1] - 23:7
**glasses** [1] - 79:11
**glassy** [1] - 80:6
**glitch** [1] - 5:14
**Governor's** [3] - 45:4,
45:17, 67:17
**GPS** [1] - 49:22
**grandkids** [2] - 49:8,
49:14
**grant** [1] - 55:13
**grants** [1] - 55:9
**great** [1] - 85:16
**greatest** [1] - 27:13
**Greek** [1] - 28:9
**grinding** [1] - 82:12
**groceries** [2] - 17:25,
83:1
**group** [1] - 33:9
**guess** [6] - 5:5, 9:1,
21:9, 28:21, 45:16,
73:20
**guests** [1] - 32:6
**guy** [1] - 74:16
**guys** [5] - 27:21,
28:23, 28:25, 49:6,
77:7

## H

**H&H** [1] - 24:20
**hair** [3] - 50:20, 80:19,
80:20
**half** [7] - 38:20, 39:15,

48:14, 53:5, 53:15,
66:1, 67:1
**hallway** [1] - 63:22
**Hamilton** [2] - 2:3
**handcuffed** [11] -
43:8, 43:15, 47:1,
48:4, 65:14, 65:20,
66:7, 66:24, 67:22,
70:5, 70:14
**handed** [1] - 46:13
**handle** [5] - 37:2,
37:15, 37:24, 56:24,
60:8
**handled** [4] - 21:11,
71:4, 74:3, 74:4
**handles** [1] - 57:10
**hands** [2] - 39:5, 39:8
**hang** [1] - 26:24
**happy** [2] - 36:11,
77:11
**harassed** [6] - 17:7,
62:6, 65:16, 66:4,
66:12, 67:20
**harassing** [2] - 61:14,
62:2
**hard** [8] - 12:4, 27:14,
37:4, 38:12, 39:22,
39:24, 40:13, 44:2
**harm** [1] - 10:4
**head** [2] - 17:8, 40:9
**health** [5] - 14:6,
57:21, 76:13, 76:22,
77:2
**healthcare** [1] - 14:3
**healthy** [3] - 23:12,
23:13, 74:16
**hear** [1] - 5:14
**heard** [4] - 41:7, 41:19,
54:7, 69:14, 69:17
**hearsay** [1] - 40:15
**heart** [5] - 18:3, 20:24,
76:23, 76:24, 86:18
**heavy** [1] - 12:23
**Heidecker** [5] - 29:19,
50:3, 50:6, 52:13,
69:18
**held** [4] - 64:25, 65:1,
66:10, 66:11
**Hellertown** [2] - 33:20,
34:4
**help** [4] - 12:21, 34:20,
52:23, 60:7
**hereby** [1] - 87:5
**herself** [1] - 45:23
**HI** [1] - 4:4
**high** [2] - 45:14, 75:1
**Highway** [1] - 2:8
**highway** [5] - 21:17,
21:23, 25:15, 26:6,

59:15
Hill [1] - 2:8
himself [6] - 38:2, 70:8, 70:16, 70:19, 73:23, 81:6
hit [1] - 16:1
hold [3] - 34:16, 60:1, 65:14
holding [1] - 36:18
holds [2] - 40:3, 70:10
home [32] - 16:20, 16:25, 22:16, 22:20, 22:21, 24:9, 24:12, 26:13, 26:16, 27:1, 27:3, 27:8, 29:19, 30:3, 30:11, 31:1, 31:25, 32:8, 36:6, 36:7, 36:8, 36:14, 36:19, 36:23, 40:17, 48:17, 48:21, 48:24, 52:21, 67:5, 67:12, 69:6
honest [2] - 31:11, 50:5
honestly [2] - 49:10, 56:12
honorable [1] - 70:6
horribly [1] - 37:5
hors [2] - 29:22, 29:23
hot [2] - 64:3, 66:14
hour [17] - 29:7, 29:11, 29:12, 43:25, 52:20, 53:2, 53:5, 53:15, 64:21, 64:22, 65:3, 65:12, 65:25, 66:5, 67:2, 78:18
hours [4] - 23:5, 34:24, 78:24, 85:13
house [18] - 27:3, 30:4, 30:7, 30:12, 30:13, 30:17, 30:24, 31:23, 33:1, 34:14, 34:23, 34:24, 44:7, 44:11, 44:17, 68:24, 69:11, 69:13
hum [1] - 85:6
human [2] - 20:3, 59:19
humiliated [1] - 72:9
hundred [2] - 20:19, 41:8
hurt [5] - 70:11, 71:8, 72:7, 72:16
hurts [2] - 84:23, 85:10
husband [74] - 4:20, 6:5, 7:5, 8:2, 8:6, 8:14, 9:21, 10:8, 14:21, 15:18, 16:6, 17:11, 21:8, 21:12,

22:13, 22:15, 22:19, 22:25, 23:1, 23:12, 25:1, 26:20, 26:21, 27:17, 28:23, 29:7, 30:21, 35:11, 35:23, 36:25, 38:1, 39:14, 40:3, 41:10, 42:15, 43:22, 43:24, 44:10, 46:17, 47:23, 48:8, 48:13, 49:1, 50:9, 51:21, 53:5, 54:3, 54:9, 55:22, 60:1, 60:13, 60:24, 61:22, 62:21, 63:13, 63:18, 65:4, 65:7, 65:17, 65:20, 66:19, 66:24, 67:11, 72:22, 76:7, 76:13, 78:8, 79:1, 83:7, 83:11, 83:17, 84:2, 84:4, 84:11
husband's [10] - 4:6, 11:9, 23:15, 25:7, 37:2, 37:13, 37:20, 37:25, 56:13, 63:4

**I**

ID [1] - 3:10
idea [3] - 28:6, 58:22, 59:10
identify [2] - 57:20, 79:8
Identity [1] - 51:21
illegal [1] - 84:2
illness [1] - 76:19
imagine [1] - 41:7
immediately [2] - 50:2, 65:19
impact [1] - 70:8
impair [1] - 6:22
impaired [4] - 43:14, 47:16, 47:19, 78:22
important [1] - 54:8
improper [1] - 68:14
inadequate [3] - 20:3, 73:3, 73:4
inches [1] - 45:25
incident [50] - 7:25, 8:6, 8:10, 8:14, 8:23, 10:14, 10:18, 10:21, 11:2, 11:15, 14:20, 19:1, 19:14, 28:25, 29:15, 30:25, 35:13, 35:16, 36:12, 37:1, 40:1, 40:11, 41:7, 43:18, 44:24, 44:25, 45:1, 48:25, 52:25, 53:18, 53:21, 53:24, 54:11, 55:5, 55:18, 59:13, 68:8, 69:22,

69:24, 71:18, 71:21, 71:23, 71:24, 72:24, 73:9, 74:7, 74:21, 75:18, 75:22, 83:21
include [1] - 40:10
including [2] - 57:22, 69:23
income [4] - 38:5, 38:7, 39:17, 57:13
increase [1] - 26:5
indicate [1] - 58:23
indicated [3] - 14:14, 35:4, 48:7
individual [2] - 22:14, 33:8
individually [1] - 9:18
information [3] - 33:11, 51:22, 81:20
injuries [19] - 7:23, 8:5, 8:20, 9:14, 14:7, 14:14, 16:17, 18:9, 18:24, 18:25, 57:24, 58:24, 58:25, 59:2, 59:7, 59:8, 59:11, 68:4, 68:8
injury [2] - 15:10, 85:24
innocent [1] - 41:21
inquiring [1] - 33:8
inside [10] - 16:5, 17:4, 22:9, 40:3, 40:4, 60:1, 63:15, 64:19, 64:23, 85:8
instead [1] - 48:3
institutional [1] - 75:14
instruction [1] - 18:15
instructions [2] - 4:19
intended [1] - 75:11
interest [1] - 77:14
interested [1] - 87:14
internalize [1] - 21:3
internalized [1] - 60:5
interrogatories [7] - 14:17, 51:3, 51:8, 57:19, 58:4, 58:14, 58:23
intoxicated [2] - 23:2, 79:5
intoxication [3] - 79:9, 80:2, 83:7
investment [1] - 34:7
irrational [1] - 81:8
issue [4] - 12:20, 41:20, 76:14, 77:2
issues [5] - 54:10, 60:20, 76:13, 77:4, 83:11
itemize [1] - 37:22

**J**

JERSEY [2] - 1:1, 1:24
Jersey [4] - 1:12, 2:8, 45:4, 87:5
Jim [3] - 50:14, 50:23, 52:13
Jimmy [4] - 50:3, 50:6, 64:22, 66:12
job [8] - 9:21, 23:16, 34:18, 36:21, 56:15, 56:18
Joe [2] - 68:25, 69:9
John [2] - 7:18, 51:10
Joseph [1] - 69:20
Josh [3] - 50:12, 50:18, 56:25
JOSHUA [1] - 2:5
justice [1] - 75:15

**K**

KAROLY [21] - 2:3, 2:5, 28:11, 38:14, 38:24, 39:4, 50:14, 50:16, 50:19, 50:23, 54:24, 64:9, 64:16, 73:18, 78:3, 78:6, 80:5, 83:14, 83:25, 84:1, 84:8
Karoly [1] - 3:5
kayak [1] - 28:18
kayaking [1] - 28:17
keep [9] - 4:21, 5:1, 17:9, 22:12, 29:13, 37:12, 52:21, 57:14, 61:13
keeping [2] - 37:13, 37:20
KENT/McMcBRIDE [1] - 2:7
kept [3] - 17:8, 36:22, 57:5
kid [1] - 20:11
kids [6] - 17:23, 49:7, 49:14, 49:18, 49:19
kill [1] - 18:17
kind [22] - 8:7, 15:22, 19:15, 21:9, 23:13, 24:4, 26:18, 26:24, 26:25, 28:21, 34:24, 39:22, 39:24, 41:11, 52:19, 59:23, 60:21, 63:4, 67:18, 67:19, 73:4, 85:2
kinder [1] - 63:1
kindness [3] - 15:23, 20:4, 22:8
Kings [1] - 2:8
knowledge [9] -

31:10, 35:14, 48:25, 52:8, 54:15, 65:3, 68:15, 73:6, 86:9
known [5] - 5:19, 51:7, 51:22

**L**

lack [1] - 82:3
lane [8] - 25:11, 25:13, 25:15, 25:19, 25:21, 26:6, 68:14
lanes [1] - 25:16
last [4] - 11:7, 21:5, 32:20, 83:25
lasting [1] - 16:15
late [9] - 22:16, 22:20, 22:22, 27:8, 36:14, 36:18, 49:18, 49:23, 67:5
laundry [1] - 82:25
law [7] - 37:14, 37:21, 37:25, 45:23, 56:21, 57:6, 75:14
LAW [1] - 2:3
lawful [1] - 21:14
lawsuit [3] - 13:23, 35:7, 51:9
lawsuits [1] - 35:8
lawyer [4] - 16:10, 17:21, 39:11, 40:22
lawyers [1] - 50:25
laying [1] - 36:9
lead [1] - 80:2
learn [2] - 60:2, 60:8
Learners [1] - 53:17
leases [1] - 32:15
least [1] - 4:5
leave [12] - 15:15, 15:16, 15:25, 22:5, 22:6, 22:21, 24:8, 30:18, 53:13, 53:14, 62:6, 64:24
leaves [1] - 17:5
left [9] - 24:18, 25:19, 25:21, 27:3, 44:7, 44:11, 44:17, 46:16, 67:3
leg [7] - 83:10, 84:19, 84:23, 85:2, 85:15
legal [1] - 15:4
less [3] - 12:16, 21:4, 33:5
letting [3] - 30:9, 30:10, 30:12
libido [1] - 71:17
license [16] - 42:11, 42:12, 46:16, 46:19
License [2] - 1:13,

87:21
**licensed** [2] - 33:22, 55:11
**licenses** [1] - 46:12
**life** [15] - 11:22, 12:16, 12:24, 13:9, 13:18, 17:7, 17:10, 18:12, 19:20, 20:17, 34:22, 35:3, 62:14, 77:20, 79:9
**lifetime** [1] - 35:9
**light** [2] - 24:1, 24:14
**lighten** [1] - 63:4
**likely** [1] - 11:17
**limit** [4] - 24:2, 25:22, 26:1, 26:5
**limitations** [3] - 16:16, 19:6
**line** [4] - 50:8, 61:23, 62:12, 62:13
**linens** [1] - 29:21
**Lisa** [2] - 7:1, 51:6
**LISA** [4] - 1:4, 1:7, 3:3, 87:6
**list** [2] - 58:6, 58:15
**listed** [2] - 58:8, 58:16
**listen** [4] - 18:14, 26:13, 26:17, 28:24
**listened** [2] - 42:14, 42:19
**literally** [1] - 21:22
**live** [2] - 30:16, 77:20
**lives** [2] - 37:15, 57:8
**living** [4] - 17:9, 18:10, 19:7, 45:10
**LLC** [1] - 1:23
**location** [4] - 34:3, 34:4, 53:15, 79:22
**log** [1] - 12:22
**long-lasting** [1] - 16:15
**long-term** [1] - 16:18
**look** [11] - 17:22, 17:23, 26:10, 26:11, 39:7, 42:21, 50:17, 50:21, 56:13, 71:14, 80:13
**looked** [1] - 54:22
**looking** [8] - 9:8, 14:23, 15:2, 15:3, 15:5, 15:8, 39:4, 57:22
**lose** [2] - 55:13, 56:1
**loses** [2] - 55:24, 56:6
**losing** [1] - 50:20
**loss** [4] - 40:6, 40:10, 40:12, 53:20
**losses** [3] - 36:25, 38:19, 54:10
**loud** [1] - 80:23

**love** [3] - 9:25, 21:16, 73:8
**lower** [2] - 84:16, 84:17
**LYNN** [2] - 1:11, 87:4

## M

**magistrate's** [1] - 68:25
**mails** [1] - 32:16
**maintaining** [1] - 25:10
**major** [1] - 21:23
**majority** [2] - 4:6, 4:10
**male** [3] - 52:9, 67:10
**man** [5] - 22:17, 70:3, 70:6, 71:12, 73:22
**management** [1] - 86:5
**managing** [1] - 56:16
**March** [1] - 33:18
**marijuana** [1] - 82:20
**marital** [6] - 69:23, 69:25, 71:9, 75:18, 75:22
**mark** [1] - 31:12
**marked** [1] - 3:11
**marriage** [4] - 7:8, 7:15, 7:16, 79:3
**married** [4] - 7:6, 7:10, 7:17, 22:25
**mask** [7] - 44:23, 45:8, 45:12, 45:21, 46:8, 46:14, 46:15
**masks** [3] - 45:5, 45:16, 67:17
**matter** [2] - 54:8, 82:23
**mean** [29] - 8:24, 9:5, 9:9, 11:17, 13:16, 13:24, 15:17, 16:1, 17:22, 21:1, 40:2, 40:12, 40:16, 41:10, 41:18, 41:22, 42:9, 49:15, 53:14, 57:2, 60:9, 60:19, 61:22, 70:2, 70:14, 71:12, 71:13, 72:13
**meaning** [2] - 29:15, 59:3
**means** [1] - 4:22
**medical** [5] - 10:13, 11:20, 13:11, 57:20, 74:12
**medication** [5] - 6:16, 10:23, 11:16, 74:6, 84:13
**medications** [7] - 6:13, 6:21, 74:14,

74:20, 74:22, 84:4, 85:19
**medicine** [1] - 74:17
**meet** [1] - 68:25
**member** [2] - 13:21, 13:25
**memory** [2] - 17:8, 40:7
**men** [1] - 40:3
**mental** [2] - 14:6, 57:21
**mentally** [1] - 19:17
**mention** [1] - 36:21
**mentioned** [12] - 9:9, 11:14, 13:12, 17:12, 26:21, 41:17, 45:18, 46:2, 57:24, 76:6, 76:10, 77:1
**mentioning** [1] - 27:25
**mentions** [1] - 41:17
**merge** [1] - 25:18
**merged** [2] - 25:15, 25:21
**merges** [1] - 25:13
**merging** [3] - 26:4, 68:16, 68:17
**met** [1] - 57:2
**midst** [1] - 45:25
**might** [5] - 35:18, 39:17, 58:21, 71:19, 76:12
**miles** [2] - 77:11, 85:14
**milligrams** [1] - 12:12
**mind** [4] - 16:25, 19:17, 19:20, 60:4
**mine** [1] - 27:12
**minute** [1] - 6:7
**minutes** [14] - 20:1, 43:25, 44:1, 44:4, 52:20, 53:4, 53:7, 53:9, 53:11, 53:13, 53:15, 67:1, 82:18
**missed** [3] - 35:12, 35:15, 53:23
**moments** [1] - 20:6
**Monday** [1] - 1:13, 69:10
**money** [8] - 34:1, 54:13, 54:16, 54:19, 55:13, 55:24, 56:1, 56:6, 56:8
**montelukast** [1] - 6:14
**month** [2] - 38:4, 70:2
**monthly** [1] - 59:9
**months** [3] - 21:7, 37:6, 55:6
**moody** [1] - 81:22
**morning** [8] - 36:20, 54:5, 56:15, 66:7,

67:8, 69:10
**most** [2] - 11:17, 12:20
**mother** [1] - 75:10
**Motrin** [1] - 84:22
**move** [3] - 46:11, 56:19, 70:20
**moved** [2] - 22:3, 46:14
**movements** [1] - 80:17
**moving** [1] - 26:23
**MR** [19] - 28:11, 38:14, 38:24, 39:4, 50:14, 50:16, 50:19, 50:23, 54:24, 64:9, 64:16, 73:18, 78:3, 78:6, 80:5, 83:14, 83:25, 84:1, 84:8
**MS** [18] - 4:3, 38:22, 50:15, 50:17, 50:21, 51:1, 64:11, 64:13, 64:20, 73:19, 78:1, 78:10, 78:14, 80:3, 83:16, 83:24, 84:10, 86:10
**mug** [1] - 47:5
**music** [1] - 26:24

## N

**name** [4] - 4:4, 6:25, 11:7, 52:2
**named** [1] - 58:4
**narcotic** [1] - 84:13
**narcotics** [2] - 84:15, 84:25
**nature** [2] - 30:15, 76:19
**necessary** [2] - 17:17, 22:11
**neck** [1] - 46:10
**need** [11] - 6:3, 6:6, 6:7, 10:23, 11:20, 14:2, 14:17, 34:6, 40:5, 46:15, 74:11
**needed** [5] - 10:24, 12:13, 52:22, 60:10
**negativeness** [1] - 20:19
**nerve** [1] - 9:20
**nerve-racking** [1] - 9:20
**nerves** [1] - 39:2
**nervous** [8] - 15:25, 16:23, 16:24, 25:2, 25:25, 39:3, 39:6
**never** [22] - 17:5, 18:6, 22:24, 23:4, 23:14, 26:22, 35:10, 57:1,

59:21, 59:22, 62:15, 62:18, 66:17, 71:23, 73:5, 73:21, 74:10, 75:9, 75:12, 84:3, 84:20
**new** [8] - 28:8, 31:24, 31:25, 32:2, 32:9, 32:10, 33:1, 57:2
**NEW** [2] - 1:1, 1:24
**New** [4] - 1:12, 2:8, 45:4, 87:5
**next** [10] - 26:18, 30:20, 35:19, 36:16, 54:1, 54:3, 54:5, 62:20, 62:21, 82:16
**nice** [7] - 18:4, 25:4, 26:12, 28:7, 30:6, 47:25, 61:3
**nicely** [1] - 22:8
**Nicola** [1] - 69:20
**night** [40] - 15:6, 16:13, 17:1, 18:4, 19:22, 21:3, 21:19, 22:16, 22:19, 24:5, 24:9, 24:11, 27:12, 27:13, 27:15, 27:16, 27:22, 28:7, 28:24, 29:4, 29:6, 29:8, 36:14, 41:19, 46:23, 47:8, 49:18, 49:23, 52:15, 60:17, 61:5, 66:2, 67:4, 67:18, 69:13, 70:21, 72:8, 72:11, 79:15
**nightmares** [1] - 14:22
**nobody** [1] - 67:16
**noisy** [1] - 80:23
**none** [1] - 25:21
**norm** [2] - 23:6, 23:7
**normal** [2] - 66:16, 84:22
**normally** [2] - 62:13, 85:16
**North** [1] - 2:8
**NORTH** [1] - 1:24
**note** [1] - 80:3
**notes** [2] - 39:11, 77:22
**nothing** [8] - 9:18, 21:20, 24:5, 27:1, 40:23, 61:19, 73:25, 87:8
**notice** [2] - 25:7, 37:4
**noticed** [3] - 71:22, 71:23, 74:10
**number** [3] - 22:23, 32:9, 40:21
**NUMBER** [1] - 3:10
**nystagmus** [1] - 42:16

## O

o'clock [5] - 22:21, 24:17, 24:18, 24:19, 36:20
objection [3] - 78:10, 78:14, 80:3
objections [1] - 5:21
obnoxious [1] - 81:11
observations [8] - 27:2, 70:11, 72:5, 72:6, 79:21, 79:25
obviously [7] - 7:8, 10:8, 32:7, 32:21, 41:19, 51:22, 59:13
occasion [1] - 19:24
occasional [3] - 12:24, 16:19, 23:7
occasions [2] - 79:6, 79:7
occurred [3] - 29:15, 48:25, 52:25
odor [2] - 82:20, 83:3
OF [2] - 1:1, 1:6
offered [1] - 48:2
office [6] - 38:2, 56:13, 56:25, 57:1, 57:10, 68:25
Officer [2] - 42:6, 42:7
officer [24] - 10:6, 15:18, 17:12, 17:20, 24:21, 35:19, 42:15, 42:19, 43:11, 47:21, 61:16, 62:15, 62:17, 62:19, 62:24, 63:25, 66:22, 67:10, 67:13, 67:15, 70:4, 71:6, 76:17
officer's [1] - 60:25
officers [2] - 52:3, 67:15
often [5] - 31:2, 59:1, 59:10, 74:13, 85:9
older [4] - 17:22, 85:7, 85:10
Olive [2] - 28:2, 28:8
once [3] - 12:22, 65:2
one [33] - 5:12, 12:15, 13:9, 18:18, 22:23, 23:17, 25:18, 28:9, 40:17, 41:11, 41:13, 45:20, 45:22, 47:14, 47:21, 48:1, 48:2, 48:10, 49:7, 49:14, 51:4, 55:23, 57:22, 61:10, 64:10, 67:10, 75:6, 77:24, 78:18, 83:10, 83:17, 83:25, 85:15
open [4] - 9:12, 34:1,

34:6, 36:1
open-ended [1] - 9:12
opened [2] - 74:24, 75:10
operate [1] - 78:23
operation [1] - 25:8
opinion [2] - 62:1, 70:24
opportunity [1] - 8:7
order [2] - 45:4, 67:17
orders [1] - 45:17
ordinary [1] - 24:5
organic [1] - 23:11
orthopedic [1] - 86:2
outside [5] - 13:20, 14:12, 32:5, 64:17, 84:5
overheat [1] - 64:4
overlooked [1] - 58:21
overly [1] - 81:24
own [12] - 7:20, 30:23, 31:20, 33:19, 35:5, 35:6, 42:21, 55:21, 56:20, 57:5, 77:14, 78:17
owned [3] - 30:24, 33:16, 33:20

## P

P.C [1] - 2:7
p.m [4] - 1:14, 28:1, 28:10, 86:13
pack [1] - 24:12
PAGE [1] - 3:2
pain [8] - 84:12, 84:16, 84:18, 85:2, 86:5
painkillers [2] - 84:13, 84:21
pandemic [2] - 45:25, 54:14
parents [2] - 34:5, 56:17
part [5] - 15:9, 34:18, 57:2, 69:1, 69:16
part-time [1] - 34:18
partial [1] - 78:23
particular [5] - 31:6, 31:23, 32:3, 85:3, 85:21
parties [1] - 87:12
passenger [2] - 8:17, 10:3
passenger's [1] - 79:19
past [5] - 25:17, 32:1, 32:6, 65:17, 66:18
pay [4] - 34:20, 38:3, 57:6, 57:8
paying [1] - 30:8

Pennsylvania [4] - 2:4, 7:3, 33:20, 48:18
people [11] - 12:20, 31:18, 31:19, 32:4, 33:9, 40:20, 41:5, 41:16, 41:20, 45:24, 59:21
percent [2] - 20:19, 41:8
perfectly [4] - 23:20, 44:15, 61:23, 61:25
performed [1] - 65:3
performing [1] - 43:6
period [6] - 5:7, 31:6, 43:20, 44:3, 60:19, 65:15, 67:23, 70:2, 72:2
permission [2] - 58:12, 58:20
person [8] - 17:14, 20:9, 30:20, 40:18, 59:20, 60:6, 64:1, 82:23
personal [2] - 15:9, 71:12
personally [1] - 56:1
perspiring [1] - 82:14
Ph [1] - 1:25
ph) [1] - 7:18
pharmacy [1] - 76:2
Philly [1] - 23:18
phone [20] - 15:15, 22:5, 22:6, 26:11, 27:24, 28:19, 42:2, 42:6, 42:8, 42:11, 42:20, 42:22, 49:4, 49:7, 49:21, 50:1, 50:4, 61:12, 62:7
physical [9] - 8:25, 14:14, 58:24, 68:4, 78:12, 79:20, 84:11, 84:12, 85:2
physically [3] - 19:4, 85:17, 85:19
physician [2] - 11:12, 58:16
pick [2] - 25:18, 70:19
picked [3] - 25:19, 62:9, 66:21
picture [4] - 16:1, 27:23, 28:15, 28:19
place [4] - 24:9, 28:8, 31:15, 32:20
placed [1] - 21:21
Plaintiffs [2] - 1:6, 2:5
play [1] - 39:9
playing [1] - 38:24, 39:1
plus [1] - 77:12

pocket [1] - 49:21
point [10] - 4:24, 12:12, 22:17, 24:7, 27:2, 44:21, 52:19, 63:17, 65:6, 68:3
police [22] - 15:18, 17:4, 17:20, 35:19, 42:19, 43:11, 45:15, 50:2, 52:17, 61:15, 62:17, 62:18, 63:10, 63:11, 64:24, 65:8, 65:9, 67:10, 70:4, 70:14, 71:6
polite [3] - 15:22, 59:25, 61:4
Popichak [1] - 7:18
possible [2] - 15:22, 38:18
possibly [2] - 32:15, 32:16
posted [1] - 52:22
potential [1] - 41:6
potentially [1] - 80:2
pounding [1] - 18:3
PPP [2] - 54:13, 55:2
prefer [2] - 14:19, 77:13
preparation [1] - 6:11
prepare [1] - 30:13
preparing [3] - 29:19, 29:20, 29:22
prescribed [6] - 10:23, 11:15, 13:5, 58:1, 84:5, 84:24
prescription [5] - 12:9, 12:11, 12:21, 13:9, 60:9
prescriptions [1] - 13:2
present [2] - 73:12, 73:13
PRESENT [1] - 2:12
pressure [1] - 6:19
presumably [1] - 79:5
pretty [15] - 27:20, 29:5, 29:6, 29:12, 30:3, 35:1, 37:17, 43:10, 57:11, 59:20, 67:23, 70:3, 71:25, 74:15, 85:20
prevent [3] - 18:9, 19:19, 20:6
pride [1] - 70:11
procedure [1] - 66:16
proceeding [2] - 4:24, 5:18
professional [8] - 13:19, 14:3, 14:6, 14:10, 60:2, 60:7, 72:19, 72:20

profitable [1] - 33:25
profits [1] - 34:3
proof [1] - 41:9
properly [1] - 25:11
properties [1] - 32:11
property [4] - 30:22, 32:10, 32:12, 32:18
protocol [1] - 17:19
prove [1] - 15:11
provide [1] - 18:19
providers [1] - 57:21
providing [1] - 81:19
proximity [1] - 78:12
psychiatrist [2] - 10:17, 13:15
psychological [4] - 57:24, 58:17, 58:25, 59:2
psychologist [3] - 10:17, 13:14, 72:6
public [2] - 69:4, 69:15
pull [3] - 14:17, 28:1, 51:2
pulled [20] - 8:15, 9:19, 16:7, 16:8, 23:22, 23:23, 24:6, 25:6, 26:7, 27:4, 27:23, 43:22, 44:8, 44:12, 46:20, 52:25, 62:14, 62:15, 79:16
pulls [1] - 84:22
puppy [4] - 9:25, 16:3, 21:24
purse [4] - 9:18, 15:16, 61:13, 62:7
put [22] - 19:20, 21:8, 22:24, 23:4, 23:14, 29:21, 32:10, 36:3, 42:2, 42:6, 42:8, 42:10, 42:20, 43:8, 46:8, 46:15, 61:12, 64:18, 66:3, 70:14, 72:15
puts [1] - 16:25
putting [3] - 21:17, 46:14, 48:10

## Q

Quakertown [3] - 7:3, 24:10, 69:12
qualify [4] - 54:17, 54:19, 55:2, 55:3
quarterlies [1] - 37:23
questions [12] - 5:6, 5:12, 5:20, 9:7, 9:13, 10:10, 11:20, 16:14, 51:7, 81:4, 83:15, 86:10

quickly [1] - 46:13
quite [1] - 35:17

# R

racial [2] - 60:23, 61:6
racing [1] - 20:24
racking [1] - 9:20
radio [1] - 26:14
ramble [1] - 80:25
rate [2] - 78:23, 76:24
re [1] - 48:20
re-routes [1] - 48:20
read [4] - 26:11,
51:14, 51:15, 51:17
ready [1] - 78:19
real [3] - 34:15, 34:16,
34:21
realize [2] - 58:18,
58:20
really [21] - 14:18,
15:1, 18:5, 21:13,
21:18, 28:4, 29:3,
35:20, 37:4, 40:4,
55:12, 56:25, 57:4,
58:2, 59:24, 60:8,
61:16, 61:18, 70:21,
74:13, 85:16
reason [14] - 6:3, 9:24,
10:2, 11:18, 15:14,
35:9, 52:11, 58:3,
58:6, 62:1, 62:9,
66:4, 67:20, 71:3
reasons [1] - 45:21
receive [1] - 55:9,
68:11, 75:4
recently [1] - 12:17
recess [1] - 64:12
recollection [4] -
14:18, 37:10, 39:18,
67:6
record [7] - 5:2, 6:25,
13:2, 13:11, 42:14,
48:22, 80:4
recordkeeping [1] -
38:7
records [11] - 13:8,
31:22, 37:9, 39:21,
39:23, 40:5, 40:6,
41:4, 58:9, 58:20,
74:12
red [1] - 24:1
refer [1] - 56:7
referred [2] - 54:14,
56:10
referring [1] - 73:2
refers [1] - 56:5
refills [1] - 11:21
reflect [1] - 12:4
refresh [1] - 14:18

regard [1] - 75:17
regarding [1] - 75:21
regulations [1] - 32:6
relationship [7] -
69:24, 69:25, 70:9,
71:10, 71:25, 75:19,
75:22
relative [2] - 87:10,
87:13
released [3] - 65:7,
66:9, 67:22
remember [8] - 12:1,
18:5, 20:14, 26:8,
29:22, 32:19, 51:7,
67:7
remembering [2] -
72:10, 82:9
remind [2] - 4:25,
25:25
reminds [1] - 17:14
remove [3] - 9:24,
15:15, 22:7
removed [2] - 9:23,
61:11
renovating [2] - 34:13,
35:4
rent [12] - 16:22, 31:1,
31:2, 31:7, 31:14,
31:15, 31:19, 32:21,
33:4, 33:5, 34:12
rental [1] - 33:3
rented [2] - 30:24,
32:20
renting [2] - 30:22,
32:25
rents [3] - 50:12,
50:16, 50:24
reorganize [1] - 34:22
repeat [3] - 18:22,
75:20, 81:6
rephrase [1] - 5:15
report [3] - 10:25,
54:1, 54:3
Reporter [1] - 1:12,
87:4, 87:20
reporter [2] - 5:19,
18:17
REPORTERS [1] -
1:23
REPORTING [1] - 1:23
represent [2] - 36:17,
56:4
reputation [3] - 40:23,
41:14, 41:20
requests [1] - 33:7
residual [1] - 59:10
respect [1] - 62:17
respectful [3] - 10:6,
17:3, 59:25
respond [1] - 81:4

responded [1] - 12:9
response [2] - 4:23
responses [3] - 4:21,
5:21, 51:15
responsible [1] -
56:17
rest [1] - 12:25
restaurant [3] - 28:2,
28:9
result [24] - 7:24, 8:5,
8:9, 8:23, 11:1,
11:15, 13:22, 14:7,
14:20, 16:16, 18:24,
19:1, 19:13, 35:13,
37:1, 40:10, 53:21,
53:23, 54:11, 55:16,
55:18, 56:11, 65:13,
68:8
results [2] - 65:19,
66:6
retired [5] - 12:17,
33:15, 34:9, 34:11,
35:1
returns [1] - 37:23
review [5] - 6:10, 33:6,
39:23
ride [4] - 26:13, 30:1,
36:23, 84:17
rides [2] - 77:14,
85:13
riding [5] - 84:19,
84:23, 85:3, 85:7,
85:11
rights [3] - 8:13,
15:10, 75:14
rings [3] - 38:25, 39:1,
39:9
risk [1] - 45:14
road [15] - 21:23, 22:3,
23:25, 24:15, 25:13,
25:18, 25:20, 26:4,
43:13, 47:15, 49:1,
52:24, 61:24, 63:7,
68:17
Road [1] - 7:3
roll [1] - 46:12
rolled [2] - 45:6, 45:12
room [3] - 4:7, 63:20,
64:1
route [1] - 48:17
routes [2] - 48:20,
48:21
routine [4] - 18:13,
20:18, 29:13, 49:19
rude [1] - 5:1
run [3] - 41:17, 46:18,
55:20
running [2] - 10:1,
35:23

# S

S-C-H-O-E-N-B-E-R-
G-E-R [1] - 11:8
sadness [1] - 20:7
sarcastic [1] - 63:3
Saucon [1] - 75:2
saw [8] - 16:1, 43:3,
66:19, 67:16, 68:2,
70:25
scared [3] - 17:4,
17:5, 66:12
scary [2] - 67:23,
72:11
scenarios [1] - 41:11
scene [5] - 18:1,
43:17, 43:21, 44:18,
66:19
schedule [1] - 33:4
scheduled [1] - 69:9
schedules [2] - 26:18,
49:19
Schoenberger [1] -
11:6
school [4] - 20:11,
74:23, 75:1
script [2] - 12:15,
74:13
search [4] - 9:24,
15:4, 15:13, 22:4
searched [1] - 9:17
searching [1] - 62:8
season [1] - 6:16
seat [3] - 8:17, 24:4,
79:19
second [4] - 7:16,
51:4, 64:10, 77:24
secretary [1] - 57:3
secretary's [1] - 57:9
see [26] - 10:5, 23:24,
27:15, 28:2, 28:4,
36:9, 41:25, 42:5,
42:21, 43:1, 46:21,
56:19, 57:23, 58:14,
61:3, 63:18, 63:21,
78:21, 79:9, 80:6,
83:6, 83:10, 85:12,
85:17, 86:2, 86:5
seeing [2] - 41:3, 49:1
seizure [2] - 15:4,
15:13
self [3] - 73:17, 73:20,
73:24
sell [1] - 34:13
seltzer [1] - 23:10
sense [2] - 33:25, 34:7
separate [3] - 7:20,
28:24, 32:9
series [1] - 51:7
serve [1] - 24:21

service [1] - 57:20
services [2] - 55:10,
57:21
set [3] - 31:9, 31:11,
57:11
seven [2] - 31:4
several [2] - 32:11,
79:6
sex [1] - 73:3
sexual [1] - 71:25
shaking [1] - 22:9
shame [1] - 47:13
shape [3] - 76:23,
83:6, 85:16
shared [2] - 24:23,
48:8
sheets [1] - 29:21
shock [4] - 23:24,
43:7, 43:9, 43:16
shocked [2] - 23:22,
43:15
shocking [1] - 61:1
shook [1] - 70:3
shore [3] - 19:8, 69:6,
77:8
shot [1] - 47:5
show [3] - 26:15, 44:4,
55:23
showed [1] - 30:5
shower [1] - 78:18
showering [1] - 78:19
side [7] - 28:17, 45:6,
46:17, 47:14, 63:7,
74:8, 74:14
sign [1] - 51:13
signed [2] - 51:14,
51:17
signs [4] - 79:8, 80:1,
80:2, 83:6
simple [1] - 62:5
simply [1] - 4:25
sing [1] - 26:25
single [2] - 25:13,
25:14
Singulair [1] - 6:15
sit [3] - 16:4, 48:23,
66:24
site [1] - 62:5
sitting [6] - 18:2, 18:3,
20:23, 65:24, 66:6,
69:2, 79:19, 82:16
situation [5] - 13:24,
37:8, 38:18, 63:5,
67:18
six [1] - 31:4
skiing [1] - 76:25
sleep [2] - 26:22,
28:23, 67:13
slight [2] - 37:10, 38:9
slightly [1] - 37:5

slow [3] - 26:4, 81:2, 81:4
slower [1] - 26:5
slurred [1] - 80:21
slurring [1] - 43:13
small [3] - 33:21, 63:2, 76:20
SMITH [2] - 1:11, 87:4
smoke [2] - 74:15, 84:3
sobriety [1] - 41:25
social [3] - 10:16, 13:15, 77:16
socialization [1] - 69:23
Society [1] - 53:17
soft [1] - 10:6
someone [4] - 20:10, 41:9, 43:12, 48:6
sometimes [4] - 24:1, 26:25, 73:14, 73:15, 74:10, 74:11
songs [2] - 26:14, 26:25
sore [2] - 84:20, 85:13
sorry [4] - 38:16, 51:6, 57:22, 71:2
sort [1] - 5:14
Sotheby's [1] - 34:17
sound [2] - 19:19, 28:14
sounds [1] - 5:11
space [3] - 50:12, 50:16, 50:24
speaking [1] - 47:13
specialist [1] - 13:14
specialists [1] - 86:5
specific [5] - 14:15, 14:19, 39:18, 40:9, 47:24
specifically [5] - 8:9, 8:22, 9:14, 10:25, 37:20
specifics [1] - 36:24
speech [1] - 80:21
speed [5] - 24:2, 25:22, 26:1, 26:4, 26:5
speeding [1] - 26:3
spell [1] - 11:7
spoken [4] - 4:21, 10:6
stagger [1] - 81:15
stamps [1] - 44:5
stand [2] - 81:17, 85:15
standing [7] - 43:10, 43:12, 45:8, 61:25, 76:24, 83:10, 85:18
stare [1] - 80:13

State [3] - 1:12, 45:3, 87:5
state [1] - 45:10
statements [2] - 37:17, 81:8
STATES [1] - 1:1
station [11] - 26:14, 45:16, 50:2, 52:17, 63:10, 63:11, 63:13, 63:15, 64:25, 65:8, 65:9
stay [5] - 23:12, 30:8, 34:1, 34:6
stayed [2] - 69:9
staying [1] - 44:11
stays [1] - 30:20
steady [2] - 35:2, 43:10
sticks [1] - 60:13
stigmatizes [1] - 60:18
still [13] - 12:14, 16:3, 16:5, 19:8, 24:14, 32:25, 36:19, 65:8, 65:20, 77:15, 77:19
stood [1] - 63:7
stop [3] - 10:9, 16:13, 20:13
stops [2] - 20:12, 44:19
straight [4] - 43:12, 61:23, 62:1, 81:17
strapped [1] - 70:15
streamline [1] - 8:8
street [1] - 22:2
Street [2] - 2:3, 33:21
STREET [1] - 1:24
stress [2] - 11:22, 12:25
stressful [3] - 12:17, 36:13, 36:15
strict [1] - 32:5
strike [2] - 75:25, 83:20
stuck [2] - 30:3, 49:22
students [2] - 33:22, 56:16
stuff [2] - 38:21, 38:22
stumble [1] - 81:15
stumbling [1] - 83:9
style [1] - 9:12
substance [2] - 78:22, 82:21
suffer [2] - 55:4, 55:18
suffering [2] - 85:22, 85:24
Suite [2] - 2:8
SUITE [1] - 1:24
summer [3] - 31:3, 31:4, 85:4

Sunday [1] - 28:13
supposed [1] - 60:23
surgery [2] - 27:18, 76:8
suspected [1] - 47:18
sustain [2] - 58:24, 68:4
sustained [7] - 14:7, 14:16, 15:11, 38:25, 38:19, 54:11, 57:25
Swamp [1] - 7:3
sway [1] - 81:15
swerving [1] - 25:20
swimming [2] - 25:1, 25:3
swims [1] - 25:1
sworn [2] - 4:2, 87:7

**T**

TAKEN [1] - 1:11
tape [1] - 76:6
tarnished [2] - 40:23, 41:15
teachers [1] - 20:13
teeth [1] - 82:12
term [1] - 16:18
terms [1] - 38:19
test [6] - 42:16, 42:25, 47:10, 65:13, 83:19
testified [12] - 4:2, 14:21, 28:25, 30:14, 35:11, 39:14, 72:22, 74:7, 78:24, 79:1, 82:17, 84:5
testify [6] - 6:22, 8:7, 39:16, 57:25, 87:7
testimony [6] - 11:16, 16:17, 44:6, 48:9, 71:2, 71:5
TESTIMONY [1] - 1:6
tests [4] - 41:25, 43:6, 77:5
text [1] - 49:20
THE [2] - 1:1, 86:12
therapist [2] - 10:16, 13:15
therefore [1] - 5:22
thick [1] - 80:21
thinking [3] - 18:2, 20:25, 46:13
thorough [1] - 6:6
threatened [1] - 15:21
three [3] - 6:17, 25:17, 31:19
throughout [1] - 56:19
thyroid [1] - 74:17
ticket [2] - 61:9, 69:2
tip [1] - 76:23
tip-top [1] - 76:23

tired [1] - 44:15
today [6] - 4:11, 6:11, 6:22, 35:8, 48:23, 55:19
together [6] - 7:13, 49:7, 77:7, 77:15, 77:16
tomorrow [2] - 21:2, 67:11
tone [1] - 61:8
took [6] - 43:15, 55:13, 65:10, 74:7, 78:17
top [7] - 16:7, 17:21, 17:25, 34:19, 40:8, 76:23
total [4] - 38:4, 43:16, 43:21
totally [2] - 17:5, 70:21
tough [1] - 41:12
towards [4] - 9:21, 15:23, 60:24, 62:18
towels [1] - 29:21
traffic [2] - 47:7, 68:11
transaction [1] - 43:3
transcript [1] - 5:20
traumatic [9] - 8:3, 9:1, 9:3, 10:7, 17:1, 20:21, 20:25, 59:23, 72:11
traveling [1] - 20:18
travels [1] - 23:18
treat [5] - 59:19, 63:6, 68:7, 72:19, 72:20
treated [11] - 14:2, 19:25, 20:3, 20:4, 20:8, 20:22, 60:4, 61:2, 62:16, 70:25
treating [2] - 58:16, 62:24
treatment [6] - 10:14, 17:25, 57:23, 70:22, 71:4, 72:8
tremors [1] - 80:16
tried [1] - 59:24
tries [2] - 23:12, 70:19, 85:8
trigger [2] - 19:18, 20:17
triggers [1] - 17:11
triple [1] - 22:23
tripled [1] - 34:2
TROOPER [1] - 1:8
trooper [4] - 43:23, 44:22, 52:8, 52:9
Trooper [15] - 25:6, 42:1, 44:22, 51:9, 51:10, 51:21, 51:23, 52:5, 52:25, 62:23, 63:12, 79:15, 79:18,

79:21
trouble [3] - 27:15, 44:10, 49:1
truck [7] - 9:24, 10:1, 16:1, 42:25, 43:8, 46:20, 84:3
trucks [1] - 21:24
true [3] - 52:15, 52:16, 68:9
truth [3] - 87:7, 87:8
truthfully [5] - 5:24, 6:23, 51:18
try [3] - 23:12, 60:2, 77:20
trying [6] - 5:1, 9:21, 15:22, 59:9, 61:18, 62:10
turned [2] - 43:7, 64:7
twitching [1] - 80:16
two [3] - 23:3, 23:5, 25:16, 25:17, 35:12, 52:3, 55:6, 67:16, 79:11
type [11] - 10:13, 12:6, 13:13, 14:15, 18:7, 33:9, 39:21, 41:11, 48:5, 50:6, 52:18
types [2] - 37:12, 37:19

**U**

um-hum [1] - 85:6
uncontrolled [1] - 80:17
under [6] - 21:21, 31:24, 45:4, 55:25, 58:19
undergo [1] - 10:13
understood [1] - 80:5
uneasiness [1] - 62:19
unfortunate [1] - 17:16
UNITED [1] - 1:1
unlawful [3] - 15:4, 15:13, 70:22
unless [2] - 32:7, 48:19
unnecessary [2] - 21:18, 70:22
unsure [1] - 73:23
unusual [4] - 25:7, 36:6, 36:8, 82:5
unusually [1] - 81:2
up [32] - 14:17, 20:19, 22:4, 24:2, 24:13, 27:23, 28:1, 29:10, 29:11, 36:1, 38:4, 38:5, 41:18, 45:11,

10

45:24, 51:2, 54:8, 56:15, 60:3, 61:7, 63:4, 65:19, 66:21, 68:22, 69:2, 70:3, 70:19, 72:10, 75:10, 76:20, 81:17
**upcoming** [1] – 26:19
**upset** [2] – 12:19, 35:17
**upsetting** [6] – 16:11, 18:1, 19:23, 35:21, 43:16, 45:13

## V

**vague** [1] – 19:15
**Valley** [1] – 75:2
**vehicle** [16] – 8:18, 15:15, 15:16, 22:4, 22:24, 23:5, 23:14, 25:8, 41:24, 42:23, 42:24, 46:15, 46:17, 62:7, 78:23, 82:21, 83:4
**vehicles** [1] – 26:23
**verbal** [1] – 4:21
**VIA** [1] – 1:11
**Viagra** [5] – 72:23, 72:24, 74:7, 74:18
**VICINAGE** [1] – 1:2
**video** [7] – 10:5, 17:2, 44:4, 46:21, 61:3, 76:7, 76:10
**VIDEOCONFERENC E** [1] – 1:11
**VIDEOGRAPHERS** [1] – 1:23
**videotape** [1] – 42:17
**violated** [5] – 9:10, 15:21, 17:7, 20:2, 61:15
**violating** [1] – 9:20
**violations** [1] – 8:13
**visible** [1] – 83:7
**vision** [1] – 27:12
**visit** [1] – 12:2
**vomiting** [1] – 82:12
**vouch** [1] – 57:1
**Vrbo** [5] – 31:22, 31:24, 32:10, 32:13, 33:6
**vs** [1] – 1:7

## W

**wage** [1] – 53:20
**wages** [4] – 37:5, 38:10, 38:17, 39:14
**wait** [2] – 18:14, 77:23
**waited** [1] – 69:15

**walk** [4] – 29:25, 61:23, 64:24, 82:5
**walked** [2] – 30:4, 61:23
**walking** [1] – 77:13
**warm** [1] – 21:9
**watch** [1] – 57:15
**watching** [1] – 23:25
**water** [1] – 23:10
**watery** [1] – 80:7
**Waze** [2] – 48:19, 48:20
**wear** [2] – 22:23, 45:5
**wearing** [1] – 44:23
**week** [5] – 26:19, 31:15, 31:17, 31:19, 32:23
**weekend** [8] – 25:4, 27:21, 31:12, 32:22, 84:19, 85:3, 85:4, 85:11
**weekends** [1] – 31:7
**weeks** [4] – 7:11, 21:6, 31:4, 35:12
**wherein** [1] – 49:13
**whole** [12] – 12:16, 32:2, 38:20, 43:3, 61:21, 62:3, 63:21, 67:18, 74:2, 87:7
**wife** [1] – 26:20
**window** [7] – 45:6, 45:12, 46:12, 61:7, 63:19, 63:21, 63:25
**wine** [2] – 23:7, 79:12
**WITNESS** [2] – 3:2, 86:12
**woman** [1] – 70:12
**wood** [1] – 84:16
**WOODBURY** [1] – 1:24
**word** [1] – 73:17
**WORD** [2] – 1:23
**words** [2] – 43:14, 63:8
**worker** [2] – 10:17, 13:15
**works** [2] – 50:14, 50:23
**worried** [1] – 66:14
**wow** [4] – 20:7, 59:18, 60:21
**write** [1] – 57:9
**writing** [4] – 12:6, 38:21, 38:22, 39:10

## X

**Xanax** [6] – 12:12, 13:3, 13:5, 13:9, 58:1

**XIO1520** [2] – 1:13, 87:21

## Y

**yard** [1] – 30:15
**year** [20] – 6:15, 12:16, 12:22, 24:18, 33:18, 34:21, 37:3, 37:10, 37:16, 37:23, 38:5, 57:3, 59:5, 59:12, 59:15, 59:17, 60:15, 60:19, 60:21, 85:5
**year-end** [2] – 37:16, 37:23
**yearly** [1] – 77:5
**years** [16] – 7:11, 7:12, 11:13, 12:3, 21:4, 21:5, 23:1, 31:10, 33:16, 34:17, 34:18, 44:2, 49:11, 53:8, 77:18
**yesterday** [1] – 21:1
**young** [4] – 16:3, 17:23, 21:24, 50:17
**younger** [1] – 50:21
**yourself** [2] – 22:13, 42:17

## Z

**ZELECHIWSKY** [6] – 1:4, 1:5, 1:7, 2:13, 3:3, 87:6
**Zelechiwsky** [5] – 4:4, 7:1, 27:4, 51:3, 51:6
**zero** [1] – 68:3

# EXHIBIT "F"

Page 1

1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
2                      VICINAGE OF CAMDEN
3
4       BOHDAN J. ZELECHIWSKY and    : NO.
        LISA A. ZELECHIWSKY,         : 22-cv-04994-CPO-AMD
5                    Plaintiffs      :
                                     :
6                  vs.               :
                                     :
7       TROOPER ASHLEY DAVIS and     :
        TROOPER JOHN DOE,            :
8                    Defendants      :
9

          ZOOM DEPOSITION OF TROOPER ASHLEY DAVIS
10

11                 Taken via Zoom on Tuesday,
12      February 20, 2024, commencing at 10:05 a.m. before
13      Gina L. Clements, Registered Professional Reporter.
14
        APPEARANCES:
15
16           KAROLY LAW FIRM, LLC
             By:  JOSHUA KAROLY, ESQ.
17           527 Hamilton Street
             Allentown, PA  18101-1511
18           (610) 437-1252
             J.Karoly@karolyfirm.com
19            -- For the Plaintiffs
20
21                        * * *
                  VERITEXT LEGAL SOLUTIONS
22                    Mid-Atlantic Region
                 5100 Tilghman Street, Suite 205
23                    Allentown, PA 18104
24
25

**Page 2**

```
 1
 2     APPEARANCES (Continued):
 3
 4     DEPUTY ATTORNEY GENERAL
       By: AZEEM M. CHAUDRY, ESQ.
 5         Deputy Attorney General
           Appeals Section, Litigation Practice Group
 6         New Jersey Office of Attorney General
           Division of Law
 7         124 Halsey Street, 5th Floor
           Newark, NJ  07101
 8         Azeem.Chaudry@law.njoag.gov
           -- For the Defendants
 9
10     ALSO PRESENT:
11
           Bohdan Zelechiwsky
12
13
14
15
16
17
18
19
20
                    * * *
21     VERITEXT LEGAL SOLUTIONS
           Mid-Atlantic Region
22     5100 Tilghman Street, Suite 205
           Allentown, PA 18104
23
24
25
```

**Page 3**

```
 1          INDEX TO WITNESSES
 2
 3
       WITNESS                        PAGE
 4
 5     TROOPER ASHLEY DAVIS
 6
          By Mr. Karoly           7, 126
 7
 8        By Mr. Chaudry             90
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          THE COURT REPORTER:  The attorneys
 2     participating in this deposition acknowledge that I
 3     am not physically present in the deposition room and
 4     that I will be reporting this deposition remotely.
 5          They further acknowledge that, in
 6     lieu of an oath administered in person, I will
 7     administer the oath remotely.  The parties and their
 8     counsel consent to this arrangement and waive any
 9     objections to this manner of reporting.
10          Please indicate your consent by
11     stating your name and agreement on the record.
12          MR. KAROLY:  Joshua Karoly for
13     plaintiffs, Bohdan Zelechiwsky and Lisa Zelechiwsky,
14     and I agree.
15          MR. CHAUDRY:  Azeem Chaudry, deputy
16     attorney general on behalf of defendant, Trooper
17     Ashley Davis, and I consent.
18          TROOPER ASHLEY DAVIS, having been
19     duly sworn, was examined and testified as follows:
20          MR. KAROLY:  And, Azeem, standard
21     stipulations?
22          MR. CHAUDRY:  With respect to?
23          MR. KAROLY:  All objections except
24     as to form are reserved for the time of trial, we
25     waive the presence of the court stenographer for any
```

**Page 5**

```
 1     use of the transcript at any further court
 2     proceeding.  And Trooper Ashley Davis waives and
 3     reads a signing of a copy of the transcript.
 4          MR. CHAUDRY:  Yes, we'll talk
 5     about -- I mean we don't -- I don't think we do
 6     that in Jersey.  I've never done that in a
 7     deposition for the standard stipulations.
 8          MR. KAROLY:  All right.  Well, how
 9     do you intend on handling any objections regarding
10     questions asked in the deposition?
11          MR. CHAUDRY:  So we usually -- you
12     can just object to the form of the question, right.
13     Your objection will be noted unless you're asked by
14     the party who is conducting depositions.
15          So if I object to you, I would say
16     objection to form.  Unless you actually ask me for
17     the grounds, there's no talking objections.
18          MR. KAROLY:  Yes, that's what
19     I said, Azeem.  That was the first of the standard
20     stipulations.
21          But that's -- those are the three
22     standard ones I've used in federal civil rights
23     cases for, you know, the last, you know, 17 years.
24          So I guess the first agreement is
25     that, yes, you agree that you'll only raise
```

2 (Pages 2 - 5)

Page 6

1  objections to the form, correct?
2          MR. CHAUDRY:  Right.
3          MR. KAROLY:  And would you waive a
4  reading and signing from Trooper Davis or would she
5  like to read and sign the transcript?
6          MR. CHAUDRY:  That's fine, she
7  can -- I mean we'll just get the transcript.
8          I mean this is usually how it goes
9  for here.  Just no talking objections.  We go by the
10 court rules.
11         MR. KAROLY:  And would you agree
12 to waive the presence of the court stenographer at
13 any later court proceeding to not require her to
14 come to authenticate the transcript?
15         MR. CHAUDRY:  I mean I can make
16 that -- we'll make that determination after the
17 fact.
18         MR. KAROLY:  It's either a yes
19 or a no, Azeem.  It's either, hey, if we're going
20 to use this transcript at a trial of Trooper Ashley
21 Davis, Gina either has to come in and say, yes,
22 this is an authentic copy of the transcript or you
23 standardly agree here today that the transcript
24 that we receive from Gina will be permitted to be
25 utilized at a later time in later court proceedings.

Page 7

1          MR. CHAUDRY:  Okay, that's fine.
2          MR. KAROLY:  Okay.
3          * * *
4          EXAMINATION
5  BY MR. KAROLY:
6  Q.      All right.  Trooper Davis, good morning.
7  My name is Joshua Karoly.  As you may know, I
8  represent Bohdan and Lisa Zelechiwsky in a complaint
9  that's been filed against you, as well as Trooper
10 John Doe in the United States District Court for
11 the District of New Jersey, Camden Division.  That
12 docket is 1:22-CV-04994.
13         Trooper Davis, obviously you've
14 seen this complaint, correct?
15 A.      Yes, sir.
16 Q.      And have you reviewed the complaint in
17 its entirety?
18 A.      Yes, sir.
19 Q.      And you understand that you are here
20 today to answer questions regarding the facts and
21 circumstances raised in the multi-counts within that
22 complaint, correct?
23 A.      Yes, sir.
24 Q.      Now, in order for this deposition to go
25 more smoothly, I am going to provide you with some

Page 8

1  instructions that I request that you follow so that
2  we don't have any issues with the court reporter or
3  the recording of this deposition.
4          Do you understand that?
5  A.      Yes, sir.
6  Q.      The first instruction is that all of
7  your answers must be oral in nature.  That is to say
8  that a shake or a nod of the head, while acceptable
9  in normal conversation, will not be recorded on the
10 stenographic record, so all of your answers must be
11 verbal.
12         Do you understand that?
13 A.      Yes, sir.
14 Q.      The second is that there is a
15 stenographer that is taking down all of the
16 questions that I ask and all of the answers that
17 you give.
18         She has two hands, but that doesn't
19 mean one hand for me and one hand for you.  So I ask
20 that you please allow me to complete the question
21 even though you may anticipate where it is that my
22 question is going.  Please allow me to complete the
23 question before you provide your answer.
24         Do you understand that?
25 A.      Yes, sir.

Page 9

1  Q.      Also, if you do not understand any
2  question that I ask or you'd like me to rephrase it
3  or explain it, all you have to do is request that
4  and I'll do my best to make sure that you understand
5  the complete question that is asked.
6          Do you understand?
7  A.      Yes.
8  Q.      Now, today is the day for your
9  deposition, and we are going to get into the facts
10 and circumstances surrounding this event.  So I ask
11 that you make sure that you provide full, complete
12 and honest answers to all of the questions that I
13 ask.
14         And if you should at a later time
15 in this deposition something would trigger with you
16 that would allow one of your answers to not be fully
17 complete, I ask that you please let me know before
18 the end of the deposition if you'd like to correct
19 anything else that you've said in any prior answer.
20         Do you understand that?
21 A.      Yes, sir.
22 Q.      So at the end of this deposition it's
23 going to be agreed upon and understood that all of
24 the answers to your questions, unless corrected by
25 the end of this deposition, are full, complete and

3 (Pages 6 - 9)

Page 10

1    accurate responses to my questions.
2        Okay?
3    A.    Yes, sir.
4    Q.    Now this is not a war of attrition. I
5    don't anticipate that this is going to be an all
6    day affair. If you would like to take a break for
7    convenience for the bathroom or to get a drink of
8    water, as long as a question is not lingering out
9    there to be answered, please just let me know and
10   I'll be happy to give you a break for convenience.
11   A.    Yes, sir.
12   Q.    Are you under the influence of any drugs
13   or alcohol at this time?
14   A.    No, sir.
15   Q.    Are you under the influence of any
16   medications that would not permit you to understand
17   the questions that I ask and provide full, complete
18   and accurate answers to the questions?
19   A.    No, sir.
20   Q.    Is there any other reason that I haven't
21   touched upon in these instructions that you'd like
22   to raise right now with counsel?
23   A.    No, sir.
24   Q.    And you're able to go forward with the
25   deposition today?

Page 11

1    A.    Yes, sir.
2    Q.    All right. Please state your name,
3    spell your last name, and please provide me with
4    your business or occupation.
5    A.    Trooper Davis, Trooper Ashley Davis,
6    D-A-V-I-S, New Jersey State Trooper for New Jersey
7    State Police.
8    Q.    And, Trooper Davis, if I could ask you
9    please -- and I apologize, I'm a little bit under
10   the weather. I have a bit of a cold as you can
11   tell. My voice is a little nasally.
12       Could you please direct the camera
13   down so we could see your mouth as you answer the
14   questions. It might be easier for the stenographer
15   to be able to take down your answers.
16       Thank you.
17   A.    Is that better?
18   Q.    It is. Thank you.
19       Trooper Davis, will you please tell
20   me how long you've been employed as a trooper for
21   the New Jersey State Police.
22   A.    For five years and seven months.
23   Q.    And where did you receive your training?
24   A.    From New Jersey State Police, at Sea
25   Girt Academy training.

Page 12

1    Q.    Okay. And did you pass the academy on
2    your first occasion?
3    A.    Yes, sir.
4    Q.    And did you have any other law
5    enforcement employment prior to being employed by
6    the New Jersey State Police?
7    A.    Yes, sir.
8    Q.    Can you please tell us about that.
9    A.    Prior to the state police I worked for
10   the Cumberland County sheriff's department for
11   approximately one year.
12   Q.    Okay. Can you kindly tell me, Trooper
13   Davis, where did you graduate high school and in
14   what year?
15   A.    Graduated from Bridgeton High School,
16   2003.
17   Q.    And did you do any post-high school
18   education?
19   A.    Yes, sir.
20   Q.    Tell us about that.
21   A.    I went to Seton Hall University.
22   Q.    How many years and did you graduate and
23   in what field?
24   A.    Four years, graduated. Criminal justice
25   bachelors degree.

Page 13

1    Q.    A bachelor of arts degree in criminal
2    justice; is that correct?
3    A.    Yes, sir.
4    Q.    And what year did you graduate?
5    A.    2009.
6    Q.    And following your graduation from Seton
7    Hall University did you go to any further school or
8    did you seek employment?
9    A.    Seek employment.
10   Q.    All right. Tell us post-graduation what
11   jobs you held.
12   A.    I worked for Kintock, which is a halfway
13   house in Bridgeton, New Jersey. And then I went
14   to work for the New Jersey Transit police as a
15   civilian.
16   Q.    Okay. So let me ask you about your
17   employment with the halfway house.
18       What years were you employed there?
19   A.    From 2008 to 2010, I believe.
20   Q.    And what was your reason for leaving
21   that employment?
22   A.    I was terminated.
23   Q.    And for what reason?
24   A.    For a horseplay incident.
25   Q.    I'm sorry, Trooper, can you say that

4 (Pages 10 - 13)

Page 14

1 again, please.
2 A.      A horseplay incident with the whole
3 shift. The whole second shift was terminated for
4 a horseplay incident.
5 Q.      So at your halfway house employment
6 you were terminated for what you call a horseplay
7 incident, meaning, I guess what your employment
8 would call misbehavior, correct?
9 A.      Correct.
10 Q.      All right. And can you please tell us
11 what the allegations were for the reason for your
12 termination?
13 A.      The employees were playing -- were
14 wrestling with each other.
15 Q.      Okay. And did you honestly tell the
16 truth when it was inquired about you what occurred?
17         MR. CHAUDRY: Objection to the form
18 of the question.
19         You can answer.
20 A.      Yes, sir.
21 Q.      And then you were -- there was no
22 progressive discipline, you were just terminated?
23         MR. CHAUDRY: Objection to the form
24 of the question.
25         You can answer.

Page 15

1 A.      Yes, sir.
2 Q.      Were you disciplined in any way, shape
3 or form by your employment prior to your termination
4 for the horseplay incident?
5 A.      Not that I can recall.
6 Q.      Okay. And following your termination
7 where was your next employment?
8 A.      For the New Jersey Transit police
9 department.
10 Q.      Okay. And at your halfway house is
11 it fair to say that you didn't receive any law
12 enforcement training while employed there, correct?
13 A.      I would disagree.
14 Q.      Okay. Well, then I guess we'll go into
15 that.
16         At the halfway house can you tell
17 me what law enforcement training you received during
18 that employment.
19 A.      We were in charge with overseeing the
20 inmates that would transition there from the prison
21 back into civilian life.
22 Q.      All right. And what classes did you
23 take or what courses did you graduate from that
24 gave you training in law enforcement during that
25 employment?

Page 16

1 A.      I didn't have any courses or training
2 for law enforcement for that job.
3 Q.      Okay.
4 A.      We just gave --
5 Q.      What was --
6 A.      -- our experience. No training toward
7 law enforcement.
8 Q.      On-the-job training dealing with
9 detainees; is that how I understand it?
10 A.      Yes, sir.
11 Q.      All right. And what was your next
12 employment?
13 A.      New Jersey Transit police.
14 Q.      And how long were you so employed and
15 what was your position there?
16 A.      I was employed from 2012 to 2017. I was
17 a civilian. I worked in the payroll department and
18 then I worked in the fare -- as a fare, F-A-R-E,
19 enforcement officer.
20 Q.      Does that mean when people jump the
21 tollbooths and not pay their fee to get on the
22 transit?
23 A.      Yes, sir.
24 Q.      Okay. And did you receive any law
25 enforcement training or courses during your

Page 17

1 employment as a civilian and as a fare officer?
2 A.      Not that I can recall.
3 Q.      Okay. And what was your reason for
4 leaving that employment?
5 A.      To join the Cumberland County sheriff's
6 department.
7 Q.      And how long were you so employed?
8 A.      For just under a year.
9 Q.      All right. And what position did you
10 hold and what was your reason for leaving that
11 employment?
12 A.      A sheriff's officer. And to join the
13 New Jersey State Police.
14 Q.      Okay. And did you receive any training
15 or did you undertake any courses regarding law
16 enforcement training while you were at the sheriff's
17 department --
18 A.      Yes.
19 Q.      -- or in preparation for that job?
20 A.      Yes, sir.
21 Q.      Please tell us about that.
22 A.      Graduated the Gloucester County Police
23 Academy.
24 Q.      And how long was the police academy?
25 A.      For about five and a half months.

Page 18

1    Q.    And was it the standard curriculum for
2    all officers in that position?
3    A.    Yes, sir.
4    Q.    Did you receive any additional training
5    or graduate from any additional courses outside of
6    the standard required for that position?
7    A.    No, sir.
8    Q.    And then you became a member of the New
9    Jersey State Police?
10    A.    Yes, sir.
11    Q.    And did you just take the academy
12    courses to become a member of the state police or
13    did you take any additional training courses
14    regarding law enforcement?
15    A.    Are you asking me during graduation or
16    after the academy for state police?
17    Q.    Yes, first before you became a member of
18    the state police and then we can go while you were
19    employed as a trooper if you did any additional
20    courses.
21    A.    I did the standard training while at the
22    academy for New Jersey State Police.
23    Q.    Okay. And after you became a member
24    of the New Jersey State Police, what courses or
25    training in law enforcement did you receive?

Page 19

1    A.    The DID training, the driving impaired
2    training, the Alcotest training certification, the
3    HGN training and several other trainings.
4          I don't have my resume in front of
5    me. It's a long list of training that I had.
6    Q.    All right. Is there requirements as a
7    New Jersey State Trooper for a certain amount of
8    continuous training per year that you have to
9    participate in?
10    A.    I don't understand your question. Are
11    you asking for in regards to a certain training or
12    in general?
13    Q.    In general are there requirements to
14    maintain your employment as a New Jersey state
15    trooper for continuing law enforcement training?
16    A.    Yes.
17    Q.    And how many hours do you need and is it
18    a yearly requirement?
19    A.    Yes, we have to do a physical training
20    test every year. And then we also have to qualify
21    for our pistol shoot twice a year.
22    Q.    And you mentioned three courses while
23    you've been employed as a New Jersey state trooper
24    that you completed, DID, apple and HGN and did not
25    recall any other courses offhand that you completed.

Page 20

1          Can you please tell us what the DID
2    training is.
3    A.    It's training to train us in identifying
4    people that may or may not be under the influence of
5    drug or alcohol.
6    Q.    Okay. And when did you complete that
7    course, and how long was that course, whether it be
8    hours or days?
9    A.    I can't recall.
10    Q.    Do you know what calendar year you
11    completed that course?
12    A.    I believe 2019.
13    Q.    And do you have any of the training
14    materials still in your possession regarding that
15    course?
16    A.    Yes.
17    Q.    All right. And how long was the course,
18    meaning was it a day course, a number of hours,
19    online, what did the course entail?
20    A.    I believe it was a week course.
21    Q.    One week?
22    A.    Yes, sir.
23    Q.    Okay. And who taught the course?
24    A.    I can't recall.
25    Q.    Meaning was it the New Jersey State

Page 21

1    Police, was it some independent agency?
2    A.    New Jersey State Police.
3    Q.    All right. What's the apple training?
4    A.    The apple training?
5    Q.    Yes.
6    A.    I don't understand.
7    Q.    I must have misheard you, because I
8    thought you said you --
9    A.    I said the New Jersey State Police were
10    the ones that trained me in that course.
11    Q.    When I questioned you about did you
12    receive any training or courses during your
13    employment with the New Jersey State Police, I
14    thought the second course that you stated was some
15    sort of apple training. I may have misheard you.
16          Is there a second training course
17    that you participated in while a member of the New
18    Jersey State Police?
19    A.    The HGN course, horizontal gaze
20    nystagmus.
21    Q.    Yes, that was the third one that I
22    wrote down.
23          Was there a second one, or I could
24    have possibly --
25    A.    Alco, I was trained in the Alcotest

6 (Pages 18 - 21)

Page 22

1  certification.
2  Q.     The what test?
3  A.     Alcotest.
4  Q.     Can you spell that.
5  A.     Like Alco, like alcoholic.
6  Q.     Alcohol test?
7  A.     Yes.
8         MR. CHAUDRY:  It's called the
9  Alcotest.  It's what the brand is.  Kind of like if
10 you have a BMW, but test.  It's called an Alco
11 in alcoholic, A-L-C-H-O-L-O-T-E-S-T (sic).
12 Q.     Okay.  Can you explain that training,
13 please, Trooper Davis.
14 A.     It's a test that we're trained in when
15 we have someone that we suspect is under the
16 influence of alcohol, we bring them back to the
17 station and you put them on the box, which
18 determines how much alcohol content the person
19 has in their system.
20 Q.     And what is the box, is that an
21 intoxilyzer, a Breathalyzer?
22 A.     A Breathalyzer.
23 Q.     So you were trained in how to administer
24 the Breathalyzer or the box?
25 A.     Yes.

Page 23

1  Q.     Okay.  Anything else that that test
2  instructed you on?
3  A.     No.
4  Q.     All right.  And obviously the HGN is
5  the horizontal gaze nystagmus test.
6         How long of instructions did
7  you receive on that and who performed those
8  instructions?
9  A.     New Jersey State Police, a week.  And
10 then I did a refresher course in 2022, which is
11 the requirement.  Every two years we have to do a
12 refresher.
13 Q.     Did you say a week?
14 A.     A week training, yes, sir.
15 Q.     One week training on the HGN test?
16 A.     Yes, sir, that I can recall.
17 Q.     All right.  Do you still maintain --
18 A.     And every two years you have a
19 refresher.
20 Q.     Do you still maintain those training
21 materials?
22 A.     Yes, sir.
23 Q.     And have you ever been disciplined as a
24 member of the New Jersey State Police?
25 A.     Yes, sir.

Page 24

1  Q.     How many times?
2  A.     Twice.
3  Q.     Do you know how many times complaints
4  have been lodged against you, whether that be by
5  members of your department, superiors or citizens?
6  A.     No, I don't know the exact number.
7  Q.     Okay.  Can you give us an educated guess
8  or an approximation?
9  A.     No, I don't have a guess.
10 Q.     All right.  And whatever that number is
11 of complaints lodged against you, two times your
12 superiors found that they were founded allegations
13 and you were disciplined; is that correct?
14        MR. CHAUDRY:  Objection to the form
15 of the question.
16        You can answer.
17 A.     Yes.
18 Q.     All right.  Tell us about those two
19 instances and what discipline was enforced against
20 you.
21 A.     My first year as a trooper when I
22 graduated, one month off of the coach program, which
23 is the program that you receive when you first
24 graduate from the academy I pulled over -- no, I
25 responded to a accident involving a member of the

Page 25

1  New Jersey State Police.
2         And since he was a superior, like
3  because he was a lieutenant, I called back to the
4  station to ask for additional help.  And a decision
5  was made in regards to that incident in which I was
6  disciplined for.
7  Q.     I can't follow that.
8         As I understand the beginning of
9  your answer, you responded to an accident where
10 a New Jersey state trooper was involved in that
11 accident; is that correct?
12 A.     Yes.
13 Q.     And that New Jersey state trooper was
14 higher in rank than you; is that correct?
15 A.     Yes, sir.
16 Q.     And then what is it that you did that
17 caused discipline to be meted out regarding that
18 situation?
19 A.     He was suspected of being under the
20 influence of alcohol and he wasn't arrested for
21 it -- well, detained for it.
22 Q.     Okay.  And he was not prosecuted for
23 that offense?
24        MR. CHAUDRY:  Objection to the form
25 of the question.

7 (Pages 22 - 25)

Page 26

1    MR. KAROLY: I'll rephrase it.
2    Q.    He was not prosecuted for him being
3    suspected of being under the influence of alcohol or
4    a controlled substance regarding that accident; is
5    that correct?
6    MR. CHAUDRY: Objection to the form
7    of the question.
8    You can answer.
9    A.    Well, you can't -- I mean you can't be
10   prosecuted for being suspected of something. He
11   wasn't taken down to the station for additional
12   testing -- or he wasn't -- he didn't --
13   Q.    You 100 percent prosecute somebody
14   for suspecting them of something. That's Law
15   Enforcement 101. You suspect somebody of a crime,
16   ergo then you prosecute them for it.
17   But is the simple answer --
18   A.    But before you prosecute them you have
19   to --
20   Q.    Let me ask a question.
21   MR. CHAUDRY: Please. Thank you.
22   I'm going to object to that as, you
23   know -- just ask your question, please, Mr. Karoly.
24   Q.    So you responded to the scene of an
25   accident where it was suspected that a fellow New

Page 27

1    Jersey state trooper was under the influence and
2    you did not take action to gather evidence regarding
3    the alleged crime; is that how I understand it?
4    MR. CHAUDRY: Objection to the form
5    of the question.
6    You can answer.
7    A.    At that time I wasn't trained in the
8    certifications I have now regarding DUI. And he was
9    a high-ranking member, so I called for additional
10   help to my sergeant.
11   Q.    And what did the sergeant do, if
12   anything?
13   A.    He responded to the scene and took over
14   the scene.
15   Q.    And did he then gather evidence of the
16   suspected intoxication?
17   A.    I don't know. I don't know what he did.
18   Q.    Did you leave the scene?
19   A.    No. I was at the scene, but I was not
20   up there where he was. I can't recall.
21   Q.    Trooper Davis, what happened here, did
22   you essentially get disciplined because you failed
23   to perform your duties regarding a suspected crime
24   that was committed?
25   MR. CHAUDRY: Objection to the form

Page 28

1    of the question.
2    Q.    Do you understand my question?
3    A.    Repeat your question, sir.
4    Q.    Were you disciplined because your
5    superiors believed you did not enforce your duties
6    as you were required as a New Jersey state trooper?
7    MR. CHAUDRY: Objection.
8    A.    Yes, sir.
9    Q.    And what was the discipline?
10   A.    I can't recall exactly what the name of
11   the discipline was, but I was disciplined.
12   Q.    Did you get time off, did you have to
13   go through retraining, were you then trained on
14   identifying signs of intoxication, what did they
15   do?
16   A.    I was disciplined.
17   Q.    What was the discipline?
18   A.    I don't recall because it was put
19   together with another discipline. It was merged
20   together with something else. I don't know who does
21   that. I can't recall the exact discipline for that
22   particular incident.
23   Q.    Was the discipline merged together with
24   the second incident that you say that you suffered
25   discipline for, or is there another incident?

Page 29

1    A.    There's the same incident that I said
2    I was disciplined for, the second incident.
3    Q.    All right. So we have the first
4    incident wherein the allegation that was founded
5    was that you didn't follow through with your duties
6    as required by a New Jersey state trooper because of
7    the individual that was involved in the accident,
8    correct?
9    MR. CHAUDRY: Objection to the form
10   of the question.
11   Q.    You understand that question, don't you,
12   Trooper?
13   A.    Can you repeat the question.
14   Q.    The first incident in which there was a
15   founded complaint against you was that you failed to
16   perform your duties as a New Jersey state trooper
17   regarding an alleged criminal conduct because of the
18   status of the individual who was alleged to have
19   committed the crime, correct?
20   MR. CHAUDRY: Objection to the form
21   of the question.
22   A.    I'm not understanding. Are you --
23   MR. CHAUDRY: I'll renew my
24   objection to the form of the question.
25   Trooper Davis, you can answer if

8 (Pages 26 - 29)

Page 30

1  you understand the question.
2  A.     I don't understand the question.
3  Q.     We have two times in which you were
4  disciplined as a New Jersey state trooper, correct?
5  A.     Correct.
6  Q.     The first time is when it was founded
7  by your superiors that you failed to perform your
8  duties as a New Jersey state trooper because of the
9  status of the individual you were investigating; am
10  I correct?
11  A.     Correct.
12  Q.     And we don't know what the discipline
13  was for that incident because apparently sometime
14  thereafter you were disciplined again for a separate
15  incident; is that correct?
16  A.     Correct.
17  Q.     Please tell us about that second
18  incident.
19  A.     My first year right off of training I
20  was assisting another trooper with a stop.  And
21  we was doing a search of a car.  And at the time
22  marijuana was illegal, and I found like really,
23  really, really small amounts of traces of marijuana.
24  And the marijuana was very small.  It slipped out of
25  my hand.  And it was like so small that I couldn't

Page 32

1          The amount was so small that the
2  prosecutors in that county did not like to prosecute
3  for that small amount.  I didn't know that.
4  Q.     Okay.  So what, you were disciplined for
5  the marijuana slipping out of your hands?
6  A.     Because I failed to put that on camera
7  that -- show the amount of marijuana or how much it
8  was in my hand on camera and let the camera know
9  that it wasn't enough evidence to be taken back to
10  the station for prosecution.
11  Q.     All right.  So you found marijuana
12  during a search and you failed to put that marijuana
13  on camera.
14          And prior to doing that you
15  disposed of the marijuana; is that how I understand
16  it?
17          MR. CHAUDRY:  Objection to the form
18  of the question.
19  Q.     Trooper, I mean we haven't even gotten
20  to the incident yet.
21          What happened, what did --
22  A.     I'm trying my best.  I mean you
23  don't understand.  I can't help it if you don't
24  understand.  I'm trying to explain it.
25          I was assisting another trooper.

Page 31

1  pick it up.
2          At the time I wasn't trained to
3  know that if it was that small of an amount that we
4  go on camera and say, not enough evidential value to
5  let -- let it be known that it's not enough to
6  take back to the station.  And the marijuana slipped
7  out of my hand.
8  Q.     Before you were on camera to be able to
9  make whatever statement you're saying you intended
10  to make?
11  A.     No, I didn't know that.  At the time I
12  wasn't trained.  I didn't know that we had to do
13  that.
14  Q.     Okay.  So you believed you weren't
15  trained properly regarding how to handle a search
16  regarding marijuana; is that correct?
17          MR. CHAUDRY:  Objection to the form
18  of the question.
19  A.     No.
20  Q.     Okay.  So what lack of training caused
21  you to say that this wasn't your fault?
22  A.     I thought all -- if you found any, no
23  matter how small the amount of marijuana at the
24  time it was illegal, I thought that it was enough
25  for evidence.

Page 33

1  We were making a search of the vehicle for probable
2  cause in reference to the odor of marijuana.
3          While assisting that trooper, I
4  found a small amount of marijuana in the car.  And
5  at that time I didn't know that it was frowned upon
6  to take or confiscate such a small amount.
7          And if you do, you go on camera to
8  show the evidence and let them know it's not enough
9  evidence to be taken back to the station.
10  Q.     So what happened to the marijuana that
11  you found?
12  A.     It was such a small amount that it fell
13  out of my hands.  It slipped out of my hands.
14  Q.     The discipline was because you didn't
15  put that on camera prior to it slipping out of your
16  hands?
17          I don't understand what the
18  allegation is that you did wrong.
19  A.     I didn't take -- I just -- it was a
20  small amount of marijuana.  I'm supposed to put it
21  on camera, my body camera, to let it be known -- to
22  show the amount of marijuana so they -- it could be
23  on record of why we're not taking it back.
24  Q.     And prior to that occurring it
25  accidentally slipped out of your hands; is that what

9 (Pages 30 - 33)

Page 34

1  you're saying?
2  A.    Yes, it slipped out.  It was such a
3  small amount.  It was like very, very, very tiny.
4        And the county prosecutor at that
5  time didn't like discipline -- I mean prosecuting
6  for that small amount.
7  Q.    So what discipline was meted out for you
8  for that?
9  A.    You asking the name of the charge or
10  the name -- or how many --
11       The discipline, I don't understand
12  your question.
13  Q.    We have an incident that was founded in
14  which discipline was meted out, meaning Trooper
15  Davis did something wrong, right?  That's the
16  infraction.  Then there is a penalty.
17  A.    I believe it was --
18  Q.    What was the penalty?
19  A.    -- failed to secure evidence.
20  Q.    And what was the penalty?
21  A.    Two days merged with the other incident.
22  Two days to get five days, but two days was served
23  with the agreement that I wouldn't get in trouble
24  within a year.
25  Q.    So the penalty was five days suspension

Page 35

1  with or without pay?
2  A.    Without pay.
3  Q.    And it was reduced to two years if you
4  did nothing --
5  A.    Two days.  Two days.
6  Q.    I'm sorry.  I apologize.
7        It was reduced to two days with the
8  caveat that you were not to get in trouble within a
9  year of the incident, and if you did, it would then
10  be the full five days?
11  A.    Yes, if I can recall correctly.
12  Q.    Okay.  So what was the month and year of
13  these two instances, if you can recall?
14  A.    I can't recall -- the year for both
15  was -- like I believe the DUI was -- they were in
16  either 2018 or '19.  I can't recall.
17  Q.    And as part of your discipline in this
18  matter and repercussions, did the New Jersey State
19  Police require you to undergo any further training?
20  A.    Yes, after that I did the DUI trainings.
21  Q.    The DID and the Alcotest?
22  A.    No.  The DID and the HGN test.
23  Q.    Okay.  Any other trainings as a result
24  of this discipline?
25  A.    I can't recall.

Page 36

1  Q.    All right.  Are there any other times in
2  which you were disciplined regarding conduct as a
3  member of the New Jersey State Police?
4  A.    Not that I can recall.
5  Q.    Were there any other instances in which
6  there were complaints that were lodged against you
7  regarding your conduct as New Jersey State Police?
8  A.    Yes.
9  Q.    And do you recall how many times that
10  occurred?
11  A.    I can't recall.
12  Q.    Is there a guesstimate that you can
13  give, roughly, approximation of the amount of times?
14  A.    No.
15  Q.    Are we talking more or less than five?
16  A.    More than five probably.
17  Q.    More or less than ten?
18  A.    I don't know.
19  Q.    Okay.  All right.  Can you tell us on
20  August the 10th of 2020 were you employed as a
21  member of the New Jersey State Police?
22  A.    Yes, sir.
23  Q.    And in what capacity?
24  A.    I was a trooper.
25  Q.    You were on patrol?

Page 37

1  A.    A trooper on patrol, yes, sir.
2  Q.    And was it standard patrol or was there
3  some sort of heightened patrol that day?
4  A.    I can't recall.
5  Q.    Okay.  And were you alone in your
6  trooper vehicle?
7  A.    Yes, sir.
8  Q.    And what were your hours of employment
9  on that day?
10  A.    I believe 6 p.m. to 6 a.m.
11  Q.    And prior to engaging in the vehicle
12  stop with Mr. Zelechiwsky, do you recall whether
13  or not you made any arrests on your shift prior to
14  that?
15  A.    I can't recall.
16  Q.    And can you tell us where you were
17  situated when you first observed Mr. Zelechiwsky's
18  vehicle?
19  A.    Off State Highway 55.
20  Q.    And were you in a stationary position
21  watching the flow of traffic or you were actually
22  driving on the road?
23  A.    Driving.
24  Q.    Okay.  So you were driving on the road
25  and you first observed Mr. Zelechiwsky's vehicle in

10 (Pages 34 - 37)

Page 38

1  front of you, aside of you, behind you, what?
2        Tell us how you first made
3  observation with the vehicle.
4  A.    In front of me.
5  Q.    So you were driving on the highway and
6  Mr. Zelechiwsky's vehicle was in front of you in the
7  right or left lane?
8  A.    The left lane.
9  Q.    Okay. And you were in which lane?
10  A.    I was in the left lane.
11  Q.    Okay. And were there any cars in
12  between you and his vehicle?
13  A.    I can't recall.
14  Q.    All right. And what do you recall
15  occurring prior to you initiating the traffic stop
16  on his vehicle?
17  A.    All right. Him being all over the road,
18  failure to maintain his lane, and then he switched
19  lanes without using his turn signal.
20  Q.    All right. So let's slow that down.
21        How long were you following
22  Mr. Zelechiwsky's vehicle prior to initiating the
23  traffic stop?
24  A.    I can't recall exactly.
25  Q.    I don't need exactly. Roughly.

Page 39

1        Are we talking, you know, hours,
2  minutes, seconds, what?
3  A.    Maybe about a minute or more.
4  Q.    Okay. So approximately a minute you
5  were following his vehicle, you don't recall whether
6  or not any vehicles were in between you and his
7  vehicle, and you observed him fail to maintain his
8  lane of travel; is that what you're saying?
9  A.    Yes, sir.
10  Q.    All right. What did you specifically
11  observe regarding Mr. Zelechiwsky's vehicle?
12  A.    Him traveling outside of his lane on
13  multiple occasions.
14  Q.    How many occasions and which part of the
15  lane?
16  A.    He was going from the left -- outside of
17  the left to outside of the right.
18  Q.    On how many occasions?
19  A.    More -- I can't recall, but more than
20  enough for me to raise my suspicion.
21  Q.    This is your opportunity to tell us what
22  you recall.
23        Is your answer that you can't
24  recall how many times you believe he traveled
25  outside of his lane?

Page 40

1        MR. CHAUDRY: Objection to the form
2  of the question.
3        You can answer if you understand
4  it.
5  A.    I can't recall.
6  Q.    Okay. And is there any other apparent
7  driving or alleged violations of the motor vehicle
8  code that you observed regarding Mr. Zelechiwsky's
9  vehicle?
10  A.    Yes.
11  Q.    What?
12  A.    Him failing to use his turn signal.
13  Q.    So apparently he must have then moved
14  into the right lane; is that correct?
15  A.    Yes, sir.
16  Q.    And you're saying he didn't use his turn
17  signal when he did so?
18  A.    Yes, sir.
19  Q.    And is that one occasion?
20  A.    Yes, sir.
21  Q.    And did he maintain that right lane of
22  travel sufficiently?
23  A.    I mean I can't recall.
24  Q.    All right. Was he speeding in any way?
25  A.    I can't recall.

Page 41

1  Q.    Did he endanger any other vehicles that
2  were around him when you say that he didn't maintain
3  his lane of travel and failed to use his turn
4  signal?
5  A.    I can't recall -- yes, sir.
6  Q.    You can't recall or yes, he did endanger
7  cars?
8  A.    Yes, if he's driving like that he's
9  endangering.
10  Q.    Ma'am, were there any vehicles around
11  him when you say he didn't maintain his lane?
12  A.    I can't recall.
13  Q.    All right. So you certainly can't say
14  that any cars had to veer out of his way or he came
15  in close proximity to striking any, correct?
16  A.    I can't understand your question.
17  Q.    If you can't recall if there were any
18  vehicles around him when he failed to maintain his
19  lane and didn't use his turn signal, you certainly
20  can't say that he endangered any other vehicles,
21  correct?
22        MR. CHAUDRY: Objection to the form
23  of the question.
24        You can answer if you understand
25  it.

11 (Pages 38 - 41)

Page 42

1    A.    Correct.
2    Q.    All right. And how far away were you
3    from his vehicle when you say that he failed to
4    maintain his lane?
5    A.    A car length or two.
6    Q.    All right. And same distance away from
7    him when you say he didn't use his turn signal?
8    A.    Yes, sir.
9    Q.    All right. And did you immediately
10   initiate a traffic stop after the alleged failure to
11   use a turn signal, or did you follow him for some
12   distance?
13   A.    Stopped after he failed to use his turn
14   signal.
15   Q.    All right. So you immediately after
16   witnessing that initiated your lights and sirens;
17   is that correct?
18   A.    Yes, sir.
19   Q.    Did Mr. Zelechiwsky comply and pull over
20   immediately upon your initiation of lights and
21   sirens?
22   A.    Yes, sir.
23   Q.    All right. And you have a MVR device in
24   your trooper vehicle?
25   A.    Yes, sir.

Page 43

1    Q.    And was it active on this date?
2    A.    I can't recall.
3    Q.    All right. Does your MVR capture a
4    certain time period prior to initiating your lights
5    and sirens, meaning is there a 30-second, 60-second
6    recapturing of what occurred within eyesight of your
7    vehicle once you initiate your lights and sirens?
8    A.    They capture it once you turn the lights
9    and sirens on -- or the lights on.
10   Q.    It only captures from that moment that
11   you turn them on, and there is no recapture, meaning
12   a 30-second recapture of what happened prior to
13   initiating the lights and sirens?
14   A.    No.
15   Q.    Okay. You guys got to look into
16   Pennsylvania's. They recapture time prior to that.
17   A.    Well, here it's just a body cam that
18   does that.
19   Q.    Okay. All right. And do we have the
20   mobile vehicle recording of this incident; did you
21   preserve it?
22   A.    Yes. It's preserved by state police.
23   Q.    Okay. And have you watched the mobile
24   vehicle recording or your body-worn camera video
25   prior to your testimony today?

Page 44

1    A.    Yes.
2    Q.    Both of them?
3    A.    Yes.
4    Q.    Okay. How about Trooper Gallagher's MVR
5    or his body-worn camera, did you watch either of
6    those prior to coming here today?
7    A.    No, not that I can recall.
8    Q.    Okay. So just your MVR videotape and
9    your body-worn camera, correct?
10   A.    I believe so.
11   Q.    All right. And you'd agree with me that
12   Mr. Zelechiwsky pulled over to the side of the road
13   in a safe manner and came to a complete stop off of
14   the roadway, correct?
15   A.    Yes, sir.
16   Q.    And when you approached his vehicle
17   prior to that, did you run any checks on his car
18   before going up to his window?
19   A.    No. I gave --
20   Q.    Okay. So you walked -- go ahead. I'm
21   sorry.
22   A.    I just gave his license plate number to
23   dispatch.
24   Q.    Okay. And when you do that, do they
25   provide back any information, like suspended driver

Page 45

1    or warrants or anything like that?
2    A.    No, not right away.
3    Q.    Okay.
4    A.    They usually don't -- or sometimes they
5    don't. Most of the time we have to ask for that.
6    Q.    Okay. But nonetheless, that certainly
7    wasn't the situation with Mr. Zelechiwsky, correct?
8          MR. CHAUDRY: Objection to the form
9    of the question.
10   A.    Correct.
11   Q.    Okay. So you approached the passenger
12   side of the vehicle, correct?
13   A.    Yes, sir.
14   Q.    All right. And Bo's wife Lisa was
15   seated in the passenger side and Bo was driving the
16   vehicle, correct?
17   A.    Yes, sir.
18   Q.    And Lisa put the window to the passenger
19   side down halfway, correct?
20   A.    I can't recall how far it was down.
21   Q.    All right. But nonetheless, she put the
22   window down to communicate with you, correct?
23   A.    Yes, sir.
24   Q.    And Mr. Zelechiwsky answered any
25   questions that you asked of him, correct?

12 (Pages 42 - 45)

Page 46

1    A.    Yes, sir.
2    Q.    And he was answering in a reasonable
3    way, meaning he wasn't stuttering or slurring his
4    words or anything like that, correct?
5    A.    Correct.
6    Q.    And he provided you with his license,
7    registration and proof of insurance or whatever
8    other documentation you requested, correct?
9    A.    Yes.
10    Q.    All right. And you certainly weren't
11    able to make any observations regarding his person
12    from the passenger side of the vehicle; is that
13    correct?
14          MR. CHAUDRY: Objection to the form
15    of the question.
16          You can answer.
17    A.    I was able to make observations.
18    Q.    All right. What observation did you
19    make from the passenger side of the vehicle?
20    A.    His body, his movements were very slow
21    and his eyes were bloodshot, glassy.
22    Q.    His movements were slow and his eyes
23    were bloodshot and glassy; is that what you said?
24    A.    Yes, sir.
25    Q.    Did you have your flashlight illuminated

Page 47

1    when you were standing on the side of the road?
2    A.    Yes, sir.
3    Q.    You did?
4    A.    Yes, sir.
5    Q.    Okay. And was it dark in this section
6    of the roadway?
7    A.    Yes, sir.
8    Q.    All right. And were there any
9    streetlights around the area where you pulled the
10    vehicle over?
11    A.    I can't recall.
12    Q.    All right. And, again, Lisa was in
13    between yourself and Bo, correct?
14    A.    Yes, sir.
15    Q.    All right. And what was hanging down
16    over your body-worn camera that stopped us from
17    getting a full view?
18    A.    My whistle.
19    Q.    Your whistle?
20    A.    Yes, sir, which is part of my uniform.
21    Q.    Okay. So you didn't realize that you
22    had a whistle hanging over the camera obstructing
23    view, correct?
24    A.    Yes.
25    Q.    Okay. So you know, not to get too ahead

Page 48

1    of ourselves, but obviously Mr. Zelechiwsky was a
2    zero point zero blood alcohol reading, meaning no
3    alcohol reading when you tested him at the station,
4    correct?
5    A.    Correct.
6    Q.    All right. But nonetheless, you said
7    you observed bloodshot and glassy eyes?
8    A.    Yes, sir.
9    Q.    All right. Can you tell us the science
10    behind bloodshot and glassy eyes and any relevance
11    to the imbibing of alcohol.
12          MR. CHAUDRY: Objection to the form
13    of the question.
14          You can answer if you understand
15    it.
16    A.    It could be a sign of alcohol, it could
17    be a sign of medication, it could be a sign that the
18    person is tired.
19    Q.    Okay. Explain.
20    A.    I just explained. It could be an
21    indication that the person is under the influence
22    of drugs or alcohol or the person is tired or
23    medication prescribed or unprescribed.
24    Q.    Did you ask him whether or not he was
25    taking any medications?

Page 49

1          MR. CHAUDRY: Objection to the form
2    of the question.
3          When?
4    Q.    When you just first pulled him over
5    and put the window down and you started making
6    observations of him.
7    A.    I asked him, but not at that time.
8    Q.    All right. So he provided you with
9    appropriate documentation and he answered all the
10    questions that you had, and you say that you
11    observed bloodshot and glassy eyes and slow
12    movements; is that what you're saying?
13    A.    Yes, sir.
14    Q.    Okay. And instead of taking his
15    information back to the patrol vehicle and running
16    it, you decided to go over to the driver side of the
17    vehicle and remove him from the vehicle, correct?
18    A.    I can't recall if I went back or if I
19    removed him right away.
20    Q.    You can't recall?
21          You cannot recall whether or not
22    you went back to your vehicle in between your
23    initial contact with the vehicle and when you --
24    A.    I removed him from the car.
25    Q.    All right. Does Mr. Zelechiwsky wear

13 (Pages 46 - 49)

Page 50

1  glasses?
2  A.     Yes.
3  Q.     And was he wearing glasses on this
4  occasion?
5  A.     Yes.
6  Q.     Nonetheless, you say that you observed
7  bloodshot and glassy eyes from the passenger side of
8  the vehicle; is that correct?
9  A.     Yes.
10 Q.     All right.
11 A.     Yes.
12 Q.     So then you walk over and you remove
13 Mr. Zelechiwsky from the vehicle; is that correct?
14 A.     Yes, sir.
15 Q.     And you asked him whether or not he was
16 drinking; fair to say?
17 A.     Yes.
18 Q.     And he said he was not, correct?
19 A.     I believe that's what he said.
20 Q.     All right.  And then tell us what you
21 did next.
22 A.     I conducted field sobriety testing.
23 Q.     Okay.  And where did you do that?
24 A.     In the front of his car.
25 Q.     All right.  And can you tell us what

Page 51

1  field sobriety tests you conducted.
2  A.     HGN, walk-and-turn test and one-leg
3  stand test.
4  Q.     Okay.  And you did the HGN test first?
5  A.     Yes, sir.
6  Q.     And you'd agree with me he wasn't
7  combative in any way, correct?
8  A.     I disagree.
9  Q.     You believe Mr. Zelechiwsky was
10 combative with you during this pullover?
11 A.     He wasn't cooperative.
12 Q.     You know, I'll tell you, Trooper, I
13 mean I've seen hundreds of body cams and MVRs.
14 And in my personal opinion I think he was the most
15 cooperative person I've ever seen on video.
16        So I'd like you --
17        MR. CHAUDRY:  Mr. Karoly, I'm going
18 to object to that.
19        You're offering testimony.  Just
20 ask the question.
21        MR. KAROLY:  That's wonderful.
22 You can object to it.  That's a prelude to my
23 question.
24        MR. CHAUDRY:  Okay.
25 Q.     Please tell us how he was uncooperative

Page 52

1  with you and combative with you during this traffic
2  stop.
3  A.     He failed to follow instructions.
4  Q.     What instructions did he fail to follow?
5  A.     For the HGN testing.
6  Q.     Explain, Trooper.
7  A.     During the test he was asked not to move
8  his head.  He continued to move his head.
9  Q.     So that's what you say leads you to
10 believe that he was uncooperative and combative
11 because he moved his head during the HGN test?
12 A.     Not cooperating, yes, sir.
13 Q.     Right.  Anything else?
14 A.     No.
15 Q.     All right.  So tell us exactly what you
16 did regarding the HGN test and exactly what you
17 observed.
18 A.     I asked him did he have any medical
19 conditions in reference to his eyes.  I believe he
20 said no.
21        And then I attempted to conduct the
22 test.  I explained the instructions and asked him to
23 not move his head.
24 Q.     Okay.  And what occurred?
25 A.     He continued to move his head.

Page 53

1  Q.     What, when you shine the pen in his eyes
2  and said follow the pen, his head moved slightly
3  towards the direction of the pen; is that what
4  happened?
5  A.     It moved.  Your head isn't supposed to
6  move.  You're supposed to keep your head straight.
7  Your eyes are supposed to move only.
8  Q.     Okay.  But you certainly didn't observe
9  any lack of smooth pursuit, correct?
10        MR. CHAUDRY:  Objection to the form
11 of the question.
12        MR. KAROLY:  What's wrong with the
13 form?
14        MR. CHAUDRY:  The form of the
15 question.
16        MR. KAROLY:  Yes.
17        MR. CHAUDRY:  You are speculating
18 based on something that's not even in the record
19 yet.  And it's repeating questions.
20        Ask her the question.
21        MR. KAROLY:  Okay.  I don't
22 understand that objection.
23 Q.     But, Trooper, you can answer.
24        THE WITNESS:  Sir, can I answer the
25 question?

14 (Pages 50 - 53)

Page 54

1  Q.      You can answer.
2          MR. CHAUDRY: Yes.
3  A.      Can you repeat the question again.
4  Q.      You did not observe any lack of smooth
5  pursuit regarding Mr. Zelechiwsky's pupils, correct?
6          MR. CHAUDRY: Objection to the
7  form.
8  A.      He didn't conduct the test correctly for
9  me to observe.
10 Q.      All right. Tell us then what you
11 observed. Go ahead.
12 A.      I wasn't able to observe anything
13 because he kept moving his head.
14 Q.      He moved his head during the HGN test
15 so you weren't able to observe any indications one
16 way or the other regarding intoxication; is that
17 your testimony?
18 A.      Well, if a person is not following
19 instruction, that's a form of indication in my
20 eyes.
21 Q.      Okay. Did you observe any other
22 indications of intoxication during that test?
23 A.      No.
24 Q.      All right. Mr. Zelechiwsky was
25 certainly able to stand still and maintain his

Page 55

1  balance while he was awaiting the performance of
2  that test, correct?
3  A.      Yes.
4  Q.      He wasn't staggering in any way, he
5  wasn't slurring his speech, correct?
6  A.      Are we talking about the HGN test?
7  Q.      I'm talking about during the entire time
8  that you observed Mr. Zelechiwsky standing in front
9  of his vehicle he was not staggering, correct?
10 A.      He wasn't able to -- he lost his
11 balance.
12 Q.      While he stood and you explained the
13 HGN test he was not staggering or falling over,
14 correct?
15 A.      No.
16 Q.      Meaning I am correct?
17 A.      Yes.
18 Q.      And he was able to maintain his balance
19 when you were shining the flashlight in his eyes,
20 correct?
21         MR. CHAUDRY: Objection to the form
22 of the question.
23 A.      Are we still on the HGN test?
24 Q.      Yes.
25 A.      Yes.

Page 56

1  Q.      And then you went on to the next field
2  sobriety test?
3  A.      Yes, sir.
4  Q.      And what was that?
5  A.      The walk-and-turn test.
6  Q.      All right. Explain to me what you
7  did regarding the walk-and-turn test and what
8  Mr. Zelechiwsky did.
9  A.      I gave him instructions and I also
10 demonstrated the test for him. And then he
11 attempted to complete the test.
12 Q.      And what did you observe?
13 A.      Him not keeping his balance, him
14 raising his hand and him not following the
15 instructions.
16 Q.      Okay. How did he not maintain his
17 balance on the walk and turn?
18 A.      When he was walking, he kind of leaned
19 over and he raised his hand.
20 Q.      What direction did he lean?
21 A.      In an attempt to keep --
22 Q.      What direction did he --
23 A.      He leaned in an attempt to maintain his
24 balance.
25         Now, again, this is on the side of a

Page 57

1  dark highway with no line that he's walking,
2  correct?
3  A.      Correct.
4  Q.      Okay. So you're saying that as he
5  was doing the walk and turn he leaned to what
6  direction?
7  A.      I can't recall.
8  Q.      Can't recall which direction he leaned;
9  is that what you're saying?
10 A.      I can't recall.
11 Q.      You cannot recall which direction he
12 leaned.
13         Do you recall on what step he
14 allegedly leaned?
15 A.      I can't recall because he wasn't
16 counting.
17 Q.      Can you see how many steps he's taking?
18 A.      Yes.
19 Q.      All right. So do you know on what step
20 you allegedly believe he leaned?
21 A.      No.
22 Q.      All right. And what hand did he
23 allegedly raise?
24 A.      I believe his left hand.
25 Q.      Okay. And on what step do you believe

15 (Pages 54 - 57)

Page 58

1  he raised his left hand?
2  A.    I can't recall what step.
3  Q.    Okay. And do you know how many times he
4  allegedly raised his left hand?
5  A.    I know at least one time.
6  Q.    And how about his lean, how many times
7  do you believe that he leaned?
8  A.    At least one time.
9  Q.    And what degree did he lean, how far
10 over did he lean?
11       MR. CHAUDRY: Object to the form of
12 the question.
13       You could answer if you understand
14 it.
15 Q.    You understand degrees, right?
16       Correct?
17 A.    Correct.
18 Q.    How far over did he lean?
19 A.    Enough not to lose his balance.
20 Q.    Enough not to lose his balance?
21       Is that what you said?
22 A.    Yes, sir.
23 Q.    All right. And then what test did you
24 perform next?
25 A.    The one-leg stand test.

Page 59

1  Q.    All right. And what did you explain and
2  what did you observe?
3  A.    I explained the test for him and also
4  demonstrated the test. I observed him -- well,
5  lose his balance, put his foot down and almost
6  fall.
7  Q.    All right. Do you know how old
8  Mr. Zelechiwsky is?
9  A.    No.
10 Q.    Okay. Still to this day you don't know?
11 A.    No.
12 Q.    You think age has any correlation to
13 balance?
14 A.    No.
15 Q.    Okay. So an 80 year old should probably
16 have the same balance observed as a 20 year old; is
17 that what --
18 A.    No.
19 Q.    -- your testimony is?
20 A.    I don't know. I'm not a doctor.
21 Q.    Okay. Well, what were you trained?
22 A.    I'm not trained to -- as a doctor.
23 Q.    No, I certainly understand that.
24       What were you trained regarding
25 balance and age, if anything?

Page 60

1  A.    Not trained in that.
2  Q.    Okay. And what were you trained
3  regarding leaning and intoxication, if anything?
4  A.    Well, if you lose your balance, that's
5  one of the clues that a person may or may not be
6  under the influence of alcohol or drugs.
7  Q.    So you're saying he didn't lose his
8  balance because he leaned?
9       MR. CHAUDRY: Object to the form of
10 the question.
11 Q.    What were you trained specifically
12 regarding the observation --
13 A.    Well --
14 Q.    Hold on.
15       What were you trained specifically
16 regarding the observation of an individual leaning
17 during the walk and turn?
18 A.    We weren't talking -- we were just
19 talking about the one-leg stand test. That's the
20 question I was answering about him losing his
21 balance.
22 Q.    I understand. And then I went on to the
23 walk and turn. What, if anything, were you trained
24 regarding --
25 A.    When you --

Page 61

1  Q.    -- the observation of -- can you let me
2  finish, please?
3       What were you trained, if anything,
4  regarding the observation of an individual leaning
5  during the walk and turn?
6  A.    If you're leaning, you're off balance.
7  You're trying to maintain your balance. If you're
8  balanced, you're not leaning.
9  Q.    And that's what you were trained
10 specifically?
11 A.    Yes.
12 Q.    Okay. What did they train you regarding
13 whether or not somebody is intoxicated or not about
14 how many times they have to lean?
15 A.    It's one time. It's one of eight clues.
16 Q.    One lean is a clue?
17 A.    Well, if you're leaning, you're off
18 balance. If you're off balance, that's one clue.
19 Q.    How far do you have to lean?
20 A.    It doesn't say.
21 Q.    Okay. How about raising your hand?
22 A.    Yes, for the walk-and-turn test you're
23 not supposed to raise your hand. Doesn't say how
24 far or how many times. That's another clue.
25 Q.    Okay. So we have a clue on him leaning

16 (Pages 58 - 61)

Page 62

1  during the walk and turn, a clue on him raising
2  his hand during the walk and turn, and he wasn't
3  able to maintain his balance on the one-legged
4  stand?
5  A.        Raising his arm, that, too. I guess he
6  had an arm.
7  Q.        Okay. Anything else?
8  A.        Are we still on the walk-and-turn test?
9  Q.        I'm just trying to get an aggregate of
10 what you say you utilized in order to arrest
11 Mr. Zelechiwsky.
12              MR. CHAUDRY: Objection to the form
13 of the question. He wasn't arrested.
14              MR. KAROLY: He wasn't arrested?
15              MR. CHAUDRY: He was not arrested.
16 Q.        All right. Trooper Davis, what is the
17 definition of an arrest?
18 A.        An arrest is when you're charged with
19 a criminal offense, taken to the station and
20 processed, fingerprinted and photographed.
21 Q.        So that's what you believe an arrest is?
22              That's what you were trained
23 regarding the constitutional basis for an arrest?
24 A.        Yes.
25 Q.        Okay. So you don't believe that an

Page 63

1  individual is arrested when their freedom of
2  movement is restricted and specifically by utilizing
3  handcuffs?
4  A.        No.
5  Q.        Okay. All right. So you don't believe
6  Mr. Zelechiwsky was arrested in this matter?
7  A.        No.
8  Q.        So your basis of an arrest is when
9  criminal charges are actually brought against an
10 individual?
11 A.        Yes.
12 Q.        Okay. So handcuffing someone and
13 putting them in the back of your cruiser car,
14 driving them 20 plus minutes away and holding them
15 at your station handcuffed to a bench for an hour is
16 not an arrest?
17 A.        No.
18 Q.        Okay. And that's how you were trained?
19 A.        Yes.
20 Q.        All right. So what did you utilize as a
21 basis for arresting Mr. Zelechiwsky for allegedly
22 driving under the influence of alcohol?
23              MR. CHAUDRY: Objection to the form
24 of the question.
25              It's not the testimony she

Page 64

1  provided. He wasn't arrested.
2  Q.        Okay. What do you call -- what did you
3  say you did to him? What word do you want to use?
4  A.        He was detained for further testing at
5  the station.
6  Q.        So what did you utilize as a basis for
7  detaining Mr. Zelechiwsky for further investigation?
8  A.        Him not following the instructions for
9  the HGN, him failing the walk-and-turn test, his
10 performance failing the one-leg stand test.
11 Q.        Okay. So you decided to then handcuff
12 him, put him in your cruiser car and take him away?
13 A.        Yes.
14 Q.        All right. And then you performed a
15 full search of the car, as well as the contents of
16 the car, correct?
17 A.        Yes.
18 Q.        Now, Lisa Zelechiwsky was within the car
19 at that time, correct?
20 A.        Yes.
21 Q.        And you had intended on turning the car
22 over to Lisa Zelechiwsky to drive it away from the
23 scene, correct?
24 A.        Yes.
25 Q.        But nonetheless, you removed her from

Page 65

1  the car and searched the car, as well as the
2  contents of the car, correct?
3  A.        Yes.
4  Q.        You searched her purse, correct?
5  A.        Yes.
6  Q.        Searched grocery bags and other closed
7  containers within the vehicle, correct?
8  A.        Yes.
9  Q.        And what did you utilize as a basis for
10 performing that search?
11 A.        A probable cause search.
12 Q.        And what is a probable cause search?
13 Please define that.
14 A.        It's a search that's conducted after you
15 believe or suspect a criminal or motor vehicle
16 violation, which is DUI, is suspected based on the
17 totality of the circumstances.
18 Q.        So you believe that you can search
19 the interior of a vehicle, as well as the closed
20 containers of the vehicle, as well as a non-arrested
21 person's purse based upon a quote/unquote probable
22 cause search?
23 A.        I don't believe that. We can do that in
24 reference to a DUI search.
25 Q.        So once you arrest the driver of a

17 (Pages 62 - 65)

Page 66

1  vehicle for DUI, even though there is another driver
2  to take the vehicle and even though you released
3  the car to that individual, you can search anything
4  within the vehicle, as well as the vehicle itself?
5  A.      Yes.
6  Q.      Okay.
7  A.      And it wasn't an arrest. It was a
8  detainment.
9  Q.      All right, a detainment.
10        You believe then you can search the
11 entire vehicle?
12 A.      Yes.
13 Q.      And do you have any authority for that,
14 meaning any federal or state statutes or any
15 reference to your rules and regulations?
16 A.      Yes, it's part of our rules and
17 regulations.
18 Q.      So in your rules and regulations there's
19 a section that permits you to then do a probable
20 cause search of an individual's car and the contents
21 of the car under these circumstances, that's within
22 your guidelines?
23 A.      Yes.
24 Q.      All right. So that's the basis that you
25 utilized.

Page 67

1        Is there any other reference that
2  you can give us that provides you with that
3  authority?
4  A.      No.
5  Q.      Okay. And do you know what section of
6  your guidelines?
7  A.      Not offhand.
8  Q.      Okay. And after you performed a search
9  you didn't find anything of any evidentiary value,
10 correct?
11 A.      No.
12 Q.      What do you recall, if anything,
13 Mr. Zelechiwsky said to you while you were having
14 conversation with him during this incident?
15 A.      I can't recall offhand, but I believe he
16 said that he didn't have any -- I asked him did he
17 had anything to drink. He said, no.
18 Q.      Okay. And do you recall engaging
19 Mrs. Zelechiwsky in any way?
20 A.      Yes.
21 Q.      All right. And do you recall anything
22 that she may or may not have said to you?
23 A.      I believe she said they had drinks
24 earlier that day.
25 Q.      I'd like you to be as specific as you

Page 68

1  can. Do you believe that she said that they had
2  drinks earlier that day?
3  A.      Yes, sir.
4  Q.      Did you ask her how many?
5  A.      I can't recall.
6  Q.      And do you believe that --
7  A.      I believe -- yes, I believe I asked her.
8  I believe I did.
9  Q.      And what did she say?
10 A.      I believe she said a couple.
11 Q.      Okay. But this is already after you had
12 Mr. Zelechiwsky handcuffed in the back of your car,
13 correct?
14 A.      I believe so.
15 Q.      All right. Is there anything else that
16 you believed Mrs. Zelechiwsky said to you?
17 A.      During that time or during this whole
18 incident?
19 Q.      At any time.
20 A.      Yes, I recall him saying that he was --
21 he took medication.
22 Q.      I'm talking about Mrs. Zelechiwsky, not
23 Mr.
24 A.      I can't recall.
25 Q.      You don't recall her saying anything

Page 69

1  else to you?
2  A.      No.
3  Q.      And do you recall her saying anything to
4  Trooper Gallagher?
5  A.      I can't recall.
6  Q.      Do you recall Mr. Zelechiwsky saying
7  anything else to you?
8  A.      No.
9  Q.      And did he say anything to you during
10 your drive to the station?
11 A.      I can't recall.
12 Q.      Did he say anything else to you at the
13 station?
14 A.      Yes.
15 Q.      What did he say?
16 A.      He was apologetic and he said he was
17 under the -- under medication.
18 Q.      What medication?
19 A.      I can't recall.
20 Q.      Okay. Did you test him for any
21 medication?
22 A.      No. He said that when everything was
23 done when he was leaving the station.
24 Q.      Well, I thought you said that he told
25 you that he was under medication at the scene?

18 (Pages 66 - 69)

Page 70

```
1    A.      No.  I said -- are you talking about the
2    scene or are you talking about the whole incident?
3    Q.      I believe that you said that he said
4    something to you regarding medication when you were
5    at the scene, correct?
6    A.      No.  I was talking about the whole
7    incident.
8    Q.      Did Mr. Zelechiwsky mention that he took
9    medication while he was at the scene, yes or no?
10   A.      No.
11   Q.      Did Mrs. Zelechiwsky mention that he had
12   carotid artery surgery and took medication while you
13   were at the scene, yes or no?
14   A.      No, not that I can recall.
15   Q.      All right.  And do you recall him saying
16   anything else to you while you were at the station?
17   A.      He was apologetic.  And he was thankful
18   for me allowing his wife to take the car.
19   Q.      And tell us what was the BAC reading on
20   the test?
21   A.      Zero.  Zero point zero.
22   Q.      Okay.  So no reading of any alcohol at
23   all?
24   A.      No.
25   Q.      But yet you say he was apologetic to
```

Page 71

```
1    you?
2    A.      Yes.
3    Q.      Okay.  Were you apologetic to him?
4            MR. CHAUDRY:  Objection to the form
5    of the question.
6            You can answer.
7    Q.      Do you understand what --
8    A.      No.
9    Q.      -- apologetic is?  I mean you're using
10   the word, right?
11   A.      I said no.
12   Q.      You were not apologetic to him?
13   A.      No.
14   Q.      Was anybody else apologetic to him?
15   A.      Not that I can recall.  I don't know.
16   Q.      Do you recall anything that Trooper
17   Gallagher did at the scene regarding this event?
18   A.      No.
19   Q.      Okay.  Do you recall him --
20   A.      He just -- I believe he just waited with
21   the wife on the side of the -- made sure she was
22   safe.  I'm not sure.
23   Q.      He didn't have any interaction with
24   Mr. Zelechiwsky, correct?
25   A.      I'm not sure.
```

Page 72

```
1    Q.      Do you recall any interaction with him?
2    A.      With who?
3    Q.      Do you recall Trooper Gallagher having
4    any interaction with Mr. Zelechiwsky?
5    A.      I said, no, I don't recall.
6    Q.      Do you recall Trooper Gallagher saying
7    anything to Mr. Zelechiwsky or Mr. Zelechiwsky
8    saying anything to Trooper Gallagher?
9    A.      No.
10   Q.      Do you recall even if they were within
11   ten feet of each other at any time during this
12   traffic stop?
13   A.      I can't recall.
14   Q.      Do you recall that you already had
15   Mr. Zelechiwsky in handcuffs and were transporting
16   him back to your vehicle when Trooper Gallagher
17   arrived on the scene?
18   A.      I can't recall.
19   Q.      All right.  Did you ask Trooper
20   Gallagher to do anything regarding this traffic
21   stop?
22   A.      I can't recall.
23   Q.      You didn't observe any indications of
24   intoxication or drug use by Mrs. Zelechiwsky,
25   correct?
```

Page 73

```
1    A.      No.
2    Q.      And once you checked that she was a
3    valid driver, you released the vehicle to her and
4    she then came to the station, correct?
5    A.      Yes.
6    Q.      How long of a drive is it from the scene
7    of the stop to the station?
8    A.      Maybe 10, 15 -- maybe 10 minutes -- 10,
9    15 minutes.
10   Q.      All right.  And how long did you have
11   Mr. Zelechiwsky at the station?
12   A.      Maybe an hour or so.
13   Q.      All right.  And while you were
14   transporting him to the vehicle -- or from the
15   vehicle into the station and to the bench, did you
16   observe any indications of intoxication?
17   A.      Yes, he was slow.
18   Q.      Slow.  How fast is he supposed to be
19   when he's handcuffed when you're walking him?
20   A.      Usually when people are under the
21   influence, they're like sluggish and slow.
22   Q.      We already know that he's not under the
23   influence because we had the test, right?
24           He's a 70 year old guy.
25   A.      We know now, but at that time I don't
```

Page 74

1  know what he was under the influence of. He could
2  have been under the influence of -- like you said,
3  he took medication, drugs or anything.
4  Q.     Yes. If you believe that, then you test
5  him for it, correct?
6  A.     Well, if he's under the influence of a
7  medication or -- all medication can't be tested, if
8  he took a over-the-counter medication that could
9  make him drowsy, make him sleepy.
10 Q.     Not illegal to take over-the-counter
11 medication, correct?
12 A.     No, but --
13 Q.     So you did not suspect him to be under
14 the influence of any controlled substance or a drug
15 that was a crime in any way, correct?
16 A.     I did suspect him to be.
17 Q.     So why didn't you blood test him?
18 A.     I can't recall.
19 Q.     You have the ability to do so, correct?
20 A.     The blood test, no, we don't have the
21 ability to do blood test.
22 Q.     You don't have the ability to blood test
23 for medications. How do you check for medication or
24 drugs?
25 A.     I'm not trained in that.

Page 75

1  Q.     You're not trained in testing for drugs?
2  A.     No. We have troopers that are trained
3  in that, but at that -- on that day we couldn't
4  locate one.
5  Q.     So nobody tested him for controlled
6  substances?
7  A.     No.
8  Q.     All right. And how many troopers were
9  at your barracks?
10 A.     I can't recall.
11 Q.     All right. So you say that
12 Mr. Zelechiwsky was slow while you were transporting
13 him.
14         Any other observations?
15 A.     Yes, his eyes. That's it.
16 Q.     What's wrong with his eyes when you're
17 transporting him?
18 A.     They were glassy.
19 Q.     Okay. And what were you trained
20 regarding glassy eyes, what could he be under the
21 influence of that would then provide the effect of
22 glassy eyes?
23 A.     Indication of alcohol, indication of
24 drugs.
25 Q.     All right. So we know that --

Page 76

1  A.     It could be over-the-counter medication.
2  Q.     We know that he's not under the
3  influence of alcohol because you tested him,
4  correct?
5  A.     At that time I didn't know. That was
6  before the test.
7  Q.     I understand, but we know your
8  allegation of glassy eyes we know can't be the
9  result of alcohol because you tested him, correct?
10 A.     Okay. Yes.
11 Q.     So what were you trained in regarding
12 drugs that could create glassy eyes?
13 A.     I wasn't trained.
14 Q.     Right. I mean you just told us that you
15 weren't trained in the detection regarding drugs,
16 right?
17 A.     Right.
18 Q.     So why then did you say that glassy eyes
19 could be the result of alcohol or drugs, whether
20 controlled or over-the-counter, you're not trained
21 in that, correct?
22 A.     I'm trained -- it could be the result of
23 alcohol.
24 Q.     All right. So glassy eyes we know -- if
25 you say Mr. Zelechiwsky had glassy eyes, we know it

Page 77

1  not to be because of alcohol, correct; do you agree
2  with me?
3  A.     We know that now, but at the time before
4  the testing you don't know that.
5  Q.     Okay. And you're not trained in whether
6  or not drugs or controlled substance causes glassy
7  eyes, correct?
8  A.     No.
9  Q.     Okay. How about exhaustion, does that
10 cause glassy eyes in your training?
11 A.     We're not trained -- I mean you know
12 that being tired can cause that, too, as well as
13 medication.
14 Q.     Are there different levels of glassiness
15 of eyes?
16 A.     No, not that I'm aware of.
17 Q.     All right. So it's just you're glassy
18 or not?
19 A.     Yes, from my understanding.
20 Q.     All right. And had you ever met
21 Mr. Zelechiwsky prior to this traffic stop?
22 A.     No.
23 Q.     Do you know how fast he moves as an
24 individual?
25 A.     No.

20 (Pages 74 - 77)

Page 78

1  Q.    All right. So why do you believe that
2  he was moving slowly when you were transporting him?
3  A.    Because he wasn't moving like -- even
4  like a normal senior citizen person moves. Like
5  normally --
6  Q.    He was slower than a normal senior
7  citizen?
8  A.    For a 80 year old, whatever age he is.
9  Q.    All right. At the station did they
10 perform any further tests on Mr. Zelechiwsky?
11 A.    Yes, he was put on the Alcotest. He was
12 given the Breathalyzer test.
13 Q.    I understand. I'm saying anything in
14 addition to that, meaning did he do --
15 A.    No.
16 Q.    -- another round of field sobriety tests
17 or drug recognition tests, nothing else?
18 A.    No.
19 Q.    And where was Mrs. Zelechiwsky at this
20 time?
21 A.    In the lobby, I believe.
22 Q.    All right. And you cited
23 Mr. Zelechiwsky for a traffic offense, correct?
24 A.    Yes.
25 Q.    And that traffic offense was dismissed,

Page 79

1  he was found not guilty of that offense, correct?
2          MR. CHAUDRY: Objection to the form
3  of the question.
4  Q.    How about this, Trooper Davis, was he
5  found guilty of the traffic offense?
6  A.    No.
7  Q.    Okay. And was that traffic offense
8  dismissed against Mr. Zelechiwsky?
9  A.    Yes.
10         MR. KAROLY: Okay. All right.
11 We'll take a ten-minute break. Okay.
12         (Short recess taken.)
13 BY MR. KAROLY:
14 Q.    All right. Trooper Davis, August the
15 10th of 2020, that was obviously at the height of
16 the COVID pandemic; am I correct?
17 A.    Yes.
18 Q.    And was New Jersey under certain
19 restrictions regarding the COVID epidemic?
20 A.    Yes.
21 Q.    Were there masking requirements in place
22 during this time period?
23 A.    Yes.
24 Q.    And was the New Jersey State Police
25 required to wear a mask during this time period?

Page 80

1  A.    I believe at that time it was up to the
2  individual.
3  Q.    August of 2020 you believe that it was
4  up to the individual whether or not they were
5  required to wear a mask during the performance of
6  their duties?
7  A.    It was at their discretion.
8  Q.    All right. And why do you believe that,
9  were there certain time periods where you were
10 required to wear a mask and certain time periods
11 where it was your discretion?
12 A.    It was at discretion.
13 Q.    And was there ever a time that you were
14 required to wear a mask?
15 A.    Not that I can recall.
16 Q.    Okay. So it was always discretionary
17 during the COVID pandemic whether or not New Jersey
18 state troopers were required to wear a mask during
19 the performance of their duties?
20 A.    Yes.
21 Q.    Okay. Now, I'd like to show you what
22 was provided in discovery. And I'm going to have to
23 do it on the screen and hold it up in front of the
24 video, NJSP Zelechiwsky 134.
25         Have you seen this document before?

Page 81

1  A.    I can't see it now. It's too small.
2  Q.    Can you see what this is?
3  A.    Yes.
4  Q.    All right. Have you seen this document
5  before?
6  A.    Yes.
7  Q.    All right. And it appears to be
8  standard operating procedure F-26 Annex C.
9          Do you agree with me?
10 A.    Yes.
11 Q.    All right. And on the top it has motor
12 vehicle stop DWI suspected, correct?
13 A.    Yes.
14 Q.    And then there's standard field sobriety
15 tests that go in the block right below it, correct?
16 A.    Yes.
17 Q.    And then it has refusal or fails and
18 passes are the two options, correct?
19 A.    You got to hold the paper up some more.
20         Yes.
21 Q.    And what's the block right below refuses
22 or fails field sobriety test?
23 A.    Arrest.
24 Q.    Okay. Arrest, correct, right, not
25 detainment, arrest?

21 (Pages 78 - 81)

Page 82

1    A.      Yes, but --
2    Q.      All right.  And then later on down in
3    the blocks it says, take the person for further
4    Breathalyzer, correct?
5    A.      What did you say it says?
6    Q.      After arrest, one, two, three, four
7    blocks down evidential breath test administered.
8    Okay.
9            So remember you told us that an
10   arrest only occurs after you decide to charge
11   somebody; remember you testifying to that?
12           Remember that?
13   A.      Your camera is breaking up.  I can't
14   understand what you're saying.
15           MR. CHAUDRY:  Counsel --
16           MR. KAROLY:  Yes.
17           MR. CHAUDRY:  -- what's the Bates
18   label on that?
19           MR. KAROLY:  NJSP Zelechiwsky 134,
20   New Jersey State Police Zelechiwsky 134.
21           MR. CHAUDRY:  Okay.
22           I'm going to try to bring it up on
23   the screen, if that's okay.
24           That way --
25           MR. KAROLY:  Sure, much easier for

Page 83

1    better --
2            MR. CHAUDRY:  Yes, exactly.
3            I'm going to share my screen.
4            Mr. Karoly, is this an accurate
5    description of what you are referring to as --
6            MR. KAROLY:  It is.
7            Thank you, Counsel.
8    BY MR. KAROLY:
9    Q.      So if you can go back to the top.
10           You'd agree with me, Trooper Davis,
11   that this is one of your standard operating
12   procedures, correct?
13   A.      I believe so.
14   Q.      And this is something that you've been
15   trained on and you were supposed to follow, correct?
16   A.      Correct.
17   Q.      And it's a flow chart regarding the
18   different steps that you are to undertake regarding
19   motor vehicle or vessel stops when there's a driving
20   while intoxicated suspected, correct?
21   A.      I don't know offhand if that's the exact
22   same one from ours, but the one that you're showing
23   on the screen, yes.
24   Q.      This is the one that was provided to me
25   by your counsel as your standard operating

Page 84

1    procedures.  I certainly didn't develop this.
2            Is this something that's provided
3    to you to follow in the course of your employment?
4    A.      You just made it smaller.
5    Q.      I understand, but is this document your
6    standard operating procedure, F-26 Annex C?
7    A.      Yes.
8    Q.      And, again, this is a flow chart of
9    steps to follow that you're trained upon regarding
10   vehicle stops and DWI suspected vehicle stops,
11   correct?
12   A.      Yes.
13   Q.      And the first block is you do standard
14   field sobriety tests, correct?
15   A.      Yes.
16   Q.      And then the flow chart goes to either
17   refusal/fails or passes, correct?
18   A.      Yes.
19   Q.      And under the refusal/fails the next
20   block is arrest, correct?
21   A.      Yes.
22   Q.      And then it goes on to return to
23   station, start 20-minute observation, ask to submit
24   to the breath test, submitting to the breath test,
25   what the results are, DRE call out, et cetera, et

Page 85

1    cetera, correct?
2    A.      Yes.
3    Q.      So you remember when we took issue with
4    you handcuffing Mr. Zelechiwsky and transporting
5    him back to the station, I called that an arrest,
6    correct?
7    A.      Yes.
8    Q.      Looking at this flow chart, does it
9    change your opinion about whether or not that is,
10   in fact, an arrest?
11   A.      No.
12   Q.      Okay.  So even though your standard
13   operating procedure states arrest, you don't believe
14   that that's accurate?
15   A.      No.
16   Q.      All right.  Any other of the training
17   materials that you've been provided with that you
18   take issue with?
19   A.      No.
20   Q.      All right.
21   A.      I'm not saying I take issue with this
22   either.
23   Q.      Well, I think that's exactly what your
24   answer was.
25           MR. CHAUDRY:  Objection to the form

22 (Pages 82 - 85)

Page 86

1  of the question.
2  Q.      Do you take issue with the fact that now
3  after looking at this handcuffing Mr. Zelechiwsky,
4  putting him in the back of your patrol car and
5  transporting him to the station is, in fact,
6  constitutionally an arrest; do you agree with that?
7  A.      No.
8  Q.      Okay. Even despite it showing on your
9  standard operating procedures?
10 A.      Well, when we do that, it doesn't count
11 as an arrest for our records.
12 Q.      Okay. All right. Nonetheless, this is
13 something that you provided and trained on, correct?
14 A.      Yes.
15 Q.      Why didn't you show up to the traffic
16 hearings?
17 A.      The first hearing I was on maternity
18 leave. And then we have a practice when we get
19 subpoenas, but we don't respond unless told
20 otherwise.
21         And the first prosecutor on the
22 case was in communication with me when to -- when
23 I had to appear and when I didn't have to appear.
24         But a different prosecutor took
25 over the case and did not communicate with me about

Page 87

1  appearing.
2  Q.      So it was the prosecutor's fault?
3  A.      I'm not saying it's anybody's fault.
4  I'm just answering your question.
5  Q.      All right. Now, you were sued in this
6  matter prior to the completion of the motor vehicle
7  hearing, correct?
8  A.      I can't recall. I don't know.
9  Q.      You were provided with a complaint on
10 August the 10th of 2022, right? That's when the
11 complaint was filed.
12 A.      I believe so.
13 Q.      The traffic hearing wasn't resolved by
14 that time, correct?
15 A.      I believe so. I don't know.
16 Q.      So didn't you think it was important
17 being sued in this matter to follow-up and handle
18 the traffic violation if, in fact, you believed
19 Mr. Zelechiwsky committed a violation?
20 A.      I followed up with the prosecutor. She
21 said it switched to a different prosecutor.
22 Q.      And did you follow-up with the different
23 prosecutor?
24 A.      That prosecutor -- well, our practice is
25 if we're needed, we're contacted by e-mail or phone

Page 88

1  call.
2  Q.      Did you follow-up with the different
3  prosecutor?
4  A.      I can't recall. I don't think so.
5  Q.      All right. And it was scheduled for a
6  number of occasions, right, not just two, it was
7  more than two times that a hearing was set, correct?
8  A.      Yes.
9  Q.      Okay. And you didn't show up for any of
10 them, correct?
11 A.      I attempted to show up to them, but they
12 were canceled.
13 Q.      They were canceled by you?
14 A.      They weren't canceled by me.
15 Q.      Okay. All right. Nonetheless, each
16 time you did not show up, correct?
17 A.      Yes.
18 Q.      All right. Now, Mr. Zelechiwsky didn't
19 have any disheveled appearance, right, he was
20 dressed neatly, hair combed, correct?
21 A.      When? I don't know when you're -- to
22 the court appearance?
23 Q.      No. At the traffic stop, Trooper Davis.
24 He was not disheveled in any manner?
25 A.      No.

Page 89

1  Q.      Okay. And when you asked him why he
2  didn't perform well on the one-legged stand, do you
3  recall what his answer was?
4  A.      No.
5  Q.      You recall him telling you it was
6  because he was nervous?
7  A.      No.
8  Q.      Is it normal in your training and
9  experience for people being stopped for motor
10 vehicle violations to be nervous when interacting
11 with troopers?
12 A.      Yes.
13 Q.      Okay. Was there an internal
14 investigation conducted regarding this matter?
15 A.      Yes. Regarding the stop or the civil --
16 Q.      I guess all of it. You know, was there
17 any internal investigation conducted regarding the
18 traffic stop of Mr. Zelechiwsky?
19 A.      I believe so.
20 Q.      Okay. And were you interviewed?
21 A.      No.
22 Q.      Okay. Were you made aware of an
23 internal investigation?
24 A.      I think it's when you're being sued
25 civilly, I think it prompts an investigation.

23 (Pages 86 - 89)

Page 90

1  Q.      Okay.  But you didn't speak to anybody
2  regarding the matter?
3  A.      Only spoke to a person in reference to
4  the court appearance.
5  Q.      Right.  I mean counsel, you didn't
6  speak to anybody that was conducting the internal
7  investigation, correct?
8  A.      No.
9  Q.      All right.  And did you receive any
10 findings regarding the internal investigation?
11 A.      No.
12 Q.      Okay.
13         MR. KAROLY:  All right.  That's all
14 I have.
15         Thank you.
16         MR. CHAUDRY:  Thank you, Counsel.
17 I have a few questions.
18         * * *
19         EXAMINATION
20 BY MR. CHAUDRY:
21 Q.      Hi, Trooper Davis.  As you know, I'm
22 your assigned attorney in this matter.  My name is
23 Azeem Chaudry.  I'm a deputy attorney general.
24         I'm just going to ask a few
25 questions.  I'm just going to point your attention

Page 91

1  to August 10, 2022.  And I'll represent to you that
2  is the day which you testified earlier which this
3  incident occurred.
4         Do you agree with that?
5  A.      Yes.
6  Q.      Okay.  Now, you testified earlier that
7  you were driving on Route 55 --
8  A.      Yes.
9  Q.      -- when you observed Mr. Zelechiwsky?
10 A.      Yes.
11 Q.      What did you observe Mr. Zelechiwsky's
12 vehicle doing?
13 A.      Failure to maintain lanes and the
14 failure to use his turn signal.
15 Q.      Now, you testified you were about
16 two car lengths behind Mr. Zelechiwsky; is that
17 correct?
18         MR. KAROLY:  Objection.
19 Q.      You can answer.
20 A.      Yes.
21 Q.      Okay.  Do you remember if it was dark
22 outside or was it daytime?
23 A.      It was dark.
24 Q.      Okay.  Now, if you could describe for
25 me what exactly did you observe Mr. Zelechiwsky's

Page 92

1  vehicle doing to elicit a traffic stop?
2  A.      He was all over the road.  His car was
3  going outside of the lane onto the other lane.  And
4  then when he switched lanes, he failed to use his
5  turn signal.
6  Q.      Okay.  Now, based on your experience,
7  is that an indication of somebody driving under the
8  influence?
9  A.      Yes.
10 Q.      Why?
11 A.      Because that person is failing to
12 maintain their lane of travel, which is a safety
13 issue, which can indicate that they may be impaired,
14 something causes them to drive that way.
15 Q.      Okay.  Have there been times during your
16 time with the New Jersey State Police where you have
17 conducted a traffic stop where an individual was
18 failing to maintain a lane and was under the
19 influence?
20 A.      Yes.
21 Q.      How many times about?
22 A.      I can't recall, but probably over 30
23 times.
24 Q.      Okay.  So is it fair to say you have
25 experience in determining whether or not somebody

Page 93

1  may be under the influence based on their driving on
2  a roadway?
3  A.      Yes, sir.
4  Q.      Okay.  All right.  Following that, you
5  conducted a traffic stop and did Mr. Zelechiwsky
6  pull over safely?
7  A.      Yes.
8  Q.      Okay.  Did you activate your lights and
9  sirens?
10 A.      My lights, not my sirens.
11 Q.      Okay.  Did you call it in that you
12 conducted a traffic stop on Mr. Zelechiwsky's
13 vehicle to the station?
14 A.      Yes, sir.  Yes.
15 Q.      You did?  What did you do, who did you
16 talk to, what did you say?
17 A.      I called my -- over the air my dispatch,
18 gave the description of his vehicle and his tag
19 number.
20 Q.      Okay.  Now, is that standard operating
21 procedure for New Jersey State Police?
22 A.      Yes, sir.
23 Q.      Okay.  Now, did you get a response from
24 dispatch regarding this traffic stop?
25 A.      Yes.

24 (Pages 90 - 93)

Page 94

1   Q.      What did they say?
2   A.      I believe receive -- like received,
3   nothing -- like that's all, just letting me know
4   that they know I'm on the stop.
5   Q.      Okay.  Now, following the stop, you
6   exited your state police vehicle, correct?
7   A.      Yes.
8   Q.      Okay.  What did you do after that?
9   A.      Went up to the car.  I made contact with
10  the driver and passenger.
11  Q.      Okay.  I'm going to show you a video
12  of your body-worn camera.  It's been submitted in
13  discovery.  And counsel for plaintiff has a copy of
14  it.
15          I'm going to share my screen now
16  and I'm going to indicate at what time we start and
17  where I'll pause it.  And that way it reflects in
18  the record.
19          (Whereupon the video was played.)
20  Q.      Ashley, can you see this?
21          Ms. Trooper Davis, can you see
22  this?
23  A.      Yes.
24  Q.      Okay.  So I'm going to represent to you
25  this is your body-worn camera on August 10, 2020,

Page 95

1   which was the incident date for the alleged civil
2   complaint.
3           I'm going to play this video for
4   you.  We're starting at 1 minute and 11 seconds.
5           (Whereupon the video was played.)
6   Q.      My apologies.  I'm going to go back a
7   little bit.  We're going to start at zero.
8           (Whereupon the video was played.)
9   A.      Sir, am I supposed to be able to
10  hear it?
11  Q.      Yes, Trooper Davis, are you able to hear
12  it?
13  A.      No.
14          MR. CHAUDRY:  Counsel, are you
15  able to hear it?
16          MR. KAROLY:  We can't hear it, but
17  later on the volume comes on.  There's no volume at
18  this point from my memory.
19          MR. CHAUDRY:  Yes, it comes on at
20  30 seconds, so just let me know if you hear it.
21          Do you hear anything now?
22          MR. KAROLY:  No.
23  Q.      All right.  Trooper Davis, I'm going to
24  pause it at 50 seconds.  It's your body-worn camera
25  footage.

Page 96

1           Is it fair to say that this is your
2   body-worn camera footage stemming from the August
3   10, 2020 incident which is the substance of the
4   allegations of Mr. Zelechiwsky's complaint?
5   A.      Yes, sir.
6   Q.      Okay.
7           (Whereupon the video was played.)
8   Q.      Okay.  I'm going to stop it at 51
9   seconds.
10          Do you see this truck, this larger
11  vehicle?
12          What do you see right now, do you
13  see a larger truck or vehicle?
14  A.      Yes.
15  Q.      Okay.  Are there bicycles on the back of
16  that vehicle?
17  A.      Yes.
18  Q.      Okay.  And you believe this to be
19  Mr. Zelechiwsky's vehicle?
20  A.      Yes.
21  Q.      Okay.  I'm playing the video.
22          (Whereupon the video was played.)
23  A.      I still can't hear the sound.
24  Q.      That's fine.  I just need the video.
25  A.      Okay.

Page 97

1   Q.      Trooper Davis, do you have a flashlight
2   in your hand?
3   A.      Yes.
4   Q.      Okay.
5           (Whereupon the video was played.)
6   Q.      Counsel (sic), if you recall, do you
7   remember being able to see Mr. Zelechiwsky in the
8   driver seat?
9           MR. KAROLY:  From the video?
10  Q.      Trooper Davis, from the --
11          MR. KAROLY:  Were you asking me?
12          MR. CHAUDRY:  No, no, no.  I'm
13  asking Trooper Davis.
14          MR. KAROLY:  Oh, I'm sorry, I
15  thought you said Counsel.
16  Q.      Trooper Davis --
17  A.      You said can I see him now or do I
18  remember seeing him then?
19  Q.      Is it fair to say that you just put
20  your flashlight into Mrs. Zelechiwsky -- into Lisa
21  Zelechiwsky's vehicle?
22          MR. KAROLY:  Objection.
23  A.      Yes.
24  Q.      Okay.  With that flashlight can you see
25  with your eyes -- can you observe Mr. Zelechiwsky?

25 (Pages 94 - 97)

Page 98

1   A.      Yes.
2   Q.      What did you observe?
3   A.      I observed him, his movements to be slow
4   and his eyes to be watery, glassy --
5   Q.      Okay.
6   A.      -- and bloodshot red.
7   Q.      When you say you saw his movement slow,
8   do you mean like delayed; what do you mean by that?
9   A.      Yes, I mean like when I asked him for
10  his credentials, he was moving not at like a normal
11  pace that most drivers move at when they're looking
12  for their credentials.
13  Q.      And is that an indication of being under
14  the influence of drugs or alcohol?
15          MR. KAROLY: Objection.
16  A.      Yes.
17  Q.      I'm going to play the video.
18          (Whereupon the video was played.)
19  Q.      You can't hear this at all?
20  A.      I can't.
21  Q.      Okay. Did you provide Mr. Zelechiwsky a
22  reason for the stop?
23  A.      Yes.
24  Q.      Okay.
25  A.      I believe so.

Page 99

1   Q.      Did Mr. Zelechiwsky, if you remember,
2   dispute that?
3   A.      I can't remember.
4   Q.      Okay. All right. So what happened
5   after you observed Mr. Zelechiwsky with glassy eyes
6   and sluggish, slow or delayed movement?
7           MR. KAROLY: Objection.
8   Q.      What did you do after that?
9   A.      I had him step out of the car for field
10  sobriety testing.
11  Q.      Okay. All right. I'm playing it at
12  2 minutes and 16 seconds, the body-worn camera
13  footage.
14          (Whereupon the video was played.)
15  Q.      Do you recall what you asked
16  Mr. Zelechiwsky at this time?
17  A.      I believe I asked him to step out for
18  the test and to make sure he's safe to drive.
19  Q.      Did Mr. Zelechiwsky kindly follow your
20  orders?
21  A.      I believe so.
22          (Whereupon the video was played.)
23  Q.      Okay. I'll represent to you that you
24  were doing the HGN test at 3 minutes and 2 seconds.
25          Tell me about the HGN test. What

Page 100

1   is it?
2   A.      It's the horizontal gaze nystagmus test.
3   It's an eye test that gives clues that a person may
4   or may not be under the influence of alcohol or
5   drugs.
6   Q.      Okay. And can you explain to me the
7   substance of this test. What exactly do you do on
8   the individual that you're testing?
9   A.      You can do a eye test which offers six
10  clues. And if you get four out of the six clues,
11  it's a indication, a 77 percent chance that the
12  person may be under the influence of drugs or
13  alcohol.
14  Q.      Okay. Now, I'm going to play the video
15  again for you. We're at 3 minutes and 2 seconds and
16  I'm pressing play.
17          And I'm also stating for the record
18  that there's no volume on this. There's no audio.
19          (Whereupon the video was played.)
20  Q.      Do you recall asking Mr. Zelechiwsky
21  whether or not -- I'm pausing the video at 3 minutes
22  and 10 seconds.
23          Do you recall whether you asked
24  Mr. Zelechiwsky if he had any injuries to his eye?
25  A.      I believe so, yes.

Page 101

1   Q.      Do you recall what Mr. Zelechiwsky
2   responded?
3   A.      I believe he said, no.
4   Q.      Okay. So --
5           MR. KAROLY: I'm sorry, can you say
6   that one more time?
7           THE WITNESS: Who, me or --
8           MR. KAROLY: I didn't hear the
9   first question.
10          MR. CHAUDRY: Gina, can you read
11  the question back.
12          (The reporter read back the
13  requested portion of the record.)
14          MR. CHAUDRY: Okay, Counsel.
15  Q.      So you just testified that
16  Mr. Zelechiwsky told you during this traffic stop
17  that he had no injuries to his eye?
18  A.      Yes, I believe so.
19  Q.      Okay. Now, explain to me, if you can,
20  the best way you can in words how you conduct an HGN
21  test.
22  A.      Well, you check for equal eye size. You
23  check the equal tracking of the eyes. Then you
24  track for the smooth pursuit of the eyes. And then
25  you conduct three -- two other tests which will

26 (Pages 98 - 101)

Page 102

1  give -- the eyes will give --
2        Can you repeat the question.
3  Q.    Certainly.  My question is regarding the
4  HGN test.
5        Can you explain to me in words how
6  you conduct an HGN test, is there a stimulus, how do
7  you do it on the individual that you're testing?
8  A.    Yes.
9  Q.    Do you understand my -- I'm asking
10 you --
11 A.    You want me to give it to you from
12 the top?
13 Q.    Correct.  How exactly do you conduct
14 it, the HGN test?  If you're doing the HGN test on
15 Mr. Zelechiwsky, what did you do first?
16 A.    Yes.  You ask them do they have any
17 injuries to their eyes that may prevent them from
18 taking this test.
19 Q.    Okay.  And Mr. Zelechiwsky responded --
20 A.    And then --
21 Q.    What do you do after that?
22 A.    Because if they have injuries to the
23 eyes, that can also give off nystagmus to the eyes
24 and cause the eyes to flutter.
25 Q.    Okay.  Following that, how do you

Page 103

1  conduct a nystagmus test?
2  A.    You check for equal eyes, that they're
3  the same size.  You check for equal tracking of the
4  eyes to make sure both eyes are following at the
5  same time.  And then you check for a lack of pursuit
6  of the eyes to make sure both eyes are going at the
7  same speed.
8  Q.    Okay.  So if I'm understanding this
9  correctly, did you ask Mr. Zelechiwsky to keep his
10 head straight?
11 A.    Yes.
12 Q.    All right.  And then did you pull out a
13 stimulus?
14 A.    Yes.
15 Q.    What was the stimulus?
16 A.    The stimulus was a pen.
17 Q.    Okay.  And then what do you do?  You can
18 show me with your body language and we'll put it on
19 the record if that's easier.
20 A.    You hold it, the pen, the stimulus,
21 about 12 to 15 inches from his head.  You check for
22 equal size.  And then after that you check for equal
23 tracking of the eyes to make sure the eyes are
24 following at the same time.
25       And then you check for a lack of a

Page 104

1  smooth pursuit for the eyes to make sure that both
2  eyes are following at the same time.
3  Q.    Okay.  Now, how did Mr. Zelechiwsky
4  perform on the HGN test?
5  A.    He didn't perform.  He kept moving his
6  head, which if you move your head, it doesn't -- you
7  can't get an indicator of the eyes properly.
8  Q.    Okay.  So are you telling me that with
9  the HGN test you keep your head straight, take a
10 stimulus, which was your pen, and you move it left
11 to right; is that correct?
12 A.    Yes.
13 Q.    15 inches away from the --
14 A.    12 to 15 inches from the person's head.
15 Q.    Okay.  Did you tell Mr. Zelechiwsky
16 not to move his head and only watch the pen with
17 your eyes?
18 A.    Yes.
19 Q.    Okay.  What did Mr. Zelechiwsky do?
20 A.    He continued to move his head.
21 Q.    Okay.  Now, what -- as a result of
22 Mr. Zelechiwsky continuing to move his head, what
23 was the determination you made?
24 A.    That he could be under the influence of
25 either drugs or alcohol since he wasn't following

Page 105

1  instructions and I couldn't get a read of whether he
2  had nystagmus in his eyes.
3  Q.    Okay.  Now you testified earlier that
4  nystagmus was 77 percent accurate?
5  A.    Yes.
6  Q.    What are you basing that off?
7  A.    Training.
8  Q.    Okay.  Now --
9  A.    Other HGN tests that I conducted.
10 Q.    Okay.  Tell me about other HGN tests
11 that you've conducted.
12 A.    If the test is properly conducted, the
13 eyes will flutter if a person is under alcohol or
14 some type of drug.
15 Q.    Okay.
16       MR. KAROLY:  I mean, Counsel, just
17 so the record is clear, I think we went over this
18 how many times that she's not trained in drug
19 recognition.
20       So if she continues to say each
21 question, we're going to have to go back to each
22 question saying whether or not it's alcohol or
23 drugs.
24 A.    Well, if it's -- if we're not trained --
25 Q.    One second, Ms. Davis.

27 (Pages 102 - 105)

Page 106

1      MR. CHAUDRY: Yes, Mr. Karoly, I'm
2  going to clarify that testimony earlier -- based
3  earlier so you can ask your follow-up questions.
4      MR. KAROLY: All right.
5      MR. CHAUDRY: I'm going to clarify
6  the drug tests.
7      Gina, can you read back the last
8  question I had.
9      (The reporter read back the
10  requested portion of the record.)
11  BY MR. CHAUDRY:
12  Q.    Do you understand the question,
13  Ms. Davis?
14  A.    Yes. When conducted and the person
15  following the instructions properly, the eyes during
16  the test -- you would -- the test you would get --
17  you can get up to six clues.
18      If you get four out of the six
19  clues, then that's a indication that the person may
20  be under the influence of something.
21  Q.    Okay. I'll just resolve -- we'll see
22  if we can figure this out. I just want some
23  clarification on your testimony earlier.
24      Now, you testified earlier that you
25  weren't trained in drug recognition.

Page 107

1      What does that mean?
2  A.    So if you -- when conducting the HGN
3  test, if the person gets the flicker of the eyes --
4  I mean if the person fails four out of the six
5  clues, it could be a indication that they're under
6  something, whether it be alcohol or drugs.
7  Q.    Okay. And you've been trained on that;
8  is that correct?
9  A.    Yes.
10  Q.    Okay. Now, you testified earlier that
11  there are only a handful of troopers that are
12  trained with respect to drug recognition, something
13  along those lines.
14      What did you mean by that?
15  A.    So we have to follow a procedure. So
16  if they fail HGN, we take them back to the station
17  and then further testing is conducted, which is a
18  Breathalyzer test.
19      If the reading comes back to zero,
20  then we often reach out to a DRE to come in for
21  further testing of the eyes to see if -- well, what
22  type of drugs that person may be under.
23  Q.    Okay. Well, based on the field sobriety
24  tests, are you trained to observe signs of being
25  under the influence of either alcohol or drugs at

Page 108

1  the scene during the field sobriety test?
2  A.    Yes.
3  Q.    Okay. And are you telling me that
4  following that you bring out a DRE, which is a
5  specialized state trooper that will come out and
6  do an additional eye test to test for drugs?
7  A.    Yes, after -- if we take them back
8  because the HGN is a indication that it could be
9  under the alcohol or drugs, so after we take them
10  back to the station, they're put on the
11  Breathalyzer.
12      If that comes back to zeros, then
13  a DRE comes in -- well, we reach out once and try to
14  get one in since it's not a lot of us trained in
15  it to see if that person is under influence of
16  drugs.
17  Q.    Okay. All right. I'm going to go back
18  to the HGN test on the screen with the body cam
19  footage.
20      How did Mr. Zelechiwsky perform on
21  the HGN test?
22  A.    He kept moving. He didn't perform
23  because he kept moving his head.
24  Q.    Is that an indication --
25  A.    When you move your head, it's a -- you

Page 109

1  don't follow the -- if you don't follow the test
2  properly, you don't get -- you can't get a
3  indication of -- if they don't follow the
4  instructions properly, then the test is not valid.
5  Q.    Okay. So if they don't follow the
6  proper --
7  A.    It's an automatically fail.
8  Q.    Okay. That's what I'm asking you.
9      So it's an automatic fail because
10  Mr. Zelechiwsky did not follow directions properly
11  during the HGN test; is that accurate?
12  A.    Yes.
13  Q.    Okay. So after making a determination
14  that Mr. Zelechiwsky failed the HGN test, what did
15  you do next?
16  A.    I went to the next test.
17  Q.    Okay. One second. I'm going to play it
18  at 3 minutes, 10 seconds. I'm going to press play
19  on Trooper Davis' body-worn camera footage.
20      (Whereupon the video was played.)
21  Q.    Do you recall what test you did next
22  after the HGN test?
23  A.    The walk-and-turn test.
24  Q.    Okay. Do you recall telling
25  Mr. Zelechiwsky numerous times to take his hands out

28 (Pages 106 - 109)

Page 110

1  of his pockets?
2  A.      Yes.
3  Q.      Why did you ask Mr. Zelechiwsky to take
4  his hands out of his pockets?
5  A.      For my safety and to conduct the test
6  properly.
7  Q.      Okay.  Now, tell me about the
8  walk-and-turn test.
9  A.      The walk-and-turn test is a test
10  conducted to gage a indication if a person may be
11  impaired to drive.
12        You explain the test to them and
13  then you demonstrate it for them.
14  Q.      Okay.  Did you do that?
15  A.      And it offers eight clues and if you get
16  two out of the eight clues, that's the indication
17  that the person may be impaired.
18  Q.      Okay.  I'm going to play the video at
19  4 minutes and 12 seconds.
20        (Whereupon the video was played.)
21  Q.      Okay.  Explain the instructions for the
22  walk-and-turn test as if you were explaining to
23  Mr. Zelechiwsky.
24  A.      Keep your hands at your side.  Put your
25  right heel to your left toe.

Page 111

1  Q.      What do you do after that?
2  A.      Remain in that position while I
3  demonstrate the test.
4        While you're taking the test, you
5  must count out loud, you must keep your hands at
6  your sides and you may not stop at no time during
7  the test.  Is that understood.  And the person
8  answers yes or no.
9        If they don't understand, I explain
10  the test to them again.
11  Q.      Okay.
12  A.      And I tell them to take nine heel-to-toe
13  steps, make a series of small turns, turn around and
14  do the same thing.
15  Q.      Okay.  I'm going to play the video for
16  you now, Trooper Davis, at 4 minutes and 36 seconds
17  of your body-worn camera.
18        (Whereupon the video was played.)
19  Q.      Trooper Davis, what are you observing
20  Mr. Zelechiwsky doing at the walk and turn,
21  what are your observations with respect to
22  Mr. Zelechiwsky's --
23  A.      Raising his left arm to try to maintain
24  his balance.
25  Q.      What does that mean?

Page 112

1  A.      It's a clue, one of the clues that a
2  person may be impaired.
3  Q.      Okay.  And what are you basing that --
4  that clue in the regulation or training, what do you
5  know about that clue?
6  A.      It's in the training.
7  Q.      Okay.  I'm going to continue playing it
8  at 5 minutes and 33 seconds.
9        (Whereupon the video was played.)
10  Q.      Do you recall Mr. Zelechiwsky counting
11  as per your instructions during the walk-and-turn
12  test?
13  A.      No.  No, not the whole test.
14  Q.      Does that indicate being under the
15  influence of drugs or alcohol?
16  A.      Yes.
17  Q.      What is that based off of?
18  A.      Not completing the test, stopping during
19  the test.
20  Q.      Okay.  I'm going to play it again,
21  your body-worn camera footage at 5 minutes and 45
22  seconds.
23        (Whereupon the video was played.)
24  Q.      You recall what test you did next?
25  A.      The one-leg stand test.

Page 113

1  Q.      Can you tell me about that test.
2  A.      It's a test that offered four clues.
3  And if you get two out of the four clues -- if the
4  person indicates two out of the four clues, that's
5  the indication that they may be impaired.
6        You give them instructions, you
7  demonstrate it for them, you tell them -- explain
8  the test to them.  You want me to explain the test
9  or you want me --
10        You ask them on which leg they feel
11  comfortable like raising six inches off of the
12  ground.  They raise that leg six inches off.
13        While that leg is raised, they keep
14  their hands at their side and they count out loud
15  with their eyes on that foot.  And they can't stop
16  until told to do so.
17        And the test is demonstrated for them.
18  Before the test you ask if they have any injuries or
19  if they'd like the test repeated.  And if they'd
20  like the test repeated, you repeat it.  And if they
21  want it demonstrated, you do so.
22  Q.      Okay.  I'm going to play your body-worn
23  camera footage at 5 minutes and 53 seconds.
24        (Whereupon the video was played.)
25  Q.      Trooper Davis, in this moment did you

29 (Pages 110 - 113)

Page 114

1  instruct Mr. Zelechiwsky to keep his hands out of
2  his pockets?
3  A.      Yes.
4  Q.      Why?
5  A.      Safety issue and that's not --
6  Q.      And what else, Trooper Davis, anything
7  else?
8  A.      And to maintain the starting position of
9  the test.
10  Q.      Okay. I'm going to press play again at
11  6 minutes and 6 seconds.
12          (Whereupon the video was played.)
13  Q.      Trooper Davis, did you ask
14  Mr. Zelechiwsky to take this garter or his mask off?
15  What's around his neck?
16  A.      I can't see it because of the light.
17  Q.      Do you see it now?
18  A.      Yes.
19  Q.      Do you know what that is?
20  A.      It looks like some type of garment
21  around his neck from the camera.
22  Q.      You testified earlier that this stop
23  was conducted during the height of COVID; is that
24  correct?
25  A.      Yes.

Page 115

1  Q.      Okay. Is Mr. Zelechiwsky's face covered
2  with any sort of protective covering?
3  A.      No.
4  Q.      Did you ask Mr. Zelechiwsky to remove
5  any of his covering?
6  A.      I can't recall.
7  Q.      Okay. I'm going to play it again at 7
8  minutes and 6 seconds.
9          (Whereupon the video was played.)
10  Q.      I'm going to pause it at 7 minutes and
11  14 seconds.
12          Trooper Davis, tell me about what
13  you just observed.
14  A.      Him putting his foot down, losing his
15  balance and hopping.
16  Q.      All right. Now, were there any -- you
17  mention that there were clues --
18  A.      And his arms are raised -- also, his
19  arms are raised, not kept at his side.
20  Q.      Okay. First, did he fail or pass the
21  one-legged stand test?
22  A.      Failed.
23  Q.      Why?
24  A.      He didn't keep his hands at his side, he
25  lost balance and he put the foot down.

Page 116

1  Q.      Okay. Now is that your own test or
2  did you get that from training, learning how to --
3  A.      Training.
4  Q.      Okay. So you were trained how to do
5  this one-legged stand test, correct?
6  A.      Yes.
7  Q.      Okay. I'm going to play it again at
8  7 minutes and 14 seconds.
9          (Whereupon the video was played.)
10  Q.      What did you do following that test?
11  A.      Placed him in handcuffs and explained
12  to him that he was going to be taken down to the
13  station, I believe, for further testing. I don't
14  know the exact words I used.
15  Q.      Why did you handcuff him?
16  A.      For safety purposes and that's per our
17  SOP when you have somebody suspected to be under the
18  influence of drugs or alcohol.
19  Q.      Okay. So you handcuffed
20  Mr. Zelechiwsky. And then you escorted him where,
21  to the back of the police cruiser?
22  A.      Yes.
23  Q.      After that what did you do?
24  A.      Placed him in the car and -- in the
25  troop car, I believe I read his Miranda rights and

Page 117

1  then conducted the search of the vehicle.
2  Q.      Okay. From the time of detaining
3  Mr. Zelechiwsky and the search of the vehicle, how
4  much time elapsed?
5  A.      I don't recall. Maybe like five, ten
6  minutes.
7  Q.      Okay.
8  A.      From the test or just from placing him
9  in cuffs and searching the car?
10  Q.      Correct.
11  A.      Altogether, maybe 5 -- 15 minutes, 10
12  minutes. Not sure.
13  Q.      Okay. So you placed Mr. Zelechiwsky in
14  handcuffs and detained him; is that correct?
15  A.      Yes.
16  Q.      And then after 5, 10 or 15 minutes you
17  conducted a search of the vehicle?
18  A.      No, after -- about maybe after five
19  minutes after I detained him that I conducted the
20  search of the vehicle.
21  Q.      Okay.
22  A.      It depends on if another trooper
23  responded. Our procedure is we have to wait for
24  another trooper to come on scene.
25  Q.      Was there another trooper on scene?

30 (Pages 114 - 117)

Page 118

1  A.     Yes.
2  Q.     When did the other trooper arrive on
3  scene?
4  A.     I can't recall.
5  Q.     Was it before or after Mr. Zelechiwsky
6  was detained?
7  A.     I believe after.
8  Q.     Okay.
9  A.     I'm not sure.
10 Q.     So following Mr. Zelechiwsky's
11 detainment you said five to ten minutes after you
12 conducted a search of the vehicle, correct?
13 A.     Yes.
14 Q.     Why did you conduct a search of the
15 vehicle?
16 A.     Because it's probable cause after we
17 detain a person for DUI.
18 Q.     So what were you looking for?
19 A.     Evidence of impairment.
20 Q.     So were you looking for alcohol or drugs
21 or anything like that?
22 A.     Alcohol, drugs.
23 Q.     Okay.  Do you remember where you looked
24 in the vehicle?
25 A.     I believe all over.  I don't -- yes, I

Page 119

1  believe in the front, the passenger seat, front
2  seat, in the console, back seat.
3  Q.     Okay.  Did you ask Mrs. Zelechiwsky to
4  exit the vehicle during the search?
5  A.     Yes.
6  Q.     Okay.  Did Mrs. Zelechiwsky have her
7  purse on her person, on her?
8  A.     I don't think so.
9  Q.     You testified earlier that --
10 A.     No, I believe it was in the car.
11 Q.     Okay.  So the purse was in the vehicle
12 when --
13 A.     Yes.
14 Q.     -- you were conducting the search.
15        Did you search Mrs. Zelechiwsky's
16 purse?
17 A.     Yes.
18 Q.     Again, what were you looking for?
19 A.     Evidence of either alcohol or drugs.
20 Q.     Okay.  Did you ever search
21 Mrs. Zelechiwsky?
22 A.     No.
23 Q.     Okay.  Where was Mrs. Zelechiwsky
24 standing, if you recall, when you were conducting
25 a search of the vehicle?

Page 120

1  A.     In the shoulder, in the grass.
2  Q.     Was she standing next to anyone, was she
3  by herself?
4  A.     I can't recall.
5  Q.     Okay.  How long did the search of the
6  vehicle last?
7  A.     Maybe five, no more than ten minutes.
8  Q.     Okay.  During the detainment of
9  Mr. Zelechiwsky did you use any physical force on
10 him?
11 A.     No.
12 Q.     Did you punch him?
13 A.     No.
14 Q.     Did you tackle him?
15 A.     No.
16 Q.     Did he tell you that his handcuffs were
17 too tight?
18 A.     Not that I can recall.
19 Q.     How would you explain Mr. Zelechiwsky's
20 demeanor following you handcuffing him and putting
21 him in the back of the trooper -- the cruiser?
22 A.     I would describe as slightly agitated.
23 Q.     Okay.  Following the search of the
24 vehicle -- how long did it last, the search?
25 A.     Maybe five to ten minutes, I believe.

Page 121

1  Q.     Were there any findings based on that
2  search?
3  A.     No.
4  Q.     Okay.  What did you do after that?
5  A.     We went back to the station to conduct
6  another test.
7  Q.     What test did you conduct and on who?
8  A.     The Breathalyzer.
9  Q.     Okay.
10 A.     On Mr. Bo.
11 Q.     I'll represent to you Mr. Bohdan
12 Zelechiwsky --
13        MR. CHAUDRY:  Counsel, please
14 correct me if I am pronouncing Mr. Zelechiwsky's
15 last name incorrectly.
16        And I apologize, I mean no
17 disrespect by it.
18        Am I saying it correctly,
19 Mr. Karoly?
20        MR. KAROLY:  Zelechiwsky.
21        MR. CHAUDRY:  Zelechiwsky.  Okay.
22 Q.     So Mr. Zelechiwsky is the plaintiff.
23 Following the detainment of Mr. Zelechiwsky you take
24 him back down to the station.
25        How far was the station from the

31 (Pages 118 - 121)

Page 122

1  location of the traffic stop?
2  A.      I believe about 10, 15 minutes.
3  Q.      Okay. Did you let Mrs. Zelechiwsky
4  drive the vehicle that was stopped back to the
5  station?
6  A.      Yes.
7  Q.      Did you make any observations as to
8  whether or not she was under the influence?
9  A.      Yes.
10 Q.      What were your observations?
11 A.      I didn't get any indicators when I
12 approached the car.
13 Q.      Okay. Did Mrs. Zelechwsky make it to
14 the station safely in her vehicle?
15 A.      Yes.
16 Q.      Okay. So you get back down to the
17 station. And you testified that you conducted an
18 Alcotest.
19         What is an Alcotest?
20 A.      It's a testing of the breath to see if
21 and how much alcohol a person may have in their
22 system.
23 Q.      Okay. Is it fair to say it's typically
24 called a Breathalyzer?
25 A.      Yes.

Page 123

1  Q.      Okay. What were the results of the
2  Breathalyzer, which I'll call it?
3  A.      Zero point zero.
4  Q.      Okay. Now, you testified earlier that
5  you needed a trooper to -- a specialized trooper
6  with experience in DRE.
7          What does DRE stand for?
8  A.      A drug recognition expert.
9  Q.      Okay. Are you a drug recognition
10 expert?
11 A.      No.
12 Q.      Okay. Were you trained to observe
13 whether or not somebody is under the influence of
14 alcohol and drugs or only one?
15 A.      HGN is trained to give -- indicates if
16 the person is under the influence of alcohol or
17 drugs, so, yes.
18 Q.      Okay. But you're not a DRE?
19 A.      No.
20 Q.      Okay. But you can still recognize
21 whether or not -- or you have training on whether
22 or not somebody may be under the influence of a
23 substance or alcohol, correct?
24 A.      Yes.
25 Q.      Okay. All right. How long did you

Page 124

1  detain Mr. Zelechiwsky for?
2  A.      I would say a hour or a little over.
3  Q.      Did Mr. Zelechiwsky raise any complaints
4  to you during his detainment at the station?
5  A.      No.
6  Q.      Was he still in handcuffs?
7  A.      They are handcuffed until -- only one
8  arm or leg is handcuffed to the bench for safety
9  purposes until the test is conducted.
10         And then after it's conducted it's
11 discretion whether we keep that person handcuffed or
12 not.
13 Q.      Okay. Now, was Mr. Zelechiwsky -- did
14 he raise any concerns of pain or that the handcuffs
15 were too tight while he was handcuffed at the
16 station?
17 A.      No.
18 Q.      Did he show any signs of emotional
19 distress?
20         MR. KAROLY: Objection.
21 A.      No. No.
22 Q.      So he wasn't shouting in pain?
23 A.      No.
24 Q.      Was he belligerent to you?
25 A.      He was agitated a little, like --

Page 125

1  Q.      Okay.
2  A.      -- a little on the nasty side.
3  Q.      Okay. So how long was Mr. Zelechiwsky
4  detained for?
5  A.      I would say for over a hour, but less
6  than two hours.
7  Q.      Okay. Who decided to release
8  Mr. Zelechiwsky, you or your supervisor?
9  A.      After the test we tried to reach out to
10 see if we can get a DRE, but we couldn't locate one,
11 so we released him.
12 Q.      Okay. Did you book Mr. Zelechiwsky?
13 And what I mean by that is fingerprints, mugshot,
14 all of that, did you do that when you brought him
15 to the station?
16 A.      No.
17 Q.      Why not?
18 A.      Because it wasn't an arrest. It was a
19 moving vehicle violation.
20 Q.      Okay. So based on your understanding,
21 an arrest -- based on your training, an arrest is
22 when the individual is fingerprinted, booked and
23 there's a mugshot?
24 A.      Yes. In New Jersey a DUI is not an
25 arrest. It's a motor vehicle violation.

32 (Pages 122 - 125)

Page 126

1   Q.      Okay.  Did Mr. Zelechiwsky say anything
2   to you when you were -- when you conducted the
3   initial stop?
4   A.      In regards to?
5   Q.      Whether or not he was under the
6   influence of anything.
7   A.      I believe he said no.
8   Q.      Okay.  Well, when you went back to the
9   station, you testified earlier Mr. Zelechiwsky
10  stated something along that he was on -- something
11  along the lines that he was on medication; is that
12  true?
13  A.      Yes.
14  Q.      Okay.
15  A.      And he was apologetic at that time.
16  Q.      Okay.
17          MR. CHAUDRY:  I don't have any
18  further questions.
19          MR. KAROLY:  I have a few
20  followups.
21              * * *
22          RE-EXAMINATION
23  BY MR. KAROLY:
24  Q.      Trooper, when you asked Mr. Zelechiwsky
25  about his medications, he told you he was on a blood

Page 127

1   pressure medication for his thyroid, correct?
2   A.      I can't recall what he said.  I can't
3   remember.
4   Q.      All right.  But he certainly didn't tell
5   you that he was under the prescription care of some
6   sort of opiates or something else that would impair
7   his ability to drive, correct?
8   A.      I can't recall.
9   Q.      Wouldn't it be something that would be
10  important in an investigation for driving while
11  intoxicated to recall what substances somebody says
12  they're under?
13  A.      Yes.
14  Q.      Okay.  Didn't write it down in any
15  report and have no idea what it is that he said?
16  A.      At that time he was released, so it was
17  done.
18  Q.      What do you mean at that time he was
19  released?
20  A.      That's when he told me he was on
21  medication, after he was released to leave the
22  station.
23  Q.      You mean when you took the handcuffs off
24  of him?
25  A.      Yes, when he was free to go to leave the

Page 128

1   station.
2   Q.      So what if he responded to you right
3   then and said, ha, ha, I'm on opiates, got you, you
4   wouldn't have arrested him then?
5          MR. CHAUDRY:  Objection to the form
6   of the question.
7          If you understand, you can
8   answer it.
9   A.      Not -- I wouldn't be known if he was --
10  no, because we weren't able to get a drug
11  recognition expert to determine that.
12  Q.      Do you have any reason to disagree that
13  the medication Mr. Zelechiwsky told you he was
14  solely taking was for blood pressure, do you have
15  any reason to disagree with that?
16  A.      I don't know if he told me that.  I
17  don't remember him saying that it was for blood
18  pressure, sir.  I can't answer that.
19  Q.      You don't remember him telling you any
20  medication or for any purposes were, correct?
21  A.      No.  He just said medication.
22  Q.      Okay.  And what steps did you take to
23  get a drug recognition expert to come to the scene?
24  A.      Can you repeat that.
25  Q.      What steps did you take to have a drug

Page 129

1   recognition expert arrive at your station to perform
2   an evaluation of Mr. Zelechiwsky?
3   A.      Well, I let my sergeant know that he
4   failed -- I mean he passed the test, that it wasn't
5   an indication that he was under alcohol.
6          So at that time he reached out for
7   whoever it was.  I don't remember what sergeant it
8   was --
9   Q.      No, I'm saying what did you do again.  I
10  don't want you to then say what you suspect somebody
11  else did.  What did you do?
12  A.      I let my sergeant know the test results
13  so we could reach out to a drug recognition expert
14  to come in.
15  Q.      Did you reach out to a drug recognition
16  expert?
17  A.      I can't -- well, I believe my sergeant
18  did.  No.
19  Q.      Did you reach out to a drug recognition
20  expert?
21  A.      No.
22  Q.      Do you know any drug recognition experts
23  that were particularly reached out to to come to the
24  station?
25  A.      I can't recall.

33 (Pages 126 - 129)

Page 130

| | | |
|---|---|---|
| 1 | Q. | Do you know the names of any drug |
| 2 | recognition experts? | |
| 3 | A. | Yes. |
| 4 | Q. | Okay. And did you reach out to any of |
| 5 | them on this occasion? | |
| 6 | A. | I didn't, no. |
| 7 | Q. | Okay. And nonetheless, nobody appeared |
| 8 | to do any further testing on Mr. Zelechiwsky? | |
| 9 | A. | No. |
| 10 | Q. | Okay. Now, do you not take blood |
| 11 | samples in New Jersey for DUI prosecutions? | |
| 12 | A. | No. |
| 13 | Q. | Do you take urine? |
| 14 | | Not that I'm aware of. |
| 15 | | Yes. |
| 16 | Q. | Do you take urine? |
| 17 | | Miss, do you take urine? |
| 18 | A. | Yes. We can, that's a discretion, we |
| 19 | can take urine. | |
| 20 | Q. | Okay. And urine samples can indicate |
| 21 | whether or not somebody is under the influence of | |
| 22 | a medication or controlled substance, correct? | |
| 23 | A. | Yes. |
| 24 | Q. | And you chose not to do that in this |
| 25 | case regardless of whether or not a drug recognition | |

Page 131

| | | |
|---|---|---|
| 1 | expert was available to come to the station, | |
| 2 | correct? | |
| 3 | A. | I can't recall. |
| 4 | Q. | You can't recall whether or not you told |
| 5 | Bo to pee in a cup, you can't recall that? | |
| 6 | A. | No, we didn't do that. I misunderstood |
| 7 | the question. | |
| 8 | Q. | All right. So you agree with me that |
| 9 | you can, in fact, take a urine sample of somebody to | |
| 10 | determine whether or not they're under the influence | |
| 11 | of any medication or controlled substance, correct? | |
| 12 | A. | Yes. |
| 13 | Q. | And you did not do that in this case, |
| 14 | correct? | |
| 15 | A. | No. |
| 16 | Q. | Meaning I am correct, you did not do |
| 17 | that in this case? | |
| 18 | A. | Yes. |
| 19 | Q. | All right. Now, did I hear you |
| 20 | correctly when you said a DUI is a motor vehicle | |
| 21 | violation and not an arrest? | |
| 22 | A. | Yes. |
| 23 | Q. | Just because something happens to maybe |
| 24 | be listed under the motor vehicle code as opposed | |
| 25 | to the crimes code, do you not believe it to be a | |

Page 132

| | | |
|---|---|---|
| 1 | criminal offense? | |
| 2 | A. | No, it's not considered criminal in |
| 3 | New Jersey. | |
| 4 | Q. | A DUI is not considered criminal in |
| 5 | New Jersey? | |
| 6 | A. | No. |
| 7 | Q. | It's a civil violation? |
| 8 | | MR. CHAUDRY: Objection to the form |
| 9 | of the question. | |
| 10 | Q. | So if it's not considered criminal, what |
| 11 | is it? | |
| 12 | A. | It's a motor vehicle violation just as |
| 13 | if you -- like a speeding ticket. | |
| 14 | Q. | So if you get a -- |
| 15 | A. | It's a moving violation. |
| 16 | Q. | If you get a third offense DUI or you |
| 17 | get a homicide by a vehicle DUI related, that's | |
| 18 | under the motor vehicle code, that's not a crime? | |
| 19 | A. | No. After your third one it progresses |
| 20 | to a crime. It's a 2C charge. A first arrest or a | |
| 21 | second arrest is under motor vehicle violation. | |
| 22 | | Once you progress to like the third |
| 23 | and fourth offenders, it upgrades to a charge if | |
| 24 | you're caught driving again. | |
| 25 | Q. | No, I understand, but is your testimony |

Page 133

| | | |
|---|---|---|
| 1 | that something isn't a crime simply because it's | |
| 2 | listed under the motor vehicle code? | |
| 3 | A. | I didn't say it wasn't a crime. I said |
| 4 | it wasn't considered an arrest for New Jersey. | |
| 5 | Q. | Okay. So a first offense DUI is not |
| 6 | considered an arrest in New Jersey? | |
| 7 | A. | It falls under motor vehicle violations. |
| 8 | Q. | I understand. I'm just trying to ask |
| 9 | you a direct question. Okay. | |
| 10 | A. | No, it's not considered an arrest. |
| 11 | Q. | And it's not considered a first |
| 12 | offense -- DUI is not considered a crime in New | |
| 13 | Jersey; is that your testimony? | |
| 14 | A. | The motor vehicle statute, no, yes. |
| 15 | Q. | I get that. I'm not quibbling with the |
| 16 | fact that it's been under one section or another | |
| 17 | section or another section. Okay. | |
| 18 | | But crimes also appear in the motor |
| 19 | vehicle code, correct? | |
| 20 | A. | Yes, it's a crime, yes. |
| 21 | Q. | Okay. So is a first offense DUI in New |
| 22 | Jersey considered a crime? | |
| 23 | A. | Yes. |
| 24 | Q. | All right. Now, you were asked |
| 25 | questions about what you searched within | |

34 (Pages 130 - 133)

Page 134

1  Mr. Zelechiwsky's vehicle by Mr. Chaudry.
2         Do you recall that?
3  A.     Yes.
4  Q.     Now you listed some things, but that
5  wasn't an exhaustive list, correct?
6  A.     Repeat the question.
7  Q.     Yes. You searched grocery bags that
8  were found in the car. You searched toolboxes that
9  were found in the car. You searched sunglass cases
10 that were found in the car. You searched a purse
11 that was found in the car.
12        You searched all items that were
13 within the vehicle, correct?
14 A.     Yes.
15 Q.     So just because we didn't provide a
16 complete list of everything you searched doesn't
17 mean it wasn't searched.
18        You'd agree with me, right?
19 A.     I can't recall exactly what I searched,
20 but anything in a motor vehicle I can search.
21 Q.     Right. And you did search, correct?
22        You did search, correct?
23 A.     Yes.
24 Q.     All right. Now, you testified that only
25 the HGN of the tests can detect the presence of

Page 135

1  alcohol or drugs.
2         Was that your testimony?
3  A.     The other tests can be a indication of
4  drugs, too.
5  Q.     All right. But you testified that the
6  HGN could be an indicator of drugs, correct?
7  A.     When it comes for the eyes.
8  Q.     But you weren't able to determine that
9  here because you said Mr. Zelechiwsky didn't
10 complete the test, correct?
11 A.     Yes.
12 Q.     All right. Now how high up does
13 somebody need to raise their hands from their
14 side for you to believe that that's a clue of
15 intoxication?
16 A.     For which test?
17 Q.     The walk and turn when you said that
18 Mr. Zelechiwsky raised his hand to his side at
19 whatever time period we froze the screen at, right?
20        Do you remember that testimony?
21 A.     Yes, but a walk and turn, if you raise
22 your hand, then that's a clue -- I mean if you raise
23 your arm, which he did.
24 Q.     So how high up did he raise his arm?
25 A.     The training doesn't say how high. It

Page 136

1  just says if the arms are raised.
2  Q.     Okay. All right. And how about the
3  lean, where was it on that video on the walk and
4  turn that he leaned now that you watched it?
5  A.     When he was walking, he was leaning,
6  which is indication that person is trying to keep
7  their balance.
8  Q.     So you think that that video shows a
9  lean by Mr. Zelechiwsky on that walk and turn?
10 A.     Yes.
11 Q.     All right. Now, you testified to
12 something to the effect of in your arrests, the HGN
13 has proved to be 77 percent accurate.
14        I didn't understand that testimony.
15 What was that?
16 A.     Not by my arrests. According to the
17 training.
18 Q.     So explain. You lost me on that.
19 A.     When a person does the test and follows
20 the instructions correctly, the test is 77 percent
21 accurate to indicate that a person is impaired.
22 Q.     And that's in your training paperwork?
23 A.     Yes.
24 Q.     That there's some study that was
25 conducted that --

Page 137

1  A.     We don't have the paperwork, but when we
2  take the training, yes, we -- that study is taught
3  to us.
4  Q.     So somebody says that number in the HGN
5  test, but you have no scientific data or the study
6  to back that up?
7  A.     I believe -- I'm not too sure, but I
8  believe it is.
9  Q.     So how about, you know, when --
10 A.     This is why we take them back to the
11 station for another test.
12 Q.     How about in situations like this where
13 you perform the test and you don't make an arrest
14 for DWI, does that go in some sort of logbook that
15 then gets calculated to do these percentages?
16        MR. CHAUDRY: Objection to the form
17 of the question.
18        If you understand, you can answer.
19 A.     I don't under -- can you repeat your
20 question, sir.
21 Q.     How many times have you pulled somebody
22 over for DWI and done field sobriety tests and not
23 arrested them for DWI?
24 A.     A lot of times, but I don't know the
25 exact number.

35 (Pages 134 - 137)

Page 138

1  Q.    So can you give percentages? Meaning
2  when you put somebody through the field sobriety
3  tests, how often do you detain them then for further
4  testing versus how often do you let them drive away?
5  A.    I can't give an exact percentage.
6  Q.    Yes, no, I know you're not going to give
7  me 63.82 percent, but is there a rough estimation
8  that you can provide?
9  A.    No.
10 Q.    All right. Did you conduct the Alcotest
11 test at the station or did somebody else?
12 A.    Somebody else did.
13 Q.    Okay. So when you testified that you
14 performed that test back at the station, that was
15 incorrect, correct?
16 A.    I didn't testify. I just said I was
17 trained in that. At that time I wasn't trained in
18 it, but I'm trained in it now.
19 Q.    Well, the record will reflect what you
20 testified to. And I believe Mr. Chaudry asked you
21 what tests you performed back at the station and you
22 stated that and then you went into that and the
23 results of the test, but nonetheless, you did not
24 personally conduct that test at the station,
25 correct?

Page 139

1  A.    When he asked that question, I believe
2  it was in reference to what test was conducted in
3  general back at the station.
4  Q.    I disagree with you, but that's fine.
5  The record will show what it shows.
6        Nonetheless, the answer is you did
7  not perform that test personally, correct?
8  A.    Correct.
9  Q.    All right. And you didn't observe
10 Mr. Zelechiwsky, you know, showing any signs of
11 intoxication when he was sitting on the bench,
12 correct?
13 A.    His eyes were watery, glassy and his
14 movements were slow.
15 Q.    So for, you know, an hour to two hour
16 time period when we know he's a zero point zero,
17 Mr. Zelechiwsky just happens to have the wateriest
18 eyes in the world?
19        MR. CHAUDRY: Objection --
20 A.    You asked me --
21        MR. CHAUDRY: -- to the form of the
22 question.
23        You can answer.
24 Q.    Huh? You see this, you know, this
25 unusually watery eyes --

Page 140

1  A.    You asked --
2  Q.    -- and you know it's a zero point zero
3  and you have a test to determine whether or not he's
4  under the --
5  A.    You asked me --
6  Q.    -- influence of drugs and you choose --
7  A.    I'm talking --
8  Q.    Let me finish, please. Okay.
9        I mean it's -- you say that he has
10 watery, glassy eyes for over an hour time period at
11 every opportunity you get to make an observation of
12 him, yet you have a test that you can determine
13 whether or not he's under the influence of
14 medication or a controlled substance and you
15 choose not to perform it, correct?
16 A.    Yep, we performed a Breathalyzer. We
17 didn't perform a drug test.
18 Q.    Right. So you have -- you say that you
19 have an indication that he's moving slow and he has
20 glassy eyes, right, when he's at the station, for
21 whatever that's worth, right?
22 A.    Yes.
23 Q.    And you know at the station that he gets
24 a zero point zero, correct?
25 A.    He was at the station prior to him

Page 141

1  taking the test, too, as well.
2  Q.    You know before he leaves the station,
3  you have these observations and he's a zero point
4  zero.
5        What's the next logical thing that
6  you do to determine whether or not he's under the
7  influence of a controlled substance?
8        MR. CHAUDRY: Objection to the form
9  of the question.
10 Q.    Do you see the disconnect there? You
11 say that, hey, I believe he might be under the
12 influence -- let me finish.
13        If you believe he might be under
14 the influence of drugs, wouldn't you test him for
15 them?
16 A.    If we could get somebody out there
17 that's trained in it, yes.
18 Q.    All you have to do is get a --
19        I'm sorry, I cut you off. Go
20 ahead.
21 A.    I'm not trained. I wasn't trained as a
22 drug expert recognition officer, so -- and we don't
23 always -- that's not a common practice to let a
24 person pee in a cup or urine in a cup.
25 Q.    It's not a common practice to have a

36 (Pages 138 - 141)

Page 142

1  scientific --
2  A.      We don't --
3  Q.      Can I finish, please.  Okay.
4        It's not a common practice to have
5  a scientific test evaluate whether or not somebody
6  is under the influence of a drug?
7  A.      No.
8  Q.      Okay.  In your training and experience
9  and as a state trooper what do you think is more
10 valuable evidence, the --
11       MR. CHAUDRY:  Objection to the form
12 of the question.
13 Q.      -- the scientific results of a test or
14 whatever your observations are regarding somebody's
15 eyes or their movements, what do you think holds
16 more evidentiary weight?
17       MR. CHAUDRY:  Objection to the
18 form of the question.  She's not an expert.
19       MR. KAROLY:  All right.
20       MR. CHAUDRY:  And --
21       MR. KAROLY:  She's --
22       MR. CHAUDRY:  By the court rules --
23       MR. KAROLY:  She said that she's
24 received plenty of training in this area.  And I'm
25 sure she's testified.  And this has been asked in a

Page 143

1  thousand different courtrooms across the country.
2  Q.      What do you think holds more weight if
3  you want to determine whether or not somebody is
4  under the influence of drugs or alcohol, a
5  scientific test or your subjective observations?
6        MR. CHAUDRY:  Objection to the form
7  of the question.
8        You can answer.
9  A.      Both.
10 Q.      Okay.
11       MR. KAROLY:  All right.  I don't
12 have any other questions.
13       Thank you.
14       MR. CHAUDRY:  Okay.  I don't have
15 any questions.
16       Thank you so much, Trooper Davis,
17 for your time.
18       THE WITNESS:  Thank you, sir.
19       THE COURT REPORTER:  Attorney
20 Chaudry, would you like a transcript?
21       MR. CHAUDRY:  Yes.
22       You want me to give you my -- you
23 guys do it in PDF or like how do you do it?
24       THE COURT REPORTER:  We have your
25 email.  I think it's a PDF they send.

Page 144

1        MR. CHAUDRY:  Okay.  Yes, that's
2  fine.  Send me a PDF.  Yes, that's fine.
3        * * *
4        (Witness excused.)
5        * * *
6        (Deposition concluded at 1:00 p.m.)

Page 145

CERTIFICATE

I do hereby certify that I am a
Notary Public in good standing, that the aforesaid
testimony was taken before me, pursuant to notice,
at the time and place indicated; that said deponent
was by me duly sworn to tell the truth, the whole
truth, and nothing but the truth; that the testimony
of said deponent was correctly recorded in machine
shorthand by me and thereafter transcribed under my
supervision with computer-aided transcription; that
the deposition is a true and correct record of the
testimony given by the witness; and that I am
neither of counsel nor kin to any party in said
action, nor interested in the outcome thereof.


WITNESS mv hand and official seal this 29th

_Jina L. Clements_

_____
Notary Public

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 146

```
 1
 2          INSTRUCTIONS TO WITNESS
 3
 4          Please read your deposition over
 5   carefully and make any necessary corrections.
 6          You should state the reason in the
 7   appropriate space on the errata sheet for any
 8   corrections that are made.
 9          After doing so, please sign the
10   errata sheet and date it.
11          You are signing same subject to the
12   changes you have noted on the errata sheet, which
13   will be attached to your deposition.
14          It is imperative that you return
15   the original errata sheet to the deposing attorney
16   within thirty (30) days of receipt of the deposition
17   transcript by you.  If you fail to do so, the
18   deposition transcript may be deemed to be accurate
19   and may be used in court.
20
21
22
23
24
25
```

Page 148

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4
 5          I, _____, do hereby
 6   certify that I have read the foregoing pages __ to
 7   ___ and that the same is a correct transcription of
 8   the answers given by me to the questions therein
 9   propounded, except for the corrections or changes in
10   form or substance, if any, noted in the attached
11   Errata Sheet.
12
13   _____    _____
14   DATE              SIGNATURE
15
16
17          Subscribed and sworn to before me this
18   29th day of February, 2024.
19
20
21   Notary Public
22
23
24
25
```

Page 147

```
 1          - - - - -
 2          E R R A T A
 3          - - - - -
 4
 5   PAGE  LINE  CHANGE
 6   ___ ___ ___ _____
 7   Reason for
 8   Change:_____
 9   ___ ___ ___ _____
10   Reason for
11   Change:_____
12   ___ ___ ___ _____
13   Reason for
14   Change:_____
15   ___ ___ ___ _____
16   Reason for
17   Change:_____
18   ___ ___ ___ _____
19   Reason for
20   Change:_____
21   ___ ___ ___ _____
22   Reason for
23   Change:_____
24   ___ ___ ___ _____
25   Assignment Number:
```

Page 149

```
 1   Azeem Chaudry, Esq.
 2   azeem.chaudry@law.njoag.gov
 3          March 1st, 2024
 4   RE:  Zelechiwsky, Bohdan J. Et Al  v. Davis, Trooper Ashley Et Al
 5   2/20/2024, Ashley Davis (#6459369)
 6          The above-referenced transcript is available for
 7   review.
 8          Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12          The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-midatlantic@veritext.com.
16   Return completed errata within 30 days from
17   receipt of testimony.
18    If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22          Yours,
23          Veritext Legal Solutions
24
25
```

**[04994 - accidently]**                                          Page 1

| 0 | | | |
|---|---|---|---|

**04994**  1:4 7:12
**07101**  2:7

**1**

**1**  95:4
**10**  73:8,8,8
91:1 94:25
96:3 100:22
109:18 117:11
117:16 122:2
**100**  26:13
**101**  26:15
**10801**  145:21
**10:05**  1:12
**10th**  36:20
79:15 87:10
**11**  95:4
**12**  103:21
104:14 110:19
**124**  2:6
**126**  3:6
**134**  80:24
82:19,20
**14**  115:11
116:8
**15**  73:8,9
103:21 104:13
104:14 117:11
117:16 122:2
**16**  99:12
**17**  5:23
**18101-1511**
1:17
**18104**  1:23
2:22

**19**  35:16
**1:00**  144:6
**1:22**  7:12
**1st**  149:3

**2**

**2**  99:12,24
100:15
**2/20/2024**
149:5
**20**  1:12 59:16
63:14 84:23
**2003**  12:16
**2008**  13:19
**2009**  13:5
**2010**  13:19
**2012**  16:16
**2017**  16:16
**2018**  35:16
**2019**  20:12
**2020**  36:20
79:15 80:3
94:25 96:3
**2022**  23:10
87:10 91:1
**2024**  1:12
145:20 148:18
149:3
**205**  1:22 2:22
**22**  1:4
**26**  81:8 84:6
**29th**  145:19
148:18
**2c**  132:20

**3**

**3**  99:24 100:15
100:21 109:18
**30**  43:5,12
92:22 95:20
146:16 149:16
**33**  112:8
**36**  111:16

**4**

**4**  110:19
111:16
**437-1252**  1:18
**45**  112:21

**5**

**5**  112:8,21
113:23 117:11
117:16
**50**  95:24
**51**  96:8
**5100**  1:22 2:22
**527**  1:17
**53**  113:23
**55**  37:19 91:7
**5th**  2:6

**6**

**6**  37:10,10
114:11,11
115:8
**60**  43:5
**610**  1:18
**63.82**  138:7
**6459369**  149:5

**7**

**7**  3:6 115:7,10
116:8
**70**  73:24
**77**  100:11
105:4 136:13
136:20

**8**

**80**  59:15 78:8

**9**

**90**  3:8

**a**

**a.m.**  1:12 37:10
**ability**  74:19,21
74:22 127:7
**able**  10:24
11:15 31:8
46:11,17 54:12
54:15,25 55:10
55:18 62:3
95:9,11,15
97:7 128:10
135:8
**above**  149:6
**academy**  11:25
12:1 17:23,24
18:11,16,22
24:24
**acceptable**  8:8
**accident**  24:25
25:9,11 26:4
26:25 29:7
**accidently**
33:25

**[accuracy - apparent]**

**accuracy** 149:9
**accurate** 10:1
  10:18 83:4
  85:14 105:4
  109:11 136:13
  136:21 146:18
**acknowledge**
  4:2,5
**acknowledg...**
  148:2 149:12
**action** 27:2
  145:16
**activate** 93:8
**active** 43:1
**actually** 5:16
  37:21 63:9
**addition** 78:14
**additional** 18:4
  18:5,13,19
  25:4 26:11
  27:9 108:6
**administer** 4:7
  22:23
**administered**
  4:6 82:7
**affair** 10:6
**aforesaid** 145:5
**age** 59:12,25
  78:8
**agency** 21:1
**aggregate** 62:9
**agitated** 120:22
  124:25
**agree** 4:14 5:25
  6:11,23 44:11

51:6 77:1 81:9
  83:10 86:6
  91:4 131:8
  134:18
**agreed** 9:23
**agreement** 4:11
  5:24 34:23
**ahead** 44:20
  47:25 54:11
  141:20
**aided** 145:12
**air** 93:17
**al** 149:4,4
**alco** 21:25 22:5
  22:10
**alcohol** 10:13
  20:5 22:6,16
  22:18 25:20
  26:3 48:2,3,11
  48:16,22 60:6
  63:22 70:22
  75:23 76:3,9
  76:19,23 77:1
  98:14 100:4,13
  104:25 105:13
  105:22 107:6
  107:25 108:9
  112:15 116:18
  118:20,22
  119:19 122:21
  123:14,16,23
  129:5 135:1
  143:4
**alcoholic** 22:5
  22:11

**alcotest** 19:2
  21:25 22:3,9
  35:21 78:11
  122:18,19
  138:10
**allegation** 29:4
  33:18 76:8
**allegations**
  14:11 24:12
  96:4
**alleged** 27:3
  29:17,18 40:7
  42:10 95:1
**allegedly** 57:14
  57:20,23 58:4
  63:21
**allentown** 1:17
  1:23 2:22
**allotted** 149:19
**allow** 8:20,22
  9:16
**allowing** 70:18
**altogether**
  117:11
**amd** 1:4
**amount** 19:7
  31:3,23 32:1,3
  32:7 33:4,6,12
  33:20,22 34:3
  34:6 36:13
**amounts** 30:23
**annex** 81:8
  84:6
**answer** 7:20
  8:23 9:19

11:13 14:19,25
  24:16 25:9
  26:8,17 27:6
  29:25 39:23
  40:3 41:24
  46:16 48:14
  53:23,24 54:1
  58:13 71:6
  85:24 89:3
  91:19 128:8,18
  137:18 139:6
  139:23 143:8
**answered** 10:9
  45:24 49:9
**answering** 46:2
  60:20 87:4
**answers** 8:7,10
  8:16 9:12,16
  9:24 10:18
  11:15 111:8
  148:8
**anticipate** 8:21
  10:5
**anybody** 71:14
  90:1,6
**anybody's** 87:3
**apologetic**
  69:16 70:17,25
  71:3,9,12,14
  126:15
**apologies** 95:6
**apologize** 11:9
  35:6 121:16
**apparent** 40:6

[apparently - back]                                                    Page 3

**apparently**
30:13 40:13
**appeals** 2:5
**appear** 86:23
86:23 133:18
**appearance**
88:19,22 90:4
**appearances**
1:14 2:1
**appeared** 130:7
**appearing** 87:1
**appears** 81:7
**apple** 19:24
21:3,4,15
**applicable**
149:8
**approached**
44:16 45:11
122:12
**appropriate**
49:9 146:7
**approximately**
12:11 39:4
**approximation**
24:8 36:13
**area** 47:9
142:24
**arm** 62:5,6
111:23 124:8
135:23,24
**arms** 115:18,19
136:1
**arrangement**
4:8

**arrest** 62:10,17
62:18,21,23
63:8,16 65:25
66:7 81:23,24
81:25 82:6,10
84:20 85:5,10
85:13 86:6,11
125:18,21,21
125:25 131:21
132:20,21
133:4,6,10
137:13
**arrested** 25:20
62:13,14,15
63:1,6 64:1
65:20 128:4
137:23
**arresting** 63:21
**arrests** 37:13
136:12,16
**arrive** 118:2
129:1
**arrived** 72:17
**artery** 70:12
**arts** 13:1
**ashley** 1:7,9 3:5
4:17,18 5:2
6:20 11:5
94:20 149:4,5
**aside** 38:1
**asked** 5:10,13
9:5 45:25 49:7
50:15 52:7,18
52:22 67:16
68:7 89:1 98:9

99:15,17
100:23 126:24
133:24 138:20
139:1,20 140:1
140:5 142:25
**asking** 18:15
19:11 34:9
97:11,13
100:20 102:9
109:8
**assigned** 90:22
**assignment**
147:25
**assisting** 30:20
32:25 33:3
**atlantic** 1:22
2:21
**attached**
146:13 148:10
149:11
**attempt** 56:21
56:23
**attempted**
52:21 56:11
88:11
**attention** 90:25
**attorney** 2:3,4
2:5 4:16 90:22
90:23 143:19
146:15 149:13
**attorneys** 4:1
**attrition** 10:4
**audio** 100:18
**august** 36:20
79:14 80:3

87:10 91:1
94:25 96:2
**authentic** 6:22
**authenticate**
6:14
**authority** 66:13
67:3
**automatic**
109:9
**automatically**
109:7
**available** 131:1
149:6
**awaiting** 55:1
**aware** 77:16
89:22 130:14
**azeem** 2:4 4:15
4:20 5:19 6:19
90:23 149:1
**azeem.chaudry**
2:7 149:2

**b**

**bac** 70:19
**bachelor** 13:1
**bachelors**
12:25
**back** 15:21
22:16 25:3
31:6 32:9 33:9
33:23 44:25
49:15,18,22
63:13 68:12
72:16 83:9
85:5 86:4 95:6
96:15 101:11

[back - calendar]                                              Page 4

| | | | |
|---|---|---|---|
| 101:12 105:21 | bates 82:17 | 87:18 | 112:21 113:22 |
| 106:7,9 107:16 | bathroom 10:7 | belligerent | bohdan 1:4 |
| 107:19 108:7 | beginning 25:8 | 124:24 | 2:11 4:13 7:8 |
| 108:10,12,17 | behalf 4:16 | bench 63:15 | 121:11 149:4 |
| 116:21 119:2 | believe 13:19 | 73:15 124:8 | book 125:12 |
| 120:21 121:5 | 20:12,20 34:17 | 139:11 | booked 125:22 |
| 121:24 122:4 | 35:15 37:10 | best 9:4 32:22 | box 22:17,20 |
| 122:16 126:8 | 39:24 44:10 | 101:20 | 22:24 |
| 137:6,10 | 50:19 51:9 | better 11:17 | brand 22:9 |
| 138:14,21 | 52:10,19 57:20 | 83:1 | break 10:6,10 |
| 139:3 | 57:24,25 58:7 | bicycles 96:15 | 79:11 |
| bags 65:6 134:7 | 62:21,25 63:5 | bit 11:9,10 95:7 | breaking 82:13 |
| balance 55:1,11 | 65:15,18,23 | block 81:15,21 | breath 82:7 |
| 55:18 56:13,17 | 66:10 67:15,23 | 84:13,20 | 84:24,24 |
| 56:24 58:19,20 | 68:1,6,7,7,8,10 | blocks 82:3,7 | 122:20 |
| 59:5,13,16,25 | 68:14 70:3 | blood 48:2 | breathalyzer |
| 60:4,8,21 61:6 | 71:20 74:4 | 74:17,20,21,22 | 22:21,22,24 |
| 61:7,18,18 | 78:1,21 80:1,3 | 126:25 128:14 | 78:12 82:4 |
| 62:3 111:24 | 80:8 83:13 | 128:17 130:10 | 107:18 108:11 |
| 115:15,25 | 85:13 87:12,15 | bloodshot | 121:8 122:24 |
| 136:7 | 89:19 94:2 | 46:21,23 48:7 | 123:2 140:16 |
| balanced 61:8 | 96:18 98:25 | 48:10 49:11 | bridgeton |
| barracks 75:9 | 99:17,21 | 50:7 98:6 | 12:15 13:13 |
| based 53:18 | 100:25 101:3 | bmw 22:10 | bring 22:16 |
| 65:16,21 92:6 | 101:18 116:13 | bo 45:15 47:13 | 82:22 108:4 |
| 93:1 106:2 | 116:25 118:7 | 121:10 131:5 | brought 63:9 |
| 107:23 112:17 | 118:25 119:1 | bo's 45:14 | 125:14 |
| 121:1 125:20 | 119:10 120:25 | body 33:21 | business 11:4 |
| 125:21 | 122:2 126:7 | 43:17,24 44:5 | **c** |
| basing 105:6 | 129:17 131:25 | 44:9 46:20 | c 22:11 81:8 |
| 112:3 | 135:14 137:7,8 | 47:16 51:13 | 84:6 145:1,1 |
| basis 62:23 | 138:20 139:1 | 94:12,25 95:24 | calculated |
| 63:8,21 64:6 | 141:11,13 | 96:2 99:12 | 137:15 |
| 65:9 66:24 | believed 28:5 | 103:18 108:18 | calendar 20:10 |
| | 31:14 68:16 | 109:19 111:17 | |

[call - citizens]                                                          Page 5

**call**  14:6,8 64:2
  84:25 88:1
  93:11 123:2
**called**  22:8,10
  25:3 27:9 85:5
  93:17 122:24
**cam**  43:17
  108:18
**camden**  1:2
  7:11
**camera**  11:12
  31:4,8 32:6,8,8
  32:13 33:7,15
  33:21,21 43:24
  44:5,9 47:16
  47:22 82:13
  94:12,25 95:24
  96:2 99:12
  109:19 111:17
  112:21 113:23
  114:21
**cams**  51:13
**canceled**  88:12
  88:13,14
**capacity**  36:23
**capture**  43:3,8
**captures**  43:10
**car**  30:21 33:4
  42:5 44:17
  49:24 50:24
  63:13 64:12,15
  64:16,18,21
  65:1,1,2 66:3
  66:20,21 68:12
  70:18 86:4

  91:16 92:2
  94:9 99:9
  116:24,25
  117:9 119:10
  122:12 134:8,9
  134:10,11
**care**  127:5
**carefully**  146:5
**carotid**  70:12
**cars**  38:11 41:7
  41:14
**case**  86:22,25
  130:25 131:13
  131:17
**cases**  5:23
  134:9
**caught**  132:24
**cause**  33:2
  65:11,12,22
  66:20 77:10,12
  102:24 118:16
**caused**  25:17
  31:20
**causes**  77:6
  92:14
**caveat**  35:8
**certain**  19:7,11
  43:4 79:18
  80:9,10
**certainly**  41:13
  41:19 45:6
  46:10 53:8
  54:25 59:23
  84:1 102:3
  127:4

**certification**
  19:2 22:1
**certifications**
  27:8
**certify**  145:4
  148:6
**cetera**  84:25
  85:1
**chance**  100:11
**change**  85:9
  147:5,8,11,14
  147:17,20,23
**changes**  146:12
  148:9 149:10
**charge**  15:19
  34:9 82:10
  132:20,23
**charged**  62:18
**charges**  63:9
**chart**  83:17
  84:8,16 85:8
**chaudry**  2:4
  3:8 4:15,15,22
  5:4,11 6:2,6,15
  7:1 14:17,23
  22:8 24:14
  25:24 26:6,21
  27:4,25 28:7
  29:9,20,23
  31:17 32:17
  40:1 41:22
  45:8 46:14
  48:12 49:1
  51:17,24 53:10
  53:14,17 54:2

  54:6 55:21
  58:11 60:9
  62:12,15 63:23
  71:4 79:2
  82:15,17,21
  83:2 85:25
  90:16,20,23
  95:14,19 97:12
  101:10,14
  106:1,5,11
  121:13,21
  126:17 128:5
  132:8 134:1
  137:16 138:20
  139:19,21
  141:8 142:11
  142:17,20,22
  143:6,14,20,21
  144:1 149:1
**check**  74:23
  101:22,23
  103:2,3,5,21,22
  103:25
**checked**  73:2
**checks**  44:17
**choose**  140:6
  140:15
**chose**  130:24
**circumstances**
  7:21 9:10
  65:17 66:21
**cited**  78:22
**citizen**  78:4,7
**citizens**  24:5

[civil - continuous]                                                        Page 6

| | | | |
|---|---|---|---|
| **civil** 5:22 89:15 | **come** 6:14,21 | 135:10 | **conducting** |
| 95:1 132:7 | 107:20 108:5 | **completed** | 5:14 90:6 |
| **civilian** 13:15 | 117:24 128:23 | 19:24,25 20:11 | 107:2 119:14 |
| 15:21 16:17 | 129:14,23 | 149:16 | 119:24 |
| 17:1 | 131:1 | **completing** | **confiscate** 33:6 |
| **civilly** 89:25 | **comes** 95:17,19 | 112:18 | **consent** 4:8,10 |
| **clarification** | 107:19 108:12 | **completion** | 4:17 |
| 106:23 | 108:13 135:7 | 87:6 | **considered** |
| **clarify** 106:2,5 | **comfortable** | **comply** 42:19 | 132:2,4,10 |
| **classes** 15:22 | 113:11 | **computer** | 133:4,6,10,11 |
| **clear** 105:17 | **coming** 44:6 | 145:12 | 133:12,22 |
| **clements** 1:13 | **commencing** | **concerns** | **console** 119:2 |
| **close** 41:15 | 1:12 | 124:14 | **constitutional** |
| **closed** 65:6,19 | **committed** | **concluded** | 62:23 |
| **clue** 61:16,18 | 27:24 29:19 | 144:6 | **constitutional...** |
| 61:24,25 62:1 | 87:19 | **conditions** | 86:6 |
| 112:1,4,5 | **common** | 52:19 | **contact** 49:23 |
| 135:14,22 | 141:23,25 | **conduct** 29:17 | 94:9 |
| **clues** 60:5 | 142:4 | 36:2,7 52:21 | **contacted** |
| 61:15 100:3,10 | **communicate** | 54:8 101:20,25 | 87:25 |
| 100:10 106:17 | 45:22 86:25 | 102:6,13 103:1 | **containers** 65:7 |
| 106:19 107:5 | **communication** | 110:5 118:14 | 65:20 |
| 110:15,16 | 86:22 | 121:5,7 138:10 | **content** 22:18 |
| 112:1 113:2,3 | **complaint** 7:8 | 138:24 | **contents** 64:15 |
| 113:4 115:17 | 7:14,16,22 | **conducted** | 65:2 66:20 |
| **coach** 24:22 | 29:15 87:9,11 | 50:22 51:1 | **continue** 112:7 |
| **code** 40:8 | 95:2 96:4 | 65:14 89:14,17 | **continued** 2:1 |
| 131:24,25 | **complaints** | 92:17 93:5,12 | 52:8,25 104:20 |
| 132:18 133:2 | 24:3,11 36:6 | 105:9,11,12 | **continues** |
| 133:19 | 124:3 | 106:14 107:17 | 105:20 |
| **cold** 11:10 | **complete** 8:20 | 110:10 114:23 | **continuing** |
| **combative** 51:7 | 8:22 9:5,11,17 | 117:1,17,19 | 19:15 104:22 |
| 51:10 52:1,10 | 9:25 10:17 | 118:12 122:17 | **continuous** |
| **combed** 88:20 | 20:6 44:13 | 124:9,10 126:2 | 19:8 |
| | 56:11 134:16 | 136:25 139:2 | |

**[controlled - cruiser]**                                                Page 7

controlled  26:4
  74:14 75:5
  76:20 77:6
  130:22 131:11
  140:14 141:7
convenience
  10:7,10
conversation
  8:9 67:14
cooperating
  52:12
cooperative
  51:11,15
copies  149:14
copy  5:3 6:22
  94:13
correct  6:1
  7:14,22 9:18
  13:2 14:8,9
  15:12 24:13
  25:11,14 26:5
  29:8,19 30:4,5
  30:10,11,15,16
  31:16 40:14
  41:15,21 42:1
  42:17 44:9,14
  45:7,10,12,16
  45:19,22,25
  46:4,5,8,13
  47:13,23 48:4
  48:5 49:17
  50:8,13,18
  51:7 53:9 54:5
  55:2,5,9,14,16
  55:20 57:2,3

58:16,17 64:16
  64:19,23 65:2
  65:4,7 67:10
  68:13 70:5
  71:24 72:25
  73:4 74:5,11
  74:15,19 76:4
  76:9,21 77:1,7
  78:23 79:1,16
  81:12,15,18,24
  82:4 83:12,15
  83:16,20 84:11
  84:14,17,20
  85:1,6 86:13
  87:7,14 88:7
  88:10,16,20
  90:7 91:17
  94:6 102:13
  104:11 107:8
  114:24 116:5
  117:10,14
  118:12 121:14
  123:23 127:1,7
  128:20 130:22
  131:2,11,14,16
  133:19 134:5
  134:13,21,22
  135:6,10
  138:15,25
  139:7,8,12
  140:15,24
  145:13 148:7
corrected  9:24
corrections
  146:5,8 148:9

correctly  35:11
  54:8 103:9
  121:18 131:20
  136:20 145:10
correlation
  59:12
counsel  4:8
  10:22 82:15
  83:7,25 90:5
  90:16 94:13
  95:14 97:6,15
  101:14 105:16
  121:13 145:15
  149:14
count  86:10
  111:5 113:14
counter  74:8,10
  76:1,20
counting  57:16
  112:10
country  143:1
counts  7:21
county  12:10
  17:5,22 32:2
  34:4
couple  68:10
course  20:7,7
  20:11,15,17,18
  20:19,20,23
  21:10,14,16,19
  23:10 84:3
courses  15:23
  16:1,25 17:15
  18:5,12,13,20
  18:24 19:22,25

21:12
court  1:1 4:1
  4:25 5:1 6:10
  6:12,13,25
  7:10 8:2 88:22
  90:4 142:22
  143:19,24
  146:19
courtrooms
  143:1
covered  115:1
covering  115:2
  115:5
covid  79:16,19
  80:17 114:23
cpo  1:4
create  76:12
credentials
  98:10,12
crime  26:15
  27:3,23 29:19
  74:15 132:18
  132:20 133:1,3
  133:12,20,22
crimes  131:25
  133:18
criminal  12:24
  13:1 29:17
  62:19 63:9
  65:15 132:1,2
  132:4,10
cruiser  63:13
  64:12 116:21
  120:21

[cs - discipline]                                                      Page 8

**cs**  149:15
**cuffs**  117:9
**cumberland**
    12:10 17:5
**cup**  131:5
    141:24,24
**curriculum**
    18:1
**cut**  141:19
**cv**  1:4 7:12

**d**

**d**  11:6
**dark**  47:5 57:1
    91:21,23
**data**  137:5
**date**  43:1 95:1
    146:10 148:14
**davis**  1:7,9 3:5
    4:17,18 5:2 6:4
    6:21 7:6,13
    11:5,5,8,19
    12:13 22:13
    27:21 29:25
    34:15 62:16
    79:4,14 83:10
    88:23 90:21
    94:21 95:11,23
    97:1,10,13,16
    105:25 106:13
    109:19 111:16
    111:19 113:25
    114:6,13
    115:12 143:16
    149:4,5

**day**  9:8 10:6
    20:18 37:3,9
    59:10 67:24
    68:2 75:3 91:2
    145:20 148:18
**days**  20:8 34:21
    34:22,22,22,25
    35:5,5,7,10
    146:16 149:16
**daytime**  91:22
**dealing**  16:8
**decide**  82:10
**decided**  49:16
    64:11 125:7
**decision**  25:4
**deemed**  146:18
**defendant**  4:16
**defendants**  1:8
    2:8
**define**  65:13
**definition**
    62:17
**degree**  12:25
    13:1 58:9
**degrees**  58:15
**delayed**  98:8
    99:6
**demeanor**
    120:20
**demonstrate**
    110:13 111:3
    113:7
**demonstrated**
    56:10 59:4
    113:17,21

**department**
    12:10 15:9
    16:17 17:6,17
    24:5
**depends**  117:22
**deponent**  145:7
    145:10 148:2
    149:13
**deposing**
    146:15 149:13
**deposition**  1:9
    4:2,3,4 5:7,10
    7:24 8:3 9:9,15
    9:18,22,25
    10:25 144:6
    145:13 146:4
    146:13,16,18
**depositions**
    5:14
**deputy**  2:3,4
    4:15 90:23
**describe**  91:24
    120:22
**description**
    83:5 93:18
**despite**  86:8
**detain**  118:17
    124:1 138:3
**detained**  25:21
    64:4 117:14,19
    118:6 125:4
**detainees**  16:9
**detaining**  64:7
    117:2

**detainment**
    66:8,9 81:25
    118:11 120:8
    121:23 124:4
**detect**  134:25
**detection**  76:15
**determination**
    6:16 104:23
    109:13
**determine**
    128:11 131:10
    135:8 140:3,12
    141:6 143:3
**determines**
    22:18
**determining**
    92:25
**develop**  84:1
**device**  42:23
**different**  77:14
    83:18 86:24
    87:21,22 88:2
    143:1
**direct**  11:12
    133:9
**direction**  53:3
    56:20,22 57:6
    57:8,11
**directions**
    109:10
**disagree**  15:13
    51:8 128:12,15
    139:4
**discipline**
    14:22 24:19

[discipline - effect]    Page 9

25:17 28:9,11
28:17,19,21,23
28:25 30:12
33:14 34:5,7
34:11,14 35:17
35:24
**disciplined**
15:2 23:23
24:13 25:6
27:22 28:4,11
28:16 29:2
30:4,14 32:4
36:2
**disconnect**
141:10
**discovery**
80:22 94:13
**discretion**  80:7
80:11,12
124:11 130:18
**discretionary**
80:16
**disheveled**
88:19,24
**dismissed**
78:25 79:8
**dispatch**  44:23
93:17,24
**disposed**  32:15
**dispute**  99:2
**disrespect**
121:17
**distance**  42:6
42:12

**distress**  124:19
**district**  1:1,1
7:10,11
**division**  2:6
7:11
**docket**  7:12
**doctor**  59:20,22
**document**
80:25 81:4
84:5
**documentation**
46:8 49:9
**doe**  1:7 7:10
**doing**  30:21
32:14 57:5
91:12 92:1
99:24 102:14
111:20 146:9
**dre**  84:25
107:20 108:4
108:13 123:6,7
123:18 125:10
**dressed**  88:20
**drink**  10:7
67:17
**drinking**  50:16
**drinks**  67:23
68:2
**drive**  64:22
69:10 73:6
92:14 99:18
110:11 122:4
127:7 138:4
**driver**  44:25
49:16 65:25

66:1 73:3
94:10 97:8
**drivers**  98:11
**driving**  19:1
37:22,23,24
38:5 40:7 41:8
45:15 63:14,22
83:19 91:7
92:7 93:1
127:10 132:24
**drowsy**  74:9
**drug**  20:5
72:24 74:14
78:17 105:14
105:18 106:6
106:25 107:12
123:8,9 128:10
128:23,25
129:13,15,19
129:22 130:1
130:25 140:17
141:22 142:6
**drugs**  10:12
48:22 60:6
74:3,24 75:1
75:24 76:12,15
76:19 77:6
98:14 100:5,12
104:25 105:23
107:6,22,25
108:6,9,16
112:15 116:18
118:20,22
119:19 123:14
123:17 135:1,4

135:6 140:6
141:14 143:4
**dui**  27:8 35:15
35:20 65:16,24
66:1 118:17
125:24 130:11
131:20 132:4
132:16,17
133:5,12,21
**duly**  4:19 145:8
**duties**  27:23
28:5 29:5,16
30:8 80:6,19
**dwi**  81:12
84:10 137:14
137:22,23

**e**

**e**  16:18 22:11
87:25 145:1,1
147:2
**earlier**  67:24
68:2 91:2,6
105:3 106:2,3
106:23,24
107:10 114:22
119:9 123:4
126:9
**easier**  11:14
82:25 103:19
**educated**  24:7
**education**
12:18
**effect**  75:21
136:12

[eight - eyes]                                                    Page 10

**eight**  61:15
  110:15,16
**either**  6:18,19
  6:21 35:16
  44:5 84:16
  85:22 104:25
  107:25 119:19
**elapsed**  117:4
**elicit**  92:1
**email**  143:25
**emotional**
  124:18
**employed**
  11:20 12:5
  13:18 15:12
  16:14,16 17:7
  18:19 19:23
  36:20
**employees**
  14:13
**employment**
  12:5 13:8,9,17
  13:21 14:5,7
  15:3,7,18,25
  16:12 17:1,4
  17:11 19:14
  21:13 37:8
  84:3
**endanger**  41:1
  41:6
**endangered**
  41:20
**endangering**
  41:9

**enforce**  28:5
**enforced**  24:19
**enforcement**
  12:5 15:12,17
  15:24 16:2,7
  16:19,25 17:16
  18:14,25 19:15
  26:15
**engaging**  37:11
  67:18
**entail**  20:19
**entire**  55:7
  66:11
**entirety**  7:17
**epidemic**  79:19
**equal**  101:22
  101:23 103:2,3
  103:22,22
**ergo**  26:16
**errata**  146:7,10
  146:12,15
  148:11 149:11
  149:13,16
**escorted**
  116:20
**esq**  1:16 2:4
  149:1
**essentially**
  27:22
**estimation**
  138:7
**et**  84:25,25
  149:4,4
**evaluate**  142:5

**evaluation**
  129:2
**event**  9:10
  71:17
**evidence**  27:2
  27:15 31:25
  32:9 33:8,9
  34:19 118:19
  119:19 142:10
**evidential**  31:4
  82:7
**evidentiary**
  67:9 142:16
**exact**  24:6
  28:21 83:21
  116:14 137:25
  138:5
**exactly**  28:10
  38:24,25 52:15
  52:16 83:2
  85:23 91:25
  100:7 102:13
  134:19
**examination**
  7:4 90:19
  126:22
**examined**  4:19
**except**  4:23
  148:9
**excused**  144:4
**exhaustion**
  77:9
**exhaustive**
  134:5

**exit**  119:4
**exited**  94:6
**experience**  16:6
  89:9 92:6,25
  123:6 142:8
**expert**  123:8,10
  128:11,23
  129:1,13,16,20
  131:1 141:22
  142:18
**experts**  129:22
  130:2
**explain**  9:3
  22:12 32:24
  48:19 52:6
  56:6 59:1
  100:6 101:19
  102:5 110:12
  110:21 111:9
  113:7,8 120:19
  136:18
**explained**
  48:20 52:22
  55:12 59:3
  116:11
**explaining**
  110:22
**eye**  100:3,9,24
  101:17,22
  108:6
**eyes**  46:21,22
  48:7,10 49:11
  50:7 52:19
  53:1,7 54:20
  55:19 75:15,16

[eyes - follows]                                                    Page 11

75:20,22 76:8
76:12,18,24,25
77:7,10,15
97:25 98:4
99:5 101:23,24
102:1,17,23,23
102:24 103:2,4
103:4,6,6,23,23
104:1,2,7,17
105:2,13
106:15 107:3
107:21 113:15
135:7 139:13
139:18,25
140:10,20
142:15
**eyesight** 43:6

**f**

**f** 16:18 81:8
   84:6 145:1
**face** 115:1
**fact** 6:17 85:10
   86:2,5 87:18
   131:9 133:16
**facts** 7:20 9:9
**fail** 39:7 52:4
   107:16 109:7,9
   115:20 146:17
**failed** 27:22
   29:15 30:7
   32:6,12 34:19
   41:3,18 42:3
   42:13 52:3
   92:4 109:14
   115:22 129:4

**failing** 40:12
   64:9,10 92:11
   92:18
**fails** 81:17,22
   84:17,19 107:4
   149:18
**failure** 38:18
   42:10 91:13,14
**fair** 15:11
   50:16 92:24
   96:1 97:19
   122:23
**fall** 59:6
**falling** 55:13
**falls** 133:7
**far** 42:2 45:20
   58:9,18 61:19
   61:24 121:25
**fare** 16:18,18
   17:1
**fast** 73:18
   77:23
**fault** 31:21
   87:2,3
**february** 1:12
   145:20 148:18
**federal** 5:22
   66:14
**fee** 16:21
**feel** 113:10
**feet** 72:11
**fell** 33:12
**fellow** 26:25
**field** 12:23
   50:22 51:1

56:1 78:16
81:14,22 84:14
99:9 107:23
108:1 137:22
138:2
**figure** 106:22
**filed** 7:9 87:11
**find** 67:9
**findings** 90:10
   121:1
**fine** 6:6 7:1
   96:24 139:4
   144:2,2
**fingerprinted**
   62:20 125:22
**fingerprints**
   125:13
**finish** 61:2
   140:8 141:12
   142:3
**firm** 1:16
**first** 5:19,24
   8:6 12:2 18:17
   24:21,23 29:3
   29:14 30:6,19
   37:17,25 38:2
   49:4 51:4
   84:13 86:17,21
   101:9 102:15
   115:20 132:20
   133:5,11,21
**five** 11:22
   17:25 34:22,25
   35:10 36:15,16
   117:5,18

118:11 120:7
120:25
**flashlight** 46:25
   55:19 97:1,20
   97:24
**flicker** 107:3
**floor** 2:6
**flow** 37:21
   83:17 84:8,16
   85:8
**flutter** 102:24
   105:13
**follow** 8:1 25:7
   29:5 42:11
   52:3,4 53:2
   83:15 84:3,9
   87:17,22 88:2
   99:19 106:3
   107:15 109:1,1
   109:3,5,10
**followed** 87:20
**following** 13:6
   15:6 38:21
   39:5 54:18
   56:14 64:8
   93:4 94:5
   102:25 103:4
   103:24 104:2
   104:25 106:15
   108:4 116:10
   118:10 120:20
   120:23 121:23
**follows** 4:19
   136:19

[followups - going]                                          Page 12

**followups**
126:20
**foot** 59:5
113:15 115:14
115:25
**footage** 95:25
96:2 99:13
108:19 109:19
112:21 113:23
**force** 120:9
**foregoing**
148:6
**form** 4:24 5:12
5:16 6:1 14:17
14:23 15:3
24:14 25:24
26:9 27:4,25
29:9,20,24
31:17 32:17
40:1 41:22
45:8 46:14
48:12 49:1
53:10,13,14
54:7,19 55:21
58:11 60:9
62:12 63:23
71:4 79:2
85:25 128:5
132:8 137:16
139:21 141:8
142:11,18
143:6 148:10
**forward** 10:24
**found** 24:12
30:22 31:22

32:11 33:4,11
79:1,5 134:8,9
134:10,11
**founded** 24:12
29:4,15 30:6
34:13
**four** 12:24 82:6
100:10 106:18
107:4 113:2,3
113:4
**fourth** 132:23
**free** 127:25
**freedom** 63:1
**front** 19:4 38:1
38:4,6 50:24
55:8 80:23
119:1,1
**frowned** 33:5
**froze** 135:19
**full** 9:11,25
10:17 35:10
47:17 64:15
**fully** 9:16
**further** 4:5 5:1
13:7 35:19
64:4,7 78:10
82:3 107:17,21
116:13 126:18
130:8 138:3

**g**

**gallagher** 69:4
71:17 72:3,6,8
72:16,20
**gallagher's**
44:4

**garment**
114:20
**garter** 114:14
**gather** 27:2,15
**gaze** 21:19 23:5
100:2
**general** 2:3,4,5
4:16 19:12,13
90:23 139:3
**getting** 47:17
**gina** 1:13 6:21
6:24 101:10
106:7
**girt** 11:25
**give** 8:17 10:10
24:7 36:13
67:2 102:1,1
102:11,23
113:6 123:15
138:1,5,6
143:22
**given** 78:12
145:14 148:8
**gives** 100:3
**glasses** 50:1,3
**glassiness**
77:14
**glassy** 46:21,23
48:7,10 49:11
50:7 75:18,20
75:22 76:8,12
76:18,24,25
77:6,10,17
98:4 99:5
139:13 140:10

140:20
**gloucester**
17:22
**go** 6:9 7:24
10:24 13:7
15:14 18:18
28:13 31:4
33:7 44:20
49:16 54:11
81:15 83:9
95:6 105:21
108:17 127:25
137:14 141:19
**goes** 6:8 84:16
84:22
**going** 6:19 7:25
8:22 9:9,23
10:5 26:22
39:16 44:18
51:17 80:22
82:22 83:3
90:24,25 92:3
94:11,15,16,24
95:3,6,7,23
96:8 98:17
100:14 103:6
105:21 106:2,5
108:17 109:17
109:18 110:18
111:15 112:7
112:20 113:22
114:10 115:7
115:10 116:7
116:12 138:6

[good - homicide]

**good**  7:6 145:5
**gotten**  32:19
**graduate**  12:13
  12:22 13:4
  15:23 18:5
  24:24
**graduated**
  12:15,24 17:22
  24:22
**graduation**
  13:6,10 18:15
**grass**  120:1
**grocery**  65:6
  134:7
**ground**  113:12
**grounds**  5:17
**group**  2:5
**guess**  5:24 14:7
  15:14 24:7,9
  62:5 89:16
**guesstimate**
  36:12
**guidelines**
  66:22 67:6
**guilty**  79:1,5
**guy**  73:24
**guys**  43:15
  143:23

**h**

**h**  22:11
**ha**  128:3,3
**hair**  88:20
**half**  17:25
**halfway**  13:12
  13:17 14:5

  15:10,16 45:19
**hall**  12:21 13:7
**halsey**  2:6
**hamilton**  1:17
**hand**  8:19,19
  30:25 31:7
  32:8 56:14,19
  57:22,24 58:1
  58:4 61:21,23
  62:2 97:2
  135:18,22
  145:19
**handcuff**  64:11
  116:15
**handcuffed**
  63:15 68:12
  73:19 116:19
  124:7,8,11,15
**handcuffing**
  63:12 85:4
  86:3 120:20
**handcuffs**  63:3
  72:15 116:11
  117:14 120:16
  124:6,14
  127:23
**handful**  107:11
**handle**  31:15
  87:17
**handling**  5:9
**hands**  8:18
  32:5 33:13,13
  33:16,25
  109:25 110:4
  110:24 111:5

  113:14 114:1
  115:24 135:13
**hanging**  47:15
  47:22
**happened**
  27:21 32:21
  33:10 43:12
  53:4 99:4
**happens**
  131:23 139:17
**happy**  10:10
**head**  8:8 52:8,8
  52:11,23,25
  53:2,5,6 54:13
  54:14 103:10
  103:21 104:6,6
  104:9,14,16,20
  104:22 108:23
  108:25
**hear**  95:10,11
  95:15,16,20,21
  96:23 98:19
  101:8 131:19
**hearing**  86:17
  87:7,13 88:7
**hearings**  86:16
**heel**  110:25
  111:12
**height**  79:15
  114:23
**heightened**
  37:3
**held**  13:11
**help**  25:4 27:10
  32:23

**hey**  6:19
  141:11
**hgn**  19:3,24
  21:19 23:4,15
  35:22 51:2,4
  52:5,11,16
  54:14 55:6,13
  55:23 64:9
  99:24,25
  101:20 102:4,6
  102:14,14
  104:4,9 105:9
  105:10 107:2
  107:16 108:8
  108:18,21
  109:11,14,22
  123:15 134:25
  135:6 136:12
  137:4
**hi**  90:21
**high**  12:13,15
  12:17 27:9
  135:12,24,25
**higher**  25:14
**highway**  37:19
  38:5 57:1
**hold**  17:10
  60:14 80:23
  81:19 103:20
**holding**  63:14
**holds**  142:15
  143:2
**homicide**
  132:17

[honest - instruction]                                             Page 14

honest 9:12
honestly 14:15
hopping 115:15
horizontal
  21:19 23:5
  100:2
horseplay
  13:24 14:2,4,6
  15:4
hour 63:15
  73:12 124:2
  125:5 139:15
  139:15 140:10
hours 19:17
  20:8,18 37:8
  39:1 125:6
house 13:13,17
  14:5 15:10,16
huh 139:24
hundreds
  51:13

i

idea 127:15
identifying
  20:3 28:14
illegal 30:22
  31:24 74:10
illuminated
  46:25
imbibing 48:11
immediately
  42:9,15,20
impair 127:6
impaired 19:1
  92:13 110:11

110:17 112:2
113:5 136:21
impairment
  118:19
imperative
  146:14
important
  87:16 127:10
inches 103:21
  104:13,14
  113:11,12
incident 13:24
  14:2,4,7 15:4
  25:5 28:22,24
  28:25 29:1,2,4
  29:14 30:13,15
  30:18 32:20
  34:13,21 35:9
  43:20 67:14
  68:18 70:2,7
  91:3 95:1 96:3
incorrect
  138:15
incorrectly
  121:15
independent
  21:1
index 3:1
indicate 4:10
  92:13 94:16
  112:14 130:20
  136:21
indicated 145:7
indicates 113:4
  123:15

indication
  48:21 54:19
  75:23,23 92:7
  98:13 100:11
  106:19 107:5
  108:8,24 109:3
  110:10,16
  113:5 129:5
  135:3 136:6
  140:19
indications
  54:15,22 72:23
  73:16
indicator 104:7
  135:6
indicators
  122:11
individual 29:7
  29:18 30:9
  60:16 61:4
  63:1,10 66:3
  77:24 80:2,4
  92:17 100:8
  102:7 125:22
individual's
  66:20
influence 10:12
  10:15 20:4
  22:16 25:20
  26:3 27:1
  48:21 60:6
  63:22 73:21,23
  74:1,2,6,14
  75:21 76:3
  92:8,19 93:1

98:14 100:4,12
104:24 106:20
107:25 108:15
112:15 116:18
122:8 123:13
123:16,22
126:6 130:21
131:10 140:6
140:13 141:7
141:12,14
142:6 143:4
information
  44:25 49:15
infraction
  34:16
initial 49:23
  126:3
initiate 42:10
  43:7
initiated 42:16
initiating 38:15
  38:22 43:4,13
initiation 42:20
injuries 100:24
  101:17 102:17
  102:22 113:18
inmates 15:20
inquired 14:16
instances 24:19
  35:13 36:5
instruct 114:1
instructed 23:2
instruction 8:6
  54:19

[instructions - know]                                                Page 15

**instructions**
  8:1 10:21 23:6
  23:8 52:3,4,22
  56:9,15 64:8
  105:1 106:15
  109:4 110:21
  112:11 113:6
  136:20 146:2
**insurance** 46:7
**intend** 5:9
**intended** 31:9
  64:21
**interacting**
  89:10
**interaction**
  71:23 72:1,4
**interested**
  145:16
**interior** 65:19
**internal** 89:13
  89:17,23 90:6
  90:10
**interviewed**
  89:20
**intoxicated**
  61:13 83:20
  127:11
**intoxication**
  27:16 28:14
  54:16,22 60:3
  72:24 73:16
  135:15 139:11
**intoxilyzer**
  22:21

**investigating**
  30:9
**investigation**
  64:7 89:14,17
  89:23,25 90:7
  90:10 127:10
**involved** 25:10
  29:7
**involving** 24:25
**issue** 85:3,18
  85:21 86:2
  92:13 114:5
**issues** 8:2
**items** 134:12

**j**

**j** 1:4 149:4
**j.karoly** 1:18
**jersey** 1:1 2:5
  5:6 7:11 11:6,6
  11:21,24 12:6
  13:13,14 15:8
  16:13 17:13
  18:9,22,24
  19:7,14,23
  20:25 21:2,9
  21:13,18 23:9
  23:24 25:1,10
  25:13 27:1
  28:6 29:6,16
  30:4,8 35:18
  36:3,7,21
  79:18,24 80:17
  82:20 92:16
  93:21 125:24
  130:11 132:3,5

133:4,6,13,22
**job** 16:2,8
  17:19
**jobs** 13:11
**john** 1:7 7:10
**join** 17:5,12
**joshua** 1:16
  4:12 7:7
**jump** 16:20
**justice** 12:24
  13:2

**k**

**karoly** 1:16,16
  3:6 4:12,12,20
  4:23 5:8,18 6:3
  6:11,18 7:2,5,7
  26:1,23 51:17
  51:21 53:12,16
  53:21 62:14
  79:10,13 82:16
  82:19,25 83:4
  83:6,8 90:13
  91:18 95:16,22
  97:9,11,14,22
  98:15 99:7
  101:5,8 105:16
  106:1,4 121:19
  121:20 124:20
  126:19,23
  142:19,21,23
  143:11
**karolyfirm.co...**
  1:18
**keep** 53:6 56:21
  103:9 104:9

110:24 111:5
  113:13 114:1
  115:24 124:11
  136:6
**keeping** 56:13
**kept** 54:13
  104:5 108:22
  108:23 115:19
**kin** 145:15
**kind** 22:9 56:18
**kindly** 12:12
  99:19
**kintock** 13:12
**know** 5:23,23
  7:7 9:17 10:9
  20:10 24:3,6
  26:23 27:17,17
  28:20 30:12
  31:3,11,12
  32:3,8 33:5,8
  36:18 39:1
  47:25 51:12
  57:19 58:3,5
  59:7,10,20
  67:5 71:15
  73:22,25 74:1
  75:25 76:2,5,7
  76:8,24,25
  77:3,4,11,23
  83:21 87:8,15
  88:21 89:16
  90:21 94:3,4
  95:20 112:5
  114:19 116:14
  128:16 129:3

**[know - maintain]**                                   Page 16

129:12,22
130:1 137:9,24
138:6 139:10
139:15,16,24
140:2,23 141:2
**known** 31:5
33:21 128:9

**l**

**l** 1:13 22:11,11
**label** 82:18
**lack** 31:20 53:9
54:4 103:5,25
**lane** 38:7,8,9,10
38:18 39:8,12
39:15,25 40:14
40:21 41:3,11
41:19 42:4
92:3,3,12,18
**lanes** 38:19
91:13 92:4
**language**
103:18
**larger** 96:10,13
**law** 1:16 2:6
12:4 15:11,17
15:24 16:2,7
16:24 17:15
18:14,25 19:15
26:14
**law.njoag.gov**
2:7 149:2
**leads** 52:9
**lean** 56:20 58:6
58:9,10,18
61:14,16,19

136:3,9
**leaned** 56:18,23
57:5,8,12,14,20
58:7 60:8
136:4
**leaning** 60:3,16
61:4,6,8,17,25
136:5
**learning** 116:2
**leave** 27:18
86:18 127:21
127:25
**leaves** 141:2
**leaving** 13:20
17:4,10 69:23
**left** 38:7,8,10
39:16,17 57:24
58:1,4 104:10
110:25 111:23
**leg** 51:2 58:25
60:19 64:10
112:25 113:10
113:12,13
124:8
**legal** 1:21 2:21
149:23
**legged** 62:3
89:2 115:21
116:5
**length** 42:5
**lengths** 91:16
**letting** 94:3
**levels** 77:14
**license** 44:22
46:6

**lieu** 4:6
**lieutenant** 25:3
**life** 15:21
**light** 114:16
**lights** 42:16,20
43:4,7,8,9,13
93:8,10
**line** 57:1 147:5
**lines** 107:13
126:11
**lingering** 10:8
**lisa** 1:4 4:13 7:8
45:14,18 47:12
64:18,22 97:20
**list** 19:5 134:5
134:16
**listed** 131:24
133:2 134:4
**litigation** 2:5
**little** 11:9,11
95:7 124:2,25
125:2
**llc** 1:16
**lobby** 78:21
**locate** 75:4
125:10
**location** 122:1
**lodged** 24:4,11
36:6
**logbook** 137:14
**logical** 141:5
**long** 10:8 11:20
16:14 17:7,24
19:5 20:7,17
23:6 38:21

73:6,10 120:5
120:24 123:25
125:3
**look** 43:15
**looked** 118:23
**looking** 85:8
86:3 98:11
118:18,20
119:18
**looks** 114:20
**lose** 58:19,20
59:5 60:4,7
**losing** 60:20
115:14
**lost** 55:10
115:25 136:18
**lot** 108:14
137:24
**loud** 111:5
113:14

**m**

**m** 2:4
**ma'am** 41:10
**machine**
145:10
**made** 25:5
37:13 38:2
71:21 84:4
89:22 94:9
104:23 146:8
**mail** 87:25
**maintain** 19:14
23:17,20 38:18
39:7 40:21
41:2,11,18

**[maintain - moved]**

42:4 54:25
55:18 56:16,23
61:7 62:3
91:13 92:12,18
111:23 114:8
**make**  6:15,16
9:4,11 31:9,10
46:11,17,19
74:9,9 99:18
103:4,6,23
104:1 111:13
122:7,13
137:13 140:11
146:5
**making**  33:1
49:5 109:13
**manner**  4:9
44:13 88:24
**march**  149:3
**marijuana**
30:22,23,24
31:6,16,23
32:5,7,11,12,15
33:2,4,10,20,22
**mask**  79:25
80:5,10,14,18
114:14
**masking**  79:21
**materials**  20:14
23:21 85:17
**maternity**
86:17
**matter**  31:23
35:18 63:6
87:6,17 89:14

90:2,22
**mean**  5:5 6:7,8
6:15 8:19
16:20 26:9
32:19,22 34:5
40:23 51:13
71:9 76:14
77:11 90:5
98:8,8,9
105:16 107:1,4
107:14 111:25
121:16 125:13
127:18,23
129:4 134:17
135:22 140:9
**meaning**  14:7
20:18,25 34:14
43:5,11 46:3
48:2 55:16
66:14 78:14
131:16 138:1
**medical**  52:18
**medication**
48:17,23 68:21
69:17,18,21,25
70:4,9,12 74:3
74:7,7,8,11,23
76:1 77:13
126:11 127:1
127:21 128:13
128:20,21
130:22 131:11
140:14
**medications**
10:16 48:25

74:23 126:25
**member**  18:8
18:12,17,23
21:17 23:24
24:25 27:9
36:3,21
**members**  24:5
**memory**  95:18
**mention**  70:8
70:11 115:17
**mentioned**
19:22
**merged**  28:19
28:23 34:21
**met**  77:20
**meted**  25:17
34:7,14
**mid**  1:22 2:21
**midatlantic**
149:15
**minute**  39:3,4
79:11 84:23
95:4
**minutes**  39:2
63:14 73:8,9
99:12,24
100:15,21
109:18 110:19
111:16 112:8
112:21 113:23
114:11 115:8
115:10 116:8
117:6,11,12,16
117:19 118:11
120:7,25 122:2

**miranda**
116:25
**misbehavior**
14:8
**misheard**  21:7
21:15
**misunderstood**
131:6
**mobile**  43:20
43:23
**moment**  43:10
113:25
**month**  24:22
35:12
**months**  11:22
17:25
**morning**  7:6
**motor**  40:7
65:15 81:11
83:19 87:6
89:9 125:25
131:20,24
132:12,18,21
133:2,7,14,18
134:20
**mouth**  11:13
**move**  52:7,8,23
52:25 53:6,7
98:11 104:6,10
104:16,20,22
108:25
**moved**  40:13
52:11 53:2,5
54:14

**[movement - observed]**                    Page 18

movement  63:2
   98:7 99:6
movements
   46:20,22 49:12
   98:3 139:14
   142:15
moves  77:23
   78:4
moving  54:13
   78:2,3 98:10
   104:5 108:22
   108:23 125:19
   132:15 140:19
mugshot
   125:13,23
multi  7:21
multiple  39:13
mvr  42:23 43:3
   44:4,8
mvrs  51:13

**n**

name  4:11 7:7
   11:2,3 28:10
   34:9,10 90:22
   121:15
names  130:1
nasally  11:11
nasty  125:2
nature  8:7
neatly  88:20
necessary
   146:5
neck  114:15,21
need  19:17
   38:25 96:24

135:13
needed  87:25
   123:5
neither  145:15
nervous  89:6
   89:10
never  5:6
new  1:1 2:5
   7:11 11:6,6,21
   11:24 12:6
   13:13,14 15:8
   16:13 17:13
   18:8,22,24
   19:7,14,23
   20:25 21:2,9
   21:13,17 23:9
   23:24 25:1,10
   25:13 26:25
   28:6 29:6,16
   30:4,8 35:18
   36:3,7,21
   79:18,24 80:17
   82:20 92:16
   93:21 125:24
   130:11 132:3,5
   133:4,6,12,21
newark  2:7
nine  111:12
nj  2:7
njsp  80:24
   82:19
nod  8:8
non  65:20
normal  8:9
   78:4,6 89:8

98:10
normally  78:5
notary  145:5
   145:23 148:21
note  149:10
noted  5:13
   146:12 148:10
notice  145:6
number  20:18
   24:6,10 44:22
   88:6 93:19
   137:4,25
   147:25
numerous
   109:25
nystagmus
   21:20 23:5
   100:2 102:23
   103:1 105:2,4

**o**

o  22:11,11
oath  4:6,7
object  5:12,15
   26:22 51:18,22
   58:11 60:9
objection  5:13
   5:16 14:17,23
   24:14 25:24
   26:6 27:4,25
   28:7 29:9,20
   29:24 31:17
   32:17 40:1
   41:22 45:8
   46:14 48:12
   49:1 53:10,22

54:6 55:21
   62:12 63:23
   71:4 79:2
   85:25 91:18
   97:22 98:15
   99:7 124:20
   128:5 132:8
   137:16 139:19
   141:8 142:11
   142:17 143:6
objections  4:9
   4:23 5:9,17 6:1
   6:9
observation
   38:3 46:18
   60:12,16 61:1
   61:4 84:23
   140:11
observations
   46:11,17 49:6
   75:14 111:21
   122:7,10 141:3
   142:14 143:5
observe  39:11
   53:8 54:4,9,12
   54:15,21 56:12
   59:2 72:23
   73:16 91:11,25
   97:25 98:2
   107:24 123:12
   139:9
observed  37:17
   37:25 39:7
   40:8 48:7
   49:11 50:6

[observed - opiates]                                            Page 19

| | | | |
|---|---|---|---|
| 52:17 54:11 | **offers** 100:9 | 64:11 66:6 | 115:1,7,20 |
| 55:8 59:4,16 | 110:15 | 67:5,8,18 | 116:1,4,7,19 |
| 91:9 98:3 99:5 | **offhand** 19:25 | 68:11 69:20 | 117:2,7,13,21 |
| 115:13 | 67:7,15 83:21 | 70:22 71:3,19 | 118:8,23 119:3 |
| **observing** | **office** 2:5 | 75:19 76:10 | 119:6,9,11,20 |
| 111:19 | **officer** 16:19 | 77:5,9 79:7,10 | 119:23 120:5,8 |
| **obstructing** | 17:1,12 141:22 | 79:11 80:16,21 | 120:23 121:4,9 |
| 47:22 | **officers** 18:2 | 81:24 82:8,21 | 121:21 122:3 |
| **obviously** 7:13 | **official** 145:19 | 82:23 85:12 | 122:13,16,23 |
| 23:4 48:1 | **oh** 97:14 | 86:8,12 88:9 | 123:1,4,9,12,18 |
| 79:15 | **okay** 7:1,2 10:2 | 88:15 89:1,13 | 123:20,25 |
| **occasion** 12:2 | 12:1,12 13:16 | 89:20,22 90:1 | 124:13 125:1,3 |
| 40:19 50:4 | 14:15 15:6,10 | 90:12 91:6,15 | 125:7,12,20 |
| 130:5 | 15:14 16:3,24 | 91:21,24 92:6 | 126:1,8,14,16 |
| **occasions** 39:13 | 17:3,14 18:23 | 92:15,24 93:4 | 127:14 128:22 |
| 39:14,18 88:6 | 20:6,23 22:12 | 93:8,11,20,23 | 130:4,7,10,20 |
| **occupation** | 23:1 24:7 | 94:5,8,11,24 | 133:5,9,17,21 |
| 11:4 | 25:22 31:14,20 | 96:6,8,15,18,21 | 136:2 138:13 |
| **occurred** 14:16 | 32:4 35:12,23 | 96:25 97:4,24 | 140:8 142:3,8 |
| 36:10 43:6 | 36:19 37:5,24 | 98:5,21,24 | 143:10,14 |
| 52:24 91:3 | 38:9,11 39:4 | 99:4,11,23 | 144:1 |
| **occurring** | 40:6 43:15,19 | 100:6,14 101:4 | **old** 59:7,15,16 |
| 33:24 38:15 | 43:23 44:4,8 | 101:14,19 | 73:24 78:8 |
| **occurs** 82:10 | 44:20,24 45:3 | 102:19,25 | **once** 43:7,8 |
| **odor** 33:2 | 45:6,11 47:5 | 103:8,17 104:3 | 65:25 73:2 |
| **offenders** | 47:21,25 48:19 | 104:8,15,19,21 | 108:13 132:22 |
| 132:23 | 49:14 50:23 | 105:3,8,10,15 | **ones** 5:22 21:10 |
| **offense** 25:23 | 51:4,24 52:24 | 106:21 107:7 | **online** 20:19 |
| 62:19 78:23,25 | 53:8,21 54:21 | 107:10,23 | **operating** 81:8 |
| 79:1,5,7 132:1 | 56:16 57:4,25 | 108:3,17 109:5 | 83:11,25 84:6 |
| 132:16 133:5 | 58:3 59:10,15 | 109:8,13,17,24 | 85:13 86:9 |
| 133:12,21 | 59:21 60:2 | 110:7,14,18,21 | 93:20 |
| **offered** 113:2 | 61:12,21,25 | 111:11,15 | **opiates** 127:6 |
| **offering** 51:19 | 62:7,25 63:5 | 112:3,7,20 | 128:3 |
| | 63:12,18 64:2 | 113:22 114:10 | |

[opinion - physical]                                      Page 20

**opinion** 51:14
  85:9
**opportunity**
  39:21 140:11
**opposed** 131:24
**options** 81:18
**oral** 8:7
**order** 7:24
  62:10
**orders** 99:20
**original** 146:15
**outcome**
  145:16
**outside** 18:5
  39:12,16,17,25
  91:22 92:3
**overseeing**
  15:19
**own** 116:1

**p**

**p.m.** 37:10
  144:6
**pa** 1:17,23 2:22
**pace** 98:11
**page** 3:3 147:5
**pages** 148:6
**pain** 124:14,22
**pandemic**
  79:16 80:17
**paper** 81:19
**paperwork**
  136:22 137:1
**part** 35:17
  39:14 47:20
  66:16

**participate**
  19:9
**participated**
  21:17
**participating**
  4:2
**particular**
  28:22
**particularly**
  129:23
**parties** 4:7
**party** 5:14
  145:15
**pass** 12:1
  115:20
**passed** 129:4
**passenger**
  45:11,15,18
  46:12,19 50:7
  94:10 119:1
**passes** 81:18
  84:17
**patrol** 36:25
  37:1,2,3 49:15
  86:4
**pause** 94:17
  95:24 115:10
**pausing** 100:21
**pay** 16:21 35:1
  35:2
**payroll** 16:17
**pdf** 143:23,25
  144:2
**pee** 131:5
  141:24

**pen** 53:1,2,3
  103:16,20
  104:10,16
**penalty** 34:16
  34:18,20,25
**pennsylvania's**
  43:16
**people** 16:20
  20:4 73:20
  89:9
**percent** 26:13
  100:11 105:4
  136:13,20
  138:7
**percentage**
  138:5
**percentages**
  137:15 138:1
**perform** 27:23
  29:16 30:7
  58:24 78:10
  89:2 104:4,5
  108:20,22
  129:1 137:13
  139:7 140:15
  140:17
**performance**
  55:1 64:10
  80:5,19
**performed** 23:7
  64:14 67:8
  138:14,21
  140:16
**performing**
  65:10

**period** 43:4
  79:22,25
  135:19 139:16
  140:10
**periods** 80:9,10
**permit** 10:16
**permits** 66:19
**permitted** 6:24
**person** 4:6
  22:18 46:11
  48:18,21,22
  51:15 54:18
  60:5 78:4 82:3
  90:3 92:11
  100:3,12
  105:13 106:14
  106:19 107:3,4
  107:22 108:15
  110:10,17
  111:7 112:2
  113:4 118:17
  119:7 122:21
  123:16 124:11
  136:6,19,21
  141:24
**person's** 65:21
  104:14
**personal** 51:14
**personally**
  138:24 139:7
**phone** 87:25
**photographed**
  62:20
**physical** 19:19
  120:9

**[physically - prompts]**                                             Page 21

| | | | |
|---|---|---|---|
| **physically** 4:3 | 11:12,19 12:8 | 114:8 | 38:22 43:4,12 |
| **pick** 31:1 | 14:1,10 17:21 | **possession** | 43:16,25 44:6 |
| **pistol** 19:21 | 20:1 22:13 | 20:14 | 44:17 77:21 |
| **place** 79:21 | 26:21,23 30:17 | **possibly** 21:24 | 87:6 140:25 |
| 145:7 | 51:25 61:2 | **post** 12:17 | **prison** 15:20 |
| **placed** 116:11 | 65:13 121:13 | 13:10 | **probable** 33:1 |
| 116:24 117:13 | 140:8 142:3 | **practice** 2:5 | 65:11,12,21 |
| **placing** 117:8 | 146:4,9 | 86:18 87:24 | 66:19 118:16 |
| **plaintiff** 94:13 | **plenty** 142:24 | 141:23,25 | **probably** 36:16 |
| 121:22 | **plus** 63:14 | 142:4 | 59:15 92:22 |
| **plaintiffs** 1:5 | **pockets** 110:1,4 | **prelude** 51:22 | **procedure** 81:8 |
| 1:19 4:13 | 114:2 | **preparation** | 84:6 85:13 |
| **plate** 44:22 | **point** 48:2 | 17:19 | 93:21 107:15 |
| **play** 95:3 98:17 | 70:21 90:25 | **prescribed** | 117:23 |
| 100:14,16 | 95:18 123:3 | 48:23 | **procedures** |
| 109:17,18 | 139:16 140:2 | **prescription** | 83:12 84:1 |
| 110:18 111:15 | 140:24 141:3 | 127:5 | 86:9 |
| 112:20 113:22 | **police** 11:7,21 | **presence** 4:25 | **proceeding** 5:2 |
| 114:10 115:7 | 11:24 12:6,9 | 6:12 134:25 | 6:13 |
| 116:7 | 13:14 15:8 | **present** 2:10 | **proceedings** |
| **played** 94:19 | 16:13 17:13,22 | 4:3 | 6:25 |
| 95:5,8 96:7,22 | 17:24 18:9,12 | **preserve** 43:21 | **processed** |
| 97:5 98:18 | 18:16,18,22,24 | **preserved** | 62:20 |
| 99:14,22 | 21:1,2,9,13,18 | 43:22 | **professional** |
| 100:19 109:20 | 23:9,24 25:1 | **press** 109:18 | 1:13 |
| 110:20 111:18 | 35:19 36:3,7 | 114:10 | **program** 24:22 |
| 112:9,23 | 36:21 43:22 | **pressing** | 24:23 |
| 113:24 114:12 | 79:24 82:20 | 100:16 | **progress** |
| 115:9 116:9 | 92:16 93:21 | **pressure** 127:1 | 132:22 |
| **playing** 14:13 | 94:6 116:21 | 128:14,18 | **progresses** |
| 96:21 99:11 | **portion** 101:13 | **prevent** 102:17 | 132:19 |
| 112:7 | 106:10 | **prior** 9:19 12:5 | **progressive** |
| **please** 4:10 | **position** 16:15 | 12:9 15:3 | 14:22 |
| 8:20,22 9:17 | 17:9 18:2,6 | 32:14 33:15,24 | **prompts** 89:25 |
| 10:9 11:2,3,9 | 37:20 111:2 | 37:11,13 38:15 | |

pronouncing
    121:14
proof   46:7
proper   109:6
properly   31:15
    104:7 105:12
    106:15 109:2,4
    109:10 110:6
propounded
    148:9
prosecute
    26:13,16,18
    32:2
prosecuted
    25:22 26:2,10
prosecuting
    34:5
prosecution
    32:10
prosecutions
    130:11
prosecutor
    34:4 86:21,24
    87:20,21,23,24
    88:3
prosecutor's
    87:2
prosecutors
    32:2
protective
    115:2
proved   136:13
provide   7:25
    8:23 9:11
    10:17 11:3

44:25 75:21
98:21 134:15
138:8
provided   46:6
    49:8 64:1
    80:22 83:24
    84:2 85:17
    86:13 87:9
provides   67:2
proximity
    41:15
public   145:5,23
    148:21
pull   42:19 93:6
    103:12
pulled   24:24
    44:12 47:9
    49:4 137:21
pullover   51:10
punch   120:12
pupils   54:5
purposes
    116:16 124:9
    128:20
purse   65:4,21
    119:7,11,16
    134:10
pursuant   145:6
pursuit   53:9
    54:5 101:24
    103:5 104:1
put   22:17 28:18
    32:6,12 33:15
    33:20 45:18,21
    49:5 59:5

64:12 78:11
97:19 103:18
108:10 110:24
115:25 138:2
putting   63:13
    86:4 115:14
    120:20

**q**

qualify   19:20
question   5:12
    8:20,22,23 9:2
    9:5 10:8 14:18
    14:24 19:10
    24:15 25:25
    26:7,20,23
    27:5 28:1,2,3
    29:10,11,13,21
    29:24 30:1,2
    31:18 32:18
    34:12 40:2
    41:16,23 45:9
    46:15 48:13
    49:2 51:20,23
    53:11,15,20,25
    54:3 55:22
    58:12 60:10,20
    62:13 63:24
    71:5 79:3 86:1
    87:4 101:9,11
    102:2,3 105:21
    105:22 106:8
    106:12 128:6
    131:7 132:9
    133:9 134:6
    137:17,20

139:1,22 141:9
142:12,18
143:7
questioned
    21:11
questions   5:10
    7:20 8:16 9:12
    9:24 10:1,17
    10:18 11:14
    45:25 49:10
    53:19 90:17,25
    106:3 126:18
    133:25 143:12
    143:15 148:8
quibbling
    133:15
quote   65:21

**r**

r   16:18 145:1
    147:2,2
raise   5:25
    10:22 39:20
    57:23 61:23
    113:12 124:3
    124:14 135:13
    135:21,22,24
raised   7:21
    56:19 58:1,4
    113:13 115:18
    115:19 135:18
    136:1
raising   56:14
    61:21 62:1,5
    111:23 113:11

[rank - regarding]                                                    Page 23

rank  25:14
ranking  27:9
reach  107:20
 108:13 125:9
 129:13,15,19
 130:4
reached  129:6
 129:23
read  6:5 101:10
 101:12 105:1
 106:7,9 116:25
 146:4 148:6
 149:9
reading  6:4
 48:2,3 70:19
 70:22 107:19
reads  5:3
realize  47:21
really  30:22,23
 30:23
reason  10:20
 13:20,23 14:11
 17:3,10 98:22
 128:12,15
 146:6 147:7,10
 147:13,16,19
 147:22 149:11
reasonable
 46:2
recall  15:5 17:2
 19:25 20:9,24
 23:16 27:20
 28:10,18,21
 35:11,13,14,16
 35:25 36:4,9

36:11 37:4,12
37:15 38:13,14
38:24 39:5,19
39:22,24 40:5
40:23,25 41:5
41:6,12,17
43:2 44:7
45:20 47:11
49:18,20,21
57:7,8,10,11,13
57:15 58:2
67:12,15,18,21
68:5,20,24,25
69:3,5,6,11,19
70:14,15 71:15
71:16,19 72:1
72:3,5,6,10,13
72:14,18,22
74:18 75:10
80:15 87:8
88:4 89:3,5
92:22 97:6
99:15 100:20
100:23 101:1
109:21,24
112:10,24
115:6 117:5
118:4 119:24
120:4,18 127:2
127:8,11
129:25 131:3,4
131:5 134:2,19
recapture
 43:11,12,16

recapturing
 43:6
receipt  146:16
 149:17
receive  6:24
 11:23 15:11
 16:24 17:14
 18:4,25 21:12
 23:7 24:23
 90:9 94:2
received  15:17
 94:2 142:24
recess  79:12
recognition
 78:17 105:19
 106:25 107:12
 123:8,9 128:11
 128:23 129:1
 129:13,15,19
 129:22 130:2
 130:25 141:22
recognize
 123:20
record  4:11
 8:10 33:23
 53:18 94:18
 100:17 101:13
 103:19 105:17
 106:10 138:19
 139:5 145:13
recorded  8:9
 145:10
recording  8:3
 43:20,24

records  86:11
red  98:6
reduced  35:3,7
reference  33:2
 52:19 65:24
 66:15 67:1
 90:3 139:2
referenced
 149:6
referring  83:5
reflect  138:19
reflects  94:17
refresher  23:10
 23:12,19
refusal  81:17
 84:17,19
refuses  81:21
regarding  5:9
 7:20 17:15
 18:14 20:14
 25:17 26:4
 27:2,8,23
 29:17 31:15,16
 36:2,7 39:11
 40:8 46:11
 52:16 54:5,16
 56:7 59:24
 60:3,12,16,24
 61:4,12 62:23
 70:4 71:17
 72:20 75:20
 76:11,15 79:19
 83:17,18 84:9
 89:14,15,17
 90:2,10 93:24

[regarding - right]                                                      Page 24

102:3 142:14
**regardless**
   130:25
**regards**  19:11
   25:5 126:4
**region**  1:22
   2:21
**registered**  1:13
**registration**
   46:7
**regulation**
   112:4
**regulations**
   66:15,17,18
**related**  132:17
**release**  125:7
**released**  66:2
   73:3 125:11
   127:16,19,21
**relevance**
   48:10
**remain**  111:2
**remember**  82:9
   82:11,12 85:3
   91:21 97:7,18
   99:1,3 118:23
   127:3 128:17
   128:19 129:7
   135:20
**remotely**  4:4,7
**remove**  49:17
   50:12 115:4
**removed**  49:19
   49:24 64:25

**renew**  29:23
**repeat**  28:3
   29:13 54:3
   102:2 113:20
   128:24 134:6
   137:19
**repeated**
   113:19,20
**repeating**
   53:19
**repercussions**
   35:18
**rephrase**  9:2
   26:1
**report**  127:15
**reporter**  1:13
   4:1 8:2 101:12
   106:9 143:19
   143:24
**reporting**  4:4,9
**represent**  7:8
   91:1 94:24
   99:23 121:11
**request**  8:1 9:3
**requested**  46:8
   101:13 106:10
**require**  6:13
   35:19
**required**  18:6
   28:6 29:6
   79:25 80:5,10
   80:14,18
**requirement**
   19:18 23:11

**requirements**
   19:6,13 79:21
**reserved**  4:24
**resolve**  106:21
**resolved**  87:13
**respect**  4:22
   107:12 111:21
**respond**  86:19
**responded**
   24:25 25:9
   26:24 27:13
   101:2 102:19
   117:23 128:2
**response**  93:23
**responses**  10:1
**restricted**  63:2
**restrictions**
   79:19
**result**  35:23
   76:9,19,22
   104:21
**results**  84:25
   123:1 129:12
   138:23 142:13
**resume**  19:4
**retraining**
   28:13
**return**  84:22
   146:14 149:13
   149:16
**review**  149:7
**reviewed**  7:16
**right**  5:8,12 6:2
   7:6 10:22 11:2
   13:10 14:10

15:22 16:11
17:9 19:6
20:17 21:3
23:4,17 24:10
24:18 29:3
30:19 32:11
34:15 36:1,19
38:7,14,17,20
39:10,17 40:14
40:21,24 41:13
42:2,6,9,15,23
43:3,19 44:11
45:2,14,21
46:10,18 47:8
47:12,15 48:6
48:9 49:8,19
49:25 50:10,20
50:25 52:13,15
54:10,24 56:6
57:19,22 58:15
58:23 59:1,7
62:16 63:5,20
64:14 66:9,24
67:21 68:15
70:15 71:10
72:19 73:10,13
73:23 75:8,11
75:25 76:14,16
76:17,24 77:17
77:20 78:1,9
78:22 79:10,14
80:8 81:4,7,11
81:15,21,24
82:2 85:16,20
86:12 87:5,10

[right - seen]    Page 25

88:5,6,15,18,19
90:5,9,13 93:4
95:23 96:12
99:4,11 103:12
104:11 106:4
108:17 110:25
115:16 123:25
127:4 128:2
131:8,19
133:24 134:18
134:21,24
135:5,12,19
136:2,11
138:10 139:9
140:18,20,21
142:19 143:11
**rights**  5:22
  116:25
**road**  37:22,24
  38:17 44:12
  47:1 92:2
**roadway**  44:14
  47:6 93:2
**room**  4:3
**rough**  138:7
**roughly**  36:13
  38:25
**round**  78:16
**route**  91:7
**rules**  6:10
  66:15,16,18
  142:22
**run**  44:17
**running**  49:15

**s**

**s**  11:6 22:11
**safe**  44:13
  71:22 99:18
**safely**  93:6
  122:14
**safety**  92:12
  110:5 114:5
  116:16 124:8
**sample**  131:9
**samples**  130:11
  130:20
**saw**  98:7
**saying**  31:9
  34:1 39:8
  40:16 49:12
  57:4,9 60:7
  68:20,25 69:3
  69:6 70:15
  72:6,8 78:13
  82:14 85:21
  87:3 105:22
  121:18 128:17
  129:9
**says**  82:3,5
  127:11 136:1
  137:4
**scene**  26:24
  27:13,14,18,19
  64:23 69:25
  70:2,5,9,13
  71:17 72:17
  73:6 108:1
  117:24,25
  118:3 128:23

**scheduled**  88:5
**school**  12:13,15
  12:17 13:7
**science**  48:9
**scientific**  137:5
  142:1,5,13
  143:5
**screen**  80:23
  82:23 83:3,23
  94:15 108:18
  135:19
**sea**  11:24
**seal**  145:19
**search**  30:21
  31:15 32:12
  33:1 64:15
  65:10,11,12,14
  65:18,22,24
  66:3,10,20
  67:8 117:1,3
  117:17,20
  118:12,14
  119:4,14,15,20
  119:25 120:5
  120:23,24
  121:2 134:20
  134:21,22
**searched**  65:1,4
  65:6 133:25
  134:7,8,9,10,12
  134:16,17,19
**searching**
  117:9
**seat**  97:8 119:1
  119:2,2

**seated**  45:15
**second**  8:14
  14:3 21:14,16
  21:23 28:24
  29:2 30:17
  43:5,5,12
  105:25 109:17
  132:21
**seconds**  39:2
  95:4,20,24
  96:9 99:12,24
  100:15,22
  109:18 110:19
  111:16 112:8
  112:22 113:23
  114:11 115:8
  115:11 116:8
**section**  2:5 47:5
  66:19 67:5
  133:16,17,17
**secure**  34:19
**see**  11:13 57:17
  81:1,2 94:20
  94:21 96:10,12
  96:13 97:7,17
  97:24 106:21
  107:21 108:15
  114:16,17
  122:20 125:10
  139:24 141:10
**seeing**  97:18
**seek**  13:8,9
**seen**  7:14 51:13
  51:15 80:25
  81:4

[send - small]                                                    Page 26

**send** 143:25
144:2
**senior** 78:4,6
**sent** 149:14
**separate** 30:14
**sergeant** 27:10
27:11 129:3,7
129:12,17
**series** 111:13
**served** 34:22
**set** 88:7
**seton** 12:21
13:6
**seven** 11:22
**several** 19:3
**shake** 8:8
**shape** 15:2
**share** 83:3
94:15
**sheet** 146:7,10
146:12,15
148:11 149:11
**sheriff's** 12:10
17:5,12,16
**shift** 14:3,3
37:13
**shine** 53:1
**shining** 55:19
**shoot** 19:21
**short** 79:12
**shorthand**
145:11
**shoulder** 120:1
**shouting**
124:22

**show** 32:7 33:8
33:22 80:21
86:15 88:9,11
88:16 94:11
103:18 124:18
139:5
**showing** 83:22
86:8 139:10
**shows** 136:8
139:5
**sic** 22:11 97:6
**side** 44:12
45:12,15,19
46:12,19 47:1
49:16 50:7
56:25 71:21
110:24 113:14
115:19,24
125:2 135:14
135:18
**sides** 111:6
**sign** 6:5 48:16
48:17,17 146:9
149:12
**signal** 38:19
40:12,17 41:4
41:19 42:7,11
42:14 91:14
92:5
**signature**
145:21 148:14
**signed** 149:19
**signing** 5:3 6:4
146:11

**signs** 28:14
107:24 124:18
139:10
**simple** 26:17
**simply** 133:1
**sir** 7:15,18,23
8:5,13,25 9:21
10:3,11,14,19
10:23 11:1
12:3,7,19 13:3
14:20 15:1
16:10,23 17:20
18:3,7,10
20:22 23:14,16
23:22,25 25:15
28:3,8 36:22
37:1,7 39:9
40:15,18,20
41:5 42:8,18
42:22,25 44:15
45:13,17,23
46:1,24 47:2,4
47:7,14,20
48:8 49:13
50:14 51:5
52:12 53:24
56:3 58:22
68:3 93:3,14
93:22 95:9
96:5 128:18
137:20 143:18
**sirens** 42:16,21
43:5,7,9,13
93:9,10

**sitting** 139:11
**situated** 37:17
**situation** 25:18
45:7
**situations**
137:12
**six** 100:9,10
106:17,18
107:4 113:11
113:12
**size** 101:22
103:3,22
**sleepy** 74:9
**slightly** 53:2
120:22
**slipped** 30:24
31:6 33:13,25
34:2
**slipping** 32:5
33:15
**slow** 38:20
46:20,22 49:11
73:17,18,21
75:12 98:3,7
99:6 139:14
140:19
**slower** 78:6
**slowly** 78:2
**sluggish** 73:21
99:6
**slurring** 46:3
55:5
**small** 30:23,24
30:25 31:3,23
32:1,3 33:4,6

[small - stenographic]                                                Page 27

33:12,20 34:3
34:6 81:1
111:13
**smaller** 84:4
**smooth** 53:9
54:4 101:24
104:1
**smoothly** 7:25
**sobriety** 50:22
51:1 56:2
78:16 81:14,22
84:14 99:10
107:23 108:1
137:22 138:2
**solely** 128:14
**solutions** 1:21
2:21 149:23
**somebody**
26:13,15 61:13
82:11 92:7,25
116:17 123:13
123:22 127:11
129:10 130:21
131:9 135:13
137:4,21 138:2
138:11,12
141:16 142:5
143:3
**somebody's**
142:14
**sop** 116:17
**sorry** 13:25
35:6 44:21
97:14 101:5
141:19

**sort** 21:15 37:3
115:2 127:6
137:14
**sound** 96:23
**space** 146:7
**speak** 90:1,6
**specialized**
108:5 123:5
**specific** 67:25
**specifically**
39:10 60:11,15
61:10 63:2
**speculating**
53:17
**speech** 55:5
**speed** 103:7
**speeding** 40:24
132:13
**spell** 11:3 22:4
**spoke** 90:3
**staggering** 55:4
55:9,13
**stand** 51:3
54:25 58:25
60:19 62:4
64:10 89:2
112:25 115:21
116:5 123:7
**standard** 4:20
5:7,19,22 18:1
18:6,21 37:2
81:8,14 83:11
83:25 84:6,13
85:12 86:9
93:20

**standardly**
6:23
**standing** 47:1
55:8 119:24
120:2 145:5
**start** 84:23
94:16 95:7
**started** 49:5
**starting** 95:4
114:8
**state** 11:2,6,7
11:21,24 12:6
12:9 17:13
18:9,12,16,18
18:22,24 19:7
19:14,23 20:25
21:2,9,13,18
23:9,24 25:1
25:10,13 27:1
28:6 29:6,16
30:4,8 35:18
36:3,7,21
37:19 43:22
66:14 79:24
80:18 82:20
92:16 93:21
94:6 108:5
142:9 146:6
**stated** 21:14
126:10 138:22
**statement** 31:9
**states** 1:1 7:10
85:13
**stating** 4:11
100:17

**station** 22:17
25:4 26:11
31:6 32:10
33:9 48:3
62:19 63:15
64:5 69:10,13
69:23 70:16
73:4,7,11,15
78:9 84:23
85:5 86:5
93:13 107:16
108:10 116:13
121:5,24,25
122:5,14,17
124:4,16
125:15 126:9
127:22 128:1
129:1,24 131:1
137:11 138:11
138:14,21,24
139:3 140:20
140:23,25
141:2
**stationary**
37:20
**status** 29:18
30:9
**statute** 133:14
**statutes** 66:14
**stemming** 96:2
**stenographer**
4:25 6:12 8:15
11:14
**stenographic**
8:10

**[step - taken]**                                                    Page 28

**step**  57:13,19
  57:25 58:2
  99:9,17
**steps**  57:17
  83:18 84:9
  111:13 128:22
  128:25
**stimulus**  102:6
  103:13,15,16
  103:20 104:10
**stipulations**
  4:21 5:7,20
**stood**  55:12
**stop**  30:20
  37:12 38:15,23
  42:10 44:13
  52:2 72:12,21
  73:7 77:21
  81:12 88:23
  89:15,18 92:1
  92:17 93:5,12
  93:24 94:4,5
  96:8 98:22
  101:16 111:6
  113:15 114:22
  122:1 126:3
**stopped**  42:13
  47:16 89:9
  122:4
**stopping**
  112:18
**stops**  83:19
  84:10,10
**straight**  53:6
  103:10 104:9

**street**  1:17,22
  2:6,22
**streetlights**
  47:9
**striking**  41:15
**study**  136:24
  137:2,5
**stuttering**  46:3
**subject**  146:11
**subjective**
  143:5
**submit**  84:23
**submitted**
  94:12
**submitting**
  84:24
**subpoenas**
  86:19
**subscribed**
  148:17
**substance**  26:4
  74:14 77:6
  96:3 100:7
  123:23 130:22
  131:11 140:14
  141:7 148:10
**substances**
  75:6 127:11
**sued**  87:5,17
  89:24
**suffered**  28:24
**sufficiently**
  40:22
**suite**  1:22 2:22

**sunglass**  134:9
**superior**  25:2
**superiors**  24:5
  24:12 28:5
  30:7
**supervision**
  145:12
**supervisor**
  125:8
**supposed**  33:20
  53:5,6,7 61:23
  73:18 83:15
  95:9
**sure**  9:4,11
  71:21,22,25
  82:25 99:18
  103:4,6,23
  104:1 117:12
  118:9 137:7
  142:25
**surgery**  70:12
**surrounding**
  9:10
**suspect**  22:15
  26:15 65:15
  74:13,16
  129:10
**suspected**
  25:19 26:3,10
  26:25 27:16,23
  65:16 81:12
  83:20 84:10
  116:17
**suspecting**
  26:14

**suspended**
  44:25
**suspension**
  34:25
**suspicion**  39:20
**switched**  38:18
  87:21 92:4
**sworn**  4:19
  145:8 148:17
**system**  22:19
  122:22

**t**

**t**  22:11,11
  145:1,1 147:2
**tackle**  120:14
**tag**  93:18
**take**  10:6 11:15
  15:23 18:11,13
  27:2 31:6 33:6
  33:19 64:12
  66:2 70:18
  74:10 79:11
  82:3 85:18,21
  86:2 104:9
  107:16 108:7,9
  109:25 110:3
  111:12 114:14
  121:23 128:22
  128:25 130:10
  130:13,16,17
  130:19 131:9
  137:2,10
**taken**  1:11
  26:11 32:9
  33:9 62:19

[taken - think]                                              Page 29

79:12 116:12
145:6
**talk** 5:4 93:16
**talking** 5:17 6:9
36:15 39:1
55:6,7 60:18
60:19 68:22
70:1,2,6 140:7
**taught** 20:23
137:2
**tell** 11:11,19
12:8,12,20
13:10 14:10,15
15:16 17:21
20:1 24:18
30:17 36:19
37:16 38:2
39:21 48:9
50:20,25 51:12
51:25 52:15
54:10 70:19
99:25 104:15
105:10 110:7
111:12 113:1,7
115:12 120:16
127:4 145:8
**telling** 89:5
104:8 108:3
109:24 128:19
**ten** 36:17 72:11
79:11 117:5
118:11 120:7
120:25
**terminated**
13:22 14:3,6

14:22
**termination**
14:12 15:3,6
**test** 19:20 22:2
22:6,10,14
23:1,5,15
35:22 51:2,3,4
52:7,11,16,22
54:8,14,22
55:2,6,13,23
56:2,5,7,10,11
58:23,25 59:3
59:4 60:19
61:22 62:8
64:9,10 69:20
70:20 73:23
74:4,17,20,21
74:22 76:6
78:12 81:22
82:7 84:24,24
99:18,24,25
100:2,3,7,9
101:21 102:4,6
102:14,14,18
103:1 104:4,9
105:12 106:16
106:16 107:3
107:18 108:1,6
108:6,18,21
109:1,4,11,14
109:16,21,22
109:23 110:5,8
110:9,9,12,22
111:3,4,7,10
112:12,13,18

112:19,24,25
113:1,2,8,8,17
113:18,19,20
114:9 115:21
116:1,5,10
117:8 121:6,7
124:9 125:9
129:4,12
135:10,16
136:19,20
137:5,11,13
138:11,14,23
138:24 139:2,7
140:3,12,17
141:1,14 142:5
142:13 143:5
**tested** 48:3 74:7
75:5 76:3,9
**testified** 4:19
91:2,6,15
101:15 105:3
106:24 107:10
114:22 119:9
122:17 123:4
126:9 134:24
135:5 136:11
138:13,20
142:25
**testify** 138:16
**testifying** 82:11
**testimony**
43:25 51:19
54:17 59:19
63:25 106:2,23
132:25 133:13

135:2,20
136:14 145:6,9
145:14 149:9
149:17
**testing** 26:12
50:22 52:5
64:4 75:1 77:4
99:10 100:8
102:7 107:17
107:21 116:13
122:20 130:8
138:4
**tests** 51:1 78:10
78:16,17 81:15
84:14 101:25
105:9,10 106:6
107:24 134:25
135:3 137:22
138:3,21
**thank** 11:16,18
26:21 83:7
90:15,16
143:13,16,18
**thankful** 70:17
**thereof** 145:16
**thing** 111:14
141:5
**things** 134:4
**think** 5:5 51:14
59:12 85:23
87:16 88:4
89:24,25
105:17 119:8
136:8 142:9,15
143:2,25

[third - transcript]                                                    Page 30

**third**  21:21
  132:16,19,22
**thirty**  146:16
**thought**  21:8
  21:14 31:22,24
  69:24 97:15
**thousand**  143:1
**three**  5:21
  19:22 82:6
  101:25
**thyroid**  127:1
**ticket**  132:13
**tight**  120:17
  124:15
**tilghman**  1:22
  2:22
**time**  4:24 6:25
  9:14 10:13
  27:7 28:12
  30:6,21 31:2
  31:11,24 33:5
  34:5 43:4,16
  45:5 49:7 55:7
  58:5,8 61:15
  64:19 68:17,19
  72:11 73:25
  76:5 77:3
  78:20 79:22,25
  80:1,9,10,13
  87:14 88:16
  92:16 94:16
  99:16 101:6
  103:5,24 104:2
  111:6 117:2,4
  126:15 127:16

  127:18 129:6
  135:19 138:17
  139:16 140:10
  143:17 145:7
  149:18
**timeframe**
  149:8
**times**  24:1,3,11
  30:3 36:1,9,13
  39:24 58:3,6
  61:14,24 88:7
  92:15,21,23
  105:18 109:25
  137:21,24
**tiny**  34:3
**tired**  48:18,22
  77:12
**today**  6:23 7:20
  9:8 10:25
  43:25 44:6
**toe**  110:25
  111:12
**together**  28:19
  28:20,23
**told**  69:24
  76:14 82:9
  86:19 101:16
  113:16 126:25
  127:20 128:13
  128:16 131:4
**tollbooths**
  16:21
**took**  27:13
  68:21 70:8,12
  74:3,8 85:3

  86:24 127:23
**toolboxes**  134:8
**top**  81:11 83:9
  102:12
**totality**  65:17
**touched**  10:21
**toward**  16:6
**towards**  53:3
**traces**  30:23
**track**  101:24
**tracking**
  101:23 103:3
  103:23
**traffic**  37:21
  38:15,23 42:10
  52:1 72:12,20
  77:21 78:23,25
  79:5,7 86:15
  87:13,18 88:23
  89:18 92:1,17
  93:5,12,24
  101:16 122:1
**train**  20:3
  61:12
**trained**  21:10
  21:25 22:14,23
  27:7 28:13
  31:2,12,15
  59:21,22,24
  60:1,2,11,15,23
  61:3,9 62:22
  63:18 74:25
  75:1,2,19
  76:11,13,15,20
  76:22 77:5,11

  83:15 84:9
  86:13 105:18
  105:24 106:25
  107:7,12,24
  108:14 116:4
  123:12,15
  138:17,17,18
  141:17,21,21
**training**  11:23
  11:25 15:12,17
  15:24 16:1,6,8
  16:25 17:14,16
  18:4,13,21,25
  19:1,2,2,3,5,8
  19:11,15,19
  20:2,3,13 21:3
  21:4,12,15,16
  22:12 23:14,15
  23:20 30:19
  31:20 35:19
  77:10 85:16
  89:8 105:7
  112:4,6 116:2
  116:3 123:21
  125:21 135:25
  136:17,22
  137:2 142:8,24
**trainings**  19:3
  35:20,23
**transcribed**
  145:11
**transcript**  5:1,3
  6:5,7,14,20,22
  6:23 143:20
  146:17,18

[transcript - undergo]    Page 31

149:6,19
**transcription**
  145:12 148:7
**transit** 13:14
  15:8 16:13,22
**transition**
  15:20
**transporting**
  72:15 73:14
  75:12,17 78:2
  85:4 86:5
**travel** 39:8
  40:22 41:3
  92:12
**traveled** 39:24
**traveling** 39:12
**trial** 4:24 6:20
**tried** 125:9
**trigger** 9:15
**troop** 116:25
**trooper** 1:7,7,9
  3:5 4:16,18 5:2
  6:4,20 7:6,9,13
  11:5,5,6,8,19
  11:20 12:12
  13:25 18:19
  19:7,15,23
  22:13 24:21
  25:10,13 27:1
  27:21 28:6
  29:6,12,16,25
  30:4,8,20
  32:19,25 33:3
  34:14 36:24
  37:1,6 42:24

44:4 51:12
52:6 53:23
62:16 69:4
71:16 72:3,6,8
72:16,19 79:4
79:14 83:10
88:23 90:21
94:21 95:11,23
97:1,10,13,16
108:5 109:19
111:16,19
113:25 114:6
114:13 115:12
117:22,24,25
118:2 120:21
123:5,5 126:24
142:9 143:16
149:4
**troopers** 75:2,8
  80:18 89:11
  107:11
**trouble** 34:23
  35:8
**truck** 96:10,13
**true** 126:12
  145:13
**truth** 14:16
  145:8,9,9
**try** 82:22
  108:13 111:23
**trying** 32:22,24
  61:7 62:9
  133:8 136:6
**tuesday** 1:11

**turn** 38:19
  40:12,16 41:3
  41:19 42:7,11
  42:13 43:8,11
  51:2 56:5,7,17
  57:5 60:17,23
  61:5,22 62:1,2
  62:8 64:9
  91:14 92:5
  109:23 110:8,9
  110:22 111:13
  111:20 112:11
  135:17,21
  136:4,9
**turning** 64:21
**turns** 111:13
**twice** 19:21
  24:2
**two** 8:18 23:11
  23:18 24:11,18
  30:3 34:21,22
  34:22 35:3,5,5
  35:7,13 42:5
  81:18 82:6
  88:6,7 91:16
  101:25 110:16
  113:3,4 125:6
  139:15
**type** 105:14
  107:22 114:20
**typically**
  122:23

**u**

**uncooperative**
  51:25 52:10
**under** 10:12,15
  11:9 17:8 20:4
  22:15 25:19
  26:3 27:1
  48:21 60:6
  63:22 66:21
  69:17,17,25
  73:20,22 74:1
  74:2,6,13
  75:20 76:2
  79:18 84:19
  92:7,18 93:1
  98:13 100:4,12
  104:24 105:13
  106:20 107:5
  107:22,25
  108:9,15
  112:14 116:17
  122:8 123:13
  123:16,22
  126:5 127:5,12
  129:5 130:21
  131:10,24
  132:18,21
  133:2,7,16
  137:19 140:4
  140:13 141:6
  141:11,13
  142:6 143:4
  145:11
**undergo** 35:19

[understand - waive]                                                    Page 32

**understand**
  7:19 8:4,12,24
  9:1,4,6,20
  10:16 16:9
  19:10 21:6
  25:8 27:3 28:2
  29:11 30:1,2
  32:15,23,24
  33:17 34:11
  40:3 41:16,24
  48:14 53:22
  58:13,15 59:23
  60:22 71:7
  76:7 78:13
  82:14 84:5
  102:9 106:12
  111:9 128:7
  132:25 133:8
  136:14 137:18
**understanding**
  29:22 77:19
  103:8 125:20
**understood**
  9:23 111:7
**undertake**
  17:15 83:18
**uniform** 47:20
**united** 1:1 7:10
**university**
  12:21 13:7
**unprescribed**
  48:23
**unquote** 65:21
**unusually**
  139:25

**upgrades**
  132:23
**urine** 130:13,16
  130:17,19,20
  131:9 141:24
**use** 5:1 6:20
  40:12,16 41:3
  41:19 42:7,11
  42:13 64:3
  72:24 91:14
  92:4 120:9
**used** 5:22
  116:14 146:19
  149:19
**using** 38:19
  71:9
**usually** 5:11
  6:8 45:4 73:20
**utilize** 63:20
  64:6 65:9
**utilized** 6:25
  62:10 66:25
**utilizing** 63:2

**v**

**v** 11:6 149:4
**valid** 73:3
  109:4
**valuable**
  142:10
**value** 31:4 67:9
**veer** 41:14
**vehicle** 33:1
  37:6,11,18,25
  38:3,6,12,16,22
  39:5,7,11 40:7

40:9 42:3,24
43:7,20,24
44:16 45:12,16
46:12,19 47:10
49:15,17,17,22
49:23 50:8,13
55:9 65:7,15
65:19,20 66:1
66:2,4,4,11
72:16 73:3,14
73:15 81:12
83:19 84:10,10
87:6 89:10
91:12 92:1
93:13,18 94:6
96:11,13,16,19
97:21 117:1,3
117:17,20
118:12,15,24
119:4,11,25
120:6,24 122:4
122:14 125:19
125:25 131:20
131:24 132:12
132:17,18,21
133:2,7,14,19
134:1,13,20
**vehicles** 39:6
  41:1,10,18,20
**verbal** 8:11
**verify** 149:9
**veritext** 1:21
  2:21 149:14,23
**veritext.com.**
  149:15

**versus** 138:4
**vessel** 83:19
**vicinage** 1:2
**video** 43:24
  51:15 80:24
  94:11,19 95:3
  95:5,8 96:7,21
  96:22,24 97:5
  97:9 98:17,18
  99:14,22
  100:14,19,21
  109:20 110:18
  110:20 111:15
  111:18 112:9
  112:23 113:24
  114:12 115:9
  116:9 136:3,8
**videotape** 44:8
**view** 47:17,23
**violation** 65:16
  87:18,19
  125:19,25
  131:21 132:7
  132:12,15,21
**violations** 40:7
  89:10 133:7
**voice** 11:11
**volume** 95:17
  95:17 100:18
**vs** 1:6

**w**

**wait** 117:23
**waited** 71:20
**waive** 4:8,25
  6:3,12

[waives - zelechiwsky]                                                    Page 33

waives  5:2
walk  50:12
  51:2 56:5,7,17
  57:5 60:17,23
  61:5,22 62:1,2
  62:8 64:9
  109:23 110:8,9
  110:22 111:20
  112:11 135:17
  135:21 136:3,9
walked  44:20
walking  56:18
  57:1 73:19
  136:5
want  64:3
  102:11 106:22
  113:8,9,21
  129:10 143:3
  143:22
war  10:4
warrants  45:1
watch  44:5
  104:16
watched  43:23
  136:4
watching  37:21
water  10:8
wateriest
  139:17
watery  98:4
  139:13,25
  140:10
way  15:2 40:24
  41:14 46:3
  51:7 54:16

55:4 67:19
74:15 82:24
92:14 94:17
101:20
wear  49:25
  79:25 80:5,10
  80:14,18
wearing  50:3
weather  11:10
week  20:20,21
  23:9,13,14,15
weight  142:16
  143:2
went  12:21
  13:13 49:18,22
  56:1 60:22
  94:9 105:17
  109:16 121:5
  126:8 138:22
whistle  47:18
  47:19,22
wife  45:14
  70:18 71:21
window  44:18
  45:18,22 49:5
witness  3:3
  53:24 101:7
  143:18 144:4
  145:14,19
  146:2 149:8,10
  149:12,18
witnesses  3:1
witnessing
  42:16

wonderful
  51:21
word  64:3
  71:10
words  46:4
  101:20 102:5
  116:14
work  13:14
worked  12:9
  13:12 16:17,18
world  139:18
worn  43:24
  44:5,9 47:16
  94:12,25 95:24
  96:2 99:12
  109:19 111:17
  112:21 113:22
worth  140:21
wrestling  14:14
write  127:14
wrong  33:18
  34:15 53:12
  75:16
wrote  21:22

y

year  12:11,14
  13:4 17:8 19:8
  19:20,21 20:10
  24:21 30:19
  34:24 35:9,12
  35:14 59:15,16
  73:24 78:8
yearly  19:18
years  5:23
  11:22 12:22,24

13:18 23:11,18
35:3
yep  140:16

z

zelechiwsky
  1:4,4 2:11 4:13
  4:13 7:8 37:12
  42:19 44:12
  45:7,24 48:1
  49:25 50:13
  51:9 54:24
  55:8 56:8 59:8
  62:11 63:6,21
  64:7,18,22
  67:13,19 68:12
  68:16,22 69:6
  70:8,11 71:24
  72:4,7,7,15,24
  73:11 75:12
  76:25 77:21
  78:10,19,23
  79:8 80:24
  82:19,20 85:4
  86:3 87:19
  88:18 89:18
  91:9,16 93:5
  97:7,20,25
  98:21 99:1,5
  99:16,19
  100:20,24
  101:1,16
  102:15,19
  103:9 104:3,15
  104:19,22
  108:20 109:10

**[zelechiwsky - zoom]**                                                     Page 34

| | |
|---|---|
| 109:14,25 | **zeros** 108:12 |
| 110:3,23 | **zoom** 1:9,11 |
| 111:20 112:10 | |
| 114:1,14 115:4 | |
| 116:20 117:3 | |
| 117:13 118:5 | |
| 119:3,6,21,23 | |
| 120:9 121:12 | |
| 121:20,21,22 | |
| 121:23 122:3 | |
| 122:13 124:1,3 | |
| 124:13 125:3,8 | |
| 125:12 126:1,9 | |
| 126:24 128:13 | |
| 129:2 130:8 | |
| 135:9,18 136:9 | |
| 139:10,17 | |
| 149:4 | |
| **zelechiwsky's** | |
| 37:17,25 38:6 | |
| 38:22 39:11 | |
| 40:8 54:5 | |
| 91:11,25 93:12 | |
| 96:4,19 97:21 | |
| 111:22 115:1 | |
| 118:10 119:15 | |
| 120:19 121:14 | |
| 134:1 | |
| **zero** 48:2,2 | |
| 70:21,21,21 | |
| 95:7 107:19 | |
| 123:3,3 139:16 | |
| 139:16 140:2,2 | |
| 140:24,24 | |
| 141:3,4 | |

Commonwealth of Pennsylvania Rules of Civil

Procedure

Title 231, Chapter 4000

Depositions and Discovery

Rule 4017


(c) When the testimony is fully transcribed a copy
of the deposition with the original signature page
shall be submitted to the witness for inspection
and signing and shall be read to or by the witness
and shall be signed by the witness, unless the
inspection, reading and signing are waived by the
witness and by all parties who attended the taking
of the deposition, or the witness is ill or cannot
be found or refuses to sign. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the person before
whom it was taken with a statement of the reasons
given by the witness for making the changes. If the
deposition is not signed by the witness within
thirty days of its submission to the witness, the
person before whom the deposition was taken shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the refusal to sign together with the reason, if

any, given therefor; and the deposition may then be
used as fully as though signed, unless the court
holds that the reasons given for the refusal to
sign require rejection of the deposition in whole
or in part.


DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT "G"

# EXHIBIT "H"

# EXHIBIT "I"

## *ALCOHOL INFLUENCE REPORT FORM, ALCOTEST 7110 MKIII-C*
## *NJSP - PORT NORRIS*

|  |  |
|---|---|
| Department Case No.: | A100202000138D |
| Summons No(s): | E-TICKET |
| Sequential File No.: | 01763 |

### Subject

| | | |
|---|---|---|
| Last Name: ZELECHIWSKY | First Name: BOHDAN | MI: J |
| D.O.B.: 07/06/1951  Age: 69 | Gender: MALE | Ht: 6 ft. 01 in.   Wt: 205 lbs. |
| Driver License Number: ████ | Issuing State: PA | |

### Arresting Officer

| | | |
|---|---|---|
| Last Name: DAVIS | First Name: TPR. | MI: - |
| Badge No.: 8138   Arrest Date: 08/10/2020 | Arrest Time: 21:35D | Arrest Location: 0610 |

### Instrument

| | | |
|---|---|---|
| Location: | Alcotest 7110 MKIII-C NJSP - PORT NORRIS | Serial No.: ARWC-0054 |
| Calibration File No.: 01721 | Calib. Date: 04/01/2020 | Calib. No.: 00039 |
| Certification File No.: 01722 | Cert. Date: 04/01/2020 | Cert. No.: 00032 |
| Linearity File No.: 01723 | Lin. Date: 04/01/2020 | Lin. No.: 00032 |
| Solution File No.: 01760 | Soln. Date: 08/08/2020 | Soln. No.: 00267 |
| Sequential File No.: 01763 | File Date: 08/10/2020 | |

| | | |
|---|---|---|
| Calibrating Unit: WET | Model No.: CU-34 | Serial No.: DDXD S3-0180 |
| Control Solution %: 0.100% | | Expires: 10/01/2020 |
| Solution Control Lot: 18330 | | Bottle No.: 0246 |

### Breath Test Information

Date of Test: 08/10/2020

| Function | Result %BAC | Time HH:MM | Volume (L) | Duration Sec (s) | Temp. Sim.(°C) | Error Message |
|---|---|---|---|---|---|---|
| Ambient Air Blank | 0.000% | 22:39D | | | | |
| Control Test 1 | | | | | 34.0°C | |
| EC Result | 0.101% | 22:40D | | | | |
| IR Result | 0.101% | 22:40D | | | | |
| Ambient Air Blank | 0.000% | 22:41D | | | | |
| Breath Test 1 | | | 2.5L | 17.4s | | |
| EC Result | 0.000% | 22:42D | | | | |
| IR Result | 0.000% | 22:42D | | | | |
| Ambient Air Blank | 0.000% | 22:43D | | | | |
| Breath Test 2 | | | 2.5L | 19.2s | | |
| EC Result | 0.000% | 22:45D | | | | |
| IR Result | 0.000% | 22:45D | | | | |
| Ambient Air Blank | 0.000% | 22:46D | | | | |
| Control Test 2 | | | | | 34.0°C | |
| EC Result | 0.100% | 22:46D | | | | |
| IR Result | 0.100% | 22:46D | | | | |
| Ambient Air Blank | 0.000% | 22:47D | | | | |

**REPORTED BREATH TEST RESULT: 0.00% BAC**

### Breath Test Operator

| | | |
|---|---|---|
| Last Name: HIGGINS | First Name: TPR. | MI: - |

Signature: *Tpr. B Higgins #8009*         Badge No.: 8009
                                         Date:    08/10/2020

*Copy Given to Subject*

Page 1 of 1

DEPARTMENT OF

Law and Public Safety

This is to certify that

**Brent P. Higgins**

**New Jersey State Police**

IS QUALIFIED AND COMPETENT SUPERVISORY CHEMICAL BREATH ANALYSES PURSUANT TO CHAPTER 1:1 OF
THE LAWS OF 1966 IN THE OPERATION OF THE Alcotest 7110 MKIII-C
A METHOD TO DETERMINE INTOXICATION.
GIVEN UNDER MY HAND AT TRENTON, NEW JERSEY THIS **11th** DAY OF **July**
TWO THOUSAND AND **Nineteen**

COLONEL
NEW JERSEY STATE POLICE

ATTORNEY GENERAL
STATE OF NEW JERSEY

ORIGINAL COURSE DATES

| | DATE | Refresher Course PLACE | INSTRUCTOR |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |

S.P. 283B (Rev. 01/18)

# EXHIBIT "J"



Expert Witness Report NO 22-cv-04005-CPO-AMD

Prepared for Diana R. Brocco, Esq.

BOHDAN J. ZELECHIWSKY :
and :
LISA A. ZELECHIWSKY, :
Plaintiffs, :
vs. :
TROOPER ASHLEY DAVIS, :
and :
TROOPER JOHN DOE :
Defendants.

August 1, 2024

Privileged and Confidential

Certain Kroll companies provide investigative services.
See www.kroll.com/licensing for state licensing information.

Kroll Boston
125 High Street, 02110
Boston, Massachusetts, 02360
USA
Kroll.com



**Privileged and Confidential**

Restricted Use Warning

This report was prepared by Kroll at the request of the client to whom it is furnished pursuant to specific terms of engagement. This report, and the information contained herein: i) are strictly confidential and may be privileged; ii) may contain personal data of individuals which is being processed for the purpose set out in the terms of engagement; and, iii) are intended solely for the private and exclusive use of the client only for the purpose set out in the terms of engagement. Any other use of this report is strictly prohibited. Any communication, publication, disclosure, dissemination or reproduction of this report in whole or in part to third parties without the advance written consent of Kroll is not authorized. Kroll assumes no direct, indirect or consequential liability to any third party for the information contained herein, its interpretation or applications, or for omissions, or for reliance by any third party or other person thereon. To the extent our findings provided in this report are based on a review of publicly-available records or rely on information provided by or on behalf of the client or received from third-party financial, industry or other sources, such findings, as presented, rely upon the accuracy and completeness of those records or information, which, unless expressly stated, have not been corroborated or independently verified by Kroll.  Statements herein concerning financial, regulatory or legal matters are given by Kroll as risk consultants and may not be relied upon as financial, regulatory or legal advice, which Kroll is not authorized to provide. All such matters should be reviewed with appropriately qualified advisors in these areas. This report may also contain material, non-public and/or inside information for the purposes of market abuse or insider dealing regulations or laws in the UK, US and elsewhere.  Such regulations/laws may impose restrictions on what the client may do with the information or whilst in possession of the information. It is the client's responsibility to assess whether or not any information in this report constitutes material non-public and/or inside information and to comply at all times with applicable market abuse or insider dealing regulations/legislation.



## Contents

1    Introduction ...........................................................................................................1

2    Curriculum Vitae ....................................................................................................3

3    Materials Reviewed...............................................................................................12

4    Timeline Review ................................................................Error! Bookmark not defined.

    4.1    Error! Bookmark not defined.

5    Video Camera Analysis ..........................................................................................13

    5.1    Dash Camera Analysis ....................................................................... 13

    5.2    Body Worn Camera Analysis.............................................................. 13

    5.3    Gallagher's Body Worn Camera Analysis............................................. 18

    5.4    Davis's Body Worn Camera Analysis Vehicle Search. .......................... 20

6    Depositions ..........................................................................................................21

7    Findings and Conclusions ......................................................................................45

DISCUSSION AND OPINIONS ......................................................................................45

8    Conclusions .........................................................................................................49



# 1   Introduction

This report represents Kroll Managing Director Daniel Linskey's expert analysis under Federal Rule 26(a)(2)(F) for the case of Bohdan Zelechiwsky (Zelechiwsky) and Lisa Zelechiwsky (Mrs. Zelechiwsky) vs. Trooper Ashley Davis (Davis) and Trooper John Doe (at the time of this report John Doe has been identified as Trooper Gallagher (Gallagher) of the New Jersey State Police.

On 08/10/2020 after spending a weekend at their beach house in Cape May, New Jersey Zelechiwsky and Mrs. Zelechiwsky were driving home in Pennsylvania in their Ford F-150 pickup truck. At approximately 9:30 p.m. Zelechiwsky was the operator of the vehicle accompanied by his wife in the passenger seat and their dog in the backseat.

Davis was operating in her assigned patrol area conducting a patrol shift in a marked New Jersey State Police (NJSP) vehicle. At some point, Davis reported observing Zelechiwsky's pickup truck to have weaved in and out of its traffic lane. Davis reported that in addition the pickup was next observed to make a lane change without signaling. Davis initiated a traffic stop of Zelechiwsky's truck. After making contact with the driver, Davis reported observing the driver had bloodshot and glassy eyes and moving in a slow manner. Davis asked if they had consumed alcohol tonight Zelechiwsky reported that he had not had anything to drink. Davis requested that the driver exit the vehicle and conducted a series of field sobriety steps. Davis evaluated Zelechiwsky's ability as he attempted to complete the tests. Based on her training and experience and her observations Davis placed Zelechiwsky under arrest. She informed him that she was taking him in for suspicion of operating under the influence and would be administrating a breath test and placed him in her vehicle.

Davis informed Mrs. Zelechiwsky that after she conducted a search of the pickup, she would be taking Zelechiwsky to the barracks and that Mrs. Zelechiwsky could follow her to barracks in the truck. Davis requested if it was possible to have the dog come out of the car as the search was being conducted. Mrs. Zelechiwsky assented and got the leash and took the dog outside. She was approached by Gallagher who had responded to back up Davis. While Davis searched the vehicle Mrs. Zelechiwsky made statements to Gallagher who was recording with his Body Worn Camera (BWC).

Davis transported Zelechiwsky followed by Mrs. Zelechiwsky to the barracks. At the barracks Davis arranged for another member of the NJSP to administrate a breathalyzer test to Zelechiwsky. The test showed that Zelechiwsky was not under the influence of alcohol with a reading of 0.0. Through her supervisor efforts were made to see if a specially trained DRE was available to conduct other testing to determine if the observations made by Davis could be attributed to drugs not alcohol. Zelechiwsky was detained between an hour and a half to two hours from the initial stop to the time he was released. After not having a resource Davis released Zelechiwsky for custody with citations for the initial moving violations. Zelechiwsky and Mrs. Zelechiwsky have brought suit alleging violations of civil rights due to the arrest of Zelechiwsky and the search of the vehicle and its contents. I have been asked to review the



documentation and information surrounding these events and offer my opinion as an expert in police policies, practices, and programs.



# 2 Curriculum Vitae

I hold a bachelor's degree in Sociology and Criminal Justice Studies from Curry College in Milton, Massachusetts. I am a graduate of the Boston Police Academy, where I earned the prestigious Hogan Award for academic excellence in the study of law. I attended and completed The Senior Executives Program for State and Local Government at the Harvard Kennedy School of Government in Cambridge, Massachusetts. I also was selected to attend and complete the National Leadership Preparedness Initiative Program at the Harvard School of Public Health in Cambridge, Massachusetts. Additionally, I am a graduate of the FBI National Academy in Quantico, Virginia.

I have been actively involved in law enforcement and police practices since 1986. I served as a sworn member of the Boston Police Department for just under 28 years. I served the Boston Police Department as a Patrol Officer, Detective, Sergeant, Sergeant Detective, Lieutenant, Lieutenant Detective, Deputy Superintendent, and Superintendent before being promoted to Superintendent-in-Chief, the highest sworn member of the Boston Police Department. In that role, I was charged with overseeing the department's day-to-day operations.

As a Lieutenant and Lieutenant Detective, I was the Commander of the Special Police Division, where I oversaw the safety and security for all of the City of Boston-owned property including public housing developments, schools, parks, community centers, police, fire, EMS, and public health buildings, and City Hall. My unit had the care and custody of over 600 facilities which we monitored in a 24-hour alarm center. I was charged with assisting in developing and implementing all access control systems, CCTV, emergency plans, and continuity of operations plans and security programs for these locations. I commanded 80 police officers and approximately 100 security personnel.

While serving as Superintendent of the Bureau of Field Services, the Special Events Planning Unit reported to me. We chaired a weekly meeting of all City of Boston departments involved in permitting and licensing special events. My team developed and implemented the safety and security and police staffing plans for hundreds of special events in the city, including road races, fairs, political rallies, sporting events, protests, parades, charity events, concerts, and other celebrations. Our department often provided private police detail support to these events, including the programming at Fenway Park, the Boston TD Garden, local colleges and universities, and hundreds of other venues.

When serving as the Superintendent-in-Chief from September 2009 until January 2014, I continued to oversee the planning and implementation of security programs for world championship contests (NFL, MLB, NBA, and NHL), sporting events, concerts, special events, and critical incidents.

I was the Incident Commander for the 2013 Boston Marathon. I oversaw the response to the bombings, the evacuation of the injured, and the stabilization of the scene, as well as the



investigation. I oversaw the deployment of resources in Watertown, Massachusetts, after the terrorists were tracked there and engaged in a gun battle where they deployed IEDs against responding officers; this resulted in a lockdown of the entire region and culminated in the death of one of the suspects and the wounding and capture of the second.

I spent much of my early career in the Drug Control Unit as a Police Officer, Detective, and Detective Supervisor. During my career, I have been involved in the preparation and execution of over a thousand search warrants. I have testified as an expert in Massachusetts and federal courts on hundreds of cases involving drug use, sales, and investigations. I have been involved in the arrests of over 3,000 individuals for various offenses. I have been involved in investigating hundreds of violent crime incidents, including homicides, rapes, aggravated assaults, and robberies. I completed the Drug Enforcement Administration's 2-week DEA course as a younger officer and have completed, developed, and conducted numerous courses and training regarding narcotic investigations, including conducting undercover operations training with the FBI.

My other assignments have included the Boston Police Academy, where I taught both recruit and in-service training courses on Investigations, Criminal Law, Juvenile Law, and Constitutional Law. I trained both recruits and in-service officers on matters related to drug dealing and drug usage as well as conducting drug investigations. In addition to teaching at the Boston Police Academy, I have taught at the Norwood, Massachusetts, Plymouth, Massachusetts, Salem, Massachusetts, Reading, Massachusetts, and Barnstable Massachusetts Police Academies. While teaching for both the Boston Police Academy and the Massachusetts Municipal Police Training Committee, I developed and presented courses designed for both new and current supervisor training programs for Sergeants, Lieutenants, and Chiefs of Police. I developed and conducted in-service training programs for all Supervisors within the Boston Police Department, which included scenario-based learning focused on current case law and best practices. I developed a search warrant course, which I presented during two different yearly training cycles to all Investigative personnel within the Boston Police Department. In addition, I was selected for and served on the Boston Police Department's Firearm Discharge Investigation Team. The team responded and investigated all discharges of firearms by Boston Police officers for both criminal and administrative review. I also was certified and served as a hostage negotiator with the Boston Police Department's Special Operations Unit.

While serving as the Superintendent-in-Chief, my duties included helping to develop and implement policies and procedures such as consistent use of force policies. I reviewed all use-of-force investigations and internal complaints involving all Boston Police personnel.

In June of 2014, I retired from the Boston Police Department. I started a consulting firm, The Linskey Group LLC (the "Linskey Group"). My company provided a wide range of security, law enforcement, and emergency management services to various clients. These services include dignitary protection, cybersecurity, and confidential investigations. The group had vast experience conducting training and exercises, preparing agencies and facilities for crises, and



conducting security assessments and incident reviews. I am a frequently sought-after public speaker presenting Leadership Lessons Learned from the Boston Marathon Bombing Attack. I have presented lectures, conducted training, and consulted with numerous federal, state, local, and international police, homeland security, and military officials regarding large-scale event management, crisis leadership and preparedness, use of force, proper police policy, and community policing initiatives.

While consulting for the Linskey Group, I worked with The Police Foundation and the United States Department of Justice. I was retained to consult with the St. Louis County Police Department and provide technical advice and training guidance relative to tactical deployments, training, community engagement strategies, and use of force programs and policies prior to the release of the verdict in the shooting of Michael Brown by Ferguson Police Officer Darrin Wilson.

I later worked with the United States Department of State's Anti-Terrorism Advisory Bureau to develop and present courses on managing the investigation of a terrorist attack for our partner nations around the globe. I taught this course for the State Department along with a panel of other instructors. I have conducted training and presented to the following regarding managing large-scale events and investigations.

- Numerous State and local police, fire, and emergency management groups in 44 states
- United States Navy Chief of Operations Strategic Studies Group
- United States Marine Corps Marathon Planning Team
- New York Police Department and New York Fire Department
- North Carolina Information and Analysis Center
- The Federal Bureau of Investigation
- The U.S. Drug Enforcement Administration
- The Bureau of Alcohol Tobacco and Firearms
- The Egyptian Ministry of Interior Police Force
- The U.S. State Department the Overseas Security Advisory Council
- The Dutch Police and Military
- The Australian Federal Police
- The Queensland Police Service
- The Finnish Police Service
- Abu Dhabi Police Service
- Iraqi Police Service
- International Association of Chiefs of Police
- The U.S. Department of State Anti-Terrorism Advisory Bureau
- The Moroccan Ministry of Interior
- The United States Veteran's Administration
- Mexican law enforcement leaders (as well as numerous law enforcement officers throughout Central and South America)
- Police senior leadership of India
- Tunisian Police Services



- Polish Police Services

In December of 2015, I joined Kroll – the global security and risk management firm – as the head of the Boston office, and I currently serve as the lead for our worldwide law enforcement consulting practice. Since joining Kroll, I have conducted work for clients in numerous industries, including education, banking, family offices, healthcare, hospitality, transportation, government, industrial, media, sports, and energy fields, and law enforcement.

I have also often been asked to provide expert witness work. I have provided training and best practice evaluations and audits to hundreds of law enforcement agencies as well as private sector clients. I have advised clients and provided expert witness assistance work in neglect security matters and law enforcement issues to clients. I am currently a fellow at the Kroll Institute.

I have conducted audits, reviews, and best-practice evaluations for the following police agencies while at Kroll:

- Braintree, Massachusetts Police Department
- University of UCLA Police Department
- University of Southern California Police Department
- Salem, New Hampshire Police Department
- University of Chicago Police Department
- Stamford Connecticut Police Department
- Austin Police Department
- Hopkinton, Massachusetts Police Department

I have been a guest lecturer and panellist at various colleges and universities, including Harvard University, The University of Seattle, Towson University, Northeastern University, the University of Southern California, and the University of Maryland, American University Law School, and Harvard Law School. regarding various law enforcement issues.

## Select Media Appearances, Presentations and Reports

I am active in several professional organizations and frequently asked to present at conferences and meetings on law enforcement and homeland security topics.

- On-air news analyst for local and national affiliates of Fox News, MSNBC, and CNN.
- International Association of Chiefs of Police 2012 National Conference: "Boston Police Response to the Occupy Movement."
- Leadership Lessons Learned from the Boston Marathon Bombing Attack.
- Leading Before, During, and After the Crisis.
- Policing 2.0



**Education & Certifications**

- B.S. Curry College
- Harvard's Kennedy School of Government: National Leadership Preparedness Initiative, Senior Executive – State/Local Government Module
- FBI National Academy, Quantico
- Boston Police Academy

**Affiliations & Memberships**

- FBI National Academy Associate
- International Association of Chiefs of Police
  - Member of the IACP Training and Education Committee 2019 to present.
- International Association of Emergency Managers
- Massachusetts Major Cities Chiefs' Association
- Police Executive Research Forum
- American Society for Industrial Security (ASIS)

**Awards & Recognition**

- Boston Police Medal of Honor three-time recipient
- State of Massachusetts George L. Hanna Medal of Honor
- Semper Fidelis Society of Boston, Semper Fi Marine of the Year Award

**Publications**

- The Role of Law Enforcement in Emergency Management and Homeland Security, (Community, Environment and Disaster Risk Management) by Mark R. Landahl (Editor), Tonya E. Thornton (Editor) contributing author
- Edwin Davis Report: "University of Massachusetts and the Town of Amherst: A Safer Community through Partnership."
- Department of Justice Collaborative Reform Initiative: An Assessment of the St. Louis County Police Department.
- Police Executive Research Forum report: "Managing Major Events: Best Practices from the Field" (contributor).
- Austin Police Department:  Review and Assessment of Training Academy April 23, 2021, Prepared for City of Austin, Office of Police Oversight / City Manager's Office.
- Evaluation of the Austin Police Department: Use of Force / Public Interactions / Recruitment / Selection, and Promotions January 21,2022 Prepared for City of Austin, Office of Police Oversight / City Manager's Office.
- APD Training Academy: Curriculum Review Process Assessment March 1, 2023, Prepared for City of Austin, City Manager's Office.
- Audit of Salem New Hampshire Police Department Time and Attendance Practices 2018.



- Audit of Salem New Hampshire Internal Affairs Practices 2018.

## Expert Witness Work

- I worked with Edward Davis LLC in reviewing the murder conviction of Raymond Tempest in the State of Rhode Island v. Raymond Tempest for Attorney Michael Kendall, with assistance from the Innocent Project. I conducted a review of the facts and circumstances of the case and participated in drafting a report for the defense supporting a reversal of the conviction of Raymond Tempest. That conviction has been overturned.

- I have worked collaboratively with Edward Davis LLC and conducted an extensive review of the Blarney Blowout. This large-scale public disorder event occurred at the University of Massachusetts in 2014. We investigated the incident and co-authored a report outlining the causes that negatively impacted the event. The report also delivered a best practice guide to prevent a repeat occurrence.

- The Office of New Hampshire Attorney General Joseph A. Foster retained me to provide expert witness services for the State of New Hampshire in the case of the *State of New Hampshire v. Mark Richardson*. Mark Richardson was a Seabrook New Hampshire Police Officer who allegedly used excessive force when dealing with a prisoner in his care and custody. Richardson had been arrested and charged with utilizing excessive force and violating the victim's civil rights. I reviewed the facts, circumstances, and evidence of the case. My report concurred with the findings of the criminal investigation that the defendant utilized excessive and unreasonable force, which was criminal and a violation of the victim's rights. I testified to such during a trial that resulted in a hung jury. On retrial, the defendant entered a guilty plea.

- On October 21, 2015, I was retained by Sheehey Furlong & Behm P.C. of Vermont as their expert witness to offer an expert opinion on the case of Grega v. Vermont. I reviewed the investigation to compare it to acceptable best practices. I determined that Grega did not receive a fair trial and his murder conviction should remain overturned. The State of Vermont reached a settlement agreement with the Plaintiff's Estate.

- In January 2016, I was retained by the Philadelphia firm of Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock, Dodig, LLP to provide expert witness services for the plaintiff in the case of Hintz v Philadelphia in state and federal court. Hintz was arrested and imprisoned by detectives in the Philadelphia police department who were later found to be involved in a large corruption ring. The City of Philadelphia settled the claim after the client's conviction was overturned.

- I was retained by attorney Joseph Donlin of Norwood, Massachusetts, to provide expert witness services for the defense in the case of Charles Morse and Lesa Morse

Plaintiffs, v. Commonwealth of Massachusetts Executive Office of Public Safety Department of State Police; State Trooper Frechette, K-9 Unit State Trooper Maher; Town Of Sturbridge; Town of Sturbridge Police Department; Police Chief Thomas Ford; Police Sergeant Michael Cloutier; Police Sergeant Jeffrey Lavalle; Police Officer David Fortier; Police Officer Larry Bateman; Police Officer Ronald Obuchowski, Jr., Defendants. The case was settled prior to trial.

- I was retained by the City of Portsmouth New Hampshire Police Department as their expert witness in a case in US District Court, Connors v. Portsmouth NH, to offer an opinion as to proper police procedure. The case was settled prior to trial.

- I was retained pro bono by the Washington, DC law firm Baker Botts to assist them in getting injunctive relief in federal court in Virginia. Our intervention prevented the public identification of an officer involved in a deadly use of force situation until a full and thorough investigation, threat assessment and safety plan had been developed.

- I was retained by attorney John J. Cloherty III of Pierce Davis & Perritano to engage my services as an expert witness in the case of Kevin O' Laughlin vs the Commonwealth of Massachusetts, town of Framingham Massachusetts; Paul Blakeley; Al Grow; Estate of Arthur Martins Alan Nardini, William Masionis, Estate of Frank Masiello and John Moor. I was the defense expert in a wrongful conviction case alleged by Kevin O'Loughlin against the officers involved in his arrest and the town of Framingham. That case was settled before trial.

- I was retained by the Strafford County Attorney's Office located in Dover, Strafford County, New Hampshire as an expert witness in the case of New Hampshire v. Burris. On December 1, 2015, at approximately 8 pm, Probation Officer Burris fired 3 rounds at a suspect's fleeing vehicle and was charged with Assault by Means of a Dangerous Weapon. The parties reached a plea agreement.

- I was retained by the firm of Pierce & Mandell, P.C in Boston as their expert representing the estate of two prominent physicians who were slain in their luxury apartment unit in a condominium building that was responsible for providing adequate security for them. The Estate of Field and Bolanos vs. The Board of Trustees of 141 Dorchester Ave. The case was settled at mediation.

- I was retained by the firm of Behman Hambelton, LLP, in Woburn, Massachusetts, as their expert in a negligent security case defending a hotel and resort from a negligent security claim that arose during an event at the property in which the plaintiff was injured. The case resulted in a summary judgment.

- I was retained by the firm Potters & Della Pietra LLP of Fairfield, New Jersey as their expert in a T.G. v. PNC Bank Arts Center, et al in a negligent security case defending the New Jersey State Police which provided security at a concert venue where the plaintiff



alleged, they were shot due to inadequate security measures. The client received a summary judgment dismissing the case.

- I was retained on behalf of the City of Baltimore as their expert witness in 30 plus store owners' cases who are bringing suit against the city for failing to adequately protect their stores and businesses during the riots in response to the Freddie Grey matter. The cases were settled.

- I am currently retained by the firm Marshall Dennehey of Philadelphia on behalf of The Hartford – Global Specialty Claims Insurance Company in a negligent security matter. Wharton Street Properties, LLC V. G&M Efestos Contracting, Inc., G&A Carpenters, Inc, Greg Karmitopoulos a/k/a Grigorio Karamitopoulos. The case was settled prior to trial.

- I was retained by the firm Marshall Dennehey of Roseland, NJ in the case of T.G. v. PNC Bank Arts Center, et al in a negligent security case defending Live Nation and the New Jersey Turnpike Authority who own a concert venue where the plaintiff alleged, they were shot due to inadequate security measures. The case was settled prior to trial,

- I was retained by the Delany Law firm 36 of Woodbury, NJ 08096 for the defense in the case of Savarese v. Bergen Brookside Auto Body, Inc., Brookside Towing Corp., and Paul T. Gudanowski in a negligent security case. The case settled prior to trial.

- I was retained by the Virginia law firm of Bancroft, McGavin, Horvath & Judkins, P.C. for the defense of Virginia Risk Sharing Association and Officers Betsy Mason, David Rilly, Donald Lee Ridenour, James Carr, Jason Pitts, Joshua Lynch, Michael Athenry, Nicole Gentry, and Rich Pennock in a suit being brought by protestors against the Fredericksburg VA. Police Department.  The case was settled prior to trial.

- I was retained by the by Attorney Jeffrey L. McCormick, Jr. of the Boyle Shaughnessy Law Worcester on behalf of Rugby's Incorporated in the case of Troy Miller, JR. v. Rugby's Incorporated D/B/A/Slattery's Restaurant & Bar in a negligent security case. The case settled prior to trial.

- I was part of a team from Kroll who performed pro-bono assistance to the Philadelphia Innocence Project in the case of Tremaine Hicks our efforts assisted in overturning his conviction after he was shot by police and falsely accused of a sexual assault and imprisoned for 19 years. After realizing they had shot an innocent man the officers planted a firearm on him framing him for the assault.

- I was retained by the by the Virginia law firm of Bancroft, McGavin, Horvath & Judkins, P.C. for the defense in the case Lamonte Gladney v. Ryan Timberlake Fairfax County Police Department. The case was settled prior to trial.



- I was retained by the law firm of Fazzano & Tomasiewicz, LLC Hartford, CT on behalf of the plaintiff Khosro Pourkavoos MD and Mariam Hakim-Zargar MD, MA, MPH, FAOOS V. Town of Avon, Edward Espinosa Detective and Mark Rinaldo Chief, who was a physician falsely arrested for sexual assault. The case was settled.

- I was retained by Attorney Sheryl L. Axelrod of the Axelrod Law Firm PC of Philadelphia PA. in the case against a non-profit RE: K.H. v.  a New York corporation, in a negligent security case representing the defendant.

- I was retained by Baltimore Assistant City Attorney Renita Collins in the case of St. Michael's Media, INC v. The City of Baltimore et al, Civil Action No: 221-cv-02337ELH for the defense of the city where the plaintiffs were alleging 1st Amendment issues in the failure to issue a permit for a protest. The case settled prior to trial.



# 3    Materials Reviewed

See **Appendix #1**, which is a full list of the materials provided to me by Plaintiffs' counsel.



# 4    Video Camera Analysis

## 4.1    Dash Camera Analysis

Davis's dash camera was activated when she conducted the stop of the Zelechiwsky pickup. I reviewed the footage and discovered that while the video ran during the stop it was not positioned to show significant detail.

## 4.2    Body Worn Camera Analysis

Trooper Davis (Davis) made a passenger side approach after pulling over the pickup truck. She engaged with the occupants of the vehicle. She explained her reason for stopping them. She informed them that she had observed the vehicle going outside the lane markings and changing lanes without signaling Davis and requested Zelechiwsky's license and registration. While Davis was addressing  Zelechiwsky, she asked if he had consumed any alcohol and he denied consuming any. [1]



Davis approached Zelechiwsky on the driver's side of the vehicle and asked him to exit the vehicle. They both proceeded to the front of the pickup where the area was illuminated by the trucks headlights Davis explained that she was going to conduct a field sobriety test which consisted of three separate tests. Davis first administered the Horizontal Gaze Nystagmus (HGN). HGN is the involuntary jerking of one's eye when it gazes to the side. Alcohol use exaggerates this jerking

---
[1] Trooper Davis's Body Worn Camera 8/10/2020 21:37:24



motion. The HGN test is evidence of impairment in DUI cases. When Davis asked Zelechiwsky if he has had any injuries to his eyes he responded "not that I know of" caveating his response. Davis Informed Zelechiwsky not move his head, just his eyes during the exam. When he disregarded her directions Davis reminded him again of the instructions. Davis had to correct him another time as he continued to move his head not his eyes in accordance with the directions. The BWC video did not capture the results of his eye movements.

Davis explained to Zelechiwsky how to perform the walk and turn test.  Zelechiwsky Informed Davis that he understood the directions. The BWC showed Zelechiwsky was staring  down at the ground and not looking at the Davis. He had his hands in his pockets, despite Davis' instruction.  He presented with a vacant stare with an expressionless face as he listened to the instructions. [2]



Zelechiwsky attempted the test and had visible balance issues reaching out with his left hand a bit to sturdy himself. [3]

---

[2] Trooper Davis's Body Worn Camera 8/10/2020 21:39:38
[3] Trooper Davis's Body Worn Camera 8/10/2020 21:40:53

KROLL



Zelechiwsky continued with the unique fixed facial affect and does not count his steps as instructed by Davis. Davis had to correct him.[4]



Davis explained the one-legged stand test. Zelechiwsky had difficulty with his balance and had to put his foot down stopping the test.[5]

---

[4] Trooper Davis's Body Worn Camera 8/10/2020 21:41:01
[5] Trooper Davis's Body Worn Camera 8/10/2020 21:42:27





He repeated the test lifting his foot only lasting a short time before he again lost his balance and had to put his foot down again.[6]



Zelechiwsky was seen still presenting with the blank facial affect.[7]

---

[6] Trooper Davis's Body Worn Camera 8/10/2020 21:42:30
[7] Trooper Davis's Body Worn Camera 8/10/2020 21:42:30





Davis had made the observations of Zelechiwsky's operation of the pickup truck on a public highway in which she observed the vehicle to fail to maintain in the lane of travel and change lanes without signaling. Davis took an enforcement action and pulled the pickup truck over to conduct a motor vehicle stop. Leaving marked lanes and changing lanes without signaling are civil violations of the New Jersey Motor Vehicle Code. These types of driving infractions can occur due to a host of reasons including inattention, distracted driving, texting and driving, fatigue, potential medical issues, and just plain carelessness. Based on Davis's training and experience, Davis was aware that the motor vehicle infractions could also be caused by someone being under the influence of alcohol, legal, and prescription drugs. Davis assessed Zelechiwsky and made an initial assessment that he may be under the influence of something. Consistent with her training the New Jersey State Police policy and procedures and accepted national standards [8] Davis conducted a standard field sobriety exam.

---

[8] https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_ig_refresher_manual.pdf Page 35



That exam was documented on her BWC. Zelechiwsky was unable to perform two of the three tests. He was unsteady on his feet and unable to follow Davis's instructions. During the time Zelechiwsky
is conducting the test the Davis is observed to have a blank stare and an emotionless affect. In addition, on the BWC Davis documented that she had observed the strong order of alcohol coming from the area of the driver's seat. Based on the observations Davis made of Zelechiwsky committing motor vehicle infractions that often can be observed when individuals are operating under the influence drugs or alcohol. Coupled with her initial assessment of Zelechiwsky and his inability to successfully complete the field sobriety test and the odor of alcohol detected in the front seat area. Davis decided to place Zelechiwsky in custody on probable cause that he had been operating under the influence of drugs and or alcohol when he committed the motor vehicle infractions. She placed Zelechiwsky into hand cuffs and escorted him into the back of her police vehicle. Davis continued her investigation and spoke with Zelechiwsky's wife, Lisa Zelechiwsky, (Mrs. Zelechiwsky).

Mrs. Zelechiwsky informed Davis that they had been at the beach earlier and had consumed beers while there.

Davis asked Mrs. Zelechiwsky to step out of the pickup truck with her dog so that she could conduct a motor vehicle exception search for any evidence of used or open containers of alcohol or drugs.

## 4.3   Gallagher's Body Worn Camera Analysis.

Trooper Gallagher arrived to back up Davis. As Davis was conducting a search of the truck Gallagher was standing near Mrs Zelechiwsky when she stated that she had a six pack of wine in the back of the vehicle.  Gallagher asked her if was open?  Mrs. Zelechiwsky replied, "I don't believe it is." [9]



---

[9] Trooper Gallagher's Body Worn Camera 8/10/20 21:48:46



Gallagher asked, "Did she explain what is going on"?  Mrs. Zelechiwsky replied yeah, "he's just he doesn't drive the greatest"[10] (This was after Davis had reported to the Zelechiwskys that the reason the vehicle was pulled over was failing to maintain lanes and changing lanes without signaling). It appeared that she was not disputing Davis's allegations of motor vehicle infractions and did not shocked that his driving had resulted in a traffic stop.



She went onto state that she believed Zelechiwsky was not drunk. She stated "we had **beer** on the beach today. She reported leaving the beach at 3:00 p.m. and going to dinner with friends at a seafood restaurant that does not serve alcohol. [11]



---

[10] Trooper Gallagher's Body Worn Camera 8/10/20 21:49:26
[11] Trooper Gallagher's Body Worn Camera 8/10/20 21:49:31



## 4.4    Davis' Body Worn Camera Analysis Vehicle Search.

After the arrest, Davis began a motor vehicle exception search of the pickup truck in accordance with the policies and procedures of the New Jersey State Police consistent with Article, I Section 8 of the New Jersey Constitution and federal law. Davis had probable cause to believe that evidence consistent with drug or alcohol use was present in the motor vehicle such as empty alcohol containers or legal and illegal drugs which may have contributed to the believed impairment. Davis knew the vehicle was on a public roadway and that was going to be turning the vehicle over to Mrs. Zelechiwsky

Davis started the search at 21:47:32. Davis took a brief break from the search to get instructions from Mrs. Zelechiwsky how to open the center console

21:51:08 Davis's BWC showed her searching the backseat area and as she looked in some of the grocery bags the video has sounds consistent with wine bottles clinking. Mrs. Zelechiwsky had reported buying 6 bottles of wine at the store. [12]



21:52:16 the search was ended. The total search lasted 4 minutes 28 seconds and did not include any items in the pickup truck bed.

---

[12] Trooper Davis's Body Worn Camera 8/10/2020 21:51:08



# 5 Depositions

## 5.1 Davis Deposition

Davis reported during her deposition that she observed the pickup truck weaving in and out of the travel lane before changing lanes without signaling leading to her decision to take an enforcement action. Davis reported contacting the vehicle assessing the driver as having glassy eyes and being slow to respond and move. Davis decided to conduct a standard field sobriety test on Zelechiwsky. At various times she reported her actions and observations during the deposition.

### 5.1.1 Regarding the HGN test Davis reported the following:

(Atty Chaudry Questioning Davis)

Mr. Chaudry: Okay.

Q. Please tell us how he was uncooperative with you and combative with you during this traffic stop.

A. He failed to follow instructions.

Q. What instructions did he fail to follow?

A. For the HGN testing

Q. Explain, Trooper.

A. During the test he was asked not to move his head. He continued to move his head.

Q. So that's what you say leads you to believe that he was uncooperative and combative because he moved his head during the HGN test?

A. Not cooperating, yes, sir.

Q. Right. Anything else?

A. No.

KROLL

Q. All right. So tell us exactly what you did regarding the HGN test and exactly what you

observed.

A. I asked him did he had any medical conditions in reference to his eyes. I believe he said no. And then I attempted to conduct the test. I explained the instructions and asked him to not move his head.

Q. Okay. And what occurred?

A. He continued to move his head.

Q. What, when you shine the pen in his eyes and said follow the pen, his head moved slightly towards the direction of the pen; is that what happened?

A. It moved. Your head isn't supposed to move. You're supposed to keep your head straight. Your eyes are supposed to move only.

Q. Okay. But you certainly didn't observe any lack of smooth pursuit, correct?

MR. CHAUDRY: Objection to the form of the question.

MR. KAROLY: What's wrong with the form?

MR. CHAUDRY: The form of the question?

MR. KAROLY: Yes.

MR. CHAUDRY: You are speculating based on something that's not even in the record yet. And it's repeating questions. Ask her the question.

MR. KAROLY: Okay. I don't understand that objection.

Q. But, Trooper, you can answer.

Q. You can answer.

MR. CHAUDRY: Yes.



A. Can you repeat the question again.

Q. You did not observe any lack of smooth pursuit regarding Mr. Zelechiwsky's pupils, correct?

MR. CHAUDRY: Objection to the form.

A. He didn't conduct the test correctly for me to observe.

Q. All right. Tell us then what you observed. Go ahead.

A. I wasn't able to observe anything because he kept moving his head.[13]

### 5.1.2     Walk and Turn Test

Regarding Davis's observations of Zelechiwsky during the walk and turn test she reported the following:

(Atty Chaudry Questioning Davis)

Q. All right. Explain to me what you did regarding the walk-and-turn test and what Mr. Zelechiwsky did.

A. I gave him instructions and I also demonstrated the test for him. And then he attempted to complete the test.

Q. And what did you observe?

A. Him not keeping his balance, him raising his hand and him not following the instructions.

Q. Okay. How did he not maintain his balance on the walk and turn?

A. When he was walking, he kind of leaned over and he raised his hand [14]

---

[13] Deposition of Trooper Ashley Davis pages 51 to 54

[14] Deposition of Trooper Ashley Davis page 56



### 5.1.3    One-Leg Stand Test

Regarding the One-Leg Stand test Davis reported the following:

(Atty Chaudry Questioning Davis)

Q. All right. And then what test did you perform next?

A. The one-leg stand test.

Q. All right. And what did you explain and what did you observe?

A. I explained the test for him and also demonstrated the test. I observed him -- well, lose his balance, put his foot down and almost fall.

Q. All right. Do you know how old Mr. Zelechiwsky is?

A. No.

Q. Okay. Still to this day you don't know?

A. No.

Q. You think age has any correlation to balance?

A. No.

Q. Okay. So, an 80 year old should probably have the same balance observed as a 20 year old. [15]

---

[15] Deposition of Trooper Ashley Davis pages 58 to 59



### 5.1.4     Alcohol Consumption by Zelechiwsky

Regarding the consumption of alcohol by Zelechiwsky Davis reported having conversations with both Zelechiwsky and Mrs. Zelechiwsky:

(Atty Chaudry Questioning Davis)

What do you recall, if anything,

Mr. Zelechiwsky said to you while you were having conversation with him during this incident?

A. I can't recall offhand, but I believe he said that he didn't have any -- I asked him did he had anything to drink. He said, no.

Q. Okay. And do you recall engaging

Mrs. Zelechiwsky in any way?

A. Yes.

Q. All right. And do you recall anything that she may or may not have said to you?

A. I believe she said they had drinks earlier that day.

Q. I'd like you to be as specific as you can. Do you believe that she said that they had drinks earlier that day?

A. Yes, sir.

Q. Did you ask her how many?

A. I can't recall.

Q. And do you believe that --

A. I believe -- yes, I believe I asked her.



I believe I did.

Q. And what did she say?. I believe she said a couple.[16]

I note that this testimony is consistent with the BWC video. The video showed Zelechiwsky originally responded that he had nothing to drink when Davis inquired. Mrs. Zelechiwsky in a separate conversation with Davis reported that they had some drinks at the beach. Mrs. Zelechiwsky also informed Gallagher that they had **Beer** at the beach. After speaking to the wife, the BWC video showed Davis speaking with Zelechiwsky. She informed him that his wife said they had been drinking that day. He replied we had five or six then changed his response to one glass of wine. He then stated that you can check me I'm fine.

## 5.2    Zelechiwsky

### 5.2.1    Reason for the Suit

(Attorney Brocco questioning Zelechiwsky)

A. You know, I think if the police officer, after everything was said and done, had come up to me, and said, Hey, Bodhan, look, I'm sorry, you know, I screwed up, you know, I really messed up, you know, and apologized to me, that would have made a world of difference. But she didn't -- not only did she not apologize, she gives me a ticket. And, you know, and just doesn't tell me anything about the results of the -- of the breath test, but gives me a ticket and sends me on my way. After humiliating me and treating me like some sort of -- some sort of a criminal, searching my vehicle, having my wife have to step outside the vehicle. And I, basically -- I think I said two words to her. She asked me whether I drank anything, I said no, you know. And she asked my wife the same question. And I think you can ask her what her response was. But it was just the way everything was handled. I think that if she had known how to do a proper nystagmus test, that right then and there would have told her that there was no alcohol. no, she did that, and then she persisted on doing other tests. But I'm -- I'm getting far afield here.[17]

---

[16] Deposition of Trooper Ashley Davis pages 67-68
[17] Deposition of Bodhan Zelcchiwsky page 32



Q. You testified earlier that had my client apologized to you, that you wouldn't have been as upset. Something along those lines. You would have been okay with it. Can you explain that to me?

A. Well, if she would have taken responsibility for her lack of professionalism and treatment of me,

but she didn't. And that --

Q. Do you think that you would have brought a lawsuit had she apologized?

MR. KAROLY: Objection.

Q. You can answer the question.

A. Probably not. If she sincerely apologized, and said, you know, I knew I screwed up. But that ship has sailed a long time ago. And apologized to my wife. Because she made her step out of the truck and took her purse and emptied through all the stuff on the seat. And my wife was, like me, totally innocent.[18]


### 5.2.2     Driving Habits of Zelechiwsky Contributing to the Stop

Q. As you sit here today, do you know why it was that you were pulled over originally?

A. Well, from what she told me, she said that I was weaving, and that I didn't use my turn signals.

Q. Okay.

A. And those are lies. Because I wasn't weaving. And, you know, my wife was with me, and I mean, she's, like -- she makes sure, you know, if I do anything wrong, she lets me know it. And I wasn't weaving. I wasn't -- anything like that. I mean, we were, you know, I was just kind of flabbergasted. And, you know, she asked for license, registration. I didn't -- my wife handed it to her. And she didn't ask -- she asked us whether we had been drinking. My wife said no. There was no smell of alcohol. I mean, there was nothing. And she just, without saying anything else, she walks around, and tells me to get out of the car. And, you know, she was wrong. She was dead wrong.

---

[18] Deposition of Bodhan Zelechiwsky page Pages 48-49



Q. So you just testified that your wife will tell you if you do anything wrong. What do you mean by that?

A. When I'm driving, she's very -- that's just one of her little -- I don't want to say quirks. It's just the way she is. If I'm, you know, if I'm going over the speed limit, Bodhan, you're speeding. If I do anything, she right away says, Bodhan, you didn't use a turn signal, or you're -- you're weaving, or something like that. You know, so she's on it.

Q. And do you know if she had any concerns about your ability to drive that night, meaning, your wife?

A. None. That night, none.[19]

### 5.2.3     Alcohol Consumed by Zelechiwsky

Q. You're putting in a full day. You're biking you're cleaning, you're beaching, you're eating,

you're doing a lot of stuff.

A. That's what we do.

Q. I get it. And about -- and did you -- were you drinking alcohol over the weekend?

A. I'm sure Saturday and Sunday, we -- we probably had some glasses of wine out to dinner. We may have had a beer or two at the beach. Monday, I know that Lisa brought -- Jimmy doesn't drink at all, so -- and Maureen doesn't drink. They do not drink at all. So we may have -- I don't know, Lisa packed a cooler, she may have put a beer in there. She may have given me a beer. I don't even think I even finished it. I wouldn't drink alone in front of Jimmy. I wouldn't do that. Mr. Heidecker. And then we came home, we showered, got ready, showed him around, and then we all went out to dinner to H&H. We didn't drink anything at all. I mean, when I say -- no alcoholic beverages. We had soda, or club soda at H&H. Then we packed up the truck, we spent some time, I think we watched the sunset with the Heideckers, which would be -- we left around 8:30, 8:45, which it takes about a half hour to get to 55 from where we were. And that's when I got pulled over.[20]

---

[19] Deposition of Bodhan Zelechiwsky page pages 54-55
[20] Deposition of Bodhan Zelechiwsky page 84-85



### 5.2.4    Zelechiwsky Performance on the Field Sobriety Tests

(Video playing.)

Q. As you sit here and watch that video, do you know if you had any problems performing that test?

A. No, except for the noise from the cars, you know, and the roadway was not the most level. But I

was straight.

Q. Is there any reason why you did not count out loud at that point in time?

MR. KAROLY: Objection. You can answer.

A. I think I just, you know, I was just so angry, and embarrassed, and felt sorry for my wife.

Q. Okay. At this point in time, do you believe that there was anything, other than the traffic, was there anything that prevented you from performing the right heel in front of left toe test?

A. I thought the video shows I performed it, and I -- and I counted part of the time.

Q. Okay. Rolling at 5:51.

(Video playing.)

Q. At this point in time, did you, at 6:28, did you understand the instructions that were given to

you by Officer -- Trooper Davis?

A. Yes.

Q. Okay. And we're talking about the one leg stand test. And she asked you to count one 1,000, two 1,000, three 1,000. And you understood her instructions, true?


A. True.

Q. Okay. Rolling at 6:28.



(Video playing.)

Q. Okay. Is there any reason why you were unsteady on your feet?

A. Yes.

Q. Can you explain?

A. Try. At that point, I'm 68 years old, on the side of a busy road at night, very embarrassed, angry, and, you know, at that age, you know, my balance isn't what it would be at 25 or 20.

Q. Okay. But you still ride your bike several miles several times a day, so you're in pretty good shape.

MR. KAROLY: Objection.

Q. So can you explain to me why you're unable to perform -- I mean --

MR. KAROLY: Objection. He just did.

A. I did.

Q. We'll continue to roll. We're at 7:01.

(Video playing.)

Q. So do you think that you, based on – and we're at 7:31. Based upon what the video is showing, do you think that you performed that test adequately?

MR. KAROLY: Objection. Adequately. He's a 68-year-old guy, trying to stand on one leg. Because he can't balance, we're going to arrest him for DUI? I mean, come on.

MS. BROCCO: He's not a hundred. He's 68. And he's in great shape.

MR. KAROLY: I think most 68-year-olds I know can't stand on one leg. I can promise you that.

MS. BROCCO: Well, I disagree with that, but anyway.

MR. KAROLY: Okay.

MS. BROCCO: I'm not here to argue. I'm just -- I'm just asking him why it was that he lost his balance. And not -- not anything else.

Q. Okay. So did you, before the test was administered, and during the test, did you have trouble performing the one leg stand test?

MR. KAROLY: Objection.

A. I --

MR. KAROLY: Go ahead.

Q. You can answer.

A. I think I was so livid that I -- I just --the way she was talking to me, and -- and to balance-- you know, like I said, I -- I thought my balance for -- at the end, you could see, I was standing up, I was standing straight. And I don't think she knows what the heck she's doing. But that's for another day.

Q. And why do you say that?

A. Because there was no signs that -- that the typical signs you look for intoxication, I didn't have. Well, first of all, she didn't even talk to me. Didn't ask me anything, except when she took me out of the vehicle, number one. Number two, you know, I didn't -- I wasn't -- if you look at me, I wasn't sleepy. I didn't have a flushed face. I wasn't -- I didn't have, you know, disheveled clothing. I didn't -- I had none of the signs that you would -- that one would look for for visibly intoxicated person. I'm standing straight. I'm not falling over.

Q. Other than being under the influence of alcohol, is there anything that you can think of that may have made you unsteady on your feet during that last test?

A. I think the road and my age.

Q. And when you say the road, you mean the uneven terrain of the road?

A. Yes, correct. It's sloped.



Q. And do you know whether your age and/or the roadway may have caused you to drive erratically before you were pulled over?[21]

A. No.

## 5.3    Mrs. Zelechiwsky

### 5.3.1    Zelechiwsky's Driving Ability

Mrs. Zelechiwsky reported in her deposition that she had no concerns about her husband's driving ability that evening she reported him driving under the speed limit. She expressed no concerns about his driving ability. That directly contradicted the video of her comments to Gallagher without being prompted when she reported he was not the greatest driver. She also appeared to contradict herself when she confirmed that she is a back seat driver who often tells her husband when he is not driving properly. That statement was consistent with her husband's deposition.

(Attorney Brocco questioning Mrs. Zelechiwsky)

Q. Well, you keep differentiating between yourself and your husband. I understand that you were not the individual driving. Do you know of ---- did you have any concerns about your husband driving home that late at night in the dark? Let's say, he is at that point a 68-year-old man. Any concerns at all?

A. I had no concerns with my husband that night, driving that late. Because we always drove home between 7 and 9 o'clock. We would leave our home that late. His eyes are better than my eyes. I have-- I wear triple bifocals. I -- number one, I would never put myself in a vehicle -- first of all – I would say I'm married -- I've been with my husband for 20 years. I think I have seen my husband intoxicated, or had a little too much to drink, maybe two times. We -- he does not drink. He's not an alcoholic. I certainly would never let -- put myself in any vehicle and drive two hours with somebody who is drunk. So that's just like our norm. It's not our norm. We will have an occasional glass of wine with dinner. We will have a beer here and there. We will go --But we drink seltzer water all the time. I'm all organic. That's how I eat. I – I try to stay healthy. My husband tries to stay as healthy as we can. It's kind of not a -- I would never put myself in a vehicle like that. And I would not be concerned about my husband's driving ability. He drives very well. He drives every day on his job, as an attorney, going from one case to another, travels from Philly then all the way to Easton, and all in the same

---

[21] Deposition of Bodhan Zelechiwsky page pages 122-127



day. He's a very good driver. His ability to drive that day was perfectly fine. I was actually shocked when she pulled us over. I was, like, why are we being pulled over? I was in shock. Because I didn't see him do anything wrong. I was watching the road. I'll always tell him sometimes, you know, hey, there's a red light coming up, or this is the speed limit, you know, because I get a little bored when we're driving back, you know. I'm kind of the back seat driver. But nothing out of the ordinary that night happened at all, actually, until she pulled us over, so.

Q. Do you know whether at any point in time before -- first of all, what time did you leave your place in Cape May that night to go home to Quakertown?

A. That night, we had dinner, an early dinner with our friends. We went back to the home to pack up our car. I don't recall the exact time, but I know it was still light out. It was, like, early evening. And then as we got on the road, it got dark. By then -- if I recall, it would get dark around 9 o'clock. So we -- based on that time of the year, I'd probably say we left around 7, 8 o'clock maybe, 8 o'clock. After 8, probably. Then we did eat at H&H, like I told the other officer, that they don't serve alcohol there. We did not drink all day. I said -- I think he had a beer on the beach. I think we shared a beer. And I don't think neither of us finished it. I think it was dumped, because we just didn't -- we were having a good time at the beach swimming. My husband swims a lot, and he makes me nervous, because he goes out far, when he goes swimming, in the bay. And we were just chatting, having a nice weekend with our friends that came down that day.

Q. Before Trooper Davis pulled you over, did you notice anything unusual about your husband's operation of the vehicle?

A. No.

Q. Did you feel that he wasn't maintaining his lane properly?

A. No. He was fine. We were coming from the road that merges onto 55. We were on a single lane, if you're familiar, coming back. We were on a single lane, and we merged onto the double lane highway. There was only two lanes. Because you were saying in the past, there was three. But there was only two. And when you merge onto a road, you have to pick one lane to go in. So he picked the left. There was no swerving all over the road, as she stated. There was none of that. He merged onto the left lane and was driving the speed limit. First of all, I don't like, myself, I don't like to be in a car driven very fast, because that would make me nervous. So I always remind whoever I'm with, hey, this is the speed limit going through this area. And that's about it. He was not driving erratically; he was not



speeding. We were merging from a slow -- the road was -- the speed limit was slower, and then we had to increase speed to go on the double lane highway, 55. [22]

### 5.3.2      Alcohol Consumption by Zelechiwsky

A. That night, we had dinner, an early dinner with our friends. We went back to the home to pack up our car. I don't recall the exact time, but I know it was still light out. It was, like, early evening. And then as we got on the road, it got dark. By then -- if I recall, it would get dark around 9 o'clock. So we -- based on that time of the year, I'd probably say we left around 7, 8 o'clock maybe, 8 o'clock. After 8, probably. Then we did eat at H&H, like I told the other officer, that they don't serve alcohol there. We did not drink all day. I said -- I think he had a beer on the beach. I think we shared a beer. And I don't think neither of us finished it. I think it was dumped, because we just didn't -- we were having a good time at the beach swimming. My husband swims a lot, and he makes me nervous, because he goes out far, when he goes swimming, in the bay. And we were just chatting, having a nice weekend with our friends that came down that day. [23]

This testimony is contrary to the report she gave without being prompted to Gallagher on his BWC during which she reported that they had beer while at the beach.  I note that she gave her deposition after sitting in on her husband's deposition.

### 5.3.3      Reason for the Suit

Q. Okay. You have allegations or you have claims that this incident adversely affected all forms of socialization, including your marital relationship. Can you tell me how this incident has affected your marital relationship?

---

[22] Deposition of Lisa Zelechiwsky pages 22-23
[23] Deposition of Lisa Zelechiwsky pages 24

**KROLL**

A. Well, I would have to go back to that time period. I mean, definitely that first month, Bo was pretty, you know, shook up. He -- he's a man, and he was taken away by a female police officer, handcuffed, and accused of something that -- you know, he's an honorable man. So that affected his ego. And it would make him more edgy. He wasn't himself for awhile. So that would impact our, you know, relationship. He just was down a little bit, you know. And he holds a lot in. Based on my observations, I'm sure she hurt his pride, you know, his ego, so. And it wasn't like it was where a woman said the wrong thing to him. It wasn't like that. I mean, he was handcuffed, put in a police car, strapped on a chair, you know, it -- he wasn't himself for a little while

Q. Okay.

A. He did the best -- he does the best he can. Bo always does. He always tries to pick himself up and move forward with things. And that's what he does. But we really feel that night was just totally unnecessary. And it was unlawful of the treatment. It didn't have to be like that. She didn't have to choose the things that she chose, in my opinion, based on what I saw, and how I was treated. There was no --

Q. So your testimony -- sorry. Go ahead.

A. No, there's -- this was no reason for her treatment of us, the way she handled things.

Q. So your testimony is that he has an ego, and he was taken away by a female police officer?

A. I wouldn't say that he has an ego. He was hurt. His ego was hurt.[24]

---

[24] Deposition of Lisa Zelechiwsky pages 69-70



# 6   Review of Plaintiff's Expert Reports

Both of the plaintiff's experts disregarded the evidence displayed on Gallagher's BWC. During which Mrs Zelechiwsky reported her husband is not the greatest driver. They disregard the statements of Zelechiwsky in which he reported that he is constantly being admonished by his wife for his poor driving habits.

Neither of them considered that Davis's BWC which captured the entire event contemporaneously laid out probable cause that something was off with Zelechiwsky that evening and he appeared impaired. In their report, they comment that the reason for Zelechiwsky's failure to perform well on the field sobriety test is attributable to his age. They make this assertion even though the depositions of both Zelechiwsky and Mrs. Zelechiwsky portray Zelechiwsky as an extremely active skier, swimmer, and cyclist who is in very good physical shape. The field sobriety test is designed and tested to be effective at assessing impairment for all ages. Not only was Zelechiwsky unable to perform, he failed to follow instructions which the plaintiff's experts have chosen to ignore.

Regarding the search of the vehicle, they both opine that it was improper. Their opinions are based on their assessment of their information in which they completely disregard the testimony of a sworn member of the NJSP, who has no known malice for Zelechiwsky.   Davis reported motor vehicle offenses which is a clear and unequivocal reason to stop a motor vehicle and aside from Mr. and Mrs. Zelechiwsky's self-serving denials, they choose to ignore the possibility that Davis was performing her duty and enforcing traffic law.  They ignore this even though as the event occurred Mrs. Zelechiwsky informed Gallagher that her husband is not the best driver and she did not appear to be surprised that the motor vehicle was stopped when talking to Gallagher.

They should know that if the motor vehicle infractions occurred as reported, then evidence that was developed established clear probable cause that Zelechiwsky was lawfully placed under arrest and as such, a suspected drunk driver whose vehicle is on a public roadway would have developed sufficient probable cause that evidence of that crime could be found in the vehicle such as empty containers, legal or illegal drugs. In this case the search revealed six unopened bottles of wine in a shopping bag which correctly was determined to not be evidence. However, if Davis had discovered a receipt in the bag showing that seven bottles of wine had been purchased and one was now missing that would in fact be evidentiary in nature.  Davis completed a motor vehicle exception search which is consistent with NJSP policies, procedures, and consistent with state and federal law.





# 7    Findings and Conclusions

### DISCUSSION AND OPINIONS

I have been asked to review this case with regard to the actions Trooper Davis of New Jersey State Police

Below, I provide opinions regarding the following topics:
1) The motor vehicle stop conducted by Davis
2) The arrest of Zelechiwsky
3) The detention Zelechiwsky while being given the breathalyzer.
4) The civil motor vehicle citations issued to Zelechiwsky

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions and the basis for my opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed.

In my review of this case, I examined the evidence from the perspective of proper police procedure and may opine whether or not the evidence does or does not support a particular allegation or statement. Regarding legal definitions, I may state definitions as taught to police officers in police training venues but leave statutory definitions to the Court. Finally, although I may opine as an expert in police practices about whether evidence does or does not support factual allegations, I acknowledge that the final determination of factual accuracy is left to the trier of fact.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law.

I have extensive practical experience in the field of law enforcement and have considerable experience analyzing police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), I serve on the IACP training Committee and have served for the past 4 years. I am a member of the Police Executive Research Forum (PERF) and have actively worked with PERF to develop guidance to police leadership. I am a member of the Federal Bureau Investigations National Academy Associates (FBINA.) I have conducted training for FBINA to tens of thousands of their membership in 44 states.



Specifically, my review of this case has found the following:

Trooper Davis is a duly sworn member of the NJSP and was on duty on the evening of 8/10/2020 when she observed Zelechiwsky's pickup truck operating on the highway. She observed what she perceived as the vehicle not maintaining the lane of travel and weaving. She later reported the vehicle was observed conducting a lane change without signaling and she decided to take an enforcement action. Zelechiwsky reported in his deposition that he was driving perfectly fine and did not commit the moving violations. He reported that his wife has been and is extremely critical of him when he is driving and voices her criticism. He opined that since she was not concerned, he was driving without issue. Gallagher's video is clear and tells a different story. When asked if Davis had informed Mrs. Zelechiwsky what was going on she responded yes. "he's just he doesn't drive the greatest". It appeared she had no trouble understanding Davis' reason for stopping them.

Davis stopped the vehicle and approached the passenger side and contacted Mrs. Zelechiwsky Davis immediately informed the occupants as to reasons why they had been pulled over. After getting their license and registration Davis illuminated the car and observed Zelechiwsky who she reported in her deposition as having glassy eyes and appearing slow in his movement. Davis asked if they had been drinking. Zelechiwsky replied that he had not. Davis went to the driver's door and requested that Zelechiwsky step out so she could make sure he was safe to drive.

Davis had Zelechiwsky take three field sobriety tests. The HGN test Davis can be heard on video twice correcting Zelechiwsky to not move his head. She determined that he continued moving his head so the test was not something that could determine indications of impairment one way or another.

Davis next had Zelechiwsky perform the walk and turn test next. He is observed on video lifting his arm to steady himself and appeared to be losing his balance. He is also seen on video not counting as instructed even though he stated that he understood the instructions. At the beginning of the test, the video showed Zelechiwsky acknowledging the instructions and requesting permission to move to an area that is best suited for the test which is granted. During the deposition and in the expert reports the location of the test is cited as a reason for the poor performance on the test.

Davis next had Zelechiwsky perform the one-leg stand test. He acknowledged the instructions and did not follow them. He attempted the test and was unable to compete in it. He stumbled multiple times after losing his balance. In his deposition and in the expert reports this failure is attributable to his age the location. During both his and Mrs. Zelechiwsky depositions, they reported how fit and active Zelechiwsky was. His usual routine was to go for long bike rides. He was an avid swimmer and skier and they reported he also spent time chopping wood and doing extensive yard work. It seems that a person of his fitness level and active lifestyle should have been very able to complete these tests. Zelechiwsky is a criminal defense attorney who has handled numerous OUI cases. He has had lots of exposure to the field sobriety testing program



used by law enforcement. He knew the importance of following instructions and even with that knowledge he was unable to follow those instructions.

When Zelechiwsky is seated in the back of the vehicle Davis stated that you didn't do too well on those tests. Zelechiwsky agreed and stated it was due to nerves.

During the stop Zelechiwsky initially reported not having consumed any alcohol. After Davis spoke to Mrs. Zelechiwsky, she informed him that she had reported they were drinking that day. Zelechiwsky changed his statement to we had 5 or 6 and then amended it to a glass of wine. Mrs. Zelechiwsky informed Gallagher without being asked that they had **Beer** at the beach which they left a 3:00 p.m.

Later at their depositions (Mrs. Zelechiwsky was present for Zelechiwsky's deposition) **Beer** at the beach was reported as consisting of the two of them sharing one beer which they did not finish that afternoon before the encounter. A single beer was packed in the cooler by Mrs. Zelechiwsky. Doctors and police officers are accustomed to individuals they encounter under reporting alcohol consumption.

Davis reported and documented her observations and actions on video as they played out. Her statements and actions are contemporaneous as the information is being developed, they are not observations that she reported after a period of time and in consultation with others. The BWC video and statements by Zelechiwsky and Mrs. Zelechiwsky support her reports.

Based on the observations reported by Davis of the motor vehicle operation by Zelechiwsky including the following:
  ➢ Observations of his physical appearance displaying glassy eyes and his movements appeared slow and hesitant.
  ➢ Zelechiwsky's performance on the field sobriety tests.
  ➢ The conflicting reporting of how much if any alcohol had been consumed.
  ➢ The presence of an order of alcoholic beverage in the driver's seat area.
  ➢ Six Bottles of wine behind the back seat.

Davis had an obligation to take Zelechiwsky into custody when probable cause was developed that Zelechiwsky was impaired and operating under the influence of alcohol, legal, or illicit drugs.

After taking Zelechiwsky into custody Davis had established probable cause that evidence of alcohol or drug use would be located in the Zelechiwsky's vehicle which was on a public way. Davis complied with NJSP policies and procedures as well as state and federal constitutional requirements when she conducted a limited search of the cab of the pickup truck. The BWC video showed the scope and intensity of the search to be consistent with acceptable practices. In fact, Davis discovered six bottles of wine which were not open in the vehicle during the search.



My process when reviewing cases with videos and documents is that I first watch the videos they inform me on what the documentation is explaining when I review them. As I review videos, I tend to take screen shots and notes of my observations of what I observed and its relevance. I did that process in this matter. When reviewing the depositions I found that my observations as to the performance of Zelechiwsky on the field sobriety test matched those reported by Davis. I with the benefit of hindsight now know that Zelechiwsky was not under the influence of alcohol. However, his affect, presentation, appearance, body movements, and inability to follow directions and complete the field sobriety tests brought me to the same conclusion that something was going on impairing him that day. That could be caused by a host of reasons, one being alcohol, based on the totality of the circumstances.

Davis followed appropriate law and procedure and transported Zelechiwsky to the barracks for a breath test. Mrs. Zelechiwsky followed in the pickup. Zelechiwsky was offered an administrative breath test which reported 0.0 alcohol in his system. Davis had established probable cause to take Zelechiwsky into custody and upon receiving information that no longer supported that probable cause Davis cited Zelechiwsky for civil citations and coordinated his released from custody. The time period of the detention was reasonable under the circumstances. In keeping with NJSP policy and procedure and consistent with what any reasonable officer reasonable officer found in a similar situation would do.



# 8   Conclusions

In summary, it is my opinion within a reasonable degree of certainty within my field that:

➤ The motor vehicle stop conducted by Davis was based on her observations and consistent with NJSP policies and procedures, and state law. The stop was conducted after Davis established reasonable suspicion to take an enforcement action.
➤ The arrest of Zelechiwsky was consistent with NJSP policies and procedures, state and federal law and was conducted after Davis established probable cause to take Zelechiwsky into custody.
➤ The detention Zelechiwsky while being given the breathalyzer was consistent with NJSP policies and procedures, state and federal law and within a reasonable time of determining that the probable cause no longer existed Zelechiwsky was released consistent with NJSP policies and procedures, state and federal law.
➤ The civil motor vehicle citations issued to Zelechiwsky  are consistent with NJSP policies and procedures, and state law.


All of my opinions are stated to a reasonable degree of professional certainty in my profession as an expert in law enforcement and security matters. I reserve my right to reassess my opinion if provided with additional facts and information not previously considered. My fees are $350 USD per hour for document review and $400 USD per hour for testimony and drafting an expert report.

Respectfully Submitted,


Daniel P. Linskey



# 9   Appendix #1 Documents Reviewed

1.   Trooper Ashley Davis BWC Footage

2.   Trooper Michael Gallagher BWC Footage

3.   Trooper Ashley Davis DIVR Footage

4.   Trooper Michael Gallagher DIVR Footage

5.   August 10, 2020 CAD Abstract- 6 pgs.

6.   August 10, 2020 Motor Vehicle Stop Report- 3 pgs.

7.   Drinking Driver Questionnaire-Zelechiwsky- 2 pgs.

8.   Alcohol Influence Report Form-Zelechiwsky- 2 pgs.

9.   Deposition Transcript of Trooper Ashley Davis- 187 pgs.

10.   Deposition Transcript of Bohdan J. Zelechiwsky- 161 pgs.

11.   Deposition Transcript of Lisa A. Zelechiwsky- 97 pgs.

12.   Expert Opinion Report by John G. Peters, Jr., Ph.D.- 21 pgs.

13.   Expert Opinion Report by Thomas Sexton -5 pgs.

14.   https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_ig_refresher_manual.pdf

15.   Various New Jersey statutes.

16.   Various NJSP policies and procedures.





# 10 Findings and Conclusions

**DISCUSSION AND OPINIONS**

I have been asked to review this case with regard to the actions Trooper Davis of Pennsylvania State Police

Below, I provide opinions regarding the following topics:
  5) The motor vehicle stop conducted by Davis
  6) The arrest of Zelechiwsky
  7) The detention Zelechiwsky while being given the breathalyzer.
  8) The civil motor vehicle citations issued to Zelechiwsky

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions and the basis for my opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed.

In my review of this case, I examined the evidence from the perspective of proper police procedure and may opine whether or not the evidence does or does not support a particular allegation or statement. Regarding legal definitions, I may state definitions as taught to police officers in police training venues but leave statutory definitions to the Court. Finally, although I may opine as an expert in police practices about whether evidence does or does not support factual allegations, I acknowledge that the final determination of factual accuracy is left to the trier of fact.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law.

I have extensive practical experience in the field of law enforcement and have considerable experience analyzing police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), I serve on the IACP training Committee and have served for the past 4 years. I am a member of the Police Executive Research Forum (PERF) and have actively worked with PERF to develop guidance to police leadership. I am a member of the Federal Bureau Investigations National Academy Associates (FBINA.) I have conducted training for FBINA to tens of thousands of their membership in 44 states.



Specifically, my review of this case has found the following:

Trooper Davis is a duly sworn member of the NJSP and was on duty on the evening of 8/10/2020 when she observed Zelechiwsky's pickup truck operating on the highway. She observed what she perceived as the vehicle not maintaining the lane of travel and weaving. She later reported the vehicle was observed conducting a lane change without signaling and she decided to take an enforcement action. Zelechiwsky testified that he was driving perfectly fine and did not commit the moving violations. He further testified that his wife has been and is extremely critical of him when he is driving and voices her criticism. He testified that since she was not concerned, he was driving without issue. Gallagher's video is clear and tells a different story. When asked if Davis had informed Mrs. Zelechiwsky what was going on she responded yes. "he's just he doesn't drive the greatest." It appeared she had no trouble understanding Davis' reason for stopping them.

Davis stopped the vehicle and approached the passenger side and contacted Mrs. Zelechiwsky Davis immediately informed the occupants as to reasons why they had been pulled over. After getting their license and registration, Davis illuminated the car and observed Zelechiwsky who she reported in her deposition as having glassy eyes and appearing slow in his movement. Davis asked if they had been drinking. Zelechiwsky replied that he had not. Davis went to the driver's door and requested that Zelechiwsky step out so she could make sure he was safe to drive.

Davis had Zelechiwsky take three field sobriety tests. The HGN test Davis can be heard on video twice correcting Zelechiwsky to not move his head. She determined that he continued moving his head so the test was not something that could determine indications of impairment one way or another.

Davis next had Zelechiwsky perform the walk and turn test next. He is observed on video lifting his arm to steady himself and appears to be losing his balance. He is also seen on video not counting as instructed to even though he stated that he understood the instructions. At the beginning of the test the video showed Zelechiwsky acknowledging the instructions and requesting permission to move to an area that is best suited for the test which is granted. During the deposition and in the expert reports the location of the test is cited as a reason for the poor performance on the test.

Davis next had Zelechiwsky perform the one-leg stand test. He acknowledged the instructions and did not follow them. He attempted the test and was unable to compete in it. He stumbled multiple times after losing his balance. In his deposition and in the expert reports this failure is attributable to his age the location. During both his and Mrs. Zelechiwsky deposition they reported how fit and active Zelechiwsky was. His usual routine was to go for long bike rides. He was an avid swimmer and skier and they reported he also spent time chopping wood and doing extensive yard work. It seems that a person of his fitness level and active lifestyle should have been very able to complete these tests. Zelechiwsky is a criminal defense attorney who has handled numerous OUI cases. He has had lots of exposure to the field sobriety testing program



used by law enforcement. He knew the importance of following instructions and even with that knowledge he was unable to follow those instructions.

When Zelechiwsky is seated in the back of the vehicle, Davis stated that you didn't do too well on those tests. Zelechiwsky agreed and stated it was due to nerves.

During the stop Zelechiwsky initially reported not having consumed any alcohol. After Davis spoke to Mrs. Zelechiwsky, she informed him that she had reported they were drinking that day. Zelechiwsky then changed his statement to we had five or six and then amended his response that he had a glass of wine. Mrs. Zelechiwsky informed Gallagher without being asked that they had **beer** at the beach which they left at 3:00 p.m.

Later at their depositions (Mrs. Zelechiwsky was present for Zelechiwsky's deposition),  **Beer** at the beach was reported as consisting of the two of them sharing one beer which was packed in the cooler by Mrs. Zelechiwsky, which they did not finish that afternoon before the encounter. Doctors and police officers are very accustomed individuals who underreport their alcohol consumption during traffic stops.  This is supported due to the inconsistencies of Zelechiwsky and the conflicting statements made by Mrs. Zelechiwsky.

Davis reported and documented her observations and actions on video as they played out. Her statements and actions are contemporaneous as the information is being developed, they are not observations that she reported after a period of time and in consultation with others. The BWC video and statements by Zelechiwsky and Mrs. Zelechiwsky support her reports.

 Based on the observations reported by Davis of the motor vehicle operation by Zelechiwsky including the following:
> ➢ Observations of his physical appearance displaying glassy eyes and his movements appeared slow and hesitant.
> ➢ Zelechiwsky's performance on the field sobriety tests.
> ➢ The conflicting reporting of how much if any alcohol had been consumed.
> ➢ The presence of an order of alcoholic beverage in the driver's seat area.
> ➢ Six Bottles of wine behind the back seat.

Davis had an obligation to take Zelechiwsky into custody when probable cause was developed that Zelechiwsky was impaired and operating under the influence of alcohol, legal, or illicit drugs.

After taking Zelechiwsky into custody Davis had established probable cause that evidence of alcohol or drug use would be located in the Zelechiwsky's vehicle which was on a public way. Davis complied with NJSP policies and procedures as well as state and federal constitutional requirements when she conducted a limited search of the cab of the pickup truck. The BWC video showed the scope and intensity of the search to be consistent with acceptable practices. In fact, Davis discovered six bottles of wine which were not open in the vehicle during the search.

**KROLL**

My process when reviewing cases with videos and documents is as follows: I first watch the videos as it can inform me on what the documentation depicts. I reviewed the videos with the benefit of hindsight that Zelechiwsky was not under the influence of alcohol. However, his affect, presentation, appearance, body movements, and inability to follow instructions of Davis, and complete the field sobriety tests brought me to the same conclusion that something impaired Zelechiwsky that day. The impairment could be caused by a host of reasons, one being alcohol based on the totality of the circumstances.

Davis followed appropriate law and procedure and transported Zelechiwsky to the barracks for a breath test. Mrs. Zelechiwsky followed in the pickup. Zelechiwsky was offered an administrative breath test which reported 0.0 alcohol in his system. Davis had established probable cause to take Zelechiwsky into custody and upon receiving information that no longer supported that probable cause Davis cited Zelechiwsky for civil citations and he coordinated his released from custody. This was in keeping with NJSP policy and procedure and consistent with what any reasonable officer found in a similar situation would have done.



## 11 Conclusions

In summary, it is my opinion within a reasonable degree of certainty within my field that:

- ➢ The motor vehicle stop conducted by Davis was based upon her observations and consistent with NJSP policies and procedures, and state law. The stop was conducted after Davis established reasonable suspicion to take an enforcement action.
- ➢ The arrest of Zelechiwsky was consistent with NJSP policies and procedures, state and federal law and was conducted after Davis established probable cause to take Zelechiwsky into custody.
- ➢ The detention of Zelechiwsky while being given the breathalyzer was consistent with NJSP policies and procedures, state and federal law and within a reasonable time of determining that the probable cause no longer existed. Zelechiwsky was released consistent with NJSP policies and procedures, state and federal law.
- ➢ The civil motor vehicle citations issued to Zelechiwsky were consistent with NJSP policies and procedures, and state law.

All of my opinions are stated to a reasonable degree of professional certainty in my profession as an expert in law enforcement and security matters. I reserve my right to reassess my opinion if provided with additional facts and information not previously considered. My fees are $350 USD per hour for document review and $400 USD per hour for testimony and drafting an expert report.

Respectfully Submitted,

*Daniel L. Linskey*



# 12  Appendix #1 Documents Reviewed

1.      Trooper Ashley Davis BWC Footage

2.      Trooper Michael Gallagher BWC Footage

3.      Trooper Ashley Davis DIVR Footage

4.      Trooper Michael Gallagher DIVR Footage

5.      August 10, 2020 CAD Abstract- 6 pgs.

6.      August 10, 2020 Motor Vehicle Stop Report- 3 pgs.

7.      Drinking Driver Questionnaire-Zelechiwsky- 2 pgs.

8.      Alcohol Influence Report Form-Zelechiwsky- 2 pgs.

9.      Deposition Transcript of Trooper Ashley Davis- 187 pgs.

10.     Deposition Transcript of Bohdan J. Zelechiwsky- 161 pgs.

11.     Deposition Transcript of Lisa A. Zelechiwsky- 97 pgs.

12.     Expert Opinion Report by John G. Peters, Jr., Ph.D.- 21 pgs.

13.     Expert Opinion Report by Thomas Sexton -5 pgs.

14.     https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_ig_refresher_manual.pdf

15.     Various New Jersey statutes.

16.     Various NJSP policies and procedures.

