IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | |
|---|---|
| BOHDAN J. ZELECHIWSKY, et al. | : |
| | : CIVIL ACTION |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : No. 1:22cv-04994-CPO-AMD |
| TROOPER ASHLEY DAVIS, | : |
| | : |
| Defendant. | : |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Defendants have filed a motion for summary judgment seeking to dismiss the claims filed by Plaintiffs.

It is important to note that in the "Introduction" section of Defendant's brief, the Defendant presents as uncontested facts, information that is most certainly contested by Plaintiffs, as more fully detailed in Plaintiffs' Response to Defendant's Statement of Material Facts, and in Plaintiffs' Statement of Material Facts in their Brief. Further, it is notable that throughout her arguments, Defendant also asserts either "non-facts" or "facts" which are clearly not viewed in the light most favorable to Plaintiff, as the law requires.

For the reasons set forth below, the Plaintiffs have divided this Memorandum of Law into three (3) categories: (1) Procedural Reasons Why The Defendant's

Motion should Be Denied; (2) Substantive Reasons Why The Defendant's Motion Should Be Denied, *Ab* Initio; and (3) The Defendant's Arguments For Summary Judgment Rebutted. The fact that the Plaintiffs, have chosen to address the Defendant's specific issues in section 3 of this Brief is not intended to, nor should it be interpreted as, an indication that this Court need go beyond Plaintiffs' arguments 1 and 2 before denying the Defendant's Summary Judgment Motion.

## II.    <u>Statement Of The Pertinent Facts</u>

1. For convenience and to avoid confusion, the Plaintiffs will utilize and refer to the following Exhibits as marked by the Defendant:

Exhibit A – Davis Motor Vehicle Stop Report
Exhibit B – Plaintiffs' Complaint
Exhibit C – Bohdan Zelechiwsky's Deposition Transcript

And, the following additional Exhibits which the Plaintiffs have labeled and filed as part of the summary judgment record, by attachment hereto:

Exhibit D – Dismissed Citation
Exhibit E - Lisa Zelechiwsky's Deposition Transcript
Exhibit F – Trooper Ashley Davis' Deposition Transcript
Exhibit G – Trooper Davis' Body Cam Footage
Exhibit H – Trooper Gallagher's Body Cam Footage
Exhibit K – Expert Report, CV and Affidavit / Declaration of Dr. John Peters
Exhibit L – Trooper Ashley Davis' MVR Black Footage
Exhibit M – Plaintiffs' Answers to Interrogatories
Exhibit N – Affidavit / Declaration of James Heidecker, Jr., Esquire
Exhibit O - Affidavit / Declaration of Maureen Heidecker
Exhibit P – Expert Report, CV and Affidavit / Declaration of Thomas Sexton

N.B. 1. The Plaintiffs have not, and will not, choose to seek to join or substitute a real party in interest under Rule 17(a)(3) for the Troper John Doe Defendant in whose name this suit was also commenced. Hence, the Plaintiffs are proceeding against Trooper Davis as the sole Defendant here. Accordingly, the singular term "Defendant" is utilized throughout this document, and refers to Defendant Trooper Davis.

N.B. 2. For convenience, as used hereinafter, "Plaintiff" shall refer to Bohdan J. Zelechiwsky, and "Plaintiffs" shall refer to both his wife Lisa and him.

N.B. 3. What the Defendant cites to as Exhibit "D", purports to be "a copy of Plaintiff Bohdan Zelechiwsky's Drinking Driver / Operator Questionnaire". It is actually not that, but rather a second copy of Davis' Motor Vehicle Stop Report that appears as Exhibit "A" (and a copy of the issued "Improper Right and Left Turns" citation dismissed by the Magistrate). (NJSP Zelechiwsky 013). It will be cited as Exhibit "D" as the dismissed citation.

1.    The Plaintiffs spent the entire day of Monday August 10, 2020 with Jim and Maureen Heidecker and their daughter, who were staying at the Plaintiffs' shore property at Cape May. Heidecker Affidavits, Exhibits N and O.

2.    The day was spent at the beach, sightseeing, shopping and at dinner, and at no time did Mr. Zelechiwsky, nor anyone else, consume any alcoholic beverages or controlled substances. *Id.*

3.    Mr. Zelechiwsky evidenced no impairment of any kind on that day. *Id.*

4.    Mr. Heidecker swore in pertinent part in his Affidavit that: "I have absolutely no doubt that Bo Zelechiwsky did not consume any alcoholic beverages on August 10, 2020, and that he manifested absolutely NO indications that he had. His talking, walking, driving, his appearance and all his actions were totally free of any impairment. He showed no signs of having consumed an alcoholic beverage, or drugs or any other substance, at any time. His eyes, speech, balance and cognition were all normal and what I have always witnessed in a man of his age and bearing"; "It is inconceivable to me that any reasonable person that came into contact with Bo on that day could disagree with my evaluation of his non-intoxicated state, even if they had just met him for the first time then", Exhibit N, para. 14 &15.

5.    When Mr. Heidecker learned that Mr. Zelechiwsky "had been stopped for a traffic violation and was being detained for a DUI . . . [he] was completely astounded by this information . . . [and he] could not comprehend how his could be possible." *Id.*

6.    Mrs. Heidecker also swore in pertinent part that: "I was totally shocked in that I spent the entire day in Bo's company and had not seen him drink any alcoholic beverage nor act in <u>any way</u> impaired. His actions, appearance,

walking, talking and driving were normal in all respects"; "I also witnessed no indication that he was, in any way, under the influence of any alcoholic beverage or drug. There is no doubt in my mind that he was not impaired in any way". Exhibit O, para. 12 & 13.

7.  Each of the Plaintiffs also testified consistent with the above observations by the Heideckers, in all respects. Exhibit C, Exhibit E. And the Plaintiff specifically confirmed that at dinner he had a club soda and one cup of coffee to drink and had no alcohol or medications that entire day. Exhibit C, 91.

8.  In summary, each of the Heideckers who also saw Mr. Zelechiwsky operate his vehicle that day, including at the start of his trip home to Pennsylvania from Cape May, during which the subsequent vehicle stop and arrest of Mr. Zelechiwsky occurred, swears, under oath, that Mr. Zelechiwsky was not impaired in anyway as he departed the Cape May property and did drive normally on his departure to home. Exhibits N and O.

9.  The Plaintiffs each further testified that Mr. Zelechiwsky did not engage in any lane weaving nor did he ever change lanes without using his turn signal. Exhibit C, 54; Exhibit E, 43. In fact, during the one minute period that, according to Defendant Davis, she followed behind them in the same left lane they were travelling in, Mr. Zelechiwsky did not change lanes at all but

5

(as the body cam video clearly shows), remained in the left lane until he was pulled over by Defendant Davis at 9:35 a.m. *Id.*, 54, 98, 99, Exhibit G, 21:35-36.

10. The Plaintiff was wearing his glasses that evening, Exhibit C, 94-95, and as can be seen in the video and as Troper Davis confirmed.

11. It was approximately ½ hour into that trip home that the Plaintiffs' vehicle was stopped by Defendant Trooper Davis, at about 9:35 p.m. <u>Stop Report</u>, Exhibit A, Exhibit C (Mr. Zelechiwsky Deposition), 85, Exhibit G, 21:35.

12. Defendant Trooper Davis had been a N.J. State Trooper for 5 years and 7 months at that time. Exhibit F, 10. And, during that time she had "so many complaints against her" as a Trooper that she doesn't "even have a guess" as to how many. (Id. 24) . . . maybe more than 10, she just doesn't know. *Id.*, 36.

13. She was also disciplined by the New Jersey State Police on at least two occasions. *Id.*, 23-24.

14. On the first occasions she was disciplined for failing to arrest and test a fellow N.J. State Trooper who was suspected of driving under the influence. This failure came to light when the fellow Trooper then had an accident. *Id.* 28.

15. The second discipline occurred because she failed to secure marijuana which she found in a vehicle search, and she also failed to place its discovery on her body camera (body cam). *Id.* 30, 33-34.

16. Both misconducts occurred in 2018 or 2019 and resulted in suspensions and each resulted in remedial DUI training and HGN test training. *Id.*, 34-35.

17. On August 10, 2020, Defendant Davis was on solo highway patrol from 6 pm to 6 am (Id., 36-37) when she claimed to have first observed the Plaintiffs' vehicle in front of her, in the same left lane, being operated outside of its lane of travel but, she can't recall how many times it failed to maintain its lane. (Id. 39-40) The vehicle also allegedly switched lanes, "on one occasion" without using its turn signal according to her but, she also didn't recall when or where that occurred. *Id.* 40.

18. According to Davis she was behind the Plaintiffs' vehicle that was driving in the same left lane as Davis. (Id. 38). She followed him for approximately one minute and doesn't recall if there were any vehicles in between them (Id. 38-39), but, nonetheless  claims that she was travelling "[a] car length or two" behind the Plaintiffs' vehicle the entire time. (Id. 42).

19. Davis' body cam footage belies Davis' claims by showing that there was one car in between Davis and the Plaintiffs' vehicle, and that no changing of lanes was done by the Plaintiffs' vehicle in the one minute after Davis

claims to have noticed the Plaintiffs' vehicle. *Id.,* 38-39. She activated her lights and sirens (later corrected to only her lights), at which time Davis testified that the Plaintiffs' vehicle immediately pulled over (Id. 42) safely and properly, and came to a complete stop off the roadway, (Id. 43-44, 93), as one would expect of an unimpaired operator.

20.    The Plaintiffs also deny that any of the events which Davis claimed precipitated the vehicle stop, ever occurred . . . no driving out of the lane, no changing of lanes without employing a turn signal, no aberrant driving of any kind. Exhibit E, 43, Exhibit C, 54.

21.    Moreover, not only does the body cam footage not show any weaving by the Plaintiff or any turns from his lane during the approximate one minute period that the Defendant claimed to have followed the Plaintiffs' vehicle in the left lane but, Davis didn't recall that there was a car in between them (as the body cam clearly shows) Exhibit F, 38-39 and G, 21:35-21:36. Davis can't recall how many times the Plaintiff traveled outside of his lane at that time (Id., 39-40); she observed no other violations of any kind, including no speeding, and can't recall not properly maintaining the right lane at any time (or even being in the right lane) (Id.); she can't recall the Plaintiffs' vehicle or any other vehicle around the Plaintiffs' vehicle (Id., 42), and the Plaintiff did not endanger anyone with his driving (Id.).

8

22. The Plaintiff, Mr. Zelechiwsky, testified that he was flabbergasted that she stopped him for allegedly weaving and the non-use of his turn signal and said: "Those are lies," that his wife was a witness to his proper driving and never would have permitted him to drive if he was impaired in any way. And, that he was angered when the Trooper repeated those lies in her deposition testimony. Exhibit C, 54.

23. In fact, at the time, the Plaintiff thought that the Trooper was going on some kind of a "call" so he moved into the right lane to allow her vehicle to pass. He was "shocked" when she pulled behind him but, he then immediately pulled over and stopped safely off the roadway. Id., 105, 107.

24. It was a Monday night. The weather was nice but, there was no lighting where his vehicle was stopped. Id., 90.

25. The Plaintiff described the scenario as being part of a "police blitz" with Troopers stopping a number of cars on the same roadway near him. (Id. 55-56) in the area of Millville, where 347 turns into Route 55, and turns into two lanes on the outskirts of Millville. Id. 57-58.

26. The Trooper testified that she was in the same left lane as the Plaintiffs, and a car length or two behind the Plaintiffs' vehicle for about one minute when she claimed to have observed that the vehicle didn't maintain its lane or use its turn signal and she immediately initiated her lights and siren (later

admitting that there was no siren). Id. 38, 39 and 42. And, in response, the Plaintiffs' vehicle immediately pulled over and on to the shoulder of the road. Id., 42.

27.    The Trooper never explained how she could have come up behind the Plaintiffs' vehicle and followed it for one minute, during which time she claims to have observed the violations when: (a) the violations do not appear on the body cam footage; (b) the Plaintiffs' vehicle never left the same left lane that she was following it in – and therefore, made no lane change for which a turn signal indication would have been required; (c) she could not have been one to two car lengths behind the Plaintiffs' vehicle because, as the body cam footage shows, the Trooper was behind another vehicle in the left lane, and, as the body cam also shows, the Trooper was at least two car lengths behind that vehicle. Exhibit G, 21:35, Exhibit E, 42.

28.    The Trooper admits that she had a MVR camera (i.e. "dash cam") mounted on her patrol car (to capture and memorialize the movement of any motor vehicle that she might later contend violated the vehicle code). Exhibit F, 43.

29.    The Trooper claims that she did possess the actual motor vehicle recording from her MVR, and that it was "preserved by [the] State Police. *Id.*

30.   She also testified, under oath, that she watched both her body cam footage and the MVR footage prior to providing her sworn deposition testimony on February 20, 2024. *Id.*, 43-44.

31.   However, the MVR footage provided in discovery apparently shows the camera pointed towards the sky, not the road in front of the Defendant as required and captures no video relevant to this matter. Exhibit L.

32.   Defendant Davis has not (could not), to date, offered any explanation as to why that occurred to such a critical, if not definitive piece of evidence in this case.

33.   Defendant Davis did however admit to the obscuring material parts of her body cam footage as a result of her decision to wear a "whistle" hanging over her body cam. Exhibit F, 47, Exhibit G.

34.   The Trooper went on to testify that she stopped the Plaintiffs' vehicle in a darkened section of the roadway without any streetlights that she could recall. *Id.*, 48.

35.   The Trooper approached the passenger side of the vehicle and directed questions to Mr. Zelechiwsky who was the operator, with Mrs. Zelechiwsky sitting in the passenger seat. *Id.*, 44-45.

36.  When asked whether he had been drinking, the Plaintiff can be heard on the body cam video replying, "No.No.No.", and his wife also responded "No." Exhibit C, 54-55, Exhibit G, 21:36-37, 21:45.

37.  Although the Defendant claimed in her deposition that the Plaintiff was stopped because: "He was all over the road. His car was going outside of the lane onto the other lane. And then when he switched lanes, he failed to use his turn signal." (Exhibit F, 38,39, 92), (1) she never charged him with the alleged lane violation (N.J.S.A. Section 39:4-88); (2) her body cam video never shows either infraction; (3) the only charge which she did file (N.J.S.A. Section 39:3-123 "Improper Right And Left Turns") was dismissed by the judge. (Exhibit F, 78-79; Exhibit A; and (4) the Defendant testified that she only followed behind the Plaintiff for one minute (Exhibit F, 38-39) in the same left lane he occupied, one to two car lengths behind before she stopped him, precluding the possibility of any improper turn. Exhibit E, 38-39.

