Exhibit "J"



Expert Witness Report NO 22-cv-04005-CPO-AMD

Prepared for Diana R. Brocco, Esq.

BOHDAN J. ZELECHIWSKY :
and :
LISA A. ZELECHIWSKY, :
Plaintiffs, :
vs. :
TROOPER ASHLEY DAVIS, :
and :
TROOPER JOHN DOE :
Defendants.

**August 1, 2024**

**Privileged and Confidential**

Certain Kroll companies provide investigative services.
See www.kroll.com/licensing for state licensing information.

Kroll Boston
125 High Street, 02110
Boston, Massachusetts, 02360
USA
Kroll.com



**Privileged and Confidential**

Restricted Use Warning

This report was prepared by Kroll at the request of the client to whom it is furnished pursuant to specific terms of engagement. This report, and the information contained herein: i) are strictly confidential and may be privileged; ii) may contain personal data of individuals which is being processed for the purpose set out in the terms of engagement; and, iii) are intended solely for the private and exclusive use of the client only for the purpose set out in the terms of engagement. Any other use of this report is strictly prohibited. Any communication, publication, disclosure, dissemination or reproduction of this report in whole or in part to third parties without the advance written consent of Kroll is not authorized. Kroll assumes no direct, indirect or consequential liability to any third party for the information contained herein, its interpretation or applications, or for omissions, or for reliance by any third party or other person thereon. To the extent our findings provided in this report are based on a review of publicly-available records or rely on information provided by or on behalf of the client or received from third-party financial, industry or other sources, such findings, as presented, rely upon the accuracy and completeness of those records or information, which, unless expressly stated, have not been corroborated or independently verified by Kroll. Statements herein concerning financial, regulatory or legal matters are given by Kroll as risk consultants and may not be relied upon as financial, regulatory or legal advice, which Kroll is not authorized to provide. All such matters should be reviewed with appropriately qualified advisors in these areas. This report may also contain material, non-public and/or inside information for the purposes of market abuse or insider dealing regulations or laws in the UK, US and elsewhere. Such regulations/laws may impose restrictions on what the client may do with the information or whilst in possession of the information. It is the client's responsibility to assess whether or not any information in this report constitutes material non-public and/or inside information and to comply at all times with applicable market abuse or insider dealing regulations/legislation.



## Contents

1   Introduction ...................................................................................................1

2   Curriculum Vitae ............................................................................................3

3   Materials Reviewed.......................................................................................12

4   Timeline Review ................................................................Error! Bookmark not defined.

    4.1     **Error! Bookmark not defined.**

5   Video Camera Analysis ...................................................................................13

    5.1     Dash Camera Analysis ............................................................ 13

    5.2     Body Worn Camera Analysis.................................................. 13

    5.3     Gallagher's Body Worn Camera Analysis............................. 18

    5.4     Davis's Body Worn Camera Analysis Vehicle Search. ......... 20

6   Depositions ...................................................................................................21

7   Findings and Conclusions ..............................................................................45

    DISCUSSION AND OPINIONS .........................................................................45

8   Conclusions ...................................................................................................49



# 1    Introduction

This report represents Kroll Managing Director Daniel Linskey's expert analysis under Federal Rule 26(a)(2)(F) for the case of Bohdan Zelechiwsky (Zelechiwsky) and Lisa Zelechiwsky (Mrs. Zelechiwsky) vs. Trooper Ashley Davis (Davis) and Trooper John Doe (at the time of this report John Doe has been identified as Trooper Gallagher (Gallagher) of the New Jersey State Police.

On 08/10/2020 after spending a weekend at their beach house in Cape May, New Jersey Zelechiwsky and Mrs. Zelechiwsky were driving home in Pennsylvania in their Ford F-150 pickup truck. At approximately 9:30 p.m. Zelechiwsky was the operator of the vehicle accompanied by his wife in the passenger seat and their dog in the backseat.

Davis was operating in her assigned patrol area conducting a patrol shift in a marked New Jersey State Police (NJSP) vehicle. At some point, Davis reported observing Zelechiwsky's pickup truck to have weaved in and out of its traffic lane. Davis reported that in addition the pickup was next observed to make a lane change without signaling. Davis initiated a traffic stop of Zelechiwsky's truck. After making contact with the driver, Davis reported observing the driver had bloodshot and glassy eyes and moving in a slow manner. Davis asked if they had consumed alcohol tonight Zelechiwsky reported that he had not had anything to drink. Davis requested that the driver exit the vehicle and conducted a series of field sobriety steps. Davis evaluated Zelechiwsky's ability as he attempted to complete the tests. Based on her training and experience and her observations Davis placed Zelechiwsky under arrest. She informed him that she was taking him in for suspicion of operating under the influence and would be administrating a breath test and placed him in her vehicle.

Davis informed Mrs. Zelechiwsky that after she conducted a search of the pickup, she would be taking Zelechiwsky to the barracks and that Mrs. Zelechiwsky could follow her to barracks in the truck. Davis requested if it was possible to have the dog come out of the car as the search was being conducted. Mrs. Zelechiwsky assented and got the leash and took the dog outside. She was approached by Gallagher who had responded to back up Davis. While Davis searched the vehicle Mrs. Zelechiwsky made statements to Gallagher who was recording with his Body Worn Camera (BWC).

Davis transported Zelechiwsky followed by Mrs. Zelechiwsky to the barracks. At the barracks Davis arranged for another member of the NJSP to administrate a breathalyzer test to Zelechiwsky. The test showed that Zelechiwsky was not under the influence of alcohol with a reading of 0.0. Through her supervisor efforts were made to see if a specially trained DRE was available to conduct other testing to determine if the observations made by Davis could be attributed to drugs not alcohol. Zelechiwsky was detained between an hour and a half to two hours from the initial stop to the time he was released. After not having a resource Davis released Zelechiwsky for custody with citations for the initial moving violations. Zelechiwsky and Mrs. Zelechiwsky have brought suit alleging violations of civil rights due to the arrest of Zelechiwsky and the search of the vehicle and its contents. I have been asked to review the



documentation and information surrounding these events and offer my opinion as an expert in police policies, practices, and programs.



# 2 Curriculum Vitae

I hold a bachelor's degree in Sociology and Criminal Justice Studies from Curry College in Milton, Massachusetts. I am a graduate of the Boston Police Academy, where I earned the prestigious Hogan Award for academic excellence in the study of law. I attended and completed The Senior Executives Program for State and Local Government at the Harvard Kennedy School of Government in Cambridge, Massachusetts. I also was selected to attend and complete the National Leadership Preparedness Initiative Program at the Harvard School of Public Health in Cambridge, Massachusetts. Additionally, I am a graduate of the FBI National Academy in Quantico, Virginia.

I have been actively involved in law enforcement and police practices since 1986. I served as a sworn member of the Boston Police Department for just under 28 years. I served the Boston Police Department as a Patrol Officer, Detective, Sergeant, Sergeant Detective, Lieutenant, Lieutenant Detective, Deputy Superintendent, and Superintendent before being promoted to Superintendent-in-Chief, the highest sworn member of the Boston Police Department. In that role, I was charged with overseeing the department's day-to-day operations.

As a Lieutenant and Lieutenant Detective, I was the Commander of the Special Police Division, where I oversaw the safety and security for all of the City of Boston-owned property including public housing developments, schools, parks, community centers, police, fire, EMS, and public health buildings, and City Hall. My unit had the care and custody of over 600 facilities which we monitored in a 24-hour alarm center. I was charged with assisting in developing and implementing all access control systems, CCTV, emergency plans, and continuity of operations plans and security programs for these locations. I commanded 80 police officers and approximately 100 security personnel.

While serving as Superintendent of the Bureau of Field Services, the Special Events Planning Unit reported to me. We chaired a weekly meeting of all City of Boston departments involved in permitting and licensing special events. My team developed and implemented the safety and security and police staffing plans for hundreds of special events in the city, including road races, fairs, political rallies, sporting events, protests, parades, charity events, concerts, and other celebrations. Our department often provided private police detail support to these events, including the programming at Fenway Park, the Boston TD Garden, local colleges and universities, and hundreds of other venues.

When serving as the Superintendent-in-Chief from September 2009 until January 2014, I continued to oversee the planning and implementation of security programs for world championship contests (NFL, MLB, NBA, and NHL), sporting events, concerts, special events, and critical incidents.

I was the Incident Commander for the 2013 Boston Marathon. I oversaw the response to the bombings, the evacuation of the injured, and the stabilization of the scene, as well as the



investigation. I oversaw the deployment of resources in Watertown, Massachusetts, after the terrorists were tracked there and engaged in a gun battle where they deployed IEDs against responding officers; this resulted in a lockdown of the entire region and culminated in the death of one of the suspects and the wounding and capture of the second.

I spent much of my early career in the Drug Control Unit as a Police Officer, Detective, and Detective Supervisor. During my career, I have been involved in the preparation and execution of over a thousand search warrants. I have testified as an expert in Massachusetts and federal courts on hundreds of cases involving drug use, sales, and investigations. I have been involved in the arrests of over 3,000 individuals for various offenses. I have been involved in investigating hundreds of violent crime incidents, including homicides, rapes, aggravated assaults, and robberies. I completed the Drug Enforcement Administration's 2-week DEA course as a younger officer and have completed, developed, and conducted numerous courses and training regarding narcotic investigations, including conducting undercover operations training with the FBI.

