## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN DIVISION

| | |
|---|---|
| **BOHDAN J. ZELECHIWSKY, et al.** | : |
| | : **CIVIL ACTION** |
| **Plaintiffs,** | : |
| | : |
| **vs.** | : |
| | : **No. 1:22cv-04994-CPO-AMD** |
| **TROOPER ASHLEY DAVIS, et al.** | : |
| | : |
| **Defendants.** | : |

## PLAINTIFFS' RESPONSIVE STATEMENT OF MATERIAL FACTS

COME NOW, the Plaintiffs, Bohdan and Lisa Zelechiwsky, by and through their legal counsel, P. Joseph Nicola, Esquire, and in accordance with Civ. RULE 56.1 so providing, hereinafter indicates agreement or disagreement with the Defendant's filing of Defendant's Statement (Doc. 52-3) in general and, to each paragraph contained therein specifically, as follows:

### A. Objections To Defendants Purported Statement of Material Facts

L.Civ.R.56.1(a) requires this Statement to "set[ ]forth material facts as to which there does not exist a general issue." (Emphasis supplied). Thus, in addition to violating the Rule by including alleged "facts" which are clearly known by the Defendant to be contested, (including by Plaintiffs' Experts' Declarations) the Defendant clutters her Statement here by including recitations of alleged facts which are clearly immaterial to this Court's Summary Judgment analysis or determination.

1

The paragraphs which are objected to and, should not be considered by this Court will be responded to with a "Objection", as none of these paragraphs constitute "material facts" because they clearly would not "affect the outcome of the suit under the governing law". *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Nor do they relate to "the existence of an element essential to the party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Nor is it possible that this "evidence is such that a reasonable jury could not return a verdict for the nonmoving party", based thereon. *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

1. Admitted.

2. Admitted. However, by way of further answer each of those counts is properly predicated upon the Civil Rights Act of 1871, as amended, 42 U.S.C. §1983. Exhibit B.

3. Admitted.

4. Denied. The Defendant's Stop Report indicates that the Plaintiff, Mr. Zelechiwsky, was allegedly stopped for a moving violation (39:4-88 b) (Unsafe Lane Change) but was actually charged and arrested for a violation of N.J.S.A. 39:4-50 "Driving While Intoxicated" (Exhibit "A"). It is clear that, contrary to the Defendant's sworn testimony at many points in her own deposition (Exhibit F, 63, 133), the Plaintiff was, in fact, arrested. But he

was never charged with DWI and he was found not guilty of the Unsafe Lane Change with which he was charged. Exhibit A. And the Plaintiff was found not guilty by a judge on that charge. Exhibit F, 78-79.

5.    Denied as stated. On August 10, 2020, Defendant Davis was on solo highway patrol from 6 pm to 6 am (Id., 36-37) when she claimed to have first observed the Plaintiffs' vehicle in front of her, in the same left lane, allegedly being operated outside of its lane of travel but, she can't recall how many times it failed to maintain its lane. (Id. 39-40). The vehicle also allegedly switched lanes, "on one occasion" without using its turn signal according to her but, she also didn't recall when or where that occurred. *Id.* 40. The Trooper claims that she shined her flashlight from the front passenger window, across the passenger seat and into the eyes of Mr. Zelechiwsky seated in the driver's seat and claimed that, from that distance, the beam of her flashlight shined through the darkness of the vehicle and through the glasses that Mr. Zelechiwsky was wearing, allegedly revealing that his eyes appeared "bloodshot, glassy". *Id.*, 46, 50. The Trooper did not explain how Mr. Zelechiwsky's glasses would not have reflected or refracted her flashlight beam or, how anyone's eyes would not have appeared similarly bloodshot or glassy with a large flashlight shined into them. However, she did admit that the appearance of his eyes could just

mean he was tired, not intoxicated. Id., 48,77. The Trooper then went to the driver's side of the vehicle where she strangely did not confirm the alleged glassy, bloodshot eyes. She did not smell an odor of an alcoholic beverage emanating from Mr. Zelechiwsky or his breath, and admitted that there was no observations at that time which suggested that he was under the influence. She then asked Mr. Zelechiwsky if he was drinking to which he replied "No.No.No." (as also heard on the body cam footage) Exhibit G, 21:38, Exhibit C, 50. His wife also said "No". *Id*., 54-55.

6.    Admitted. Nonetheless, the Trooper asked the Plaintiff (Mr. Zelechiwsky) to exit the vehicle, and he complied, exiting normally and without any assistance, or difficulty, full equilibrium and evidencing no signs of intoxication. Exhibit G, 21:38.

7.    Denied. The Trooper proceeded to conduct field sobriety tests on the uneven and rounded macadam shoulder, the Plaintiff's high beams of his truck only a few feet away, (*Id.*); and on the side of a dark highway with cars whisking by, and with no line to walk. *Id.*, and Exhibit F, 56-57. The HGN test was performed at 3 minutes and 2 second on the video. Exhibit F, 99. And, the walk and turn test commenced 3 minutes and 10 seconds into the test. Exhibit F, 109. This means that the Plaintiff's head movement which the Trooper complained of (and the Plaintiff and his wife and

4

Plaintiffs' experts said never occurred), supposedly took place within 8 seconds.

Trooper Davis stated that she didn't reply upon the results of the HGN test because she wasn't too sure if there was scientific data to back it up but; "This is why we take them back to the station for another test." The Plaintiff performed the walk and turn test for less than one minute – from 4 minutes and 36 seconds until 5 minutes and 36 seconds or, again, for less than one minute. Exhibit F, 111-112. And, the Plaintiff performed the one leg stand from 7 minutes 6 seconds (Id., 115) for approximately another minute and then, handcuffed the Plaintiff. While the Trooper testified that the standard instructions for this test require her to demonstrate the proper way to perform each of the performance tests (Exhibit F, 111 ln. 2-3, walk and turn test); 113 (one-leg stand), and while the Plaintiff's experts agree (Exhibits K and P), she didn't demonstrate either test (Exhibit G) (perhaps three steps on the 18 step walk and turn (heel-to-toe test, Exhibit G, 21:39-40). And, in fact, she later testified that she only demonstrates "if they want it demonstrated." Exhibit F, 113.

