Exhibit K (Report)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

### CAMDEN DIVISION

| | | |
|---|---|---|
| **BOHDAN J. ZELECHIWSKY** | : | NO. |
| and | : | 22-cv-04005-CPO-AMD |
| **LISA A. ZELECHIWSKY,** | : | |
| | | |
| Plaintiffs, | : | |
| | | |
| vs. | : | |
| | | |
| TROOPER ASHLEY DAVIS, | : | |
| and | : | |
| TROOPER JOHN DOE | : | |
| | | |
| Defendants. | : | |

**Expert Opinion Report: John G. Peters, Jr., Ph.D.**
209 South Stephanie Street ✦ Suite B249 ✦ Henderson, Nevada 89012
Telephone: 717.538.5940

I, John G. Peters, Jr., Ph.D., hereby submit my report that contains a complete statement of opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*John G. Peters, Jr., Ph.D.*

John G. Peters, Jr., Ph.D.
July 1, 2024

I.    **CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED**: See APPENDIX A.

II.   **FOCUS OF ANALYSIS**

Through counsel for Bohdan and Lisa Zelechiwsky, I am retained to provide expert opinions in the areas of police practices and training. I am not a party to this litigation, and I am over the age of twenty-one. A copy of my *Curriculum Vitae* is provided as an exhibit to Defendants' designation. My *Curriculum Vitae* identifies my education, professional experience, over 300 publications, and other training and experience. There are areas of my education, training, and experience that are truly relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* and *Corrections* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am also an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical). I have also earned the designation of *Public Safety Disability Specialist*, in addition to teaching and writing about human disabilities and the Americans with Disabilities Act. I have co-authored, with Michael Coleman, a text, **Wheelchair: Officers' Field Guide**, in addition to a Wheelchair Instructor program.

Vocationally, I serve as president of the Henderson, Nevada-based Institute for the Prevention of In-custody Deaths, Inc., (IPICD), and its senior instructional designer. The IPICD provides a variety of Train-the-Trainer programs to law enforcement agencies across the globe. These training programs include but are not limited to: "Prevention and Management of Suicide," "Agitated Chaotic Events™ Instructor: Recognizing, Responding, Preventing, and Investigating Arrest-Related and Sudden, In-Custody Deaths Version 6.0;" "Use-of-Force Train-the-Trainer;" and "Arrest-Related and In-Custody Death Investigative Specialist™." Agitated Chaotic Events is a term developed by the IPICD to encompass a constellation of delirium-like, mind-body disconnect, agitated behaviors where the underlying cause is unknown to first responders. The topics include, but are not limited to epilepsy, Hyponatremia, alcohol withdrawal, synthetic drugs, energy drinks, diabetes, autism, and others.

Annually, the IPICD hosts an international conference (2023 was the 18th one) that presents the latest scientific, legal, medical, and psychological research, in addition to street-proven tactics and programs used by law enforcement agencies to identify, prevent, and/or manage sudden in-custody and/or arrest-related deaths. In 2016, presentations included the latest information about Fentanyl and other widely used drugs and how fast they are spreading and killing individuals. The IPICD has also awarded unrestricted grants for the funding of scientific research (e.g., UCSD School of Medicine; University of Miami, Miller School of Medicine), including the conducting of in-house primary research on in-custody and arrest-related deaths topics. The IPICD has also awarded unrestricted grants to the University of California, San Diego, School of Medicine to conduct research that included the first scientific study on the safety of restraint chairs.

In 2014, the Singapore Prison Service had engaged my services to conduct training in Singapore and to evaluate several of its training programs. I also teach in the "Jail: Legal Issues" programs held in Las Vegas, Nevada, which are hosted by the AELE. Several correctional facilities have engaged me to review policies, procedures, and training, including, but not limited to jails in Texas, New Mexico, Idaho, Massachusetts, Pennsylvania, and California.

For more than 30 years I have taught crowd control, defensive tactics, tactical handcuffing, restraint techniques, including the use of a restraint chair and "The WRAP," impact tools (e.g., batons), and arrest techniques instructor- and user-level programs to thousands of law enforcement officers across the globe. I have authored more than 310 publications, including texts on defensive tactics and on tactical handcuffing: **Realistic Defensive Tactics** and **Tactical Handcuffing for Chain- and Hinged-Style Handcuffs**. I have presented law enforcement instructor programs (e.g., use-of-force, defensive tactics, handcuffing, baton, etc.) across the United States for the past 30 years. I have also taught New Jersey State Troopers and retired New Jersey State Troopers.

I am also a graduate of the TASER M26™ and X26™ ECD Instructor programs. I have taken a five-second TASER ECD exposure, the TASER Armorer program, the TASER Evidence Collection and Analysis Training program, the TASER X3™ ECD instructor program, the TASER XREP™ instructor program, the TASER X2™ instructor program, the TASER AXON™ instructor program, the TASER Evidence.com program, and have authored several articles about TASER ECD and related devices.