38.  The Trooper admitted that Mr. Zelechiwsky answered any questions that she asked of him. *Id*. And that "[h]e was answering in a reasonable way . . . he wasn't stuttering or slurring his words or anything like that." *Id*., 44-47.

39.  The Trooper also admitted that he was fully cooperative with her and that "he provided [her] with his license, registration and proof of insurance or whatever other documents [that she] requested." *Id.*, 46-47.

40.  The Trooper claims that she shined her flashlight from the front passenger window, across the passenger seat and into the eyes of Mr. Zelechiwsky seated in the driver's seat and claimed that, from that distance, the beam of her flashlight shined through the darkness of the vehicle and through the glasses that Mr. Zelechiwsky was wearing, allegedly revealing that his eyes appeared "bloodshot, glassy". *Id.*, 46, 50.

41.  The Trooper did not explain how Mr. Zelechiwsky's glasses would not have reflected or refracted her flashlight beam or, how anyone's eyes would not have appeared similarly bloodshot or glassy with a large flashlight shined into them. She did admit that the appearance of his eyes could just mean he was tired, not intoxicated. Id., 48.

42.  The Trooper then went to the driver's side of the vehicle where she strangely did not confirm the alleged glassy, bloodshot eyes; and she did not smell an odor of an alcoholic beverage emanating from Mr. Zelechiwsky or his breath, and admitted that there was no observations at that time which suggested that he was under the influence. She then asked Mr. Zelechiwsky if he was drinking to which he replied "No.No.No." (as

also heard on the body cam footage) Exhibit G, 21:38, Exhibit C, 50. His wife also said "No". *Id*., 54-55.

43.   Nonetheless, the Trooper asked the Plaintiff (Mr. Zelechiwsky) to exit the vehicle, and he complied, exiting normally and without any assistance, or differently, and in full equilibrium. Exhibit G, 21:38.

44.   The Trooper proceeded to conduct field sobriety tests on the uneven and rounded macadam shoulder, with the high beams of his truck only a few feet away, (*Id.*) and on the side of a dark highway with cars whisking by, and with no line to walk. *Id.*, and Exhibit F, 56-57.

45.   The trooper failed to demonstrate how the Plaintiff was to perform the field sobriety tests, with the exception of the 18 step heal-to-tow test which she demonstrated by taking approximately three (3) steps. Exhibit G, 21:39-40.

46.   She never asked him the most significant pre-requisite to field testing for sobriety, to wit, whether he has any injury or condition that would affect his test performance. She only asked him if he had any medical condition with regard to his eyes. *Id.*, 52; Exhibit G.

47.   The Trooper admitted that: "Mr. Zelechiwsky was certainly able to stand still and maintain his balance while he was awaiting the performance of [the HGN] test." *Id.*, 55, which was an extended period of time. Exhibit G, 21:38-21:43.

48.  The Trooper admitted that: "He" [Mr. Zelechiwsky] was able to maintain his balance when [she] [was] shining the flashlight in his eyes." *Id.*

49.  And although the Trooper claimed that Mr. Zelechiwsky moved his head when she was shining her flashlight in his eyes, and while the Plaintiffs high beams were shining, the Plaintiffs each deny that any such movement occurred, and the body cam footage shows none. Exhibit G, 21:38-39. And the Trooper admits that she did not "observe any other indications of intoxication during that test".

50.  Mrs. Zelechiwsky was positioned in the front seat of the truck facing directly into the test performance just feet away, and saw her husband's performance of all the field tests, and they were done as well as possible, with no problems and with no indication of impairment. Exhibit E, 42-43.

51.  In fact, Mrs. Zelechiwsky attempted to record the tests in real time because she knew they would establish her husband's sobriety and the wrongfulness of the stop but, Trooper Davis approached her and told her to "put [her] phone away . . . put your phone away," and took Mrs. Zelechiwsky's license to further intimidate her. So, Mrs. Zelechiwsky "put [her] phone down, away" and was not able to record her husband's field test performance. *Id.* 42.

52.   Mrs. Zelechiwsky had no doubt that her husband demonstrated no signs of

being impaired in any way:

> Q. So you did, so you saw the whole transaction?
> A. Yes.
> Q. And did you have any concerns about him performing any
>    of the tests?
> A. No. I was actually in shock that she turned him around on
>    the truck and handcuffed him and put him away. I was just
>    in shock why she was doing that. Because he was
>    standing steady for a pretty long time. I know, if I was a
>    police officer, and someone was standing straight like that
>    on a very busy road for a very long time, and not slurring
>    words or not doing anything to appear impaired, I was
>    shocked that she handcuffed him and took him away. I
>    was in total shock. It was very upsetting.

Exhibit E, 43.

53.   The Plaintiffs' experts, both trained in administering and even in instructing

members of law enforcement on the proper administration of the field

sobriety tests, each agreed that even based upon partially obscured body

cam images, and given the improper environment, the uneven road surface,

and with truck headlights shining from just feet away, and even considering

the defective administration of the tests themselves, no reasonably objective

police officer operating in a manner consistent with law enforcement

standards, could conclude that Mr. Zelechiwsky failed the field sobriety

tests, or that he was in any way impaired. See, Exhibits K and P and Exhibit

G, 21:38-39.

54.   The unobscured portions of the trooper Body Cam (Exhibit G) also corroborate that:

a.   The alleged motor vehicle violations never occurred. 21:35.

b.   The Trooper could never have witnessed the violations she claimed to have seen because the Plaintiffs' vehicle never changed lanes, nor had the ability to change lanes, in the approximate one minute that the Trooper claimed she followed behind it in the same left lane. *Id.*

c.   The Trooper was not "one or two car lengths" behind the Plaintiffs' vehicle because the footage clearly shows an intervening vehicle, with the Trooper being some distance behind it. Exhibit G, 21:35-36.

d.   The Plaintiff immediately, appropriately and safely drove his vehicle to the roadside and parked it capably and safely on the small off-road shoulder, properly in response to the Trooper's light activation. *Id.*, 21:35

e.   The Plaintiff was polite, cooperative, mentally sharp and displayed full equilibrium and balance at all times, including while producing all his driving documents, exiting his vehicle, ambulating outside of the vehicle on a darkened, non-flat, busy highway shoulder with high beams from his truck shinning, responding to questioning, and entered

easily the Trooper's vehicle on his own with his hands handcuffed behind him. *Id.*, 21:35 – 21:44.

55. According to Mrs. Zelechiwsky, her husband did not exhibit any signs of intoxication or impairment on the evening in question. Exhibit E, 23-34, 43.

56. Mr. Zelechiwsky was administered a breathalyzer test at State Police Headquarters which resulted in a 00.00% reading of no alcohol in his system. Exhibit A, Exhibit F, 70.

57. Mr. Zelechiwsky was kept handcuffed to a bench for more than one hour, less than two hours after he passed the breathalyzer test and, during this time the Trooper was apparently preparing his traffic violation. *Id.*, 63, Exhibit E, 65.

58. A summary criminal citation was filed by Trooper Davis alleging a violation of violations of N.J. Rev. Stat. §39:4-88 ("Traffic on Marked Lanes") and not for any alleged violation, N.J. Rev. Stat. §39:4-123 ("Right and Left Hand Turns"). Following many months of continuances by Trooper Davis, the Plaintiff was found not guilty by a judge, at a hearing at which Trooper Davis failed to appear. Exhibit F, 78-79.

59. Throughout her deposition, Trooper Davis swore under oath that Mr. Zelechiwsky was never arrested on the night in question. For example:

> Mr. Karoly: He wasn't arrested?
> Mr. Chaudry: He was not arrested.

Q. All right. Trooper Davis, what is the definition of an arrest?

Davis: An arrest is when you're charged with a criminal offense, taken to the station, processed, fingerprinted and photographed.

Q. So that's what you believe an arrest is? That's what you were trained regarding the constitutional basis for an arrest?

A. Yes.

Q. Okay. So you don't believe that an individual is arrested when their freedom of movement is restricted and specifically by utilizing handcuffs?

A. No.

Q. So your basis of an arrest is when criminal chares are actually brought again an individual?

A. Yes.

Q. Okay. So handcuffing someone and putting them in the back of your cruiser car, driving them 20 plus minutes away and holding them at your station handcuffed to a bench for an hour is not an arrest?

A. No.

Q. Okay. And that's how you were trained?

A. Yes.

Exhibit F, 62-63.

60.   The Defendant's Stop Report indicates that the Plaintiff, Mr. Zelechiwsky, was allegedly stopped for a moving violation (39:4-88 b) (Unsafe Lane Change) but charged and arrested for a violation of N.J.S.A. 39:4-50 "Driving While Intoxicated" (Exhibit "A"). It is clear that, contrary to the Defendant's sworn testimony at many points (Exhibit F, 63, 133) the Plaintiff was, in fact arrested; but, never charged with DWI.

61. And, the Defendant's own Stop Report clearly states that the Plaintiff was "Arrested" on "Charges: 39:4-50 (DWI)" and the narrative Trooper Davis clearly states: "Driver failed SIST's and was <u>arrested</u> (DWI). Exhibit A.

62. According to Mrs. Zelechiwsky, Trooper Davis acted and talked arrogantly, harassingly, as if she was out to get them, with malice and even appeared to be racially motivated, and was "way out of line" including by directing her to leave her phone and purse in the car so she could search the purse, and so that she would be precluded from recording what was actually happening to them, and how her husband was obviously not intoxicated. Exhibit E, 60-63. Trooper Davis made her put her cell phone down so Lisa could not record that her husband showed no signs of intoxication. And, the Trooper came and took her driver's license to make sure she would not pick up her phone and record with it. Exhibit E, 41-42.

63. The Trooper admits that the Plaintiff followed her orders. Exhibit F, 99.

64. He was handcuffed and read his Miranda Rights and directed into the Trooper's car. Id., 116, which he entered without assistance with his hand handcuffed behind his back. Exhibit G.

65. The Trooper then proceeded to search the Plaintiffs' entire vehicle, including its contents, and expressly stated, under oath, that she did so because it was permitted by specific NJSP "rules and regulations", Exhibit

F, 66, although she didn't know the Section "offhand". Id., 64-67. Moreover, the Trooper could not name any federal law or state statute which provided her with that authority. Id., 66-67.

66. The Trooper bluntly stated in her deposition that her reason for searching the vehicle was: "Because its probable cause after we detain a person for DUI". Id., 118, ln. 16-17.

67. The Trooper admitted to looking "all over" in her search of the vehicle and when asked what she was looking for she said, "evidence of impairment" (whatever that could be). Id., 118, ln. 19, 25.

68. The Trooper admitted that she told Mrs. Zelechiwsky to exit the vehicle and to leave her purse and her phone in the vehicle, and then she searched her purse. Exhibit E, 15, 61. When asked at her deposition what she was looking for in the purse, the Trooper replied "evidence of either alcohol or drugs". Exhibit E, 119, ln. 19.

69. The Trooper saw no evidence of any contraband or the proceeds of a crime prior to when she searched the vehicle. And, the Trooper's search of Mr. Zelechiwsky produced no evidence of contraband or the proceeds of a crime, and, there was nothing in plain view within the vehicle which appeared to be contraband or criminal proceeds and, indeed, the search

produced no contraband or evidence of a crime or anything of evidentiary value. Exhibit A, Exhibit F, 64-67.

70. The Trooper transported the Plaintiff to headquarters while he was handcuffed in the back seat of her vehicle. *Id.*

71. The only thing Trooper Davis remembers the Plaintiff saying the whole night was that he had nothing to drink. *Id.*, 67. He said nothing else to her. *Id.*, 69.

72. Troper Davis did not subject the Plaintiff to any blood or urine drug testing at headquarters and, she can't recall why not. *Id.*, 74.

73. She also did not retest him using any of the field sobriety test under the clearly more reasonable conditions presented there. *Id.*, 78, 140, (except for a breathalyzer test). *Id.*

74. There is no evidence that the Plaintiff did anything but reasonably and promptly comply with another Trooper's administration of a breathalyzer test ("Alcotest") which provided a 00.00% alcohol reading. *Id.*, 70.

75. The Plaintiffs' two police practices experts, Dr. John Peters and Thomas Sexton provided sworn and verified expert reports which contradicted and disputed the propriety of Trooper Davis vehicle stop, her field sobriety testing and her perceived observations related thereto, her search of the

Plaintiffs' vehicle, her arrest and further detention and prosecution of the Plaintiff. Exhibit K and P respectfully.

76.   Their reports are comprehensive and based upon their education, training, professional experience, their review of the Parties' depositions and related documents, as well as a careful review of Trooper Davis' body cam footage concerning the events on the evening of August 10, 2020. And, because an encyclopedic recitation of their findings and opinions are not possible here, an excerpt from each is warranted.

Thomas Sexton opined that:

> Nonetheless, the body camera video review which I conducted, based upon my years of training and education, and my experience performing literally hundreds of traffic stops personally, provide more than a sufficient basis to opine, based upon a reasonable degree of professional certainty, that: 1) her stop of the vehicle was inconsistent with standard police training in that it was not made based upon a reasonable and articulable suspicion that Mr. Zelechiwsky had violated the law; 2) her field sobriety tests did not reveal results which, based upon law enforcement training, objectively presented probable cause for Mr. Zelechiwsky's arrest which she in fact clearly effected; and 3) that her training made it clear that she could not conduct a warrantless search of the Zelechiwsky vehicle or Mrs. Zelechiwsky's purse.

Sexton Affidavit/Declaration/Report of July 1, 2024, Exhibit P, pgs. 1-2.

Dr. John Peters "Executive Summary of Opinions" states that:

1. Trooper Davis' reasons for stopping the Zelechiwsky truck are both confusing and contradictory, thereby undermining any purported basis for the traffic stop.

2. Mr. Zelechiwsky was not free to leave the traffic stop, was handcuffed by Trooper Davis, was transported in her police vehicle to the State Police barracks, was handcuffed to a bench, within an estimated period of one and one-half hours, and was reported by her to have been an "arrest" which she effected, all of which was contrary to the constitutional principles requiring the elements of probable cause upon which she and other law enforcement officers are trained.

3. The search of the Zelechiwsky truck and Ms. Zelechiwsky's purse by Trooper Davis demonstrated a gross and defiant deviation from the standard law enforcement training regarding the constitutional limits imposed upon such searches.