My other assignments have included the Boston Police Academy, where I taught both recruit and in-service training courses on Investigations, Criminal Law, Juvenile Law, and Constitutional Law. I trained both recruits and in-service officers on matters related to drug dealing and drug usage as well as conducting drug investigations. In addition to teaching at the Boston Police Academy, I have taught at the Norwood, Massachusetts, Plymouth, Massachusetts, Salem, Massachusetts, Reading, Massachusetts, and Barnstable Massachusetts Police Academies. While teaching for both the Boston Police Academy and the Massachusetts Municipal Police Training Committee, I developed and presented courses designed for both new and current supervisor training programs for Sergeants, Lieutenants, and Chiefs of Police. I developed and conducted in-service training programs for all Supervisors within the Boston Police Department, which included scenario-based learning focused on current case law and best practices. I developed a search warrant course, which I presented during two different yearly training cycles to all Investigative personnel within the Boston Police Department. In addition, I was selected for and served on the Boston Police Department's Firearm Discharge Investigation Team. The team responded and investigated all discharges of firearms by Boston Police officers for both criminal and administrative review. I also was certified and served as a hostage negotiator with the Boston Police Department's Special Operations Unit.

While serving as the Superintendent-in-Chief, my duties included helping to develop and implement policies and procedures such as consistent use of force policies. I reviewed all use-of-force investigations and internal complaints involving all Boston Police personnel.

In June of 2014, I retired from the Boston Police Department. I started a consulting firm, The Linskey Group LLC (the "Linskey Group"). My company provided a wide range of security, law enforcement, and emergency management services to various clients. These services include dignitary protection, cybersecurity, and confidential investigations. The group had vast experience conducting training and exercises, preparing agencies and facilities for crises, and



conducting security assessments and incident reviews. I am a frequently sought-after public speaker presenting Leadership Lessons Learned from the Boston Marathon Bombing Attack. I have presented lectures, conducted training, and consulted with numerous federal, state, local, and international police, homeland security, and military officials regarding large-scale event management, crisis leadership and preparedness, use of force, proper police policy, and community policing initiatives.

While consulting for the Linskey Group, I worked with The Police Foundation and the United States Department of Justice. I was retained to consult with the St. Louis County Police Department and provide technical advice and training guidance relative to tactical deployments, training, community engagement strategies, and use of force programs and policies prior to the release of the verdict in the shooting of Michael Brown by Ferguson Police Officer Darrin Wilson.

I later worked with the United States Department of State's Anti-Terrorism Advisory Bureau to develop and present courses on managing the investigation of a terrorist attack for our partner nations around the globe. I taught this course for the State Department along with a panel of other instructors. I have conducted training and presented to the following regarding managing large-scale events and investigations.

- Numerous State and local police, fire, and emergency management groups in 44 states
- United States Navy Chief of Operations Strategic Studies Group
- United States Marine Corps Marathon Planning Team
- New York Police Department and New York Fire Department
- North Carolina Information and Analysis Center
- The Federal Bureau of Investigation
- The U.S. Drug Enforcement Administration
- The Bureau of Alcohol Tobacco and Firearms
- The Egyptian Ministry of Interior Police Force
- The U.S. State Department the Overseas Security Advisory Council
- The Dutch Police and Military
- The Australian Federal Police
- The Queensland Police Service
- The Finnish Police Service
- Abu Dhabi Police Service
- Iraqi Police Service
- International Association of Chiefs of Police
- The U.S. Department of State Anti-Terrorism Advisory Bureau
- The Moroccan Ministry of Interior
- The United States Veteran's Administration
- Mexican law enforcement leaders (as well as numerous law enforcement officers throughout Central and South America)
- Police senior leadership of India
- Tunisian Police Services



- Polish Police Services

In December of 2015, I joined Kroll – the global security and risk management firm – as the head of the Boston office, and I currently serve as the lead for our worldwide law enforcement consulting practice. Since joining Kroll, I have conducted work for clients in numerous industries, including education, banking, family offices, healthcare, hospitality, transportation, government, industrial, media, sports, and energy fields, and law enforcement.

I have also often been asked to provide expert witness work. I have provided training and best practice evaluations and audits to hundreds of law enforcement agencies as well as private sector clients. I have advised clients and provided expert witness assistance work in neglect security matters and law enforcement issues to clients. I am currently a fellow at the Kroll Institute.

I have conducted audits, reviews, and best-practice evaluations for the following police agencies while at Kroll:

- Braintree, Massachusetts Police Department
- University of UCLA Police Department
- University of Southern California Police Department
- Salem, New Hampshire Police Department
- University of Chicago Police Department
- Stamford Connecticut Police Department
- Austin Police Department
- Hopkinton, Massachusetts Police Department

I have been a guest lecturer and panellist at various colleges and universities, including Harvard University, The University of Seattle, Towson University, Northeastern University, the University of Southern California, and the University of Maryland, American University Law School, and Harvard Law School. regarding various law enforcement issues.

## Select Media Appearances, Presentations and Reports

I am active in several professional organizations and frequently asked to present at conferences and meetings on law enforcement and homeland security topics.

- On-air news analyst for local and national affiliates of Fox News, MSNBC, and CNN.
- International Association of Chiefs of Police 2012 National Conference: "Boston Police Response to the Occupy Movement."
- Leadership Lessons Learned from the Boston Marathon Bombing Attack.
- Leading Before, During, and After the Crisis.
- Policing 2.0



## Education & Certifications

- B.S. Curry College
- Harvard's Kennedy School of Government: National Leadership Preparedness Initiative, Senior Executive – State/Local Government Module
- FBI National Academy, Quantico
- Boston Police Academy

## Affiliations & Memberships

- FBI National Academy Associate
- International Association of Chiefs of Police
  - Member of the IACP Training and Education Committee 2019 to present.
- International Association of Emergency Managers
- Massachusetts Major Cities Chiefs' Association
- Police Executive Research Forum
- American Society for Industrial Security (ASIS)

## Awards & Recognition

- Boston Police Medal of Honor three-time recipient
- State of Massachusetts George L. Hanna Medal of Honor
- Semper Fidelis Society of Boston, Semper Fi Marine of the Year Award

## Publications

- The Role of Law Enforcement in Emergency Management and Homeland Security, (Community, Environment and Disaster Risk Management) by Mark R. Landahl (Editor), Tonya E. Thornton (Editor) contributing author
- Edwin Davis Report: "University of Massachusetts and the Town of Amherst: A Safer Community through Partnership."
- Department of Justice Collaborative Reform Initiative: An Assessment of the St. Louis County Police Department.
- Police Executive Research Forum report: "Managing Major Events: Best Practices from the Field" (contributor).
- Austin Police Department:  Review and Assessment of Training Academy April 23, 2021, Prepared for City of Austin, Office of Police Oversight / City Manager's Office.
- Evaluation of the Austin Police Department: Use of Force / Public Interactions / Recruitment / Selection, and Promotions January 21,2022 Prepared for City of Austin, Office of Police Oversight / City Manager's Office.
- APD Training Academy: Curriculum Review Process Assessment March 1, 2023, Prepared for City of Austin, City Manager's Office.
- Audit of Salem New Hampshire Police Department Time and Attendance Practices 2018.



- Audit of Salem New Hampshire Internal Affairs Practices 2018.

**Expert Witness Work**

- I worked with Edward Davis LLC in reviewing the murder conviction of Raymond Tempest in the State of Rhode Island v. Raymond Tempest for Attorney Michael Kendall, with assistance from the Innocent Project. I conducted a review of the facts and circumstances of the case and participated in drafting a report for the defense supporting a reversal of the conviction of Raymond Tempest. That conviction has been overturned.

- I have worked collaboratively with Edward Davis LLC and conducted an extensive review of the Blarney Blowout. This large-scale public disorder event occurred at the University of Massachusetts in 2014. We investigated the incident and co-authored a report outlining the causes that negatively impacted the event. The report also delivered a best practice guide to prevent a repeat occurrence.

- The Office of New Hampshire Attorney General Joseph A. Foster retained me to provide expert witness services for the State of New Hampshire in the case of the *State of New Hampshire v. Mark Richardson*. Mark Richardson was a Seabrook New Hampshire Police Officer who allegedly used excessive force when dealing with a prisoner in his care and custody. Richardson had been arrested and charged with utilizing excessive force and violating the victim's civil rights. I reviewed the facts, circumstances, and evidence of the case. My report concurred with the findings of the criminal investigation that the defendant utilized excessive and unreasonable force, which was criminal and a violation of the victim's rights. I testified to such during a trial that resulted in a hung jury. On retrial, the defendant entered a guilty plea.

- On October 21, 2015, I was retained by Sheehey Furlong & Behm P.C. of Vermont as their expert witness to offer an expert opinion on the case of Grega v. Vermont. I reviewed the investigation to compare it to acceptable best practices. I determined that Grega did not receive a fair trial and his murder conviction should remain overturned. The State of Vermont reached a settlement agreement with the Plaintiff's Estate.

- In January 2016, I was retained by the Philadelphia firm of Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock, Dodig, LLP to provide expert witness services for the plaintiff in the case of Hintz v Philadelphia in state and federal court. Hintz was arrested and imprisoned by detectives in the Philadelphia police department who were later found to be involved in a large corruption ring. The City of Philadelphia settled the claim after the client's conviction was overturned.