She never asked him the most significant pre-requisite to field testing for sobriety, to wit, whether he has any injury or condition that would affect his test performance. She only asked him if he had any medical condition

with regard to his eyes. *Id.*, 52; Exhibit G. The Trooper admitted that: "Mr. Zelechiwsky was certainly able to stand still and maintain his balance while he was awaiting the performance of [the HGN] test." *Id.*, 55, which was an extended period of time. Exhibit G, 21:38-21:43. The Trooper admitted that: "He" [Mr. Zelechiwsky] was able to maintain his balance when [she] [was] shining the flashlight in his eyes." *Id*. And although the Trooper claimed that Mr. Zelechiwsky moved his head when she was shining her flashlight in his eyes, and while the Plaintiffs high beams were shining, the Plaintiffs each deny that any such movement occurred, and the body cam footage shows none. Exhibit G, 21:38-39. And the Trooper admits that she did not "observe any other indications of intoxication during that test". Exhibit F, 54.

Mrs. Zelechiwsky was positioned in the front seat of the truck facing directly into the test performance just feet away, and saw her husband's performance of all the field tests, and they were done as well as possible, with no problems and with no indication of impairment. Exhibit E, 42-43

8.  Denied. The Trooper then proceeded to search the Plaintiffs' entire vehicle, including its contents, and expressly stated, under oath, that she did so because it was permitted by specific NJSP "rules and regulations", Exhibit F, 66, although she didn't know the Section "offhand". Id., 64-67. Moreover,

the Trooper could not name any federal law or state statute which provided her with that authority. Id., 66-67. The Trooper bluntly stated in her deposition that her reason for searching the vehicle was: "Because its probable cause after we detain a person for DUI". Id., 118, ln. 16-17. The Trooper admitted to looking "all over" in her search of the vehicle and when asked what she was looking for she said, "evidence of impairment" (whatever that could be). Id., 118, ln. 19, 25. The Trooper admitted that she told Mrs. Zelechiwsky to exit the vehicle and to leave her purse and her phone in the vehicle, and then she searched her purse. Exhibit E, 15, 61. When asked at her deposition what she was looking for in the purse, the Trooper replied "evidence of either alcohol or drugs". Exhibit E, 119, ln. 19. The Trooper saw no evidence of any contraband or the proceeds of a crime prior to when she searched the vehicle. And, the Trooper's search of Mr. Zelechiwsky produced no evidence of contraband or the proceeds of a crime, and, there was nothing in plain view within the vehicle which appeared to be contraband or criminal proceeds and, indeed, the search produced no contraband or evidence of a crime or anything of evidentiary value. Exhibit A, Exhibit F, 64-67.

9.    Admitted one that it was released.

10. Admitted. But also clear that the Plaintiff, Mr. Zelechiwsky showed no signs of intoxication and had a valid driver's license. Exhibit B, 140; Exhibit C, 140; Exhibits K and P; Exhibit E, 43; Exhibits N and O.

11. Admitted. Troper Davis did not subject the Plaintiff to any blood or urine drug testing at headquarters and, she can't recall why not. *Id*., 74. She also did not retest him using any of the field sobriety tests under the clearly more reasonable conditions presented at headquarters, *Id.*, 78, 140, (except for a breathalyzer test). *Id*. There is no evidence that the Plaintiff did anything but reasonably and promptly comply with another Trooper's administration of a breathalyzer test ("Alcotest") which provided a 00.00% alcohol reading. *Id*., 70.

12. Admitted. Although he was perfectly fine to drive home.

13. Objection.

14. Objection.

15. Objection.

16. Admitted.

17. Objection.

18. Objection.

19. Admitted.

20. Admitted. Although they also went to numerous other places.

21.    Denied and no Questionnaire is attached as Exhibit "D" or any other exhibit. Moreover, any such question would normally be completed after ones arrest so it is completely irrelevant to pre-arrest probable cause.

22.    Denied as stated. It was 5 or 6 in the afternoon. No one ingested alcohol. Bohdan Zelechiwsky was not impaired in any way going to, at, or leaving from the Restaurant. Exhibits N and O; Exhibit E, 43; Exhibit G, 23, Exhibit C, 54-55, 78, 86, 91, 93, 101, 106.

23.    Admitted. The Plaintiffs had not consumed any alcohol and were not impaired in any way. *Id.*

24.    Denied as stated. This reference is to his entire 40-45 minutes or so of driving, not prior to the stop. Exhibit C, 86:3-5. And Trooper Davis saw him right in front of her in the same left lane for about one minute. According to Davis she was behind the Plaintiffs' vehicle that was driving in the same left lane as Davis. (Id. 38). She followed him for approximately one minute and doesn't recall if there were any vehicles in between them (Id. 38-39), but, she claims that she was travelling "[a] car length or two" behind the Plaintiffs' vehicle the entire time. (Id. 42). Davis' body cam footage belies Davis' claims that she was the car behind the Plaintiffs, by showing that there was one car in between Davis and the Plaintiffs' vehicle, and that no changing of lanes was done by the Plaintiffs' vehicle in the one