On February 1, 2020, the Americans for Effective Law Enforcement (AELE) Board of Directors appointed me Executive Director of AELE. In addition to my supervision of a part-time staff of three people, I manage the scheduling and presenters of AELE seminars. I also serve as an instructional designer of AELE seminars, webinars, and online programs. These seminars have been approved in many states as certified training for police and other law enforcement personnel, as well as qualifying Continued Legal Education credits for licensed attorneys.

Since 1982, I have been providing consulting and expert witness services to municipalities, attorneys, and others throughout the United States and Hong Kong. These services have included but are not limited to the review of municipal and/or law enforcement policies, procedures, rules, training, competency-based testing, supervision, internal investigations, and conducting of primary research on sexual harassment and sexual assault.

In addition to writing about and lecturing on law enforcement policy and procedures, use-of-force, force options, force training, force policies, force warnings, excited delirium, sudden in-custody death, investigations, and related topics, I am an AELE Certified Litigation Specialist in Police liability, and a faculty member teaching in its "Discipline and Internal Investigations for Law Enforcement, Public Safety and Corrections" and "Biometric, Psychological and Legal Aspects of Lethal and Less Lethal Force and the Management, Oversight, Monitoring, Investigation and Adjudication of the Use of Force" programs.

I have been a consultant to many correctional facilities, including, but not limited to the Harris County Jail, Houston, Texas (3rd largest jail in the United States). Additionally, I am an AELE Certified Litigation Specialist in Corrections Liability, and a faculty member who teaches in its "Jail Legal Issues," "Internal Affairs," and "Managing Force" seminars. I have also been an invited speaker, on two occasions, at the American Jail Association International Training Conferences, and have been a contracted trainer for the American Jail Association. I have also consulted with the American Correctional Association. I have also conducted training for the California Sheriff's Association throughout California on several occasions and the Los Angeles County Sheriff's Department. I am a member of the California Force Instructors Association.

As a former law enforcement administrator, patrol officer, and deputy sheriff, I am familiar with the need for written policy, rules, and procedures, and the need to train officers about them. I was also President of a municipal Civil Service Commission, where I oversaw testing requirements for law enforcement officers and was involved with disciplinary actions involving law enforcement officers. Supervisory training is also a key ingredient to organizational effectiveness, as is having contemporary policies and procedures. I have written about these issues, conducted organizational diagnoses about management, training, policies and procedures, etc. in law enforcement and correctional organizations, and hold graduate degrees (Ph.D. and M.B.A.) in management. I have also served on a Fugitive Squad, working in plain clothes to capture both in-state and out-of-state fugitives.

I have conducted primary research on the efficacy and liquid impedance of Spit Restraint Devices, The WRAP Restraint System, the management of criminal investigations, and taught how to conduct criminal and internal investigations. I am a former criminal and internal investigator.

As a certified *Public Safety Disability Specialist,* I have instructed on various disability issues (e.g., Americans with Disabilities Act, wheelchairs, service animals, identifying and managing disabled individuals, etc.), and co-developed a seminar Wheelchair Instructor program and am co-author of the text *Wheelchair Officers' Field Guide*. I also instruct law enforcement officers about excited delirium, agitated chaotic events, mental illness, and de-escalation interventions. Since 2006, my training firm, Institute for the Prevention of In-custody Deaths, Inc., has held international conferences on disability, mental health, excited delirium, and arrest-related deaths issues and how to conduct investigations into arrest-related deaths.

## III.    RIGHT TO AMEND

I reserve the right to amend and/or supplement my opinions when additional information becomes available. It is also my understanding that additional discovery may be produced. Further, I also reserve the right to amend in response to expert disclosures of other parties, or if questions are asked of me that do not relate to information contained in this disclosure.

## IV.    OPINION STANDARDS

All expressed opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## V.    BASES for OPINION METHODOLOGY and FORMULATION

In addition to my education, training, and experience, my opinions are developed using one or more qualitative and quantitative research methodologies that follow the rigor of the scientific method even though this is not a scientific study. Per Zikmund (2003), "[s]cientific method techniques or procedures[1] used to analyze empirical evidence in an attempt to confirm or disprove prior conceptions" (p. 7). *Qualitative research* "focuses on collecting and analyzing words" (Jansen & Warren, 2023, p. 5), and where "concepts are viewed as sensitizing ideas or terms that enhance our understanding" (Hagan, 2010, p. 14). Per Leedy and Ormrod (1985), "qualitative research is typically used to answer questions about the complex nature of phenomena, often with the purpose of describing and understanding the phenomena from the participants' point of view" (p. 101).

Quantitative research "focuses on measurement and testing using numerical data" (Jansen & Warren, 2023, p. 5) and where "concepts are assigned numerical value" Hagan, 2010, p. 14). "Quantitative research is used to answer questions about relationships among measured variables with the purpose of explaining, predicting, and controlling phenomena" (Leedy & Ormrod, 1985, p. 101).

My reliable research methodologies may include *Historiography*[2], *Content Analysis*[3], *Phenomenology*[4], *Ethnography*[5], *Discourse Analysis*[6], and/or *Case Study*[7]. My methodology included comparing the policies, procedures, and/or guidelines that were in place during this incident, against well-established state, national and/or otherwise relevant training and operational practices and procedures in the law enforcement profession, which are normative.