4. The "Stop Report" completed by Trooper Davis is misleading and does not show that the MVR was reviewed by anyone, even though she testified it was operational, which is inconsistent with supervisory review.

Dr. Peter's Affidavit/Declaration/Report of July 1, 2024, Exhibit K, pgs. 6-7.

## III.   <u>Summary Judgment Standard of Review</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute of material fact is

"genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.

In deciding a summary judgment motion, *all inferences "should be drawn in the light most favorable to the non-moving. party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore v. Bell Tel. Co. of Pa., 24* F.3d 508, 512 (3d Cir. 1994)(emphasis added). (Please note that, each and every argument the Defendant makes here miscarries because it is predicated upon Defendant's alleged version of the "facts" which are either very adversely `spun' or, which simply dehors the record.)

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the *jury." Anderson,* 477 U.S. at 251-52. Thus, in evaluating a motion for summary judgment, the Court must first determine if the moving party has made a prima facie showing that it is entitled to summary judgment. See Fed. R. Civ. P. 56(a); *Celotex,* 477 U.S. at 331. Only once that prima facie showing has been made does the burden

shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. See Fed. R. Civ. P. 56(a); *Celotex,* 477 U.S. at 331. And, if the moving party fails to make a prima facie showing demonstrating that there is no possibility that a jury could find in Plaintiff's favor, the inquiry ends there and the motion will be denied. *Hunt v. Cromartie*, 526 U.S. 541 (1999).

If on the other hand, a movant meets its summary judgment burden, the burden shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (quoting *"Anderson,* 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000) (quoting *Anderson,* 477 U.S. at 255). In other words, in deciding a party's summary judgment motion, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See, Anderson,* 477 U.S. at

255. "Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the nonmovant." *Adams v. Fayette Home Care & Hospice,* 452 F. App'x 137, 139 (3d Cir. 2011) (citing *Anderson,* 477 U.S. at 248, 255). If the moving party bears the burden of proof at trial, summary judgment is not appropriate if the evidence is susceptible to different interpretations or inferences by the trier of fact. *Hunt*, 526 U.S. 541 at 553.

## IV.   DISCUSSION

### 1.   The Defendant's Summary Judgment Motion Should Be Dismissed On Its Face As A Matter Of Law, For Several Reasons.

#### a.   The Defendant's Filings Violate The Applicable Rules And Her Motion For Summary Judgment Should Accordingly Be Dismissed, *Ab Initio*.

Motions for Summary Judgment are governed by Federal Rule of Civil Procedure 56, Civ. Rule 56.1 of the Local Civil and Criminal Rules of the United States District Court for the District of New Jersey, and Rule 6 of the Rules and Preferences of the Honorable Edward S. Kiel, United States District Judge of the District of New Jersey, Camden Vicinage. Violations of any of these Rules may result in sanctions imposed pursuant to Federal Rules of Civil procedure 16(f), Rule 37, and Rule 83, and said sanctions may be imposed upon the party and/or any attorney of the party. *Republic of Philippines v. Westinghouse Electric Corps*., 43 F.3d 65 (3d Cir. 1994).

Each district court may develop local rules (*Hollingsworth v. Perry*, 558 U.S. 183, 191 (2010)) that have the effect of law (Id.) and must be obeyed. See, *Weil v. Neary*, 278 U.S. 160, 169 (1929); *Frakes v. Peoria Sch. Dist. No. 150*), 872 F. 3d 545, 549 (7th Cir. 2017). The Court has authority to impose sanctions when a party violates the court's local rules. *Carmena v. Wright*, 233 F.R.D. 270, 275 (N.D. N.Y. 2006).

### *District of New Jersey Local Rule 56.1 Summary Judgment Motions*

Local Rule 56.1 places the specific obligation upon Defendant Davis, as the summary judgment movant, to set forth a statement of <u>uncontested</u> material facts in the case *sub judice*:

> On motions for summary judgment, the movant shall furnish a statement which sets forth material facts <u>as to which there does not exist a genuine issue</u> . . . A motion for summary judgment unaccompanied by a statement of material facts <u>not in dispute shall be dismissed</u>.

*Id. (emphasis supplied)*

The "Defendant's Statement of Material Facts" which has been submitted by the Defendant, is certainly not a listing of "material facts as to which there does not exist a genuine issue". In most pertinent part, the Defendant's "Statement", when it comes to issues that are actually "material" to the summary judgment motion she has filed, are often personal and/or impermissible legal opinions of the Defendant

herself, and those inadmissible statements and opinions of her expert [1] which are, of course, hotly contested by the Plaintiffs and their experts - a fact clearly known by the Defendant. This disregard for this Districts' Local Rules should warrant the same dismissal of Defendant's Motion.

*Judge Edward S. Kiel's - Rules And Preferences*

In addition to providing a "Defendant's Statement of Material Facts" which violates Local Rule 56.1, Defendant's submission is in clear violation of this Court's "Rules and Preferences" regarding "Motions for Summary Judgment."

The singular proviso regarding (non-early) motions for summary judgment is the Rule of this Court which expressly states:

> Parties <u>may not incorporate</u> by their reference, in their briefs, their numbered statements of material facts (L.Civ.R. 56.1(a)) or responses thereto <u>as a substitute</u> for a <u>statement of facts</u>.

*Id.* (emphasis supplied).

The Defendant has not included a detailed statement of facts in her submitted brief. Accordingly, the Defendant's brief cannot be accepted and her motion should be denied, *ab initio*.

**b.** <u>**The Report Of Daniel P. Linsky (Exhibit "J") Is Not In Verified Affidavit Form And Therefore May Not Be Considered As Part Of The Defendant's Motion.**</u>

---

[1] The opinions of Defendant's expert, Mr. Daniel Linsky.

Under Fed.R.Civ.P. 56, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n 17 (1970), and within the Third Circuit, an expert report offered at summary judgment must be supported by a sworn affidavit or a declaration subscribed to under penalty of perjury. See *Barkus v. Knirnschild*, No. 15-704, 2018 WL 1244515, at *7 (WD. Pa. Mar. 9, 2018) ("Defendant's expert report cannot be considered on summary judgment because is it unaccompanied by an appropriate affidavit or declaration.").

This requirement stems from *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989), a case interpreting Rule 56. In *Fowle*, the "substance of [an expert's] report was not sworn to by the alleged expert," and thus, the report was "not competent to be considered on a motion for summary judgment." *Good Ol School LLC v. Westchester*, 2024 WL 2866339 at *2 (E.D. Pa. 2024); See also, Accord, *Snead v. Bally's*, 700 F. Supp. 3d 203 (D.N.J. 2023) (Citing *Fowe*, and *Burrell v. 3M*, 2011 WL 5458324 at *1 n.1 (E.D. Pa. 2011) and Rule 56)); *Jorjani v. N.J. Institute of Technology*, 2024 WL 3599401 (D.N.J. 2024).

It is respectfully submitted that, if not standing alone, but certainly in combination, the above deficiencies warrant a denial of Defendant's Summary Judgment Motion.

**2.** **There are Substantive Reasons Why The Defendant's Motion For Summary Judgment Should Be Denied, Ab Initio.**

There are immutable principles which apply to federal summary judgment under Rule 56 which preclude summary judgment in a case such as this, even before this Court contemplates the arguments advanced by the Defendant in her motion.

**A.    <u>The Defendant's Unexplained Pointing Of The Critical MVR Footage In The Air To Avoid Recording In This Case, Constitutes Spoliation Which Should Result In The Court Entering Summary Judgment For The Plaintiffs, But, Even If Not, It Should Require, At The Very Least, An Adverse Inference Spoliation Charge To The Jury Which, Itself, Precludes Summary Judgment Here</u>.**

The Defendant's unexplained pointing of her critical MVR footage in a direction to avoid recording the instant interaction seriously prejudices the Plaintiff's and must be addressed by this Court.

On page 4 and 5 of the Defendants brief she argues that "the fact that the dash cam does not show Plaintiffs' vehicle improperly changing lanes, with no use of signal or weaving" should not preclude summary judgment because the Court may rely upon the Defendant's self-serving representations in that regard. It is distressing to read that the Defendant believes that the fact that she failed to take any steps to ensure that the critical MVR footage in this case recorded the interaction, could reasonably work to deprive the Plaintiffs of a jury by way of summary judgment. In truth, the opposite is the case. From this fact alone, the jury could render a verdict favorable to the Plaintiffs on each of Plaintiffs' Counts, based upon adverse inference charge, thereby precluding summary judgment – or this Court could do so on its own authority as an authorized sanction.

Arguably the most critical and objective, real-time evidence in this case is the footage of the Defendant's MVR taken on the day of the incident and which the Defendant reviewed to prepare herself for her deposition. Exhibit F, 43-44. Not only would it presumably reveal, as is its purpose, whether there was any basis for the Defendant to stop/seize the Plaintiffs' vehicle on the day in question, but it would also affect all the probable cause determinations as to the Defendant's conduct thereafter, including whether the remainder of the Trooper's testimony should be believed.

However, inexplicably, and with no attempted explanation, much less justification by the Defendant on this summary judgment record, the MVR footage which the Defendant reviewed prior to her deposition and swore under oath at that time, was being preserved (*Id*.), depicts the night sky, and not the interation as required.

Because of the ease with which digital recordings such as this can be destroyed, the Supreme Court found it necessary to promulgate amended Rule 37(e) in recognition of "the serious problem resulting from the continued exponential growth in the volume of [electronically stored] information. "<u>Fed.R.Crim.P</u>. 37(e) advisory committee's note to 2015 amendment.

Rule 37(e) now provides, in pertinent part:

> If electronically stored information that should have been preserved in the anticipation or conduct of

> litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court [may impose various sanctions].

*Id.*, *G.N. Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 1019) (quoting *Schmid v. Milwaukee Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994).

> If spoliation has occurred sanctions may be imposed under the court's inherent authority. As noted above, in determining what sanction is appropriate, courts in the Third Circuit consider both the spoliating party's degree of fault and the adverse party's degree of prejudice, as well as whether any lesser sanction would adequately remedy the loss of evidence. Possible sanctions for spoliation include suppression of evidence, an adverse inference, and attorney's fees, as well as case-dispositive sanctions in extreme cases.

*Bistrian v. Levi*, 448 F.Supp 3d 454, 467 (E.D. Pa. 2020) (citing *Mosaid Techs., Inc. v. Samsung Elecs. Co. Ltd.*, 348 F.Supp. 2d 332, 335 (D.N.J. 2004).

There is no question here that the Defendant had a duty to ensure this footage captured the action in front of her vehicle as it was intended. The same footage that she said under oath had been preserved, clearly this MVR footage is the 'beating heart' of this case. Rule 37(e) applies to "electronically stored information that should have been preserved in the anticipation or conduct of litigation." Fed.R.Civ.P. 37(e). A party "is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." *Mosaid Techs., Inc.*, 348 F. Supp. 2d 335. Here it was not only reasonably foreseeable that there would

be litigation but, litigation had been ongoing for more than a year when the footage provided shows apparently the black sky.

Weighing the above three *Bistrian* factors which the Third Circuit has indicated should be considered in imposing sanctions under Rule 37, *GN Netcome, Inc., supra.,* the Plaintiffs believe that they weigh very heavily in favor of entering an adverse judgment against the Defendant, which they hereby request. But, failing that, in the very least, the jury should be directed to apply an adverse inference against the Defendant in this case. Even though the Plaintiffs would argue that any lesser sanction other than entering an adverse judgment would not serve to deter such conduct by others in the future, it cannot be argued that an adverse inference, (the least sanction available) in this instance would not, by its very nature, permit a jury to find in the Plaintiffs' favor on Plaintiffs' claims, thereby defeating summary judgment.

The courts must protect the integrity of their proceedings and the administration of justice when a party permits relevant evidence to be destroyed, lost or altered in some way. And, the victim of evidence unavailable due to such spoliation is expressly entitled to pursue multiple sanctions against the offending party which range from dismissal, down to the least harsh sanction of an "adverse inference" in a charge to the jury.

At the least, the Plaintiff should be entitled here to an adverse inference charge from which the jury could render a verdict in their favor, thereby precluding Defendant's summary judgment motion here.

Importantly, if not parenthetically, although a jury in this case could reasonably conclude otherwise, spoliation can be accidental. *Scott v. IBM Corp.*, 196 F.R.D. 233, 248-49 (D.N.J. 2000); *Quaglietta v. Nissan*, 2000WL 1306791, at *2-3 (D.N.J. 2000); *Mosaid Technologies Inc. v. Samsung*, 348 F. Supp. 2d 332, 337-338 (D.N.J. 2004).

It should also be kept in mind that, as a general rule, spoliation includes both "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Victor v. Lawler,* Civ. No. 3:08-CV-1374, 2012 WL 1642603, at *6 (M.D. Pa. May 10, 2012) (quoting *Fortune v. Bitner*, No. Civ. 3:CV-01-0111, 2006 WL 839346, at *1 (M.D. Pa. Mar. 29, 2006)), aff'd 520 F. App'x 103 (3d Cir. 2013). The Court's authority to impose sanctions for spoliation stems from both the Federal Rules of Civil Procedure and the Court's inherent authority to sanction litigants for misconduct. *MOSAID Teals. Inc. v. Samsung Elecs. Co*., 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (citing *Scott v. IBM Corp*., 96 F.R.D. 233, 247 (D.N.J. 2000)); *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991) (noting courts' inherent power to impose sanctions for misconduct before the court). The decision to impose sanctions

is a matter committed to the Court's sound discretion. *Bozic v. City of Washington*, 912 F. Supp. 2d 257, 266 (W.D. Pa. 2012).

Because the MVR recording would constitute real-time evidence of what Trooper Davis actually observed with regard to Mr. Zelechiwsky's operation of his vehicle, it is fair to say that no more critical evidence could exist to prove the Plaintiffs' argument that he operated his vehicle in full compliance with the law – providing no probable cause for the Defendant's vehicle stop. Since the vehicle stop precipitated all of the Defendant's unconstitutional acts, the degree of prejudice suffered by the Plaintiffs due to the negligent alteration of the MVR video footage could not be potentially greater. "[T]he degree of prejudice suffered to the opposing party" is a critical consideration for the court in imposing the particular degree of sanctions, *Duong v. Benihana National Corp.*, 2022 WL 1125392 at *3 (3d Cir. 2022) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F. 3d 76, 79 (3d Cir. 1994).

Significantly, nowhere in the summary judgment record has the Defendant explained away, much less justified, the fact that the most relevant real-time evidence of whether the Defendant had any probable cause for her stop/seizure of the Plaintiffs' vehicle, and all the actions which she took thereafter, is effectively unavailable to the Plaintiffs to prove their case, or for this Court and a jury to properly consider.