- I was retained by attorney Joseph Donlin of Norwood, Massachusetts, to provide expert witness services for the defense in the case of Charles Morse and Lesa Morse



Plaintiffs, v. Commonwealth of Massachusetts Executive Office of Public Safety Department of State Police; State Trooper Frechette, K-9 Unit State Trooper Maher; Town Of Sturbridge; Town of Sturbridge Police Department; Police Chief Thomas Ford; Police Sergeant Michael Cloutier; Police Sergeant Jeffrey Lavalle; Police Officer David Fortier; Police Officer Larry Bateman; Police Officer Ronald Obuchowski, Jr., Defendants. The case was settled prior to trial.

- I was retained by the City of Portsmouth New Hampshire Police Department as their expert witness in a case in US District Court, Connors v. Portsmouth NH, to offer an opinion as to proper police procedure. The case was settled prior to trial.

- I was retained pro bono by the Washington, DC law firm Baker Botts to assist them in getting injunctive relief in federal court in Virginia. Our intervention prevented the public identification of an officer involved in a deadly use of force situation until a full and thorough investigation, threat assessment and safety plan had been developed.

- I was retained by attorney John J. Cloherty III of Pierce Davis & Perritano to engage my services as an expert witness in the case of Kevin O' Laughlin vs the Commonwealth of Massachusetts, town of Framingham Massachusetts; Paul Blakeley; Al Grow; Estate of Arthur Martins Alan Nardini, William Masionis, Estate of Frank Masiello and John Moor. I was the defense expert in a wrongful conviction case alleged by Kevin O'Loughlin against the officers involved in his arrest and the town of Framingham. That case was settled before trial.

- I was retained by the Strafford County Attorney's Office located in Dover, Strafford County, New Hampshire as an expert witness in the case of New Hampshire v. Burris. On December 1, 2015, at approximately 8 pm, Probation Officer Burris fired 3 rounds at a suspect's fleeing vehicle and was charged with Assault by Means of a Dangerous Weapon. The parties reached a plea agreement.

- I was retained by the firm of Pierce & Mandell, P.C in Boston as their expert representing the estate of two prominent physicians who were slain in their luxury apartment unit in a condominium building that was responsible for providing adequate security for them. The Estate of Field and Bolanos vs. The Board of Trustees of 141 Dorchester Ave. The case was settled at mediation.

- I was retained by the firm of Behman Hambelton, LLP, in Woburn, Massachusetts, as their expert in a negligent security case defending a hotel and resort from a negligent security claim that arose during an event at the property in which the plaintiff was injured. The case resulted in a summary judgment.

- I was retained by the firm Potters & Della Pietra LLP of Fairfield, New Jersey as their expert in a T.G. v. PNC Bank Arts Center, et al in a negligent security case defending the New Jersey State Police which provided security at a concert venue where the plaintiff



alleged, they were shot due to inadequate security measures. The client received a summary judgment dismissing the case.

- I was retained on behalf of the City of Baltimore as their expert witness in 30 plus store owners' cases who are bringing suit against the city for failing to adequately protect their stores and businesses during the riots in response to the Freddie Grey matter. The cases were settled.

- I am currently retained by the firm Marshall Dennehey of Philadelphia on behalf of The Hartford – Global Specialty Claims Insurance Company in a negligent security matter. Wharton Street Properties, LLC V. G&M Efestos Contracting, Inc., G&A Carpenters, Inc, Greg Karmitopoulos a/k/a Grigorio Karamitopoulos. The case was settled prior to trial.

- I was retained by the firm Marshall Dennehey of Roseland, NJ in the case of T.G. v. PNC Bank Arts Center, et al in a negligent security case defending Live Nation and the New Jersey Turnpike Authority who own a concert venue where the plaintiff alleged, they were shot due to inadequate security measures. The case was settled prior to trial,

- I was retained by the Delany Law firm 36 of Woodbury, NJ 08096 for the defense in the case of Savarese v. Bergen Brookside Auto Body, Inc., Brookside Towing Corp., and Paul T. Gudanowski in a negligent security case. The case settled prior to trial.

- I was retained by the Virginia law firm of Bancroft, McGavin, Horvath & Judkins, P.C. for the defense of Virginia Risk Sharing Association and Officers Betsy Mason, David Rilly, Donald Lee Ridenour, James Carr, Jason Pitts, Joshua Lynch, Michael Athenry, Nicole Gentry, and Rich Pennock in a suit being brought by protestors against the Fredericksburg VA. Police Department. The case was settled prior to trial.

- I was retained by the by Attorney Jeffrey L. McCormick, Jr. of the Boyle Shaughnessy Law Worcester on behalf of Rugby's Incorporated in the case of Troy Miller, JR. v. Rugby's Incorporated D/B/A/Slattery's Restaurant & Bar in a negligent security case. The case settled prior to trial.

- I was part of a team from Kroll who performed pro-bono assistance to the Philadelphia Innocence Project in the case of Tremaine Hicks our efforts assisted in overturning his conviction after he was shot by police and falsely accused of a sexual assault and imprisoned for 19 years. After realizing they had shot an innocent man the officers planted a firearm on him framing him for the assault.

- I was retained by the by the Virginia law firm of Bancroft, McGavin, Horvath & Judkins, P.C. for the defense in the case Lamonte Gladney v. Ryan Timberlake Fairfax County Police Department. The case was settled prior to trial.



- I was retained by the law firm of Fazzano & Tomasiewicz, LLC Hartford, CT on behalf of the plaintiff Khosro Pourkavoos MD and Mariam Hakim-Zargar MD, MA, MPH, FAOOS V. Town of Avon, Edward Espinosa Detective and Mark Rinaldo Chief, who was a physician falsely arrested for sexual assault. The case was settled.

- I was retained by Attorney Sheryl L. Axelrod of the Axelrod Law Firm PC of Philadelphia PA. in the case against a non-profit RE: K.H. v.  a New York corporation, in a negligent security case representing the defendant.

- I was retained by Baltimore Assistant City Attorney Renita Collins in the case of St. Michael's Media, INC v. The City of Baltimore et al, Civil Action No: 221-cv-02337ELH for the defense of the city where the plaintiffs were alleging 1st Amendment issues in the failure to issue a permit for a protest. The case settled prior to trial.



# 3    Materials Reviewed

See **Appendix #1**, which is a full list of the materials provided to me by Plaintiffs' counsel.



# 4  Video Camera Analysis

## 4.1  Dash Camera Analysis

Davis's dash camera was activated when she conducted the stop of the Zelechiwsky pickup. I reviewed the footage and discovered that while the video ran during the stop it was not positioned to show significant detail.

## 4.2  Body Worn Camera Analysis

Trooper Davis (Davis) made a passenger side approach after pulling over the pickup truck. She engaged with the occupants of the vehicle. She explained her reason for stopping them. She informed them that she had observed the vehicle going outside the lane markings and changing lanes without signaling Davis and requested Zelechiwsky's license and registration. While Davis was addressing Zelechiwsky, she asked if he had consumed any alcohol and he denied consuming any. [1]



Davis approached Zelechiwsky on the driver's side of the vehicle and asked him to exit the vehicle. They both proceeded to the front of the pickup where the area was illuminated by the trucks headlights Davis explained that she was going to conduct a field sobriety test which consisted of three separate tests. Davis first administered the Horizontal Gaze Nystagmus (HGN). HGN is the involuntary jerking of one's eye when it gazes to the side. Alcohol use exaggerates this jerking

---

[1] Trooper Davis's Body Worn Camera 8/10/2020 21:37:24



motion. The HGN test is evidence of impairment in DUI cases. When Davis asked Zelechiwsky if he has had any injuries to his eyes he responded "not that I know of" caveating his response. Davis Informed Zelechiwsky not move his head, just his eyes during the exam. When he disregarded her directions Davis reminded him again of the instructions. Davis had to correct him another time as he continued to move his head not his eyes in accordance with the directions. The BWC video did not capture the results of his eye movements.

Davis explained to Zelechiwsky how to perform the walk and turn test. Zelechiwsky Informed Davis that he understood the directions. The BWC showed Zelechiwsky was staring down at the ground and not looking at the Davis. He had his hands in his pockets, despite Davis' instruction. He presented with a vacant stare with an expressionless face as he listened to the instructions. [2]



Zelechiwsky attempted the test and had visible balance issues reaching out with his left hand a bit to sturdy himself. [3]

---

[2] Trooper Davis's Body Worn Camera 8/10/2020 21:39:38
[3] Trooper Davis's Body Worn Camera 8/10/2020 21:40:53





Zelechiwsky continued with the unique fixed facial affect and does not count his steps as instructed by Davis. Davis had to correct him.[4]



Davis explained the one-legged stand test. Zelechiwsky had difficulty with his balance and had to put his foot down stopping the test.[5]

---

[4] Trooper Davis's Body Worn Camera 8/10/2020 21:41:01
[5] Trooper Davis's Body Worn Camera 8/10/2020 21:42:27





He repeated the test lifting his foot only lasting a short time before he again lost his balance and had to put his foot down again.[6]



Zelechiwsky was seen still presenting with the blank facial affect.[7]

---

[6] Trooper Davis's Body Worn Camera 8/10/2020 21:42:30
[7] Trooper Davis's Body Worn Camera 8/10/2020 21:42:30





Davis had made the observations of Zelechiwsky's operation of the pickup truck on a public highway in which she observed the vehicle to fail to maintain in the lane of travel and change lanes without signaling. Davis took an enforcement action and pulled the pickup truck over to conduct a motor vehicle stop. Leaving marked lanes and changing lanes without signaling are civil violations of the New Jersey Motor Vehicle Code. These types of driving infractions can occur due to a host of reasons including inattention, distracted driving, texting and driving, fatigue, potential medical issues, and just plain carelessness. Based on Davis's training and experience, Davis was aware that the motor vehicle infractions could also be caused by someone being under the influence of alcohol, legal, and prescription drugs. Davis assessed Zelechiwsky and made an initial assessment that he may be under the influence of something. Consistent with her training the New Jersey State Police policy and procedures and accepted national standards [8] Davis conducted a standard field sobriety exam.