minute after Davis claims to have noticed the Plaintiffs' vehicle. *Id.,* 38-39. She activated her lights and sirens (later corrected to only her lights), at which time Davis testified that the Plaintiffs' vehicle immediately pulled over (Id. 42) safely and properly, and came to a complete stop off the roadway, (Id. 43-44, 93), exactly as one would expect of an unimpaired operator. The Plaintiffs also deny that any of the events which Davis claimed precipitated the vehicle stop, ever occurred . . . no driving out of the lane, no changing of lanes without employing a turn signal, no aberrant driving of any kind. Exhibit E, 43, Exhibit C, 54. Moreover, not only does the body cam footage not show any weaving by the Plaintiff or any turns from his lane during the approximate one minute period that the Defendant claimed to have followed the Plaintiffs' vehicle in the left lane but, Davis didn't recall that there was a car in between them (as the body cam clearly shows) Exhibit F, 38-39 and G, 21:35-21:36. Davis can't recall how many times the Plaintiff traveled outside of his lane at that time (Id., 39-40); she observed no other violations of any kind, including no speeding, and can't recall not properly maintaining the right lane at any time (or even being in the right lane) (Id.); she can't recall the Plaintiffs' vehicle or any other vehicle around the Plaintiffs' vehicle (Id., 42), and the Plaintiff did not endanger anyone with his driving (Id.). The Plaintiff, Mr. Zelechiwsky,

testified that he was flabbergasted that she stopped him for allegedly weaving and the non-use of his turn signal and said: "Those are lies," that his wife was a witness to his proper driving and never would have permitted him to drive if he was impaired in any way. And, that he was angered when the Trooper repeated those lies in her deposition testimony. Exhibit C, 54. In fact, at the time, the Plaintiff thought that the Trooper was going on some kind of a "call" so he moved into the right lane to allow her vehicle to pass. He was "shocked" when she pulled behind him but, he then immediately pulled over and stopped safely off the roadway. Id., 105, 107.

25. Denied as stated. He didn't recall making any lane changes and the body cam footage shows none. See #24.

26. Objection.

27. Admitted.

28. Admitted.

29. Objection.

30. Objection.

31. Objection.

32. Objection.

33. Objection.

34. Objection.

35.   Admitted in part.  Defendant Trooper Davis had been a N.J. State Trooper for 5 years and 7 months at that time. Exhibit F, 10. And, during that time she admitting to having "so many complaints against her" as a Trooper that she doesn't "even have a guess" as to how many. (Id. 24) . . . maybe more than 10, she just doesn't know. *Id.*, 36. She was also disciplined by the New Jersey State Police on at least two occasions. *Id.*, 23-24. On the first occasions she was disciplined for failing to arrest and test a fellow N.J. State Trooper who was suspected of driving under the influence. This failure came to light when the fellow Trooper then had an accident. *Id.* 28. The second discipline occurred because she failed to secure marijuana which she found in a vehicle search, and she also failed to place its discovery on her body camera (body cam). *Id.* 30, 33-34. Both misconducts occurred in 2018 or 2019 and resulted in suspensions and each resulted in remedial DUI training and HGN test training. *Id.*, 34-35.

36.   Admitted.

37.   Admitted. And as Trooper Davis testified, Mr. Zelechiwsky pulled over safely. Exhibit F, 93.

38-74. Denied as stated. The scenario described here is seriously disputed. What the summary judgment record shows, when the Plaintiffs' evidence is

taken as true, is entirely different than the self-serving, erroneous and/or incomplete.

According to Davis she was behind the Plaintiffs' vehicle that was driving in the same left lane as Davis. (Id. 38). She followed him for approximately one minute and doesn't recall if there were any vehicles in between them (Id. 38-39), but, nonetheless claims that she was travelling "[a] car length or two" behind the Plaintiffs' vehicle the entire time. (Id. 42). Davis' body cam footage belies Davis' claims by showing that there was one car in between Davis and the Plaintiffs' vehicle, and that no changing of lanes was done by the Plaintiffs' vehicle in the one minute after Davis claims to have noticed the Plaintiffs' vehicle. *Id.,* 38-39. She activated her lights and sirens (later corrected to only her lights), at which time Davis testified that the Plaintiffs' vehicle immediately pulled over (Id. 42) safely and properly, and came to a complete stop off the roadway, (Id. 43-44, 93), as one would expect of an unimpaired operator. The Plaintiffs also deny that any of the events which Davis claimed precipitated the vehicle stop, ever occurred . . . no driving out of the lane, no changing of lanes without employing a turn signal, no aberrant driving of any kind. Exhibit E, 43, Exhibit C, 54. Moreover, not only does the body cam footage not show any weaving by the Plaintiff or any turns from his lane

during the approximate one minute period that the Defendant claimed to have followed the Plaintiffs' vehicle in the left lane but, Davis didn't recall that there was a car in between them (as the body cam clearly shows) Exhibit F, 38-39 and G, 21:35-21:36. Davis can't recall how many times the Plaintiff traveled outside of his lane at that time (Id., 39-40); she observed no other violations of any kind, including no speeding, and can't recall not properly maintaining the right lane at any time (or even being in the right lane) (Id.); she can't recall the Plaintiffs' vehicle or any other vehicle around the Plaintiffs' vehicle (Id., 42), and the Plaintiff did not endanger anyone with his driving (Id.). The Plaintiff, Mr. Zelechiwsky, testified that he was flabbergasted that she stopped him for allegedly weaving and the non-use of his turn signal and said: "Those are lies," that his wife was a witness to his proper driving and never would have permitted him to drive if he was impaired in any way. And, that he was angered when the Trooper repeated those lies in her deposition testimony. Exhibit C, 54.

In fact, at the time, the Plaintiff thought that the Trooper was going on some kind of a "call" so he moved into the right lane to allow her vehicle to pass. He was "shocked" when she pulled behind him but, he then immediately pulled over and stopped safely off the roadway. Id., 105, 107.

It was a Monday night. The weather was nice but, there was no lighting where his vehicle was stopped. Id., 90.