I have conducted a literature review[8], which is not considered a research methodology, in addition to the use of *chronology*[9], also not a considered research methodology. The literature review and the chronology are parts of my design of process inquiry for the identification of

---

[1] Scientific research involves, at a minimum, the posing of a question(s), the development of procedures to answer the question(s), the planning for, and then making, appropriate empirical observations, and the rational interpretation of the empirical observations" (Graziano & Raulin, 2000, p. 29).

[2] Historiography is the study of history or genuine historical research (Leedy & Ormrod, 2001).

[3] A detailed and systematic examination of the contents of a particular body of material . . . for the purpose of identifying patterns, themes, or biases within the material" (Leedy and Ormond, 2001, p. 114).

[4] Phenomenology focuses on attempts to understand participants' perspectives about an event (lived experiences). Phenomenological studies examine human experiences through the descriptions that are provided by the people involved (OED Online, Oxford University Press, June 2022).

[5] Ethnography focuses on the cultural group and people, in this case policing, its practices, and officers.

[6] "A method of examining utterances people exchange, for the purpose of discovering the rules and strategies people use to structure, sequence, and take turn in speaking, to learn how people manage their interactions with others" (Reinard, 1998, p. 8).

[7] Case study permits an investigation of a situation that is bounded by time, specific to the events, to learn more about "an unknown or poorly understood situation" (Leedy & Ormrod, 2001, p. 114; Yin, 1994).

[8] A literature review is a search and review of scholarly sources that provides an overview of a particular topic. Literature reviews are a collection of the most relevant and significant publications regarding a topic to provide a comprehensive overview of the topic.

[9] Chronology is "the setting down of occurrences and events in the order in which they happened" (Leedy & Ormrod, 2001, p. 175).

Dr. Peters Opinion Report:  Zelechiwsky, et al. vs. Trooper Davis, et al.
©2024. A.R.R.

relevant *information*. Per Zikmund (2003), *information* is "a body of facts that are in a format suitable for decision making" (p. 738).

The documents reviewed are classified in the social sciences as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences, and are of particular relevance in law enforcement or disability domain.

## VI.    CASE STUDY DESIGN

The law enforcement transaction between and among Bohdan J. Zelechiwsky (Mr. Zelechiwsky) and Lisa A. Zelechiwsky (Mrs. Zelechiwsky),  Trooper Ashley Davis (Trooper Davis), and Trooper Gallagher on August 10, 2020, meets the criteria for a case study methodology as previously defined (see footnote 7). My quantitative and qualitative analyses focus on the traffic stop of the Zelechiwsky's by Trooper Davis, the bases for arresting Mr. Zelechiwsky, the bases for her non-consent and warrantless searching his vehicle and Mrs. Zelechiwsky's purse, her training, organizational culture, and/or practices of the New Jersey State Police.

## VII.  EXECUTIVE SUMMARY OF OPINIONS

**1. Trooper Davis' reasons for stopping the Zelechiwsky truck are both confusing and contradictory, thereby undermining any purported basis for the traffic stop.**

**2. Mr. Zelechiwsky was not free to leave the traffic stop, was handcuffed by Trooper Davis, was transported in her police vehicle to the State Police barracks, was handcuffed to a bench, within an estimated period of one and one-half hours, and was reported by her to have been an "arrest" which she effected, all of which was contrary to the constitutional principles requiring the elements of probable cause upon which she and other law enforcement officers are trained.**

**3. The search of the Zelechiwsky truck and Ms. Zelechiwsky's purse by Trooper Davis demonstrated a gross and defiant deviation from the standard law enforcement training regarding the constitutional limits imposed upon such searches.**

**4. Trooper Gallagher was at the scene of Ms. Zelechiwsky's seizure and searching of the Zelechiwsky vehicle and Mrs. Zelechiwsky's purse by Trooper Davis and failed to intervene and/or stop Trooper Davis from violating the Zelechiwsky's constitutional rights when he should know from his law enforcement training that he must attempt intervene to stop such perceived and/or real violation(s) and/or abuse when, he had an opportunity to do it.**

**5. The "Stop Report" completed by Trooper Davis is misleading and does not show that the MVR was reviewed by anyone, even though she testified it was operational, which is inconsistent with supervisory review.**

## VIII. DISCUSSION of OPINIONS

1. **Trooper Davis' reasons for stopping the Zelechiwsky truck are both confusing and contradictory, which undermines the basis for the traffic stop.**

Trooper Davis testified she was driving her marked patrol vehicle behind the Zelechiwsky truck and was "one or two vehicle lengths behind them" but could not recall if there was another vehicle between them (Davis deposition, 38:13; 39:9). Because she cannot recall if there was another vehicle between the Zelechiwsky vehicle and her patrol car, it is difficult to understand how she explained witnessing Mr. Zelechiwsky "traveling outside of his lane on multiple occasions" (40:15). Further, another vehicle being between them might have prevented her from seeing the driver of the truck changing lanes without using a turn signal.