**B.** **The Plaintiffs' Two Expert Reports, And The Existence Of Defendant's Conflicting Expert Report, In And Of Themselves, Preclude Summary Judgment As A Matter Of Law.**

Federal summary judgment Rule, F.R.Civ.P. 56, specifically permits a party to resist summary judgment by an affidavit or declaration. Rule 56(c)(4).

Plaintiffs' two verified expert reports (Exhibit "K", Dr. John Peters and Exhibit "P", Thomas Sexton), when coupled with the evidence of record supporting their opinions (which evidence is specifically referred to in their reports), may not only rebut Defendant's claim for summary judgment (or qualified immunity for that matter) but, standing alone, form a basis upon which a jury could render a verdict for the Plaintiffs on each of Plaintiffs' claims (see also, *Plaintiff's Response To Defendants' Statement Of Facts*). The Third Circuit has expressly found such verified expert reports to be a sufficient means to overcome summary judgment in *Halsey v. Pfeiffer*, 750 F.3d 273, 309 (3d Cir. 2014). In *Halsey*, the Third Circuit adopted the Ninth Circuit's holding in *Thomas v. Newton Int'l Enter*, 42 F.3d 1266, 1270 (9th Cir. 1994), which established,

> that expert opinion created material dispute when included with other evidence, and noting that it is "itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."

This of course means that in the case *sub judice*, the Plaintiffs' two comprehensive expert reports, standing alone, should constitute sufficient cause to deny the Defendant's summary judgment motion *ab initio*. But further still, the Third

Circuit has also stated very clearly that dueling experts (which we have here), by their very nature, create a genuine issue of material fact which precludes summary judgment in cases such as the present one.

> Conflicting experts reports create a genuine issue of material fact which precludes summary judgment. *1.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, 2008 WL 269476, at *6 (E.D. Pa. Jan. 20, 2008), citing *Hill v. Lamanna*, 2007 WL 777007, at *12 (W.D. Pa. Mar. 12, 2007), citing *Goldman v. Standard Ins. Co.*, 341 F. 3d 1023, 1036 (9th Cir. 2003) ("Who is correct in the battle of experts is not for us to decide. We do conclude, however, that [plaintiff's] expert evidence is sufficient to deny standard summary judgment").

*Callahan v. A.E.V., Inc.*, 182 F.3d 237, (3d Cir. 1999). See also, *In Re Biogen*, 2018 WL 3586271 (D.N.J. July 26, 2018. *In re Sorin 3T Heater-Cooler Sys. Prod. Liab-Litig.*, 231 WL 8016522 (M.D. Pa. July 19, 2021) ("When issues turn on opposing expert reports, 'a genuine issue of material fact patently exists preventing summary judgment.'").

In the case *sub judice*, the Plaintiffs have filed, by way of attached affidavits, the expert reports of Dr. John Peters, and Thomas Sexton (See Exhibit K & P) which, standing alone, preclude the Defendants' motion for summary judgment. *Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp*, 143 F. App'x 320, 329-30 (Fed. Cir. July 25, 2005) (finding "expert testimony sufficient to raise a genuine issue of material fact resisting summary judgments"). Moreover, both reports clearly conflict with Defendants' expert report from Daniel Linskey (See, Exhibit J), thereby raising

38

genuine factual issues that "make summary judgment inappropriate." *B-K Lighting, Inc., v. Fresno Valves & Castings, Inc.*, 375 F. App'x 28, 32 (Fed. Cir. Apr. 28, 2010); *In Re Biogen*, supra, 2018 WL 3586271, at *9.

C.    **The Same Factual Disputes Which Preclude The Defendant's Request For Summary Judgment Also Preclude Her Request For Qualified Immunity.**

It is clear that before analyzing the Defendant's claim to qualified immunity pursuant to the two-prong examination required (see, qualified immunity, discussion, infra), a court must examine whether the issue of qualified immunity is proper for a pre-trial (summary judgment) application. Here, the Defendant is not entitled to qualified immunity as a matter of law because enduring disputes over material facts pertinent to the immunity question still require a jury to decide those facts. See, *Curley v. Klein*, 298 F.3d 271, 278 (3d Cir. 2002).

In fact, a court's reliance upon a "disputed finding of probable cause to grant defendant's qualified immunity" will be "reversed". *T.S. v. New Jersey State Police*, 2022 WL 2821580 at *10 (App. Div. 2022) (citing *Masgleski v. Orabani*, 330 N.J. Super. 10, 24 (App. Div. 2000)).

3.    **The Defendant's Arguments For Summary Judgment Rebutted.**

A.    **The Existence Of Probable Cause In §1983 Cases Is A Question Of Fact For The Jury, Which, Accordingly, Precludes The Summary Judgment Which The Defendant Seeks Regarding The Plaintiffs' §1983 Claims.**

Plaintiffs assert three separate claims for false arrest, false imprisonment, and unreasonable seizure. However, the claims are not distinct. "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "False arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make arrest." *Padilla v. Miller*, 143 F. Supp. 2d 479, 489 (M.D. Pa. 2001) (quoting D. Dobbs, The Law of Torts 67 (2001)). "Because false arrest is a type of false imprisonment, the claims may be treated together." *Ingram v. Lupas*, NO. 3:07-CV-02259, 2009 WL 249788, at *7 (M.D. Pa. Feb. 3, 2009). Furthermore, "[a] claim under §1983 for false arrest/false imprisonment is grounded in the Fourth Amendment guarantee against unreasonable seizures." *Kokinda v. Breiner*, F. Supp. 2d 581, 593 (M.D. Pa. 2008) (footnote omitted) (citing *Garcia v. Cty. Of Bucks*, 155 F. Supp. 2d 259, 265 (E.D. Pa. 2001)); see *Baskerville v. City of Harrisburg*, 2020 WL 108421, at *4 (Pa. M.D. Jan. 9, 2020) ("The Fourth Amendment ... protects individuals from unreasonable searches and seizures ... [and] this protection applies to false arrest and false imprisonment by state actors, constitutional torts that 'overlap' and are often referred to together as false imprisonment.") (citations omitted).

Such a claim requires the plaintiff to show "that the arresting officer lacked probable cause to make the arrest." Id. "Probable cause exists when the totality of

facts and circumstances are sufficient to warrant an ordinary prudent officer to believe that the party charged has committed an offense." Id.; see, *Orsatti v. N J. State Police*, 71 F.3d 480, 382 (3d Cir. 1995).

The Defendant's motion for summary judgment as to the Plaintiffs' Fourth Amendment Claims (Count I through IV of their Complaint) is predicated solely upon the Defendant's asserted existence of probable cause, which she claims justifies each of her actions complained about *sub judice*. Specifically, the Defendant asserts that according to her testimony, she had probable cause (or in the case of the traffic stop, probable cause in the form of "reasonable suspicion") to stop, seize, arrest and prosecute the Plaintiff, Mr. Zelechiwsky and probable cause to search the Plaintiffs' vehicle. Unfortunately, the Defendant faces two impenetrable hurdles. It is not <u>her subjective</u> beliefs as to probable cause that are considered but, the objective beliefs of a reasonable officer standard, that applies. And, here, in the summary judgment context, (as stated in the "Summary Judgment Standard of Review" above), it is the Plaintiffs and Plaintiffs' evidence which must be believed and considered by the Court.

It is clear that probable cause may not be established simply by showing that the officer who made the challenged arrest or search subjectively believed that she had grounds for her action. As the Supreme Court emphasized in *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964):

> *We* may assume that the officers acted in good faith in arresting the petitioner. But "good faith on the part of the arresting officers is not enough." * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.

*Id.*

The probable cause test, then, is an objective one. This is further reflected in the fact that the Supreme Court has repeatedly said that in order for there to be probable cause, the facts must be such as would warrant such an objective a belief by "a prudent man," *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) "a man of reasonable caution," *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) or "a reasonably discrete and prudent man." *Dumbra v. United States*, 268 U.S. 435, 45 S.Ct. 546, 69 L.Ed. 1032 (1925). "The scheme of the Fourth Amendment," said the Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts

available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate'?"

Simply, what this means is that "the mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this Court, which must independently scrutinize the objective facts to determine the existence of probable cause." *U.S. ex. Rel Senk v. Brierley*, 381 F.Supp. 447 (M.D. Pa. 1974).

And, what this particularly means in the summary judgment (or qualified immunity) context presented here is that, if after viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could possibly conclude that Defendant Davis did not have objective proof of probable cause to stop the Plaintiffs' vehicle ("reasonable suspicion"), to search the Plaintiffs' vehicle and its contents, to arrest the Plaintiff, or to prosecute the Plaintiff, summary judgment on each such causes must be denied.

Further, the Third Circuit could not have spoken more clearly, when it stated that in a §1983 case such as this, that the Defendant cannot predicate a motion for summary judgment upon the question of the existence of probable cause:

> It is well-established in the Third Circuit that 'the existence of probable cause in Section 1983 actions is a question of fact and therefore, <u>must be decided by the jury</u>. *Russoli*, 126 F. Supp. 2d at 840.

*Sherwood v. Malvihill*, 113 F. 3d 396, 401 (3d Cir. 1997) (emphasis supplied).

Even if this flatly proscriptive rule in §1983 cases were not to exist, the Defendant would still not be able to demonstrate, in the presence of all the evidence on the summary judgment record, when viewed in the light most favorable to the Plaintiff, that there are not genuine issues of material fact which preclude summary judgment, because the resolution of that issue depends upon which version of the facts one accepts . . . the one claimed by the Defendant or, that set forth under oath by the Plaintiffs, their two experts, their two eye witnesses, the Defendant's own admissions and, the body cam footage (no matter how obscured) which contradicts the Defendant's version of the pre-seizure, pre-arrest, pre-search events. When just one of these sources is capable of belief by a jury, probable cause is an issue which the jury alone must decide. See, *Montgomery v. DeSimone*, 159 F. 3d 120, 124 (3d Cir. 1998); *Boseman v. Upper Providence Twsp.*, 680 Fed.Appx. 65, 68-69 (3d Cir. 2017); *Merkle v. Upper Dublin School Dist*, 211 F. 3d 782, 788-89 (3d Cir. 2000); *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 638 (D.N.J. 2011); *Groman v. Township of Manalapan*, 47 F. 3d 628, 635 (3d Cir. 1995).

Accordingly, the Defendant's motion for summary judgment based upon the contested factual issue of probable cause (as set forth in detail in the Plaintiffs' Statement of Material Facts here and as set forth in their Response to Defendants

Statement of Material Facts) as to Count I-IV of Plaintiffs' Complaint [2] must be denied as a matter of law.

(2) Factual Dispute

Even if the law were not as expressly stated as above, the Plaintiffs wish to briefly explain why the Defendant has failed to carry her summary judgment burden of proving that there is no genuine issue of fact as to whether her traffic stop constituted an unlawful seizure or whether Mr. Zelechiwsky was subjected to a false arrest and unlawful imprisonment.

### a. **The Plaintiffs' Traffic Stop Constituted An Unlawful Seizure, Or At Least The Summary Judgment Record Presents A Genuine Issue As To That Fact.**

The Defendant <u>expressly acknowledges</u> that, the Plaintiffs were seized as they have alleged, and the evidence makes that clear because:

> "A traffic stop, however brief, constitutes a seizure under the Fourth Amendment and is subject to review for reasonableness", quoting *United States v. Hunter*, 88 F. 4th 221, 224 (3d Cir. 2023) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1966)].

<u>Defendant, Trooper Ashley Davis' Brief In Support of Motion for Summary Judgment</u>, Doc. 52-2, p.7 (Hereafter, "Defendant's Brief")

Unfortunately, the argument she makes throughout her Brief (starting here) is that she is entitled to summary judgment <u>based upon her testimony, and not the summary judgment record evidence presented by the Plaintiffs as the nonmoving</u>

---

[2] And, as to its qualified immunity assertion discussed hereinafter, as well.

parties. And, in so doing, she argues the inverse of what the law requires even after correctly citing it as follows.

> "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus, Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

*Id.,* p.3

Because all of the Defendant's self-serving statements of what she claims to have observed, and especially all the critical parts of her alleged observations which are <u>not</u> supported by and, are in fact directly contradicted by her own body camera recordings, and contested by the sworn testimony of the Plaintiffs, the Defendant's self-serving statements must respectfully be rejected  That is simply the nature of this motion and proceeding.

For the last 45 years, since the Supreme Court's decision in *Delaware v. Prouse*, 440 US 648, 99 S.Ct. 1391, 59 L.Ed. 2d 660 (1979), all members of law enforcement have been instructed that their traffic stops must be guided by the following pertinent principles to avoid Constitutional violations:

1. The Fourth Amendment protects individuals "against unreasonable searches and seizures." US Const. amend IV.

2. A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention

quite brief." *Prouse*, 440 US at 653. See also, *US v. Arvizu*, 534 US 266, 273, 122 S.Ct. 744, 151 L.Ed. 2d 740 (2002).

3. A traffic stop that is not demonstrated to be based upon an officer's reasonable, articulable, and individualized suspicion that criminal activity is afoot, is unconstitutional. See, *US v. Lowe,* 791 F.3d 424, 434 (3d Cir. 2015).

4. Where a traffic violation is the alleged basis for the stop, to be Constitutional, the burden is on the officer to produce evidence which would "objectively . . . support reasonable suspicion of a traffic infraction." *US v. Delfin-Colina*, 464 F.3d 392, 398 3d Cir. 2006). And, that is the case regardless if the officers involved actually had good "motivations" and, were well-intentioned. *Whren v. US*, 517 US 806, 813, 116 S.Ct. 1769, 135 L.Ed 2d 89 (1996).

It is common knowledge that traffic stops occur with great frequency. But, based upon recent data produced by the Stanford Open Policing Project (a unique partnership between the Stanford Computational Journalism Lab and the Stanford Computational Policy Lab), predicated upon data collected beginning in 2015, from 21 state patrol agencies and 29 municipal police department, comprising nearly 100 million individual traffic stops, we know that police pull over more than 50,000 drivers on a typical day, more than 20 million motorists per year. Because vehicle stops represent the most common police interaction with citizens, all law enforcement agencies, including the New Jersey State Police, emphasize in their

training and instruction the importance of conducting vehicle stops "by the book," in order to protect the most fundamental rights of American citizens to be free from unlawful searches and seizure and to avoid Constitutional violations for which the officer will be held strictly liable in a court of law.