---

[8] https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_ig_refresher_manual.pdf Page 35



That exam was documented on her BWC. Zelechiwsky was unable to perform two of the three tests. He was unsteady on his feet and unable to follow Davis's instructions. During the time Zelechiwsky
is conducting the test the Davis is observed to have a blank stare and an emotionless affect. In addition, on the BWC Davis documented that she had observed the strong order of alcohol coming from the area of the driver's seat. Based on the observations Davis made of Zelechiwsky committing motor vehicle infractions that often can be observed when individuals are operating under the influence drugs or alcohol. Coupled with her initial assessment of Zelechiwsky and his inability to successfully complete the field sobriety test and the odor of alcohol detected in the front seat area. Davis decided to place Zelechiwsky in custody on probable cause that he had been operating under the influence of drugs and or alcohol when he committed the motor vehicle infractions. She placed Zelechiwsky into hand cuffs and escorted him into the back of her police vehicle. Davis continued her investigation and spoke with Zelechiwsky's wife, Lisa Zelechiwsky, (Mrs. Zelechiwsky).

Mrs. Zelechiwsky informed Davis that they had been at the beach earlier and had consumed beers while there.

Davis asked Mrs. Zelechiwsky to step out of the pickup truck with her dog so that she could conduct a motor vehicle exception search for any evidence of used or open containers of alcohol or drugs.

## 4.3    Gallagher's Body Worn Camera Analysis.

Trooper Gallagher arrived to back up Davis. As Davis was conducting a search of the truck Gallagher was standing near Mrs Zelechiwsky when she stated that she had a six pack of wine in the back of the vehicle.  Gallagher asked her if was open?  Mrs. Zelechiwsky replied, "I don't believe it is." [9]



---

[9] Trooper Gallagher's Body Worn Camera 8/10/20 21:48:46



Gallagher asked, "Did she explain what is going on"? Mrs. Zelechiwsky replied yeah, "he's just he doesn't drive the greatest"[10] (This was after Davis had reported to the Zelechiwskys that the reason the vehicle was pulled over was failing to maintain lanes and changing lanes without signaling). It appeared that she was not disputing Davis's allegations of motor vehicle infractions and did not shocked that his driving had resulted in a traffic stop.



She went onto state that she believed Zelechiwsky was not drunk. She stated "we had **beer** on the beach today. She reported leaving the beach at 3:00 p.m. and going to dinner with friends at a seafood restaurant that does not serve alcohol. [11]



---

10 Trooper Gallagher's Body Worn Camera 8/10/20 21:49:26
11 Trooper Gallagher's Body Worn Camera 8/10/20 21:49:31



## 4.4    Davis' Body Worn Camera Analysis Vehicle Search.

After the arrest, Davis began a motor vehicle exception search of the pickup truck in accordance with the policies and procedures of the New Jersey State Police consistent with Article, I Section 8 of the New Jersey Constitution and federal law. Davis had probable cause to believe that evidence consistent with drug or alcohol use was present in the motor vehicle such as empty alcohol containers or legal and illegal drugs which may have contributed to the believed impairment. Davis knew the vehicle was on a public roadway and that was going to be turning the vehicle over to Mrs. Zelechiwsky

Davis started the search at 21:47:32. Davis took a brief break from the search to get instructions from Mrs. Zelechiwsky how to open the center console

21:51:08 Davis's BWC showed her searching the backseat area and as she looked in some of the grocery bags the video has sounds consistent with wine bottles clinking. Mrs. Zelechiwsky had reported buying 6 bottles of wine at the store. [12]



21:52:16 the search was ended. The total search lasted 4 minutes 28 seconds and did not include any items in the pickup truck bed.

---

[12] Trooper Davis's Body Worn Camera 8/10/2020 21:51:08



# 5   Depositions

## 5.1   Davis Deposition

Davis reported during her deposition that she observed the pickup truck weaving in and out of the travel lane before changing lanes without signaling leading to her decision to take an enforcement action. Davis reported contacting the vehicle assessing the driver as having glassy eyes and being slow to respond and move. Davis decided to conduct a standard field sobriety test on Zelechiwsky. At various times she reported her actions and observations during the deposition.

### 5.1.1   Regarding the HGN test Davis reported the following:

(Atty Chaudry Questioning Davis)

Mr. Chaudry: Okay.

Q. Please tell us how he was uncooperative with you and combative with you during this traffic stop.

A. He failed to follow instructions.

Q. What instructions did he fail to follow?

A. For the HGN testing

Q. Explain, Trooper.

A. During the test he was asked not to move his head. He continued to move his head.

Q. So that's what you say leads you to believe that he was uncooperative and combative because he moved his head during the HGN test?

A. Not cooperating, yes, sir.

Q. Right. Anything else?

A. No.

KROLL

Q. All right. So tell us exactly what you did regarding the HGN test and exactly what you

observed.

A. I asked him did he had any medical conditions in reference to his eyes. I believe he said no. And then I attempted to conduct the test. I explained the instructions and asked him to not move his head.

Q. Okay. And what occurred?

A. He continued to move his head.

Q. What, when you shine the pen in his eyes and said follow the pen, his head moved slightly towards the direction of the pen; is that what happened?

A. It moved. Your head isn't supposed to move. You're supposed to keep your head straight. Your eyes are supposed to move only.

Q. Okay. But you certainly didn't observe any lack of smooth pursuit, correct?

MR. CHAUDRY: Objection to the form of the question.

MR. KAROLY: What's wrong with the form?

MR. CHAUDRY: The form of the question?

MR. KAROLY: Yes.

MR. CHAUDRY: You are speculating based on something that's not even in the record yet. And it's repeating questions. Ask her the question.

MR. KAROLY: Okay. I don't understand that objection.

Q. But, Trooper, you can answer.

Q. You can answer.

MR. CHAUDRY: Yes.



A. Can you repeat the question again.

Q. You did not observe any lack of smooth pursuit regarding Mr. Zelechiwsky's pupils, correct?

MR. CHAUDRY: Objection to the form.

A. He didn't conduct the test correctly for me to observe.

Q. All right. Tell us then what you observed. Go ahead.

A. I wasn't able to observe anything because he kept moving his head.[13]

## 5.1.2    Walk and Turn Test

Regarding Davis's observations of Zelechiwsky during the walk and turn test she reported the following:

(Atty Chaudry Questioning Davis)

Q. All right. Explain to me what you did regarding the walk-and-turn test and what Mr. Zelechiwsky did.

A. I gave him instructions and I also demonstrated the test for him. And then he attempted to complete the test.

Q. And what did you observe?

A. Him not keeping his balance, him raising his hand and him not following the instructions.

Q. Okay. How did he not maintain his balance on the walk and turn?

A. When he was walking, he kind of leaned over and he raised his hand [14]

---

[13] Deposition of Trooper Ashley Davis pages 51 to 54

[14] Deposition of Trooper Ashley Davis page 56



### 5.1.3    One-Leg Stand Test

Regarding the One-Leg Stand test Davis reported the following:

(Atty Chaudry Questioning Davis)

Q. All right. And then what test did you perform next?

A. The one-leg stand test.

Q. All right. And what did you explain and what did you observe?

A. I explained the test for him and also demonstrated the test. I observed him -- well, lose his balance, put his foot down and almost fall.

Q. All right. Do you know how old Mr. Zelechiwsky is?

A. No.

Q. Okay. Still to this day you don't know?

A. No.

Q. You think age has any correlation to balance?

A. No.

Q. Okay. So, an 80 year old should probably have the same balance observed as a 20 year old. [15]

---

[15] Deposition of Trooper Ashley Davis pages 58 to 59



### 5.1.4    Alcohol Consumption by Zelechiwsky

Regarding the consumption of alcohol by Zelechiwsky Davis reported having conversations with both Zelechiwsky and Mrs. Zelechiwsky:

(Atty Chaudry Questioning Davis)

What do you recall, if anything,

Mr. Zelechiwsky said to you while you were having conversation with him during this incident?

A. I can't recall offhand, but I believe he said that he didn't have any -- I asked him did he had anything to drink. He said, no.

Q. Okay. And do you recall engaging

Mrs. Zelechiwsky in any way?