The Plaintiff described the scenario as being part of a "police blitz" with Troopers stopping a number of cars on the same roadway near him. (Id. 55-56) in the area of Millville, where 347 turns into Route 55, and turns into two lanes on the outskirts of Millville. Id. 57-58. The Trooper testified that she was in the same left lane as the Plaintiffs, and a car length or two behind the Plaintiffs' vehicle for about one minute when she claimed to have observed that the vehicle didn't maintain its lane or use its turn signal and she immediately initiated her lights and siren (later admitting that there was no siren). Id. 38, 39 and 42. And, in response, the Plaintiffs' vehicle immediately pulled over and on to the shoulder of the road. Id., 42. The Trooper never explained how she could have come up behind the Plaintiffs' vehicle and followed it for one minute, during which time she claims to have observed the violations when: (a) the violations do not appear on the body cam footage; (b) the Plaintiffs' vehicle never left the same left lane that she was following it in – and therefore, made no lane change for which a turn signal indication would have been required; (c) she could not have been one to two car lengths behind the Plaintiffs' vehicle because, as the body cam footage shows, the Trooper was behind

another vehicle in the left lane, and, as the body cam also shows, the Trooper was at least two car lengths behind that vehicle. Exhibit G, 21:35, Exhibit E, 42.

The Trooper admits that she had a MVR camera (i.e. "dash cam") mounted on her patrol car (to capture and memorialize the movement of any motor vehicle that she might later contend violated the vehicle code). Exhibit F, 43. The Trooper claims that she did possess the actual motor vehicle recording from her MVR, and that it was "preserved by [the] State Police. *Id*. She also testified, under oath, that she watched both her body cam footage and the MVR footage prior to providing her sworn deposition testimony on February 20, 2024. *Id*., 43-44. However, the MVR footage provided in discovery apparently shows the camera pointed towards the sky, not the road in front of the Defendant as required and captures no video relevant to this matter. Exhibit L. Defendant Davis has not (could not), to date, offered any explanation as to why that occurred to such a critical, if not definitive piece of evidence in this case. Defendant Davis did however admit to the obscuring material parts of her body cam footage as a result of her decision to wear a "whistle" hanging over her body cam. Exhibit F, 47, Exhibit G. The Trooper went on to testify that she stopped the Plaintiffs' vehicle in a darkened section of the roadway without any

streetlights that she could recall. *Id.*, 48. The Trooper approached the passenger side of the vehicle and directed questions to Mr. Zelechiwsky who was the operator, with Mrs. Zelechiwsky sitting in the passenger seat. *Id.*, 44-45. When asked whether he had been drinking, the Plaintiff can be heard on the body cam video replying, "No.No.No.", and his wife also responded "No." Exhibit C, 54-55, Exhibit G, 21:36-37, 21:45. Although the Defendant claimed in her deposition that the Plaintiff was stopped because: "He was all over the road. His car was going outside of the lane onto the other lane. And then when he switched lanes, he failed to use his turn signal." (Exhibit F, 38,39, 92), (1) she never charged him with the alleged lane violation (N.J.S.A. Section 39:4-88); (2) her body cam video never shows either infraction; (3) the only charge which she did file (N.J.S.A. Section 39:3-123 "Improper Right And Left Turns") was dismissed by the judge. (Exhibit F, 78-79; Exhibit A; and (4) the Defendant testified that she only followed behind the Plaintiff for one minute (Exhibit F, 38-39) in the same left lane he occupied, one to two car lengths behind before she stopped him, precluding the possibility of any improper turn. Exhibit E, 38-39. The Trooper admitted that Mr. Zelechiwsky answered any questions that she asked of him. *Id*. And that "[h]e was answering in a reasonable way . . . he wasn't stuttering or

slurring his words or anything like that." *Id.*, 44-47. The Trooper also admitted that he was fully cooperative with her and that "he provided [her] with his license, registration and proof of insurance or whatever other documents [that she] requested." *Id.*, 46-47. The Trooper claims that she shined her flashlight from the front passenger window, across the passenger seat and into the eyes of Mr. Zelechiwsky seated in the driver's seat and claimed that, from that distance, the beam of her flashlight shined through the darkness of the vehicle and through the glasses that Mr. Zelechiwsky was wearing, allegedly revealing that his eyes appeared "bloodshot, glassy". *Id.*, 46, 50. The Trooper did not explain how Mr. Zelechiwsky's glasses would not have reflected or refracted her flashlight beam or, how anyone's eyes would not have appeared similarly bloodshot or glassy with a large flashlight shined into them. She did admit that the appearance of his eyes could just mean he was tired, not intoxicated. Id., 48. The Trooper then went to the driver's side of the vehicle where she strangely did not confirm the alleged glassy, bloodshot eyes; and she did not smell an odor of an alcoholic beverage emanating from Mr. Zelechiwsky or his breath, and admitted that there was no observations at that time which suggested that he was under the influence. She then asked Mr. Zelechiwsky if he was drinking to which he replied "No.No.No." (as

18

also heard on the body cam footage) Exhibit G, 21:38, Exhibit C, 50. His wife also said "No". *Id*., 54-55. Nonetheless, the Trooper asked the Plaintiff (Mr. Zelechiwsky) to exit the vehicle, and he complied, exiting normally and without any assistance, or differently, and in full equilibrium. Exhibit G, 21:38. The Trooper proceeded to conduct field sobriety tests on the uneven and rounded macadam shoulder, with the high beams of his truck only a few feet away, (*Id.*) and on the side of a dark highway with cars whisking by, and with no line to walk. *Id.*, and Exhibit F, 56-57. The Trooper failed to demonstrate how the Plaintiff was to perform the field sobriety tests, with the exception of the 18 step heal-to-toe test which she demonstrated by taking approximately three (3) steps. Exhibit G, 21:39-40. She never asked him the most significant pre-requisite to field testing for sobriety, to wit, whether he has any injury or condition that would affect his test performance. She only asked him if he had any medical condition with regard to his eyes. *Id.*, 52; Exhibit G. The Trooper admitted that: "Mr. Zelechiwsky was certainly able to stand still and maintain his balance while he was awaiting the performance of [the HGN] test." *Id.*, 55, which was an extended period of time. Exhibit G, 21:38-21:43. The Trooper admitted that: "He" [Mr. Zelechiwsky] was able to maintain his balance when [she] [was] shining the flashlight in his eyes." *Id*