Confusingly, Trooper Davis did not immediately need to stop the truck for multiple lane change violations but waited until the driver allegedly failed to use a turn signal. How and why the (possible) intervening vehicle did not also pull over in response to the Trooper's lights, as Mr. Zelechiwsky did, remains a mystery. These confusing and contradictory explanations testified to by Trooper Davis fail to explain how these many violations could have occurred in about a minute's time.

Trooper Davis was clear in her testimony that the driver of the truck (later identified as Mr. Zelechiwsky) immediately, safely pulled over and stopped appropriately within the confines of the shoulder, upon her activation of lights indicating that he should pull off the roadway and stop (Davis deposition, 42:22). Although she thought the driver might be intoxicated, Mr. Zelechiwsky admitted response to the Trooper activation of her lights belied any evidence of driving impairment, and Trooper Davis testified that Mr. Zelechiwsky did not slur his words or stutter when speaking to her (46:5). Per Trooper Davis' testimony, Mr. Zelechiwsky had slow body movements and his eyes were glassy (46:20-21). Both Zelechiwskys also testified that there was no aberrant driving by Mr. Zelechiwsky or that he committed any violations of the traffic laws. Also, the fact that the MVR was never provided for review (see opinion 5) leads one to believe that it would have contained exculpatory evidence and contradict the basis for the traffic stop, as same would have been recorded. It is appropriate to take an adverse inference from this failed production.

Based upon my experience, training, and knowledge, the reasons for stopping the Zelechiwsky truck are confusing and contradictory. It appears she was looking for a fluid reason to detain Mr. Zelechiwsky given the absence of the elements necessary for criminal activity.

2. **Mr. Zelechiwsky was not free to leave the traffic stop, was handcuffed by Trooper Davis, was transported in her police vehicle to the State Police barracks, was handcuffed to a bench, within an estimated period of one and one-half hours, and was reported by her to have been an "arrest" which she**

**effected, all of which was contrary to the constitutional principles requiring the elements of probable cause upon which she and other law enforcement officers are trained.**

After being stopped by Trooper Davis on August 10, 2020, for allegedly driving all over the road and changing lanes without a signal, Mr. Zelechiwsky and Mrs. Zelechiwsky were not free to leave. Mr. Zelechiwsky was not free to leave for an estimated one and one-half hours (Davis deposition, 38:17-19; L. Zelechiwsky deposition, 65:11-12, 25; 66:1). Based upon my education, training, and experience, when an individual is not free to leave or believes that (s)he is not free to leave after a police officer stopped him or her, officers are taught such stops are converted into an arrest under the circumstances presented here.

Trooper Davis testified Mr. Zelechiwsky was not under arrest, even though he was not free to leave, was handcuffed, was eventually transported in her patrol car to the State Police barracks, handcuffed to a bench, and then given a breathalyzer test (Davis deposition, 63:4, 17, 11, 17). If Mr. Zelechiwsky were not under arrest, then why did Trooper Davis read him his Miranda Rights, which she testified she read to him after she had placed him into the rear seat of her patrol vehicle (116:24-25)? Why did she formally report on her "Stop Report" that she placed him under "arrest?"

I know from teaching peace officers in New Jersey that being stopped for suspicion of driving while intoxicated is often characterized as a traffic stop, not a crime. Given the predicate for Trooper Davis' traffic stop was fluid, she focused on Mr. Zelechiwsky driving allegedly while under the influence of drugs or alcohol, because he had allegedly bloodshot and glassy eyes (David deposition, 48:16-18). Both Mr. and Mrs. Zelechiwsky testified that Mr. Zelechiwsky did not have blood shot or glassy eyes. Also, the having of glassy eyes need not be related to alcohol consumption and could be because a person is tired (Davis deposition, 48:16-18). Trooper Davis testified that she first saw that Mr. Zelechiwsky's eyes were "glassy" when she had shined her flashlight from outside the passenger side of the truck through the front area presumably illuminating his facial area. The glasses that Mr. Zelechiwsky was wearing may have had an impact on her visual assessment and his eyes. More likely, as the breathalyzer indicated, Mr. Zelechiwsky did not have glassy bloodshot eyes as the Plaintiffs indicated.

Trooper Davis testified that Mr. Zelechiwsky was cooperative with her, provided her with his license, truck registration, and proof of insurance, and was not slurring his words or stuttering (David deposition 46: 5). Based upon my education, training, and experience having made arrests of individuals who were driving under the influence, these important variables of cooperation, not slurring words or stuttering, and responding to Trooper Davis' requests should mitigate her suspicion of Mr. Zelechiwsky driving while under the influence based upon her academy and/or specialized driver impairment training.

My content analysis of the body-worn camera video and audio identified the following key factors:

- Mr. Zelechiwsky responded to Trooper Davis in a normal, alert, and polite way during their interactions.