Notwithstanding the importance, emphasis, and clear instruction of these universal vehicle stop principles to all members of law enforcement, set down nearly a half century ago by our U.S. Supreme Court, Trooper Davis violated the law by failing to produce evidence that would objectively support a reasonable suspicion that the Plaintiff committed the alleged traffic violation of weaving between lanes and failing to properly signal a lane change. See Statement of the Material Facts, numbered paragraphs 1 through 76.

Further, the Trooper's explanation of the reasons for her stoppage of the Plaintiffs' car, is both confusing and contradictory. She states that she found herself behind the Plaintiffs vehicle, travelling in the same direction on Route 55, "one or two vehicle lengths behind them" but, is unsure whether or not there was a vehicle travelling in between them. (Exhibit F, p. 38 and 39). There was Exhibit G, 21:35. The Trooper states that the Plaintiffs' vehicle was "traveling outside of his lane on multiple occasions." (Exhibit F, 59). But, she doesn't recall how many times this occurred or where it occurred. *Id.* 39-40. Moreover, the Trooper does not explain how, if there was an intervening vehicle that would have obviously obscured the

Plaintiffs' vehicle's alleged lane deviations, on a darkened roadway, without lighting, she could have witnessed such deviation, or even how she could have viewed the Plaintiffs' non-use of a turn signal when moving to the right lane. In fact, the Trooper does not explain why, if the Plaintiffs' vehicle was committing multiple lane violations, she didn't immediately activate her lights and pull the vehicle over but, instead waited for the alleged failure to use a turn signal when the vehicle allegedly moved into the right lane (which never occurred) Exhibit G, 21:35-21:36. (*Id.* 40) The Trooper also does not indicate how all that could have occurred in only approximately one minute of time. *Id.*, 38-39). And, she does not explain what happened to the intervening car, especially after the Trooper activated her lights while following directly behind that vehicle, and <u>not</u> the Plaintiffs' vehicle *Id*. And perhaps most incredible of all is the fact that she testified that, <u>she never witnessed the Plaintiffs' vehicle in any other lane other than the same left lane</u> that she was in when she first noticed the vehicle in front of her (two cars in front of her), (*Id.* 38-39, 40-48) until the very moment she activated her lights approximately <u>one minute later</u>. Id., at 38-39. At that moment, her body cam clearly confirms the Plaintiffs' vehicle to <u>still be in the left lane</u>, with one car in-between the Trooper's vehicle and the Plaintiffs' vehicle. And, it shows the Plaintiffs' vehicle then traveled from the left lane, <u>for the first time,</u> to pull into the right lane (and eventually onto the shoulder) in <u>response to</u>, the Defendants' lights and siren. Exhibit G, 21:35-36. In other words,

Case 1:22-cv-04994-ESK-AMD    Document 56    Filed 10/18/24    Page 50 of 90 PageID: 577

according to the Defendant, she first noticed the Plaintiffs' vehicle in the <u>left lane</u> when she found herself behind it in the same left lane. And, if she followed it in that same lane for one minute until she activated her lights (as she states, because it swerved and then "turned" without signaling), and yet, at that very moment her body cam still shows the Plaintiffs' vehicle to be in the same left-lane. A change of lanes, by the Defendant's own admission, and based upon the body cam footage, did not and, <u>could never have occurred</u> and <u>the necessity to signal also never could have occurred</u>. (The above scenario is testified to by the Defendant at Exhibit F, 38-41). Exhibit G, 21:35-36. Thus, there exists not only the absence of reasonable suspicion to stop the Plaintiffs' vehicle, but irrefutable evidence of no basis to stop the vehicle at all.

The Trooper's vehicle was also equipped with a Motor Vehicle Recorder (MVR) or dash cam (Exhibit F, 42) which recorded upon her activation of her red and blue lights, and for a reasonable period pre-activation – as all MVR's do. Her Stop Report confirms that her vehicle was equipped with a MVR. (Exhibit A). In fact, she testified not only that the MVR recording of the incident "was preserved" (showing the Plaintiff's claimed lane violations and failure to us a turn signal) but, she actually viewed "both" of the videos from the MVR and the body cam, prior to giving her sworn deposition testimony on February 20, 2024 in this case. Exhibit F, 43-44.

50

Despite repeated requests, and even a Court Order (Municipal Court) she failed to produce the MVR video until required to do so in discovery in this case. And, when she did so, the video footage is black, apparently depicting the night sky. Exhibit L. And, her Stop Arrest shows that the footage was never actually received by a MVR Reviewer. Exhibit A. The conclusion one must of course reach is that if her MVR footage had been properly recording it would not demonstrate any traffic violation to justify the stop of the Plaintiffs' vehicle. (See spoliation argument, *supra*).

Police vehicles that are assigned to traffic stops should, of course, be fully equipped with a MVR to record and memorialize the reasons for those stops. After all, the officer's justification for the vehicle stop is the foundation upon which all subsequent citations and/or searches and arrests are based and, are the most frequently contested portion of police-driver interactions. Video recordings are designed to remove any doubt as to whether there was a valid justification for the vehicle stop, search or arrest. Specifically, it will show whether the officer had specific, articulable facts which would support a reasonable suspicion of the commission of a traffic infraction – something that officers know is necessary before they can Constitutionally stop a vehicle lawfully using the country's highways and byways.

Even if a police vehicle is not equipped with a MVR (often recording, for a time, events occurring before activation), an officer's body-cam (body camera) should obviously be worn and activated from a seat adjusted to provide the same view through the windshield as the officer is experiencing. Neither was the case here. Accordingly, the Trooper's evidence in support of her claims that the Plaintiff was weaving and changing lanes without appropriate use of the turn signal, is non-existent. In fact, in the worst of cases, even during the period when the body cam is partially directed at the interior of the Trooper's car, she still had the ability – though not nearly as reliable – to orally and contemporaneously record the nature and extent of the weaving or turning without signaling, which she claimed she observing and, when and how many times and at what locations she allegedly observed violations by the Plaintiff occurring. She failed to do even this. Simply put, the Trooper has failed to present any objective evidence of the Plaintiff's alleged Vehicle Code Violations – all of which are steadfastly denied by the Plaintiff and his wife. And, any video which could establish articulable facts, if they existed, which would support a reasonable suspicion of the commission of a traffic infraction, either shows otherwise (i.e. the body cam) or shows a black recording.

And finally, it must be pointed out that beside the Defendant's fundamental failure to argue her motion based upon the actual legal standard, the Defendant makes arguments like: Trooper Davis wouldn't "stop Plaintiffs' vehicle for no good

reason" (Defendant's Brief, p. 11); the Plaintiff "could have been distracted" by such things as a dog in the back seat, mounted bikes on the back of the vehicle, his use of "waze" to navigate, etc., or he "could have" been tired from his long day of entertaining friends, etc. (Id., p. 12-13). These all constitute, post-stoppage, pure, improper speculation, and not "evidence" – no matter what the standard to be employed.

Because the Plaintiffs' evidence, consisting of, *inter alia*, the sworn testimony of the Plaintiffs that the Plaintiff had not consumed any alcohol and that no swerving or un-signaled lane change occurred, the Affidavits of the Heideckers swearing that the Plaintiff did not consume alcohol, was not impaired in any way and operated his vehicle safely when they witnessed him drive shortly before the instant vehicle stop, because the Trooper's Body Cam footage belies any aberrational driving by the Plaintiff and conflicts with Trooper Davis' version of the events, because Trooper Davis precluded the use of her MVR footage from being used by this case as further evidence of the absence of any reasonable suspicion to justify the traffic stop of the Plaintiffs vehicle and because of Plaintiffs' two expert reports which question the propriety of the stop based upon carefully viewing the body cam footage, and summary judgment record and contrasting it with standard police practices, there exists, at the very least, a genuine issue as to propriety of the instant traffic stop, and the Defendant's motion for summary judgment must be denied.

**b.** <u>Given All The Evidence Of The Plaintiff's Lack Of Intoxication And Impairment, A Reasonable Jury Could Conclude That, As Plaintiffs' Contend, There Was No Probable Cause To Arrest The Plaintiff For DWI, Thereby Precluding Summary Judgment</u>

The Plaintiffs' Statement of The Material Facts, *supra*, contain over 90 discrete facts supported by the summary judgment record (i.e. the Plaintiffs' sworn depositions, the sworn Affidavits/Declarations of Mr. and Mrs. Heidecker, the Plaintiffs' sworn Affidavits/Declarations of Plaintiffs' two experts, Dr. John Peters and Thomas Sexton, the body cam and black MVR footage from the Defendant's vehicle (constituting spoliation, *supra*), the Plaintiffs' Answers to Interrogatories, and the cited admissions appearing in the Defendant's own Deposition and Stop Report), when viewed in the light most favorable to the Plaintiffs, together with all favorable inferences to be derived therefrom, clearly would permit a jury to conclude that the Defendant lacked probable cause to arrest the Plaintiff (or for that matter, to seize the Plaintiffs' vehicle, search it and its contents, or to prosecute the Plaintiff - thereby precluding summary judgment. The Plaintiffs will not recite each of these discrete facts again here, but will simply incorporate them by reference.

Since at least the US Supreme Court's pronouncement in *California v. Hodari D.*, 499 US 621, 111 S.Ct. 1547 690 (1991), the "laying on of hands" on a person or the mere "show of authority" that in some way "restrain[s] the liberty of a person" constitutes the seizure of a person and that "merely touching a person" is sufficient

to constitute an arrest. See, *Torres v. Madrid*, 592 US 306, 141 S.Ct. 989 (2021) (tracing this definition from colonial times).

Trooper's initial stated defense to Mr. Zelechiwsky's claimed unlawful seizure and false arrest and imprisonment claims, that Mr. Zelechiwsky was not arrested because he was not "photographed or booked" and that "DUI is <u>not</u> a crime in New Jersey. (Davis, 62-63). She later recanted her assertion and admitted that DUI is a crime in New Jersey and, that she did state in her Stop Report (Exhibit A) that she <u>did</u> arrest the Plaintiff for DWI. Exhibit F, 62-62, 133).

Trooper Davis thus not only demonstrated a profound misunderstanding of what an unlawful seizure and arrest are but, after being confronted with the number of times that she recorded in her own paperwork (Stop Report, Exhibit A) that the Plaintiff was under arrest, she admitted that she arrested him. (Exhibit F, p. 133).

The New Jersey State Police, like all other state-employed police forces in the nation, are provided mandatory training and instruction, and rules and policies which dictate and delimit how they carry out their sworn duty to protect and serve the citizens over whom they exercise significant authority.

To safeguard the citizen from any abuse of that police power, all state police forces are constantly reminded, in their training and in their written policies, that the protections afforded all citizens by the United States Constitutions (and supplemented by their state's own Constitution) must be  scrupulously abided by

and, that if they are not, they will be held liable for the harms which naturally result from such Constitutional violations. See Expert Report of Dr. Peters, Exhibit K.

For the past 30 years, at least since the Third Circuit's pronouncement in a 1995 federal lawsuit brought against the N.J. State Police in *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995), all N.J. State Troopers are carefully instructed that they can only arrest a person if probable cause exists to do so, and that "[p]robable cause to arrest [only] exists when the facts and circumstances within the arresting officers knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." The case reinforces the fact that gut feelings, mere suspicion, conjecture and possibilities are not substitutes for probable cause. Further, New Jersey State Troopers know that arresting a citizen and depriving him or her of their liberty is a very serious undertaking that can have life-long repercussions which are severe, including imprisonment, fines, loss of driving privileges, loss of employment, loss of one's professional license, loss of child custody, inability to join numerous professions, including the armed forces, creation of mental distress and family disharmony, public humiliation, embarrassment and, individual estrangement. Consequently, N.J. Troopers are instructed that the probable cause decision to arrest is second only in significance to a decision to discharge their weapon, and requires the exercise of great care to avoid effecting an improper arrest. *Id*.

The confusing and contradictory nature of the Troopers explanation of the events on that day does not, end with the vehicle stop. The Trooper claims that she suspected Mr. Zelechiwsky of being under the influence, but admits that he promptly, appropriately and safely drove his vehicle over to the shoulder of the roadway without difficulty when she activated her lights and siren. Exhibit F, 93. And, that he operated his vehicle properly in the right lane when he entered it (Id. 40) and he pulled over in a safe manner and came to a complete stop off the roadway and on the shoulder *Id.* 43-44.

Trooper Davis also stated that she had a suspicion that Mr. Zelechiwsky was DUI because, when she shined her flashlight through a partially opened passenger side front window where Mrs. Zelechiwsky was seated, into the face of Mr. Zelechiwsky, she could see that "his eyes were bloodshot, glassy" (*Id*. 46) and later referred to them as "watery". *Id.* 98. This, of course, is a physical improbability in that Mr. Zelechiwsky was wearing glasses, which would have reflected the flashlight's beam. And, even if the science of reflection and refraction were somehow suspended here, it is clear that all person's eyes would appear "glassy" when a light is shined into them. Notably, the Trooper's whistle obscures the video at this time (*Id*. 47) However, the Trooper admits to knowing that glassy eyes need not be related to alcohol consumption, but could indicate, for example, a person being tired. *Id* 48.

Further evidence of Mr. Zelechiwsky's absence of impairment was also admitted to by the Trooper. The Trooper admits that Mr. Zelechiwsky "answered any questions that [the Trooper] asked of him" and did so "in a reasonable way, meaning that he wasn't stuttering or slurring his words or anything like that." (*Id.* 45-46) And, she confesses that Mr. Zelechiwsky cooperatively "provided [her] with his license, registration and proof of insurance or whatever other documentation [she] requested." (*Id*. 46).

These admissions certainly mitigate against any claim that Mr. Zelechiwski was acting under the influence of drugs or alcohol

The video also shows us several important non-impairment factors regarding the pre-arrest evidence which a jury could reasonably find negates probable cause. (See Exhibit "P" Thomas Sexton, p.1-3):

1. The driver, Mr. Zelechiwsky, responds in a normal, alert and polite way to the Trooper from the start to the end of their interaction.

2. The driver fully follows the directions of the trooper and is compliant, responsive, polite and never belligerent or confrontational.

3. The driver's oral responses are intelligent, understandable and appropriate throughout.

4. The driver's performance of his instructed field sobriety tests showed no evidence of intoxication and that any minor deviations which may be

occurred were to be expected, given his age, the lack of ambient lighting in the area, the slopped location where the tests were performed, in an environment where cars were whisking by at high speed, and where he was required to perform all of his field tests with the very close high beams of the Plaintiffs' vehicle striking him in the eyes.