A. Yes.

Q. All right. And do you recall anything that she may or may not have said to you?

A. I believe she said they had drinks earlier that day.

Q. I'd like you to be as specific as you can. Do you believe that she said that they had drinks earlier that day?

A. Yes, sir.

Q. Did you ask her how many?

A. I can't recall.

Q. And do you believe that --

A. I believe -- yes, I believe I asked her.



I believe I did.

Q. And what did she say?. I believe she said a couple.[16]

I note that this testimony is consistent with the BWC video. The video showed Zelechiwsky originally responded that he had nothing to drink when Davis inquired. Mrs. Zelechiwsky in a separate conversation with Davis reported that they had some drinks at the beach. Mrs. Zelechiwsky also informed Gallagher that they had **Beer** at the beach. After speaking to the wife, the BWC video showed Davis speaking with Zelechiwsky. She informed him that his wife said they had been drinking that day. He replied we had five or six then changed his response to one glass of wine. He then stated that you can check me I'm fine.

## 5.2    Zelechiwsky

### 5.2.1    **Reason for the Suit**

(Attorney Brocco questioning Zelechiwsky)

A. You know, I think if the police officer, after everything was said and done, had come up to me, and said, Hey, Bodhan, look, I'm sorry, you know, I screwed up, you know, I really messed up, you know, and apologized to me, that would have made a world of difference. But she didn't -- not only did she not apologize, she gives me a ticket. And, you know, and just doesn't tell me anything about the results of the -- of the breath test, but gives me a ticket and sends me on my way. After humiliating me and treating me like some sort of -- some sort of a criminal, searching my vehicle, having my wife have to step outside the vehicle. And I, basically -- I think I said two words to her. She asked me whether I drank anything, I said no, you know. And she asked my wife the same question. And I think you can ask her what her response was. But it was just the way everything was handled. I think that if she had known how to do a proper nystagmus test, that right then and there would have told her that there was no alcohol. no, she did that, and then she persisted on doing other tests. But I'm -- I'm getting far afield here.[17]

---

[16] Deposition of Trooper Ashley Davis pages 67-68
[17] Deposition of Bodhan Zelcchiwsky page 32



Q. You testified earlier that had my client apologized to you, that you wouldn't have been as upset. Something along those lines. You would have been okay with it. Can you explain that to me?

A. Well, if she would have taken responsibility for her lack of professionalism and treatment of me,

but she didn't. And that --

Q. Do you think that you would have brought a lawsuit had she apologized?

MR. KAROLY: Objection.

Q. You can answer the question.

A. Probably not. If she sincerely apologized, and said, you know, I knew I screwed up. But that ship has sailed a long time ago. And apologized to my wife. Because she made her step out of the truck and took her purse and emptied through all the stuff on the seat. And my wife was, like me, totally innocent.[18]


### 5.2.2    Driving Habits of Zelechiwsky Contributing to the Stop

Q. As you sit here today, do you know why it was that you were pulled over originally?

A. Well, from what she told me, she said that I was weaving, and that I didn't use my turn signals.

Q. Okay.

A. And those are lies. Because I wasn't weaving. And, you know, my wife was with me, and I mean, she's, like -- she makes sure, you know, if I do anything wrong, she lets me know it. And I wasn't weaving. I wasn't -- anything like that. I mean, we were, you know, I was just kind of flabbergasted. And, you know, she asked for license, registration. I didn't -- my wife handed it to her. And she didn't ask -- she asked us whether we had been drinking. My wife said no. There was no smell of alcohol. I mean, there was nothing. And she just, without saying anything else, she walks around, and tells me to get out of the car. And, you know, she was wrong. She was dead wrong.

---

[18] Deposition of Bodhan Zelechiwsky page Pages 48-49



Q. So you just testified that your wife will tell you if you do anything wrong. What do you mean by that?

A. When I'm driving, she's very -- that's just one of her little -- I don't want to say quirks. It's just the way she is. If I'm, you know, if I'm going over the speed limit, Bodhan, you're speeding. If I do anything, she right away says, Bodhan, you didn't use a turn signal, or you're -- you're weaving, or something like that. You know, so she's on it.

Q. And do you know if she had any concerns about your ability to drive that night, meaning, your wife?

A. None. That night, none.[19]

### 5.2.3    Alcohol Consumed by Zelechiwsky

Q. You're putting in a full day. You're biking you're cleaning, you're beaching, you're eating,

you're doing a lot of stuff.

A. That's what we do.

Q. I get it. And about -- and did you – were you drinking alcohol over the weekend?

A. I'm sure Saturday and Sunday, we – we probably had some glasses of wine out to dinner. We may have had a beer or two at the beach. Monday, I know that Lisa brought -- Jimmy doesn't drink at all, so -- and Maureen doesn't drink. They do not drink at all. So we may have -- I don't know, Lisa packed a cooler, she may have put a beer in there. She may have given me a beer. I don't even think I even finished it. I wouldn't drink alone in front of Jimmy. I wouldn't do that. Mr. Heidecker. And then we came home, we showered, got ready, showed him around, and then we all went out to dinner to H&H. We didn't drink anything at all. I mean, when I say -- no alcoholic beverages. We had soda, or club soda at H&H. Then we packed up the truck, we spent some time, I think we watched the sunset with the Heideckers, which would be -- we left around 8:30, 8:45, which it takes about a half hour to get to 55 from where we were. And that's when I got pulled over.[20]

---

[19] Deposition of Bodhan Zelechiwsky page pages 54-55
[20] Deposition of Bodhan Zelechiwsky page 84-85



### 5.2.4    Zelechiwsky Performance on the Field Sobriety Tests

(Video playing.)

Q. As you sit here and watch that video, do you know if you had any problems performing that test?

A. No, except for the noise from the cars, you know, and the roadway was not the most level. But I

was straight.

Q. Is there any reason why you did not count out loud at that point in time?

MR. KAROLY: Objection. You can answer.

A. I think I just, you know, I was just so angry, and embarrassed, and felt sorry for my wife.

Q. Okay. At this point in time, do you believe that there was anything, other than the traffic, was there anything that prevented you from performing the right heel in front of left toe test?

A. I thought the video shows I performed it, and I -- and I counted part of the time.

Q. Okay. Rolling at 5:51.

(Video playing.)

Q. At this point in time, did you, at 6:28, did you understand the instructions that were given to

you by Officer -- Trooper Davis?

A. Yes.

Q. Okay. And we're talking about the one leg stand test. And she asked you to count one 1,000, two 1,000, three 1,000. And you understood her instructions, true?


A. True.

Q. Okay. Rolling at 6:28.



(Video playing.)

Q. Okay. Is there any reason why you were unsteady on your feet?

A. Yes.

Q. Can you explain?

A. Try. At that point, I'm 68 years old, on the side of a busy road at night, very embarrassed, angry, and, you know, at that age, you know, my balance isn't what it would be at 25 or 20.

Q. Okay. But you still ride your bike several miles several times a day, so you're in pretty good shape.

MR. KAROLY: Objection.

Q. So can you explain to me why you're unable to perform -- I mean --

MR. KAROLY: Objection. He just did.

A. I did.

Q. We'll continue to roll. We're at 7:01.

(Video playing.)

Q. So do you think that you, based on – and we're at 7:31. Based upon what the video is showing, do you think that you performed that test adequately?

MR. KAROLY: Objection. Adequately. He's a 68-year-old guy, trying to stand on one leg. Because he can't balance, we're going to arrest him for DUI? I mean, come on.

MS. BROCCO: He's not a hundred. He's 68. And he's in great shape.

MR. KAROLY: I think most 68-year-olds I know can't stand on one leg. I can promise you that.

MS. BROCCO: Well, I disagree with that, but anyway.

MR. KAROLY: Okay.

KR☉LL

MS. BROCCO: I'm not here to argue. I'm just -- I'm just asking him why it was that he lost his balance. And not -- not anything else.

Q. Okay. So did you, before the test was administered, and during the test, did you have trouble performing the one leg stand test?

MR. KAROLY: Objection.

A. I --

MR. KAROLY: Go ahead.

Q. You can answer.

A. I think I was so livid that I -- I just --the way she was talking to me, and -- and to balance-- you know, like I said, I -- I thought my balance for -- at the end, you could see, I was standing up, I was standing straight. And I don't think she knows what the heck she's doing. But that's for another day.

Q. And why do you say that?

A. Because there was no signs that -- that the typical signs you look for intoxication, I didn't have. Well, first of all, she didn't even talk to me. Didn't ask me anything, except when she took me out of the vehicle, number one. Number two, you know, I didn't -- I wasn't -- if you look at me, I wasn't sleepy. I didn't have a flushed face. I wasn't -- I didn't have, you know, disheveled clothing. I didn't -- I had none of the signs that you would -- that one would look for for visibly intoxicated person. I'm standing straight. I'm not falling over.

Q. Other than being under the influence of alcohol, is there anything that you can think of that may have made you unsteady on your feet during that last test?

A. I think the road and my age.

Q. And when you say the road, you mean the uneven terrain of the road?

A. Yes, correct. It's sloped.



Q. And do you know whether your age and/or the roadway may have caused you to drive erratically before you were pulled over?[21]

A. No.

# 5.3    Mrs. Zelechiwsky

### 5.3.1    Zelechiwsky's Driving Ability

Mrs. Zelechiwsky reported in her deposition that she had no concerns about her husband's driving ability that evening she reported him driving under the speed limit. She expressed no concerns about his driving ability. That directly contradicted the video of her comments to Gallagher without being prompted when she reported he was not the greatest driver. She also appeared to contradict herself when she confirmed that she is a back seat driver who often tells her husband when he is not driving properly. That statement was consistent with her husband's deposition.