And although the Trooper claimed that Mr. Zelechiwsky moved his head when she was shining her flashlight in his eyes, and while the Plaintiffs high beams were shining, the Plaintiffs each deny that any such movement occurred, and the body cam footage shows none. Exhibit G, 21:38-39. And the Trooper admits that she did not "observe any other indications of intoxication during that test". Mrs. Zelechiwsky was positioned in the front seat of the truck facing directly into the test performance just feet away, and saw her husband's performance of all the field tests, and they were done as well as possible, with no problems and with no indication of impairment. Exhibit E, 42-43. In fact, Mrs. Zelechiwsky attempted to record the tests in real time because she knew they would establish her husband's sobriety and the wrongfulness of the stop but, Trooper Davis approached her and told her to "put [her] phone away . . . put your phone away," and took Mrs. Zelechiwsky's license to further intimidate her. So, Mrs. Zelechiwsky "put [her] phone down, away" and was not able to record her husband's field test performance. *Id*. 42. Mrs. Zelechiwsky had no doubt that her husband demonstrated no signs of being impaired in any way:

> Q. So you did, so you saw the whole transaction?
> A. Yes.
> Q. And did you have any concerns about him performing any
>    of the tests?

A. No. I was actually in shock that she turned him around on the truck and handcuffed him and put him away. I was just in shock why she was doing that. Because he was standing steady for a pretty long time. I know, if I was a police officer, and someone was standing straight like that on a very busy road for a very long time, and not slurring words or not doing anything to appear impaired, I was shocked that she handcuffed him and took him away. I was in total shock. It was very upsetting.

Exhibit E, 43.

The Plaintiffs' experts, both trained in administering and even in instructing members of law enforcement on the proper administration of the field sobriety tests, each agreed that even based upon partially obscured body cam images, and given the improper environment, the uneven road surface, and with truck headlights shining from just feet away, and even considering the defective administration of the tests themselves, no reasonably objective police officer operating in a manner consistent with law enforcement standards, could conclude that Mr. Zelechiwsky failed the field sobriety tests, or that he was in any way impaired. See, Exhibits K and P and Exhibit G, 21:38-39. The unobscured portions of the trooper Body Cam (Exhibit G) also corroborate that:

a. The alleged motor vehicle violations never occurred. 21:35.

b. The Trooper could never have witnessed the violations she claimed to have seen because the Plaintiffs' vehicle never changed lanes, nor had

the ability to change lanes, in the approximate one minute that the Trooper claimed she followed behind it in the same left lane. *Id.*

c.  The Trooper was not "one or two car lengths" behind the Plaintiffs' vehicle because the footage clearly shows an intervening vehicle, with the Trooper being some distance behind it. Exhibit G, 21:35-36.

d.  The Plaintiff immediately, appropriately and safely drove his vehicle to the roadside and parked it capably and safely on the small off-road shoulder, properly in response to the Trooper's light activation. *Id*., 21:35

e.  The Plaintiff was polite, cooperative, mentally sharp and displayed full equilibrium and balance at all times, including while producing all his driving documents, exiting his vehicle, ambulating outside of the vehicle on a darkened, non-flat, busy highway shoulder with high beams from his truck shinning, responding to questioning, and entered easily the Trooper's vehicle on his own with his hands handcuffed behind him. *Id*., 21:35 – 21:44.

According to Mrs. Zelechiwsky, her husband did not exhibit any signs of intoxication or impairment on the evening in question. Exhibit E, 23-34, 43. Mr. Zelechiwsky was administered a breathalyzer test at State Police

Headquarters which resulted in a 00.00% reading of no alcohol in his system. Exhibit A, Exhibit F, 70.

Mr. Zelechiwsky was kept handcuffed to a bench for more than one hour, less than two hours after he passed the breathalyzer test and, during this time the Trooper was apparently preparing his traffic violation. *Id.*, 63, Exhibit E, 65. A summary criminal citation was filed by Trooper Davis alleging a violation of violations of N.J. Rev. Stat. §39:4-88 ("Traffic on Marked Lanes") and not for any alleged violation, N.J. Rev. Stat. §39:4-123 ("Right and Left Hand Turns"). Following many months of continuances by Trooper Davis, the Plaintiff was found not guilty by a judge, at a hearing at which Trooper Davis failed to appear. Exhibit F, 78-79.

75.    Admitted.

76.    Denied. See #38-74 above. Moreover, he did not loose his balance (Exhibit B, 123:1-3; Exhibit E, 42-43:

> Q. Did you actually look to see with your own eyes, not with a phone or anything, what was going on in back of your vehicle?
> A. This was in the front of my vehicle. It was in the front of the truck that she did the test on him. And I was able to see him. He was right in front of me.
> Q. So you did, so you saw the whole transaction?
> A. Yes.
> Q. And did you have any concerns about him performing any of the tests?

A. No. I was actually in shock that she turned him around on the truck and handcuffed him and put him away. I was just in shock why she was doing that. Because he was standing steady for a pretty long time. I know, if I was a police officer, and someone was standing straight like that on a very busy road for a very long time, and not slurring words or not doing anything to appear impaired, I was shocked that she handcuffed him and took him away. I was in total shock. It was very upsetting.