- Mr. Zelechiwsky followed her directions, was compliant, never belligerent, or confrontational.
- Mr. Zelechiwsky's responses, based upon my education, training, and experience, were understandable and appropriate.
- Mr. Zelechiwsky's performance on the physical field sobriety tests showed no signs or evidence of intoxication. The minor deviations testified to by Trooper Davis, failure to maintain balance, moving his head during a Horizontal Gaze Nystagmus (HGN) test, and putting one foot down during a one-leg balance test, can be expected given her poor instruction on the HGN test, his age, lack of ambient lighting in the area where the test were performed, cars that were passing by their location, and the slope of the ground upon which he was compelled to perform the tests. I know from experience that impairment must be supported by more than these tests, especially given the extant circumstances.

Mr. Zelechiwsky testified he was unsteady because of the slope of the road and his age (B. Zelechiwsky deposition, 126:21, 24). Further, Trooper Davis was consistent in shining her flashlight beam into the facial area of Mr. Zelechiwsky while the truck's headlights were shining brightly on him, both of which can impede a person's balance. As the author of the widely adopted text, **Defensive Tactics with Flashlights**, notes, and training hundreds of law enforcement officers as defensive flashlight instructors, there are tactical advantages to temporarily blinding an individual with a flashlight beam. One of those advantages is to disable their physical balance by interfering with their sight, particularly in darkness.

Further evidence that failed to support Mr. Zelechiwsky's presumed intoxication is when a handcuffed Mr. Zelechiwsky walked to Trooper Davis' car and got into the rear seat without assistance (something in my experience, a healthy and unimpaired young man often has difficulty doing). Additionally, Mr. Zelechiwsky, did not exhibit, according to the Plaintiff's testimony and the body-worn camera footage, significant indicators of intoxication for an arrest. If anything, he showed the opposite! Unfortunately, the body-worn camera view was partially blocked with Trooper Davis' whistle (as it was for her initial glassy eyes/slow movement assessment). The placement of the body-worn camera on her uniform raises concerns about her intentionally positioning it so any recording might be partially recorded (and she could fill in the obscured moments), or whether she was simply deficient in her location of the body-worn camera.

Based upon my education, training, and experience, it is abundantly clear that Mr. Zelechiwsky was not free to leave the presence of Trooper Davis or the immediate area, and she should have known from her training that she lacked the elements of probable cause to arrest Mr. Zelechiwsky for driving under the influence, or any other alleged act. From a law enforcement training perspective, officers are taught the length of time Mr. Zelechiwsky was under the care, custody, and control of Trooper Davis transitions into an arrest. The NJSACOP LEAP Model Policy on "Arrest Procedures" directs  and trains New Jersey officers to consider the following to help determine if a person has been "arrested:"

- **The extent to which the officer(s) restrained the individual.**

- **Whether the individual was transported to another location against his will (how far and why).**
- **Whether the individual was free to choose between terminating or continuing the encounter with the officer(s) (p. 1).**

Mr. Zelechiwsky was handcuffed by Trooper Davis, and further restrained when she placed him into her patrol car, locked the door, and drove him to another location some distance away. He was clearly under her care, custody, and control. Upon arrival at the State Police barracks, Mr. Zelechiwsky testified that he sat on a hard bench with his left hand handcuffed to the bench (B. Zelechiwsky deposition, 130: 19, 21,22). Mr. Zelechiwsky's being handcuffed to a bench is objective evidence that he was not free to leave. Further, Mr. Zelechiwsky was not free to leave the situation, the geography, and/or the control and restraint of Trooper Davis until she dismissed him at the New Jersey State Police barracks following a breathalyzer test that recorded 0.0 results, indicating no alcohol present in Mr. Zelechiwsky's system.

Based upon my education, training, and experience, the testimony and actions of Trooper Davis demonstrates her profound misunderstanding of seizing a free person and/or subjecting him to arrest. On her "Stop Report" Trooper Davis indicated Mr. Zelechiwsky "was arrested" (p. 1), which contradicts her sworn testimony, and provides further evidence that she was aware at the very moment of Mr. Zelechiwsky's arrest that, that is precisely what it was, an "arrest." My review of the body-worn camera recording (both video and audio) clearly indicated there were no significant indicators (e.g., slurring words, using profanity, stumbling, etc.) present that matched the elements of driving under the influence that officers are taught, and therefore, there was not an objective basis for arresting him.

3.    **The search of the Zelechiwsky truck and Mrs. Zelechiwsky's purse by Trooper Davis demonstrated a gross and defiant deviation from the standard law enforcement training regarding the constitutional limits imposed upon such searches.**

In my more than three decades of consulting on police practices cases, I have never seen a situation where a law enforcement officer was so poorly trained by his or her employer, and/or ignored the training provided regarding the seizure of individuals and/or the searching of motor vehicles and/or personal property of individuals who were not suspected of violating the law.