5. Whether a driver is impaired in any way is often clear from his movements quite separate and apart from formalized balance testing (i.e. field sobriety tests). The degree to which a driver requires assistance in exiting his vehicle and/or entering the Trooper's vehicle, is highly indicative of whether the driver is under the influence. Here, the driver exits his vehicle with ease and required no assistance by the Trooper. Even more conclusive of Mr. Zelechiwsky lack of impairment was the ease with which he, <u>while handcuffed behind his back</u>, entered the rear of the Trooper's vehicle, without any assistance at all. A jury could reasonably conclude that a completely sober and much younger person could not normally perform as well, and know that, more than one such person has hit his head entering the rear seat – especially if he were over 6' tall, as is Mr. Zelechiwsky. See Exhibit (video and expert reports).

On the other hand, the video discloses that the Trooper's own performance on explaining and directing the field sobriety tests was less than acceptable.

1. The Troopers first job in conducting the tests is to select an appropriate test site which is flat and evenly elevated. While it is understandable that by choosing to conduct her field sobriety tests between patrol cars on the side of a busy highway, Trooper Davis would want to make sure that the driver is removed from the flow of passing traffic, the test was performed on that part of the shoulder of the roadway far too close to the adjoining grass. It is clear that directing or allowing the Plaintiff to perform his field sobriety tests parallel and so close to the grass edge of the shoulder, create such an uneven walking surface – with the foot closer to the midline of the road being substantially elevated – that none of the balancing tests would be considered fair, or accurate. Imagine the hobbled balance results of anyone with one leg shorter than the other being asked to walk or stand on the downside portion of a hill. And yet, the body cam footage, as observed as it was at times by the Defendant's wholly shows that the Plaintiff performed as well as one his age reasonably could be expected to under those circumstances. Perhaps that impediment to balance was the reason that the Trooper did not demonstrate the tests first – something which is also part of most standard instructions. The Trooper's selection of the test site was contrary to police standards for field sobriety testing.

2. The Trooper's instructions were not given with the clarity required by the testing regime. The Trooper also failed to demonstrate the tests herself which was only compounded by the improper area in which she demanded that they be performed. Nowhere is this perhaps more obvious than in her HGN instructions where she at first, instructed the Plaintiff to "follow your eyes" rather than to "follow the pen with your eyes without moving your head." (See video).

3. The Trooper also failed to give the important instruction of "do not begin until I instruct you to." By failing to give that instruction she not only failed to importantly determine whether a subject's comprehension was impaired (a police form of "Simon says"), but, made the Plaintiff stand heel to toe for an improperly extended period of time before she began the actual test – further eroding the tests integrity.

4. The body cam video footage shows that Mr. Zelechiwsky is made to perform the field sobriety tests with the high beams of his vehicle in his eyes and the Trooper improperly shining her flashlight into his eyes throughout her testing. As Trooper's are instructed, and as anyone knows who has had a bright light hit them in the eyes, the light creates a form of transient blindness and disequilibrium (that is, difficulty with balance) and must be scrupulously avoided when performing field

sobriety tests which are designed, in pertinent part, to test balance. See, Dr. Peters Report, Exhibit K. Thus, even if Mr. Zelechiwsky showed some degree of imbalance – something which did <u>not</u> appear on the body cam footage to be beyond normal in the field tests – a jury could find that it could not form the objective basis for a reasonable belief that an intoxicant was involved.

5. Field sobriety tests only have value when they are uniformly conducted and evaluated. Training and policy do not permit an officer to choose his or her own standards for a person passing or failing such tests. Instead, performance is mathematically scored pass or fail based upon the presence or absence of test "cues" – i.e. visual indicators. A jury could reasonably find, as the Plaintiffs and their experts contend, that the video shows that Trooper Davis' violated those standards by substituting her own personal evaluation for the uniform system she was supposed to employ and that Plaintiff passed the field sobriety tests (no matter how defectively deployed) and should not have been arrested and detained for DUI. (See Exhibit K, Dr. John Peters, and Exhibit P, Thomas Sexton, pgs. 1-3). As the footage shows, Mr. Zelechiwsky's only observable deficiency came when he was required to perform the one-legged stand on a significantly uneven surface, something he

admittedly could not perform on even an even surface given his age. Notably, the Trooper did not try to demonstrate the one-legged stand on the same surface. In fact, the only demonstration she provided in all her testing was taking three (3) steps total in the 18 step walk and turn test. See Exhibit G (Video) 21:39-40.

6. Notably, the Trooper's choice of field sobriety tests did not include one of the common tests which would not have been significantly affected by the sloped surface the Trooper selected, to wit, the finger-to-nose test. A jury could reasonably find that not giving this common standardized test under the extant circumstances further impoverished the Trooper's suspicion that the Plaintiff was under the influence.

The Plaintiffs assert that Mr. Zelechiwsky performed the HGN test as he was directed and, the Defendant's Body Cam Video's footage shows the Plaintiff following her instructions and none of the head movements the Defendant alleges invalidated the test, This also creates a genuine issue of material fact as to whether such movements occurred. Moreover, it is important to note that the Trooper's conduct of the HGN test was considerably substandard and, although the video provides an obscured view of the test, it is clear that the Trooper's decision to register the test as having been failed was premature and a test performance failure <u>on the Trooper's part</u>. The subject is told to follow the pen in front of him without moving

his head. As the bodycam video however discloses, the Troper actually tells Mr. Zelechiwsky to "follow your eyes". Moreover, if the tester moves the pen too far to the left or right – that is, beyond the subject's peripheral vision, the subject cannot follow it with his eyes without moving his head. Although the Trooper's whistle dangling in front of her body cam makes it difficult to see, that appears to be what happened here. Instead of terminating the test as she did (which test has nothing to so with testing the subject's peripheral vision) the Trooper should have shortened her arc of movement to avoid creating head movement (if in fact any head movement occurred). Instead, she improperly and prematurely marked the test a failure and/or "refusal to perform", depriving herself, Mr. Zelechiwsky, and the jury of important information which, like the breathalyzer, would have disproved intoxication. Moreover, when properly performed, the HGN test actually will produce its intended results within the arc of movement, <u>even though head movement may thereafter occur</u>. The fact that the Trooper admittedly saw no irregular ocular movements is an indication that the subject was not under the influence. It is not indicative of a failed test due to head movement.

     **c.**   **<u>Because (As Argued Supra) A Jury Could Find That Mr. Zelechiwsky Was Subjected To An Arrest Lacking Probable Cause (i.e False Arrest) And, Because There Is No Dispute That He Was Detained As A Result Of That Arrest, His False Imprisonment Claim Also Precludes Summary Judgment</u>.**

In *Gorman v. Township of Manalapan*, 47 F. 3d 628, (3d Cir. 1995), in reversing the lower court's grant of summary judgment on a claim of false imprisonment as to a defendant police officer, the Third Circuit set forth perhaps its most succinct statement on false imprisonment and why it resists an assertion in a case such as the one *sub judice*.

> A false imprisonment claim under 42 U.S.C. §1983 is based on the Fourteenth Amendment protection against deprivations of liberty without due process of law. *Baker v. McCollan,* 443 U.S. 137, 142, 99 S. Ct. 2689, 2693, 61 L.Ed.2d 433 (1979). The Court in *Baker* made it clear an arrest based on probable cause could not become the source of a claim for false imprisonment. *Id.* at 143-44, 99 S. Ct. at 2694-94. On the other hand, where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest. *Thomas v. Kippermann,* 846 F.2d 1009, 1011 (5th Cir.1988). A false imprisonment claim under §1983 which is based on an arrest made without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures. *Barna v. City of Perth Amboy,* 42 F.3d 809, 820 (3d Cir.1994); *Guenther v. Holmgreen,* 738 F.2d 879, 883 (7th Cir.1984), *cert. denied,* 469 U.S. 1212, 105 S. Ct. 1182, 84 L.Ed.2d 329 (1985); *Weber v. Village of Hanover Park,* 768 F. Supp. 630, 634-36 (N.D.Ill.1991). If the jury found in plaintiffs' favor on the false arrest claim, it could also find that Groman suffered a violation of his constitutional rights by virtue of his detention pursuant to that arrest. *See Pritchard v. Perry,* 508 F.2d 423, 425 (4th Cir.1975) (holding "[t]hat an infringement of personal liberty such as follows from an unconstitutional arrest has resulted in but a short period of restraint ... manifestly cannot ... abort an aggrieved plaintiffs right of action under Section 1983."). We will reverse the grant of summary judgment on the false imprisonment claim as to police officer Kirkland.

*Id.*, 47 F. 3d at 636. Accord, *Saintil v. Borough of Carteret*, 2024 WL 3565308 at *6 (3d Cir. July 29, 2024) (false arrest application); *Sowell v. Altoona Police Department*, 2024 WL 1477082 at *3 (3d Cir. April 5, 2024) ("Similarly to state a false arrest claim, a plaintiff must allege that an arrest was made without probable cause.") (citing *Gorman*, 47 F.3d at 636.)

Because, as argued above, a jury could reasonably find that the Plaintiffs' arrest lacked probable cause, the fact that he was detained thereafter based upon that arrest, is not subject to dispute. The Plaintiff was physically seized, handcuffed, transported a significant distance in a patrol car while in hand cuffs, and taken to a detention room where he was handcuffed to a bench for more than one- and one-half hours (the vast portion of which occurred after he had been cleared of his DWI offense due to a zero-breathalyzer reading). And, Trooper Davis claimed that she had the "discretion" to detain the Plaintiff as she had. Exhibit F, 124. *Groman, Thomas, Barna, Sainfil, Sowell, supra.*

### d. A Genuine Dispute As To The Presence Or Absence Of The Requisite Probable Cause To Search The Plaintiffs' Vehicle And Its Contents, Also Precludes Summary Judgment Here.

Law enforcement officers are generally required by the Fourth Amendment to obtain a warrant before conducting a search. See, *Maryland v. Dyson,* 527 U.S. 465, 466 (1999). Nonetheless, under the "automobile exception" to the warrant requirement, law enforcement may conduct a warrantless search of a vehicle if there is "probable

cause to believe that the vehicle contains evidence of a crime." See *United States v. Donahue,* 764 F.3d 293, 299-300 (3d Cir. 2014) citations omitted). If there is a "fair probability" that evidence of a crime or contraband would be found in a vehicle, then probable cause to search the vehicle exists. See Id. at 301 (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). Whether probable cause exists is an objective determination based on the totality of the circumstances present at the time of the search. See, *United States v. Williams*, 413 F.3d 347, 353 n.6 (3d Cir. 2005).

Trooper Davis admitted that she searched everything in the Plaintiffs' vehicle, including closed containers and things clearly belonging to Mrs. Zelechiwsky, like her purse. (Exhibit F, 118, 119, 134). More chillingly, the Trooper claimed that "anything in a motor vehicle I can search," and she did exactly that. (*Id.*).

Trooper Ashley Davis's February 20, 2024, sworn deposition demonstrates a shocking unawareness of her obligations as a member of law enforcement to avoid unlawful searches and seizures by her claim to have the right to do so based upon "DWI probable cause". *Id.* 118; Exhibit G, 21:35-21:54.

The "automobile exception" to the warrant requirement which Trooper Davis seeks to invoke, permits vehicle searches without a warrant it here is "probable cause" to believe that the vehicle contains evidence of a crime. *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir.1991), abrogated on other grounds by *United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir.2013) (en banc). (Emphasis

supplied). The government bears the burden of establishing the applicability of the exception, *United States v. Herrold*, 962 F.2d 1131, 1143 (3d Cir.1992), by a preponderance of the evidence, *United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987). *U.S. v. Donahue*, 764 F.3d 293, 299-300 (2014).

> "Whether in the arrest context or in a search context, it is the same standard of proof that controls: probable cause. See, *State v. Moore*, 181 N.J. 40, 45, 853 A.2d 903 (2004) (citing *State v. Smith*, 155 N.J. 83, 92, 713 A.2d 1033 (1988)); see also *United States v, Humphries*, 372 F. 3d 653, 659 (4th Cir. 2004) ("In both [arrest and search] cases,  the quantum of facts required for the officer to search or seize is 'probable cause' and the quantum of evidence needed to constitute probable cause for a search or seizure is the same." (citations omitted).
>
> * * *
>
> [However] . . probable cause to arrest and probable cause to search involve distinct and not necessarily identical inquiries. A finding of probable cause as to one does not mean that probable cause to the other must follow, nor does the lack of one compel a finding that here is a lack of support for the other.

*State of New Jersey v. Chippero*, 201 N.J. 14, 30-31 (2009).

In other words, while the probable cause to search, and the probable cause to arrest, are measured by the same objective standards, the two standards require separate inquiries and the facts necessary to establish probable cause may differ. This is no more obvious than in the case of the search of the Plaintiffs' motor vehicle here where, regardless of whether there is probable cause to stop a vehicle (i.e. seizure) or, probable cause to arrest, neither has an effect upon the determination of the probable cause to search the vehicle. Such a search requires the objective, non-

speculative showing, that there exists "a fair probability that contraband or evidence of a crime will be found" in the area to be searched. *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting *Illinois v. Gales*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)).

Thus, for example, where contraband is found on the driver, it may suggest that the next probable place to search for more contraband is the automobile. This is the essence of the probable cause necessary to search which adheres to the search of an automobile - in the same fashion as, for example, that an officer's plain view of contraband in the vehicle's interior may permit a warrantless search under certain circumstances. Here, however, there was no contraband found on the driver (or his passenger), or seen in "plain view", and consequently, there was no reason to believe that contraband would be found in the Plaintiffs' car when the Defendant unlawfully searched it and its contents, including closed containers like Mrs. Zelechiwsky's purse.

But even more obvious is the fact, that the N.J. Constitution, Article 1, Section 7 in particular, provides even more rights to Citizens than they have under the U.S. Constitution. Specifically, <u>in addition</u> to requiring probable cause to conduct a warrantless search of an automobile, to conduct a lawful search under the 4th Amendment to the U.S. Constitution, members of N.J. law enforcement, including of course the members of its State Police, must meet an additional requirement

before searching a vehicle without a warrant (under the apparent motor vehicle exception that Trooper Davis wrongfully relies upon here). Specifically stated, a warrantless vehicle search is only authorized <u>when police have probable cause AND where the circumstances giving rise to probable cause were unforeseeable and spontaneous</u>. *State of New Jersey v. Witt*, 223 N.J. 409 (2015). Trooper Davis' searched the Plaintiffs' vehicle because she was looking for "evidence of impairment" (Exhibit F, 118), "alcohol or drugs" (*Id*., 118-119), something unforeseen and spontaneous didn't come up. The Trooper's search constituted the very "fishing expedition" and "invasion of privacy" that the Fourth Amendment in general, and New Jersey Constitutional law in particular, was intended to prohibit. *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000).