(Attorney Brocco questioning Mrs. Zelechiwsky)

Q. Well, you keep differentiating between yourself and your husband. I understand that you were not the individual driving. Do you know of ---- did you have any concerns about your husband driving home that late at night in the dark? Let's say, he is at that point a 68-year-old man. Any concerns at all?

A. I had no concerns with my husband that night, driving that late. Because we always drove home between 7 and 9 o'clock. We would leave our home that late. His eyes are better than my eyes. I have-- I wear triple bifocals. I -- number one, I would never put myself in a vehicle -- first of all – I would say I'm married -- I've been with my husband for 20 years. I think I have seen my husband intoxicated, or had a little too much to drink, maybe two times. We -- he does not drink. He's not an alcoholic. I certainly would never let -- put myself in any vehicle and drive two hours with somebody who is drunk. So that's just like our norm. It's not our norm. We will have an occasional glass of wine with dinner. We will have a beer here and there. We will go --But we drink seltzer water all the time. I'm all organic. That's how I eat. I – I try to stay healthy. My husband tries to stay as healthy as we can. It's kind of not a -- I would never put myself in a vehicle like that. And I would not be concerned about my husband's driving ability. He drives very well. He drives every day on his job, as an attorney, going from one case to another, travels from Philly then all the way to Easton, and all in the same

---

[21] Deposition of Bodhan Zelechiwsky page pages 122-127



day. He's a very good driver. His ability to drive that day was perfectly fine. I was actually shocked when she pulled us over. I was, like, why are we being pulled over? I was in shock. Because I didn't see him do anything wrong. I was watching the road. I'll always tell him sometimes, you know, hey, there's a red light coming up, or this is the speed limit, you know, because I get a little bored when we're driving back, you know. I'm kind of the back seat driver. But nothing out of the ordinary that night happened at all, actually, until she pulled us over, so.

Q. Do you know whether at any point in time before -- first of all, what time did you leave your place in Cape May that night to go home to Quakertown?

A. That night, we had dinner, an early dinner with our friends. We went back to the home to pack up our car. I don't recall the exact time, but I know it was still light out. It was, like, early evening. And then as we got on the road, it got dark. By then -- if I recall, it would get dark around 9 o'clock. So we -- based on that time of the year, I'd probably say we left around 7, 8 o'clock maybe, 8 o'clock. After 8, probably. Then we did eat at H&H, like I told the other officer, that they don't serve alcohol there. We did not drink all day. I said -- I think he had a beer on the beach. I think we shared a beer. And I don't think neither of us finished it. I think it was dumped, because we just didn't -- we were having a good time at the beach swimming. My husband swims a lot, and he makes me nervous, because he goes out far, when he goes swimming, in the bay. And we were just chatting, having a nice weekend with our friends that came down that day.

Q. Before Trooper Davis pulled you over, did you notice anything unusual about your husband's operation of the vehicle?

A. No.

Q. Did you feel that he wasn't maintaining his lane properly?

A. No. He was fine. We were coming from the road that merges onto 55. We were on a single lane, if you're familiar, coming back. We were on a single lane, and we merged onto the double lane highway. There was only two lanes. Because you were saying in the past, there was three. But there was only two. And when you merge onto a road, you have to pick one lane to go in. So he picked the left. There was no swerving all over the road, as she stated. There was none of that. He merged onto the left lane and was driving the speed limit. First of all, I don't like, myself, I don't like to be in a car driven very fast, because that would make me nervous. So I always remind whoever I'm with, hey, this is the speed limit going through this area. And that's about it. He was not driving erratically; he was not



speeding. We were merging from a slow -- the road was -- the speed limit was slower, and then we had to increase speed to go on the double lane highway, 55. [22]

### 5.3.2     Alcohol Consumption by Zelechiwsky

A. That night, we had dinner, an early dinner with our friends. We went back to the home to pack up our car. I don't recall the exact time, but I know it was still light out. It was, like, early evening. And then as we got on the road, it got dark. By then -- if I recall, it would get dark around 9 o'clock. So we -- based on that time of the year, I'd probably say we left around 7, 8 o'clock maybe, 8 o'clock. After 8, probably. Then we did eat at H&H, like I told the other officer, that they don't serve alcohol there. We did not drink all day. I said -- I think he had a beer on the beach. I think we shared a beer. And I don't think neither of us finished it. I think it was dumped, because we just didn't -- we were having a good time at the beach swimming. My husband swims a lot, and he makes me nervous, because he goes out far, when he goes swimming, in the bay. And we were just chatting, having a nice weekend with our friends that came down that day. [23]

This testimony is contrary to the report she gave without being prompted to Gallagher on his BWC during which she reported that they had beer while at the beach. I note that she gave her deposition after sitting in on her husband's deposition.

### 5.3.3     Reason for the Suit

Q. Okay. You have allegations or you have claims that this incident adversely affected all forms of socialization, including your marital relationship. Can you tell me how this incident has affected your marital relationship?

---

[22] Deposition of Lisa Zelechiwsky pages 22-23
[23] Deposition of Lisa Zelechiwsky pages 24



A. Well, I would have to go back to that time period. I mean, definitely that first month, Bo was pretty, you know, shook up. He -- he's a man, and he was taken away by a female police officer, handcuffed, and accused of something that -- you know, he's an honorable man. So that affected his ego. And it would make him more edgy. He wasn't himself for awhile. So that would impact our, you know, relationship. He just was down a little bit, you know. And he holds a lot in. Based on my observations, I'm sure she hurt his pride, you know, his ego, so. And it wasn't like it was where a woman said the wrong thing to him. It wasn't like that. I mean, he was handcuffed, put in a police car, strapped on a chair, you know, it -- he wasn't himself for a little while

Q. Okay.

A. He did the best -- he does the best he can. Bo always does. He always tries to pick himself up and move forward with things. And that's what he does. But we really feel that night was just totally unnecessary. And it was unlawful of the treatment. It didn't have to be like that. She didn't have to choose the things that she chose, in my opinion, based on what I saw, and how I was treated. There was no --

Q. So your testimony -- sorry. Go ahead.

A. No, there's -- this was no reason for her treatment of us, the way she handled things.

Q. So your testimony is that he has an ego, and he was taken away by a female police officer?

A. I wouldn't say that he has an ego. He was hurt. His ego was hurt.[24]

---

[24] Deposition of Lisa Zelechiwsky pages 69-70



# 6   Review of Plaintiff's Expert Reports

Both of the plaintiff's experts disregarded the evidence displayed on Gallagher's BWC. During which Mrs Zelechiwsky reported her husband is not the greatest driver. They disregard the statements of Zelechiwsky in which he reported that he is constantly being admonished by his wife for his poor driving habits.

Neither of them considered that Davis's BWC which captured the entire event contemporaneously laid out probable cause that something was off with Zelechiwsky that evening and he appeared impaired. In their report, they comment that the reason for Zelechiwsky's failure to perform well on the field sobriety test is attributable to his age. They make this assertion even though the depositions of both Zelechiwsky and Mrs. Zelechiwsky portray Zelechiwsky as an extremely active skier, swimmer, and cyclist who is in very good physical shape. The field sobriety test is designed and tested to be effective at assessing impairment for all ages. Not only was Zelechiwsky unable to perform, he failed to follow instructions which the plaintiff's experts have chosen to ignore.

Regarding the search of the vehicle, they both opine that it was improper. Their opinions are based on their assessment of their information in which they completely disregard the testimony of a sworn member of the NJSP, who has no known malice for Zelechiwsky.   Davis reported motor vehicle offenses which is a clear and unequivocal reason to stop a motor vehicle and aside from Mr. and Mrs. Zelechiwsky's self-serving denials, they choose to ignore the possibility that Davis was performing her duty and enforcing traffic law.  They ignore this even though as the event occurred Mrs. Zelechiwsky informed Gallagher that her husband is not the best driver and she did not appear to be surprised that the motor vehicle was stopped when talking to Gallagher.

They should know that if the motor vehicle infractions occurred as reported, then evidence that was developed established clear probable cause that Zelechiwsky was lawfully placed under arrest and as such, a suspected drunk driver whose vehicle is on a public roadway would have developed sufficient probable cause that evidence of that crime could be found in the vehicle such as empty containers, legal or illegal drugs. In this case the search revealed six unopened bottles of wine in a shopping bag which correctly was determined to not be evidence. However, if Davis had discovered a receipt in the bag showing that seven bottles of wine had been purchased and one was now missing that would in fact be evidentiary in nature.  Davis completed a motor vehicle exception search which is consistent with NJSP policies, procedures, and consistent with state and federal law.



# 7    Findings and Conclusions

**DISCUSSION AND OPINIONS**

I have been asked to review this case with regard to the actions Trooper Davis of New Jersey State Police

Below, I provide opinions regarding the following topics:
1) The motor vehicle stop conducted by Davis
2) The arrest of Zelechiwsky
3) The detention Zelechiwsky while being given the breathalyzer.
4) The civil motor vehicle citations issued to Zelechiwsky

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions and the basis for my opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed.