The fact that the high beams of the Plaintiff's truck at the time that he performed the walk and turn (heel-to-toe) field sobriety test and the one legged stand renders the test invalid because that alone will grossly affect equilibrium. See, Exhibit K and . Likewise, requiring the Plaintiff to perform these tests on the rounded portion of the shoulder slanting off into the grass violated the flat surface requirement of the test and will cause performance difficulties in any unimpaired testee. Also, there were cars whizzing by; the Plaintiff is 68 years of age; the Trooper failed to demonstrate the tests as required by standard procedure (probably because she would have had difficulty performing them if she did; the Trooper gave improper instructions; the Trooper failed to retest the Plaintiff at headquarters where conditions would not be problematic and dangerous as is the law enforcement standards and the trooper failed to ask the Plaintiff whether he suffers from any infirmity that might adversely affect his test performance – a serious failure in testing

protocol. Notwithstanding the foregoing, as stated, hereinbefore, according to the Plaintiff, his wife and Plaintiffs' body cam reviewing experts, Dr. John Peters and Thomas Sexton, the Plaintiff should not have been deemed to have failed any of the field sobriety tests under the circumstances per universal law enforcement standards.

Expert Report K and P, Exhibit G, 21:42.

77.    Denied. See #76 above.

78.    Denied. See #76 above.

79-80.    It is admitted that these represent a few sentences of the Plaintiff's deposition which, when vied in the light most favorable to the Plaintiff together with all reasonable inferenced favorable to him to be drawn therefrom, supports the proposition that he was not intoxicated on the evening in question.

81.    It is admitted that the Plaintiff was handcuffed but it is denied that he was "placed in the police vehicle". Rather, as he body cam video shows, the Plaintiff entered the back seat of the vehicle on his own, without loss of balance, with amazing ease, even with his hands handcuffed behind his back – a feat difficulty to perform by even a much younger person who is not over six feet tall. This is further evidence of the lack of intoxication to be considered by a jury, applying their everyday experience and common sense.

82.    Denied. This is pure inadmissible hearsay as the Trooper presented no such evidence on this record. To the contrary, the Trooper said that her decision to leave the Plaintiff handcuffed to a wooden bench for more than an hour <u>after</u> his breathalyzer test showed he had consumed no alcohol, was totally at her discretion. Exhibt F, 124:10-11.

84.    Denied. As stated above, this is denied by the Plaintiff, his wife, and the Heideckers, Exhibits N and O.

85.    Admitted in part. She was asked to leave her car and leave her purse behind so that the Trooper could search it without a warrant and without any reason to believe that contraband or proceeds of a crime would be found therein. And, it is admitted that the Plaintiffs did not consent to the warrantless search of their vehicle without probable cause. And finally, it is admitted that the Trooper said that she was going to search the "car". She never said that she was going to search its contents, including closed containers and Mrs. Zelechiwsky's purse located therein.

86.    It is admitted that Trooper Davis performed a full warrantless search of the Plaintiffs' vehicle. But, what is not mentioned is that the search included the vehicles contents, closed compartments, and closed containers – all without any reasonable belief that the proceeds of a crime or contraband would be found therein.

87. Admitted, among other things that it was unconstitutional to search. The Defendant's Stop Report indicates that the Plaintiff, Mr. Zelechiwsky, was allegedly stopped for a moving violation (39:4-88 b) (Unsafe Lane Change) but charged and arrested for a violation of N.J.S.A. 39:4-50 "Driving While Intoxicated" (Exhibit "A"). It is clear that, contrary to the Defendant's sworn testimony at many points (Exhibit F, 63, 133) the Plaintiff was, in fact arrested; but, never charged with DWI. And, the Defendant's own Stop Report clearly states that the Plaintiff was "Arrested" on "Charges: 39:4-50 (DWI)" and the narrative Trooper Davis clearly states: "Driver failed SIST's and was arrested (DWI). Exhibit A. According to Mrs. Zelechiwsky, Trooper Davis acted and talked arrogantly, harassingly, as if she was out to get them, with malice and even appeared to be racially motivated, and was "way out of line" including by directing her to leave her phone and purse in the car so she could search the purse, and so that she would be precluded from recording what was actually happening to them, and how her husband was obviously not intoxicated. Exhibit E, 60-63. Trooper Davis made her put her cell phone down so Lisa could not record that her husband showed no signs of intoxication. And, the Trooper came and took her driver's license to make sure she would not pick up her phone and record with it. Exhibit E, 41-42. The Trooper admits that the Plaintiff followed her orders. Exhibit F, 99. He

was handcuffed and read his Miranda Rights and directed into the Trooper's car. Id., 116, which he entered without assistance with his hand handcuffed behind his back. Exhibit G. The Trooper then proceeded to search the Plaintiffs' entire vehicle, including its contents, and expressly stated, under oath, that she did so because it was permitted by specific NJSP "rules and regulations", Exhibit F, 66, although she didn't know the Section "offhand". Id., 64-67. Moreover, the Trooper could not name any federal law or state statute which provided her with that authority. Id., 66-67. The Trooper bluntly stated in her deposition that her reason for searching the vehicle was: "Because its probable cause after we detain a person for DUI". Id., 118, ln. 16-17. The Trooper admitted to looking "all over" in her search of the vehicle and when asked what she was looking for she said, "evidence of impairment" (whatever that could be). Id., 118, ln. 19, 25.

The Trooper admitted that she told Mrs. Zelechiwsky to exit the vehicle and to leave her purse and her phone in the vehicle, and then she searched her purse. Exhibit E, 15, 61. When asked at her deposition what she was looking for in the purse, the Trooper replied "evidence of either alcohol or drugs". Exhibit E, 119, ln. 19. The Trooper saw no evidence of any contraband or the proceeds of a crime prior to when she searched the vehicle. And, the Trooper's search of Mr. Zelechiwsky produced no evidence of contraband or the

proceeds of a crime, and, there was nothing in plain view within the vehicle which appeared to be contraband or criminal proceeds and, indeed, the search produced no contraband or evidence of a crime or anything of evidentiary value. Exhibit A, Exhibit F, 64-67. The Trooper transported the Plaintiff to headquarters while he was handcuffed in the back seat of her vehicle. *Id.*

The only thing Trooper Davis remembers the Plaintiff saying the whole night was that he had nothing to drink. *Id*., 67. He said nothing else to her. *Id*., 69. Troper Davis did not subject the Plaintiff to any blood or urine drug testing at headquarters and, she can't recall why not. *Id*., 74. She also did not retest him using any of the field sobriety test under the clearly more reasonable conditions presented there. *Id.*, 78, 140, (except for a breathalyzer test). *Id*.