Even though Trooper Davis testified she did not "arrest" Mr. Zelechiwsky (Davis deposition, 63:7), which was reiterated and supported by Deputy Attorney General Mr. Chaudry (62:15), Trooper Davis admitted that she searched everything in the Zelechiwsky truck, including closed containers and things that clearly belonged to Mrs. Zelechiwsky, like her purse (118:16-17, 25; 119:17, 19, 22). Trooper Davis testified that New Jersey State Police Rules and Regulations approved her conducting a "probable cause" search of an individual's car like the Zelechiwsky's truck (66:23). Trooper Davis cannot have it both ways by testifying that Mr. Zelechiwsky was not "arrested" by her, and then saying she had "probable cause" to search his vehicle, meaning it was incidental to arrest.

This opinion is not a legal one, but rather one based on law enforcement training. Trooper Davis testified it took her approximately five to ten minutes to do a warrantless search of the Zelechiwsky truck (Davis deposition, (120:7), exclusive of the search of Mrs. Zelechiwsky's personal items (119:22). More shockingly, Trooper Davis testified, "anything in a motor vehicle I can search" because she was looking for evidence of alcohol or drugs (119:19). She had searched the truck "all over" because it constitutes probable cause after we detain a person for DUI (118:16-17, 25).

Mrs. Zelechiwsky testified Trooper Davis had instructed her to exit the truck and to leave her phone and purse inside the vehicle (L. Zelechiwsky deposition, 15:14-17). Trooper Davis appeared to expand her unwarranted search to Mrs. Zelechiwsky's personal items because she had found no contraband on Mr. Zelechiwsky. Based upon my education, training, and experience, there was no training-based or other reason to search for contraband in the truck or in Mrs. Zelechiwsky's personal items.

Having taught New Jersey law enforcement officers, I know the State of New Jersey placed additional restrictions on its law enforcement officers about the search of a vehicle without first obtaining a warrant. It is my understanding from speaking to New Jersey law enforcement officers and reading state-specific law enforcement training materials, that a warrantless search of a motor vehicle is only authorized when police have probable cause and where the circumstances giving rise to probable cause were unforeseeable and spontaneous (see for example training on *State of New Jersey v. Witt,* 2015).

Based upon my training, education, and experience, the searching of the Zelechiwsky truck and of Mrs. Zelechiwsky's person items by Trooper Davis violated the Constitution and the constitutional limitations presumably provided to her and other New Jersey police officers in their comprehensive training. Her behavior appears to be based on two possible explanations: she was poorly trained by the New Jersey State Police and/or she chose to ignore the training that was given to her.

4.   **Trooper Gallagher was at the scene of Ms. Zelechiwsky's seizure and searching of the Zelechiwsky vehicle and Mrs. Zelechiwsky's purse by Trooper Davis and failed to intervene and/or stop Trooper Davis from violating the Zelechiwsky's constitutional rights when he should know from his law enforcement training that he must attempt intervene to stop such perceived and/or real violation(s) and/or abuse when, he had an opportunity to do it.**

New Jersey State Troopers should know from their law enforcement training that they have both an ethical and a legal obligation to intervene when they perceive and/or know and have a realistic opportunity to intervene to prevent harm resulting from (including Constitutional violations) occurring to an individual, such as Mr. and/or Mrs. Zelechiwsky, from one or more other law enforcement officers. Trooper Gallagher responded to the traffic stop by Trooper Davis as a second officer (Davis deposition, 44:7), and failed to intervene to stop her inappropriate behaviors. Law enforcement training generally defines intervention as the act of stopping or

attempting to stop the inappropriate or unlawful behavior of another law enforcement officer (see Smith v. Mensinger, 293 F. 3d 641, 650-52 (3d Cir. 2002); Baker v. Monroe Township, 50 F. 3d 1186 (3d Cir. 1995). Intervention strategies may include but are not limited to: strong verbal caution; physical restraint of one or more officers; and immediate reporting of the incident without delay.

Based upon my education, training, and experience, Mr. Zelechiwsky was subjected to Trooper Davis' using more force than necessary to seize him, handcuff him (two separate occasions), and improperly searching of the Zelechiwsky truck, and Mrs. Zelechiwsky's purse. Trooper Gallagher failed to intervene and/or stop the alleged violation of their constitutional rights even though he had a clear, motivated, and timely opportunity. A trained and/or experienced Trooper should know from his or her training that conduct that is shared with other officers will suffice to demonstrate an agreement between them, and that mere acquiescence is sufficient to constitute a civil conspiracy (see Hafner v. Brown, 983 F. 2d 570 (3rd. Cir. 1992).

5.  **The "Stop Report" completed by Trooper Davis is misleading and does not show that the MVR was reviewed by anyone, even though she testified it was operational, which is inconsistent with supervisory review.**

Trooper Davis testified her MVR (Dash Camera video recorder) was operational and recorded the traffic stop and interaction between and among her and Mr. and Mrs. Zelechiwsky when she activated her lights and that the MVR was preserved by the New Jersey State Police (Davis deposition, 43: 8-9, 22). The purpose of the MVR is to provide audio-video footage and sound of both a vehicle stop and in the instant matter, record the performance of field sobriety tests, Trooper actions and behaviors. The review of the video and/or audio recordings by a first-line supervisor or another supervisor will help confirm or refute what a Trooper reports about an incident. Body-worn camera and MTR review may identify areas for remedial training needed by the officer to correct deficiencies so they will not happen in the future.