Trooper Davis stated under oath that she stopped the Plaintiffs' vehicle specifically because she suspected that the operator was driving DUI. During her investigatory stop, she did not uncover anything "unforeseeable and spontaneous" that would authorize her search. In fact, she never mentioned that requirement in her testimony or Stop Report, claiming solely that she had a right to search the entire vehicle and its contents just because it was a "DUI Stop". Exhibit F, 118. Consequently, her search clearly violated well-established Constitutional limitations. *Witt* was decided nearly a decade ago and was well-established in the

law when Trooper Davis decided to search the Plaintiffs' vehicle in violation of her

training, the N.J. Supreme Court's, and the U.S. Supreme Court's clear dictates.

**e.** **There Exists A Genuine Issue Of Material Fact As To Whether There Was Probable Cause To Initiate Criminal Proceedings Against Mr. Zelechiwsky, Thereby Precluding Summary Judgment On His Malicious Prosecution Claim.**

To establish malicious prosecution in  violation of the Fourth Amendment, for

purposes of §1983, a plaintiff must establish (1) that the defendant initiated a

criminal proceeding, (2) that the criminal proceeding ended in the plaintiffs favor,

(3) that the defendant initiated the proceeding without probable cause, (4) that the

defendant acted "maliciously or for a purpose other than bringing the plaintiff to

justice," and 5) that the plaintiff suffered a deprivation of liberty as a result of the

proceeding. *Halsey v. Pfeiffer*, 750 F. 3d 273, 296-97 (quoting *Johnson v. Knorr*,

477 F.3d 75, 82 (3d Cir.2007); *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d

Cir. 200). See also, *Heck v. Humphrey*, 512 U.S. 472, 484-489 (1994). As with the

Defendant's other challenges, she challenges the third element of malicious

prosecution, to wit, that "the defendant initiated the proceeding without probable

cause". *Id.*, *Wang v. N.J. State Police*, 2024 WL 3580671 at *14 (N.J.D.C. July 31,

2024).

The Defendant challenges the Plaintiffs' malicious prosecution claim with

regard to the third element of probable cause only, which means that she is asserting

yet again, that no jury could conclude that the Defendant lacked probable cause to

support her (unsuccessful) prosecution of Mr. Zelechiwsky. This argument once again ignores the mountain of record evidence which, especially when taken as true, and viewed in the light most favorable to the Plaintiffs, together with all reasonable inferenced to be drawn therefrom, would clearly permit a jury to find the absence of probable cause to initiate criminal charges against the Plaintiff.

> [A] malicious – prosecution claim [ ] requires the plaintiff to prove he, among other things, that he suffered a deprivation brought with a reckless disregard for the truth in determining probable cause. See, *Geness v. Cox*, 902 F.3d 344, 356-57 (3d Cir. 2018).

*Marvillus v. Union County*, 73 F. 4th 185, 194 (3d Cir. 2023). See also, *McDonough v. Smith*, 139 S.Ct. 2149, 2156 (2019).

The Third Circuit has made it clear that motions for summary judgment, especially with regard to questions of probable cause to initiate criminal prosecutions, where the underlying facts are contested, are, once again, matters for a jury, not the courts, to decide.

> Courts should exercise caution before granting a defendant summary judgment in such cases when there is a question of whether there was probable cause for the initiation of the criminal proceedings.

*Halsey v. Pfeiffer*, 750 F. 3d 272, 200 (3d Cir. 2014).

This is because:

> Generally, the existence of probable cause is a factual issue [and it] certainly inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual

72

> disputes bearing on the issue or if reasonable minds could differ on whether he had probable cause for the institution of the criminal proceedings based on the information available to him.

*Id.* (internal quotations and citations omitted); see also, *Castro v. New jersey*, 521 F. Supp. 3d 509, 514, 522-23 (D.N.J. 2021).

When viewed in the light most favorable to the Plaintiffs, the Defendant's reckless disregard for the truth punctuates the entirety of her testimony including, by her own statements which are contradicted by her body cam footage; by her repeated under-oath assertions that she did not arrest Mr. Zelechiwsky, and by her reversing that critical statement when she was confronted with the fact that she admitted to arresting him on her own Stop Report; by her falsely noting on her Stop Report that the Plaintiff had admitted to consuming beer before driving when, in fact, his response to her inquiry of "have you been drinking?" was answered by Mr. Zelechiwsky "No.No.No." (as evidence by the Defendant's body cam recording, Exhibit G, 21:36-37); by her wearing a whistle to block her body cam footage; by her attempt to deny incontrovertible physical facts, such as her obvious inability to witness any lane or turn violations allegedly committed by Mr. Zelechiwsky because of her one minute of observation and the intervening vehicle captured on defendant's body cam; and, is further shown by her unavailability of usable MVR footage (so that it would not record the critical, infraction – free operation of the Plaintiffs' vehicle, and hence, would not reveal her unlawful stop of same).

Significantly, as stated, *infra.*, the law permits a jury to infer "malice" in federal malicious prosecution claims, from the mere absence of probable cause.

Moreover, in this case, a reasonable jury could not only conclude that the Defendant engaged in conduct that recklessly disregarded the truth of what happened on the day in question, and therefore that the Defendant engaged in "willful misconduct" (see, *infra.*), but that she maliciously and wantonly engaged in false testimony, false report writing, spoliation, material report omissions, in the instant case. See, *Black v. Montgomery Cty.*, 835 F. 3d 358, 362-63 (3d Cir. 2016) (involving significant fabrication and material omission of evidence in an arson prosecution). Mr. Zelechiwsky was of course acquitted in the prosecution which the Defendant brought maliciously, which she had continued for many months before a judge found him not guilty at a hearing. Exhibit F, 78-79.

As argued hereinbefore, a jury could readily conclude, as Plaintiffs so clearly assert, that (1) Mr. Zelechiwsky was arrested without probable cause in violation of the Fourth Amendment's guarantee against unreasonable seizures. (2) It is admitted that Mr. Zelechiwsky suffered an infringement of his personal liberty when he was handcuffed, transported to police headquarters and handcuffed to a bench in a detaining room for a period of approximately one- and one-half hours. And, (3) it was the aforesaid unconstitutional arrest which resulted in his period of restraint and

limitations on his liberty (including having to appear in person for a hearing in New Jersey).

When viewed in the light most favorable to the Plaintiffs, there is no question that this is precisely what occurred, and Trooper Davis cannot avoid having the Plaintiffs present these record facts to a jury, by seeking summary judgment.

**B. The Same Evidence Of Record, Which Supports Plaintiffs' §1983 Claims, Supports Its New Jersey Analogue, The New Jersey Civil Rights Act ("N.J.C.R.A.").**

The New Jersey Civil Rights Act ("NJCRA") N.J. Stat. Ann. §10:6-2(c) provides that, "[a]ny person who has been deprived of any substantive rights, privileges, or immunities secured by the constitution or laws of this state by a person acting under the color of law, may bring a civil action for damages." When it enacted the NJCRA, the New Jersey State Legislature, intended it as an analogue to 42 U.S.C. §1983, and sought to incorporate existing §1983 jurisprudence. *Perez v. Zagami*, 218 N.J. 202, 515, 93 A.3d 869 (2014); *Ramos vs. Flowers*, 429 N.J. Super. 13, 23, 56 A.3d 869 (App. Div. 2012) (stating that the NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights") (citation omitted). The Third Circuit has, in fact, adopted its analogous application as a matter of law. "The NJCA is interpreted as analogous to §1983" *Szemple v. Corr. Med. Servs.*, 493 F. App'x. 238, 241 (3d Cir. 2012) aff'd. 747 F. Appx. 73 (3d Cir. 2018); same, *Ortiz v. New Jersey State Police*, No. 16-7976, 2017

75

WL 3671307, at *2 (D.N.J. Aug. 25, 2017); Accord, *Estate of Roman v. City of Newark*, 914 F.3d 784, 796 n.5 (3d Cir. 2019). And, thus, the Plaintiffs' "claims under that statute rise and fall with [their] parallel Section 1983 claims". *Mervilus v. Union* County, 73 F. 4th 185, fn. 4 (3d Cir. 2019) (cutting *Estate of* Romas, 914 F. 3d at 796 n.5). Accordingly, the Plaintiffs hereby assert that as an analogue to their Section 1983 claims, the arguments made with regard to those claims and existing §1983 jurisprudence is incorporated herein as if fully set forth, *et extenso*, here.

**C. <u>The Defendant Is Not Shielded By The Doctrine Of Qualified Immunity Because There Exists At Least A Genuine Issue Of Material Fact As To Whether Her Conduct Violated Clearly Established Statutory Or Constitutional Rights Of Which A Reasonable Officer Would Have Known.</u>**

Defendant asserts that she is entitled to qualified immunity here.

"Qualified immunity is intended to shield government officials performing discretionary functions, including police officers, from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified Immunity will not act as a shield for "the official who knows or should know he is acting outside the law. "*Butz v.* Economou, 438 U.S. 478, 506-07 (1978); *Coles v.* Carlini, 162 F. Supp. 3d 380, 399 (D.C.N.J. 2015). And, a law enforcement officer will not be entitled to either qualified immunity or immunity under the NJTCA where a jury could conclude that he did not have probable cause to arrest the plaintiff and made deliberate

misrepresentations to justify his arrest. *Pomykacz v. Borough of W.* Wildwood, 438 F.Supp. 2d 504, 514-15 (D.N.J. 2006). A defendant has the burden to establish that she is entitled to qualified immunity. See *Beers—Capitol v. Whetzel,* 256 F.3d 120, 142 n. 15 (3d Cir.2001).

The qualified immunity analysis has two parts: (1) the court must "determine whether the facts, and inferences drawn therefrom, taken in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right." *McGreevy v. Stoup,* 413 F.3d 359, 364 (3d Cir. 2005) (citing *Saucier v. Katz,* 533 U.S. 194 (2001)); and (2) the court must "determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Id.* (citing *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir. 2000)). This step requires "that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent." F.3d at 366 (citing *Wilson v. Layne,* 526 U.S. 603, 615 (1999). It is the burden of a defendant official asserting qualified immunity to establish an entitlement to the same. *Kopec v. Tate,* 361 F.3d 772, 773(3r$^d$ Cir. 2004); *Beers—Capitol v. Whetzel,* 256 F.3d 120, 142 n.15 (3d Cir. 2001) (quoting *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir. 1989)).

Not surprisingly, as with §1983 actions, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury. *See Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (qualified immunity may turn on disputed issues of fact); *Karnes v. Skrutski,* 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is

frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination.") *Monterio v. City of Elizabeth,* 436 F.3d 397, 403 (2006). In sum, this Court should be guided by one of the most oft quoted paragraphs in this Circuit:

> Because we are applying this standard on a summary judgment motion, we must address to what extent questions of "reasonableness" can be resolved on summary judgment. Reasonableness under the Fourth Amendment resembles tort law in its attention to how a specific, concrete circumstance should affect an officer's judgment. This sensitivity to context suggests that regardless of whether objective reasonableness invokes a different and heightened standard from negligence, reasonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

*Abraham v. Raso,* 183 F.3d 279, 289-290 (3d Cir. 1990).

Accordingly, Defendants' motion for summary judgment based on an entitlement of qualified immunity should be denied because, as argued hereinbefore, there are clearly genuine issues of material fact regarding what occurred here, including serious issues of credibility which must be resolved by a jury. But, even if that were not the case, Defendant Davis does not meet the two-step test required by the Supreme Court.

As we have emphasized throughout this brief:

> Summary Judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law but only when the evidence is viewed "in the light most favorable to the non-moving party

> and [that party] is given the benefit of all reasonable
> inferences that can be drawn from the evidence."

*Mack v. Yost*, 63 F. 4th 211, 227 n.14 (3d Cir. 2023) (internal quote marks and quoted source omitted).

The Supreme Court has made it clear that this summary judgment standard applies to both prongs of the qualified immunity analysis:

> Our qualified-immunity cases illustrate the importance
> of drawing inferences in favor of the non-movement,
> even . . . [on] the clearly established prong of the
> standard.

*Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861 (2014); accord, *Peroza-Benitez*, 994 F. 3d 157, 165-166 (3d Cir. 2021).

As our Third Circuit Court has made abundantly clear, if the qualified immunity analysis requires the resolution of disputed facts, the court must postpone consideration of the immunity until a jury resolves those factual issues. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Monteiro v. City of Elizabeth*, 436 F. 3d 397, 405 (3d Cir. 2006).

The Defendant once again attempts to avoid a jury determination as to her liability in this case, this time, under the guise of "qualified immunity". Once again, her brief argument in this regard ignores the fact that at this summary judgment stage, she cannot base her claim for qualified immunity upon her contested version of the underlying disputed facts (including those facts favorable to the Plaintiffs which are supported by Defendant's own body cam footage, no matter how obscured

by her whistle the images may be). This additional attempt to avoid the scrutiny of a jury of her peers, must fail.

All of the causes of action for the Defendant seeks qualified immunity, that is, unlawful seizure, false arrest, illegal search and malicious prosecution, derive from the Fourth Amendment right to be secure from unreasonable searches and seizures. See, *Wheeler v. Wheeler*, 639 F. App'x 147, 151 (3d Cir. 2016) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Merkle v. Upper Dublin Sch. Dist.*, 211 F. 3d 782, 788-89 (3d Cir. 2000); US Constitution, Amendment IV. And, the Defendant does not contend that the right to be free from unlawful seizure, false arrest, illegal search and malicious prosecution were not clearly established decades ago - and sufficiently so as to defeat the "clearly established" second prong of the Defendant's qualified immunity defense.[3]

---

[3] By way of example only, almost three decades ago, the Third Circuit held that there "is no question that ... the right to be free from arrest except on probable cause was clearly established." See, Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995); see also, *Andrews v. Scuilli*, 853 F.3d 690, 705 (3d Cir. 2017) (same). The Third Circuit has also stated that "[p]olice officers clearly know that they need probable cause to arrest someone and we can assume that they know they face personal liability if they arrest someone without probable cause." See, *George v. Rehiel*, 738 F.2d 562, 583 (3d Cir. 2013). (Arresting a driver for Fourth Amendment, and a reasonable official would understand as much. *Cuvo v. DeBiasi*, 169 Fed. Appx. 688, 692 (3d Cir 2006) (officers is DUI arrests are not entitled to qualified immunity).