In my review of this case, I examined the evidence from the perspective of proper police procedure and may opine whether or not the evidence does or does not support a particular allegation or statement. Regarding legal definitions, I may state definitions as taught to police officers in police training venues but leave statutory definitions to the Court. Finally, although I may opine as an expert in police practices about whether evidence does or does not support factual allegations, I acknowledge that the final determination of factual accuracy is left to the trier of fact.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law.
I have extensive practical experience in the field of law enforcement and have considerable experience analyzing police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), I serve on the IACP training Committee and have served for the past 4 years. I am a member of the Police Executive Research Forum (PERF) and have actively worked with PERF to develop guidance to police leadership. I am a member of the Federal Bureau Investigations National Academy Associates (FBINA.) I have conducted training for FBINA to tens of thousands of their membership in 44 states.



Specifically, my review of this case has found the following:

Trooper Davis is a duly sworn member of the NJSP and was on duty on the evening of 8/10/2020 when she observed Zelechiwsky's pickup truck operating on the highway. She observed what she perceived as the vehicle not maintaining the lane of travel and weaving. She later reported the vehicle was observed conducting a lane change without signaling and she decided to take an enforcement action. Zelechiwsky reported in his deposition that he was driving perfectly fine and did not commit the moving violations. He reported that his wife has been and is extremely critical of him when he is driving and voices her criticism. He opined that since she was not concerned, he was driving without issue. Gallagher's video is clear and tells a different story. When asked if Davis had informed Mrs. Zelechiwsky what was going on she responded yes. "he's just he doesn't drive the greatest". It appeared she had no trouble understanding Davis' reason for stopping them.

Davis stopped the vehicle and approached the passenger side and contacted Mrs. Zelechiwsky Davis immediately informed the occupants as to reasons why they had been pulled over. After getting their license and registration Davis illuminated the car and observed Zelechiwsky who she reported in her deposition as having glassy eyes and appearing slow in his movement. Davis asked if they had been drinking. Zelechiwsky replied that he had not. Davis went to the driver's door and requested that Zelechiwsky step out so she could make sure he was safe to drive.

Davis had Zelechiwsky take three field sobriety tests. The HGN test Davis can be heard on video twice correcting Zelechiwsky to not move his head. She determined that he continued moving his head so the test was not something that could determine indications of impairment one way or another.

Davis next had Zelechiwsky perform the walk and turn test next. He is observed on video lifting his arm to steady himself and appeared to be losing his balance. He is also seen on video not counting as instructed even though he stated that he understood the instructions. At the beginning of the test, the video showed Zelechiwsky acknowledging the instructions and requesting permission to move to an area that is best suited for the test which is granted. During the deposition and in the expert reports the location of the test is cited as a reason for the poor performance on the test.

Davis next had Zelechiwsky perform the one-leg stand test. He acknowledged the instructions and did not follow them. He attempted the test and was unable to compete in it. He stumbled multiple times after losing his balance. In his deposition and in the expert reports this failure is attributable to his age the location. During both his and Mrs. Zelechiwsky depositions, they reported how fit and active Zelechiwsky was. His usual routine was to go for long bike rides. He was an avid swimmer and skier and they reported he also spent time chopping wood and doing extensive yard work. It seems that a person of his fitness level and active lifestyle should have been very able to complete these tests. Zelechiwsky is a criminal defense attorney who has handled numerous OUI cases. He has had lots of exposure to the field sobriety testing program



used by law enforcement. He knew the importance of following instructions and even with that knowledge he was unable to follow those instructions.

When Zelechiwsky is seated in the back of the vehicle Davis stated that you didn't do too well on those tests. Zelechiwsky agreed and stated it was due to nerves.

During the stop Zelechiwsky initially reported not having consumed any alcohol. After Davis spoke to Mrs. Zelechiwsky, she informed him that she had reported they were drinking that day. Zelechiwsky changed his statement to we had 5 or 6 and then amended it to a glass of wine. Mrs. Zelechiwsky informed Gallagher without being asked that they had **Beer** at the beach which they left a 3:00 p.m.

Later at their depositions (Mrs. Zelechiwsky was present for Zelechiwsky's deposition) **Beer** at the beach was reported as consisting of the two of them sharing one beer which they did not finish that afternoon before the encounter.  A single beer was packed in the cooler by Mrs. Zelechiwsky. Doctors and police officers are accustomed to individuals they encounter under reporting alcohol consumption.

Davis reported and documented her observations and actions on video as they played out. Her statements and actions are contemporaneous as the information is being developed, they are not observations that she reported after a period of time and in consultation with others. The BWC video and statements by Zelechiwsky and Mrs. Zelechiwsky support her reports.

Based on the observations reported by Davis of the motor vehicle operation by Zelechiwsky including the following:
- ➢ Observations of his physical appearance displaying glassy eyes and his movements appeared slow and hesitant.
- ➢ Zelechiwsky's performance on the field sobriety tests.
- ➢ The conflicting reporting of how much if any alcohol had been consumed.
- ➢ The presence of an order of alcoholic beverage in the driver's seat area.
- ➢ Six Bottles of wine behind the back seat.

Davis had an obligation to take Zelechiwsky into custody when probable cause was developed that Zelechiwsky was impaired and operating under the influence of alcohol, legal, or illicit drugs.

After taking Zelechiwsky into custody Davis had established probable cause that evidence of alcohol or drug use would be located in the Zelechiwsky's vehicle which was on a public way. Davis complied with NJSP policies and procedures as well as state and federal constitutional requirements when she conducted a limited search of the cab of the pickup truck. The BWC video showed the scope and intensity of the search to be consistent with acceptable practices. In fact, Davis discovered six bottles of wine which were not open in the vehicle during the search.



My process when reviewing cases with videos and documents is that I first watch the videos they inform me on what the documentation is explaining when I review them. As I review videos, I tend to take screen shots and notes of my observations of what I observed and its relevance. I did that process in this matter. When reviewing the depositions I found that my observations as to the performance of Zelechiwsky on the field sobriety test matched those reported by Davis. I with the benefit of hindsight now know that Zelechiwsky was not under the influence of alcohol. However, his affect, presentation, appearance, body movements, and inability to follow directions and complete the field sobriety tests brought me to the same conclusion that something was going on impairing him that day. That could be caused by a host of reasons, one being alcohol, based on the totality of the circumstances.

Davis followed appropriate law and procedure and transported Zelechiwsky to the barracks for a breath test. Mrs. Zelechiwsky followed in the pickup. Zelechiwsky was offered an administrative breath test which reported 0.0 alcohol in his system. Davis had established probable cause to take Zelechiwsky into custody and upon receiving information that no longer supported that probable cause Davis cited Zelechiwsky for civil citations and coordinated his released from custody. The time period of the detention was reasonable under the circumstances. In keeping with NJSP policy and procedure and consistent with what any reasonable officer reasonable officer found in a similar situation would do.



# 8   Conclusions

In summary, it is my opinion within a reasonable degree of certainty within my field that:

> The motor vehicle stop conducted by Davis was based on her observations and consistent with NJSP policies and procedures, and state law. The stop was conducted after Davis established reasonable suspicion to take an enforcement action.
> The arrest of Zelechiwsky was consistent with NJSP policies and procedures, state and federal law and was conducted after Davis established probable cause to take Zelechiwsky into custody.
> The detention Zelechiwsky while being given the breathalyzer was consistent with NJSP policies and procedures, state and federal law and within a reasonable time of determining that the probable cause no longer existed Zelechiwsky was released consistent with NJSP policies and procedures, state and federal law.
> The civil motor vehicle citations issued to Zelechiwsky are consistent with NJSP policies and procedures, and state law.


All of my opinions are stated to a reasonable degree of professional certainty in my profession as an expert in law enforcement and security matters. I reserve my right to reassess my opinion if provided with additional facts and information not previously considered. My fees are $350 USD per hour for document review and $400 USD per hour for testimony and drafting an expert report.

Respectfully Submitted,

Daniel O. Linsky



# 9    Appendix #1 Documents Reviewed

1.    Trooper Ashley Davis BWC Footage

2.    Trooper Michael Gallagher BWC Footage

3.    Trooper Ashley Davis DIVR Footage

4.    Trooper Michael Gallagher DIVR Footage

5.    August 10, 2020 CAD Abstract- 6 pgs.

6.    August 10, 2020 Motor Vehicle Stop Report- 3 pgs.

7.    Drinking Driver Questionnaire-Zelechiwsky- 2 pgs.

8.    Alcohol Influence Report Form-Zelechiwsky- 2 pgs.

9.    Deposition Transcript of Trooper Ashley Davis- 187 pgs.

10.    Deposition Transcript of Bohdan J. Zelechiwsky- 161 pgs.

11.    Deposition Transcript of Lisa A. Zelechiwsky- 97 pgs.

12.    Expert Opinion Report by John G. Peters, Jr., Ph.D.- 21 pgs.

13.    Expert Opinion Report by Thomas Sexton -5 pgs.

14.    https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_ig_refresher_manual.pdf

15.    Various New Jersey statutes.

16.    Various NJSP policies and procedures.



# 10 Findings and Conclusions

**DISCUSSION AND OPINIONS**

I have been asked to review this case with regard to the actions Trooper Davis of Pennsylvania State Police

Below, I provide opinions regarding the following topics:
5) The motor vehicle stop conducted by Davis
6) The arrest of Zelechiwsky
7) The detention Zelechiwsky while being given the breathalyzer.
8) The civil motor vehicle citations issued to Zelechiwsky

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions and the basis for my opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed.