88.   Denied as stated. Trooper Davis stated that the search lasted no more than 10 minutes, Exhibit F, 12. However, the time taken to conduct an unconstitutional search is irrelevant.

89.   This is Plaintiff's present belief. However, this is further evidence that the search constituted pure harassment and lacked a genuine purpose and was not based upon earnest suspicion or probable cause of any kind. If it were a legitimate search in that sense, the bed of the truck would not have arbitrarily excluded.

90.   Objection.

91.    Objection. It is not objected to that Mrs. Zelechiwsky said she knows he was not drinking since she previously stated at the onset of the stop that he had not had anything to drink all day. However, her opinion that "he doesn't drive the greatest" means that another person – say Mario Andretti, is a better driver. It is also irrelevant and, it is stated in the passive tense which has nothing to do with how he drove on that day. Finally, it has been denied throughout Mrs. Zelechiwsky's deposition (Exhibit C) and Mr. Zelechiwsky's deposition (Exhibit E) and within the filed affidavits of the Heideckers (Exhibit N an O) as stated hereinbefore that none of them, including especially Mr. Zelechiwsky, had any alcohol the entire day.

92.    It is believed that Trooper Gallagher was present at the scene for some time but, his body cam footage doesn't show that he viewed what Trooper Davis was searching. Exhibit H.

93.    Objection.

94.    Denied. This is a conclusion of law – not a finding of fact. And, moreover, it is an erroneous conclusion of law. See, Plaintiffs' Brief.

95.    Admitted.

96.    Denied. Not only is this denied by Mr. Zelechiwsky, as stated hereinbefore, but it is certainly incredible that in an unlit vehicle, with Trooper Davis driving in the front seat (with, presumably, her eyes on the road), that she could see

Mr. Zelechiwsky's eyes or any slowness - he was handcuffed and unable to move. Moreover, it is not mentioned here that when they arrived at the barracks, the Plaintiff ran up the stairs without any assistance. Exhibit C, 130:1-2. Also, Trooper Davis never mentioned that she thought that the Plaintiff appeared to have bloodshot eyes, or any physical signs of intoxication. *Id.*, 13:6-11.

97.    Denied as stated. A stated above, Davis handcuffed Mr. Zelechiwsky by his left hand to a hard bench (Exhibit C, 130) when he arrived and, except for the 45minutes or so it took him to perform a breathalyzer test, he remained handcuffed to the bench for more than one and one half hours – the vast majority of that time being handcuffed occurred <u>after</u> the breathalyzer results showed he has a 00.00 alcohol reading. Troper Davis could not recall if Mr. Zelechiwsky was shackled to the bench by the leg or by the wrist.  Exhibit F. But she was clear that she did so for the entirety of the one to two hours, at her sole discretion. And, she did not state why she chose to keep the Plaintiff handcuffed or chackled for that period of time, including after knowing that he was not intoxicated or a threat of any kind as part of her exercise of that discretion. Exhibit F, 124:10-11.

98.    Admitted. It should also be stated that he had no trouble following the instruction on how to present a sufficient breath sample or in proving one; and

that, after he blew a 00.00 alcohol content result, Trooper Davis handcuffed the Plaintiff to a wooden bench for more than one hour.

99. Admitted that this was Mr. Zelechiwsky's recollection more than two years later and without his ability to look at his watch which was handcuffed behind his back.

100. Admitted that the Plaintiff was fully compliant, cooperative, and respectful to all members of the State Police on that day, as he always had been. He was also detained alone in a confinement room where there was no one to speak with. And, when he was released, he was clearly traumatized, lacked trust in the New Jersey State Police in general, and simply wanted to get out of his place of confinement. Exhibit C, 130:16-17.

101. Admitted that his wife could see parts of her husband during a period of time.

102. Denied as stated. After Trooper Davis took Mrs. Zelechiwsky's driver's license at the scene, she told Lisa to follow her in the Plaintiffs' car to the barracks where she was made to wait in a separate room from her husband. She was the only means of returning her husband home to Pennsylvania.

103. It is admitted that she was not processed, however, she felt like she and her husband were being harassed, and that Trooper Davis was way out of line. Exhibit E, 61-62.

104. Denied. Trooper Davis told the Plaintiff that if he didn't cooperate with her, and tell her the truth about how much he drank that night, that she was going to throw the book at him. *Id.*, 144:4-7, 9.

105. Denied. She never made that accusation or even mentioned drugs, only drinking and intoxication. *Id.*

106. Admitted.

107. Admitted.

108. Denied. Not only is this a legal conclusion but, it is an erroneous legal conclusion. As stated above, Trooper Davis stated on her own Stop Report (Exhibit A) that she had arrested the Plaintiff.

109. Denied. This is not only a legal conclusion but, it is an erroneous legal conclusion. As stated in the Plaintiffs' Brief, for federal civil rights purposes and the §1983 basis of the Plaintiffs' claims, an arrest occurs whenever a person's liberty is circumscribed by a state actor who has arrest authority. See, Plaintiff's Brief. In fact, the Trooper inexplicably testified that the N.J. State Police written standards operating procedures which state that the handcuffing and transporting the Plaintiff back to the station, constitutes an "arrest" – are wrong – inaccurate Exhibit F, 85.

110. Admitted.

111. Admitted.

112. Admitted that they were 00.0%. Exhibit I.

113. Admitted.

114. Denied. The Plaintiff did not apologize nor state that he was on medication.

115. See answer to #100 above.

116. Denied. The Plaintiff was livid, and he was in a state of shock when Trooper Davis initiated the traffic stop. Exhibit C, 118:23-25, 199:1.