In the instant matter, the MVR has not been provided, and there is no indication on the "Stop Report" that it was reviewed by a supervisor. Surprisingly, Trooper Davis required Mr. Zelechiwsky to perform the field sobriety tests in front of his truck, rather than in front of her patrol car that had the mounted MVR that would have recorded the events. This is a serious deviation from standard DUI procedure because it deprives the driver being tested of evidence which could be exonerating and denies the Trooper validation of what happened should a complaint be filed by a citizen.

The "Stop Report" submitted by Trooper Davis contained valuable information and had missing information. For example, the report identified the duration of the stop being 23 minutes and that it was recorded by MVR. The reason for the stop was identified as a "moving violation." There is no mention of Trooper Davis identifying that she obtained "consent" from either of the Zelechiwsky's to search the truck, closed containers, including Mrs. Zelechiwsky's purse. Although Trooper Davis testified that Mr. Zelechiwsky was not "arrested," which is supported by Mr. Chaudry, she identified the basis for entering the truck as "DUI Search (PC)."

In direct opposition to her sworn, deposition testimony and the support from Mr. Chaudry, Trooper Davis identified Mr. Zelechiwsky on her official, signed "Stop Report" as being "arrested for DUI."

The MVR apparently was never reviewed because the signature for such a review is not on the "Stop Report," which means, if true, no one compared the MVR to the narrative of Trooper Davis.

Based upon my education, training, and experience, there is enough information on the "Stop Report" and enough missing information on the report for a first-line supervisor to question its accuracy and the propriety of Mr. Zelechiwsky's arrest and the search of the vehicle and his wife's purse. It is the role of a first-line supervisor to review the report submitted by an officer, and then to compare it to any objective evidence also available, such as the MVR or body-worn camera recordings. Not only did a first-line supervisor fail to perform his or her responsibilities, but also command staff failed to identify this failure and request it be reviewed.

I also have serious concerns about the MVR recording not being produced to the Plaintiffs for review—in my experience, a highly unusual, improper, and clearly prejudicial behavior by the Defendants, concerning which I reserve the right to supplement this report if ever properly disclosed. Trooper Davis testified she had reviewed it prior to her deposition but withholding it by Defendants precludes me from reviewing it, which may provide exculpatory information—both visual and auditory.

X.      **COMPENSATION**: See APPENDIX B.

XI.     **CV and PUBLICATIONS**: My Curriculum Vitae and list of publications are in APPENDIX C.

XII.    **CASE LISTINGS**: Over the past four years I have testified as an expert at trial are shown in APPENDIX D.

# REFERENCES

Graziano, A. M., & Raulin, M. L. (2000). **Research methods: A process of inquiry** (4th ed.). Boston: Allyn and Bacon.

Hagan, F. E. (2010). **Research methods in criminal justice and criminology** (8th ed.). Upper Saddle River, NJ: Prentice Hall.

Leedy, P. D., & Ormrod, J. E. (2001). **Practical research: Planning and design** (7th ed.). Upper Saddle River, NJ: Merrill Prentice Hall.

Yin, R. K. (1994). **Case study research** (2nd ed.). Thousand Oaks, CA: Sage Publications.

Zikmund, W. G. (2003). **Business research methods** (7th ed.). Mason, OH: South-Western.

**APPENDIX A**

**CASE DOCUMENTS CONSIDERED and/or REVIEWED**

**Bohan Zelechiwsky, et al. vs. Trooper Davis, et al.**

1. Complaint

2. Deposition transcript: Ashley Davis

3. Deposition transcript:  Bohan Zelechiwsky

4. Deposition transcript: Lisa Zelechiwsky

5. Citation

6. Trooper Davis: "Stop Report" and,

7. Documents exchanged in discovery.

## APPENDIX B

## COMPENSATION

### Bohan Zelechiwsky, et al. vs. Trooper Davis, et al.

**Compensation**

The charges applicable to my expert time charged in this case are as follows:

<u>Document Review and Report Preparation</u>: I will invoice at my published hourly rate of $300 per hour.

<u>Deposition</u>: $2000.00 per day or any portion thereof, if at my location (Las Vegas metro area) <u>and pre-paid</u>, plus travel, lodging, and per diem; $3000.00 outside the Las Vegas metro area, or not pre-paid, plus travel, lodging, and per diem.

<u>ZOOM or similar format depositions:</u> $2000.00 per day.

<u>On-site visits</u>: $3000.00 per day, plus travel, lodging, and per diem.

<u>Trial testimony</u>: $2000.00 per day, or any portion thereof, in the Las Vegas metro area. $3000.00 per day, or any portion thereof, outside the Las Vegas area, plus travel, lodging, and per diem.

17

## APPENDIX C

## CURRICULUM VITAE

**Bohan Zelechiwsky, et al. vs. Trooper Davis, et al.**

See separate document.