Additionally, numerous district courts in this circuit have defined, as a sufficiently specific, clearly established right for the purpose of analyzing a qualified-immunity defense, the right to be free from arrest except upon probable cause. See Donohue v. Rineer, No. 1:10-cv-01324, 2010 WL 51358 2, at *5 (M.D. Pa. Dec. 10, 2010) (adopting definition of clearly established right as the right to be free from an arrest on a warrant unless "supported by probable cause"); see also, e.g., Catalano v. City of Newark, No. 15-cv-04189, 2017 WL 6265090, at *11 (D.N.J. Dec. 8, 2017) (stating, "[t]here should be no doubt that the right to be free from arrest without probable cause is clearly established").

Rather, the Defendant contends that her actions did not violate those "clearly established" rights because she had probable cause to stop the Plaintiffs' vehicle, to seize (arrest) him and to prosecute him, to conduct a warrantless search the Plaintiffs' vehicle and its contents, and to prosecute him. Fortunately, as stated hereinbefore, where the facts which this Court must rely upon to make that determination in this summary judgment context, are those interpreted based upon the Plaintiffs' version of the facts and evidence, there is a genuine issue as to whether probable cause existed for any of the Defendant's acts or omissions, as has been argued at length hereinbefore.

A reasonable jury clearly could find that, when viewed in the light most favorable to the Plaintiffs, together with all favorable inferenced which could be deprived therefrom, the Plaintiffs' testimony disputing that there was any motor vehicle violation committed by Mr. Zelechiwsky, that he was not impaired in his driving in any way, that he had not consumed an alcoholic beverage of any kind, that he had satisfactorily performed his field sobriety tests, that he moved, conversed and responded to commands and appeared in all respects as any normal, unimpaired driver of his age would, and that said evidence was supported by the Defendant's body camera footage, Plaintiffs' two expert declarations/affidavits, and the affidavits of two additional eye witnesses to Mr. Zelechiwsky's lack of impairment in the hours immediately preceding his operation of the family vehicle (up to and including his

departure from the shore) just before the Defendant's vehicle stop; and, the sworn testimony of the Plaintiffs themselves, all establish that the Defendant's actions were not supported by probable cause and violated the Plaintiffs' well-established Constitutional rights on the day in question. And, therefore, as stated above, when the Defendants immunity depends upon disputed facts, it is not for a judge to decide. And, when viewed as true, this evidence precludes summary judgment when it comes to qualified immunity as well.

      **D.  <u>Because The Plaintiffs Have Presented Sufficient Evidence In The Record From Which A Jury Could Conclude That Defendant Davis Engaged In Willful Misconduct, Davis Is Not Entitled To Immunity Under The NJTCA Itself.</u>**

Under the NJTCA, "a public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J. Stat. Ann. §29:3-3. Good faith immunity is nonetheless overcome if the employee can be shown not to have acted in "good faith" or, for example, acted with "actual malice or willful misconduct". N.J.S.A. 59:38 and 59:9-2d.

Even if the Defendant could meet its other requirements, the N.J. State Tort Claims Act, N.J.S.A. 59:1-1, *et seq*, does not provide the good faith or other immunity, nor the pain and suffering limitations, as the Defendant contends in her brief. They simply are not available where, as here, a jury could reasonably find, viewing the facts and the evidence most favorable to the Plaintiffs, that the

Defendant acted with "actual malice" or committed "willful misconduct". See exceptions at N.J.S.A. 59:3-8 and 59:9-2d.

The Plaintiffs have alleged and presented evidence showing that not only did Defendant Davis engage in conduct which was objectively unreasonable and which constituted willful misconduct, but they have alleged and have shown, including by expert declarations, that Davis is liable for punitive damages for her reckless disregard of their Constitutional rights.

Contrary to the Defendants' first assertion, the actual malice component asserted in Plaintiffs' causes of action, as well as the jury's ability to find evidence of same from this summary judgment record, also relieve Plaintiffs "of the restrictions of the statutory pain and suffering threshold" of the limitation on the recovery of pain and suffering damages found in N.J.S.A. 59:9-2d. *Jobes v. Evangelista*, 369 N.J. Super. 384, 399-400 (2004); *Taglieri v. Moss*, 367 N.J. Super. 184, 196, 842 A.2d 280 (App. Div. 2004).

Contrary to the Defendants' second assertion, she is not entitled to the good faith exoneration of public employees accorded by N.J.S.A. 59:3-3, due to a jury's ability to find that same actual malice or willful misconduct, as the evidence here clearly and reasonably permits. *Jobes*, 369 N.J. Super. 400 (internal citations omitted).

And, identically, an actual malice or willful misconduct finding by a jury, will also result in the Defendant's "within the scope" loss of immunity under N.J.S.A

59:3-8, *Pitts v. Newark Bd. Of Ed.*, 337 N.J. Super. 331, 338-229, 766 A.2d 1206 (App. Div. 2001); *Jobes*, 369 N.J. Super at 395. In sum, a jury would clearly be permitted to find that the Defendant acted with "actual malice" or engaged in "willful misconduct" when it considers, *inter alia*, that the Defendant: engaged in a vehicle stop for alleged vehicle code violations that never occurred, and the absence of which are sufficiently depicted on Defendant's body cam, and were further prevented by the Defendant from being more clearly directly visible by a cam-blocking whistle which she wore, and her MVR footage which shows a black screen; fabricated field test findings that did not appear on the body cam footage; intentionally conducted sobriety field testing in an area and under conditions obviously inimical to proper testing (e.g. a seriously sloped shoulder with the bright lights of the Plaintiffs' vehicle shining directly in his eyes); kept the Plaintiff handcuffed to a wooden bench even after his breathalyzer test showed 00.00%; and, when the jury considers both verified expert reports which detail how significantly and how frequently the Defendant's conduct fell below the reasonable standards of performance and accountability expected of all similarly situated law enforcement officers. (Plaintiffs' Exhibits K and P).

And, finally, it must be remembered what "malice" is in this context. The Third Circuit has stated that "malice can mean ill-will or the use of a prosecution for an extraneous purpose or a lack of belief in the guilt of the accused." *Lippay v.*

*Christas*, 996 F. 2d 1490, 1503 (3d Cir. 1993). And, malice may also merely be inferred from the absence of probable cause. *Id.* At 1502 (citations omitted). There can be no doubt that, when taken as true, the Plaintiffs' evidence compels a finding of malice here.

**E.** **The N.J.T.C.A. Is Not Applicable To Plaintiffs' §1983 Claims, And Any Limitations On Punitive Or Compensatory Damages Found In The NJTCA Or The PDA Have No Effect On Plaintiffs' §1983 Claims For Which Such Damages Are Clearly Authorized And Appropriate For A Jury To Award Here**

While the jury's ability, upon proper instruction from this Court, to find that the Defendant here has engaged in willful misconduct thereby depriving the Defendant of any immunity under the NJTCA, is unquestioned, that no willful misconduct need be found by a jury before granting the Plaintiffs' relief on their §1983 claims or, denying the Defendant qualified immunity on Plaintiffs NJTC or §1983 claims. This is so, because the law is clear that, while the NJTCA may provide certain protections from State court claims, it does not shield the Defendant from Plaintiffs' federal civil rights claims brought under 42 U.S.C.A §1983. *Tice v. Cramer*, supra, 133 N.J. at 375. See also, *Fielder*, supra, 141 N.J. at 133, 661 A.2d 231. The federal statute creates a "species of tort liability" in which "a plaintiff must show a violation of a right secured by the Constitution or laws of the United States committed by a person acting under color of state law," and the federal Supremacy Clause will not yield to attempts at state limitation of these specifically recognized

federal Constitutional rights under §1983. See, e.g. *Kollar*, supra, 286 N.J. Super. at 472-73, 669 A.2d 845 (citing *Carey v. Piphus*, 435 U.S. 247, 253, 98 S. Ct. 1042, 1047, 55 L.Ed. 2d, 252, 258 (1978); *West v. Atkins*, 487 U.S. 42, 48-49, 108 S.Ct. 2250, 2254-55, 101 L.Ed, 2d 40, 48-49 (1988); *Kirk v. City of Newark*, 109 N.J. 173, 185, 536 A.2d 229 (1988)).

The N.J.T.C.A. not only cannot immunize the Defendant from Plaintiffs' §1983 Claims but, must be read and applied in accordance with Plaintiffs' §1983 Claims. See "Discussion", argument 3.B s*upra*.

The New Jersey Civil Rights Act ("NJCRA") N.J. Stat. Ann. §10:6-2(c) provides that, "[a]ny person who has been deprived of any substantive rights, privileges, or immunities secured by the constitution or laws of this state by a person acting under the color of law, may bring a civil action for damages."

When it enacted the NJCRA, the New Jersey State Legislature, intended it as an analogue to 42 U.S.C. §1983, and sought to incorporate existing §1983 jurisprudence. *Perez v. Zagami,* 218 N.J. 202, 515, 93 A.3d 869 (2014); *Ramos vs. Flowers,* 429 N.J. Super. 13, 23, 56 A.3d 869 (App. Div. 2012) (stating that the NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights") (citation omitted).

The Third Circuit has, in fact, adopted its analogous application as a matter of law. "The NJCA is interpreted as analogous to *§1983"Szemple v. Corr. Med. Servs.,* 493

F. App'x. 238, 241 (3d Cir. 2012) aff'd. 747 F. Appx. 73 (3d Cir. 2018); same, *Ortiz v. New Jersey State Police,* No. 16-7976, 2017 WL 3671307, at *2 (D.N.J. Aug. 25, 2017); Accord, *Estate of Roman v. City of Newark,* 914 F.3d 784, 796 n.5 (3d Cir. 2019).

Accordingly, the Plaintiff has incorporated all the paragraphs, which set forth Plaintiffs' causes of action under 42 U.S.C. §1983 and all the damages, injuries and losses associated therewith, into their NJCA claims and damages because the principle purpose of §1983 is to compensate for harm caused by unconstitutional conduct. *Farrar v. Bobby*, 506 U.S. 103, 112, 113 S.Ct. 566 (1992).

Individuals may bring civil claims for damages resulting from violations of their Fourth Amendment rights under § 1983. See, *Parkhurst v. Trapp*, 77 F.3d 707 (3d Cir.1996); *Gillard v. Schmidt*, 579 F.2d 825 (3d Cir.1978). The Third Circuit has recognized that "Section 1983, Title 42 U.S.C.A., is completely silent as to the kind of damages which may be awarded an injured plaintiff in a civil right suit", *Basista v. Weir*, 340 F.2d 74, 85 (3d Cir.1965), and the Supreme Court has held that §1983 damages "may include ... out-of-pocket loss and other monetary harms." *Memphis Cnty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). Actions brought under §1983 are reviewed like common law tort claims. See, *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L. Ed. 383 (1994); *Carey*

*v. Piphu*s, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Olsen v. Correiro*, 189 F.3d 52 (1st Cir.1999); *Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir.1998).

Because the principle purpose of §1983 is to compensate for harm caused by unconstitutional conduct. *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S.Ct. 566 (1992), the Defendant's attempt at eliminating the Plaintiffs' claims for the harms suffered here is simply inconsistent with the law and impermissibly contravenes the fundamental purpose of §1983.

> Plaintiff are entitled to recover for the restrictions on their liberty, the interruption of their travel, the indignities they suffered, and the humiliation they endured. . . [this includes] the impact on the plaintiffs while they were being detained and the unlawful search was being conducted . . . the period of time during which plaintiffs' Fourth Amendment rights were violated.
>
> Moreover, [f]actors pertinent to a claim for damages for false imprisonment include the length and condition of the detention . . . the amount of any lost earnings, humiliation, emotional distress, and injury to reputation.

*Padilla v. Miller, A Pennsylvania State Trooper*, 143 F. Supp. 2d 479, 494 (M.D. Pa. 2001) (internal quotations omitted).

As the Third Circuit made abundantly clear in *Hector v. Watt*, 235 F. 3d 154, 157 (3d Cir. 2000);

> Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy – including (where appropriate) damages for physical injury, property damage, injury to reputation, etc . . .

*Id.*, (adopting and quoting from the same standard adopted in *Townes v. City of New York*, 176 F. 3d 138, 148 (2d Cir.), cert. den., 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed. 2d 311 (1999).

The Defendant also implies that the absence of an expert witness to establish the emotional harm the Plaintiffs claim, because they did not seek psychological treatment, is an equally false statement of Third Circuit law. Simply put, neither expert testimony nor treatment is required to sustain an award of emotional distress damages (i.e. the non-economic damages the Defendant refers to). See, *Bolden v. Southeastern Pennsylvania Transportation Authority*, 21 F.3d 29, 35-36 (3d Cir. 1994).

This analysis includes punitive damages which are clearly applicable here under §1983. Although punitive damages are not available against the municipal entities and against the Defendant in her official capacity, Plaintiffs may seek punitive damages against the Defendant in her individual capacity. The Third Circuit has stated that for a plaintiff in a § 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages may also be allowed if the conduct is intentional or motivated by evil motive, but the Defendant's action need not necessarily meet this higher standard. *Savarese v. Agriss,* 883 F.2d 1194, 1204 (3d Cir.1989) (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). "Thus, for a § 1983 plaintiff to qualify for a punitive damages, a "defendant's conduct must be,

at a minimum, reckless and callous"-it is not essential that defendants meet the higher standard of intentional or evil motive. *Savarese v. Agriss,* 883 F.2d 1194, 1204 (3d Cir.1989).

As stated above in the prior section regarding "malice" or "willful misconduct", the actions of Trooper Davis meet the "reckless" or "callous" standard for §1983 punitive damages standard for the very same reasons cited above.

## V.   CONLCUSION

For the reasons set forth hereinbefore, it is clear that the Defendant cannot be afforded the right to avoid explaining her actions to a jury in this matter, and that the Plaintiffs cannot be denied their right to trial. The Defendant's Summary Judgement Motion must be denied.

Respectfully Submitted,

Dated:10/18/24                          By:   /s/ P. Joseph Nicola
                                              P. Joseph Nicola, Esquire
                                              N.J. Attorney I.D. # 02531980
                                              1420 Locust Street, Suite 140
                                              Philadelphia, PA 19102
                                              (856) 229-2454
                                              jnicola@nicolalaw.com
                                              Attorney for Plaintiffs