In my review of this case, I examined the evidence from the perspective of proper police procedure and may opine whether or not the evidence does or does not support a particular allegation or statement. Regarding legal definitions, I may state definitions as taught to police officers in police training venues but leave statutory definitions to the Court. Finally, although I may opine as an expert in police practices about whether evidence does or does not support factual allegations, I acknowledge that the final determination of factual accuracy is left to the trier of fact.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law.

I have extensive practical experience in the field of law enforcement and have considerable experience analyzing police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), I serve on the IACP training Committee and have served for the past 4 years. I am a member of the Police Executive Research Forum (PERF) and have actively worked with PERF to develop guidance to police leadership. I am a member of the Federal Bureau Investigations National Academy Associates (FBINA.) I have conducted training for FBINA to tens of thousands of their membership in 44 states.



Specifically, my review of this case has found the following:

Trooper Davis is a duly sworn member of the NJSP and was on duty on the evening of 8/10/2020 when she observed Zelechiwsky's pickup truck operating on the highway. She observed what she perceived as the vehicle not maintaining the lane of travel and weaving. She later reported the vehicle was observed conducting a lane change without signaling and she decided to take an enforcement action. Zelechiwsky testified that he was driving perfectly fine and did not commit the moving violations. He further testified that his wife has been and is extremely critical of him when he is driving and voices her criticism. He testified that since she was not concerned, he was driving without issue. Gallagher's video is clear and tells a different story. When asked if Davis had informed Mrs. Zelechiwsky what was going on she responded yes. "he's just he doesn't drive the greatest." It appeared she had no trouble understanding Davis' reason for stopping them.

Davis stopped the vehicle and approached the passenger side and contacted Mrs. Zelechiwsky Davis immediately informed the occupants as to reasons why they had been pulled over. After getting their license and registration, Davis illuminated the car and observed Zelechiwsky who she reported in her deposition as having glassy eyes and appearing slow in his movement. Davis asked if they had been drinking. Zelechiwsky replied that he had not. Davis went to the driver's door and requested that Zelechiwsky step out so she could make sure he was safe to drive.

Davis had Zelechiwsky take three field sobriety tests. The HGN test Davis can be heard on video twice correcting Zelechiwsky to not move his head. She determined that he continued moving his head so the test was not something that could determine indications of impairment one way or another.

Davis next had Zelechiwsky perform the walk and turn test next. He is observed on video lifting his arm to steady himself and appears to be losing his balance. He is also seen on video not counting as instructed to even though he stated that he understood the instructions. At the beginning of the test the video showed Zelechiwsky acknowledging the instructions and requesting permission to move to an area that is best suited for the test which is granted. During the deposition and in the expert reports the location of the test is cited as a reason for the poor performance on the test.

Davis next had Zelechiwsky perform the one-leg stand test. He acknowledged the instructions and did not follow them. He attempted the test and was unable to compete in it. He stumbled multiple times after losing his balance. In his deposition and in the expert reports this failure is attributable to his age the location. During both his and Mrs. Zelechiwsky deposition they reported how fit and active Zelechiwsky was. His usual routine was to go for long bike rides. He was an avid swimmer and skier and they reported he also spent time chopping wood and doing extensive yard work. It seems that a person of his fitness level and active lifestyle should have been very able to complete these tests. Zelechiwsky is a criminal defense attorney who has handled numerous OUI cases. He has had lots of exposure to the field sobriety testing program



used by law enforcement. He knew the importance of following instructions and even with that knowledge he was unable to follow those instructions.

When Zelechiwsky is seated in the back of the vehicle, Davis stated that you didn't do too well on those tests. Zelechiwsky agreed and stated it was due to nerves.

During the stop Zelechiwsky initially reported not having consumed any alcohol. After Davis spoke to Mrs. Zelechiwsky, she informed him that she had reported they were drinking that day. Zelechiwsky then changed his statement to we had five or six and then amended his response that he had a glass of wine. Mrs. Zelechiwsky informed Gallagher without being asked that they had **beer** at the beach which they left at 3:00 p.m.

Later at their depositions (Mrs. Zelechiwsky was present for Zelechiwsky's deposition), **Beer** at the beach was reported as consisting of the two of them sharing one beer which was packed in the cooler by Mrs. Zelechiwsky, which they did not finish that afternoon before the encounter. Doctors and police officers are very accustomed individuals who underreport their alcohol consumption during traffic stops. This is supported due to the inconsistencies of Zelechiwsky and the conflicting statements made by Mrs. Zelechiwsky.

Davis reported and documented her observations and actions on video as they played out. Her statements and actions are contemporaneous as the information is being developed, they are not observations that she reported after a period of time and in consultation with others. The BWC video and statements by Zelechiwsky and Mrs. Zelechiwsky support her reports.

Based on the observations reported by Davis of the motor vehicle operation by Zelechiwsky including the following:
- ➢ Observations of his physical appearance displaying glassy eyes and his movements appeared slow and hesitant.
- ➢ Zelechiwsky's performance on the field sobriety tests.
- ➢ The conflicting reporting of how much if any alcohol had been consumed.
- ➢ The presence of an order of alcoholic beverage in the driver's seat area.
- ➢ Six Bottles of wine behind the back seat.

Davis had an obligation to take Zelechiwsky into custody when probable cause was developed that Zelechiwsky was impaired and operating under the influence of alcohol, legal, or illicit drugs.

After taking Zelechiwsky into custody Davis had established probable cause that evidence of alcohol or drug use would be located in the Zelechiwsky's vehicle which was on a public way. Davis complied with NJSP policies and procedures as well as state and federal constitutional requirements when she conducted a limited search of the cab of the pickup truck. The BWC video showed the scope and intensity of the search to be consistent with acceptable practices. In fact, Davis discovered six bottles of wine which were not open in the vehicle during the search.



My process when reviewing cases with videos and documents is as follows: I first watch the videos as it can inform me on what the documentation depicts. I reviewed the videos with the benefit of hindsight that Zelechiwsky was not under the influence of alcohol. However, his affect, presentation, appearance, body movements, and inability to follow instructions of Davis, and complete the field sobriety tests brought me to the same conclusion that something impaired Zelechiwsky that day. The impairment could be caused by a host of reasons, one being alcohol based on the totality of the circumstances.

Davis followed appropriate law and procedure and transported Zelechiwsky to the barracks for a breath test. Mrs. Zelechiwsky followed in the pickup. Zelechiwsky was offered an administrative breath test which reported 0.0 alcohol in his system. Davis had established probable cause to take Zelechiwsky into custody and upon receiving information that no longer supported that probable cause Davis cited Zelechiwsky for civil citations and he coordinated his released from custody. This was in keeping with NJSP policy and procedure and consistent with what any reasonable officer found in a similar situation would have done.



# 11 Conclusions

In summary, it is my opinion within a reasonable degree of certainty within my field that:

> ➢ The motor vehicle stop conducted by Davis was based upon her observations and consistent with NJSP policies and procedures, and state law. The stop was conducted after Davis established reasonable suspicion to take an enforcement action.
> ➢ The arrest of Zelechiwsky was consistent with NJSP policies and procedures, state and federal law and was conducted after Davis established probable cause to take Zelechiwsky into custody.
> ➢ The detention of Zelechiwsky while being given the breathalyzer was consistent with NJSP policies and procedures, state and federal law and within a reasonable time of determining that the probable cause no longer existed.  Zelechiwsky was released consistent with NJSP policies and procedures, state and federal law.
> ➢ The civil motor vehicle citations issued to Zelechiwsky were consistent with NJSP policies and procedures, and state law.

All of my opinions are stated to a reasonable degree of professional certainty in my profession as an expert in law enforcement and security matters. I reserve my right to reassess my opinion if provided with additional facts and information not previously considered. My fees are $350 USD per hour for document review and $400 USD per hour for testimony and drafting an expert report.

Respectfully Submitted,



# 12  Appendix #1 Documents Reviewed

1.     Trooper Ashley Davis BWC Footage

2.     Trooper Michael Gallagher BWC Footage

3.     Trooper Ashley Davis DIVR Footage

4.     Trooper Michael Gallagher DIVR Footage

5.     August 10, 2020 CAD Abstract- 6 pgs.

6.     August 10, 2020 Motor Vehicle Stop Report- 3 pgs.

7.     Drinking Driver Questionnaire-Zelechiwsky- 2 pgs.

8.     Alcohol Influence Report Form-Zelechiwsky- 2 pgs.

9.     Deposition Transcript of Trooper Ashley Davis- 187 pgs.

10.    Deposition Transcript of Bohdan J. Zelechiwsky- 161 pgs.

11.    Deposition Transcript of Lisa A. Zelechiwsky- 97 pgs.

12.    Expert Opinion Report by John G. Peters, Jr., Ph.D.- 21 pgs.

13.    Expert Opinion Report by Thomas Sexton -5 pgs.

14.    https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/sfst_ig_refresher_manual.pdf

15.    Various New Jersey statutes.

16.    Various NJSP policies and procedures.