117-119.    Denied and the Defendant has provided no such proof. Instead, she admitted that she ignored her obligation to follow-up with the prosecutor concerning her court appearances in this case. Exhibit F, 88.

120. Denied. First, only one citation was filed against the Plaintiff. Exhibit A. Secondly, it was dismissed by a Judge at a scheduled hearing in New Jersey where the Plaintiff was required to attend with his lawyer. Exhibit C, 135:16-23. He was not found guilty of the offense by a judge. Exhibit F, 79:4-6.

121. Denied as stated. This statement is unintelligible and must be denied. By way of further response, the Plaintiff sustained substantial emotional injuries, financial loss, loss of life's pleasure, reputational damages and all the other injuries which are compensable under Section 1983, including legal fees and costs, invasion of privacy, loss of society, etc.

122. Admitted. However, the Plaintiffs did suffer fear of contracting COVID-19 which is compensable under the law.

123. Admitted. However, this is precisely symptomatic, if not diagnostic, of the emotional and psychological injuries he sustained at the hands of the Defendant, and the perceived stigma associated with treatment for a mental health condition which logically follows. Exhibit C, 51-54.

124. Admitted. However, he has also suffered all the other losses claimed in his Complaint (Exhibit B). See also, Exhibit C.

125. Denied, She sought out professional counselling help from a member of her family, Exhibit E, 13, this is precisely symptomatic, if not diagnostic, of the emotional and psychological injuries he sustained at the hands of the Defendant, and the perceived stigma associated with treatment for a mental health condition which logically follows. Exhibit E, 16-21.

126. Admitted that she approximated the frequency of her Xanax usage.

127. Denied. She merely said that she needed to check her records. Exhibit E, 13.

128. Denied as stated. They still socialize and enjoy life together but not like, or with the same frequency as prior to the incident. Exhibit C, 51-54; Exhibit B, 28 and 41.

129. Admitted in part, but see #123 above.

130. Denied. This wrongfully assumes that reputational injuries can be quantified. They can't, that is why they are referred to in law as unliquidated damages.

131.  Denied as stated. They did decrease after the incident and he continues to realize a loss in productivity in income because of the incident. Exhibit C, 39.

132.  Plaintiff Lisa Zelechiwsky testified that she would have to review the records, but her husband was not working to his full capacity after the incident. Exhibit C, 39-40. And, in fact the pandemic also produced more work for attorneys like the Plaintiff.

133.  Denied as stated. The Plaintiffs have produced all relevant tax returns in the answers to the Defendant's Requests for Production.

134.  Denied as stated. This is a reference to the Defendant apologizing for pulling the Plaintiff over on the highway for no reason. It does not refer to an apology for subjecting him to testing without reason, the search without probable cause, the false arrest or the malicious prosecution lasting more than a year. As the Plaintiff has testified, "[b]ut that ship has sailed a ling time ago." *Id*., 49, 135.

135.  Denied as stated. This statement of fact just sets forth an aspect of the damages Mrs. Zelechiwsky testified to that her husband suffered and continues to suffer. In fact, this 7 line reference goes on for four more pages. Exhibit E, 70-74.

136.  Objection.

137-141.  The Defendants expert, Daniel Linskey's expert report is inadmissible for the reasons set forth in Plaintiffs' brief, which are incorporated herein. Further, Linskey's opinions, even if admissible, are

refuted by the Plaintiffs' experts, Dr. John Peters and Thomas Sexton's expert reports, Exhibits K and P respectfully. And their reports are properly verified and admissible into evidence.

By way of example only, Plaintiffs' experts state to a reasonable degree of professional certainty that:

> Thomas Sexton opined that:
>
> Nonetheless, the body camera video review which I conducted, based upon my years of training and education, and my experience performing literally hundreds of traffic stops personally, provide more than a sufficient basis to opine, based upon a reasonable degree of professional certainty, that: 1) her stop of the vehicle was inconsistent with standard police training in that it was not made based upon a reasonable and articulable suspicion that Mr. Zelechiwsky had violated the law; 2) her field sobriety tests did not reveal results which, based upon law enforcement training, objectively presented probable cause for Mr. Zelechiwsky's arrest which she in fact clearly effected; and 3) that her training made it clear that she could not conduct a warrantless search of the Zelechiwsky vehicle or Mrs. Zelechiwsky's purse.

Sexton Affidavit/Declaration/Report of July 1, 2024, Exhibit P, pgs. 1-2.

Dr. John Peters "Executive Summary of Opinions" states that:

1. Trooper Davis' reasons for stopping the Zelechiwsky truck are both confusing and contradictory, thereby undermining any purported basis for the traffic stop.

2. Mr. Zelechiwsky was not free to leave the traffic stop, was handcuffed by Trooper Davis, was transported in her police vehicle to the State Police barracks, was handcuffed to a bench, within an estimated period of

one and one-half hours, and was reported by her to have been an "arrest" which she effected, all of which was contrary to the constitutional principles requiring the elements of probable cause upon which she and other law enforcement officers are trained.

3. The search of the Zelechiwsky truck and Ms. Zelechiwsky's purse by Trooper Davis demonstrated a gross and defiant deviation from the standard law enforcement training regarding the constitutional limits imposed upon such searches.

4. The "Stop Report" completed by Trooper Davis is misleading and does not show that the MVR was reviewed by anyone, even though she testified it was operational, which is inconsistent with supervisory review.

Dr. Peter's Affidavit/Declaration/Report of July 1, 2024, Exhibit K, pgs. 6-7.

Respectfully Submitted,

Dated: 10/21/24                    By:    /s/ P. Joseph Nicola
                                          P. Joseph Nicola, Esquire
                                          N.J. Attorney I.D. # 02531980
                                          1420 Locust Street, Suite 140
                                          Philadelphia, PA 19102
                                          (856) 229-2454
                                          jnicola@nicolalaw.com
                                          Attorney for Plaintiffs