18

# APPENDIX D

## TESTIMONY in the PAST FOUR YEARS

### Bohan Zelechiwsky, et al. vs. Trooper Davis, et al.

I have testified in the following cases during the last four years 2020, 2021, 2022, 2023, and 2024:

| 2020 | Deposition | Trial |
|---|---|---|
| State of Nevada v. Griffith<br>Evidentiary Hearing<br>District Court<br>Defendant: Choke hold | | X |
| Timothy Solloway, et al v.<br>State of Louisiana, et al.<br>State of Louisiana, Parish of<br>Ouachita, 4th District Court<br>No. 16-2128<br>Plaintiff: Policy, Procedure,<br>Rules; Internal Investigation;<br>Use of Force; Supervision | X | |
| Davon Johnson v. Las Vegas<br>Metropolitan Police Dept., et al.<br>United States District Court,<br>District of Nevada<br>No. 2:19-cv-01817-JCM-NJK<br>Defense: Policy, Procedure,<br>Rules; Training; Arrest; Use<br>of Force | X | |
| Susan Doxtator, et al. v.<br>Erik O'Brien, et al.<br>United States District Court<br>Eastern District of Wisconsin<br>No. 1:19-cv-137-WCG<br>Defense: Use of force; OC<br>Use; policy & procedures;<br>Training. | X | |
| Margaret Agwomoh vs. Village<br>Of Dolton, et al. | X | |

Circuit Court of Cook County, IL
No. 18 L 2677
Plaintiff: Use of Force; Training
Odell Edwards vs. Roy Oliver, et al.          X
United States District Court for the
Northern District of Texas Dallas Division
No. 3:17-CV-1208
Plaintiff: Policy and procedures; Use of
Force; Internal Investigation

**2021**

Donald Hawkins vs. City of Prichard, et al.      X
Unites States District Court Southern
District of Alabama—Mobile Division
No. 1:19-cv-00992
Plaintiff: Use of Force; Training; Internal
Investigation.

Bobbie Allen Woods v. City of Hayward, et al.      X
United States District Court
Northern District of California
No. 19-cv-01350-JCS
Plaintiff:  Detention; Training; ADA.

Richard Lucibella v. Officer Richard Ermeri, et al.    X
United States District Court
Southern District of Florida
No. 9:20-cv-82156-AMC
Defense:  Training; Internal Affairs Investigation;
Arrest; Defensive Tactics

United States District Court                         X
For the District of Hawaii
No.: 19-00116 LEK-WRP
Defense: Sexual assault; Supervision; Policy;
Training; Internal Affairs Investigation.

Victor Perez vs. State of Nevada, et al.          X
U.S. District Court, District of Nevada
No. 2:15-cv-01572-APG-DJA
Defense: Deadly force; training;
Policy; competency-based testing.

**2022**

Victor Ezeibe v. Corey Chivers, et al.
United States District Court
Middle District of Pennsylvania
No. 1:19-cv-00189
Daubert Testimony
Plaintiff: Use of Force; Traffic Stop

Otis Davis, Sr., et al. v. The City of Dallas, TX, et al.                    X
United States District Court
Northern District of Texas (Dallas Division)
No. 3:16-CV-2548
Plaintiff: Use of Force

Yaron Barami, et al. v. Las Vegas Metro Police, et al.        X
District Court, Clark County, NV
No. A-20-815852-C
Defense: Use of Force; Arrest

Thurman King v. City of Rockford, et al.        X
United States District Court
Western District of Michigan, Southern Division
No. 1:21-cv-259
Plaintiff: Traffic stop; Detention; Arrest; IA

Rose Marie Celestin v. City of Ocoee, et al.        X
United States District Court
Middle District of Florida
No. 6:21-cv-00896-RBD-EJK
Defense: Use of Force; Behavioral Cues; Restraint

Keith Adams v. Las Vegas Metropolitan Police Dept., et al.    (Arbitration)
Eighth Judicial District Court, Clark County, NV
No. A-21-837784-C
Defense: Handcuffing; Investigative Detention

**2023**                    **DEPOSITION**        **TRIAL**

McKinley Bates, III v. Lane Normand, et al.        X
United States District Court
Western District of Louisiana, Alexandria Division
No. 1:20-cv-00036

Plaintiff:  Use of Force; Tactics; Evidence

Odell Edwards v. Roy Oliver                                                  X
United States District Court for the Northern
District of Texas, Dallas Division
No. 3:17-CV-1208
Plaintiff: Use of Force; Tactics

Joseph A. Nelson, individually and as                                       X
Personal Representative of the Estate of
Joel A. Nelson v. Thurston County, et al.
United States District Court, Western District
Of Washington at Tacoma
No. 3:18-cv-05184-RBL
Plaintiff: Policy, Procedure, Rules;
Internal Investigation; Training; Use
of Force.

**2024**

Ramses Polland v. City of Chicago, et al.            X
United states District Court, Northern
District of Illinois, Eastern Division
No. 20-cv-7054
Policies; Training; Handcuffing; Use of Force

L. Lindsay Myeni vs. City/County of Honolulu, et al.
Circuit Court of the First Circuit State of Hawaii
No. 1CCV-21-0000694
Policies; Training; Use of Force